IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JAMES **DELLINGER**, | ) | |
| | ) | |
| Petitioner, | ) | No. 3:09-CV-104 |
| | ) | |
| vs. | ) | Judge Varlan/Magistrate Shirley |
| | ) | |
| ROLAND **COLSON,** Warden, | ) | **DEATH PENALTY CASE** |
| Riverbend Maximum Security Institution | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER JAMES DELLINGER'S RESPONSE TO RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

James Dellinger is intellectually disabled. As such he is constitutionally ineligible for the death penalty. He is condemned to death for a crime that he didn't commit and which --- even if he had committed --- did not carry the death penalty when committed. This double injustice was born of Dellinger's counsels' ineptitude on the one hand and legal chicanery by the State on the other hand. It falls to this honorable Court to remedy this injustice.

Before trial, counsel for Mr. Dellinger had a full neuropsychological assessment of Mr. Dellinger, including an assessment of his IQ. Despite literally having in their hands proof of Mr. Dellinger's intellectual disability and significant brain damage, counsel were unaware of the import of the neuropsychological findings. Though Mr. Dellinger's IQ score on the Woodcock Johnson Tests of Cognitive Ability (WJ) and his scores on both the Peabody Picture Vocabulary Test (PPVT-R) and the Halstead-Reitan Neuropsycholocial Battery (HRB) provided clear proof of both his intellectual disability and his brain damage, counsel failed to investigate either brain damage or intellectual disability any further and totally neglected to present the evidence of Mr.

Dellinger's significant impairments. Though counsel had findings which demonstrated that Mr. Dellinger was constitutionally exempt from the death penalty, that proof was never presented and Mr. Dellinger was sentenced to death.

To compound this injustice, Mr. Dellinger sits on death row for a crime he did not commit. He has steadfastly maintained his innocence from the first moment he spoke with law enforcement through to his present petition for habeas corpus relief. His conviction for this offense was only possible through legal wrangling on the part of the State which was not only unseemly, but also unconstitutional. Because the state perceived that without proof of the Connie Branam murder the state would be unable to convict Mr. Dellinger of this offense, the State decided to try that case first. Unable to obtain a death verdict in that case, the state then used the fact of that conviction as justification for seeking death for the murder of Tommy Griffin. In truth and in fact, Mr. Dellinger was not eligible for a capital murder conviction at the time of the Tommy Griffin murder --- as admitted by the District Attorney for Blount County, there were no aggravating circumstances inherent in the crime itself, nothing about that crime allowed the state to seek the death penalty. So the state bootstrapped the convictions, using the Blount County death of Tommy Griffin to obtain a conviction in Sevier County for the death of Connie Branam, then turning around and using the conviction for the death of Connie Branam to justify the death sentence in Blount County for the murder of Tommy Griffin. Mr. Dellinger was twice put to trial on the same facts – proof of both murders in each jurisdiction. And he sits condemned to death based on facts which were not in existence at the time of the Tommy Griffin murder, in clear contravention of the ex post facto clause of the Constitution.

## II. SUMMARY OF DOCUMENT

As will be demonstrated *infra*, Respondent's motion for summary judgment must be denied, because: (1) Respondent is not entitled to judgment as a matter of law; and (2) viewing the facts in a light most favorable to James Dellinger, and drawing all reasonable inferences in his favor, Respondent is not entitled to judgment as a matter of law. James Dellinger will respond to Respondent's Motion accordingly:

In Section III, Mr. Dellinger will set forth standards for summary judgment,

Sections IV- XVI Mr. Dellinger will resolve, claim by claim, his entitlement to relief for each claim presented in his petition.

On these claims, this Court should deny Respondent's Motion for Summary Judgment and instead grant Mr. Dellinger habeas corpus relief.

## III. STANDARDS APPLICABLE TO SUMMARY JUDGMENT

Summary judgment is appropriate only where there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[O]n a motion for summary judgment, the evidence presented by the non-moving party is to be taken as true and all reasonable inferences that may be drawn there from are to be drawn in the non-moving party's favor." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 660 (6th Cir. 1999). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); Kraft v. United States, 991 F.2d 292, 296 (6th Cir. 1993). The Court must

evaluate each motion on its own merit and draw inferences *against* the party whose motion is being considered. Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Accordingly, because James Dellinger is the non-moving party, this Court must credit – in a light most favorable to him – all facts in the record and presented by him, and the Court must likewise infer from that evidence all inferences which might entitle him to habeas corpus relief. As a corollary, as to disputed facts, the Court must likewise refuse to credit any inferences which would support Respondent's position. The benefit of any doubt on any factual issue must inure to the benefit of James Dellinger, requiring that Respondent's summary judgment motion be denied.

Further, to the extent that Respondent moves for summary judgment, does not present any disputed facts, and, consequently, there are no genuine issues of material fact, summary judgment may be awarded to James Dellinger as the non-moving party. See, e.g., Gospel Missions of America v. City of Los Angeles, 328 F.ed 548, 553 (9th Cir. 2003); Project Release v. Prevost, 722 F.2d 960, 969 (2d Cir. 1983); Cool Fuel, Inc. v. Connett, 685 F.2d 309, 311 (9th Cir. 1982); Many Cultures, One Message v. Clements, 2011 WL 5515515, *14 (W.D. Wash., Nov. 8, 2011) (citing Commission on Independent Colleges and Universities v. New York Temporary State Comm'n on Regulation of Lobbying, 534 F.Supp. 489, 501 (N.D.N.Y. 1982)).

As will be demonstrated *infra*, Respondent's motion for summary judgment must be denied, because: (1) Respondent is not entitled to judgment as a matter of law; (2) viewing the facts in a light most favorable to James Dellinger, and drawing all reasonable inferences in his favor, Respondent is not entitled to judgment as a matter of law; and (3) to the extent Respondent has placed no facts at issue with respect to matters of law as to which James Dellinger is entitled to relief, Mr. Dellinger is entitled to summary judgment as the non-moving party.

To assist the Court in addressing Respondent's summary judgment motion, below Mr. Dellinger divides Respondent's motion for summary judgment into three categories of claims: (1) those as to which Respondent argues are not entitled to summary judgment on the merits; (2) those as to which respondent argues are *both* procedurally defaulted and are not meritorious; and (3) those as to which Respondent argues solely that they are procedurally defaulted, but has not sought or addressed summary judgment on the merits. Respondent's assertions, the pertinent claims, and Mr. Dellinger's position generally with respect to each category of claims are as follows:

> (1) **Claims Respondent argues are not entitled to summary judgment on the merits:** See Petition ¶¶ 3.1. (Sufficiency); 3.1.1.(no rational trier of fact could conclude guilt beyond a reasonable doubt); 3.1.3.( no proof of premeditation, deliberation or intent);3.3. (trial court violated due process); 3.3.1. (denial of severance); 3.3.1.1. (prejudice); 3.3.2.(denial of change of venue); 3.3.2.1.(trial counsel filed repeated motions); 3.3.2.2.(voir dire had to be aborted because too many jurors knew about case); 3.3.2.3. (trial court denied funding for jury consultant for resumed voir dire).; 3.3.2.4.(trial court did not conduct thorough voir dire when took over questioning); 3.3.3. (trial court initially found jury consultant necessary then took away funding); 3.3.3.1 (prejudice); 3.3.3.1.1.(counsel did not know how to select death penalty jurors); 3.3.3.1.5.(trial counsel lacked experience to function as jury consultant); 3.3.4.(trial court impermissibly limited voir dire); 3.3.5.(admission of evidence violated 4th Amendment); 3.3.5.1. (search warrant for Defendant's property was void on its face); 3.3.5.2. (search warrant invalid b/c false statements); 3.3.11.(admission of 404(b) evidence violated due process); 3.3.11.1.(admission of evidence regarding fight on side of road); 3.3.11.2.(arson of trailer); 3.3.11.3.(admission of evidence of Connie Branam's death); 3.3.13.(admission of Tommy Griffin's statements to police was hearsay, violation of due process); 3.3.14. (trial court admitted testimony of Dr. Harlan violating due process); 3.3.16.2.(jury instructions invited speculation on length of life sentence); 3.3.16.3. (jury instructions precluded consideration of all mitigating evidence); 3.3.17.( trial court did not excuse juror who thought Sutton tried to bribe him); 3.5.(*Brady*); 3.5.1.(*Brady* as to other suspects); 3.5.1.1.(*Brady*

information withheld regarding Tommy Griffin and Connie Branam's connection to drug activity); 3.5.1.1.1.(Report of Chief Volcannan withheld in contravention of *Brady*); 3.5.1.2.(withheld *Brady* information that Tommy Griffin and Connie Branam were cooperating with law enforcement); 3.5.1.4. (withheld *Brady* evidence that someone else killed them); 3.5.1.6.(*Brady* information withheld, information from North Carolina regarding Lester Johnson); 3.5.2. (*Brady* information withheld regarding Dr. Harlan); 3.7.1.3.(ineffective assistance of counsel (hereafter IAC) for failure to investigate alibi); 3.7.1.3.1.(failure to investigate witnesses at Huddle House); 3.7.1.3.2.(failed to investigate witnesses as to what Dellinger doing at actual time of death – as opposed to at time of state's theory of time of death); 3.7.3.2.(IAC—failed to challenge proof); 3.7.4.(IAC sentencing, including all sub-parts); 3.7.5. (IAC appeal, including all subparts); 3.7.7. (IAC cumulative effect); 3.10.(death penalty after life offer); 3.12.(lethal injection is cruel and unusual); 3.13. (death penalty imposed in arbitrary manner); 3.14.(death penalty violates international treaties); 3.15.(*Ring/Apprendi* claim); 3.16. (death penalty unconstitutional). Mr. Dellinger submits as demonstrated in the pertinent sections of this Response that Respondent is incorrect; the claims are indeed meritorious; consequently Respondent is not entitled to summary judgment, but Mr. Dellinger is entitled to relief on the claims as the non-moving party. On these claims, this Court should deny Respondent's motion for summary judgment and grant Mr. Dellinger habeas corpus relief as the non-moving party

(2) **Claims Respondent argues are both procedurally defaulted and are not meritorious**.[1] See Petition ¶¶ 3.1.2.(state did not disprove every other reasonable explanation other than defendant's guilt as required in circumstantial evidence case); 3.2. (actual innocence, including subparts); 3.3.6. (trial tainted by jury's knowledge of Sevier County trial); 3.3.12.(trial court allowed emotional, irrelevant evidence violating due process); 3.7.3.1. (IAC voir dire); 3.7.6.(IAC for failing to raise all claims in the petition). Mr. Dellinger submits that these claims are not defaulted and they meritorious, as set it in the appropriate sections of this Response, below. As such, Respondent is not entitled to summary judgment, and Mr. Dellinger is entitled to habeas corpus relief as

[1] Notably, with respect to most of Respondent's assertions on the merits simply state, "not cognizable," citing no legal authority or record references and providing no explanation for the conclusion.

the non-moving party. This Court should deny Respondent's Motion for Summary Judgment and grant Mr. Dellinger habeas corpus relief as the non-moving party

(3) **Claims thatRespondent argues are procedurally defaulted, but which he does not argue on the merits or seek summary judgment.** See Petition ¶¶ s 3.3.1.1.1.(trial court violated due process by refusing severance in light of Terrie Lillie's testimony about Sutton threatening her); 3.3.1.1.2. (trial court violated due process by refusing severance in light of bribed juror) ; 3.3.1.2.(Mr. Dellinger prejudiced by lack of funding for jury consultant because lawyers selected a former Blount Co deputy, Juror Key); 3.3.3.1.3. (Mr. Dellinger prejudiced by lack of funding for jury consultant because lawyers didn't learn that Juror Key knew and trusted Detective Widenor and Officer Beeler) ; 3.3.3.1.4. (Juror Key tainted jury with his extrajudicial knowledge of definition of "consecutive" and "concurrent" thereby prejudicing petitioner); 3.3.7. (trial on Sunday violated due process); 3.3.8.(failure to keep jurors together during church on Sunday violated due process); 3.3.9. (sequestration in Townsend caused jury to pass crime scene twice a day tainting jury and prejudicing Mr. Dellinger); 3.3.10.(trial court allowed jury to go past Howies Hideway on way to supper); 3.3.15.(trial court did not inform Mr. Dellinger of right to testify nor ascertain waiver); 3.5.4.(Brady from TBI about fingerprints on shotgun shells); 3.6.3.(state presented false/misleading testimony of fire investigator Claibo); 3.6.4.(state presented false/misleading testimony of ballistics experts Carmen and Masson); 3.6.5. (state presented false/misleading testimony of Terrie Lillie); 3.7.1.2.3.(IAC: failure of obtain fingerprint expert); 3.7.1.2.4.(IAC: failure to obtain metallurgist); 3.7.1.2.5.(IAC: failure to obtain crime scene expert); 3.7.1.2.6.( IAC: failure to obtain competent expert, including for MR and brain injury); 3.7.1.4.(IAC: failure to investigate circumstances of Barbara Gordon's identification of Mr. Dellinger's truck); 3.7.1.5.(IAC: failure to investigate dirt samples and tire tread impressions); 3.7.1.6.(IAC: failure to investigate Mr. Dellinger's MR); 3.7.2.(IAC: failure to file appropriate motions, includes subparts); .3.7.3.3.(IAC: failure to present proof of a defense, includes subparts); 3.7.3.5.(IAC: failure to object to jury instructions); 3.7.3.6. (Mr. Dellinger was prejudiced by counsel's errors); 3.8. (jury misconduct, includes subparts); 3.9. (Prosecution abused discretion and violated due process by manipulating order of prosecution to get an aggravating circumstance); 3.11. (electrocution is cruel and unusual); 3.17. (death penalty statute violates *Furman)*; 3.22.( cumulative effect of

all errors). Mr. Dellinger submits that because these claims are not defaulted, this Court should deny Respondent's motion for summary judgment, which is based solely on alleged procedural default. Because Respondent has not contested the merits of these particular claims, upon resolution of the procedural defenses, this Court should deny summary judgment and order a hearing on the merits. In the alternative, upon denying Respondent's motion for summary judgment, this Court should order further briefing on the merits of such claims, to allow Respondent to advance his arguments on the merits and to allow Mr. Dellinger to respond thereafter.

## IV. MR. DELLINGER IS MENTALLY RETARDED AS SUCH HE IS CATEGORICALLY EXEMPT FROM THE DEATH PENALTY (¶3.2.2.)

Under Atkins v. Virginia, 536 U.S. 304 (2002), Tenn. Code Ann. §39-13-203) and Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), James Dellinger is intellectually disabled.[1] The Eighth and Fourteenth Amendments thus categorically prohibit his execution. Atkins, *supra*. Consequently, Respondent's motion for summary judgment on this claim must be denied.

James Dellinger acknowledges that his *Atkins* claim has yet to be considered by the state courts, but as he has noted elsewhere (*see,* D.E. 56, *Motion to Stay Proceedings*) it quite clear that he now has an available remedy in state court. Because he is intellectually disabled, because his intellectual disability makes him ineligible to executed, and because *Coleman* has recently been decided, James Dellinger can now raise his *Atkins/Coleman* claim in a motion to reopen his post-conviction petition under

---

[1] Although the clinical term *mental retardation* is a subtype of *intellectual disability* the latter is now preferred by most advocates in most English-speaking countries as a euphemism for mental retardation. Since the passage of Rosa's Law on October 6, 2010, *intellectual disability* has replaced *mental retardation* in official documents of the federal government. Tennessee has likewise replaced the term *mental retardation* with *intellectual disability* in both its statutes and court opinions. Some entities are also using *developmental disability* which has an established wider meaning. In this pleading, the term intellectual disability is used to designate the specific impairment defined by the Tennessee legislature as consisting of a functional IQ below 70 and deficits in adaptive behavior which manifests prior to age eighteen.

Tennessee Code Annotated §40-30-117. See D.E. 56, Attachment 1, Keen v. State, No. W2011-00789-CA-R11-P; Shelby Crim. No. P-2515 (application for permission to appeal granted to determine whether inmate alleging intellectual disability may seek relief via motion to reopen post-conviction petition). James Dellinger is in the process of preparing and filing his motion to reopen.

Accordingly, where principles of exhaustion require the state courts to consider Dellinger's *Atkins/Coleman* in the first instance, this Court must abate proceedings on this claim (as well as the entire petition for writ of habeas corpus) to allow the state courts to consider this claim. Respondent's motion for summary judgment must thus be denied as Dellinger pursues his state court remedy on this claim -- especially where (as shown *infra*) it quite clearly appears that his *Atkins* claim is meritorious.

### A. *James Dellinger Is Intellectually Disabled Under Atkins*

There is undisputed proof that James Dellinger is indeed intellectually disabled under *Atkins*. The attached affidavits of Drs. Dale Watson, Ph.D. (Exhibit 1), Steven Greenspan, Ph.D. (Exhibit 2), and James Murray (Exhibit 3) make clear that James Dellinger is intellectually disabled and thus ineligible for execution under *Atkins*. As all three of these doctors have clearly demonstrated, James Dellinger meets each of the three prongs of the clinical and statutory definitions for intellectual disability: (1) He has significantly substandard intelligence as shown by an Intelligence Quotient (IQ) of 70 or below; (2) he suffers deficits in adaptive behavior; and (3) these deficits manifested before the age of eighteen. See generally, Tenn. Code Ann. §39-13-203; 2010 AAIDD-11 Diagnostic Manual; DSM-IV-TR; Coleman v. State, 341 S.W.3d 221 (Tenn. 2011).

### B. *James Dellinger's Intelligence Quotient Is Below 70, He Suffers Deficits In Adaptive Behavior, And The Onset Of His Disabilities Was Before Age Eighteen*

James Dellinger is intellectually disabled. He has been intellectually disabled, though undiagnosed, for most of his life – certainly since childhood, if not from birth. Though official, written records of Mr. Dellinger's life are scarce, the few records that do exist document his manifold adaptive deficits (or, better stated, his inability to adapt). Recollections by people who knew Mr. Dellinger as a child and teen-ager are replete with references to his inability to function in ways which are prototypical of intellectual disability. The failure of any court prior to now to recognize Mr. Dellinger's disability has nothing to do with the reality of Mr. Dellinger's IQ or adaptive deficits and everything to do with the profound void of resources into which Mr. Dellinger was born, raised, and ultimately brought to trial.

#### 1. James Dellinger's Functional IQ Is In The Intellectually Disabled Range.

James Dellinger's functional IQ is within the intellectually disabled range. Exhibit 1 and 1a, *Affidavit and Report of Dr. Watson*; Exhibit 2 and 2a, *Affidavit and Declaration of Dr. Greenspan*. Most recently, Mr. Dellinger's IQ was tested on the WAIS-IV, the newest testing instrument from the Weschler series of IQ tests.[2] As noted by Dr. Greenspan, the Weschler tests have "long been regarded as the 'gold standard' for the assessment of IQ." Mr. Dellinger's full scale IQ on the WAIS-IV placed his overall level of intellectual functioning within the "extremely low" range. His full scale IQ (FSIQ) was 69, placing him at the second percentile rank of the population. Exhibit 1a, *Report of Dr. Watson*.

---

[2] **Error! Main Document Only.**Published in the summer of 2008, eleven (11) years after the WAIS-III, the WAIS-IV offers updated normative data, includes new and enhanced subtests, and is specifically enhanced to give the most accurate I.Q. assessment for older adults, like Mr. Dellinger. See Pearson's Clinical Assessment of the Wechsler Adult Intelligence Scale – Fourth Edition, www.wais-iv.com (last visited February 1, 2012).

As made plain by the Affidavit of Dr. Watson (Exhibit 1), the best estimate of Mr. Dellinger's functional IQ, using "the most conservative data" is that his IQ is 69. "Using somewhat more advantageous assumptions, his composite IQ would be 68. Simply using the two most recent tests to determine Mr. Dellinger's composite IQ, given their improved psychometric properties, it would be 66." Exhibit 1, *Affidavit of Dr. Watson* at p. 22. As Dr. Watson explains, arriving at a "functional IQ" as demanded by the Tennessee statute is a rigorous exercise when a subject has been administered a multitude of IQ instruments, as Mr. Dellinger has. As Dr. Watson explains, "the true score is the theoretical score if it were possible to administer a test an infinite number of times (without practice effects) to any one individual." Id. at p. 17. A reliable calculation of true score "requires information as to the correlation between the instruments in question." Id. at p. 18. Dr. Watson evaluated each of the administrations of IQ instruments to Mr. Dellinger, relied only upon those scores which were administered under conditions which indicated reliability (ie. where the administrator was appropriately qualified and where the IQ test had not been "learned" by repeated prior administrations). Based upon his clinical judgment, the scores obtained, and the computation of the hypothetical "true" score using the formula which weights each instrument according to its reliability Dr. Watson found that in his expert opinion, to a reasonable degree of scientific certainty, Mr. Dellinger's functional IQ is below 70. Id. at p.26.

2. James Dellinger's Adaptive Deficits Are Manifest.

James Dellinger's adaptive deficits are manifest and obvious. From the accounts of his family, friends, teachers, ex-wife, and his former employers James Dellinger exhibits limitations in multiple domains of the clinically defined categories of adaptive behavior. Exhibit 2b,

*Declaration of Dr. Greenspan*, p.14 ("The picture painted of Mr. Dellinger was that of someone with every significant adaptive deficits both before and after the age of 18"). For example, though James wore a digital watch, he was unable to express time conceptually as "a quarter till or a quarter after" the hour. Id. James couldn't point to a date on a calendar. Id. He couldn't follow verbal directions. Id. He often misunderstood jokes, and engaged in behavior that other people realized was risky or dangerous. Id. "Mr. Dellinger could not perform many of the tasks one would expect of a young adult – housework, saving money, opening a bank account, or setting short and long term goals." Id. He was also unable to make or count change, "When he need to pay for something he would put out his hand with some money in it and leg whoever he was paying take what they wanted." Id. On the job, James's abilities were similarly limited. Dr. Greenspan interviewed Mr. Dellinger's former employer, Jeff Dodgen:

> Jeff was very clear about what duties James could perform: carry lumber and supplies and occasionally saw pre-marked boards. However, he was just as clear about what James could not do: measure boards, operate big equipment, or skilled carpentry work. Above all, Dodgen emphasized that Mr. Dellinger had to be monitored closely on job sites because he would often forget instruction and had to be frequently reminded of steps to take to complete a task. It appears that Mr. Dellinger was able to hold such unskilled construction jobs largely through the benevolence of his employers and friends who recognized, accepted, and accommodates his limitations.

Id.

Further, James Dellinger does not read or write. In fact, he cannot. It is the opinion of three psychological experts that James Dellinger is profoundly illiterate. Exhibit 1and 1a, *Affidavit and Report of Dr. Dale Watson*, Exhibit 2 and 2a *Affidavit and Declaration of Dr. Stephen Greenspan*, Exhibit 3, *Report of Dr. James Murray*. School records (Exhibit 4, *Scholastic History of James Dellinger from the Sevier County School System*) and social history

related by his family and associates substantiate the observations of the experts. See generally, Exhibits 5- 10, 15, 16, 17, 18. Mr. Dellinger has never been able to read or to write much more than his name. Even after several years of one-on-one instruction in prison, he still performs at the first grade level. Exhibit 5, *Declaration of Rickey Harvelle*.

The story of James Dellinger's life is replete with such evidence of intellectual disability. Despite James's attempts to mask his deficits, his life-long limitations are exposed by even a cursory review of the sworn statements of those who knew him:

- James tried to learn in school, but he just couldn't remember what he studied the very next day . . . I remember when James got what they promoted to third grade. He was about ten years old when we moved to Mill Creek and started going to Laurel Lick School. There he was, a big ten year old boy, sitting in the first grade row with all the little six year olds. One day the teacher asked the little girl behind James why she wasn't doing her sums like she was supposed to. She said she couldn't because, "big ole James is blocking the board, and I can't see it." The teacher said to James to go on and move on over to the empty seat in the third grade row. We've always laughed and teased James about how he got "promoted" all the way to third grade. Exhibit 6, *Declaration of Maralee Dellinger Ramsey* (sister).

- [W]hen James was around twelve or thirteen, he started taking off instead of working. We would all be out working in the field and James would get it in his head he didn't want to work that day and he'd just take off. Sometimes I would say to Daddy that that just wasn't fair — James getting out of the work that way. Daddy would whip James when he got home, but James didn't seem to learn not to keep on doing that. Exhibit 7, *Declaration of John Dellinger* (brother).

- After James started working construction jobs and made a paycheck, he'd stop and cash his check at a store near our house. The Law would be waiting for James every Friday afternoon. They knew James didn't have a license and that he'd just gotten paid. The cops took his money just about every weekend. Exhibit 6, *Declaration of Maralee Dellinger Ramsey* (sister).

- James had a little book he wrote phone numbers in. He couldn't look up a number in the regular phone book or use information. He just wrote down all the numbers he needed — without any names. If he didn't remember which number was the one for the person he wanted to call, he'd call every one of the numbers in his

book until he got the right person. Exhibit 8, Declaration *of Annabel Stewart* (ex-wife).

- [H]e could nail up boards, he couldn't measure, but if a board was already marked, sometimes we'd let him saw. Exhibit 9, *Declaration of Jeff Dodgen* (employer).

- I knew that James was "slow." I never saw James read or write anything. You had to figure out how to explain things to James, had to be selective in how you said it. You had to give explicit instructions and usually had to repeat the instructions. You somewhat had to refresh his recollection every day. You could tell James to sweep the floor, and he'd do it. But on more complex things you would have to tell him over and over -- and watch him too. Exhibit 9, *Declaration of Jeff Dodgen* (employer).

3. The Onset Of James Dellinger's Intellectual Disability Was Before Age Eighteen

There is also no question that James Dellinger's disability manifested itself before age eighteen. As the Reports of Dr. Dale Watson and Dr. Stephen Greenspan make clear, "Mr. Dellinger's deficits are life-long and both developed and manifested during the developmental period, before age eighteen." Exhibit 1a, *Report of Dr. Watson*. The reports of the experts are substantiated by the anecdotal history provided by Mr. Dellinger's family, friends, and employers. See Exhibits 5- 10; 15-18.

*C. James Dellinger's Intellectual Disability May Be Traced To Familial, Genetic Roots, Exposure To Environmental Toxins, And/Or Traumatic Brain Injury*

1. Familial, Genetic Link

James Dellinger's intellectual disability has a clear familial link, possibly evidencing a genetic component. Though a determination of etiology is unnecessary to a diagnosis of intellectual disability, often contributing factors are easy to discern and offer compelling proof as to the age of on-set of the disability. The circumstances of James Dellinger's birth and early

childhood are replete with known "risk factors" for intellectual disability: intergenerational history of illiteracy, poverty, isolation, violence and substance abuse; illiterate parents; no prenatal care; maternal prenatal malnutrition; difficult birth; unstable family life; no traditional medical care; history of serious untreated head injuries with protracted loss of consciousness; exposure to chemical toxins; hunger; regular consumption of large quantities moonshine. See Exhibit 10, *Biopsychosocial Evaluation*, p. 25-26. While any of those factors might have resulted in low IQ and adaptive deficits, the history of the Dellinger family's inability to learn is perhaps the most instructive "risk factor" as it points to a possible genetic link to this disability.

> [I]t is noted that it appears that intellectual disabilities may simply run in Mr. Dellinger's family. This is perhaps not surprising in that there is a significant genetic component to intellectual functioning. Kaufman and Lichtenberger (2006) reported, "Probably the best overall estimate of the heritability of IQ is 50%, a value proposed as the most sensible summary of the results from the diversity of behavioral genetic research (Plomin & Petrill, 1997). Other estimates of the heritability of IQ are as high as 85%. Nevertheless, in other words, at a minimum, 50% of the variance in an individual's intelligence is attributable to hereditary factors.

Exhibit 1, Affidavit of Dr. Watson, at p. 25.

Neither of James Dellinger's parents was able to read and write. Id. In 1943, Mr. Dellinger's father, Clyde Sr., was drafted into the army. Military records show that upon inscription, Clyde Sr. reported that he had attended to school off and on for eight years and yet never passed first grade. Id. While in the army, Clyde Sr. had four months of school at Camp Shelby, but couldn't learn there either. After discharge from the army, Clyde Sr., still could not read and could only write his name. Id. James's mother was, likewise, unable to read and write. A review of the deeds to the family properties shows that she signed her name with an "X" until 1973. Id.

Despite being hard working and motivated people, James's brothers and sisters also describe themselves as being "unable to learn." The highest grade attained by any of his siblings was third grade; two of his sisters report that they can read, though it is unclear how well they read. Exhibit 10, *Biopsychosocial Evaluation*, p.16 (Mary reports that she can read most words in the newspaper, but without comprehension).

The genetically linked component of James Dellinger's intellectual disability is also evident in his off-spring. Each of Mr. Dellinger's children suffers from serious intellectual disabilities.[3] Intelligence testing of Tammy Sue Dellinger, the oldest of James Dellinger's children, while she was in middle school revealed that she functioned in the borderline mentally retarded range.[4] Exhibit 11, *Scholastic Records of Tammy Sue Dellinger*. Tammy Sue's scholastic records reveal that she passed first grade after her third attempt, then was socially promoted the following year from second grade to third. Id. She failed third grade for two years. She then entered school in Georgia and was placed in seventh grade. She passed both seventh and eighth grades in Georgia despite reading and doing math only at an "elementary" level. Id. Upon a return to the Sevier County schools, Tammy Sue appears to have been placed in a special education program[5]; despite this accommodation, she flunked out of school after two years of high school. Id.

The genetically-linked component of Mr. Dellinger's intellectual disability is even more dramatically revealed in the records relating to his two sons. James Dellinger's oldest son,

---

[3] Jamie Dellinger, born to James Dellinger and Lynda Buchannan (who later married Mr. Dellinger in 1981) died in an accident when he was 2 years old. His intellectual functioning was never tested.

[4] The formal psychoeducational report of the administration of the WAIS-R to Tammy Sue does not, unfortunately, report an IQ score. However she was placed in special education, which pursuant to The Education for All Handicapped Children Act (EHA) required a finding that she was mentally retarded. Further her records indicate that she functioned "in the mentally deficient range." Exhibit 11, *Scholastic Records of Tammy Sue Dellinger*.

[5] Tammy Sue Dellinger's school records reflect that she took a modified curriculum the majority of which was comprised of vocational skills classes. After two years she had a total of 6.5 credits toward graduation.

Timmy "Lee" Dellinger, failed every grade of elementary school. Exhibit 12, *Scholastic Records of Timmy "Lee" Dellinger*. Though his scholastic record is jumbled and confusing, a notation in his sixth grade year reads "Timmy's assignments were all modified to his level and he did satisfactory work at this level." Id. Thereafter a notation appears that he continued through school on a "non-graded program." Timmy Lee obtained a "special diploma" in 1991, despite indicators that he was reading only at a second grade level. Id.

The youngest of Mr. Dellinger's children, James Jr., has been diagnosed as mentally retarded. He has a full scale IQ of 63 (WISC-III administered in 1996). Exhibit 13, *Scholastic Records of James Dellinger, Jr*. On the Woodcock Johnson Test of Achievement, James Jr. measured in the .1% of children his age (15) on reading, reading comprehension, and math. His deficits in adaptive skills on the Vineland Adaptive Behavior Scales – Interview Edition, confirmed the diagnosis of intellectual disability. Id.

2. Exposure To Toxins

*"A guy told me he used a bushel of horse manure in his moonshine and a couple of car batteries dropped in it. Moonshine could kill you."* *Declaration of George Frank Dellinger*.

Though etiology is not required for a finding of intellectual disability, one possible cause of James Dellinger's brain's dysfunction is exposure to toxins while his brain was still developing.

> During James's early childhood, his family began farming tobacco. Growing tobacco was harsh and dangerous work. Clyde provided the seeds, the plow, the mule, the pesticides, and the labor – using his wife and eight children as labor. After James, Clyde and Janie had two more children, totaling eight in all. The older children recall Janie breastfeeding in the midst of the toxin encrusted tobacco fields, thus exposing the infants, including James, to dangerous chemicals, rending them all the more vulnerable during their developing years . . . The children's duties included treating the plants for horn worms by dusting with lead

> arsenate. Unable to afford proper and safe equipment, the Dellingers made pesticide dusters out of old coffee cans with holes punched in the bottom and a stick nailed on as a handle. From the time he was old enough to hold a duster, James shook the lead arsenate on the tobacco plants and, like the other children and his parents, breathed in lead arsenate dust. The family worked the plots from daylight until dark. Janie, covered in lead arsenate dust, would stop long enough to nurse a new baby. Though accounts differ as to what age James began working the tobacco, it is clear that by the time Clyde Sr. purchased the farm on Mill Creek when James was ten-years-old, James was expected to do a full day's work the same as an adult.

Exhibit 10, *Biopsychosocial Evaluation*, p.11.

Additionally, beginning in his pre-teen years --- while his brain was clearly still developing --- James Dellinger regularly consumed large quantities of moonshine.

> To his unique mix of risk factors, James exposed his still developing brain to an additional toxin: he began drinking moonshine around the age of eleven. Readily available, this extremely toxic and potentially lethal form of pure grain alcohol was typically mixed with substances such as battery acid and horse manure to expedite the distilling process. According to James and his brothers, moonshine producers would lower car batteries into the mash, which would cause the moonshine to start bubbling; thus "cooking" the shine faster.

Id. at p. 17.

Exposure to such toxins can lead to serious brain damage. Exhibit 14, *Toxicology Report by Andres Lugo, M.D.; M.Ph.; FACMT.*

> [B]ased on my own investigation and the materials that you provided me, it is my opinion that there is a significant probability that Mr. Dellinger's identified neurological and cognitive disabilities were in part, if not in whole, the product of his mother's exposure to highly toxic pesticides during her pregnancy and from Mr. Dellinger's own exposure to such substances throughout his childhood and increasingly during his adolescence. This conclusion is based on the high toxicity of the substances, the period when Mr. Dellinger was first exposed, the length of time he was exposed, the introduction and exposure of other toxins during

his developmental period, and the known fact that the exposure to such toxins prenatally and throughout childhood can have a direct, substantial impact of neurological development.

Id.

3. Traumatic Brain Injury Further Compounded James Dellinger's Cognitive Limitations.

Mr. Dellinger's intellectual disability stems, in part, from brain damage. According to Dr. Peter Young, who evaluated Mr. Dellinger in 1995, Mr. Dellinger's score reflected the highest level of impairment that the Halstead-Reitan Neuropsychological Battery (HRNB) registers, a result which clearly indicated brain damage. Exhibit 1a, *Report of Dr. Watson*. Dr. Dale Watson, neuropsychologist, confirmed those results when he re-administered the HRNB in 2010. As Dr. Watson reported, "Mr. Dellinger demonstrated clear and convincing evidence of significant brain dysfunction impacting his overall intellectual capacity, his capacity to attend, his memory abilities, executive functions, his ability to problem solve and to perform essentially any academic task . . . The severity of his impairments is of at least a moderate intensity, which is sufficient to cause significant problems in his day-to-day life. The findings point to a focus of impairment within the left hemisphere of the brain." Exhibit 1a, *Report of Dr. Watson* at p. 29.

Mr. Dellinger's neurological impairment is consistent with his history of repeated head injuries. As a thirteen or fourteen year old, Mr. Dellinger was kicked in the head by a horse. Exhibit 15, *Declaration of Ralph Dellinger* While accounts vary as to whether Mr. Dellinger lost consciousness following that kick, (compare Exhibit 15, *Declaration of Ralph Edward Dellinger* at p.2 with Exhibit 1a, *Report of Dr. Watson* at p.8) it is clear that it resulted in a serious injury to the front part of Mr. Dellinger's head. Likewise, Dellinger's brain suffered additional insult when he was struck by a falling two by four, when he hit his head during numerous car

collisions, and from the consumption of moonshine as a young teenager. "These incidents, particularly because they occurred during childhood, likely resulted in irreparable harm to James' still developing brain. Although James' physical scars healed, the symptoms of these brain injuries (memory loss, behavioral changes, personality changes, and lack of concentration) seem to have persisted for the rest of his life." Exhibit 2a, *Declaration of Dr. Greenspan*, p.12.

*2. For Years, James Dellinger's Intellectual Disability Went Unrecognized And Undiagnosed Because Of A Fundamental Lack Of Resources*

> "Before James Dellinger entered this world, his life was being shaped by forces of deprivation and want. Born the sixth of eight children to an illiterate and malnourished mother, James's difficult birth set the stage for his life to come. As the lay midwife pulled James from the womb he literally and figuratively inherited his parents' struggles with hunger, ignorance, and cultural isolation. It was against this genetic and sociological backdrop that the particulars of James's life played out."
>
> - Biopsychosocial Evaluation,
> Jan Vogelsang, LISW-CP, BCD

The Dellinger family was not a family in which young James's cognitive and behavioral deficits could be appropriately recognized. Simply put, the other members of the Dellinger family are low functioning themselves and lived in extreme poverty and hardship such that identification of James's disabilities was impossible. See Exhibit 10 , *Biopsychosocial Evaluation*; Exhibit 16, *Declaration of Mary Dellinger Ramsey*; Exhibit 17, *Declaration of Clyde McKinley Dellinger, Jr.;* Exhibit 18, *Declaration of George Frank Dellinger*; Exhibit 7, *Declaration of John Albert Dellinger;* Exhibit 15, *Declaration of Ralph Edward Dellinger*; Exhibit 6, *Declaration of Maralee Dellinger Ramsey*; Exhibit 38, The Almost Invisibles of Sevier County *(A Social History by Dr. Bruce Wheeler).*

> [U]nlike his siblings, James exhibited special needs, marked by inability to learn and clear indicators of cognitive impairment. Parents like the Dellingers – who are tired, traumatized, fearful, and abusing substances – are unable to provide the panoply of resources a special needs child requires to become a well-rounded, functional adult. When such a situation is combined with parental illiteracy and abject poverty, as was the case here, the combination can prove especially pernicious for a child like James, virtually guaranteeing that his needs will go unaddressed.

Exhibit 10, *Biopsychosocial Evaluation*, at p. 22.

An absolute vacuum of resources characterized Mr. Dellinger's few encounters with social support systems that could have detected his disability. During his short-lived tenure in the Sevier County school system, Mr. Dellinger's disability went undetected -- primarily due to scarcity of resources.

In the 1950's when James Dellinger attended school in Sevier County, the school system did not have any services for the intellectually disabled. See Exhibit 19, *Declaration of John T. Enloe, Ph.D*. Further for the short time he attended school, Mr. Dellinger attended in one room schoolhouses where one teacher instructed eight "grades" and even more levels of ability. Id.; See also Exhibit 6, *Declaration of Maralee Dellinger Ramsey*; Exhibit 16, *Declaration of Mary Dellinger Ramsey.* Teachers at that time, in that school system, were not trained in the detection or assessment of intellectual disability. Exhibit 19, *Declaration of John Enloe, Ph.D.* Given these conditions, it is not surprising that James Dellinger's intellectual disability was not detected by the Sevier County school system.

Despite the failure of his family and school system to formally identify his disability, James Dellinger's limitations were perceived by everyone who came into contact with him.

> His disabilities, while not formally identified as such by a wholly inadequate school system, were obvious nonetheless to his

> teachers and friends – and even to his siblings who, themselves, had serious learning problems. Although none of the people interviewed described James as having "special needs" (because it was neither a familiar term nor concept) – several identified him as "slow." Tellingly, every person interviewed described limitations and behaviors in James that were consistent with serious adaptive deficits that define intellectual disability. At another time and in another setting, James would have been identified as a child eligible for special services.

Exhibit 10, *Biopsychosocial Evaluation* at p. 23.

### 3. *Respondent's Motion For Summary Judgment Must Be Denied*

#### 1. Going Back To State Court – Must Let The State Court Decide The Issue

As this Court is aware, James Dellinger intends to return to state court for resolution of his claim of intellectual disability. See D.E. 56, Motion to Stay Proceedings. Recent (and continuing) events in Tennessee jurisprudence have made such a return possible and necessary. On April 11, 2011, in *Coleman v. State*, 341 S.W.3d 221 (Tenn.2011), the Tennessee Supreme Court issued a landmark decision that materially changed the substantive definition of intellectual disability for purposes of exemption from the death penalty. The Coleman decision also substantially changed the procedures and evidence necessary to satisfy the standard. *Coleman*, however, did not address directly Mr. Dellinger's procedural dilemma.

On December 15, 2011, in *Black v. Bell*, 2011 WL 6224560 (6th Cir. 2011), the Sixth Circuit reversed a determination by the district court that petitioner Black had not established an *Atkins* claim, remanding the case for the evaluation of a 2004 state court conclusion in light of *Coleman*. Four days later, on December 19, 2011, in Smith v. State, 2011 WL 6318946, *22-28 (Tenn. 2011), the Tennessee Supreme Court reversed a 2004 trial court determination that the petitioner was not mentally retarded, remanding for reconsideration under standards and

procedures announced in *Coleman*. *Smith* and *Black* strongly indicated that *Coleman* is a new rule that must be applied retroactively.

On December 14, 2011, the Tennessee Supreme Court granted discretionary review of an order of the Tennessee Court of Criminal Appeals in *Keen v. State* No.W2001-00789 that denied post-conviction relief on the ground that *Coleman* was not new law. *Keen* squarely presents the question of whether *Coleman* is a new rule of law. Obviously, Mr. Dellinger's *Atkins* claim is crucial to his habeas petition. It now appears that he has a state court remedy for exhausting the claim. 28 U.S.C. §2254(b)(1)(A). As such, his return to state court for the prompt state court resolution of this claim is critical.

These recent events demand that counsel seek to stay this action and return to state court immediately. In fact, the state courts' resolution of Mr. Dellinger's *Atkins* claim will most likely pretermit the need for this Court to address a number of sentencing issues. Indeed, unforeseeable events in state court could eliminate the need to adjudicate any issues in the Petition. See e.g., Exhibit 20, *12/16/11 Order Dismissing the Petition with prejudice in Coleman v. Bell No. 2:89-cv-02469 (D.E. 218).*

2. Contrary To Respondent's Claims, The Execution Of A Person With Intellectual Disability Is An Error So Fundamental That the Issue Can Never Be Forfeited Or Waived. Even If A Waiver Were Possible, Such Would Result In A Fundamental Miscarriage Of Justice Requiring Review Of The Claim

> Because of [the mentally retarded] person's disabilities in areas of reasoning, judgment, and control of their impulses . . . they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings. *Atkins v. Virginia*

*Atkins v. Virginia* is a categorical restriction on the death penalty, recognizing that the Eighth Amendment bars the intellectually disabled as constitutionally ineligible for execution. As

clearly set forth by the Supreme Court in subsequent decisions, *Atkins* provides immunity from capital punishment for an entire class of people. See Roper v. Simmons, 543 U.S. 551, 563-64 (2005)(explaining that *Atkins* "ruled that the death penalty constitutes an excessive sanction for the entire category of mentally retarded offenders."); Kennedy v. Louisiana, 554 U.S. 407 (2008) (referring to *Atkins* in the context of the Supreme Court "confining the instances in which the [death penalty] can be imposed."). Given the constitutional prohibition of the very punishment imposed in this case, Mr. Dellinger's claim that he is condemned despite his intellectual disability is a structural error which is not waived nor forfeited by his failure to raise it in state court.

*a. Atkins is a categorical restriction on imposition of the death penalty.*

In *Atkins v. Virginia*, the Supreme Court imposed a categorical restriction on the imposition of the death penalty. Atkins v. Virginia, 536 U.S. 304 (2002); Walton v. Johnson, 440 F.3d 160 (4th Cir. 2006). "Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Id. at 321, quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986).

The Court found that death penalty jurisprudence "provides two reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execution. First, there is a serious question as to whether either justification that we have recognized as a basis for the death penalty applies to mentally retarded offenders." Akins, at 319. The second reason for the categorical ban is found in the "reduced capacity of mentally retarded offenders." Id. "The risk 'that the death penalty will be imposed in spite of factors which may

call for a less severe penalty,' is enhanced, not only by the possibility of false confessions, but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." Id. at 321, quoting *Lockett v. Ohio*, 438 U.S. 586 (1978).

In Tennessee, execution of the mentally retarded was already forbidden by law. Twenty years ago, the Tennessee General Assembly was among the first state legislatures to enact a statute on this subject, clearly intended that individuals with intellectual disability should not be subject to the death penalty. (The bill's caption was "An Act to Amend Tennessee Code Annotated, Title 39, Chapter 13, Part 2, to Prohibit the Imposition of a Sentence of Death for a Person with Mental Retardation." H.B. No. 2107, TN Legis. 1038, 96th Sess. (Tenn. 1990)). The Tennessee Courts recognized that the Tennessee Constitution prohibits the execution of the mentally retarded in 2001. Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001).

*b. Constitutional protection from cruel and unusual punishment cannot be defaulted nor forfeited.*

There is no right more fundamental than the right to be free from cruel and unusual punishment. Though some constitutional rights may be forfeited, other rights, including the prohibition on cruel and unusual punishment, are so fundamental as to never be forfeited. As the Supreme Court recently noted in the context of a prisoner's rights case:

> As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. "**The basic**

**concept underlying the Eighth Amendment is nothing less than the dignity of man**."

Brown v. Palta, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)(emphasis added)).

The rules governing waiver of constitutional rights, likewise pertain to the hierarchy of the rights themselves. As the Supreme Court instructed in *New York v. Hill,* 528 U.S. 110, 114-115, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000):

> What suffices for waiver depends on the nature of the right at issue. '[W]hether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.' For certain fundamental rights, the defendant must personally make an informed waiver. For other rights, however, waiver may be effected by action of counsel."

*New York v. Hill*, 528 U.S. 110, 114-115, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000)(quoting, United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); citing, Johnson v. Zerbst, 304 U.S. 458, 464-465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Brookhart v. Janis, 384 U.S. 1, 7-8, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)).

As the right to be free of cruel and unusual punishment that flows from the Eighth Amendment is both a right of the person (to be free of the fear of such abuse) and a right of society (to be free from the guilt of such abuse) waiver of that right is not a purely personal matter. No court has held that a defendant may knowingly waive his ineligibility for a death sentence, but were a defendant hypothetically able to do so, the right of society to be free from the commission of such a travesty would eclipse the individual waiver.

c. *James Dellinger is entitled to Federal review of his Atkins claim, to an evidentiary hearing and to habeas corpus relief.*

James Dellinger has alleged that under *Atkins v. Virginia*, 536 U.S. 304 (2002), he is intellectually disabled, actually innocent of the death penalty, and ineligible for execution. To be sure, Mr. Dellinger's *Atkins* claim has not been presented to the state courts. Nevertheless, he is entitled to plenary habeas review of his claim because his intellectual disability places him within the category of persons who simply cannot be executed. Allowing him to be executed despite his intellectual disability would thus result in a "fundamental miscarriage of justice." This Court must therefore review his claim on the merits and ultimately grant him relief.

**i) A habeas corpus petitioner is entitled to review of an otherwise procedurally defaulted claim if failure to review the claim and grant relief would result in a "fundamental miscarriage of justice."**

James Dellinger acknowledges that his *Atkins* claim has not been presented to the state courts and is thus arguably procedurally defaulted. Nevertheless, a petitioner is still entitled to federal habeas review of a defaulted claim if he establishes either "cause and prejudice" for his default or a resulting "fundamental miscarriage of justice." Sawyer v. Whitley, 505 U.S. 333, 339 (1992). While James Dellinger can make both showings, the "miscarriage of justice" exception is most salient here, because his *Atkins* claim by definition makes him categorically ineligible for execution under the Eighth Amendment. Given the uniqueness of an *Atkins* claim and its exalted status in the pantheon of constitutional claims, this Court must consider his claim on the merits.

**ii) Because intellectual disability makes James Dellinger categorically ineligible to be executed under the Eighth Amendment, presentation of his claim is necessary to avoid a fundamental miscarriage of justice.**

A petitioner establishes a "fundamental miscarriage of justice" if he makes one of two showings: (1) that is actually innocent of the offense of conviction ( House v. Bell, 547 U.S. 518 (2006)); or (2) that he is "actually innocent" of the death sentence. Sawyer v. Whitley, 505 U.S. 333 (1992). As the Supreme Court explained in *Sawyer,* a death-sentenced petitioner is "actually innocent" of the death sentence and shows a fundamental miscarriage of justice if, but for constitutional error, the petitioner would not be "eligible for the death penalty." Id. at 348, 349. Put another way, under *Sawyer*, a death-sentenced petitioner must be granted review of an otherwise defaulted claim if upon establishing the claim, the petitioner is ineligible for execution. See Sasser v. Norris, 553 F.3d 1121, 1125 n.4 (8th Cir. 2009)("A petitioner is 'actually innocent' of the death penalty where he is ineligible for the death penalty."); Adams v. Thaler, 421 Fed.Appx. 322, 331 (5th Cir. 2011)("One way to demonstrate a fundamental miscarriage of justice is to show that the petitioner is actually innocent of the death penalty.")

That is the precise situation here, given the very nature of James Dellinger's Eighth Amendment *Atkins* claim. "[T]he Supreme Court announced [a] categorical ban on executing mentally retarded inmates in *Atkins*." Walton v. Johnson, 440 F.3d 160, 177 n.21 (4th Cir. 2006); See also, Graham v. Florida, 560 U.S. ___, ___ (2010)(*Atkins* excludes entire class of mentally retarded persons from capital punishment). Because *Atkins* provides a "categorical restriction on the death penalty"(Henderson v. Thaler, 626 F.3d 773, 785 (5th Cir. 2010)), any individual who is mentally retarded is "actually innocent" of the death penalty under *Sawyer*. In other words, under *Sawyer*, because he is an intellectually disabled individual, James Dellinger would suffer a "fundamental miscarriage of justice" were his *Atkins* claim not reviewed on the merits.

Given the interplay between *Atkins* and *Sawyer*, courts and judges have properly concluded that a petitioner with an otherwise defaulted *Atkins* claims falls within *Sawyer*'s

narrow "miscarriage of justice" exception to procedural default. See e.g., Moore v. Quarterman, 491 F.3d 213, 230-231 (5th Cir. 2007)(Dennis, J., dissenting)(death-sentenced petitioner satisfies *Sawyer* because he can show he is intellectually disabled); Frazier v. Bobby, 2011 U.S.Dist.Lexis 123435 *68-69 (N.D.Ohio 2011)(proof of intellectual disability would establish actual innocence of death sentence and overcome procedural default); Bowling v. Commonwealth, 163 S.W.3d 361, 372-373 (Ky. 2005)(adopting *Sawyer* standard to conclude that allegedly intellectually disabled petitioner entitled to review of his *Atkins* claim). See also Turpin v. Hill, 269 Ga. 302, 498 S.E.2d 52 (Ga. 2002)(intellectual disability claims not defaulted under Georgia miscarriage of justice exception).

So it is with James Dellinger. He establishes that he is intellectually disabled. See pp. 5-17, *supra* & Exhibits 1, 1a, 2, 2a, and 3, *supra*. Consequently, he satisfies *Sawyer*'s "miscarriage of justice" exception to procedural default, and this Court must therefore review his claim on the merits and grant him habeas corpus relief.[6]

**iii) James Dellinger is entitled to an evidentiary hearing on his *Atkins* claim.**

Because James Dellinger is innocent of the death sentence, this Court must also conduct an evidentiary hearing on his claim. He is entitled to a hearing as a matter of law under 28 U.S.C. §2243. He is also entitled to a hearing because he is innocent of the death sentence and this Court

[6] He also establishes "cause and prejudice" given the ineffective assistance of post-conviction counsel in failing to fully litigate an *Atkins* claim. The Supreme Court is currently considering whether failures of post-conviction counsel (including the ineffectiveness of post-conviction counsel) provide "cause" for the procedural default of a constitutional claim. See Martinez v. Schriro, 623 F.3d 731 (9th Cir. 2010), *cert. granted sub nom. Martinez v. Ryan*, 563 U.S. ___ (2011)(U.S. No. 10-1001). Dellinger maintains that his post-conviction counsel was ineffective because counsel's performance was deficient and it has resulted in prejudice to Dellinger. See Strickland v. Washington, 466 U.S. 668 (1984). Following decisions in *Martinez*, this Court should grant James Dellinger a hearing at which he can establish the ineffectiveness of post-conviction counsel and thus "cause and prejudice" for any alleged procedural default.

has an Article III duty to enforce the Eighth Amendment under the circumstances. And 28 U.S.C. §2254(e)(2) cannot (and does not) in any way impede this Court's duty to hear this claim.

First, James Dellinger is entitled to a hearing on his claim under 28 U.S.C. §2243. 28 U.S.C. §2243 provides that in a habeas corpus proceeding, "*The court shall summarily hear and determine the facts*, and dispose of the matter as law and justice require" (emphasis supplied). This Court must therefore hear and determine the facts, and to do so, it must hold an evidentiary hearing. Indeed, as the Supreme Court has noted, the power of inquiry in habeas proceedings is plenary. Townsend v. Sain, 372 U.S. 293 (1963). Because §2243 restates the common law governing a federal court's habeas inquiry, this Court must apply §2243 to conduct a hearing at which it can hear and determine the facts of Dellinger's *Atkins* claim.

Second, a hearing is not prohibited by 28 U.S.C. §2254(e)(2),[7] because §2254(e)(2) does not abrogate this Court's duties to hear and determine the facts under §2243. Section 2243 was adopted in 1948, it embodies the long-standing common law rules requiring the court to inquire into the cause of an inmate's detention, and §2243 has never been repealed. Section 2254(e)(2) was not adopted until nearly fifty years later (in 1996), and even then, it does not explicitly

[7] 28 U.S.C. §2254(e)(2) purports to limit a petitioner's entitlement to an evidentiary hearing if he "fails to develop" his claim in state court. A petitioner "fails to develop" a claim when he fails to present evidence to a state court because of "a lack of diligence, or some greater fault, *attributable to the petitioner* or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000)(emphasis supplied). If there is fault attributable to the petitioner, 28 U.S.C. §2254(e)(2) provides that a petitioner may still be granted a hearing on his claim if:

(A) The claim relies on –

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §2254(e)(2).

repeal §2243. Section 2243 therefore remains in full force, requiring this Court to conduct a hearing to determine the facts.

Third, 28 U.S.C. §2254(e)(2) simply cannot prevent a hearing here, because it would be unconstitutional to apply the statute to allow James Dellinger to be executed despite his intellectual disability. The Eighth Amendment categorically prohibits the execution of the mentally retarded, and execution of a mentally retarded individual would constitute a miscarriage of justice. Section 2254(e)(2), therefore, cannot be interpreted or applied to allow such a miscarriage of justice. Because the Constitution prohibits the miscarriage of justice flowing from the execution of one who is mentally retarded and thus actually innocent of the death sentence, Article III of the Constitution, and the Eighth and Fourteenth Amendments themselves demand that the federal courts be able to fully consider such a claim and grant relief. The AEDPA is unconstitutional to the extent that it would otherwise allow the execution of some like Dellinger who is actually innocent of the death sentence. See In Re Davis, 557 U.S. ___, 130 S.Ct. 1 (2009)(Stevens, J., concurring)(argument that application of the AEDPA to allow execution of one who is actually innocent would be unconstitutional).

In other words, section 2254(e)(2) is not superior to the Eighth and Fourteenth Amendments which provide Dellinger a substantive right against execution. It is not superior to Article III of the Constitution, which requires this Court to declare "what the law is" and to enforce the constitutional prohibition against the execution of the mentally retarded. Thus, any limitations provided by 2254(e)(2) must give way if they would otherwise allow the execution of one who is mentally retarded and thus innocent of the death penalty. In 2254(e)(2), Congress simply cannot undermine this Court's Article III power to inquire into the cause of Dellinger's detention, declare the law, and thereby enforce the Eighth and Fourteenth Amendments as they

apply to James Dellinger. See Crater v. Galaza, 508 F.3d 1261 (9th Cir. 2007)(Reinhardt, J., dissenting from denial of rehearing en banc). Section 2254(e)(2) would be unconstitutional if, by its terms, it would thwart this Court from granting habeas relief on Dellinger's meritorious *Atkins* claim. See also Liebman, "Some Effectual Power": The Quantity And Quality Of Decisionmaking Required Of Article III Courts, 98 Colum.L.Rev. 696 (1998)(AEDPA as interfering with the "judicial power" of the United States exercised by Article III courts).

In addition, were it interpreted so as to prohibit relief for James Dellinger despite his intellectual disability, Section 2254(e)(2) would effectively suspend the "privilege of the Writ of Habeas Corpus," in violation of Article I §9 of the Constitution. James Dellinger is entitled to a writ prohibiting his execution because he is mentally retarded. Any interference with that right -- despite Dellinger's entitlement to the writ -- would suspend the writ in violation of Art. I §9.

Fourth, even under 2254(e)(2), James Dellinger did not "fail to develop" his claim in state court. As he has shown, he is mentally retarded, and thus, under *Williams v. Taylor,* any failure to develop the facts is not "attributable to the petitioner." Williams v. Taylor, 529 U.S. 420 (2000). James Dellinger cannot personally be faulted for not raising or developing the claim in state court. It would be ironic indeed if a mentally retarded person could be executed because, as a result of his intellectual disability, he was unable to personally raise his intellectual disability claim in state court. Nor are the failures of post-conviction counsel attributable to James Dellinger. His direct appeal concluded before the United States Supreme Court decided *Atkins*, and thus his first opportunity to raise his *Atkins* claim was in post-conviction proceedings. Consequently, he was entitled to the effective assistance of post-conviction counsel to raise the claim. See Martinez v. Schriro, 623 F.3d 731 (9th Cir. 2010), *cert. granted sub nom. Martinez v. Ryan*, 563 U.S. ___ (2011)(U.S. No. 10-1001). This is especially true, where post-conviction

counsel had an ethical duty to provide James Dellinger competent representation (Tenn.S.Ct.R. 8, RPC 1.1) and to protect his interests, given his mental limitations. See Tenn.S.Ct.R. 8, RPC 1.14. Having been denied such effective assistance and the fully ethical representation he is entitled under the law, James Dellinger did not "fail to develop" his *Atkins* claim in state court.[8]

Fifth, Dellinger satisfies section 2254(e)(2). Under §2254(e)(2)(A)(ii), because James Dellinger is mentally retarded, he could not have discovered and presented the evidence through his own diligence. Again, post-conviction counsel's failures are simply not attributable to him -- either ethically or legally. See Martinez, *supra*. And because his proof establishes that no reasonable juror would have sentenced him to death given proof of his intellectual disability, Dellinger likewise satisfies 28 U.S.C. §2254(e)(2)(B). To be sure, by its terms, section (e)(2)(B) requires proof that no reasonable fact-finder would have found him guilty of the "underlying offense," but that standard necessarily subsumes *Sawyer*'s "innocence of the death penalty" standard as well. Thompson v. Calderon, 151 F.3d 918, 923 (9th Cir. 1998)(en banc)(interpreting identical language of 28 U.S.C. §2244(b)(2)(B)(ii)).[9]

At bottom, a hearing is mandated because: The Eighth Amendment under *Atkins* categorically prohibits James Dellinger's execution; this Court has an Article III duty to declare what the law is and enforce *Atkins*; this Court cannot allow the execution of a person who is actually innocent of the death penalty; 28 U.S.C. §2243 is fully applicable here and requires this Court to determine the facts at a hearing; and any application of 2254(e)(2) which would prevent

---

[8] Because no court has yet to consider the effectiveness of post-conviction counsel, an evidentiary hearing on the failure to raise the *Atkins* claim would also be appropriate.

[9] Any failure to develop the claim would also be forgiven under 28 U.S.C. §2254(e)(2)(A)(i). The Supreme Court has yet to explicitly hold *Atkins* to be retroactive. As the Supreme Court has held: "[A] new rule is not 'made retroactive to cases on collateral review' unless the Supreme Court holds it to be retroactive." Tyler v. Cain, 533 U.S. 656, 663 (2001)(considering identical language governing filing of successive habeas petitions). Thus, once the Supreme Court actually makes *Atkins* retroactive, it will be a "new rule" "made retroactive" which will then become a claim "available" for a hearing under Section (e)(2)(A)(i).

this Court from hearing the facts and preventing a miscarriage of justice would violate Article III, Article I §9, and the Eighth and Fourteenth Amendments.

### 3. Resolution Of This Issue Not Ripe For Adjudication By This Court; Petitioner Must Be Allowed To Return To State Court To Exhaust This Meritorious Claim. Resolution Of The Claim In State Court Will Obviate Any Need For Federal Litigation.

As a matter of federalism, it is for the state courts to determine whether a petitioner has an available remedy under state law. Thus, it is appropriate for the federal court to stay its hand and allow the petitioner to initially seek relief in the state courts if it is unclear whether a state court remedy is, in fact, available. If "it is unclear whether such remedies are available," the proper course is to have the petitioner "approach the state courts" first. Ryan v. Hopkins, 1996 U.S.Dist.Lexis 14165 *72 (D.Neb., Jul 31, 1996). That is especially true when the petitioner, like James Dellinger, is raising an *Atkins* claim, and the availability of state court remedy is uncertain or remains "untested." Rodriguez v. Cockrell, 2003 U.S.Dist.Lexis 6408 *27-28 (W.D.Tex., Mar. 31 2003) (where petitioner raised *Atkins* claim and "an avenue for obtaining state review of [the claim] remain[ed] untested," the District Court ordered petitioner to initially present claim to state courts). See also Snethen v. Nix, 736 F.2d 1241, 1245 (8th Cir. 1984) ("Principles of comity require the federal court to refrain from predicting a state court's probable determination on the merits of a claim in order to avoid the exhaustion requirement.")

Accordingly, as here, when a state court could conclude that a federal habeas petitioner may have an available state court remedy and/or be entitled to relief, a United States District Court properly orders a stay and abeyance of federal proceedings, pending the state courts' resolution of the petitioner's claim. See e.g., Gonzalez v. Wong, 2011 U.S.App.Lexis 24191 (9th Cir, Dec. 7,. 2011) (ordering stay and abeyance to allow petitioner opportunity to present

*Brady* claim to state courts); Howard v. Norris, 616 F.3d 799, 801 (8th Cir. 2010) (district court ordered stay and abeyance of federal habeas proceedings where the district court "Determined there was a plausible argument that post-conviction proceedings remained available for Howard's unexhausted claims."); Terry v. Cartledge, 2011 U.S.Dist.Lexis 113868 *12 (D.S.C., Sept 30 2011) (staying habeas proceeding where petitioner had unexhausted claim and respondent suggested that remedies "may be available before the state court.").

In sum, it is apparent that the Tennessee Supreme Court takes the prohibition against the mentally retarded very seriously. It should. Given the substantial evidence of Mr. Dellinger's developmental disability, and the extraordinary circumstances giving rise to the failure to present a core claim to the state courts, the Tennessee court should decide in the first instance whether there is remedy; whether if not generally, whether there is one in this case; and in either event, what the remedy shall be. Principles of federalism embodied in AEDPA suggest no other course.

## V. MR. DELLINGER IS ACTUAL INNOCENT, AND THUS HIS CONVICTION AND DEATH SENTENCE VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS. (Petition ¶ 3.2 )

James Dellinger is factually innocent of the crime for which he is condemned. That is to say, James Dellinger neither killed Tommy Griffin nor was in any way criminally responsible for the murder of Tommy Griffin. Dellinger has thus stated meritorious due process claims for relief. Respondent's motion for summary judgment must be denied. This Court should deny the motion under Fed.R.Civ.P. 56(d)(2), because this Court has not yet provided Petitioner the discovery he requires to prepare and fully present this claim. Rather, this Court should deny summary judgment, grant discovery as Petitioner previously requested, and afterwards conduct further proceedings on this claim. Alternatively, this Court should simply deny Respondent's motion

for summary judgment and conduct further proceedings, as James Dellinger has presented potentially meritorious claims for relief.

Respondent contends that James Dellinger has failed to state a claim upon which relief may be granted. Respondent's reliance on *Herrera v. Collins* is misplaced. Herrrera v. Collins, 506 U.S. 390 (1993). To be sure, Herrera does hold, as Respondent has pled, that in most cases there is no "freestanding claim of actual innocence" cognizable in habeas corpus. However, the majority of the Court noted the possibility that where a "truly persuasive demonstration of 'actual innocence'" is made, execution of such a defendant would be unconstitutional and would warrant federal habeas relief – "if there were no state avenue open to process such a claim." Id. at 417. Petitioner's claim is thus cognizable, though not yet ripe for disposition.

Once Petitioner has received discovery and has exhausted all state procedures (corum nobis, clemency) it may fall to this Honorable Court to determine the constitutionality of this claim. As for Respondent's further Answer that Petitioner has defaulted this claim, Petitioner's clear Response must be that Respondent is manifestly wrong.

Without regard for the subsequent determination of the Tennessee Supreme Court, Respondent argues that the Court of Criminal Appeals determined that Petitioner's "freestanding claim of innocence does not fall within the confines of the [Post-Conviction Procedure] Act." D.E. 34, Response, p. 36 (quoting Dellinger v. State, 2007 Tenn. Crim. App. LEXIS 682, *61-64 (Tenn. Crim. App. Aug. 28, 2007). Regardless of the intermediate court's thoughts on the subject, the Tennessee Supreme Court expressly found – in this very case – that a freestanding claim of actual innocence does, in fact, exist pursuant to the Tennessee Post-Conviction Procedure Act. Dellinger v. State, 2009 WL 161284 (Tenn. 2009).

While deciding that a "freestanding claim of actual innocence based on new scientific evidence" is provided for in the Post-Conviction Procedures Act, the Tennessee Supreme Court ducked the larger issue of whether a freestanding claim without new scientific evidence is required under the state or federal constitution. Dellinger, 2009 WL 161284 (Tenn. 2009) at *6. The Court assumed, without deciding, that such a freestanding claim is required and proceeded to analyze Mr. Dellinger's new scientific evidence of his innocence under the state standard which requires proof of the allegations of fact by clear and convincing evidence.

That Mr. Dellinger raised his actual, factual innocence in state court and that such a claim was reviewed by the state court is clear. Further it is beyond clear that Mr. Dellinger raised the claim pursuant to both the state and federal constitutions --- and that, despite his insistence that such a claim be reviewed under the state and federal constitutions, the Tennessee Supreme Court expressly refused to determine the constitutional implications of the claim. Mr. Dellinger has not defaulted the claim.

Accordingly, where Mr. Dellinger has stated a claim upon which relief may be granted (though not now) and to which the State has not factually disputed, but where Mr. Dellinger cannot yet establish his entitlement to relief because of the Motion for Discovery which remains pending in the District Court, Respondent's motion for summary judgment must be denied. This Court should grant discovery on this claim as Petitioner has moved (see D.E. 46, Motion for Discovery; D.E. 50, Objection to Magistrate's Denial of Discovery) and order further proceedings.

## VI. THE DEATH SENTENCE IN THIS CASE VIOLATES THE DUE PROCESS CLAUSE AND THE PROHIBITION AGAINST EX POST FACTO APPLICATION OF LAW BECAUSE AT THE TIME THE VICTIM WAS

**KILLED THERE WERE NO CIRCUMSTANCES MAKING PETITIONER DEATH ELIGIBLE. (Petition ¶ 3.4 )**

At approximately 11:55 p.m. on February 21, 1992, Tommy Griffin was murdered in Blount County, Tennessee. At most, it was a first-degree murder. There were no facts at the time of the murder, and there are no facts now, that would have supported the initiation of a capital murder prosecution or the imposition of a sentence of death. The Blount County District Attorney Mike Flynn knew this.

> Blount County District Attorney General Mike Flynn said Wednesday he will not seek the death penalty against Gary Wayne Sutton, 28, of Kodak and his uncle, James A. Dellinger, 41, or Seymour in connection with the February slaying of Tommy Griffin, 24. Griffin was shot in the back of a head with a shotgun. Unfortunately, we don't have any of the enhancing factors that apply.' Blount Count District Attorney General Mike Flynn said. 'Al [Sevier County District Attorney General Al Schmutzer Jr] and I are just going to have to work together and try to get the same results in Sevier County."

Exhibit 21, *Blount can't seek execution for brother's death,* THE MOUNTAIN PRESS.[1]

The State of Tennessee's initiation of a capital murder prosecution and the imposition of a sentence of death pursuant to Tennessee capital murder statute violate the express constitutional prohibition against retrospective criminal laws. The after-the-fact application of Tennessee's capital murder statutes to the events of February 21, 1992, unconstitutionally (1) aggravated the crime and (2) inflicted a greater punishment in violation of the ex post facto guarantee. See Calder v. Bull, 3 U.S.(3 Dall.) 386, 389 (1798). The application of Tennessee's capital murder law to impose a death sentence, when the circumstances of February 21, 1992

---

[1] This Court can take judicial notice of the Sevier County state court record filed manually as D.E. 19 in Sutton v. Bell, No. 3:07-cv-00030 (E.D. Tenn., Knoxville) . Fed.R.Civ.P. 201. E.g., In re Korean Airlines, Ltd., 642 F.3d 685, 689 n.1 (9th Cir. 2011 ) (a court can take judicial notice of its own records in other cases).

supported at most a life sentence, was plainly unconstitutional, as Chief Justice Marshall explained in Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 138 (1810).

Mr. Dellinger's Amended Petition sets out the foregoing, including his claim that these facts render him innocent of the death penalty. (D.E. 26, at 9, 17-18 ¶¶3.2.3 and 3.4 (11/30/09 Amended Petition)). Subsection A, below, demonstrates that Mr. Dellinger's claim is meritorious. Respondent does not address the merits, but asserts that the State is entitled to summary judgment, because Mr. Dellinger has procedurally defaulted the ex post facto claim. (D.E. 34, at 35, 60 ¶¶ 3.2.3 and 3.4. 5/12/10 Answer To Amended Petition). It is true that the Tennessee Supreme Court did not address the ex post facto issue on direct appeal. Respondent errs, however, in suggesting that (1) the ex post facto issue was not fairly presented; (2) the issue can be defaulted or forfeited, even assuming it was not fairly presented; and/or (3) the unconstitutional application of Tennessee's capital murder statute would not result in Mr. Dellinger being actually innocent of the death penalty.

Respondent's motion for summary judgment must be denied. Mr. Dellinger, as the non-moving party, is entitled to summary judgment on his ex post facto claim and, as such, his sentence of death must be set aside.

*A. The Ex Post Facto Clause Bars The Retrospective Application Of Tennessee's Death Penalty Statue To A Murder That Was Not A Capital Offense When It Was Committed.*

1. The History And Purpose Of The Ex Post Facto Clauses Underscore Their Key Constitutional Role In Protecting The Liberty of Citizens.

The importance of the Ex Post Facto Clauses cannot be viewed apart from the structure of our government, which is set out in the body of the Constitution. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610 (1952) (Frankfurter, J, concurring). This framework

establishes two sovereigns - federal and state – operating together and in tension -- in ways that the founders anticipated would protect the life and liberty of citizens from governmental overreaching and tyranny. See, e.g., Wyeth v. Levine, 555 U.S. 555 (2009) (Breyer, J., concurring) (in appeal from state court judgment against drug manufacturer for failure to warn court held that the action was not preempted by federal law enforced by the Food and Drug Administration respecting warning labels:"In order 'to ensure the protection of our fundamental liberties' . . . the 'Constitution establishes a system of dual sovereignty between the States and the Federal Government,'" quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242 (1985); and Gregory v. Ashcroft, 501 U.S. 452, 457 (1991)).

Thus, while the Constitution, the laws, and the United States government itself were to be supreme, again in tension with this ultimate responsibility, the authority of the federal government was limited to powers expressly delegated to it, as well as by express reservations of other powers. See United States v. Cruikshank, 92 U.S. (2 Otto) 542, 551 (1875) (Waite, C.J.) ("The government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution'); see also United States v. Lopez, 514 U.S. 549, 592 (1995) (Thomas, J., concurring) ("The comments of Hamilton and others . . . reflected the well-known truth that the new Government would have only the limited enumerated powers found in the Constitutions") (citations omitted); Gonzales v. Raich, 545 U.S. 1, 57 (2005) (O'Connor and Thomas, JJ, and Rehnquist, C.J., dissenting) (powers delegated to United States few and defined); id. 545 U.S. at 71 (Thomas, J., dissenting) ("'[t]he Constitution created a Federal Government of limited powers.'" (quoting New York v. United States, 505 U.S. 144, 155 (1992) (quoting Gregory v. Ashcroft, 501 U.S. 144, 155 (1991))); United States v. Brown, 381 U.S. 437 (1965) ("By a limited constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex post facto laws, and the like. . . . Without this, all the reservations of particular rights or privileges would amount to nothing," quoting THE FEDERALIST NO. 78 (Alexander Hamilton)).

In contrast, while the states were in a sense inferior sovereigns, all powers not expressly delegated to the United States and those not expressly withheld from the states were reserved to states and to the people. U.S. Const. Amdt. 10; see, e.g., Wyeth v. Levine, 555 U.S. at 584-85 (Breyer, J., concurring) (citing Alden v. Maine, 527 U.S. 706, 713 (1999));United States v. Lopez, 514 U.S. at 576 (Kennedy and O'Connor, JJ, concurring) (the Framers believed that the notion of dual sovereigns gave rise to a "double security" to the individual rights of citizens

because "[t]he different governments will control each other, at the same time that each will be controlled by itself, quoting THE FEDERALIST No. 51, p. 323 (J. Madison) and citing, inter alia, Gregory v. Ashcroft, 501 U.S. 452, 458-59 (1991) ("a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front....In the tension between federal and state power lies the promise of liberty").

As Justice Harlan stated in *Grafton v. United States*, 206 U.S. 333, 354 (1907):

> The government of the United States has no power, except as expressly or by necessary implication has been granted to it, while the several states may exert such powers as are not inconsistent with the Constitution of the United States nor with a republican form of government, and which have not been surrendered by them to the general government.

As further protection from governmental tyranny, the Framers set out in the Bill of Rights the indefeasible incidents of citizenship. Notably, the prohibition against retrospective laws is not in the Bill of Rights, but the body of the Constitution itself. It is stated not once, but twice, as an express limitation on the power of each sovereign. See Weaver v. Graham, 450 U.S. 24, 29 n. 8 (1981) (Marshall, J.) ("So much importance did the [Constitutional C]onvention attach to [the ex post facto prohibition], that it is found twice in the Constitution," quoting Kring v. Missouri, 107 U.S (17 Ott. 221, 227 (1883)) overruled on other grounds in Collins v. Youngblood, 497 U.S. 37 (1990) (limiting application of Ex Post Facto Clause to procedural rules that directly affect the substance of the offense or the punishment)).

Article I, section 9 of the Constitution – cataloguing limitations on the power of Congress – provides in clause 3 of section 9 that: "No . . . ex post facto Law shall be passed." Article I, section 10 – containing limitations on states' powers – provides in clause 1 that, "No State shall . . . pass any . . . ex post facto Law . . . ."

The prohibition is unambiguous: neither the federal government nor the states have the power to enact *ex post facto* laws. As Justice Baldwin explain in his concurring opinion in *Brisco v. President and Directors, Bank of Cmmwlth. of Kentucky*, 36 U.S. (11 Pet.) 257, 1837 WL 3545, at *80 (1837):

> . . . *[E]x post facto* laws . . . were not subjects of any delegated powers to congress; but as they were opposed to the whole spirit of the people, and the constitution, it annulled all power, state and federal to do these things; and the prohibition is, in its nature and object, absolute and illimitable.

See also Bond v. United States, 131 S.Ct. 2355, 2367 (2011) (Ginsburg and Bryer, JJ., concurring) (noting that "[a]n offence increased [by a retrospective law violating ex post facto], . . . is not a crime," quoting Ex parte Siebold, 100 U.S. 371, 376 (1880)).

The inclusion of the ex post facto prohibitions in the body of the Constitution is of signal importance. The prohibition against retrospective criminal laws is one of the most "widely held value-judgment[s] in the entire history of human thought." Rogers v. Tennessee, 532 U.S.451, 467 (2001) (Scalia, Stevens and Thomas, JJ., dissenting); Carmell v. Texas, Carmell v. Texas, 529 U.S. 513, 532 (2000) (Stevens, J.) (ex post facto laws "are oppressive, unjust, and tyrannical; and, as such, are condemned by the universal sentence of civilized man," quoting Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 266, 6 L.Ed.606 (1827)); Kaiser Aluminum & Chem. Corp. v. Bojorno, 494 U.S. 827, 855 (1990) (Scalia, J., concurring) ("The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has *timeless and universal human appeal*) (emphasis added); United States v. Davis, 397 F.3d 340, 348 (6th Cir. 2005) (reversing sentence applying wrong guidelines under ex post facto guarantee: "The *ex post facto* clause announces a fundamental constitutional absolute"); see generally, W. Logan, "The Ex Post Facto Clause And The Jurisprudence of Punishment," 35

AM.CRIM.L.REV. 1261, 1275-76 (1998) (*Logan*) (Alexander Hamilton considered the ex post facto prohibition among the three "greate[st] securities to liberty and republicanism [the Constitution] contains.," quoting THE FEDERALIST No. 84)); id. *Logan*, 35 AM.CRIM.L.REV. at 1316 (James Madison believed that the Ex Post Facto clauses were a fundamental "constitutional bulwark in favor of personal security and private rights," quoting THE FEDERALIST NO. 44).

The Framers' view was based on a a principle thousands of years old, beginning in ancient Greek law and continuing through Roman law, the English common law and the Code Napoleon. See generally E. Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence*, 20 MINN. L. REV.775, 775-76 and nn. 1-4 (1936) *(Smead)*; *Logan*, 35 AM.CRIM.L.REV.at 1275-76; R. Natelson, *Statutory Retroactivity: The Founders' View*, 39 IDAHO L. REV. 489, 499-502 (2003) (*Natelson*). In effect, if not in fact, for the founders the ex post facto prohibition constituted a simple declaration of an innate understanding. It reflected the ancient Roman maxim that, "[t]he penalty for a past wrong is never increased ex post facto." *Natelson*, 39 IDAHO L. REV. at 500.

At the time of the constitutional convention prominent delegates thought the prohibition against ex post facto criminal laws to be such a bedrock principle that it need not be included in the Constitution at all. As Delegate {Judge] Oliver Ellworth asserted, "there was no lawyer, no civilian who would not say that ex post facto laws were void of themselves. It cannot then be necessary to prohibit them." *Natelson*, 39 IDAHO L. REV. at 514 and nn. 134-35. Others, including Delegate James Wilson, thought that including an ex post fact declaration in the Constitution would make the delegates appear simple-minded: "It will bring reflexions [sic] on the Constitution-and proclaim that we are ignorant of the first principles of Legislation, or are constituting a Government which will be so." Id, 39 IDAHO L. REV. at 514.

As the Constitution reflects, the majority of delegates thought otherwise. A scholar reviewing writings and the records prepared around the time of the constitutional convention has concluded that it was fairly certain that: (1) most speakers and writers showed a great aversion to retroactive lawmaking; and (2) anti-retroactivity was central to the constitutional bargain. *Natelson*, 39 IDAHO L. REV. at 493. "The anti-retroactivity clauses applicable to the states in Article I, Section 10 were important provisions, to be strictly enforced" Id. 39 IDAHO L. REV. at 493.

The mechanisms for limiting governmental tyranny operated in different ways. The Constitution created a federal government with two sovereigns. It separated the judicial, legislative and executive functions, envisioning that each operate as a check on the others. It declared bedrock incidents of citizenship. It takes aim against various forms of governmental arbitrariness including, for example, the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Eighth Amendment's prohibition of cruel and inhuman treatment. E.g., Daniels v. Williams, 474 U.S. 327, 331-32 (1986) (Rehnquist, J.) (both substantive and procedural guarantees of due process are "intended to secure the individual from the arbitrary exercise of the powers of government") Furman v. Georgia, 408 U.S. 238, 309 (1972) (per curiam) (Stewart, J., concurring) (under the Eighth Amendment the imposition of the death penalty under Georgia's capital sentencing scheme is "cruel and unusual in the same way that being struck by lighting is cruel and unusual").

The Ex Post Facto Clauses play an important role in this structure because they prohibit a particularly pernicious form of arbitrariness – one that is, quite simply, "unjust."[2] Eastern

[2] As Justice Chase explained in Calder v. Bull, 3 U.S.(3 Dall.) 386, 389 (1798), the ex post facto prohibitions were "introduced for greater caution, and very probably arose from the knowledge, that the Parliament of Great Britain claimed and exercised a power to pass such laws, under the denomination of fills of attainder, or bills of pains and

Enterprises v. Apfel, 514 U.S. at 538 (Thomas, J., concurring); see also Carmell v. Texas, 529 U.S. 513, 532 (2000) (ex post facto laws "are oppressive, unjust, and tyrannical; and, as such, are condemned by the universal sentence of civilized man," quoting Ogden v. Saunders, 25 U.S. (12 Wheat)) 213, 266 (1827)).[3]

The central problem with retrospective legislation is, of course, that it completely unsettles expectations and undermines understandings *without notice*. See Marks v. United States, 430 U.S. 188, 191-92 (1977) (Powell, J.) (Due Process Clause of Fifth Amendment precluded retroactive application of *Miller v. California* standards to defendants "[t]he principle of the Ex Post Facto Clause that persons have a right to fair warning that will give rise to criminal penalties is fundamental to our concept of constitutional liberty"); see also Landgraf v. USI Film Products, 511 U.S. 244, 266-67 (1994) (Thomas and Scalia, JJ., concurring in part and concurring in judgment) (Civil Rights Act of 1991 provisions creating right to compensatory and punitive damages did not apply to Title VII case pending on appeal when statute enacted: the Ex

---

penalties; the first inflicting capital, and the other less, punishment." Noting that the power was not infrequently exercised and when it was exercised it was on the ground that:

> [T]he safety of the kingdom depended on the death, or other punishment, of the offender: as if traitors, when discovered, could be so formidable, or the government so insecure! With very few exceptions, *the advocates of such laws were stimulated by ambition, or personal resentment, and vindictive malice*. To prevent such, and similar, acts of violence and injustice, I believe, the Federal and State Legislatures, were prohibited from passing any bill of attainder; or any ex post facto law.

(Emphasis added).

[3] Compare State Bank v. Cooper, 10 Tenn 599, 1831 WL 1032, at *2 (1831) (act creating special court to determine suits commenced by Bank of State of Tennessee is retrospective [art. I, §20] and violates other provisions of constitution), in which Justice Green explained:

> [C]ertain limits to the exercise of legislative power have been recognized from the earliest times. It is a principle of the English common law, as old as the law itself, that a statute, even of the omnipotent Parliament of Great Britain, is not to have a retrospective effect. . . . . It was so considered because there are eternal principles of justice which no government has a right to disregard.

Post Facto Clause ensure fair warning about criminal statutes); Miller v. Florida, 482 U.S. 423 (1987) (O'Connor, J.) (application of revised sentencing guidelines to crimes that occurred before effective date violated Ex Post Facto Clause: Ex Post Facto Clauses aimed a legislation giving fair warning of effect so that people may rely on meaning).

To the extent that retrospective laws effect change without notice they are also, *a fortiori*, completely *arbitrary* – substantively and procedurally.[4] See, e.g., Landgraf v. USI Film Products, 511 U.S.at 266-67 (Ex Post Facto Clauses ensure fair warning, thereby preventing arbitrary action, citing Weaver v. Graham, 450 U.S. 24, 28-29 (1981).

Finally, the arbitrariness of retrospective laws can, and often does, cloak vindictiveness. Thus, the Ex Post Facto Clause prohibits retrospective laws that are *vindictive*, that is laws aimed at imposing further punishment on disfavored persons or a despised class. See Stogner v. California, 539 U.S. 607, 611 (2003) (holding California law reviving prosecutions against sex offenders for crimes otherwise time barred violated the Double Jeopardy Clause, noting that the Clause protected against "potentially vindictive legislation"); Lynce v. Mathis, 519 U.S. 433, 443-45 and n.15 (1997) (holding statute that retroactively cancelled early release credits violated Ex Post facto Clause and noting that the purpose of the statute "was not actually benign, but rather it sought" to prevent the early release" of convicted murders); Landgraf v. USI Film Products, 511 U.S. at 266-27 and n. 20 (noting that Ex Post Facto Clause aimed not only at restraining arbitrary action without notice, but preventing *vindictive* laws aimed at changing the

---

4 At the cases make clear, the prohibition against retrospective laws is based on the lack of notice, arbitrariness, and vindictiveness. One commentator has suggested that there has been an important shift in emphasis in ex post facto analysis that focuses less on reliance and notice interests and more on the arbitrariness of such laws. See W. Logan, *"Democratic Despotism" And Constitutional Constraint: An Empirical Analysis Of Ex Post Facto Claims By State Courts*, 12 WM & MARY BILL OF RIGHTS J. 439, 440 (2004). There is some authority for this conclusion. See, e.g., Olatunji v. Ashcroft, 387 F.3d 383 (4th Cir. 2004)(reliance on prior law is not an element of an ex post facto claims, as the elements of Justice Story's recitation [in *Society for the Propagation of the Gospel v. Wheeler*] underscores).

rules with regard to specific persons or classes of persons, quoting James v. United States, 366 U.S. 213, 247 n. 3 (1961) (Harlan and Frankfurter, JJ., concurring)).

Importantly, the protection for the pernicious effects of retrospective legislation is not limited to, nor was it ever intended to be limited to model citizens. It extends to the disfavored, including persons who have committed past criminal acts. See, e.g., Miller v. Florida, 482 U.S. at 429-30 (protection from arbitrary and vindictive retrospective legislation extends to those convicted of crimes); Lynce v. Mathis, 519 U.S. at, 443-45 and n.15 (Ex Post Facto guarantee protects those convicted of murder); Landgraf v. USI Film Products, 511 U.S. at 283 n.35 ([e]ven where the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent whenever the law imposes additional burdens on conduct that occurred in the past"); Olatunji v. Ashcroft, 387 F.3d 383, 391 (4th Cir. 2004)( application of Illlegal Immigration Reform and Immigrant Responsibility Act to prohibit reentry of permanent resident alien convicted of a felony violated ex post facto clause: noting it is irrelevant for ex post facto purposes that the conduct at issue is morally reprehensible or illegal).

The Ex Post Facto Clauses protect core values embedded in our understanding of the relationship between the government and citizens. These same values animate the judicial inquiry addressed to whether a law is impermissibly retrospective.

### 2. The Ex Post Facto Clauses Prohibit The Retrospective Application Of Laws That Aggravate The Seriousness Of A Crime Or Impose Greater Punishment After The Offense Has Been Committed

Every law that "aggravates a crime or makes it greater than it was when committed" and "every law that changes the punishment, and inflicts a greater punishment than the law annexed to the crime, when committed" violates the ex post facto guarantee. Calder v. Bull, 3 U.S. at 390 (1798). As Chief Justice Marshall explained, "An *ex post facto* law is one which renders an act

*punishable in a manner in which it was not punishable when it was committed*." Fletcher v. Peck, 10 U.S. (6 Cranch) 87 (1810) (Emphasis added).

Justice Story (sitting as a Circuit Court judge) emphasized that determining whether a law violates the Ex Post Facto Clause is a practical exercise, not a technical one. It requires a court to focus on the substantive impact of the law, not its form, and to assess the effect of a retrospective law on "considerations already past." Society for the Propagation of the Gospel v. Wheeler, 22 F.Cas. 756, 767 (CC.D.N.H. 1814).[5]

The *substantive effect* of the law on past completed acts, then, is the focus of the ex post facto inquiry. Given this, subtle evasions are as impermissible as overt ones. See Stogner v. California, 539 U.S. at 616 (citing Collins v. Youngblood, 497 U.S. at 46 ("Subtle ex post faction violations are not more permissible") and Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 329 (1867) ("The provision of the Federal Constitution, intended to secure the liberty of the citizen, cannot be evaded by the form in which the power of the State is exerted. If this were not so, if that which cannot be accomplished by means looking directly to the end, can be accomplished by indirect means, the inhibition may be evaded at pleasure")); Beazell v. Ohio, 269 U.S. 167, 170 (1925) (ex post facto guarantee prohibits "laws, whatever their form, which

---

[5] In *Wheeler*, Justice Story identified the core inquiry in deciding whether a statute had a constitutionally impermissible retroactive effect based on the nature of the injury the ex post facto prohibition aimed at preventing:

> What is a retrospective law, within the true intent and meaning of this article? Is it confined to statutes, which are enacted to take effect from a time anterior to their passage? *Or does it embrace all statutes, which, though operating only from their passage, affect vested rights and past transactions? It would be a construction utterly subversive to all the objects of the provision, to adhere to the former definition. It would enable the legislature to accomplish that indirectly, which it could not do directly.* Upon principle, every statute, which . . . attaches a new disability, in respect to transaction or considerations already past, must be deemed retrospective; and this doctrine seems fully supported by authorities.

Id., 22 F.Cas. at 767. (Emphasis added).

"aggravate an offense . . . either by the legal definition of the offense or by the nature of amount of punishment imposed").

Of course, sentencing provisions are subject to the *ex post facto* and due process provisions of the Constitution, Miller v. Florida, 482 U.S. 423 (1987), Weaver, 450 U.S. at 28-29, and the Constitution "forbids the application of any new punitive measure to a crime already consummated." Lindsey v. Washington, 301 U.S. 397, 401 (1937). Thus, a sentencing provision may not be applied to a defendant if it did not apply at the time of an offense and it alters "one determinant of petitioner's [sentence, such that] his effective sentence is altered once this determinant is changed." Weaver, 450 U.S. at 32. If application of a sentencing law "substantially alters the consequences to a crime already completed, and therefore changes 'the quantum of punishment'" which the defendant receives, it is unconstitutional. Id., 450 U.S. at 33.

"[T]wo critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver v. Graham, 450 U.S. at 29 (change in state law that affected good time credits applied to a crime committed before its effective date violated ex post facto clause); see Kellogg v. Shoemaker, 46 F.3d 503, 509 (6th Cir. 1994) (retroactive parole regulations precluding presentation of mitigating evidence which was permitted at the time of the offense violated ex post facto because the provision was "retroactive in its application" and "disadvantaged the offender"), cert. denied 516 U.S. 839 and 516 U.S. 907 (1995); see also United States v. Lanham, 617 F.3d 873, 889 (6th Cir. 2010) ( retroactive (application of 2008 advisory Sentencing Guidelines with higher base offense level to crime that took place in 2003, when governed by the 2002 Guidelines would violate Ex Post Facto Clause)

In determining under *Calder* whether a law retrospectively aggravates a crime or increases punishment, the inquiry is based on the "time of the offense,." that is, when the offense "was committed." Calder v. Bull, 3 U.S. at 390; Fletcher v. Peck 10 U.S. at 138; Cummings v. Missouri, 71 U.S.at 325-26; In re Medley, 134 U.S. 160, 171 (1890); Weaver v. Graham, 450 U.S. at 28; Kaiser Aluminum & Chem Corp. v. Bojorno, 494 U.S. at 855 (Scalia, J., concurring); Lynce v. Mathis, 519 U.S. at 441; Rogers v. Tennessee 532 U.S. at 467 (Scalia, Steven and Thomas, JJ., dissenting).

Consistent with the above, when a defendant's sentence is at issue, the constitutional inquiry must focus on how the petitioner would have been sentenced at the time of the offense, compared to the manner in which he was sentenced when he was later tried. "The focus . . . is the time the offense was committed." Kellogg v. Shoemaker, 46 F.3d at 509; United States v. Jewett, 978 F.2d 248, 253 (6th Cir. 1992) (sentence must be based upon circumstances and law at time of offense; constitutional violation even though contested sentencing law "effective at the time of Jewett's guilty plea and sentencing"); United States v. Menon, 24 F.3d 550, 566 (3d Cir. 1994)(*ex post facto* violation where sentencing enhancement provision not applicable "at the time of Menon's *conduct*.") (emphasis in original); United States v. Morrow, 925 F.2d 779, 782 (4th Cir. 1991) (looking to sentencing provisions as they applied "at the time of the offense.").

The time of the offense is also the critical inquiry because the due process guarantee and the *ex post facto* prohibition are founded upon the principle that a defendant is charged with knowledge of statutes as they exist at the time of criminal conduct, and *only* as they existed at the time of that conduct. The prohibition against *ex post facto* laws was designed to "assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. at 28-29, 101 S.Ct. at 964; See Warner v.

Zent, 997 F.2d 116, 134 (6th Cir. 1993) ("Fundamental to our concept of constitutional liberty is the unwavering ideal that a person has the immutable right to fair warning of the conduct which will permit the imposition of criminal sanctions.") When a defendant is not on notice at the time of an offense of the measure of punishment attending to his actions, due process and the *ex post facto* prohibition preclude the application of such law.

*Calder*'s inquiry addressed to whether a retrospective statute "aggravates a crime" is self-explanatory and clear. This is particularly so here, with respect to the legal and factual difference between first-degree murder, on the one hand, and capital murder, on the other. At the time of Tommy Griffin's murder, first-degree premeditated murder was codified in Tenn.Code Ann. §39-13-202(a)(1) (Michie 1991, codifying1989 Tenn.Pub.Acts ch 591 §1, 1990 Tenn.Pub. Acts ch.1030, §15; 1991 Tenn.Pub.Acts ch. 377, §2). The only possible sentence was life. On the other hand, to initiate a capital prosecution there must be a showing that at the time of the offense there were facts establishing aggravating circumstances as then codified in Tenn.Code Ann. §39-13-204(i) (Michie 1991, codifying 1989 Tenn.Pub.Acts ch 591 §1, 1990 Tenn.Pub. Acts ch.1038, §3).

In the absence of facts establishing aggravating circumstances (and, necessarily, the presence of statutorily defined aggravating circumstances) a "[death] sentence [was] unavailable," only a sentence of life could be sought or imposed. See Ring v. Arizona, 536 U.S. 584, 599 (2002) (quoting with approval Justice Kennedy's dissent in Walton v. Arizona, 497 U.S. 639, 709 n.1 (1990)); id, 536 U.S. at 600-01 (quoting with approval the dissent of Justices Kennedy and O'Connor and Chief Justice Rehnquist in Jones v. United States, 526 U.S. 227, 271-72 (1999) that absent the finding in *Walton* "of at least one of the enumerated aggravating factors . . *the maximum **potential** punishment provided by law was a term of imprisonment*"))

(emphasis added); id 536 U.S. at 610 (Scalia and Thomas, JJ, concurring: "all facts essential to the imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Janes – must be found by the jury beyond a reasonable doubt[6], citing Justice Scalia's own dissent in Almendarez-Tores v. United States, 523 U.S. 224, 248 (1998)); compare Rogers v. Tennessee, 532 U.S. at 467 (Scalia, Stevens and Thomas, JJ., dissenting) ("The Court today approves the conviction of a man for murder that was not murder (but only manslaughter, *when the offense was committed*") (emphasis added).

As to the second *Calder* inquiry – whether a retrospective law "increases punishment" – the question is whether the challenged action makes the offense "punishable in a manner in which it was not punishable *when it was committed."* Fletcher v. Peck, 10 U.S. at 138 (emphasis added). In making this determination, it is of no constitutional significance that the harsher punishment or the possibility of increased punishment falls within a possible *range of punishment* authorized at the time the offense was committed (although for reasons described above a life sentence and a sentence of death are not in the same range of punishment by any principled measure). The Supreme Court and the lower courts have made clear that, even when a defendant is not subjected to a higher maximum punishment by the retroactive operation of law, there is still an *ex post facto* and due process violation if newly applicable sentencing procedures disadvantage the petitioner in the determination of his presumptive or ultimate sentence *vis-a-vis* application of the standards governing at the time of the offense.

[6] Given the ex post facto concern about notice, it is noteworthy that under the Fifth Amendment, in federal courts, an indictment "must set forth all the elements of a crime." Hamling v. United States, 418 U.S. 87, 117 (1974).

Thus, for example, in Miller v. Florida, 482 U.S. 423 (1987), the Supreme Court held that there was an *ex post facto* violation where the defendant was sentenced for the second-degree felony of sexual battery, under sentencing provisions which were different from those when he committed the offense. As a second-degree felony, sexual battery was punishable by a maximum of 15 years imprisonment. See Fla. Stat. Ann. 775.082(3)(c)(1984); Harris v. State, 483 So.2d 111 (Fla. App. 1986). Both at the time of the offense and at the time he was sentenced, therefore, Miller could have received up to 15 years imprisonment. However, the new law changed the rules for determining the appropriate sentence, and made his presumptive sentence 5.5 to 7 years, compared to 3.5 to 4.5 years under the law applicable at the time of the offense. Miller, 482 U.S. at 427. Miller was then sentenced to 7 years, a term well within the statutory range for a second-degree felony.

However, notwithstanding the fact that Miller was subject to a fifteen-year sentence both at the time of the offense and at the time of sentencing, the Supreme Court found that his constitutional rights were violated. The maximum available punishment was not the focus of their inquiry, but rather the *manner* in which Miller's sentence was ultimately calculated and determined, *vis-a-vis* the manner in which it would have been determined at the time of the offense.

The Supreme Court made clear that the *ex post facto* prohibition demands that the laws "give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Miller, 482 U.S. at 430. Here, however, Miller's rights were violated because he was not given notice of the new sentencing provisions at the time he committed his offense: "[T]he statute in effect at the time petitioner acted did not warn him that Florida prescribed a 5½- to 7-year presumptive sentence for that crime." Id. at 431. And importantly, compared to the law

existing at the time of the offense, the new guidelines "clearly disadvantage[d] the petitioner and similarly situated defendants." Id. at 431. The Supreme Court emphasized that even though Miller could have received the same sentence under the law at the time of the offense, this was not relevant: "Thus, even if the revised guidelines law did not 'technically increase the punishment annexed to petitioner's crime," it foreclosed his ability to challenge the imposition of a sentence longer than his presumptive sentence under the old law. Petitioner was therefore 'substantially disadvantaged' by the retrospective application of the revised guidelines to his crime." Id. at 433. The question was whether the petitioner was "disadvantaged" by the manner of calculating the sentence under the statute, not whether his sentence would have available at the time of the offense.

The Sixth Circuit recently reconfirmed that ex post facto problems arise even though a retroactive law only increases punishment within boundaries established by statute *and* even though the retroactive law relates only to the exercise of the sentencer's discretion. In *United States v. Lanham*, 617 F.3d at 889-90 (6th Cir. 2010), the government appealed the district court's decision that the application of the 2008 sentencing Guidelines to an offense which occurred in 2003 (and subject to the 2002 Guidelines) was barred by ex post facto principles. The Sixth Circuit affirmed, concluding that the recommendation of a more severe punishment was barred by the ex post facto guarantee, even though subsequent increases in the guideline rage remained *within boundaries established by statute* and even though the federal guidelines are advisory and *need not be followed*. Id. (citing Michael v. Ghee, 498 F.3d 372, 382 (6th Cir. 1993) (legal standards that affect the exercise of discretion are subject to ex post facto scrutiny)).

Each of the ex post facto principles described in this section – with respect to relevant facts, mixed findings of fact and law, and legal conclusions – presents a federal question to be

determined by this Court. See Lindsey v. Washington, 301 U.S. at 400. The application of these principles to the facts of Mr. Dellinger's case compels the conclusion that his sentence of death violates the ex post facto guarantee. To the extent that these retrospective actions were completely arbitrary, they also violated the substantive and procedural protections of the Due Process Clause of the Fourteenth Amendment and the Eighth and Fourteen Amendments.

### 3. The Retrospective Imposition Of The Death Penalty For A First-Degree Murder That Was Not A Capital Offense At The Time It Was Committed Violates Ex Post Facto And Due Process Principles

Sometime around11:55 p.m on the evening of February 21, 1992, Tommy Griffin was murdered in Blount County Tennessee. (See State v. Dellinger, 79 S.W.3d at 462-64). At the time of the offense (as a matter of fact, as a mixed question of fact and law, and as a matter of law), James Dellinger was only subject to a first-degree murder prosecution and liable, if convicted, to be sentenced to life in prison. (DE 24 (Addendum _, Vol. 1 Technical Record at 2 (4/5/92 Indictment)). It was *not* a capital murder offense. And, given this, the Blount County District Attorney General did not initiate a capital murder prosecution.

.

> Blount County District Attorney General Mike Flynn said Wednesday he will not seek the death penalty against Gary Wayne Sutton, 28, of Kodak and his uncle, James A. Dellinger, 41, or Seymour in connection with the February slaying of Tommy Griffin, 24. Griffin was shot in the back of a head with a shotgun.
>
> Unfortunately, we don't have any of the enhancing factors that apply.' Blount Count District Attorney General Mike Flynn said. 'Al (Sevier County District Attorney General Al Schmutzer Jr) and I are just going to have to work together and try to get the same results in Sevier County."

(Sevier County Technical Record Vol. _ at 297 (6/18/92 article: *Blount can't seek execution for brother's death,* THE MOUNTAIN PRESS), Attached as Exhibit 21.

Despite the above acknowledgment and the indisputable fact that at the time of the February 21, 1992 first-degree murder of Tommy Griffin was not a capital crime, on March 29, 1993, Blount County District Attorney Mike Flynn initiated a capital murder prosecution against Mr. Dellinger for the murder of Tommy Griffin by filing a Notice Of Intent To Seek Death Penalty. D.E. 24 (Addendum _ Vol. 1 Technical Record at 17) (Notice Of Intent to Seek Death Penalty). The Notice informing that the State would seek the death penalty did not set out any facts or aggravating circumstance that existed at the time of the February 21, 1992 first-degree murder of Tommy Griffin. There were none.

The guilt-innocence phase of the trial commenced August 19, 1996. At the conclusion of the guilt phase, the jury returned a verdict finding Mr. Dellinger guilty of the first-degree murder of Tommy Griffin. D.E. 24 (Addendum _ Technical Record Vol. 2, at 259, 306) (verdict forms). During the sentencing phase of the capital prosecution, the Blount County District Attorney did not introduce any facts in support of an aggravating circumstance warranting the death penalty that existed at the time of the February 21, 1992 offense. During the sentencing phase of the capital prosecution, the state did not rely on any aggravating circumstance that existed at the time of the February 21, 1992 offense.

At the conclusion of the sentencing phase, the jury sentenced Mr. Dellinger to death because he had been convicted of the murder of Connie Branam. D.E. 24 (Addendum _ Technical Record Vol. __, at __ (jury verdict forms and judgments). Neither Connie Branam's murder, which occurred days after February 21, 1992, nor Mr. Dellinger's conviction for her murder were facts or circumstances that existed at 11:55 p.m. on February 21, 1992, the time of the murder of Tommy Griffin.

- Here, as prohibited by *Calder Fletcher*. and *Beazell*, the application of the capital sentencing statute to James Dellinger and the initiation of a capital murder prosecution, aggravated the crime of first-degree murder, which was the most serious offense committed on February 21, 1992. Compare See Ring v. Arizona, 536 U.S. 599 (in the absence of statutory aggravating circumstances a death sentence is unavailable)); id, 536 U.S. at 600-01 (absent the presence "of at least one of the enumerated aggravating factors . . *the maximum **potential** punishment provided by law was a term of imprisonment*")) (emphasis added); id 536. U.S. at 610 (Scalia and Thomas, JJ, concurring: "all facts essential to the imposition" of a death penalty must be introduced and established beyond a reasonable doubt); Rogers v. Tennessee, 532 U.S. at 467 (Scalia, Stevens and Thomas, JJ., dissenting) ("The Court today approves the conviction of a man for murder that was not murder (but only manslaughter, *when the offense was committed*") (emphasis added).

- Here, as prohibited by *Calder, Fletcher, Beazell, Cummings, Medley, Weaver, Kaiser,* and *Lynce*, the initiation of a capital prosecution for the events of February 21, 1992 was retrospective in that it aggravated the most serious and only offense that occurred on that date.

- Here, as prohibited by *Calder, Fletcher, Wheeler, Beazell, Cummings, Miller,* and *Lindsey*, seeking and obtaining a sentence of death for the events of February 21, 1992, impermissibly and retrospectively increased the punishment for the offense (from life to death) under the law as it existed at the time of the offense.

- Here, as *Miller* makes clear, Mr. Dellinger was entitled to rely on the law as it existed on February 21, 1992. And as such, here, as prohibited by *Calder, Fletcher, Wheeler, Beazell, Cummings* and as emphasized in *Marks, Landsbraf,* and *Miller,* the retrospective initiation of a capital prosecution and the imposition of a sentence of death occurred without notice and was by virtue of this circumstance completely arbitrary – substantively and procedurally.

- Here, as *Miller, Lynce, Landgraf,* and *Olatunji* make clear, the fact that the first degree murder of Tommy Griffin on February 21, 1992 was reprehensible – did not disqualify Mr. Dellinger from the protection accorded by the Ex Post Facto Clause.

- Here, as prohibited by *Stogner*, *Lynce*, *Landgraff* and *James*, the invocation of the capital murder statute to initiate a capital prosecution and impose a sentence of death for the events of February 21, 1992, was vindictive, being animated by a legislative prejudice against convicted murderers as well as contempt for the protections of ex post factors.

- Here, as noted by Justice Chase in *Calder* ("With very few exceptions, the advocates of such law were stimulated by ambition, or personal resentment, and vindictive malice) and in Section VII, infra, and as declared by Blount County District Attorney Mike Flynn himself (while not a capital murder case he would work with the Sevier County District Attorney to obtain a death sentence in the adjacent county), a constitutionally deficient capital murder statute was manipulated by two prosecutors working together on behalf of the State without regard to Mr. Dellinger's constitutional rights. U.S. Const., art. I, § 10 "*No State* shall . . . pass any . . . ex post facto Law . . . ." (Emphasis added); compare State v. Superior Oil, Inc., 875 S.W.2d 658, 660 (Tenn. 1994) (discretion of prosecutor is virtually limitless, with the exception of "certain constitutional constraints").

### *B. Mr. Dellinger's Did Not Default his Ex Post Facto Claim, Which Cannot Be Barred By AEDPA*

Respondent asserts that he is entitled to summary judgment on Mr. Dellinger's claim that the Blount County death sentence must be set aside because it violates the Ex Post Facto Clause, rendering Mr. Dellliger actually innocent of the death penalty (D.E. 26, at 9, 17-18 ¶¶3.2.3 and 3.4 (11/30/09 Amended Petition)), because Mr. Dellinger has defaulted his claims. D.E. 34, at 35, 60 ¶¶ 3.2.3 and 3.4. While it is true that the Tennessee Supreme Court did not address the ex post facto issue on direct appeal, it is not accurate to say that Mr. Dellinger did not fairly present it. For this reason, and the other reasons outlined below, Respondent errs in claiming that he is entitled to summary judgment on this issue. Respondent's motions should be denied.

1. Petitioner Fairly Present His Ex Post Facto Claim To The Tennessee Supreme Court

There are two reasons Mr. Dellinger has not defaulted his double jeopardy claim under AEDPA.

First, a federal habeas court must consider claims presented to it that the petitioner presented on direct appeal or during an appeal of the denial of post-conviction relief. See Tuggle v. Seabold, 806 F.2d 87, 91 (6th Cir. 1986). To present fairly the constitutional nature of a claim to a state court, a petitioner need not cite chapter and verse of the federal constitutional provision on which he relies. Rather, a petitioner can fairly present the nature of a federal constitutional claim by (1) relying on federal cases interpreting the federal constitutional provision involved; (2) relying on State cases interpreting the federal constitutional provision involved; (3) asserting a claim in terms that call to mind the specific right guaranteed by the federal Constitution; or (4) alleging a factual pattern within the mainstream of federal constitutional litigation. See Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005); Franklin v. Rose, 811 F.2d 322, 326 (6th Cir. 1987). While a ruling on a claim by a state court provides evidence that the petitioner raised the claim to that court, a ruling on a presented claim is not required to make the claim available for federal review. See Dye v. Hofbauer, 546 U.S. 1, 3 (2005).

Pre-trial Mr. Dellinger's counsel challenged the fact that the capital prosecution based on the facts of the February 21, 1992 murder was fundamentally unfair because at the time of the offense, there were no facts to support a capital murder prosecution or a sentence of death. D.E. 24 Addendum _ (Vol.1 Technical Record at 70 - 4/27/93 Motion To Strike the Death Penalty (asserting that the murder of Connie Branam occurred *after* 2/21/92 and the conviction for her murder occurred long after that date). Indeed, Mr. Dellinger's counsel, did everything they could to challenge the complete arbitrariness of prosecuting Mr. Dellinger for capital murder based on

subsequent events that did not exist at the time of the offense, and the unfairness of using the first-degree murder conviction of Connie Branam to obtain a death sentence when on February 21, 1992, as further described in Section VII.B.1., infra.

In their initial brief in the Tennessee Supreme Court, filed May 3, 2001, Mr. Dellinger's counsel continued their assault on the arbitrariness and fundamental unfairness of using Connie Branam's death to support a capital murder prosecution or a sentence of death. See D.E. 24 (Addendum 2, Doc. 6 (5/3/01 Brief of Appellant at 3)(" 3. [Pre-Trial Issues] The Court erred in failing to keep out evidence of Connie Branam's death or any claimed to be committed outside of Blount County"); id. at 4 ("2. [Sentencing Issues] the Court was in error in allowing the Connie Branam conviction to be used in the penalty phase of the trial"); id at 4 ("3. The sentence in this case constitutes a violation of the United States and Tennessee Constitutions since the facts used to enhance the punishment were never contained in the indictments"); see also id. at 8, 23, 24, 34)).

In the Supplemental Brief filed on December 31, 2001 in the Tennessee Supreme Court, counsel continued their assault on the arbitrary and unfair reliance of the murder of Connie Branam as the basis for the capital prosecution and the sentence of death. D.E. 24 (Addendum 2, Doc. 8 (12/31/01Supplemental Brief). Because the Supplemental Brief was not paginated properly and contains random page numbers that do not correspondent to the actual page numbers, the relevant arguments are quoted below.

> According to the State's theory, the prior conviction used against Defendant Dellinger, *the murder conviction of Connie Branam, occurred at least a day after the murder of Tommy Griffin.* Therefore Dellinger's prior conviction does not fit the statutory definition of a prior conviction in the State of Tennessee. Without this prior conviction the State could not seek the death penalty

> against Appellant Dellinger since he would have had no prior convictions.

D.E. 24 (Addendum 2, Doc. 8 (12/31/01Supplemental Brief [arbitrarily numbered as page 15]) (Emphasis added).

> Branum was killed after Griffin, but that trial was conducted first at the [option] of the state.

.

D.E. 24 (Addendum 2, Doc. 8 (12/31/01Supplemental Brief [page without a number beginning, "Issue No. 3]).

> If an invalid aggravating factor is used, a violation of the Eighth Amendment to the U.S. Constitution has happened and invalidates the procedure

D.E. 24 (Addendum 2, Doc. 8 (12/31/01Supplemental Brief [page without a number beginning, "Issue No. 4 . . . ."]).

Second, given the rules governing the Tennessee Supreme Court's review of capital cases, the Supreme Court reviewed Mr. Dellinger's double jeopardy claim. When a state court with authority to make a final adjudication of a claim considers the claim's merits, a federal court must also review the claim's merits. See Webb v. Mitchell, 586 F.3d 383, 400-01 (6th Cir. 2009), cert. denied sub nom. Webb v. Bobby, 130 S.Ct. 2110 (2010); Alverson v. Workman, 595 F.3d 1142, 1153 n. 3 (10th Cir.), cert. denied, 131 S.Ct. 512 (2010); Walton v. Caspari, 916 F.2d 1352, 1356-57 (8th Cir. 1990), cert. denied, 499 U.S. 931 (1991); Cooper v. Wainwright, 807 F.2d 881, 887 (11th Cir. 1986), cert. denied sub nom. Dugger v. Cooper, 481 U.S. 1050 (1987); Sandstrom v. Butterworth, 738 F.2d 1200, 1206 (11th Cir. 1994), cert. denied, 469 U.S. 1109 (1985).

At the time of Mr. Dellinger's direct appeal, Tennessee law required that on direct review of death penalty cases the Tennessee Supreme Court determine whether, among other things, the death sentence was imposed in any arbitrary fashion. Tenn.Code Ann. §39-13-206(c) The Tennessee Supreme Court's opinion on direct review expressly acknowledged that the Court performed this review.

> In accordance with Tenn.Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate
>
> We have reviewed all of the issues raised by the defendants and conclude that they do not warrant relief. . . .

State v. Dellinger, 79 S.W.3d at 477.

Thus, the Tennessee Supreme Court considered on direct appeal all claims appearing on the face of the record that raise the possibility that Mr. Dellinger's death sentence is arbitrary, excessive, or disproportionate. See Webb v. Mitchell, 586 F.3d at 400-01. Those claims included Mr. Dellinger's ex post facto claim, which was fairly presented to, and considered by, the Tennessee Supreme Court.

Respondent's motion for summary judgment on the ground that Mr. Dellinger defaulted his double jeopardy claim must be denied. The claim must be reviewed on the merits.

2. Mr. Dellinger's Ex Post Facto Claim Cannot Be Defaulted, Or Constructively Or Impliedly Waived

The prohibition against ex post facto laws is thousands of years old, it is fundamental, and the Supreme Court has said that its protection removes the power from both the federal and

state governments to retrospectively aggravate an offense or increase the punishment after the offense has occurred. The body of the United States Constitution expressly provides that no state shall have the power to enact retrospective legislation, the effect of which is evaluated practically based on the statute and punishment that were in effect at the time the offense was committed. U.S. Const., art. I, § 10. cl. 1.

Such a core constitutional right cannot be impliedly or constructively waived or defaulted. See United States v. Gonzales-Lopez, 548 U.S. 140, 148-49 (2006) (Scalia, J.)); College Savings Bank v. Florida Postsecondary Educ. Expense Bd., 527 U.S. 666, 681-82 (1999) (Scalia, J.) (no implied or constructive waivers of core constitutional rights); United States v. Olano, 507 U.S. 725, 733-34 (1993) (O'Connor, J.) ("Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for the waiver and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake"); Railey v. Webb, 540 F.3d. 393, 399 (6th Cir. 2008) (Batchelder, J. ) (structural errors are not subject to forfeiture or default citing Washington v. Recuenco, 548 U.S. 212, 219(2006) (Thomas, J.) and Sullivan v. Louisiana, 508 U.S. 275, 283 (1993) (Scalia, J.)), cert. denied, 129 S.Ct. 2878 (2009)

Assuming this Court finds that Mr. Dellinger's ex post facto claim was not fairly presented, that there is no available state court remedy for presenting the claim, and that the ex post facto claim was defaulted under state law within the meaning of AEDPA, because the prohibition against retrospective legislation is fundamental to the criminal justice process and a core right of citizens, it cannot be forfeited, impliedly or constructively waived, or defaulted and must be considered on the merits. Respondent's motion for summary judgment based on default must be denied. The ex post facto claim must be reviewed on the merits.

3. The AEDPA Does Not Bar Consideration Of Mr. Dellinger's Meritorious Ex Post Facto Claim, Which Itself Establishes That He Is Actually Innocent of The Death Penalty, A Setttled Exception To The Procedural Default Rule

Article I, section 10, clause 2 of the Constitution and *Calder, Fletcher, Beazell, Cummings*, *Medley, Weaver*, *Kaiser*, and *Lynce* provide that the State may not enact a retrospective law that aggravates an offense or increases the punishment that existed at the time of the offense. . Assuming that this Court determines that Mr. Dellinger did not fairly present his ex post facto claim, that the Tennessee Supreme Court did not decided it, and that a violation of guarantee of against ex post facto law is not a fundamental structural error and therefore cannot be defaulted, Mr. Dellinger's meritorious ex post facto claim itself establishes that he is actually innocent of the death penalty, and so it must be decided and resolved on the merits. Magwood v. Warden, 664 F.3d 1340, 1346-47 (11th Cir. 2011 (assuming that petitioner defaulted capital sentencing claim, *Sawyer v. Whitley*, 505 U.S. 333, 346-47 (1992) provides that a procedural default of a claim that would result in ineligibility for the death penalty falls within the actual innocence exception to procedural default).

Mr. Dellinger's ex post facto claim, like the sentencing claim raised in *Magwood*, presents the unique, rare circumstances that bring Mr. Dellinger squarely within the *Sawyer* doctrine.

Respondent's motion for summary judgment based on default must be denied. The ex post facto claim must be reviewed on the merits.

4. To The Extent AEDPA Bars This Court From Considering Unique Circumstances Presented With Respect To A Core Constitutional Claim AEDPA Is Unconstitutional, Because It Violates The Separation Of Powers Doctrine And Because It Impermissibly Suspends The Writ Of Habeas Corpus

Habeas corpus is, at its core, an equitable remedy. See Munaf v. Geren, 553 U.S. 674, 693 (2008) (citing Fay v. Noia, 372 U.S. 391 (1963); Schlup v. Delo, 513 U.S. 298, 319 (1995). Given that equitable principles govern the substantive law of habeas corpus, the Supreme Court has emphasized that it will "not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,'" Holland v. Florida, 130 S.Ct. 2549, 1560-62 (2010) (quoting Miller v. French, 530 U.S. 327, 340 (2000) (quoting Califano v. Yamasaki, 442 U.S. 682, 705 (1979).

Equitable principles are not simply tools in the judicial tool box in exercising habeas corpus jurisdiction or construing and applying constitutional principles to specific cases; equitable notions (like waiver and estoppel) are the marrow of effectuating constitutional rights and the crucial lens through which constitutional claims must be viewed in habeas litigation. To the extent that AEDPA prevents this Court from performing its role in adjudicating the ex post facto claim here, it is unconstitutional for the reasons set out in Section VII.B.4, infra, which are incorporated herein by reference.

*C. Conclusion*

The capital prosecution of Mr. Dellinger in Blount County for the February 21, 1992 murder of Tommy Griffin and Mr. Dellinger's sentence of death violate the Ex Post Facto Clause The effect of the retrospective application of Tennessee capital murder statutes was procedurally and substantively arbitrary, in violation of the Due Process Clause and the Eight Amendment, and it was also evidence of vindictiveness, as is also proscribed by the Ex Post Facto Clause.

Respondent is not entitled to summary judgment on this claim on the ground of default. Indeed, Mr. Dellinger is entitled to summary judgment as the nonmoving party. Respondent's motion for summary judgment on this claim must be denied.

## VII. BECAUSE A JURY ACQUITTED MR. DELLINGER OF THE CAPITAL MURDERS OF CONNIE BRANAM AND TOMMY GRIFFIN, THE DOUBLE JEOPARDY CLAUSE PROHIBITED THE STATE OF TENNESSEE FROM SEEKING THE DEATH PENALTY FOR THOSE MURDERS A SECOND TIME OR OBTAINING A SENTENCE OF DEATH IN THE SECOND PROCEEDING. (Petition ¶¶ 3.4 .1 and 3.4.2)

The State of Tennessee initiated two capital prosecutions against James Dellinger seeking the death penalty in both cases for the murders of Connie Branam and Tommy Griffin. In the first capital prosecution in Sevier County, Tennessee, the jury acquitted James Dellinger of the death sentence and recommended a sentence of life. In the second capital prosecution in Blount County seeking the death penalty for those same murders, the jury recommended a sentence of death. The second capital prosecution in Blount County seeking the death penalty for the murders of Tommy Griffin and Connie Branam violated the Double Jeopardy Clause and principles of estoppel embedded in that right. The death sentence at issue here is unconstitutional for these same reasons, as demonstrated in subsection A, below. (See D.E. 26, at 18 ¶¶3.4.1 and 3.4.2 (11/30/09 Amended Petition)).

Respondent asserts that he is entitled to summary judgment on the double jeopardy claim, because it is presented for the first time in the amended petition. This being so, Respondent argues that the double jeopardy claim has been procedurally defaulted because there is no available state avenue for exhausting the claim. See D.E. 34, at 61-62 ¶¶3.4.1 and 3.4.2, Answer To Amended Petition. As James Dellinger shows in subsection B, below, (1) he fairly presented the double jeopardy issue to the Tennessee Supreme Court on direct appeal; (2) the protections of the Double Jeopardy Clause are fundamental structural guarantees that cannot be forfeited, impliedly waived, or defaulted; and (3) in any event, because the double jeopardy claim renders the death penalty unconstitutional, he is innocent of the death penalty, such that the claim must be considered on the merits.

Respondent errs in asserting that he is entitled to summary judgment on this claim for procedural reasons. Indeed, James Dellinger is entitled to summary judgment on these substantive and procedural issues as the non-moving party.

### *A. The Double Jeopardy Clause Bars James Dellinger's Sentence Of Death For The Murders of Tommy Griffin and Connie Branam*

#### 1. The History, Purpose And General Principles Of The Double Jeopardy Clause

The Double Jeopardy Clause of the Fifth Amendment provides, "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life and limb." The precise origins of the prohibition are obscure. Yet, rules against double jeopardy have existed for millennia. See Benton v. Maryland, 395 U.S. 284, 795(1969); see generally D. Rudstein, *A Brief History of the Fifth Amendment Guarantee Against Double Jeopardy*, 14 WM. & MARY BILL OF RTS. J.193, 196-204, 242 (2005) (outline of pre-colonial origins) (*Rudstein*). Ancient Jewish law, Greek law, Roman law, and ultimately the cannon law and English common law contained prohibitions against double jeopardy. See *Rudstein*, at 197-200.

Plainly, the prohibition against double jeopardy is fundamental. See Benton v. Maryland, 395 U.S. at 795. It is a bulwark against governmental vindictiveness; harassment; and re-do's – that is, rolling the dice until the punishment or outcome suits the prosecution. See, e.g., United States v. Dixon, 509 U.S. 688, 696 (1993) (Scalia, J.) (double jeopardy prohibits successive punishments and successive prosecutions for the same criminal offense); Bullington v. Missouri, 451 U.S. 430, 446) (1981) ("having received 'one fair opportunity to offer whatever proof it could assemble . . . the State is not entitled to another") (citations omitted); Burks v. United States, 437 U.S. 1, 11 (1978) (Burger, C.J.) ("The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it

failed to muster in the first proceeding"); Brown v. Ohio, 432 U.S. 161, 165-66 (1977) (Powell, J.) (double jeopardy "protects the accused from attempts to relitigate the facts underlying a prior acquittal . . . and from attempts to secure additional punishment after a prior conviction and sentence") (citations omitted); Ashe v. Swenson, 397 U.S. 436, 444 n.10 (1970) (noting the potential for unfair and abusive reprosecution attending the proliferation of statutory offenses); id, 397 U.S. at 459 (Brennan, J., concurring) (The Double Jeopardy clause is empty of meaning "if the State may make 'repeated attempts' to touch up its case"); Green v. United States, 355 U.S. 184, 190 (1957) (the Double Jeopardy Clause "surely protects a man who has been acquitted from having to"[run the ga[u]ntlet' a second time"). Indeed, because the protections of citizens against double jeopardy are fundamental, neither the federal nor state governments have the power – viz. they have no jurisdiction – to twice prosecute a citizen or heap on additional punishment. See Grafton v. United States, 206 U.S. 333, 351-52, 354 (1907) (Harlan, J.) (once tried and convicted or acquitted by a tribunal deriving its jurisdiction and authority from the United States, the government has no power to try the person again for the same offense); Ex Parte Lange, 85 U.S. (18 Wall.) 163, 176 (1873) (after the judgment was entered further punishment was error, "because the power to render any further judgment did not exist"). Double jeopardy is bottomed on notions of finality with respect to the criminal prosecution and punishment of citizens.

Thus, as pertinent here, the Double Jeopardy Clause protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. See North Carolina v. Pearce, 395 U.S. 711, 717 (1969) (Stewart, J.) (significant increase in sentence on resentencing violated due process), overruled on other grounds Alabama v. Smith, 490 U.S. 794 (1989)

(Rehnquist, C.J., holding no presumption of vindictiveness from greater sentence after re-trial than previously imposed pursuant to guilty plea); see generally *Rudstein* at 193-95 (discussing Double Jeopardy Clause's purposes and a number of other cases). Although the protection against retrial itself is of great concern, see e.g., In re Neilsen, 131 U.S. 176, 190-91 (1889) ("[I]t seems to us very clear that where . . . a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried"), at its core, the Double Jeopardy Clause is aimed at preventing multiple punishments for the same offense. See Ex Parte Lange, 85 U.S. at 173 ("Manifestly it is not the danger or jeopardy of being a second time found guilty. It is the punishment that would legally follow the second conviction which is the real danger guarded against by the Constitution"); see also North Carolina v. Pearce, 395 U.S. at 718 (the double jeopardy "guarantee is violated when punishment already exacted for an offense is not fully 'credited' in imposing sentence upon a new conviction for the same offense"). Green v. United States, 355 U.S. at 187 ("The common law not only prohibited a second punishment for the same offence," but went further).

In determining whether a second punishment or second prosecution violates the Double Jeopardy Clause, the two offenses need not be identical; the statutes need not have the same name, nor need they be stated in *haec verba*. See Brown v. Ohio, 432 U.S. at 164 ("separate statutory crimes need not be identical either in constituent elements or in actual proof in order to be the same within the meaning of" the Double Jeopardy Clause); id. 432 U.S. at 166 n.6 (even when statutory offenses different, "successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved the first, citing *Ashe*); Waller v. Florida, 397 U.S. 387, 390, 392 (1970) (Burger, C.J.) (Double Jeopardy Clause barred state prosecution for grand larceny based upon same facts involved in prior

conviction under municipal ordinance for destruction of city property and breach of the peace); Grafton v. United States, 206 U.S. at 349-50 ("The identity of the offenses is determined, not by their grade, but by their nature. One crime may be a constituent part of the other. The criterion is, Does the result of the first prosecution negative the facts charged in the second?"); id, 206 U.S. at 350-51 ("'It is not in all cases necessary that the two charges should be precisely the same in point of degree, for it is sufficient if an acquittal of one will show that the defendant could not have been guilty of the other.'. . . If the transaction is the same, or *if each rests upon the same facts between the same parties, it is sufficient to make good the defense")* (Emphasis added); United States v. Frazier, 880 F.2d 878 (6th Cir. 1989) (acquittal on count charging misapplication of funds concerning a certain loan precluded, on collateral estoppel grounds, retrial on count charging false entries relating to same loan), cert. denied sub nom. DeBusk v. United States, 493 U.S. 1083 (1990). Nor do the facts presented in the first action and sought to be presented in the second action need not be identical. See e.g., Sealfon v. United States, 575, 578-79, 580 (1948) (the prosecution may not undertake second attempt to establish charge with new facts that were necessarily adjudicated against the government is prior action).

The protections of the Double Jeopardy Clause also do turn on the virtual identity of the parties (the courts or the prosecutors) in the first and second actions. See Simpson v. Florida, 403 U.S. 384, 386 (1971) (per curiam) ("[I]n *Ashe* itself [397 U.S. at 443], we specifically noted that 'mutuality' was not an ingredient of the collateral estoppel rule imposed by the Fifth and Fourteenth Amendments"); Waller v. Florida, 397 U.S. at 392 ("Political subdivisions of States – counties, cities, or whatever – never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded a subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions," quoting

Reynolds v. Simms, 377 U.S. 533, 575 (1964)); Grafton v. United States, 206 U.S. at 351-52 (holding that double jeopardy barred enforcement of judgment of territorial court based on previous acquittal of homicide in court marshal proceedings – "If therefore, a person be tried for an offense in a tribunal deriving its jurisdiction and authority from the United States, and is acquitted or convicted, he cannot again be tried for the same offense in another tribunal deriving its jurisdiction and authority from the United States").

Significantly, because finality (that is, the protection of citizens from being subjected to multiple criminal punishments or prosecutions) is a fundamental concern of the double jeopardy, see Crist v. Bret, 437 U.S. 28, 33 (1978) (primary purpose of double jeopardy is "akin to that served by the doctrines of res judicata"), whether the outcome of the first proceeding was right or wrong is completely beside the point. See, e.g., Arizona v. Rumsey, 467 U.S. 203, 211 (1984) (O'Connor, J.) (Double jeopardy applies even if the verdict of acquittal in the first case was a result of mistaken evidentiary ruling or interpretations of the law). This is so because a prior verdict "represents the community's collective judgment regarding all the evidence and arguments presented to it. Even if the verdict is 'based upon an egregiously erroneous foundation' . . . it's finality is unassailable." Yeager v. United States, 557 U.S. 110, 129 S.Ct. 2360, 2368 (2009) (quoting Foo v. United States, 369 U.S. 141, 143 (1962) (per curiam)); cf. Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 398-99 (1981) (in civil actions, the preclusive effects of a prior judgment are unaffected by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case, citing Supreme Court decisions).

The application of these rules and principles is relatively straightforward, and as the Supreme Court has emphasized, the double jeopardy inquiry is practical, being tethered to the

exercise of judicial common sense arising out of ancient understandings deeply embedded in judges and citizens alike.

The double jeopardy inquiry, then, is rational, not "hypertechnical." Ashe v. Swenson, 397 U.S. at 444, requiring a court to

> examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

*Ashe*, 397 U.S. at 444; see, e.g, Rice v. Marshall, 816 F.2d 1126 (6th Cir. 1987) (collateral estoppel barred evidence of carrying a gun in rape case when defendant previously acquitted of gun charge in connection with same rape: the record must be examined carefully and practically because "[a]ny test more technically restrictive would . . . simply amount to a rejection of the rule of collateral estoppel in criminal proceedings"); State v. Thompson, 285 S.W.3d 840, 848 (Tenn. 2009) (Wade, J.) (finding estoppel in second prosecution and citing *Ashe* standard of practical, principled review).

Of course, the prohibition against double jeopardy has been applied to capital prosecutions and capital sentencing hearings for decades. See, e.g. Ball v. United States, 163 U.S. 662, 669, 671 (1896); Bullington v. Missouri, 451 U.S. 430, 446 (1981); Arizona v. Rumsey, 467 U.S. at 209. Moreover, after the Supreme Court's decision in Furman v. Georgia, 408 U.S. 238 (1972), when many States, including Tennessee, enacted death penalty procedures that provided a separate, trial-like capital sentencing hearings, the double jeopardy decisions addressing capital sentencing became more precise. Indeed, in *Bullington v. Missouri*, in important respects presaging the decision in *Ring v. Arizona*, 536 U.S. 584, 609 (2002) twenty years later,, the Court held that the Double Jeopardy Clause must apply to capital sentencing

hearings because of the specific findings required to be made and the procedures for ensuring the accuracy of these findings. See *Bullington*, 451 U.S. at 433.

Given the nature of post-*Furman* capital sentencing hearings, the Supreme Court has held that for double jeopardy purposes a sentence of life in the first sentencing hearing operates as an acquittal and a bar to seeking the death penalty again. See *Bullington* 451 U.S. 442, 446; Arizona v. Rumsey, 467 U.S. at 209; see also Sattazahn v. Pennsylvania, 537 U.S. 101, 117 (2003) (O'Connor, J., concurring except as to Part III and concurring in judgment) (citing Poland v. Arizona, 476 U.S. 147, 155-56 ((1986) (White, J.) (An acquittal of the death penalty occurs when "the sentencer or reviewing court has 'decided that the prosecution has not proved its case' *that the death penalty is appropriate*") (Emphasis in *Poland*)). Notably, in *Sattazahn*, consistent with the double jeopardy principles described above, Justice Scalia explained that to the extent an aggravating circumstance (or circumstances) increases the maximum punishment to be imposed, "that fact – *no matter how the State labels it* - constitutes an element, and must be found by a jury beyond a reasonable doubt." *Sattazahn*, 537 U.S. at 111 (emphasis added). Thus, capital sentencing findings necessarily included in a general verdict of acquittal (a life sentence) cannot be revisited whether the subsidiary questions on which the general verdict is based are characterized as findings on an ultimate issue, findings on mixed questions of law and fact, and/or findings on material issues of fact.

Estoppel principles embedded in the protection against double jeopardy illuminate the above-described constitutional standards.

2. The Collateral Estoppel (Preclusive) Effects Of Prior Judgments Under the Double Jeopardy Clause.

In the 1970 decision in *Ashe v. Swenson,* Justice Stewart announced that principles of collateral estoppel are "embodied" in the guarantee of the Double Jeopardy Clause. *Ashe*, 397

U.S. 442-43. After *Ashe* questions of collateral estoppel under the Double Jeopardy Clause are not simply state law procedural questions, but matters of "constitutional fact." Id. While to be sure *Ashe* was a landmark decision, the plain fact is that it was not the first double jeopardy decision to apply collateral estoppel *principles* expressly or by implication.

In *United States v. Oppenheimer*, 242 U.S. 85, 87 (1916), for example, Justice Holmes applied collateral estoppel to the government to bar a second indictment after the first prosecution was dismissed as time barred, explaining that:

> Of course, the quashing of a bad indictment is no bar to a prosecution upon a good one, but a judgment for the defendant upon the ground that the prosecution is barred goes to his liability as matter of substantive law, and one judgment that he is free as a matter of substantive law is as good as another

Id. 397 U.S. at 87; see RESTATEMENT (SECOND) OF JUDGMENTS §27 cmt. d (ALI 2011) (RESTATEMENT).[1]

Not only had the Supreme Court expressly applied collateral estoppel in double jeopardy cases before *Ashe*, but as the cases in subjection A.1, supra, demonstrate, because the goals of *res judicata* and the Double Jeopardy Clause are closely related – that is, to ensure finality,

---

[1] As discussed in the text, infra, Section 27 of the RESTATEMENT defines collateral estoppel or issue preclusion. An element of the application of collateral estoppel as a bar to a second action or the adjudication of a specific issue of fact is that it have been "actually litigated" previously. As comment d to Section 27 explains, the requirement that an issue have been "actually litigated" does not, in fact, require the presentation of evidence, as Justice Homes' decision in *Oppenheimer* illustrates..

> *d. When an issue is actually litigated.* When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated within the meaning of this Section. An issue may be submitted and determined on a motion to dismiss for failure to state a claim, a motion for judgment on the pleadings, a motion for summary judgment (see Illustration 10), a motion for directed verdict, or their equivalents, as well as on a judgment entered on a verdict. A determination may be based on a failure of pleading or of proof as well as on the sustaining of the burden of proof.

avoiding inconsistent verdicts, and protecting the judicial process from abuse – many of the double jeopardy decisions employ *res judicata* notions without saying so.

The close relationship of *res judicata* and double jeopardy principles is useful, because the principles of *res judicata* are more fully developed and explained than are the double jeopardy principles in criminal cases. A number of such principles apply here.

The doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion) are judicially crafted rules that promote the finality of judgments, prevent abuse of the judicial process, and prevent inconsistent outcomes. See Allen v. McCurry, 449 U.S. 90, 94 (1980); see also Cromwell v. Sac County. 4 U.S. (4 Otto) 351, 1876 WL 19560, at * 3-4 (1876)(Field, J.) (explaining res judicata and collateral estoppel and describing common law origins). Collateral estoppel (or issue preclusion) prevents the relitigation of issues of fact or law. Section 27 of the RESTATEMENT (SECOND) OF JUDGMENTS defines collateral estoppel.

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim**.**

A nettlesome question regarding the collateral estoppel requirement that an issue has actually litigated is determining the dimensions of the issue with respect to the prior action and the action in which estoppel is raised. Thus, while it is settled that relitigation is foreclosed whether the matter is one of evidentiary fact, ultimate fact (that is, application of law to fact), or law, see RESTATEMENT §27 cmt. c, determining the precise scope of an issue previously litigated and the issue claimed to be barred involves the consideration of a number of factors. As the RESTATEMENT explains:

> The problem involves a balancing of important interests: on the one hand, a desire not to deprive a litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute. When there is a

> lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example: Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

Certainly not all of these considerations are not squarely presented in a criminal case or identify the same concerns that arise in the criminal context. Yet, while this is so, the double jeopardy inquiry whether the defendant should be subjected to another prosecution or an additional penalty, like the civil inquiry, most certainly requires the evaluation of: (1) whether there is a substantial overlap in the evidence and argument in the two proceedings; (2) whether the new evidence or argument to be asserted in the second proceeding involves the same or essentially the same principle(s) of law; and (3) how closely related the claims or issues are in the two proceedings.

Another pertinent requirement of collateral estoppel is that the issue to be precluded must have been "essential to the judgment" in the earlier case. Again, while there are a number of considerations regarding this determination, the resolution is ultimately a practical one, involving the application of common sense. Thus, the RESTATEMENT explains, as pertinent to the double jeopardy inquiry, that absent unusual circumstances whether an issue was essential to the prior judgment turns on "whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment. If so, the determination is conclusive between the parties in a subsequent action . . . ." RESTATEMENT §27 cmt. j.

One final question that relates to the application of collateral estoppel and double jeopardy is the effect of a prior judgment in different court or a court with different jurisdiction.

For example, do collateral estoppel principles apply to courts of the same state with different jurisdiction? As a general proposition, the fact that the courts possess differing jurisdiction does not prevent application of the doctrine. As RESTATEMENT §28 Comment d, explains.

> Not infrequently, issue preclusion will be asserted in an action over which the court rendering the prior judgment would not have subject matter jurisdiction. In many such cases there is no reason why preclusion should not apply; the procedures followed in the two courts are comparable in quality and extensiveness, and the first court was fully competent to render a determination of the issue on which preclusion is sought. . . .[2]

In fact, as discussed in Subsection A.1., supra, the Supreme Court has concluded that adjudication of issues in fora with differing jurisdiction does not bar extending the important protection of double jeopardy in the second case in a different jurisdiction. See Waller v. Florida, 397 U.S. at 390, 392 (Double Jeopardy Clause barred state prosecution for grand larceny based upon same facts involved in prior conviction under municipal ordinance for destruction of city property and breach of the peace); Grafton v. United States, 206 U.S. at 349-50 (court marshal acquittal barred enforcement of judgment of Philippine territorial court).

These principles of double jeopardy, including collateral estoppel principles embedded in the Double Jeopardy Clause, apply to the successive capital prosecutions of Mr. Dellinger in

---

[2] A RESTATEMENT illustration to Comment d is helpful.

> In a probate court proceeding involving the state of A, in which B and C are active and adverse participants, it is determined that C is A's legitimate son. A subsequent action by B against C is brought in a court of general jurisdiction for a declaratory judgment that C is not entitled to share in the proceeds of a certain inter vivos trust because he is not A's legitimate son. The procedures followed in the probate court are of comparable quality to those in the court of general jurisdiction. The determination of legitimacy in the prior action is conclusive. . . .

See also RESTATEMENT §28 cmt. e (*Courts of different states; state and federal courts*) which explains by way of example that, "a court in State A may determine an issue involving title to land in State B, even though the A court would not have had jurisdiction over the land itself. In such a case, the determination is conclusive as between the parties to the proceeding in State A and should be give preclusive effect in State B and other states"

which the State of Tennessee twice sought to impose the death penalty for the murders of Tommy Griffin and Connie Branam. They compel the conclusion that the second capital sentencing hearing in Blount County and the sentence following the Sevier County jury's acquittal on the same faces are unconstitutional.

3. The Jury's Acquittal Of James Dellinger For the Capital Murders Of Tommy Griffin And Connie Branam In The Sevier County Sentencing Hearing Barred The Imposition Of A Death Sentence In The Blount County Sentencing Hearing For The Capital Murders Of Tommy Griffin And Connie Branam

This Court has previously evaluated the facts of the capital murder prosecutions against James Dellinger in federal habeas corpus proceedings on behalf of co-defendant Gary Sutton that have been dismissed. Sutton v. Colson No. 3:06-cv-00388 (E.D. Tenn., Knoxville) (D.E. 147-48 (Memorandum, Opinion, Judgment, and COA) and Sutton v. Bell, No. 3:07-cv-00030 (E.D. Tenn., Knoxville). For this reason, only the core facts are summarized below.[3]

According to the Blount and Sevier Counties prosecutors, in late February 1992, Mr. Dellinger killed Tommy Griffin, then some time shortly thereafter, Connie Branam. The State asserted that Mr. Dellinger did so to eliminate her as a witness. While Blount Count District Attorney Mike Flynn could have prosecuted Mr. Dellinger for first degree murder, he acknowledged that he could not prosecute him for capital murder in Blount County, because

[3] This Court can take judicial notice of the Sevier County state court record filed manually as D.E. 19 in Sutton v. Bell, No. 3:07-cv-00030 (E.D. Tenn., Knoxville) . Fed.R.Civ.P. 201. E.g., In re Korean Airlines, Ltd., 642 F.3d 685, 689 n.1 (9th Cir. 2011 ) (a court can take judicial notice of its own records in other cases). However, because principles of *res judicata* and collateral estoppel, as well as *Ashe v. Swenson*, 397 U.S. at 444, require a practical and complete review of the records at issue, counsel have contemporaneously filed a motion requesting the Court either to direct the Clerk to make the Sevier County recotd (D.E. 19 in the *Sutton* case) part of this record, or to direct Respondent to file a copy of the Sevier County record in the record in this case.

Further, because the Sevier County record is not available electronically, counsel do not know how it is organized by the Clerk. Consequently, references in this section are made to Mr. Dellinger's present copy of the record of the Sevier County capital murder prosecution.

there were no aggravating circumstances as required by statute.[4] Therefore, rather that prosecute Mr. Dellinger for the first degree murder of Tommy Griffin, District Attorney Flynn decided to assist the Sevier County District Attorney General in the capital murder prosecution of Mr. Dellinger for the deaths of both Tommy Griffin and Connie Branam

> The district attorney general in Maryville said he will work with Sevier County's district attorney general to try to get two Sevier county men sent to the electric chair.
>
> Blount County District Attorney General Mike Flynn said Wednesday he will not seek the death penalty against Gary Wayne Sutton, 28, of Kodak and his uncle, James A. Dellinger, 41, or Seymour in connection with the February slaying of Tommy Griffin, 24. Griffin was shot in the back of a head with a shotgun.
>
> Unfortunately, we don't have any of the enhancing factors that apply.' Blount Count District Attorney General Mike Flynn said. 'Al (Sevier County District Attorney General Al Schmutzer Jr) and I are just going to have to work together and try to get the same results in Sevier County."

(Sevier County Technical Record Vol. _ at 297 (6/18/92 article: *Blount can't seek execution for brother's death,* THE MOUNTAIN PRESS), Attached as Exhibit 21.

On March 5, 1992, the Sevier County Grand Jury issued a presentment charging Mr. Dellinger for the first-degree murder of Connie Branam. (Sevier County Technical Record Vol. 1, at 3). Approximately two months later, on May 14, 1992, the Sevier County District Attorney issued a Notice of Intent to Seek Death Penalty against Mr. Dellinger, converting the first-degree murder case to a capital murder prosecution. (Sevier County Technical Record Vol. __, at 246 (Notice of Intent To Seek Death Penalty). While the notice did not identify the murder of Tommy Griffin as the specific reason for the notice, in fact this was so. Thus, the notice provided that the State was seeking the death penalty pursuant to Tenn. Code Ann. §39-13-204(I) – that

---

[4] At the time of the Sevier and Blount County prosecutions first degree murder was codified at Tenn.Code Ann.§39-13-202(a) (1991 Tenn.Pub. Acts ch. 377, §2). Capital murder required a showing of first-degree murder under §39-13-202(a) plus aggravating circumstances listed in §39-13-204(i) determined in accordance with the procedures prescribed in the other subsections of §39-13-204.(1990 Tenn. Pub. Acts ch. 1038, §3).

the "Murder [of Connie Branam] was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of [Mr. Dellinger for the murder of Tommy Griffin]. Id.

True to his word, Blount County District Attorney Flynn attended the capital murder prosecution in Sevier County, a fact which the trial court pointed out to jurors. See, e.g., Sevier County Record Vol.6 at 525 (Voir Dire, Proceedings of 2/18/1993). From the outset, the State made clear that the Sevier County trial was a capital murder prosecution seeking a sentence of death for the murders of Connie Branam and Tommy Griffin. Indeed, these were almost the first words of Sevier County District Attorney Schmutzer mouth. See Sevier County Record Vol. _, at 102 (Opening Statement at Guilt-Innocence) (noting that until February 1992 Mrs. Viola Griffin had seven children, "but by February the 22nd of 1992, she had only five"); id at 116 (noting that Mr. Dellinger had the motive, opportunity and means to kill Connie Branam: "the motive, obviously, for these defendants being the fact that Connie Branum was getting hot on their trail, and catching them in some lies with regard to her brother's death").

Consistent with District Attorney Schmutzer's opening statement, the prosecution's witnesses testified extensively to facts supporting the murders of Connie Branam and Tommy Griffin. At the close of proof at the guilt-innocence phase, the State stressed that the prosecution aimed to seek redress for the capital murders of Connie Branam and Tommy Griffin.

> Oh, what a tangled web we weave . . . . We saw it beginning back at Howie's Hideaway when these two defendants, attempting to cover up the fact that they had brutally murder Connie Branum's brother, and burned his trailer, to with her ostensibly for the purpose of helping her to find her brother.

Sevier County Record Vol. _, at 1334 (opening argument of DA at conclusion of guilt-innocence); see also id. at 1366 (closing argument of DA at conclusion of guilt-innocence:"Tommy Griffin died from a gunshot wound to the back of his head 30 minutes later

after they'd taken him out of the jail. They left him laying on the side of the road"); id at 1366 ("[T]hose men did it, and that formed the motive for why they took Connie Branum's life because she was getting too close to them. She was unraveling their web of deceit").

At the conclusion of the guilt-innocence phase, the jury returned a guilty verdict against Mr. Dellinger for the first-degree murder of Connie Branam. Sevier County Record Vol. _, at 1389-90.

The first phase of the capital murder prosecution was complete; the stage had been set for sentencing. At the outset of the sentencing hearing District Attorney Schmutzer moved in all of the evidence presented at the guilt-innocence phase. Sevier County Record Vol. _, at 1395-96. In his opening statement, District Attorney Schmutzer explained that a death sentence was warranted for the murders of Connie Branam and her brother Tommy Griffin.

> The State's position, and I submit to you, the State has proven that this aggravating factor that I'm about to read is the aggravating factor that, in this case warrants the death penalty. 'The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest and prosecution of the defendants.' At this time, You Honor, the State – it is our position that at the end of all this proof that we will adopt, You Honor, and if the Court please, all of the proof that's previously been submitted in this trial as evidence in this hearing. The proof, and how it relates to the aggravating factor, it is our position that it's proven, and it's proven beyond a reasonable doubt, and that it outweighs beyond a reasonable doubt any of the mitigating factors that may be brought forth in this case on behalf of the defendants.

Sevier County Record Vol. _, at 1395 (Opening argument at Sentencing).

At the conclusion of the sentencing hearing, Mr. Schmutzer's continued the argument that began at opening statement.

> These men murdered Connie Branum simply to avoid arrest and prosecution for the murder of Tommy Griffin. You've already found that in your verdict beyond a reasonable doubt.

Sevier County Record Vol. _, at 1435 (Closing argument at Sentencing). General Schmutzer concluded that a sentence of death for the two murders was compelled.

> Because of the actions of these two men right here, because they've made a conscious decision to murder Connie Branum within 24 hours after they had taken the life of her brother. That's why we are here.

Sevier County Record Vol. _, at 1437 (Closing argument at Sentencing).

At the conclusion of the sentencing hearing the trial court instructed the jury that any statutory aggravating circumstance had to be established beyond a reasonable doubt. Sevier County Record Vol. _, at 1440 (sentencing instructions). The trial court further instructed that the decision to impose the death penalty had to be unanimous and it had to be based on evidence established beyond a reasonable doubt. Sevier County Record Vol. _, at 1441 (sentencing instructions). Finally, the trial court instructed that the decision to return a life sentence had to be unanimous. Sevier County Record Vol. _, at 1443 (sentencing instructions).[5]

On February 24, 1993, the Sevier County Jury unanimously acquitted James Dellinger of the capital murders of Connie Branam and Tommy Griffin. It concluded that Mr. Dellinger was to be sentenced to life for these two murders. The jury found no aggravating circumstances to support a capital murder conviction and sentence of death. Sevier County Technical Record Vol. _, at 390-92 (Verdict forms); id. __ (Sevier County Judgment as to Mr. Dellinger)).

On March 29, 1993, shortly after the Sevier County had acquitted Mr. Dellinger of the capital murders of Connie Branam and Tommy Griffin, Blount County District Attorney Mike

---

[5] The trial court's instruction provided:

> If you unanimously determine that no statutory aggravating circumstance has been proved by the State beyond a reasonable doubt, or if you unanimously determine that a statutory aggravating circumstance or circumstance have been proved by the State beyond a reasonable doubt, but that said statutory aggravating circumstance or circumstance have not been proven by the State to outweigh[] any mitigating circumstance beyond a reasonable doubt, the sentence shall be life imprisonment.

Flynn initiated a second capital murder prosecution against Mr. Dellinger for the murders of Tommy Griffin and Connie Branam by filing a Notice of Intent to Seek Death Penalty. D.E. 24 (Addendum _ Vol. 1 Technical Record at 17) (Notice Of Intent to Seek Death Penalty).[6] The notice provided that Blount County was relying on the aggravating circumstance in Tenn.Code Ann. §39-13-204(i)(2) – that [Mr. Dellinger had been] previously convicted of one (1) or more felonies [viz. the first-degree murder of Connie Branam], other than the present charge, whose statutory elements involve the use of violence to the person. Id. (Mr. Dellinger had no other prior felony convictions meeting the statutory standard, as District Attorney Flynn had concluded some time earlier).

On April 20, 1994 – more than a year after commencing the capital prosecution by issuing the Notice Of Intent To Seek Death (seeking a death sentence for the murders of Tommy Griffin and Connie Branam) – District Attorney Flynn acknowledged that he simply intended to retry the Sevier County case, observing that, "This is an unusual case . . . because basically it has been tried once previously in another jurisdiction." D.E. 14 (Addendum _ Vol. [VIII or I, variously labels so as to be completely unclear] ( 4/20/94 Motions at 15).

Pre-trial, at virtually every opportunity, Mr. Dellinger's counsel unsuccessfully argued that a second capital murder prosecution for the deaths of Tommy Griffin and Connie Branam was fundamentally unfair, in violation of the Due Process Clause, the Double Jeopardy Clause, and the Eighth Amendment. See, e.g., D.E. 24 (Addendum _ Vol. 1 Technical Record Vol. 1 at 66-67 ,¶¶1-5 (4/27/93 Motion To Strike Or Dismiss, asserting reliance on Branam capital murder

---

6 The Blount County grand jury indicted Mr. Dellinger for the first-degree murder of Tommy Griffin on April 6, 1992. (D.E. 24 (Addendum _ Vol. 1 Technical Record at __)). As noted previously, Blount County District Attorney Mike Flynn acknowledged that the murder of Tommy Griffin could not proceed as a capital murder prosecution because there were no statutory aggravating circumstances. (See Sevier County Technical Record Vol. _ at 297 (6/18/92 article: *Blount can't seek execution for brother's death,* THE MOUNTAIN PRESS)), Attached as Exhibit 21.

prosecution violated double jeopardy and the Eighth Amendment); id at 70 (4/27/93 Motion To Strike The Death Penalty (because Branam murder was *after* the death of Tommy Griffin); compare Rice v. Marshall, 816 F.2d 1126, 1130 (6th Cir. 1987) (ineffective assistance of counsel to fail to object to evidence that rape defendant was carrying a firearm when he had previously been acquitted of weapons charge in connection with the same rape). So, from the State's opening statement the Blount County prosecutor emphasized that the trial would be about the murders of Tommy Griffin and Connie Branam. D.E. 24 (Addendum _ (Opening Statement of the Prosecution Vol. __, at 4-11); id at 11 (after about 7:00 p.m. on Saturday, February 22, 1992, "Connie Branam was never seen alive again).

The State's evidence in Blount County in support of its capital prosecution against Mr. Dellinger for the murders of Tommy Griffin and Connie Branam, with minor exceptions, was identical to the evidence presented in Sevier County, including the order in which the witnesses were presented.[7] See Exhibit 22, *Chart of Witnesses for Sevier and Blount County Prosecutions.*

At the conclusion of the guilt-innocence phase, in the State's opening statement, the Blount County prosecutor underscored his theme – as had the prosecutor in Sevier County – that the case was about the murder of Tommy Griffin and Connie Branam.

> The reason that we're even interested in the death of Connie Branam here is because, ladies and gentlemen, if they hadn't killed Tommy Mayford Griffin, Connie Branam would be here today. Connie Branam dies because she knew too much. She died for what these people thought was their own protection.

D.E. 24 (Addendum _ (Opening argument of the Prosecution at Vol. __, at 17).

> [T]here were people there [at the Chapman Highway bar] who could be identified who saw them [the defendants and Branam] together,

[7] Given the virtual identity of the prosecutions, in all probably, the presentation of witnesses in a different order was the product of scheduling problems.

> who knew things. When Connie Branam was there and discovered this and learned this, her death warrant was sealed.

D.E. 24 (Addendum _ (Opening argument of the Prosecution at Vol. __, at 19); see also id. at 24, 46). The jury returned a verdict finding Mr. Dellinger guilty of the first-degree murder of Tommy Griffin. D.E. 24 (Addendum _ (Technical Record Vol. 2, at 259, 306) (verdict forms).

At sentencing, the Blount County District Attorney introduced the February 14, 1993 Sevier County conviction for the murder of Connie Branam and again asked the jury to impose the death penalty Mr. Dellinger's conviction of the first-degree murder of Connie Branam and , the jury's earlier finding that Mr. Dellinger had murdered Tommy Griffin. D.E. 24 Addendum _ (Opening statement of the prosecution at sentencing Vol. __, at 90-91). Having introduced all of the facts relating to the murders of Tommy Griffin and Connie Branam and the Sevier County judgment finding Mr. Dellinger guilty of the first-degree murder or Connie Branam, the prosecution asked and answered its own rhetorical question:

> Have we proven to you beyond a reasonable doubt the aggravating factor that they've had a prior felony conviction for an act that involved violence to the person. I submit to you, beyond any doubt we have done that. They have both been convicted before of taking a human life, deliberately, intentionally, with premeditation and with malice, taking a human life

D.E. 24 Addendum _ (Closing argument of the prosecution at sentencing Vol. 37, at 12-13). The jury returned a verdict recommending that Mr. Dellinger be sentenced to death for the capital murder of Tommy Griffin and Connie Branam and finding that Mr. Dellinger had been previously convicted of the first-degree murder of Connie Branam. D.E. 24 (Addendum _ (Technical Record Vol. __, at __ (jury verdict forms and judgments).

4. Ineluctable Conclusions

Under the circumstances described above, Mr. Dellinger's sentence of death for the murders of Tommy Griffin and Connie Branam in this capital murder prosecution after a Sevier County jury had acquitted him of the death penalty for the murders of Connie Branam and Tommy Griffin in a virtually identical capital murder prosecution violates the double jeopardy guarantee of the Fifth Amendment (including embedded principles of collateral estoppel), the Eighth Amendment (principles of fundamental fairness and arbitrary and vindictive punishment), and the Fourteenth Amendment to the Constitution.

> - Here, as in *Ex Parte Lange, Cromwell, In re Neilsen Grafton*, *Oppenheimer, Green, Benton, Ashe,* and *Brown*, the Double Jeopardy Clause and principles of collateral estoppel barred the initiation of a second capital prosecution seeking the death penalty for the murders of Tommy Griffin and Connie Branam.
>
> - Here, as in *Bullington, Burks, Green, Poland, Rumsey,* and *Sattazahn*, the Double Jeopardy Clause and principles of collateral estoppel barred obtaining a death sentence in Blount County for the murders of Tommy Griffin and Connie Branam when – after the issue was actually and extensively litigated
>
> – the Sevier County jury had previously sentenced Mr. Dellinger to life in prison, rather than death, for the same murders. See also Brown v. Commonwealth, 313 S.W3d 577, 589-95 (Ky. 2010) (jury's determination of life sentence and capital hearing operates as acquittal of the death penalty,
>
> - Here, as in *Waller* and *Grafton*, the Double Jeopardy and collateral estoppel bar against the State seeking or obtaining a death sentence is not affected by the fact that the Sevier and Blount County courts were exercising different jurisdiction, because (1) the State was prosecuting both cases as it deemed fit; (2) pursing and actually litigating the same factual and ultimate issues (a death sentence for the murders of Tommy Griffin and Connie Branam); (3) based on, or arising out of the same acts, occurrences, transactions or series of occurrences; and (4) asserting in support of these facts and its demand that Mr. Dellinger be sentenced to death identical arguments. See also RESTATEMENT §28 cmts. d & e (and illustrations).
>
> - Here, as in *Waller, Grafton,* and *Montana v. United States*, 440 U.S. 143, 155, 157-58, 164-65 (non-party governmental entity bound by behind the scenes participation and manipulation), the Double Jeopardy and collateral

estoppel bar to seeking or obtaining a death sentence is not affected by the fact the State was pursuing identical death sentences through separate district attorney offices,[8] because (1) both were prosecuting in the name of the State; and (2) the Blount County District Attorney Flynn (a) participated in the Sevier County case; (b) timed the Blount County prosecution to circumvent statutory and constitutional limitations on his office seeking the death penalty and the outset and the constitutional rights of Mr. Dellinger in the criminal justice process; (c) was aware of the identity of the facts, ultimate issues, and legal issues in the two cases; and (d) elected to proceed as he did, working hand in glove with the Sevier County prosecutor.

- Here, as in *Grafton, Brown, Ashe*, and *Waller* the bar of the Double Jeopardy Clause and collateral estoppel is not affected by the fact that the Sevier and Blount County aggravating circumstances had different names, because (1) the nature of the aggravating circumstances was the same; (2) they were based on virtually identical facts; (3) according to the prosecutors, the facts arose out of the same transaction, occurrence or series of transactions or occurrences the constituted the *res gestae* of the offenses set out in the indictments; (4) the facts supporting the differently worded aggravating circumstances were presented pursuant to the same arguments; (5) which the prosecutors, the defendants, and the courts understood to present the same issue; and (6) which related to the identical ultimate issue – whether Mr. Dellinger should be sentenced to death for the murders of Tommy Griffin and Connie Branam.

- Finally, here, as in *Ashe* and *Burks* the fact that the death sentence in Blount County was based on a single "additional" fact – viz. the Sevier County first-degree murder

---

[8] The office of the district attorney is created pursuant to Section 5, Article VI of the Tennessee Constitution and regulated pursuant to the provisions of Tenn. Code Ann.§8-7-301 et seq. While the district attorneys have broad and essentially unreviewable discretion, they do not have the power to violate the Constitution or to manipulate constitutional rights of the accused. As the Tennessee Supreme Court explained in State v. Superior Oil, Inc., 875 S.W.2d 658, 660 (Tenn. 1994),

> [T]here are not statutory criteria governing the exercise of the prosecutorial discretional traditionally vested in the officer in determining whether, when, and against whom to institute criminal proceedings. Indeed, it has been often recognized that "prosecutorial discretion in the charging process is very broad." "So long as the prosecutor has probable cause to believe that the accused committed an offense, the decision whether to prosecute, and what charge to bring before a grand jury generally rests entirely within the discretion of the prosecution," *limited only by certain constitutional constraints*.

(Emphasis added).

> conviction – does not constitute a bar to the application of the Double Jeopardy Clause and principles of collateral estoppel. The addition of a "new" or "additional" fact in the second prosecution to alter the outcome in the first action is (1) expressly prohibited by the Double Jeopardy Clause as an initial matter; and (2) independently, such a new fact is of no constitutional significance, given that it added virtually no weight to the extensive, similar evidence that had been previously introduced in the Sevier County, the identical arguments that had been made in Sevier County in support of a death penalty, and the identity of the ultimate issue in the Sevier and then Blount county cases - namely, whether the jury should sentence Mr. Dellinger to death for the murders of Connie Branam and Tommy Griffin.

Double jeopardy and collateral estoppel barred the State from seeking the death penalty for the murders of Tommy Griffin and Connie Branam a second time and these principles barred the sentence of death reflected in the judgment.

*B. Mr. Dellinger's Did Not Default his Double Jeopardy Claim, Which Cannot Be Barred By AEDPA*

Respondent asserts that he is entitled to summary judgment on Mr. Dellinger's claim that the Blount County death sentence violates the Double Jeopardy Clause, (D.E. 26, at 18 ¶¶3.4.1 and 3.4.2 (11/30/09 Amended Petition)), because it is defaulted. D.E. 34, at 61-62 ¶¶3.4.1 and 3.4.2. While it is true that the Tennessee Supreme Court did not address the double jeopardy issue on direct appeal, it is not accurate to say that Mr. Dellinger did not fairly present it. For this reason, and the other reasons outlined below, Respondent errs in claiming that he is entitled to summary judgment on this issue. Respondent's motions should be denied.

1. Petitioner Fairly Present His Double Jeopardy Claim To The Tennessee Supreme Court

There are two reasons Mr. Dellinger has not defaulted his double jeopardy claim under AEDPA.

First, a federal habeas court must consider claims presented to it that the petitioner presented on direct appeal or during an appeal of the denial of post-conviction relief. See Tuggle v. Seabold, 806 F.2d 87, 91 (6th Cir. 1986). To present fairly the constitutional nature of a claim to a state court, a petitioner need not cite chapter and verse of the federal constitutional provision

on which he relies. Rather, a petitioner can fairly present the nature of a federal constitutional claim by (1) relying on federal cases interpreting the federal constitutional provision involved; (2) relying on State cases interpreting the federal constitutional provision involved; (3) asserting a claim in terms that call to mind the specific right guaranteed by the federal Constitution; or (4) alleging a factual pattern within the mainstream of federal constitutional litigation. See Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005); Franklin v. Rose, 811 F.2d 322, 326 (6th Cir. 1987). While a ruling on a claim by a state court provides evidence that the petitioner raised the claim to that court, a ruling on a presented claim is not required to make the claim available for federal review. See Dye v. Hofbauer, 546 U.S. 1, 3 (2005).

Pre-trial Mr. Dellinger's counsel challenged the use of the Sevier County conviction repeatedly. In their initial brief in the Tennessee Supreme Court, filed May 3, 2001, they continued these arguments, asserting, among other things, that, "the Court was in error in allowing the Connie Branam conviction to be used in the penalty phase of trial. D.E. 24 (Addendum 2, Doc. 6 (5/3/01 Brief of Appellant at 4); see also id. at 2, 4, 8, 24).

In the Supplemental Brief filed on December 31, 2001 in the Tennessee Supreme Court, counsel made a number of arguments challenging the use of the Sevier County evidence and conviction in Blount County, including an argument that fairly presented his double jeopardy claim. D.E. 24 (Addendum 2, Doc. 8 (Supplemental Brief). Because the Supplemental Brief was not paginated, the argument is quoted below.

> The theory of the State was that Branum was killed to cover up the Griffin murder. Branum was killed after Griffin, but that trial was conducted first at the opinion of the state. *The Sevier County jury heard the same evidence in that case under the same theory and gave life imprisonment*. (The only difference in the two trial[s] was the use of the conviction from Sevier County in the Blount County trial).

(Emphasis added). The double jeopardy and collateral estoppel issues were fairly presented to the Supreme Court despite the court's failure expressly to address them.

Second, given the rules governing the Tennessee Supreme Court's review of capital cases, the Supreme Court reviewed Mr. Dellinger's double jeopardy claim. When a state court with authority to make a final adjudication of a claim considers the claim's merits, a federal court must also review the claim's merits. See Webb v. Mitchell, 586 F.3d 383, 400-01 (6th Cir. 2009), cert. denied sub nom. Webb v. Bobby, 130 S.Ct. 2110 (2010); Alverson v. Workman, 595 F.3d 1142, 1153 n. 3 (10th Cir.), cert. denied, 131 S.Ct. 512 (2010); Walton v. Caspari, 916 F.2d 1352, 1356-57 (8th Cir. 1990), cert. denied, 499 U.S. 931 (1991); Cooper v. Wainwright, 807 F.2d 881, 887 (11th Cir. 1986), cert. denied sub nom. Dugger v. Cooper, 481 U.S. 1050 (1987); Sandstrom v. Butterworth, 738 F.2d 1200, 1206 (11th Cir. 1994), cert. denied, 469 U.S. 1109 (1985).

At the time of Mr. Dellinger's direct appeal, Tennessee law required that on direct review of death penalty cases the Tennessee Supreme Court determine whether, among other things, the death sentence was imposed in any arbitrary fashion. Tenn.Code Ann. §39-13-206(c) The Tennessee Supreme Court's opinion on direct review expressly acknowledged that the Court performed this review.

> In accordance with Tenn.Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate
>
> We have reviewed all of the issues raised by the defendants and conclude that they do not warrant relief. . . .

State v. Dellinger, 79 S.W.3d at 477.

Thus, the Tennessee Supreme Court considered on direct appeal all claims appearing on the face of the record that raise the possibility that Mr. Dellinger's death sentence is arbitrary, excessive, or disproportionate. See Webb v. Mitchell, 586 F.3d at 400-01. Those claims included Mr. Dellinger's double jeopardy claim, which was fairly presented to, and considered by, the Tennessee Supreme Court.

Respondent's motion for summary judgment on the ground that Mr. Dellinger defaulted his double jeopardy claim must be denied. The claim must be reviewed on the merits.

2. Mr. Dellinger's Double Jeopardy Claim Cannot Be Defaulted, Or Constructively Or Impliedly Waived

The prohibition against double jeopardy is thousands of years old, it is fundamental, and the Supreme Court has said that its protection removes the power from both the federal and state governments to initiate a second prosecution regardless of the outcome of the first. The Supreme Court has also said that under the Double Jeopardy Clause a prior prosecution on the same charges completely disables the federal and state governments from trying a person a second time or seeking additional punishment. Such a core constitutional right cannot be impliedly or constructively waived or defaulted. See United States v. Gonzales-Lopez, 548 U.S. 140, 148-49 (2006) (Scalia, J.)); College Savings Bank v. Florida Postsecondary Educ. Expense Bd., 527 U.S. 666, 681-82 (1999) (Scalia, J.) (no implied or constructive waivers of core constitutional rights); United States v. Olano, 507 U.S. 725, 733-34 (1993) (O'Connor, J.) ("Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for the waiver and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake"); Railey v. Webb, 540 F.3d. 393, 399 (6th Cir. 2008) (Batchelder, J. ) (structural errors are not subject to forfeiture or default citing

Washington v. Recuenco, 548 U.S. 212, 219(2006) (Thomas, J.) And Sullivan v. Louisiana, 508 U.S. 275, 283 (1993) (Scalia, J.)), cert. denied, 129 S.Ct. 2878 (2009).

Assuming this Court finds that Mr. Dellinger's double jeopardy claim was not fairly presented, that there is no available state court remedy for presenting the claim, and that the double jeopardy claim was defaulted under state law within the meaning of AEDPA, because the prohibition against double jeopardy is fundamental to the criminal justice process and a core right of citizens, it cannot be forfeited, impliedly or constructively waived, or defaulted and must be considered on the merits. Respondent's motion for summary judgment based on default must be denied. The double jeopardy claim must be reviewed on the merits.

3. The AEDPA Does Not Bar Consideration Of Mr. Dellinger's Meritorious Double Jeopardy Claim, Which Itself Establishes That He Is Actually Innocent of The Death Penalty, A Setttled Exception To The Procedural Default Rule

As *Bullington, Burks, Green, Poland, Rumsey,* and *Sattazahn* teach, double jeopardy and collateral estoppel bar the federal or state governments from seeking the death penalty after the defendant has previously acquitted of the death penalty on identical facts, mixed findings of fact, or ultimate conclusions. Assuming that this Court determines that Mr. Dellinger did not fairly present his double jeopardy claim, that the Tennessee Supreme Court did not decided it, and that the guarantee of against double jeopardy is not a fundamental structural error and therefore cannot be defaulted, Mr. Dellinger's meritorious double jeopardy claim itself establishes that he is actually innocent of the death penalty, and so it must be decided and resolved on the merits. Magwood v. Warden, 664 F.3d 1340, 1346-47 (11th Cir. 2011 (assuming that petitioner defaulted capital sentencing claim, *Sawyer v. Whitley,* 505 U.S. 333, 346-47 (1992) provides that a procedural default of a claim that would result in ineligibility for the death penalty falls within the actual innocence exception to procedural default).

Mr. Dellinger's double jeopardy claim, like the sentencing claim raised in *Magwood*, presents the unique, rare circumstances that bring Mr. Dellinger squarely within the *Sawyer* doctrine.

Respondent's motion for summary judgment based on default must be denied. The double jeopardy claim must be reviewed on the merits.

4. To The Extent AEDPA Bars This Court From Considering Unique Circumstances Presented With Respect To A Core Constitutional Claim AEDPA Is Unconstitutional, Because It Violates The Separation Of Powers Doctrine And Because It Impermissibly Suspending The Writ Of Habeas Corpus

Habeas corpus is, at its core, an equitable remedy. See Munaf v. Geren, 553 U.S. 674, 693 (2008) (citing Fay v. Noia, 372 U.S. 391 (1963); Schlup v. Delo, 513 U.S. 298, 319 (1995). Given that equitable principles govern the substantive law of habeas corpus, the Supreme Court has emphasized that it will "not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,'" Holland v. Florida, 130 S.Ct. 2549, 1560-62 (2010) (quoting Miller v. French, 530 U.S. 327, 340 (2000) (quoting Califano v. Yamasaki, 442 U.S. 682, 705 (1979).

Equitable principles not only govern the substantive law of habeas corpus, but they are embodied in specific constitutional guarantees, establishing meaning, contours, and standards for the proper application of constitutional rights in specific cases, including the Double Jeopardy Clause. See Ashe v. Swenson, 397 U.S. at 442-43, 445 (collateral estoppel is part of the double jeopardy prohibition, rendering its application a matter of "constitutional fact").

Thus, equitable principles are not simply tools in the judicial tool box in exercising habeas corpus jurisdiction or construing and applying constitutional principles to specific cases; equitable notions (like waiver and estoppel) are the marrow of effectuating constitutional rights and the crucial lens through which constitutional claims must be viewed in habeas litigation. To

the extent that AEDPA prevents this Court from performing its role in adjudicating the double jeopardy claim here, it is unconstitutional.

It is the ultimate responsibility of the courts to interpret and apply the Constitution and law of the United States. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178-80 (1803). Of course, this is also true when a court is exercising jurisdiction on habeas review; that is, a court has an independent obligation to weigh what the law is. See Williams v. Taylor, 529 U.S. 362, 411 (2000) (quoting Wright v. West, 505 U.S. 277, 305 (1992) (O'Connor, J., concurring). Consistent with this responsibility, federal courts have the power to restrain themselves, subject to the limitation that they do not effectively abdicate their own jurisdiction. See New Orleans Pub. Serv. Inc v. Council of the City of New Orleans, 491 U.S. 2350, 358 (1989); Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). On the other hand, there are limitations on the ability of Congress to restrain the exercise of judicial power.

While the Constitution confers on Congress the authority to vest judicial power in the courts, its duty is to vest the "whole of judicial power," when it does so. Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 330 (1816) (Story, J.). Thus, although Congress has extensive power to regulate the jurisdiction of the courts, it may not interfere with the federal court's independent process of adjudication and interpretation once power is conferred. See United States v. Klein, 80 U.S. (13 Wall) 128 (1871). This distinction – that is, between prescribing limitations on jurisdiction and constraining the full and proper exercise jurisdiction once conferred – has been repeatedly recognized to be a crucial one. See Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 430 (1995).

Indeed, this distinction is mandated by the doctrine of separation of powers, which "is at the heart of our Constitution." Buckley v. Valeo, 424 U.S. 1, 119 (1976); see Plant v.

Spendthrift Farm, Inc, 514 U.S. 211, 221 (1995) (founders deemed it of critical importance "to separate the legislative from the judicial power").

Congress granted federal court jurisdiction to adjudicate habeas claims of persons in state custody in 28 U.S.C. §2254(a). The incidents and powers of adjudication are a fortiori part and parcel of this jurisdictional grant. Compare Moore v. Dempsey, 261 U.S. 86, 92 (1923) (Holmes, J.) ("it does not seem to us sufficient to allow a Judge of the United States to escape the duty of examining the facts for himself when if true as alleged make the trial absolutely void"). To the extent that 28 U.S.C. §2254(d)(1) prescribes a rule of decision – "contrary to" or an "unreasonable application of" "clearly established" federal law "as established by the Supreme Court" – it suspends the doctrine of *stare decisis*. It also eliminates by congressional fiat the vast quantity of Circuit Court opinions that are the crucible where the vast majority of constitutional claims are adjudicated and rights clarified.

Finally, AEDPA's limitations on the exercise of habeas jurisdiction also constrain the proper exercise of equitable principles in habeas cases, but prevents, distorts or interferes with the consideration of equitable principles that are bound up in the meaning and application of the Constitution itself. Equitable principles by their very nature recognize that rigid "legislative" rules do not, and cannot account for the manifold circumstances of life, which occur more frequently than not in the interstices that the rules necessarily create. Equitable principles lie at the heart of the adjudication of habeas cases and they are part of the fabric of constitutional rights. To the extent AEDPA limits the application of these principles, it violates the separation of powers doctrine as well as effectively limiting or suspending the writ.

To the extent that Mr. Dellinger's double jeopardy claim is barred by the above limitations imposed by AEDPA, the statute is unconstitutional. To the extent that courts

exercising habeas jurisdiction for the purpose of interpreting and applying constitutional rights defer to this encroachment, they, in turn, are wrongfully abdicating their responsibility under the Constitution and the jurisdictional grant in 28 U.S.C. §2254(a).

*C. Conclusion*

The second capital prosecution of Mr. Dellinger seeking that he be sentenced to death for the murders of Tommy Griffin and Connie Branam violated the Double Jeopardy Clause and principles of estoppel that clarify the right. Having previously been acquitted of the capital murder of Connie Branam and Tommy Griffin, the sentence of death in Blount County for the capital murders of Tommy Griffin and Connie Branam is also unconstitutional and must be set aside.

Respondent is not entitled to summary judgment on this claim on the ground of default. Indeed, Mr. Dellinger is entitled to summary judgment as the nonmoving party. Respondent's motion for summary judgment on this claim must be denied.

## VIII. JAMES DELLINGER IS ENTITLED TO HABEAS CORPUS RELIEF BECAUSE THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE THAT WAS MATERIAL TO HIS CONVICTION AND DEATH SENTENCE. (Petition ¶¶3.5)

In violation of due process under the Fourteenth Amendment, the prosecution failed to disclose to James Dellinger numerous exculpatory documents which were material to his conviction and sentence, because they establish reasonable doubt whether he was guilty of first-degree murder and/or whether he deserved of the death sentence. Under Brady v. Maryland, 373 U.S. 83 (1963), Dellinger has thus stated meritorious due process claims for relief. Respondent's motion for summary judgment must be denied. This Court should deny the motion under Fed.R.Civ.P. 56(d)(2), because this Court has not provided Petitioner the discovery he requires to

prepare and fully present this claim. Rather, this Court should deny summary judgment, grant discovery as Petitioner previously requested, and afterwards conduct further proceedings on this claim. Alternatively, this Court should simply deny Respondent's motion for summary judgment and conduct further proceedings, as James Dellinger has presented potentially meritorious claims for relief under *Brady*.

*A. The Brady Standard*

Under Brady v. Maryland, 373 U.S. 83 (1963), the prosecution violates due process when it withholds exculpatory evidence that is "material" to either guilt or sentence. As the Sixth Circuit has explained the three elements of a *Brady* claim:

> [*Brady*] and its progeny held that due process is violated when the prosecution suppresses evidence favorable to the accused in a criminal case if the evidence is material to guilt or to sentencing. *Id*. at 87. This duty extends to information in the possession of the law enforcement agency investigating the offense. *Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995).
> A *Brady* violation consists of three elements . . . (1) that the evidence was favorable . . . (2) that it was suppressed (whether intentionally or not) by the government, and (3) that prejudice ensued. [*Strickler v. Greene*, 527 U.S.] at 281-282. The prejudice (or materiality) element of a *Brady* violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available.

Jamison v. Collins, 291 F.3d 380, 384-385 (6th Cir. 2002).

While the first two prongs of the *Brady* standard (evidence exculpatory, evidence suppressed) are straightforward, the third prong – materiality – bears some explication. A "reasonable probability" of a different outcome is a probability sufficient to undermine confidence in the outcome of the trial. Kyles v. Whitley, 514 U.S. 419, 434 (1995). A petitioner *need not* demonstrate "by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," whether "based on the presence of

reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant." Id.

When a guilt-phase *Brady* claim is at issue, a petitioner need only show a "reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt." Strickland v. Washington, 466 U.S. 668, 695 (1984). Put another way, the question is whether the withheld evidence "would have permitted the development of alternate theories or different lines of argument." Bell v. Bell, 512 F.3d 223, 237 (6th Cir. 2008)(en banc). The "cumulative effect" of the withheld evidence on the verdict must be assessed. Kyles v. Whitley, 514 U.S. 419 (1995).

When addressing a *Brady*-at-sentencing claim, the question is whether the withheld evidence was "material to the jury's assessment of the proper punishment . . . ." Cone v. Bell, 556 U.S. ___, ___ (2009). "Prejudice is established if there is a reasonable probability that at least one juror would have struck a difference balance between life and death," had such evidence been disclosed. Hamilton v. Ayers, 2009 U.S.App.Lexis 21107 *88 (9th Cir. 2009), *citing* Wiggins v. Smith, 539 U.S. 510, 537 (2003). See also Banks v. Dretke, 540 U.S. 668 (2004)(finding *Brady* violation in capital sentencing proceeding). Where, as here, residual doubt as to guilt is, by Tennessee law, a mitigating circumstance which may be considered by the jury all withheld evidence which identifies or supports a theory that someone other than Mr. Dellinger committed the crime is relevant and material to sentencing. State v. Kiser, 284 S.W.3d 227, 260 n. 36 ("Residual doubt is an unspecified mitigating factor" provided for in [Tennessee Code Annotated] subsection 39-13-204 (j)(9)).

*B. Summary Judgment Is Inappropriate Where Discovery Has Not Been Completed.*

Summary judgment is inappropriate where, as here, discovery has not yet been granted for the development of the facts necessary to support Mr. Dellinger's claims. Pursuant to Rule 56 (d)(2) of the Rules of Civil Procedure, if a nonmovant cannot present facts essential to justify its opposition, the court may properly allow time to take discovery before the resolution of the motion for summary judgment. In this matter, James Dellinger has filed a motion for discovery (D.E. 46), which the Magistrate has denied. D.E. 49. Mr. Dellinger, however, has entered his objection to that order (D.E. 50), and there has been no final resolution of his entitlement to discovery on his *Brady* claim. Accordingly, summary judgment is, under Rule 56(d)(2), premature. The Court should, therefore, deny Respondent's motion for summary judgment, pending disposition of Petitioner's objection's to the denial of discovery. Afterwards, the Court should grant discovery, allow Petitioner the opportunity to fully present his opposition to Respondent's request for summary judgment. Respondent's motion should thus be denied.

*C. James Dellinger Has Stated Meritorious Brady Claims.*

Even without discovery, James Dellinger has meritorious *Brady* claims, because he establishes by undisputed facts that the prosecution withheld exculpatory evidence that was, under *Brady* and *Kyles*, material to Dellinger's conviction and sentence. This Court should therefore deny summary judgment and instead order further proceedings on such claims. In particular, it quite clearly appears that James Dellinger has presented two meritorious *Brady* claims: (1) the prosecution withheld material exculpatory evidence demonstrating that Tommy Griffin was heavily involved in drug dealing and that persons other than James Dellinger had motive and opportunity to kill Griffin; and (2) the prosecution withheld material exculpatory evidence showing that Dr. Charles Harlan lacked credibility and/or testified falsely and/or misled the jury about the timing and circumstances of the victim's death.

1. The Prosecution And Its Agents Had In Their Possession, But Withheld, Exculpatory Evidence Showing That Tommy "Dooley" or "Doodley" Griffin Was Involved In The Drug Trade And Was At Least Rumored To Be An Informant --- A Status Which Would Have Given Several Suspects Reason To Kill Griffin. **(Petition ¶3.5.1.)**

There is no factual dispute that there was significant exculpatory evidence in the possession of the prosecution and/or law enforcement authorities which showed that Tommy Griffin was heavily involved in the Sevier County drug trade, primarily as the agent of Drug Dealer Bobby Floyd. See D.E. 35, p. 64, Answer to Amended Petition for a Writ of Habeas Corpus. The State possessed, but did not disclosed to the defense, proof of Tommy Griffin's involvement with Bobby Floyd, nor did the State disclose Floyd's connection to Dennis "Hippie" Schular, Gregory Anawalt, Michael Gaines, Jimmie Gates, Juan Sierra, and others all of whom were under investigation at the time of Mr. Griffin's death for involvement in a large cocaine conspiracy.

As the Tennessee Supreme Court has found that the proof in this matter showed that "the defendants were friends of the victim, and no clear motive was established at trial," the existence of other suspects completely unrelated to Mr. Dellinger was clear *Brady* information.[10] At the trial of this matter, the State repeatedly emphasized that the burden of proof did not extend to proof of motive – because the State had not uncovered any motive for James Dellinger to kill Tommy Griffin. In light of this gaping hole in the State's case, information regarding the motive of the members of large cocaine conspiracy to kill Tommy Griffin became all the more material and relevant.

[10] That James Dellinger was aware of Tommy Griffin's drug habit and association with Bobby Floyd is irrelevant for the analysis of this claim. James Dellinger was unaware of the FBI, TBI, and drug task force surveillance of Hippie Shular, Juan Sierra, and others in the COCAINE CONSPIRACY and was equally unaware of task force investigation of Bobby Floyd, Richard Clark, Jimmie Gates, and Gregory Anawalt. As such, though he heard gossip that Tommy Griffin had "narced" on Bobby Floyd and so informed his counsel (see Exhibit 23, *Memo by Trial Counsel, Eugene Dixon*) he and his attorneys were unable to substantiate that claim nor even evaluate it properly without the withheld *Brady* information.

Though Mr. Dellinger has been denied discovery of additional information necessary for the full presentation of his claim,[11] the documents he does possess clearly show law enforcement's knowledge of the following:

1) Tommy Griffin's participation in the drug trade Exhibit 24, *Chief Voncannon Report (interview with Richard Deitwiler).*

2) Tommy Griffin's association with Bobby Floyd; Id.;

3) Bobby Floyd's association with Hippie Shular and through Shular with Juan Sierra, Burky Burkhart, et al (identified in prior pleadings as "COCAINE CONSPIRACY");[12]

4) Tommy Griffin's presence at a December 2, 1991 cocaine deal involving "a pile of cocaine…approximately three inches in diameter and three to four inches high" at Richard Clark's trailer in Maryville with Bobby Floyd. (See Exhibit 25, USA v. Bobby Floyd; Exhibit 26, *FBI Transcript of Wire Recording of Drug Buy*).

5) The threat of violence implied by Gregory Anawalt's gun at Richard Clark's trailer on December 2, 1991. (See Exhibit 25, supra).

As law enforcement was aware of Tommy Griffin's participation in a drug deal with Bobby Floyd on December 2, 1991 --- less than 3 months before his death --- and of Bobby Floyd's arrest on January 17, 1992 and Richard Clark's arrest on January 21, 1992 --- one month and one day before Tommy Griffin's death, and was aware that Mr. Griffin either was or was

---

[11] Mr. Dellinger's objection to the denial of discovery of federal judicial and law enforcement records regarding COCAINE CONSPIRARY, the TBI files, Blount County Dispatch records regarding the men with whom Tommy Griffin was found prior to his arrest the night he disappeared, and ballistics and latent print evidence remains pending in front of the District Court. Without this critical discovery, Mr. Dellinger is constrained from fully arguing the merits of his claims contained in D.E.26, ¶ 3.5.1. Without discovery, Petitioner cannot even address his claims contained in ¶¶3.5.1.3.; 3.5.1.4.; 3.5.1.8.

[12] Mr. Dellinger defined the COCAINE CONSPIRACY specifying, "For the purposes of this motion, the COCAINE CONSPIRACY references all participants and acts investigated by the TBI, F.B.I., and local law enforcement relative to the undercover operations nicknamed "Sweet Pickles" and "Sevier Trauma" including, but not limited to, the charges which were prosecuted in Federal Court in the following case numbers: 3:95-140 Arthur Harmon; 3:95-141 Carlos Jimenez; 3:95-142 Juan Sierra; 3:95-143 James Shahan;3:95-144 Dennis Shular; 3:95-91(1) Juan Sierra; 3:95-91(2) Dennis Shular; 3:95-91(3) James Shahan; 3:95-91(4) Carlos Jimenez; 3:95-91(5) Burkey C. Burkhart; 3:95-91(6) Joseph Abbott, Jr.; 3:95-91(7) Charles Abbott; 3:95-91(8) Kenneth Hamblin; 3:95-93 Carolyn Freeman; 3:95-94 Corey Hedrick; 3:95-95 Gary Lewis; 3:95-96 Ricky Freeman; 3:92-10 Richard Clark; 3:92-10 Bobby Floyd." (See, D.E. 49, 50, incorporated by reference).

thought to be an informant, all information law enforcement had regarding Mr. Griffin's involvement with drug activity was relevant and material to Mr. Dellinger's defense.

That law enforcement had information showing that Mr. Griffin was thought to be --- as Bobby Floyd related he had heard ---an informant is critical to Mr. Dellinger's claim. (See Exhibit 24, *Chief Voncannon Report* (interview with Bobby Floyd about rumor Tommy Griffin was a "the one who got [Bobby Floyd] busted"). While Mr. Dellinger has claimed that law enforcement knows the truth of whether Mr. Griffin was, in fact, an informant, and has requested the discovery relevant to that determination, Mr. Dellinger --- without such discovery --- is not in a position to prove that law enforcement withheld information that Mr. Griffin was an informant. However that is not dispositive of this issue: in truth and in fact, whether Mr. Griffin was an informant is less relevant to the motivation of members of the cocaine conspiracy to kill him than is information that shows Mr. Griffin was **thought to be an informant**. Whether Mr. Griffin in fact provided information to law enforcement was irrelevant to his marked status if it was generally thought that he did.

Upon the appropriate grant of discovery as previously requested in this matter, James Dellinger will obtain additional information which should have been provided to the defense in support of his claim that the government withheld information regarding other suspects who had motive to kill Mr. Griffin due to his involvement in the drug trade and/or status as a known/suspected informant. [13]

---

[13] In seeking discovery, James Dellinger has sought disclosure of numerous investigative and other documents in the possession of the federal courts (and/or federal law enforcement), which the court will not disclose without a court order. See also Exhibit 27. *Declaration of Counsel Amy D. Harwell*, para. 7. Because Dellinger has, to date, not ever seen these materials which continue to be withheld from him, he has, by definition, "cause and prejudice" for failing to litigate the materiality of any such documents in state court. See Apanovitch v. Houk 466 F.3d 460, 474 (6th Cir. 2006)(withholding of material evidence constitutes *per se* exception to allegation of procedural default). Upon being granted discovery, therefore, Dellinger will be entitled to merits review of his *Brady* claim concerning the materiality of these particular documents and/or materials.

The State has moved for summary judgment alleging that the Tennessee Court of Criminal Appeals' determination of this issue is not contrary to nor an unreasonable application of clearly established federal law and that it did not involve an unreasonable determination of the facts at issue. Respondent is wrong. In regards to this claim, the Tennessee Court of Criminal Appeals erroneously and unreasonably determined that: "Notably, the petitioner does not contend that the state had in its possession any information relative to this claim." Dellinger v. State, 2007 WL 2428049 at *26 (C.C.A., Aug 28, 2007) perm. app. granted Feb. 25, 2008. In fact, the Petition for Post-Conviction Relief alleged exactly the opposite. Claim 2: Prosecutorial Misconduct found on page nineteen of the Petition alleged "The State of Tennessee failed to provide counsel for Mr. Dellinger with exculpatory material in violation of his rights . . ." The list of materials the State was alleged to have failed to provide included, in paragraph sixty-four (64), "The State failed to turn over audio records of wire taps involving other suspects . . ." The Tennessee Court's determination that James Dellinger had failed to allege that the state possessed *Brady* materials relating to Tommy Griffin's drug activity was unreasonable.

2. The Prosecution And Its Agents Had In Their Possession But Withheld, Exculpatory Evidence Showing That At The Time Dr. Charles Harlan Testified At Mr. Dellinger's Capital Trial, He Was Under Investigation By The TBI For Unethical, Incompetent And Illegal Conduct.

Despite being under investigation for unethical, incompetent and illegal conduct – and in fact having been stripped of his appointment as Chief Medical Examiner --- Charles Harlan testified at James Dellinger's trial as to his expert opinion as to the time of death as the purported Chief Medical Examiner of the State of Tennessee. The State failed to disclose Harlan's unethical, incompetent, and illegal conduct to Mr. Dellinger or his attorneys and allowed Harlan to testify under oath that he was the Chief Medical Examiner when, in fact, he was not.

As Exhibits 28 and 29 demonstrate, Charles Harlan was not, in fact, the Chief Medical Examiner for the State of Tennessee at the time of James Dellinger's trial as he testified to the jury. See Exhibit 28, *Portion of filings initiated by the Tennessee Attorney Generals Against Doctor Harlan;* Exhibit 29, *Department of Health Documents*. Contrary to his testimony under oath, Harlan's contract as the state's chief medical examiner had been discontinued on June 20, 1995. Id. The Department of Health sought judicial intervention to enforce the termination of Harlan's contract and a court order was entered August 7, 1995 informing Dr. Harlan that he was no longer the State of Tennessee's Chief Medical Examiner. Id. at 12. Because Harlan continued to misrepresent his credentials, the State of Tennessee, through the Office of the Attorney General, specifically John Knox Walkup, filed legal action to enjoin Harlan from misrepresenting his credentials. Exhibit 28, supra at p. 19. None of this history or documents was made known to trial counsel before or during Harlan's testimony.

James Dellinger has cause and prejudice for any failure to raise this claim until now, because Tennessee's Post-Conviction Act does not allow for discovery – which would have enabled him to present this claim in state court. In the alternative, if this Court were to find that Mr. Dellinger should have been able to obtain this information for presentation in state court, he has cause for the resulting default in the ineffective assistance of counsel in post-conviction proceedings.

*a. James Dellinger has cause to overcome any alleged default.*

James Dellinger has cause to overcome any alleged default of this *Brady* Claim. As set forth in Tennessee Supreme Court Rule 28 discovery in post-conviction proceedings is limited to the discovery provided by Tennessee Rules of Criminal Procedure, Rule 16, which does not allow for discovery of materials such as Harlan's TBI file.

If the Court were to find that the lack of discovery in post-conviction proceedings is not sufficient cause to excuse Mr. Dellinger's default of this claim, Mr. Dellinger would submit that he has additional cause --- the ineffective assistance of his post-conviction counsel. While in the past it has been true that generally there is no constitutional right to counsel in state post-conviction proceedings (See Pennsylvania v. Finley, 481 U.S. 551 (1987)), the issue remains unresolved: The Supreme Court has just recently granted certiorari to determine whether a post-conviction petitioner has a right to counsel to present claims that first become available in post-conviction proceedings (such as ineffective assistance of counsel). See Martinez v. Schriro, 623 F.3d 731 (9th Cir. 2010), *cert. granted sub nom. Martinez v. Ryan*, 563 U.S. ___ (2011)(U.S. No. 10-1001)

If a constitutional claim can only be brought for the first time in post-conviction, an exception to the old, general, rule must apply. Because post-conviction proceedings provide the first opportunity for Mr. Dellinger to litigate his Brady claims, he was (and is) entitled to effective assistance of counsel for the presentation of such claims. Cf. Coleman v. Thompson, 501 U.S. 722, 756, 111 S.Ct. 2546, 2568 (1991)("Coleman has had his 'one and only appeal,' if that is what a state collateral proceeding may be considered"). To conclude otherwise would mean that Mr. Dellinger was not entitled in any forum to the effective assistance of counsel in presenting a constitutional claim. This conclusion comports with the narrow holding in Coleman, where the Court ruled only that a petitioner did not have the right to counsel on appeal from an adverse ruling in a state habeas trial court. Cf. Coleman, 501 U.S. at 755, 111 S.Ct. at 2567-68.

Therefore, James Dellinger has established cause for any failure to present his *Brady* claims in post-conviction. See MacKall v. Murray, 109 F.3d 957, 960 (4th Cir. 1997)(petitioner in post-conviction proceedings entitled to effective assistance of counsel on claims which could

only be raised for first time in post-conviction proceedings: "To decide that a defendant claiming ineffective trial counsel is not entitled to representation in his first habeas corpus proceeding . . . would be to conclude that the defendant is not entitled in any forum to an attorney's assistance in presenting a fundamental constitutional claim. We will not so hold."), rev'd en banc, 131 F.3d 442 (4th Cir. 1997). See also, Exhibit 30, *Jackson v. State, No. 3:97-0444 (M.D.Tenn. June 14, 2001)(Judge Nixon)(*in addressing claims that post-conviction counsel was ineffective, the District Court recognized that reasonable jurists could debate whether petitioners are entitled to the effective assistance of post-conviction counsel on claims that could not have been presented previously)

*b. James Dellinger can establish prejudice to overcome any alleged default.*

James Dellinger can establish prejudice to overcome any procedural default: Dellinger's *Brady* claim entitles him to habeas corpus relief. The proof withheld by the State would have allowed trial counsel to prove that Harlan committed perjury in his testimony in this case – ie. by testifying falsely that he was "chief medical examiner for the State of Tennessee." Without Harlan's testimony, the State did not have any evidence to rebut the defense expert's testimony that Tommy Griffin did not die until twenty-four to thirty-six hours before his body was found (well outside the period of time necessary for the prosecutions' theory of Dellinger's guilt). If the defense had had the necessary documents and information to impeach Harlan's testimony regarding his credentials, Dr. Wolfe's correct assessment of Tommy Griffin's time of death would have been credited by the jury and James Dellinger would have been acquitted. The failure of the state to disclose the critical information which would have proven their surprise rebuttal witness was not, in fact, the "Chief Medical Examiner for the State of Tennessee" irreparably prejudiced Mr. Dellinger.

Because Mr. Dellinger has established both cause and prejudice to overcome any procedural default of these claims, there is no bar to federal review of these claims. Respondent is not entitled to summary judgment and Mr. Dellinger is entitled to a hearing.

## IX. THE IMPOSITION OF THE DEATH PEANLTY IN THIS CASE IS UNCONSITUTIONAL BECAUSE THE SEVIER COUNTY CONVICTION USED AS THE SOLE AGGRAVATING CIRCUMSTANCE TO MAKE MR. DELLINGER ELIGIBLE FOR THE DEAHT PENALTY WAS OBTAINED IN VIOLATION OF HIS CONSITUTIONAL RIGHTS. (¶¶ 3.2.3. and 3.21)

### A. *Respondent's Summary Judgment Motion Must Be Denied Because It Is Premature, Given Dellinger's Separate Pending Habeas Challenge To The Sevier County Conviction*

As this Court is aware, James Dellinger has a petition for a writ of habeas corpus currently pending in front of this Court. Mr. Dellinger's petition asserts multiple grounds for relief and outlines several violations of constitutional rights. Central to Mr. Dellinger's entitlement to relief is the denial of due process to Mr. Dellinger which resulted from the trial court's refusal to sever Mr. Dellinger's case from Mr. Sutton's case --- even after Mr. Sutton demonstrably committed perjury. See 3:09-cv-404 D.E. 1, pps. 2, 3, 9, incorporated by reference.

#### 1. The Sevier County Conviction Remains Pending In This Court On Federal Habeas Review.

Mr. Dellinger's Petition for a Writ of Habeas Corpus, 3:09-cv-404, remains pending in this Court on Mr. Dellinger's Motion for Equitable Tolling. As Mr. Dellinger's entitlement to relief on the Sevier County conviction is, in the first instance, to be determined in that case, resolution of this matter – regarding the use of that conviction as an aggravating circumstance to justify imposition of the death penalty in this case – must await this Court's determination of that separate, but related, case.

2. This Court Has Yet To Decide Dellinger's Entitlement To Discovery On His Habeas Challenge To The Sevier County Conviction (Rule 56).

Summary judgment is inappropriate where, as here, discovery has not yet been granted for the development of the facts necessary to support Mr. Dellinger's claims. Pursuant to Rule 56 (d)(2) of the Rules of Civil Procedure, if a nonmovant cannot present facts essential to justify its opposition, the court may allow time to take discovery before the resolution of the motion for summary judgment. In this matter, this Court has not yet ruled on Mr. Dellinger's Motion for Equitable Tolling (3:09-cv-404, D.E. 29) nor upon Mr. Dellinger's Motion for Discovery in support of his claim of actual innocence, included within the Motion for Equitable Tolling. For the reasons already argued and argued herein, and in light of Rule 56, this Court should deny summary judgment, grant discovery, and provide Mr. Dellinger an evidentiary hearing at which he may prove his entitlement to relief.

3. Dellinger May Secure Habeas Corpus Relief On His Sevier County Conviction.

The sole aggravating circumstance to support the imposition of the death penalty in this case, the Sevier County conviction, was obtained in violation of Mr. Dellinger's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. Further, the Tennessee Courts made unreasonable factual determinations in order to uphold the convictions in the face of the errors about which Mr. Dellinger complained. Accordingly, this Court may review Mr. Dellinger's claims for relief in the Sevier County case (3:09-cv-404) without the deference to the state court judgment that normally attaches under the AEDPA.

In the Sevier County case, Mr. Dellinger was tried in a joint trial with Gary Sutton. The joint trial resulted in unfair prejudice to James Dellinger in violation of his right to a fair trial, including his right to due process under the Fifth and Fourteenth Amendments. During the Sevier

County trial, the State presented witnesses who testified to seeing an altercation beside the roadway on Alcoa Highway involving at least two men in a Camaro. The witnesses were unable to describe the Camaro in question other than that one of its front headlights was burned out. The State further introduced proof that Tommy Griffin was arrested by law enforcement near the area where the one-headlighted Camaro and fight had been seen. Further, hearsay testimony was admitted regarding Tommy Griffin's statements to law enforcement that he had been with friends who had put him out of the car. In the defense proof, co-defendant Sutton testified regarding the headlights on his Camaro. Mr. Sutton testified that one of the headlights on the Camaro had been out when he purchased the car six or seven months before the events in question, but that he had replaced the headlight shortly after buying the car. Sutton further swore under oath that the headlights were in working order on the night Griffin went missing[14] and were still in working order when Sutton was arrested in put in jail. Sutton's attorneys moved for the admission of a headlight as an exhibit to Sutton's case in chief. The headlight was admitted through the testimony of a court officer who testified that he verified that the headlight was in working order prior to its removal from co-defendant Sutton's Camaro. Sutton's credibility --- and Dellinger's chance at a fair trial --- came crashing down when a juror noted and pointed out to the other jurors and the court that the headlight introduced into evidence had been manufactured February 13, 1992.

The record reflects that Dellinger renewed his motion for severance from Sutton following Sutton's introduction of the headlight. The trial court denied Dellinger's motion for a severance and a motion by both defendants for a curative instruction. The court did not give the jury any instruction or direction as how Sutton's attempt at falsifying evidence was to be viewed.

[14] Mr. Griffin was last seen alive on February 21, 1992. The fighting beside Alcoa Highway near a one-head-lighted Camaro was witnessed on February 21, 1992.

Indeed, the trial court's comments in response to Dellinger's renewed motion to sever illustrates the unfair prejudice Dellinger suffered by Sutton's act:

> This Court is not aware of any instruction that it can give in regards to how the jury may consider the credibility of any witness. That is – it is contained in the general charge that all of you have heard this Court give before. That is what the Court will do. If evidence was offered by anyone in this Court that turns out to be perjury --- that is a peril anyone runs when they wear under oath to testify truthfully, and I have no control over that other than I will charge the law as I understand it. If perjury has been committed by anyone who's testified, that, as I say, is their problem. That is their peril . . . The Court realizes, again, the severity of the problem. These clients own – strike that. These defendants' own statements placed them together throughout this period, other witnesses placed the together. There is absolutely no reason, other than the facts themselves, that create a problem for these defendants in being tried together, but under the law, these defendants should have been tried together, and they are tried together, and the evidence comes in as it comes in. That's the law.

Sevier County Record Vol. 21, at pps. 2014-15.

Once Sutton demonstrably committed perjury, the trial court's failure to sever Dellinger's case from that of his co-defendant violated Mr. Dellinger's right to due process. Co-defendant Sutton's falsehood became, in essence, proof against Mr. Dellinger. As a result of Sutton's lie, the proof against Mr. Dellinger changed. Suddenly the State no longer had merely a circumstantial evidence case that might put Sutton and Dellinger as being the last people seen with Mr. Griffin alive, but Sutton's lie about the headlight became substantive proof of their, collective, guilt.

The state courts of Tennessee ruled on this issue based upon an unreasonable determination of the facts. James Dellinger raised issue of the introduction of the headlight/the denial of severance on direct appeal in the Sevier County case. Despite extensive briefing regarding the affair of the headlight, Tennessee Court's determination of this issue completely ignored the introduction of the headlight into evidence – addressing only other 404(b) evidence

admitted against Sutton and whether that evidence tainted Dellinger's trial. Holding that the trial court's instructions regarding the proof to be considered as to each party was sufficient to cure any injustice at having been tried together, the Tennessee Court of Criminal Appeals failed to recognize that when Sutton introduced the headlight and the juror identified the date stamped on the headlight, thereby pointing out Sutton's perjury, the trial court did not give any curative instruction --- despite Dellinger's renewed motion for a severance. The Tennessee court's unreasonable determination of these facts opens this claim for review by this Court in the Sevier County litigation (3:09-cv-404).

4. Conclusion: Respondent's Motion For Summary Judgment Must Be Denied Pending Final Resolution Of The Sevier County Habeas Corpus Proceeding

For all these reasons, the Warden's motion for summary judgment must be denied. Until resolution of the related case 3:09-cv-404, resolution of this issue in this case is premature. Mr. Dellinger is entitled to discovery for the development of his claims of entitlement to relief, indeed his motion for discovery in the related case has been pending for quite some time. Until such time as Mr. Dellinger has been granted discovery such that he can fully present his entitlement to relief, summary judgment is inappropriate under Federal Rules of Civil Procedure Rule 56(d).

*B. Dellinger's Challenge To The Use Of The Sevier County Conviction As The Sole Aggravating Circumstance Is Not Barred By Any Procedural Default*

In its Answer to the Petition for a Writ of Habeas Corpus, the Warden asserts that "to the extent that the petitioner's present specific issue differs from that which was presented in the state courts, it is procedurally defaulted and barred from habeas corpus review." D.E. 34,

*Response* at p118. While Mr. Dellinger did not raise this claim in state court, his failure to do so does not constitute default.

1. Because The Invalid Sevier County Conviction Is The Sole Aggravating Circumstance Supporting The Death Penalty, Dellinger Is Actually Innocent Of The Death Sentence And His Challenge To The Sevier County Conviction Is Not Defaulted.

Contrary to Respondent's contentions, James Dellinger cannot have defaulted his entitlement to relief under this claim. If the Sevier County conviction –the sole aggravating circumstance used to justify imposition of the death sentence in this case – is determined to be invalid in other proceedings, then the death sentence in this case is void. T.C.A. 39-13-204 *et seq*.

2. In Any Event, The Proper Forum In Which To Consider Any Issues of Default Is The Separate Sevier County Habeas Proceeding.

James Dellinger is innocent of the crime for which he was convicted in Sevier County. He has proclaimed his innocence at every opportunity from his initial, pre-arrest, statements to law enforcement through his untimely filed Petition for a Writ of Habeas Corpus. But for the unethical abandonment of Mr. Dellinger by and mental illness of his counsel, Mr. Dellinger's claims for relief in the Sevier County case would have already been determined by this Court. See 3:09-cv-404, D.E.1, D.E. 29, incorporated by reference. Any question regarding any perceived default of any challenge to the Sevier County conviction should be resolved in that, the Sevier County, litigation, presently before this Court as 3:09-cv-404. As Mr. Dellinger's claims await adjudication in that matter, the determination of the issues which flow from his Sevier County claims, such as his claim of ineligibility for the death penalty presented here, are not ripe for summary judgment.

## X. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT FOR MR. DELLINGER'S CLAIM THAT THE STATE KNOWINGLY PRESENTED FALSE AND MISLEADING TESTIMONY AS A MATTER OF LAW. (Petition ¶ 3.6)

In the event that the court deems Mr. Dellinger's claim is defaulted, there is cause and prejudice to excuse any default. Federal courts retain jurisdiction to consider the merits of a procedurally defaulted claim. They must do so if the habeas petitioner establishes cause for the default and prejudice arising from such default. Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977). A habeas petitioner establishes cause for a procedural default by demonstrating that the default occurred due to "something that cannot fairly be attributed to him." Coleman v. Thompson, 501 U.S. 722, 753 (1991). Under this standard, cause for a procedural default exists if the default occurs at a stage of the proceedings at which a petitioner is entitled to effective representation, and counsel in allowing the default, performs deficiently. Murray v. Carrier, 477 U.S. 478, 488 (1986). Because Mr. Dellinger had the right to constitutionally effective counsel pre-trial, during trial, and on direct appeal (*Strickland v. Washington*, 466 U.S. 668 (1984) and *Evitts v. Lucey*, 469 U.S. 387, 393 (1985)), and because, as discussed below, in failing to take specified actions counsel performed ineffectively, this Court should consider the merits of specified claims.

Counsel renders ineffective assistance if he fails to present to the state courts an available, arguably meritorious issue. See Ratliff v. United States, 999 F.2d 1023, 1026 (6th Cir. 1993). Because appellate counsel could raise on direct appeal any issue, whether brought to the attention of the trial court or not, *State v. Duncan*, 698 S.W.2d 63, 67-68 (Tenn. 1985), in

addition to any claim that was or could have been perfected for appeal in the trial court, any issue appearing on the face of the record was also available for counsel to raise.

The following issues were available for presentation to the trial court and/or available for appeal. Because they are meritorious for the following reasons, any failure of counsel to perfect and raise them constitutes a deficient, prejudicial performance.

*A. False Testimony Standard*

The prosecution violates due process when it knowingly elicits material false testimony and when it fails to correct such testimony during trial. Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Mooney v. Holohan, 294 U.S. 103, 112-13 (1935). Similar to the rule in *Brady*, this prohibition applies not only to false testimony implicating a defendant, but to false testimony touching upon a witness's credibility (Napue, 360 U.S. at 269), and to false testimony that State officers know to be false even if the prosecutor does not know the testimony is false. See Longworth v. Ozmint, 377 F.3d 437, 445 (4th Cir. 2004); Williams v. Griswald, 743 F.2d 1533, 1542 (11th Cir. 1984); Wedra v. Thomas, 671 F.2d 713, 717 n.1 (2nd Cir. 1982); Schneider v. Estelle, 552 F.2d 593, 595 (5th Cir. 1977); Curran v. Delaware, 259 F.2d 707, 712-13 (3rd Cir. 1958).

The Court derives its definition of materiality in this context, in part, from the definition of materiality in the context of *Brady*. Accordingly, withheld evidence is material if there exists a reasonable probability that the result of the proceeding would have been different had the evidence not been withheld. Kyles v. Whitley, 514 U.S. 419, 434 (1995). However, because a false testimony claim involves official misconduct, the materiality standard is even less demanding than when such evidence is withheld. As such, false testimony is material if it *may* have had an effect on the outcome of the proceeding (*Napue*, 360 U.S. at 272); or, to put it

differently, if there is *any* reasonable likelihood that the false testimony could have affected the outcome the Court deems it material. Kyles, 514 U.S. at 433 n.7. In making these materiality determinations, federal courts do not engage in an item by item analysis of the evidence that the state wrongly withheld or presented, rather, they assess the collective effect of the evidence. See id. at 436-37.

1. The State Knowingly Presented the False Testimony of Dr. Charles Harlan, Whose Testimony Regarding Tommy Griffin's Time of Death Was Neither Scientifically Valid Nor Reliable (Petition ¶ 3.6.1).

Mr. Dellinger alleges in the Amended Petition that the State violated his due process rights when it knowingly presented the false testimony of Dr. Charles Harlan, who inaccurately testified about his credentials, the soundness of his methodology, and ultimately, Tommy Griffin's time of death. D.E. 26, Claim 3.6.1, p. 22. Respondent asserts that the claim is procedurally defaulted, and in the alternative, summarily dismisses the claim without adequately addressing the facts alleged in the Amended Petition. Instead, the State merely asserts that Dr. Harlan was not a material witness, any impeaching evidence was available as public record, and that there was no state knowledge of the falsity of the testimony. This is incorrect.

The State knew, or should have known, that Dr. Charles Harlan's testimony was false with regard to his qualifications, his alleged "scientific" methods, and his conclusions. At the time of Mr. Dellinger's trial, the State of Tennessee was investigating Dr. Harlan for his questionable medical practices and reprimanding him for his continuous misrepresentation that he was the Chief Medical Examiner of the State of Tennessee, a position that he lost in 1995 as a result of dubious practices. See Exhibit 31, *State v. Harlan Complaint*, p. 2. Regardless, the prosecution allowed Dr. Harlan to testify falsely against Mr. Dellinger about the time of Tommy Griffin's death under the shroud of his false credentials.

*a. Dr. Charles Harlan's Testimony Was Material*

The State claims that Dr. Charles Harlan was merely a rebuttal witness and thus was not material. In doing so, the State misconstrues the elements of knowingly presenting a false statement under *Napue* and *Giglio*. A witness need not be material; instead, the testimonial evidence that the witness provides must be material. As to material evidence, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 506. The knowing presentation of false evidence "undermines the confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678 (1985). Dr. Harlan's testimony regarding Tommy Griffin's time of death, which was inaccurate, directly undermined the trial's outcome because the prosecution built their case around it.

The State's case against Mr. Dellinger relied almost exclusively on the jury accepting the proposition that Tommy Griffin died shortly before midnight on Friday, February 21, 1992 or, in the very early morning hours of Saturday, February 22, 1992. Given the fact that the prosecution's case against Mr. Dellinger was based solely on circumstantial evidence, they used the time of death as a linchpin. Assistant District Attorney Edward Bailey's closing argument opened with the proposition that Tommy Griffin died shortly before midnight on Friday, February 21, 1992[15] and the following 60 pages of argument relied on that proposition. See Tr. Closing Argument by State, pp. 3-66. Attorney General Mike Flynn bolstered Dr. Harlan's testimony by emphasizing that "[t]he only person that you heard testify who is a board certified forensic pathologist who has done 15,000 autopsies is Dr. Charles Harlan." Id. at 42.

---

[15] ". . . I'm going to try to start at the beginning here. On Friday the 21st of February, just a few minutes before midnight, two gunshots were heard at the Blue Hole. That, you know, is a fact, ladies and gentlemen. At that moment, from this evidence, we think that the rational conclusion and the only rational conclusion is that at that moment Tommy Griffin, plunged head-first down that river bank, dead in all likelihood before he ever hit the ground." (Closing Argument of State, Tr. p. 5).

Conversely, if the jury did not accept that Mr. Griffin died during that window of time, then the State's case would have fallen apart. Accordingly, Jason McDonald's testimony that he heard gunshots on Friday night, February 21, 1992 (Tr. Vol. III, p. 443) would have been no more noteworthy than any other night of noncriminal gun fire in the hollow and all testimony regarding Connie Branam's death would have been irrelevant – as she was supposedly killed on Saturday to prevent her from discovering her brother's death on Friday night/Saturday morning.

*b. Dr. Charles Harlan Testified Falsely*

The Attorney General's Office has already conceded before this Court that Dr. Charles Harlan testified falsely at the Blount County trial. During co-defendant Gary Sutton's federal capital habeas proceedings before Judge Varlan, the Respondent asserted that there was only one element in dispute – whether the law requires the Court to impute the TBI and the Attorney General's knowledge that Dr. Harlan testified falsely on the attorneys prosecuting Mr. Dellinger. Specifically, the Attorney General articulated the issue as:

> imputed knowledge, whether [the state] should have known about any larger scale investigation into Dr. Harlan at the time of the trial. The evidence that we will show at this hearing is that the Attorney General's Office or the District Attorneys Office knew of no investigation into that, nor should they have known of any investigation into that. Those are the only issues that are remaining.

D.E. 137, 22 (Sutton v. Colson, 3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010). As noted previously, this Court may take judicial notice of its prior proceedings.

Dr. Charles Harlan testified falsely about his qualifications, his methodology, and his medical opinions. He began by claiming that he was the most recent Chief Medical Examiner for the State of Tennessee. Tr. Vol. XIV, p. 2010. When the defense asked if Dr. Harlan still held that position, he coyly responded "That's a matter of debate . . . [b]etween lawyers" and then proceeded to tout his qualifications and experience as Chief Medical Examiner. Id. at 2031-

32. Under these false pretenses of credibility, Dr. Harlan concluded that Tommy Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. February 22, 1992. Id. at 2016.

In reaching his conclusion about the time of death, Dr. Harlan testified that he relied on two factors: (1) the fact that rigor mortis was present when police found the body and (2) the examination of microscopic slides taken from the autopsy. Tr. Vol. XIV, p. 2015.

Rigor mortis is the gradual stiffening of the body and forensic pathologists routinely consider it, along with other factors, to determinate the time of death. See D.E. 137, 92 (3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010). Dr. Harlan claimed that it was possible for a body to be in rigor mortis for as many as 72 hours, or three days, after death. Id. at 2018. The police discovered Mr. Griffin's body on Monday, February 24, 1992 with rigor mortis. Tr. Vol. XIV, p. 2015; see also D.E. 137, 121-22 (3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010). However, Dr. Stanton Kessler, who trains doctors to become certified forensic pathologists across the county, testified at co-defendant Sutton's federal evidentiary hearing that "[r]igor starts at six to eight hours [after death], [by] twelve hours [rigor mortis] is usually full and it starts disappearing and [is] usually gone within twenty-four hours." Id. at 121. Dr. Kessler then testified that Dr. Harlan's projected time of death – more than 64 hours prior to discovery – was inconsistent with the extent of rigor mortis present in Tommy Griffin's body when authorities discovered it. Id. at 122-23. As such, Tommy Griffin did not die on Friday evening or early Saturday morning while in the company of Mr. Dellinger, he died on Sunday, February 23 or in the early hours of Monday, February 24. See D.E. 137, 129 (3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010).

Moreover, Dr. Harlan's reliance on examining microscopic slides of organs to determine the time of death was not scientifically sound. See D.E. 137, 114-15 (3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010). Dr. Kessler described such reliance as "way outside the realm of any

science that I know of" later clarifying that "I had never heard of this theory and don't know any one that ascribes to it." In testifying that such reliance was without scientific basis, Dr. Kessler testified that "I think he made it up." Id. at 115.

Dr. Charles Harlan neglected to use appropriate scientific factors to determine an accurate time of death and he disavowed well-established methods in an effort to discredit the defense's experts. For instance, he claimed that ". . . early transitional lividity[16] just doesn't have any real meaning in forensic pathology" (Tr. Vol. XIV, p. 2019), and that lividity was "not really material in determining the time of death in this case." Id. at 2020. In direct response to Dr. Harlan's testimony regarding lividity, Dr. Kessler stated that "I don't believe anything [Harlan] said there is standard scientific fact." D.E 137, 107 (3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010). Under Dr. Harlan's theory that the Tommy Griffin had expired three days prior to police finding his body, there should have been obvious decomposition. See D.E. 137, 107-09, 110 (3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010) ("It starts immediately. You start noticing it within 16, 24 hours."). Instead, Dr. Kessler testified that unobstructed photographs of Mr. Griffin's body had "no evidence of swelling or decomposition or greenish tinge at all. There is no evidence of decomposition at all in any portion of his body." Id. at 112. When asked whether the lack of decomposition was consistent with death occurring 64-hours prior (let alone 72-hours prior), Dr. Kessler testified "Not at all." Id. at 114.

During cross examination, Dr. Kessler shed light on the discrepancy between his testimony and the trial testimony of Dr. Harlan, whom Dr. Kessler knew personally and professionally: "Dr. Harlan did a lot of things that I thought were unconscionable as a forensic pathologist . . . . [he] had [bizarre] and unscientific medical practices . . . I knew some of his

---

[16] Livor mortis or lividity is the settling of the blood in the lower portion of the body, causing a purplish red discoloration of the skin whereby gravity causes the red blood cells to sink through the body. The presence of livor mortis can indicate time of death and help determine if the body was moved after death.

forensic practices that he followed were things that just were bad science." D.E. 139, 8 (3:06-cv-388) (Evidentiary Hr'g, Feb. 2, 2010).

*c. The State Knowingly Presented Dr. Harlan's False Testimony*

The prosecution vouched for Dr. Charles Harlan, asserting that he was a well-regarded and well-qualified medical examiner. The State referred to him as the "the only person that you heard testify who is a board certified forensic pathologist who had done 15,000 autopsies." See Tr. Closing Argument by State, p. 42. However, the prosecution knew otherwise and thus knowingly misled the jury. Moreover, the State withheld exculpatory and impeaching evidence from the defense in violation of *Brady*.

Dr. Harlan testified that he was the Chief Medical Examiner. Tr. Vol. XIV, p. 2010 and 2031-32. This was a lie. Exhibit 32, "*State Files Suit Against Dr. Charles Harlan, Forensic Pathology Associates, P.C. for Deceptive Advertising Claims.*" News Release (Dec. 12, 1997). The State chose not to renew Dr. Harlan's contract as Chief Medical Examiner in June 1995, more than a year before Mr. Dellinger's Blount County trial. Id. At the time of Mr. Dellinger's trial, the Tennessee Bureau of Investigation, the Department of Health, and the Tennessee Attorney General's office all knew that the state revoked Dr. Harlan's title and they were all investigating the fact that Dr. Harlan publicly and repeatedly lied about his credentials. Exhibit31, State v. Harlan Complaint, at p.2. When a state agency knows such information, that knowledge can be imputed to the prosecution, who in turn has an obligation to inform the defense. See Kyles, 514 U.S. at 437-38 ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case . . .").

Given that Dr. Charles Harlan submitted material testimony evidence, that evidence was false, and the State knew that Dr. Harlan's testimony was false (under *Kyles*), the Respondent is not entitled to summary judgment on Claim 3.6.

2. The State Knowingly Presented the False Testimony of Dr. William Bass,[17] Whose Testimony Regarding the Source of the Fire in Connie Branam's Car Was Not Based on Scientific Principles. Moreover, the State Falsely Presented Dr. Bass as an Expert in Fire Science (Petition ¶ 3.6.2).

Dr. William Bass was not a fire science expert by any measure; he was an anthropology professor. His testimony regarding the source of the fire that contributed to Connie Branam's death was based on speculation and not scientific principles. The prosecution knew that. Regardless of its validity, the State heavily relied on Dr. Bass's material testimonial evidence. As a result, the prosecution knowingly presented false testimony when Dr. Bass testified about the source of the fire in Connie Branam's car.

Dr. Bass was a well-known and respected forensic anthropologist. At the time of the trial he was a professor emeritus at the University of Tennessee, Knoxville who specialized in determining information from human skeletal remains. Tr. Vol. V, pp. 649-50. When Dr. Bass began to pontificate about the fire that burned Connie Branam's car and her remains – "there has been accelerant poured in that car" – the defense objected. Tr. Vol. V, pp. 655-57. The court allowed the testimony and Dr. Bass continued to offer inflammatory opinions – "To get this much burning, you would have to have something added to this. There's simply not enough fuel load there to give you this amount of burning of a human body." Tr. Vol. V, p. 659.

The lack of Dr. Bass's experience with fire became clear on cross examination. "Q: Are you a member of the National Fire Protection Association? A: No, sir, I'm not. Q: Are you a member of the National Association of Fire Investigators? A: No. . . . Q: Are you certified as a fire or explosive investigator? A: No, sir. Q: Or arson investigator? A: No, sir. I didn't have the time." Tr. Vol. V, pp. 667-68. Not only did the defense emphasize Dr. Bass's lack of experience, it also shed light on his unscientific methodology.

[17] Petitioner inadvertently referred to Dr. William Bass as Dr. Charles Bass in the Amended Petition (D.E. 26, p. 22-23).

Q: As part of your investigation, did you take a look into the fire's susceptibility and the burning capability of the interior of this specific model of automobile?

A: No, sir, I haven't, no.

Q: So when you're stating that there was obviously another accelerant used, you have not taken into account the fact that this car may have a more – a greater propensity to burn than perhaps other models?

A: No. I haven't done a model to model research.

Tr. Vol. V, p. 670.

The prosecution retained Dr. William Bass specifically for his expertise in identifying a severely burned human body. As such, Dr. Bass performed an examination of the human remains that authorities found in Sevier County and then he authored a report reflecting his findings. Exhibit 33, *Bass Report (Mar. 11, 1992).* In that report, he identified the remains as belonging to Connie Branam. Id. At no point did Dr. Bass perform an analysis to determine the cause or source of the fire that burned Connie Branam and her car. The prosecution knew he was not qualified to perform such work. See Bass CV; Tr. Vol. V, pp. 649-51. Moreover, Dr. Bass's testimony was unquestionably material. The State relied on Mr. Dellinger's earlier conviction for Connie Branam's death as the sole aggravating circumstance to charge Mr. Dellinger with a capital crime. Although the State had already secured a conviction for Ms. Branam's death, they bolstered the earlier conviction by continually putting on evidence of Ms. Branam's death – such as Dr. Bass's testimony about her car fire. Thus, in eliciting Dr. Bass's material testimony about his first impressions of the burned car, the State knowingly elicited (and presented) false testimony. Tr. Vol. V., 655, 659.

3. The State Knowingly Presented the False Testimony of Gary Clabo, Whose Testimony Regarding the Source of the Fire in Connie Branam's Car and the Fire in Tommy Griffin's Trailer Was Scientifically Inaccurate and Based on Unreliable Principles (Petition ¶ 3.6.3).

The State knowingly presented false testimony when Gary Clabo testified about the fires in Connie Branam's car and Tommy Griffin's trailer because he was grossly underqualified to offer an expert opinion and he failed to use scientific methods to support his conclusions. Gary Clabo was a licensed fire and arson investigator in the state of Tennessee with certification from the International Association of Arson Investigators. Tr. Vol. V, pp. 706-07. Although Mr. Clabo had attended a handful of seminars and training session regarding fire and arson investigation, Mr. Clabo had only a high school degree and no knowledge of advanced chemistry, which would have been required, at bottom, to actually understand burn patterns, fire sources, and the destruction that fire causes. See Tr. Vol. V, p. 706.

> Many arson investigators, it turned out, had only a high school education. In most states, in order to be certified, investigators had to take a forty-hour course on fire investigation, and pass a written exam. Often, the bulk of investigator's training came on the job, learning from 'old-timers' in the field, who passed down a body of wisdom about the telltale signs of arson, even though a study in 1977 warned that there was nothing in 'the scientific literature to substantiate their validity.' . . . In 1997, the International Association of Arson Investigators filed a legal brief arguing that arson sleuths should not be bound by a 1993 Supreme Court decision requiring experts who testified at trials to adhere to the scientific method.

Exhibit 34, Grann, David "Trial by Fire: Did Texas execute an innocent man?" *The New Yorker*, Sept. 7, 2009, 24 [hereinafter "Grann"].

The State knew that Mr. Clabo did not possess the necessary scientific background to testify accurately about the fire in Connie Branam's car or the fire in Mr. Griffin's trailer. Mr. Clabo, relying solely on visual observation of Ms. Branam's vehicle, stated at trial that: "All the fire in this vehicle interior is low burn on the floor or at sea level . . . [it] tells me that something was placed on the floor to make it burn faster, hotter." Tr. Vol. V, pp. 717-18. He later testified that that "something" was "an accelerant." Tr. Vol. V, p. 721. He offered identical testimony when discussing the fire in Mr. Griffin's trailer: ". . . I found that this fire was incendiary, set by

human hands, that a liquid-type accelerant was used . . . An accelerant can be a gas, a solid, or a liquid and anything that can be used to make a fire burn hotter and faster." Tr. Vol. V, pp. 733, 734-35. However, "[t]he notion that a flammable or combustible liquid caused flames to reach higher temperatures had been repeated in court by arson sleuths for decades. Yet the theory was nonsense: experiments have proved that wood and gasoline-fuelled fires burn at essentially the same temperature." Exhibit 34, *Grann*, at p. 25.

In addition to lacking the required expertise to testify competently about fires, Mr. Clabo lacked the ability to perform scientific experiments to properly determine a fire's source. Mr. Clabo continued to speculate about the fire in Ms. Branam's car under the guise of expertise, testifying that "[i]f [the fire] had started on the seat, we would have seen the pattern up here in this area. So, that burn pattern, burn pattern tells me that the fire is on the floor area." Tr. Vol. V, p. 720. Similarly, when looking at photographs of Mr. Griffin's burned trailer, Mr. Calbo testified: "That depicts or tells us that there is a possible use of an accelerant because the fire should have burned this material, this carpet evenly." Tr. Vol. V, p. 732. Yet, actual fire experts know that "[w]ith the naked eye, it is impossible to distinguish between the pour patterns and puddle configurations caused by an accelerant and those caused naturally by post-flashover.[18] The only reliable way to tell the difference is to take samples from the burn patterns and test them in a laboratory for the presence of flammable or combustible liquids." Exhibit 34, *Grann*, at p. 27-28.

In lieu of waiting for any laboratory test results, Gary Clabo summarily decided that an accelerant had caused the fire in Connie Branam's car. Before any expert, let alone Mr. Clabo, conducted laboratory tests on evidence collected from Connie Branam's car, Mr. Clabo stated:

---

[18] A flashover is "the point at which radiant heat causes a fire in a room to become a room on fire." Exhibit 34, *Grann*, at p. 27.

"Damage to victim indicates use of accelerate on body. Accelerate possibly solid or liquid." Exhibit 35, *Clabo Request for Exam, Mar. 1, 1992*, p.2. He could not have known this information without reviewing the laboratory results. The prosecution knew about Mr. Clabo's premature findings and had the document containing this statement in their files. Mr. Clabo's testimony was material for the same reason that Dr. Bass's testimony was material. Thus, the State knowingly presented false testimony when Mr. Clabo testified.

4. The State Knowingly Presented the False Testimony of Don Carmen and Joseph Masson, Both of Whom Misled the Jury into Believing that Firearms Identification Can Identify Tool Marks Linking Projectiles or Shells to a Specific Weapon (Petition ¶ 3.6.4).

The State knowingly put on false testimony in violation of James Dellinger's constitutional rights when Don Carmen and Joseph Masson testified. Messrs. Carmen and Masson were both experienced firearm examiners – Carmen was locally based and Masson was based out of Maryland. However, their claim that they could match shells to a specific firearm based on the fired shell's unique "toolmarks" was flawed and not based on scientific principles. Tr. Vol. VII, pp. 986-987 and 1028-30. The prosecution was aware of this and presented the false testimony nonetheless.

Don Carmen testified falsely when he claimed that the 12-gauge shotgun shells found near Tommy Griffin's body were fired from the same gun as the 12-gauge shotgun shells found on James Dellinger's property. Tr. Vol. VII, pp. 990-91, 994-95, 999-1000. The state knew that Mr. Carmen did not use scientific principles to identify and match what he called "mechanical fingerprints" on the shells. Tr. Vol. VII, p. 1000 (". . . you said you viewed those through a comparison microscope and using your judgment and eyesight and experience and training"). In an effort to bolster his credibility in the eyes of the jury and to explain why laboratory policy was to not memorialize microscopic comparisons, Mr. Carmen testified that: "it takes an examiner

approximately six months to a year training every single day to look at these individual characteristics and know that they are unique and how to match them up." Tr. Vol. VII, p. 1001.

The methodology Mr. Carmen used and later described in testimony essentially entailed comparing microscopic images visually and looking for similarities (Tr. Vol. VII, p. 990) – something a layperson with decent vision could perform. In fact, Mr. Carmen admitted when testifying that he could not "elaborat[e] on any technical or method procedures" on metal found in Connie Branam's body because he didn't perform any chemical analysis on the evidence. Tr. Vol. VII, p. 1003. The State knew Mr. Carmen was uniquely underqualified[19] as a firearm expert and yet touted him as an authority on identifying shotgun shells and firearms.

Joseph Masson offered similar testimony, claiming that he was able to match seven 12-gauge shotgun cartridges to the same firearm, a Remington-Peters, using a comparison microscope. Tr. Vol. VII, pp. 1029-31. The authorities found some of those shells near Tommy Griffin's body and some of them inside Mr. Dellinger's residence. Mr. Masson relied on the same methodology as Mr. Carmen, which was not based on scientific principles. The State was aware of this. Moreover, the testimony of Messrs. Masson and Carmen was unquestionably material. It was some of the only physical evidence that linked Mr. Dellinger to the crime. Besides ballistic evidence, the State relied almost exclusively on circumstantial evidence to build a case at trial against Mr. Dellinger.

Thus the State's use of Mr. Masson and Mr. Carmen as witnesses and their subsequent testimony violated Mr. Dellinger's constitutional rights. See Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959); Mooney v. Holohan, 294 U.S. 103, 112-13 (1935).

[19] Don Carmen left Western Kentucky University without earning a degree after receiving "F's" in both chemistry and mathematics. See Tr. Vol. VII, 1022-1025.

5. The State Knowingly Presented the False Testimony of Terry Lellie Newman,[20] Who Fabricated Testimony About Menacing Statements that Co-Defendant Gary Sutton Made to Her (Petition ¶ 3.6.5).

Terry Lellie Newman testified falsely about supposedly menacing statements co-defendant Gary Sutton made to her on February 22, 1992 and her response to those statements. Tr. Vol. VI, pp. 522, 534-35. Gary Sutton never made menacing statements to Ms. Lellie Newman at Howie's Hideaway, the bar where Ms. Lellie Newman worked at the time. Exhibit 36, *Declaration of Ann Walker-King*. The State knew this information was false. Because the State failed to remedy the falsity at trial and Ms. Lellie Newman's testimony was material, it violated Mr. Dellinger's constitutional rights.

Initially, the State called Ms. Lellie Newman to testify that while she was bartending at Howie's Hideaway, James Dellinger, co-defendant Gary Sutton, and decedent Tommy Griffin came into bar, consumed a few beers, played pool, and left on February 21, 1992. Tr. Vol. I, pp. 66-81. The State recalled Ms. Lellie Newman to testify that the following day, Messrs Dellinger and Sutton returned to Howie's Hideaway with decedent Connie Branam to inquire about the whereabouts of Mr. Griffin. Tr. Vol. VI, pp. 514-535. Terry Lellie Newman testified that during that second visit, Mr. Sutton asked Ms. Lellie Newman if she would leave the bar with them and join the search for Mr. Griffin. Tr. Vol. VI, p. 521. When Ms. Lellie Newman refused, she testified that Mr. Sutton said, "your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." Id. at 522. Ms. Lellie Newman then added that as a result she "called my husband and asked him to come up and follow me home," because she was shaken up. Id. at 533. Ms. Lellie Newman claimed that that was the first time

[20] At the time of the underlying crime in February 1992, Terry was known as Terry Lellie, which is reflected on police reports and other investigative materials produced shortly thereafter. However, when Terry Lellie testified at trial in 1996, she had been remarried and adopted the name Terry Lellie Newman.

she called her husband, Robert Lellie, to come to the bar and follow her home. Id. at 534-35. Mr. Sutton's comment and Ms. Lellie Newman's response were totally fabricated details. Robert Paul Lellie, Ms. Lellie Newman's husband at the time, never received a call from his wife in February 1992 asking him to escort her home from the bar because a man said menacing things to her. Exhibit 36, *Declaration of Ann Walker-King.* Mr. Lellie would have remembered because had someone said such things to Ms. Lellie Newman, Mr. Lellie would not have allowed her to continue working at the bar. Id. Moreover, the couple lived only two miles from Howie's Hideaway and had Mr. Lellie driven to the bar to escort his wife home, he would have remembered it because it would have been a rare occurrence. Id.

Moreover, Ms. Lellie Newman's testimony was material. It added a sinister element where none existed. Accordingly, the State relied on it heavily, referencing it in the closing argument. Closing Argument, Tr. p. 19-20.[21] Messrs. Dellinger and Sutton were simply looking for their friend, along with their friend's sister, Connie Branam. The State knew that Ms. Lellie Newman testified falsely about Mr. Sutton making menacing remarks to her on February 22, 1992 and her supposed response to those remarks. As such, the State knowingly presented false testimony when Ms. Lellie Newman testified about Mr. Sutton's comments.

Thus, Respondent is not entitled to summary judgment as to Claim 3.6 because the State knowingly presented false testimony.

## XI. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT FOR MR. DELLINGER'S CLIAM THAT THE TRIAL COURT DENIED HIS DUE PROCESS AND FAILR TRIAL RIGHTS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS (Petition ¶ 3.3)

[21] "Because there were people [at Howie's Hideaway] who could be identified who saw them together, who knew things. When Connie Branam was there and discovered this and learned this, her death warrant was sealed. Think about something else. Terri Newman, the second person to testify from the bar, when they were getting ready to leave, Sutton wanted her to go with him. She wouldn't go. And what was the last thing she heard out of him? Your husband will be surprised sometime when you don't come home and are never heard of again."

***Petitioner Is Entitled To Review Of His Otherwise Procedurally Defaulted Claims Because He Can Establish Cause And Prejudice To Excuse The Default* (Petition ¶¶ 3.3.7-3.3.10, 3.3.12 and 3.3.15)**

The Respondent asserts that James Dellinger has not presented the following claims to the state courts and is thus procedurally defaulted from doing so. Regardless, federal courts retain jurisdiction to consider the merits of procedurally defaulted claims. They must do so if the habeas petitioner establishes cause for the default and prejudice arising from such default. Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977).

A habeas petitioner establishes cause for a procedural default by demonstrating that the default occurred due to "something that cannot fairly be attributed to him." Coleman v. Thompson, 501 U.S. 722, 753 (1991). Under this standard, cause for a procedural default exists if the default occurs at a stage of the proceedings at which a petitioner is entitled to effective representation, and counsel in allowing the default, performs deficiently. Murray v. Carrier, 477 U.S. 478, 488 (1986). Mr. Dellinger had the right to constitutionally effective counsel pre-trial, during trial, and on direct appeal (*Strickland v. Washington*, 466 U.S. 668 (1984) and *Evitts v. Lucey*, 469 U.S. 387, 393 (1985)).

As discussed in Section XII, counsel performed ineffectively in failing to take specified actions. Significantly, in considering ineffective assistance of counsel claims previously adjudicated in the Tennessee courts, this Court must review the issue *de novo*, according no deference to state court findings pursuant to 28 U.S.C. §2254(d)(1). The determination of "cause" for purposes of excusing procedural default is a federal question as to which the State courts have no input. See Joseph v. Coyle, 469 F.3d 441, 459 (6th Cir. 2006), cert. denied sub nom. Houk v. Joseph, 549 U.S. 1280 (2007); Ege v. Yukins, 485 F.3d 364, 379-80 n. 7 (6th Cir. 2007); Hall v. Vasbinder, 563 F.3d 222, 236-37 (6th Cir. 2009); Gulmette v. Howes, 624 F.3d

286, 295 (6th Cir. 2010); see also Fischetti v. Johnson, 384 F.3d 140, 154-55 (3d Cir. 2004). A *de novo* review of Mr. Dellinger's ineffective assistance of counsel claim will result in a conclusion that Mr. Dellinger's lawyers were ineffective (thereby establishing cause). As such, this Court must consider the merits of the following claims.

### A. *In Violation Of Mr. Dellinger's Rights, The Trial Court Conducted Proceedings on Sunday (Petition ¶ 3.3.7)*

James Dellinger alleges that proceedings in his capital prosecution were conducted on Sunday, in violation of due process. (D.E. 26 (11/30/96 Amended Petition at 13, ¶3.3.7)). Respondent asserts that the claim is procedurally defaulted because it is presented for the first time in his amended petition. (D.E. 34 (5/12/10 Answer To Amended Petition at 50, ¶3.3.7)). This claim was fairly presented to the Tennessee Courts on direct appeal and is not defaulted. Since approximately 571 in England, and throughout Tennessee legal history, up to and including Mr. Dellinger's trial, conducting legal proceedings on Sunday was prohibited, and doing so rendered such proceedings absolutely void. Conducting capital trial deliberations on Sunday violated Mr. Dellinger's right to due process. The judicial repudiation of this ancient doctrine after his trial and while his case was on appeal violated the substantive due process guarantee of the Fourteenth Amendment to the Constitution.

On direct appeal, Mr. Dellinger challenged the lawfulness of the judgment against him because jury deliberations had occurred on Sunday, September 1, 1996. See State v. Dellinger, 2001 WL 220186, * 34-35. The Court of Criminal Appeals addressed this claim, and rejected it based on an after-the-fact repudiation of a long standing common law rule by the Tennessee Supreme Court in State v. King, 40 S.W.3d 442, 443, 44 (Tenn. 2001). This claim was fairly presented to the Tennessee Supreme Court.

A federal habeas court must consider claims presented to it that the petitioner presented on direct appeal or during an appeal of the denial of post-conviction relief. See Tuggle v. Seabold, 806 F.2d 87, 91 (6th Cir. 1986). To present fairly the constitutional nature of a claim to a state court, a petitioner need not cite chapter and verse of the federal constitutional provision on which he relies. Rather, a petitioner can fairly present the nature of a federal constitutional claim by (1) relying on federal cases interpreting the federal constitutional provision involved; (2) relying on State cases interpreting the federal constitutional provision involved; (3) asserting a claim in terms that call to mind the specific right guaranteed by the federal Constitution; or (4) alleging a factual pattern within the mainstream of federal constitutional litigation. See Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005); Franklin v. Rose, 811 F.2d 322, 326 (6th Cir. 1987). Mr. Dellinger's challenge to Sunday proceedings was fairly presented.

Certain religious and moral principles have no place in the judicial administration of the death penalty. They gum up the works. See, e.g, State v. Reid, 213 S.W.3d 792, 833 (Tenn. 2006) (rejecting argument that exclusion of capital jurors who express religious objections to death penalty violates Tenn.Const. art. I, §6 (prohibiting the uses of religious tests); Wolf v. Sundquist, 955 S.W.2d 626 (Tenn.App. 1997) (holding that exclusion of religiously scrupled jurors does not violate Tenn. Const. art I, §3 (protection of religious freedom) or Tenn.Const. art. I, §6 (governing the qualifications of jurors)). Other such principles are benign with respect to the administration of the death penalty, simply embodying across-the-board beliefs that affect all legal proceedings alike.

At the time of Mr. Dellinger's trial, it was settled that conducting legal proceedings on Sundays rendered those proceedings void, and of no effect. See Styles v. Harrison, 41 S.W.3d 333 (1897) (Sunday is *dies non juridicus*, and proceedings on that day are "absolutely void");

Moss v. State 173 S.W. 859, 860 (1915) (Sunday is one of the most useful institutions we possess:); Smith v. State, 385 S.W.2d 748, 750 (1965) (it is "axiomatic that the common law recognized the sanctity of the Lord's Day"). After Mr. Dellinger's trial, the Tennessee Supreme Court abrogated this long-standing common law rule. See State v. King, 40 S.W.3d 442, 443-44 (Tenn. 2001),

The Due Process Clause of the Fourteenth Amendment as applied to criminal trials protects procedures, rules and deeply-rooted expectations that are deemed "essential to the very concept of justice. See, e.g., Lisenba v. California, 314 U.S. 219, 236 (1941). The ancient common law rule prohibiting judicial proceedings on Sunday is obviously such a rule. Given Mr. Dellinger's indisputable life and liberty interests at stake in the capital prosecution against him, he had (1) a cognizable protected interest in the proceedings, and (2) a reasonable expectation that the rules would be followed, including the ancient prohibition against Sunday proceedings. E.g., Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (Kennedy, J.) (identifying sources of protected life and liberty interests under Due Process Clause of the Fourteenth Amendment). A state-created procedural interest affecting a criminal trial cannot be arbitrarily ignored. See, e.g., Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1 (1979); Vitek v. Jones, 445 U.S. 480, 488-89 (1980) (citing Wolf v. McDonald, 418 U.S. 539 (1974)); and Morrissey v. Brewer, 408 U.S. 471 (1972)).

The trial court's failure to respect the ancient common law protection arbitrarily denied Mr. Dellinger his right to due process. The after-the-fact abrogation of the rule by the Tennessee Supreme Court and its application to his case by the Tennessee Court of Criminal Appeals only compounded the arbitrariness. See, e.g, Eastern Enterprises v. Apfel, 524 U.S. 498, 532 (1998) (O'Connor, Scalia, and Thomas, JJ, and Rehnquist) (Takings Clause: "Retroactivity is generally

disfavored in the law . . ., in accordance with 'fundamental notions of justice' that have been recognized throughout history,." quoting Kaiser Aluminum & Chem. Corp. v. Bojorno, 494 U.S. 827, 855 (1990) (Scalia, J., concurring)); id. 524 U.S. at 539 (Kennedy, J., concurring in judgment and dissenting in part) (legislation "must be invalidated as contrary to essential due process principles, without regard to the Takings clause of the Fifth Amendment"); id. at 547 ("[F]or centuries our law has harbored a singular distrust of retroactive statutes").

Respondent's motion for summary judgment must be denied. Petitioner, as the non-moving party is entitled to summary judgment on this issue.

B. *In Violation Of Mr. Dellinger's Rights To A Fair Trial, The Trial Court Allowed Jurors To Be Exposed To Extra-Judicial Information*

James Dellinger alleges that the trial court denied him the right to a fair trial by permitting the jurors to be separated and allowing them to be exposed to sites relevant to the charged capital offense, including the place where Tommy Griffin's body was found and Howie's bar, the hub of activity where each of the victim's spent many of their last hours, although at different times.. (D.E. 26 (11/30/09 Amended Petition at 13-14, ¶¶3.3.8, 3.3.9 and 3.3.10). Respondent asserts that these claims are defaulted because they have never been presented to the Tennessee courts. (D.E. 34 (5/12/10 Answer To Amended Petition at 5-51, ¶¶3.3.8, 3.3.9, and 3.3.10). While these claims have not been presented to the Tennessee courts, for the reasons set out in the introduction to Section XI, this Court should review them..

The Due Process Clause of the Fourteenth Amendment requires a fair trial before a neutral and impartial factfinder. See, e.g., In re Murchison, 349 U.S. 133, 136 (1955). The violation of sequestration rules and juror exposure to extra-judicial information undermine the guarantee of neutrality in the same ways: that is, they potentially or actually expose jurors to information that

bears on the case, the scope and sources of such information being unknown or not being subject to confrontation and examination. E.g., McBroom v. Orner, 64 Wash. 2d 287, 395 P.2d 95 (1964); Alford v. Sventek, 53 N.Y.2d 743, 439 N.Y.S.2d 339, 421 N.E.2d 831 (1981).

*Tennessee Code Annotated* Section 40-18-116 requires that the trial judge shall not permit the jurors to be separated "when they are not engaged upon actual trial or deliberation". While the prohibition is not to be read literally, it has been enforced strictly withing common-sense boundaries. See Wesley v. State, 30 Tenn. 502 (1851); State v. Bondurant, 4 S.W.3d 662 (Tenn. 1999). The separation of the jurors, permitting some to attend church, while others did not was an evident violation of the rule of sequestration and a direct threat to the juror's neutrality.

To the extent that the jurors were permitted to pass repeatedly by the site where Tommy Griffin's body was recovered and the roadside bar where many of the critical events of the case took place, they were exposed extra-judicial information which undermined their neutrality and provided the opportunity to observe physical evidence and locations that was not subject to confrontation and cross examination. E.g., Brock v. Smith, 268 S.W.2d 947 (Ky. 1954).

For these reasons, and those discussed in the introduction to Section XI, Respondent's motion for summary judgment on this claims should be denied.

*C. In Violation Of Mr. Dellinger's Rights, The Trial Court Unlawfully Allowed The State To Present Irrelevant Prejudicial Evidence To Deliberately Inject Emotion Into the Trial (Petition ¶ 3.3.12)*

In violation of James Dellinger's constitutional right to a fair trial under the Sixth and Fourteenth Amendment, the trial court allowed the prosecution to present irrelevant and prejudicial evidence to the jury, the majority of which involved Connie Branam's death. As stated in the Amended Petition, evidence that the trial court allowed the State to admit in err, included, but was not limited to – a witness testifying that Connie Branam was a 33-year-old

married mother with three children (Tr. Vol. I, pp. 26-27); an exhibit depicting an irrelevant photograph of Ms. Branam (id. at 27-28); and numerous references to "bad acts" other than the murder of Tommy Griffin. D.E. 26, p. 14. Such evidence was not only irrelevant and prejudicial; it unlawfully tainted the trial and resulted in the denial of Mr. Dellinger's due process.

Respondent asserts that Petitioner failed to raise this claim to a state court. This is incorrect. Petitioner first raised this claim in his direct appeal brief to the Criminal Court of Appeals in 1997 – asserting that the trial court's failure to stop the prosecution from presenting evidence of Connie Branam and her death resulted in evidence that was "so prejudicial and so immaterial and irrelevant that it constitutes reversible error." See Exhibit 37, *Dellinger's Direct Appeal Brief to CCA, pp. 143-48*. Respondent further argues that Petitioner failed to state a cognizable claim for relief. This is also incorrect. In certain instances, "the due process clause of the Fourteenth Amendment requires the exclusion of prejudicial evidence of prior convictions even though limiting instructions are given and even though a valid state purpose . . . is served." Spencer v. Texas, 386 U.S. 554, 563 (1967). The State's presentation of evidence related to Mr. Dellinger's prior conviction for Connie Branam's death and facts related to her death amounted to one such instance.

The Court has long held that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." Spencer, 386 U.S. at 563-64 (citing Tumey v. Ohio, 273 U.S. 510 (1927); Betts v. Brady, 316 U.S. 455 (1942); Gideon v. Wainwright, 372 U.S. 335 (1963); Estes v. Texas, 381 U.S. 532 (1965); Sheppard v. Maxwell, 384 U.S. 333 (1966); and Griffin v. Illinois, 351 U.S. 12 (1956)). The trial court's failure to keep the State from

introducing irrelevant and prejudicial evidence about Connie Branam amounted to a violation of Mr. Dellinger's constitutional right to a fair trial.

Given the fact that Mr. Dellinger previously raised this claim in his direct appeal and that the claim is cognizable, Respondent is not entitled to summary judgment.

D. *In Violation Of Mr. Dellinger's Rights, The Trial Court Failed To Inform Petitioner Of His Right To Testify Or Ascertain Whether Mr. Dellinger Wished To Waive That Right (Petition ¶ 3.3.15)*

In violation of the Fifth and Fourteenth Amendments and *Johnson v. Zerbst*, 304 U.S. 458 (1938), the trial court did not inform Mr. Dellinger of his right to testify nor ascertain whether Mr. Dellinger wished to waive that right. Respondent asserts that Petitioner's claim is defaulted because he failed to present this claim to state court. As discussed above, Mr. Dellinger has cause for the alleged default and has shown the resulting prejudice, thus this court must review his claim on the merits.

"The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that 'are essential to due process of law in a fair adversary process.'" Rock v. Arkansas, 483 U.S. 51 (1987) (quoting Faretta v. California, 422 U.S. 806, 819 n.15 (1975)). In *Johnson v. Zerbst*, the Court explained that to forgo a fundamental right, such as the right not to testify in your own defense, a defendant must first waive that right. Johnson, 304 U.S. at 464. The Court continued, defining wavier as "an intentional relinquishment or abandonment of a known right or privilege." Id.

In the instant case, the trial court never informed Mr. Dellinger of his right to testify nor did the court determine whether Mr. Dellinger waived his right not to testify. Thus, Mr. Dellinger never had the opportunity to exercise his right to testify on his own behalf. Tr. Vol. I,

p. 3-15 (witnesses list showing an absence of James Dellinger as a witness). Respondent is not entitled to summary judgment on this claim.

***The State Is Not Entitled To Summary Judgment For The Following Claims As A Matter Of Law Because Petitioner Presents A Genuine Issue of Material Fact*** **(Petition ¶¶ 3.3.5 and 3.3.6)**

James Dellinger is entitled to summary judgment, and not the Respondent, for the following claims because the evidence, looked at in the light most favorable to Petitioner, presents a genuine issue of material facts. Anderson v. Liberty Looby, Inc., 477 U.S. 242, 248 (1986) ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); Fed. R. Civ. P. 56(e). Respondent failed to controvert the facts Petitioner asserted in his claim for relief, instead, Respondent merely states that Petitioner has failed to "present a cognizable ground for habeas relief." D.E. 34, pp. 48, 49. As such, Petitioner, and not the Respondent, is entitled to summary judgment.

*E. In Violation Of Mr. Dellinger's Rights, the Trial Court Allowed Admission Of Unlawfully Obtained Evidence*

James Dellinger alleges that in violation of his rights to a fair trial, the trial court allowed the introduction of evidence obtained in violation of the Fourth Amendment to the Constitution. (D.E. 26 (11/30/09 Amended Petition at 12, ¶¶3.3.5.1 and 3.3.5.2). Respondent asserts that these claims are not cognizable under Stone v. Powell, 428 U.S. 465, 494 (1976), which bars the litigation of Fourth Amendment claims in habeas corpus. (D.E. 34 (5/12/10 Answer To Amended Petition).

Respondent is correct, and Mr. Dellinger's counsel is presently unaware of any facts that would take this claim out of the general rule in *Stone*. See Wallace v. Kato, 127 S.Ct. 1091, 1099 n.5 (2007). Respondent's motion for summary judgment on this claims should be granted.

*F. The Trial Court Impermissibly Allowed The Jury To Hear Evidence Of The Sevier County Offense and Trial In Violation Of Mr. Dellinger's Rights (Petition ¶ 3.3.6)*

The Amended Petition states that the Mr. Dellinger's trial was fundamentally unfair because the trial court permitted District Attorney Flynn to introduce virtually the same evidence that had been presented in Sevier County to show that Mr. Dellinger killed Connie Branam because she knew about her brother's murder, when such evidence was inadmissible, irrelevant and highly prejudicial. D.E. 26 (11/30/09 Amended Petition at 12, ¶3.3.6); see also D.E. 24 Addendum __ Vol. 1 at 66-67 (Technical Record - 4/27/93 Motion To Strike Or Dismiss [Notice of Intent To Seek Death Penalty]); id. ¶¶ 1 and 2 (notice of enhancement in Sevier County Connie Branam case was that murder cover up of Tommy Griffin murder); id. ¶3 (evidence in support of Sevier County enhancement fully presented to jury); id ¶4 (Sevier County jury acquitted Mr. Dellinger of the death penalty based on the theory that Connie Branam was murdered to cover up the Tommy Griffin murder); D.E. 24 Addendum __ Vol. 2 at 199-200 (Technical Record - 7/8/96 Motion To Reconsider Use Of Evidence Of The Sevier County Case In The State's Case In Chief); D.E. 24 Addendum __ Vol. 2 at 220 (Technical Record - 8/19/96 Order Denying 7/8/96 Motion To Reconsider); D.E. 24 Addendum __ Vol. 3 at 307-13, ¶6 (9/25/96 Joint Motion For New Trial) (failure to exclude evidence of Connie Branam murder); id. at 313 ¶23 (prosecutorial misconduct in repeated comments on Connie Branam murder and suggestions that Mr. Dellinger had been previously convicted of murder); D.E. 24 Addendum __ Vol. 4 at 61-62 (Technical Record as to co-defendant Sutton - Motion To Strike Or Dismiss)

("the full evidentiary facts of the Blount county murder were presented to a Sevier County jury in support of the state's theory and request for enhancement to death penalty as the Sevier County jury had, in fact, to decide that both murders were committed by these men as part of a common scheme."); D.E. 24 Addendum 2, Doc. 6 (5/3/01 Brief at 24 ("The State was allowed to present the entire Connie Branam case at this trial and Appellants were forced to defend against it."); D.E. 24, Addendum 2, Doc. 8 (12/31/01 Supplemental Brief - not paginated - ( "*The theory of the State was that Branum was killed to cover up the Griffin murder. Branum was killed after Griffin, but that trial was conducted first at the option of the state. The Sevier County jury heard the same evidence in that case under the same theory and gave life imprisonment*. (The only difference in the two trial[s] was the use of the conviction from Sevier County in the Blount County trial)") (emphasis added); compare D.E. 24 Addendum __ Vol. VII at 15 (4/20/94 Motions) (District Attorney Flynn informs the court that, "*This is an unusual case . . . because basically it has been tried once previously in another jurisdiction*") (emphasis added)).

The trial court refused to address Mr. Dellinger's repeated assertions that given the outcome in Sevier County case, it was fundamentally unfair to force him to again defend against identical evidence and an identical theory. Rather, the trial court held that under Tenn.R.Evid. 404(b), evidence of the Branam murder was admissible to (1) show a continuing course of conduct, and (2) establish the identity of the perpetrators of the Tommy Griffin murder. D.E. 24 Addendum __ Vol. XIV, at 43 (6/18.96 Motion Hearing) (Bench ruling). On direct appeal, the Court of Criminal Appeals similarly ignored the record of Mr. Dellinger's ongoing complaints that the introduction of the evidence of Connie Branam's murder was fundamentally unfair, confining its ruling to Rule 404(b) standards. State v. Dellinger, 2001 WL 220186, *22 (Tenn.Crim.App., Mar. 7, 2001) ("*the evidence of Branam's murder was highly relevant* to

establishing the identity of Griffin's killers *because it tended to show that Appellants had killed Branam in order to conceal the fact that they had murdered Griffin*"[1]) (emphasis added). The Tennessee Supreme Court affirmed the decision of Court of Criminal Appeals without comment. State v. Dellinger, 79 S.W.3d 458, 477 (Tenn. 2002).

As demonstrated below, the introduction of the entire case regarding the murder of Connie Branam in the capital prosecution for the murder of Tommy Griffin was profoundly unfair and contrary to elementary notions of fair play and decency, in violation of the Due Process Clause of the Fourteenth Amendment. Before addressing the due process claim, Mr. Dellinger addresses briefly the State's mistaken assertion that this claim is procedural defaulted.

1. Mr. Dellinger Fairly Presented His Claim That The Introduction Of The Evidence Of Connie Branam's Murder In Support Of The State's Theory That He Killed Connie Branam To Prevent Her From Revealing The Murder Of Tommy Griffin Was Fundamentally Unfair[2]

Respondent asserts that Mr. Dellinger's claim that the introduction of the Connie Branam evidence was (1) defaulted because it was not presented to the state courts, and (2) is a complaint about an evidentiary issue, which is not cognizable in habeas corpus proceedings. D.E. 34 (5/12/10 Answer to Amended Petition at 49 ¶3.3.6). Respondent errs on both counts.

First, this claim was fairly presented to the Tennessee Supreme Court. A federal habeas court must consider claims presented to it that the petitioner presented on direct appeal or during an appeal of the denial of post-conviction relief. See Tuggle v. Seabold, 806 F.2d 87, 91 (6th

[1] The witness elimination justification by the Court of Criminal Appeals is precisely the theory that the Sevier County District presented to the jury throughout the Connie Branam capital prosecution and that the jury rejected at sentencing.

[2] This claim is presented in Section XI because it was Mr. Dellinger's belief that doing so would, as an organization matter, facilitate the Court's review of the many claims in the Amended Petition. Section XI addresses principally defaulted claims, but the Rule 404(b)/fair trial claim is most certainly not defaulted. Whether the Court finds the organizational principles for this response helpful, by proceeding this way, Mr. Dellinger does not intend to waive, and does not waive his position that this claim is not, and cannot be defaulted, for reasons discussed in the text.

Cir. 1986). To present fairly the constitutional nature of a claim to a state court, a petitioner need not cite chapter and verse of the federal constitutional provision on which he relies. Rather, a petitioner can fairly present the nature of a federal constitutional claim by (1) relying on federal cases interpreting the federal constitutional provision involved; (2) relying on State cases interpreting the federal constitutional provision involved; (3) asserting a claim in terms that call to mind the specific right guaranteed by the federal Constitution; or (4) alleging a factual pattern within the mainstream of federal constitutional litigation. See Whiting v. Burt, 395 F.3d 602, 613 (6th Cir. 2005); Franklin v. Rose, 811 F.2d 322, 326 (6th Cir. 1987). While a ruling on a claim by a state court provides evidence that the petitioner raised the claim to that court, a ruling on a presented claim is not required to make the claim available for federal review. See Dye v. Hofbauer, 546 U.S. 1, 3 (2005). A review of the complete record in this case – including but not limited to the pretrial, trial, and appellate proceedings cited above – compels the conclusion that Mr. Dellinger's continuing complaints about the unfairness of the introduction of the evidence of Connie Branam's murder was unjust and fundamentally unfair, indisputably called to mind the precise issue presented in *Dowling v. United States*, 493 U.S. 342, 352, 353 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977); *Mooney v. Holohan*, 294 U.S. 103, 122 (1935); and *Rochin v. California*, 342 U.S. 165, 173 (1952)).

Moreover, when, as here, a state court which has authority to make a final adjudication of a claim considers the claim's merits, a federal court must also review the claim's merits. See Webb v. Mitchell, 586 F.3d 383, 400-01 (6th Cir. 2009), cert. denied sub nom. Webb v. Bobby, 130 S.Ct. 2110 (2010); Alverson v. Workman, 595 F.3d 1142, 1153 n. 3 (10th Cir.), cert. denied, 131 S.Ct. 512 (2010); Walton v. Caspari, 916 F.2d 1352, 1356-57 (8th Cir. 1990), cert. denied, 499 U.S. 931 (1991); Cooper v. Wainwright, 807 F.2d 881, 887 (11th Cir. 1986), cert. denied sub

nom. Dugger v. Cooper, 481 U.S. 1050 (1987); Sandstrom v. Butterworth, 738 F.2d 1200, 1206 (11th Cir. 1994), cert. denied, 469 U.S. 1109 (1985). Here, pursuant to Tennessee Code Annotated §39-13-206(c), the Tennessee Supreme Court acknowledged reviewing the entire record for, among other things, evidence of arbitrariness. State v. Dellinger, 79 S.W.3d at 477. Thus, the Tennessee Supreme Court considered on direct appeal all claims appearing on the face of the record that raise the possibility that Mr. Dellinger's death sentence is arbitrary, excessive, or disproportionate. See Webb v. Mitchell, 586 F.3d at 400-01. This claim was fairly presented to, and decided by the Tennessee Supreme Court, including Mr. Dellinger's assertion that he was "unfairly prejudiced" by the introduction of this evidence. State v. Dellinger, 2001 WL 220186, * 22 (concluding that the Branam evidence did not "unfair[ly] prejudice" Mr. Dellinger). It is not defaulted.

With respect to Respondent's assertion that Mr. Dellinger's claim presents merely an evidentiary issue, Respondent ignores the teaching of *Dowling* that in circumstances much less serious than those presented here, the introduction of evidence pursuant to Rule 404(b) *necessarily* raises issues of fundamental fairness. *Dowling*, 493 U.S. at 348, 349, 352, 353 (1990); see also Lisenba v. California, 314 U.S. 219, 236 (1941) ("[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false," and that "[a]s applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice"); Jones v. Cain, 600 F.3d 527, 536 (5th Cir. 2010) (aff'g habeas relief based on erroneous evidentiary ruling, because although "[t]he State is correct that federal courts sitting in habeas do not review state courts' application of state evidence law," the district court "correctly asked whether the state court's application of state evidence rules violated Jones'

constitutional rights . . . Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application violates the Constitution. . . . Adoption of the State's argument would immunize constitutional error from review when the error is related . . . to a state evidentiary ruling. That is not the law") (citations omitted); Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) ("What due process requires will often depend on what state law is . . . . Once states have promulgated laws to define criminal conduct, however, federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated those laws. Thus, while we may not grant habeas relief for a 'mere error of state law,' a finding that the petitioner was erroneously deprived of [a trial ruling] to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights") (citations omitted).

Further, to the extent that this claim sets out an error that affects the fabric of the trial according to innate notions of fair play and decency, it cannot defaulted. See *Moore v. Dempsey*, 261 U.S. 86, 87 (1923) (Holmes, J.) (the proceedings in state Court, "although a trial in form, were only a form"); compare United States v. Gonzales-Lopez, 548 U.S. 140, 148-49 (2006) (Scalia, J.)); College Savings Bank v. Florida Postsecondary Educ. Expense Bd., 527 U.S. 666, 681-82 (1999) (Scalia, J.) (no implied or constructive waivers of core constitutional rights); United States v. Olano, 507 U.S. 725, 733-34 (1993) (O'Connor, J.) ("Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for the waiver and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake"); Railey v. Webb, 540 F.3d. 393, 399 (6th Cir. 2008) (Batchelder, J. ) (structural errors are not subject to forfeiture or default citing

Washington v. Recuenco, 548 U.S. 212, 219(2006) (Thomas, J.) and Sullivan v. Louisiana, 508 U.S. 275, 283 (1993) (Scalia, J.)), cert. denied, 129 S.Ct. 2878 (2009).

This claim is not procedurally defaulted. It does not present only a question of evidence, but the way in which the massive amount of evidence presented by the State – unrelated to the offense by any standard that the State's hypothesis and conjecture – unfairly and unreasonably prejudiced Mr. Dellinger and his ability to defend himself.

2. The Introduction Of All Of The Evidence In Support Of The State's Theory That Mr. Dellinger Killed Her So That He Could Prevent Her From Disclosing That He Had Killed Tommy Griffin Was Profoundly And Indisputably Unfair

As demonstrated in Sections VI A and VII A (incorporated herein by reference), supra, the prohibitions contained in the Ex Post Facto Clauses and the Double Jeopardy Clause (including principles of collateral estoppel or issue preclusion) are bound up in innate notions of what the government can and cannot do in a criminal prosecution. Both prohibitions are aimed at protecting citizens (even those who have been accused of serious crimes) from being embarrassed in their ability to defend themselves against after-the-fact or repeated charges. Like these prohibitions, the Due Process Clause of the Fourteenth Amendment ensures the right to a fair trial consistent with elementary notions of decency. See, e.g., Estelle v. Williams, 425 U.S. 501, 503 (1976) ("The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment"); Mooney v. Holohan, 294 U.S. at 122 (due process inquiry addresses whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions"); Rochin v. California, 342 U.S. 165, 173 (1952) (due process is tethered to those basic notions which define 'the community's sense of fair play and decency") .

It is settled that due process principles of fair play extend to the admission or exclusion of evidence at trial. See, e.g., Lisenba v. California, 314 U.S. at 236 ("[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false," and that "[a]s applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice"); Jones v. Cain, 600 F.3d at 536 ( the district court "correctly asked whether the state court's application of state evidence rules violated Jones' constitutional rights . . . Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application violates the Constitution"); Davis v. Strack, 270 F.3d at 123 ("while we may not grant habeas relief for a 'mere error of state law,' a finding that the petitioner was erroneously deprived of [a trial ruling] to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights"). As here, issues of evidence and fundamental fairness can be virtually inseparable. Thus, fundamental fairness issues relating to the trial of a case (more broadly but not unlike evidentiary rules) address not only whether evidence is true or false or relevant or irrelevant, but also whether evidentiary rulings threaten to distort jurors' perceptions, improperly or unfairly shift burdens, or embarrass an accused's ability to defend himself. See Chambers v. Mississippi, 410 U.S. 284 , 294 (1973) ("[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defendant against the State's accusations," and that due process is denied when trial error renders the defense theory "far less persuasive" than it otherwise would have been); cf. Old Chief v. United States, 519 U.S. 172, 180 (1997) (discussing relevance and prejudice in the context of Fed.R.Evi. 403: "'[U]nfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant

evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged"). These due process principles compel the conclusion that the trial court's action in allowing the State to introduce its entire case regarding the murder of Connie Branam in the capital prosecution for the murder of Tommy Griffin violated due process guarantees essential to a fair trial in two distinct ways.

First, in *Dowling v. United States*, 493 U.S. 342 (1990) the Supreme Court stated that a prior acquittal of an offense did not preclude the government from introducing evidence relating to that offense in a subsequent trial on another charge pursuant to Rule 404(b), because the standard for admissibility of evidence under Rule 404(b) is lower than that governing an acquittal. *Dowling*, 493 U.S. at 349 (citing United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361-62 (1984) (the acquittal did not prove that defendant is innocent, thus it did not negate that under a preponderance standard he could have been guilty)). *Dowling* emphasized however, that this did not end the inquiry. Rather, given the extraordinarily prejudicial nature of 404(b) evidence, the ultimate question was whether the introduction of such evidence under the circumstances of the case was "so extremely unfair that its admission violate[d] 'fundamental conceptions of justice,'" *Dowling*, 493 U.S. at 352. (quoting United States v. Lovasco, 431 U.S. at 790). In turn, an assessment of extreme prejudice required an evaluation of whether other fundamental rights were implicated such that notions of fair play and decency were implicated. *Dowling*, 493 U.S. at 353. After reviewing the record, and concluding that evidence of the prior crime was limited to identification testimony of the victim of the prior crime, coupled with the limiting instruction given to the jury, Dowling had not shown such prejudice.

Here, applying the principles of *Dowling*, it is plain that the introduction of the evidence violated elementary notions of fair plain and decency.

- Here, unlike in *Dowling*, the evidence of the murder of Connie Branam consisted of approximately half of the evidence presented to the jury. See Exhibit 22, *Chart of Witnesses for Sevier and Blount County Prosecutions.*[3]

> - Here, unlike in *Dowling*, given the massive amount of Rule 404(b) evidence introduced, the prejudice inquiry does not relate to one witness, but to approximately half of the trial evidence, including witnesses and exhibits. Thus, the error relating to the introduction of each of these witnesses and each piece of evidence must be cumulated for purposes of due process analysis. Cf. Chambers v. Mississippi, 410 U.S. 284, 302-02 (1973) (noting that the cumulative effect of evidentiary trial errors can deny a fair trial "in accord with traditional and fundamental standards of due process"); Montana v. Egelhoff, 518 U.S. 37, 52-53 (1996).(explaining *Chambers* holding to be that "erroneous evidentiary ruling can, in combination, rise to the level of a due process violation").
>
> - Here, unlike in *Dowling*, the evidence of the murder of Connie Branam was based on a theory that the Sevier County jury rejected at sentencing, viz. that Mr. Dellinger murdered Connie Branam so that she would not disclose that he had murdered Tommy Griffin.
>
> - Here, unlike in *Dowling*, while jurors are presumed to follow limiting instructions about the inferences that can be drawn from the evidence, the volume of evidence the State introduced was so substantial that it defies common sense to conclude that the jury could ignore the cut and thrust of the state's theory - that is, that Mr. Dellinger was a murderer. Indeed, even the Court of Criminal Appeals noted that the evidence showed that Mr. Dellinger "had killed Branam in order to conceal the fact that [he] had murdered Griffin." State v. Dellinger, 2001 WL 220186, * 22.
>
> - Here, unlike in *Dowling*, because defense counsel did not want the jury to know about the prior conviction for Branam's murder (an understandable, but problematic goal given the small, rural, contiguous communities in Sevier and Blount Counties), they were prevented from defending against this evidence on the ground that the Sevier County jury had expressly rejected this theory. Thus, while counsel could have argued to the Blount County jurors that the Sevier County jurors had concluded that Mr. Dellinger did not kill Connie Branam to prevent her from disclosing the murder of Tommy Griffin, this would have required them to abandon their aim of keeping out the conviction itself during the guilt-innocence phase.

[3] This chart only identifies the order of witnesses and their overlap in the two trials. It does not catalogue or compare the physical and other evidence the State paraded before the jury to support a theory that had been previously rejected.

- Here, unlike in *Dowling*, the trial court improperly and in violation of Tennessee law permitted the State to introduce evidence of the Branam murder under Rule 404(b) in support of the State's theory. Yet, clearly established Tennessee law that provided that when there had been a prior acquittal (at sentencing in Sevier County) evidence relating to a decision (here that Mr. Dellinger did not kill Connie Branam to cover up the Tommy Griffin murder) *cannot be introduced* under Rule 404(b). The Tennessee Supreme Court explained that the effect of the prior jury determination renders such evidence "less than 'clear and convincing,'" a condition precedent to the admissibility f such evidence. State v. Holman, 611 S.W.2d 411 (Tenn. 1981) ("the effect of the acquittal [in a prior case] is to render less than 'clear and convincing' the proffered evidence that the defendant committed the prior crime and the probative value of such evidence cannot be said to outweigh its prejudicial effect. . . . "); State v. Shropshire, 45 S.W.3d 64, 75, 76 n.8 (Tenn.Crim.App. 2000) (noting that *Holman* compels automatic exclusion of proposed Rule 404(b) evidence that was the subject of a prior acquittal).

- Here, unlike in *Dowling*, to the extent that the Tennessee law set out in Rule 404(b) and *Holman* gave rise to a procedure limiting the introduction of highly damaging Rule 404(b) evidence in criminal cases, and to the extent that Mr. Dellinger had constitutionally protected interests in life and liberty during his capital prosecution, see, e.g., Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (Kennedy, J.) (identifying sources of protected life and liberty interests under Due Process Clause of the Fourteenth Amendment), the fundamental unfairness of the introduction of the Connie Branam murder was compounded by this legal wrong *and was a separate, independent due process violation*. Cf. Hicks v. Oklahoma, 447 U.S. 343 (1980) (petitioner deprived of his state created right to jury sentencing - "Where [ ] a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a mater of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will not be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion . . . . [An interest] that the Fourteenth Amendment preserves against arbitrary deprivation by the State. (Citing Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1 (1979); Vitek v. Jones, 445 U.S. 480, 488-89 (1980) (citing Wolf v. McDonald, 418 U.S. 539 (1974)); and Morrissey v. Brewer, 408 U.S. 471 (1972)).

Mr. Dellinger fairly presented his claim that the introduction of voluminous evidence of Connie Branam's murder was fundamentally unfair. The issue is not an evidentiary issue, but a constitutional issue that is inseparable from evidentiary questions. The issue has not been, and cannot be defaulted. Upon a review of the record, it is plain that Mr. Dellinger's right to a fair trial was denied in very fundamental ways. Respondent is not entitled to summary judgment.

Rather, Mr. Dellinger is entitled to summary judgment as the nonmoving party, Respondent having failed to identify any disputed issues of material fact.

***The State Is Not Entitled To Summary Judgment For The Following Claims Because The State Courts' Resolution Of These Claims Was Contrary To Established Federal Law* (Petition ¶¶ 3.3.1-3.3.4, 3.3.11, 3.3.13, 3.3.14, 3.3.16, 3.3.17)**

Respondent has moved for summary judgment alleging that the Tennessee Court of Criminal Appeals' determination of these issues is not contrary to nor an unreasonable application of clearly established federal law and that it did not involve an unreasonable determination of the facts at issue. The State is wrong. In regard to these claims, the Tennessee Court of Criminal Appeals made erroneous and unreasonable determinations contrary to clearly established federal law. William v. Taylor, 529 U.S. 362, 405-06 (2000).

Moreover, "the Supreme Court has emphasized that AEDPA 'stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.' [Harrington v. Richter, 2011 U.S. LEXIS 912, *29 (Jan 19, 2011)]. Rather, federal habeas review continues to serve the important role of 'guard[ing] against extreme malfunctions in the state criminal justice systems." Walker v. Morrow, 2012 FED App. 0122N, *15 (6th Cir. Feb. 1, 2012) (citing Harrington, 2011 U.S. LEXIS, at *30). Thus, this Court must review the following claims to guard against the state criminal justice system's extreme malfunction.

*G. In Violation Of Mr. Dellinger's Rights, The Trial Court Refused To Grant Mr. Dellinger A Fair Trial Separate From His Co-Defendant, Gary Sutton (Petition ¶ 3.3.1)*

In violation of Mr. Dellinger's right to due process of law and a fair trial under the Sixth and Fourteenth Amendments, the trial court unlawfully denied Mr. Dellinger's motion to server his trial from his co-defendant, Gary Sutton. Respondent asserts that the state court decision, holding that there was no error in the trial court's refusal to grant severance, was neither contrary

to, nor an unreasonable application of clearly established federal law. See D.E. 34, p. 37-38. This is incorrect. The Tennessee Supreme Court held that "we find no error in the trial court's refusal to grant a severance of the defendants in this case . . . Severance is not required when the evidence admitted at trial would have been admissible against each defendant at separate trials." State v. Dellinger, 79 S.W.3d 458, 468 (Tenn. 2002). The state court's decision resulted in an unreasonable application of clearly established federal law. Moreover, as detailed below, certain evidence that the State admitted against Mr. Dellinger, could not have been admitted if the trial court severed Mr. Dellinger's case from Mr. Sutton's case.

Although joint trials can conserve prosecutorial resources, decrease inconvenience to witnesses, and avoid delays in the administration of criminal justice, "considerations of fairness normally outweigh administrative concerns." Richardson v. Marsh, 481 U.S. 200, 217 (1987). The Supreme Court continued to reason that "joint trials create special risks of prejudice to one of the defendants, and that such risks often make it necessary to grant severances." Richardson, 481 U.S. at 217. Such risks were present in Messrs. Dellinger and Sutton's joint trial. Despite that fact, the Blount County trial court unlawfully allowed administrative concerns to outweigh considerations of fairness. "An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence." Bruton v. United States, 391 U.S. 123, 132 n6 (1968) (overturned, in part, on other grounds). As asserted below, the jury in the Blount County joint trial considered irrelevant evidence that did not bear on Mr. Dellinger's guilt or innocence, but rather, the inadmissible evidence shed light on Mr. Sutton's culpability and ultimately prejudiced Mr. Dellinger.

The trial court's unlawful denial of Mr. Dellinger's motion for severance prejudiced him in two significant respects – (1) the State's introduction of Terri Lellie Newman's testimony that

Mr. Sutton made menacing statements to her; and (2) the jury who sat in judgment of Mr. Dellinger was prejudiced by the actions of Mr. Sutton (and/or Mr. Sutton's family) who attempted to bribe Juror Michael Everett. In both instances, the testimony and actions were wholly irrelevant to Mr. Dellinger's guilt or innocence, but both were highly prejudicial to Mr. Dellinger's care.

Initially, the State called Ms. Lellie Newman to testify that while she was bartending at Howie's Hideaway, James Dellinger, co-defendant Gary Sutton, and decedent Tommy Griffin came into bar, consumed a few beers, played pool, and left on February 21, 1992. Tr. Vol. I, pp. 66-81. The State recalled Ms. Lellie Newman to testify that the following day, Dellinger and Sutton returned to Howie's Hideaway with decedent Connie Branam to inquire about the whereabouts of Mr. Griffin. Tr. Vol. VI, pp. 514-535. Terry Lellie Newman testified that during that second visit, Mr. Sutton asked Ms. Lellie Newman if she would leave the bar with them and join the search for Mr. Griffin. Tr. Vol. VI, p. 521. When Ms. Lellie Newman refused, she testified that Mr. Sutton said, "your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." Id. at 522. Ms. Lellie Newman then added that as a result she "called my husband and asked him to come up and follow me home," because she was shaken up. Id. at 533. Ms. Lellie Newman claimed that that was the first time she called her husband, Robert Lellie, to come to the bar and follow her home. Id. at 534-35. Mr. Sutton's comment and Ms. Lellie Newman's response were totally fabricated details. The State relied on it heavily, referencing it in the closing argument. Closing Argument, Tr. p. 19-20.

Although the veracity of Ms. Lellie Newman's testimony is highly questionable (see Section X, Subsection 5), the prejudice as to Mr. Dellinger is clear. The jury heard from Ms. Lellie Newman that Mr. Sutton said menacing statements to her – statements that seemed to echo

the fact that Mr. Sutton was culpable for the disappearance and murder of Connie Branam and by extension, Mr. Griffin as well. In fact, the State made that same conclusion in their closing argument:

> Because there were people [at Howie's Hideaway] who could be identified who saw [Sutton, Dellinger, and Branam] together, who knew things. When Connie Branam was there and discovered this and learned this, her death warrant was sealed. Think about something else. Terri Newman, the second person to testify from the bar, when [Sutton, Dellinger, and Branam] were getting ready to leave, Sutton wanted her to go with him. She wouldn't go. And what was the last thing she heard out of him? Your husband will be surprised sometime when you don't come home and are never heard of again.

Closing Argument, Tr. p. 19-20. Had the trial court granted Mr. Dellinger's motion for severance, Ms. Lellie Newman's testimony regarding Mr. Sutton's statement to her would have been inadmissible against Mr. Dellinger. Without Ms. Lellie Newman's testimony, the jury likely would not have found Mr. Dellinger guilty.

Mr. Dellinger was similarly prejudiced by the fact that Mr. Sutton (or someone from Mr. Sutton's family) attempted to bribe one of the jurors. On September 1, 1996, Juror Michael Everett informed the trial court that he received a phone call from his ex-wife while sequestered. Exhibit 39, *September 1, 1996 Proceeding Regarding Bribery Attempt.* During the call, the ex-wife stated that in exchange for Mr. Everett voting not-guilty on Mr. Sutton, "they" would pay him $500. Id. at 4. She did not elaborate on who "they" were. When the court asked how that situation made him feel about staying on the jury and listening to the instructions, Mr. Everett replied: "I'm not going to change what I already decided on." Id. at 7. This conversation with the court occurred prior to the end of the presentation of proof. Despite the court's earlier instruction to the jury that no juror was to make any determination regarding the case until all the evidence had been presented and the law charged, Juror Everett admitted that he had already made his determination.

Had the trial court properly granted Mr. Dellinger's motion for severance, there would have been no reason for Mr. Sutton (or his family member) to bribe a juror sitting in judgment of Mr. Dellinger. Instead, the trial court's refusal to grant the motion, resulted in prejudice to Mr. Dellinger. Moreover, not only did the attempted bribery violate Mr. Dellinger's constitutional right with regard to the trial court's refusal to grant Mr. Dellinger's motion for severance, it also violated Mr. Dellinger's constitutional right to an unbiased jury. Reynolds v. United States, 98 U.S. 145, 155 (1878) ("[t]he theory of the law is that a juror who has formed an opinion cannot be impartial").

For these reasons, the State court ruled contrary to well established federal law and Mr. Dellinger is entitled to relief because the trial court unlawfully denied his motion for severance.

### H. *In Violation Of Mr. Dellinger's Rights, The Trial Court Continually Refused To Grant Mr. Dellinger A Change of Venue (Petition ¶ 3.3.2)*

The trial court violated Mr. Dellinger's due process rights and his right to a fair trial under the Sixth and Fourteenth Amendments when it continually refused to grant his requests for a change of venue. The Respondent argues that "[t]he state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent." D.E. 34, p. 39. This is incorrect. Although the state court identified the correct legal standard and applied the facts of the case to that standard, its decision was unreasonable in light of prevailing federal law.

The Sixth Amendment guarantees a criminal defendant a fair trial at the hands of an impartial jury. Duncan v. Louisana, 391 U.S. 145, 149 (1968). The Fourteenth Amendment extends this same right to defendants facing state criminal prosecutions. Id. An example of a biased jury is one who has been exposed to pretrial publicity. In certain situations, "adverse

pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." Patton v. Yount, 467 U.S. 1025, 1031 (1984). In one case, the Court held that "Where one's life is at stake – and accounting for the frailties of human nature – we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards. Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him . . ." Irvin v. Dowd, 366 U.S. 717, 727-28 (1961) (overruled on other grounds). Mr. Dellinger faced similarly extensive pretrial publicity in which newspapers and other media attributed another murder to him – the murder of Connie Branam.

The Tennessee Court of Criminal Appeals correctly identified that a change of venue may be warranted if "'upon motion of the defendant . . . it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.'" State v. Dellinger, 2001 Tenn. Crim. App. LEXIS 170, *39 (Mar. 7, 2001). However, the state court concluded that: "Appellants have failed to specifically identify any pretrial publicity that would suggest that there was any 'undue excitement against [them]' in Blount County or any other reason why a fair trial could not be had in Blount County." It is no surprise that the state court held that Mr. Dellinger failed to specifically identify any pretrial publicity suggesting bias against him when, in a footnote, the court conceded that the newspaper article Mr. Dellinger attached to his original motion for a change of venue was not in the record. Dellinger, 2001 Tenn. Crim. App. LEXIS, at *41 n.8. In addition, the state court incorrectly identified the article, stating that it came from the January 6, 1996 edition of the *Daily Times*, the same day that Mr. Dellinger filed the motion. Id. at 40.

This is clearly inaccurate; Mr. Dellinger filed his motion on January 26, 1996 and the article came from the January 26, 1996 edition of the *Daily Times*. Exhibit 40, *Motion for Change of Venue;* Exhibit 41, Anna C. Irwin, *Selection of jurors continues in murder trial*, Daily Times, Jan. 26, 1996, at 3A. Not only did the state court fail to review the article to determine whether it demonstrated bias against Mr. Dellinger, the court referred to the wrong date of publication for the article. The state court's failure to review the article on which Mr. Dellinger based his motion is unreasonable. Thus, the state court's conclusion with regard to Mr. Dellinger's claim is both unreasonable and unreliable.

The article Mr. Dellinger referenced in his motion for change of venue discusses several facts of the Blount County crime, provides a detailed report of the Sevier County crime and trial outcome, and identifies the State's theory of the case in the Blount County case. Exhibit 41, Anna C. Irwin, *Selection of jurors continues in murder trial*, Daily Times, Jan. 26, 1996, at 3A. "Attorney General Mike Flynn and Assistant Attorney General Ed Bailey, prosecutors in the case, will attempt to show the three men were together earlier that evening, fought about something and Griffin was put out of Sutton's car alongside Alcoa Highway." Id. The article continues, mentioning that while Mr. Griffin was in jail his trailer was intentionally burned: "Prosecutors contend Dellinger and Sutton left Griffin beside the highway, drove to Sevier County and burned his trailer; then came back to Blount County where they got Griffin out of jail and drove to the spot near Walland where Griffin was shot in the back of the head." Id. The article also states that "Dellinger and Sutton were convicted of first-degree murder in the death of Griffin's 34-year-old sister, Connie Branum, in a February 1993 trial in Sevier County . . . She and her car were burned almost beyond recognition." Id. It also reported that "[e]ach of the

men was sentenced to life imprisonment in Branum's murder plus two years in the burning of Griffin's trailer" and that all of their appeals to date had been denied. Id.

As Mr. Dellinger's original motion for change of venue argues, "[t]he January 26, 1996, edition of The Daily Times contains an extensive review of this case," causing "irreparable harm . . . to [Mr. Dellinger's] rights to due process." Exhibit 40, *Motion for Change of Venue.* In addition to requesting other remedies, Mr. Dellinger's trial counsel moved for "a change of venue . . . to another county." Id. Given the overwhelming evidence in support of a change of venue, the reviewing state court's refusal to grant Mr. Dellinger relief is an unreasonable application of well established federal law.

Acting similarly unreasonable, the state court also held that Mr. Dellinger failed to specify which jurors were biased against him as a result of pretrial publicity. Dellinger, 2001 Tenn. Crim. App. LEXIS, at * 41 ("Appellants have failed to identify a single juror who was allegedly biased.") However, in Mr. Dellinger's January 30, 1996 motion to strike jurors for cause, for mistrial and for change of venue, he specifically identifies 12 jurors who had been exposed to adverse pretrial publicity and whose impartiality was questionable. "Defendants respectfully move the Court as follows: 1. to strike the following named jurors due to the fact that they are aware of too much pre-trial publicity to the extent that they will be biased in favor of guilty in the guilty/not guilty phase of this trial: [list of twelve jurors]". Exhibit 42, *Motion to Strike Jurors*, at p. 1). The fact that the reviewing state court failed to take note of Mr. Dellinger's specificity and, in fact, claimed that Mr. Dellinger lacked specificity, is an unreasonable application of well established federal law.

For these reasons, the Respondent is not entitled to summary judgment on this claim.

### *I. The Trial Court Arbitrarily Denied Funding To The Defense For Jury Selection Expert, Marjorie Fargo, In Violation of Mr. Dellinger's Rights To A Fair Trial (Petition ¶ 3.3.3)*

In violation of Mr. Dellinger's Sixth and Fourteenth Amendment right to a fair trial and due process, the trial court arbitrarily revoked its initial approval of funds which had enabled the defense to hire a jury consultant, Marjorie Fargo. Exhibit 43, *Ruling on Request for Funding for Jury Expert*, at p. 7. Respondent claims that the state court's holding was neither contrary to federal law nor an unreasonable application of federal law and thus Petitioner is not entitled to relief. This is incorrect. The Tennessee Court of Criminal Appeals reasoned that the trial court may exercise discretion when determining whether to hire funds for an expert to assist an indigent defendant and that "a trial court may deny a defendant the assistance of a jury selection expert when the defendant has failed to demonstrate a particularized need for the expert services." Dellinger, 2001 Tenn. Crim. App. LEXIS, at *45-46 (citing State v. Mann, 959 S.W.2d 503, 526 (1997); State v. Black, 815 S.W.2d 166, 180 (1991)). Given the facts, Judge Kelly Thomas abused his discretion in denying funding for Ms. Fargo despite the fact that Mr. Dellinger presented a particularized need for her continued services. Thus, Respondent is not entitled to summary judgment on this claim.

The Sixth Amendment guarantees criminal defendants the right to a fair trial, including the right to the effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). Effective assistance of counsel in a capital trial includes not just effective attorneys, but a team of specialized professionals "reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 952 (2003).[22] However, an attorney's inability to compensate a reasonably necessary expert's services

[22] The Court has long referred to the ABA Guidelines (in all of its editions) as "guides to determining what is reasonable." Strickland, 466 U.S. at 688, Williams v. Taylor, 529 U.S. at 396; Wiggins, 539 U.S. at 524.

"unquestionably chills even a qualified attorney's zealous representation of his client." McFarland v. Scott, 512 U.S. 1256, 1258 (1994) (Blackmun, J., dissenting).

Mr. Dellinger's lawyers, Charles Deas and Eugene Dixon had never tried a capital case. PC Vol. I, p. 66-67 ("Q: And had you ever had a capital case that went to trial? [Mr. Deas]: Never."); PC Vol. IV, p. 511 ("Q: At the time you were appointed to represent Mr. Dellinger's case, how many capital cases had you handled? [Mr. Dixon]: Zero."). In preparation for representation, Messrs. Deas and Dixon attended a death penalty seminar in Nashville. See PC Tr. Vol. I, p. 91. There, they heard about a jury consultant, Marjorie Fargo, who had never had a jury vote for death on a capital case she worked on. Id. at 83. In November 1993, Mr. Dixon solicited Ms. Fargo's services. Exhibit 44, *November 1993 Letter to Marjorie Fargo from Trial Counsel.* The court initially granted the defense's request for funding to hire Ms. Fargo in March 1994. Exhibit 45, *March 7, 1994 Letter from trial counsel to Marjorie Fargo.* As a result, the defense heavily relied on her. "I viewed her services as being not only invaluable, but as absolutely necessary. And I really did not want to do this case without her." Charles Deas, PC Tr. Vol. I, p. 85. With the help of Ms. Fargo, jury selection began in January 1996. However, on January 31, 1996, the trial court continued the case until a later date because the lawyers had exhausted the available jury pool.

On June 18, 1996, the trial judge announced that he had bad news to deliver regarding the defense's expert services. Exhibit 43, *Ruling on Request for Funding for Jury Expert*. The judge claimed that he had received a letter from the chief judge regarding death penalty cases and that certain things need to be "done ahead of time and reasons for why [experts are] needed and blah, blah, blah, on these kinds of things." Id. at 5. At that point he announced, arbitrarily, that he was revoking funds for Ms. Fargo, telling the defense that "you all spent a week and a half with

her and have learned everything from her that a person needs to know about selecting a jury."

Id. at p. 7. The judge then continued:

> . . . I don't think she's any longer necessary for her – what were the words we used – due process and – what? What is it? To approve these in the first place, I've got to find that it's reasonably necessary for them to – what?
>
> Mr. Deas: Ensure their constitutional rights.
>
> The court: Yeah, and that they have a fair trial and their rights are all protected. And I don't think it's any longer necessary to have Ms. Fargo to do that.

Id. at pps. 7-8. Messrs. Deas and Dixon were left adrift without a captain to steer their ship. "[W]e were in shock[;] that was the point of shock, not having Margie Fargo back aboard. And we were discussing, you know, we – let's all – let's stop this madness, you know, and we will try to withdraw." Charles Deas, PC Tr. Vol. I, p. 90.

Judge Thomas revoked funding for Ms. Fargo despite the fact that Mr. Dellinger's attorneys had filed a motion, particularizing why Mr. Dellinger necessitated her services. Exhibit 46, *Memorandum in Support of Ex Parte Motion for Expert Services.* In it, Mr. Dellinger's attorneys referred to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, highlighting the fact that the court should allow the defense to work with experts and other professionals necessary for effective defense representation at every stage of the proceedings. Id. at p. 3. They reiterated Mr. Dellinger's right to effective representation of counsel under the Sixth and Fourteenth Amendments, as well as his right to a fair trial and due process. Id. at p. 3-4. Mr. Dellinger's attorneys also attached a transcript of proceedings in a neighboring jurisdiction in which a trial judge approved of funds to hire Ms. Fargo in a capital case. Id. at pps. 6-26. Despite Mr. Dellinger's attorneys' showing of a particularized need for

Ms. Fargo's services, the trial judge arbitrarily revoked funding to hire her. Thus, Mr. Dellinger is entitled to relief on this claim.

### *J. The Trial Court Impermissibly Limited Voir Dire On Issues Regarding The Death Penalty In Violation of Mr. Dellinger's Rights (Petition ¶ 3.3.4)*

In violation of Mr. Dellinger's right to an impartial jury under the Sixth Amendment and his right to due process under the Fourteenth Amendment, the trial court impermissibly limited voir dire on issues regarding the death penalty. Respondent claims that the reviewing state court's decision was neither contrary to nor an unreasonably application of federal law. This is incorrect. The state court held that Mr. Dellinger's "issue has no merit," explaining that Mr. Dellinger's "only allegation as to how [he was] prejudiced by the trial court's method of conducting voir dire is the vague statement that 'they would not get a feel of the true feeling of the jurors concerning the death penalty.'" Dellinger, 2001 Tenn. Crim. App. LEXIS, at *43.

The Sixth Amendment guarantees a criminal defendant a fair trial at the hands of an impartial jury. Duncan v. Louisana, 391 U.S. 145, 149 (1968). The Fourteenth Amendment extends this same right to defendants facing state criminal prosecutions. Id. The Court has also held that an impartial jury is especially important when a criminal defendant is facing capital charges. Morgan v. Illinois, 504 U.S. 719, 727-28 (1992). In the same case, the Court held that a defendant's right to an impartial jury includes voir dire to identify unqualified jurors. Id. at 729. Thus, the Tennessee Court of Criminal Appeals' decision – holding that the trial judge's decision to limit voir dire was permissible – was contrary to well established federal law.

After the initial attempt at jury selection failed due to too many unqualified jurors, the trial judge indicated that during the second voir dire, he would personally conduct the questioning regarding issues relating to eligibility to serve: "I am going to conduct all the voir

dire on the death penalty from this point on . . ." As a result, Mr. Dellinger was impermissibly prejudiced in violation of *Morgan*. Thus, Respondent is not entitled to summary judgment.

*K. In Violation of Mr. Dellinger's Rights, The Trial Court Unlawfully Allowed Proof Of Other Crimes And Bad Acts Allegedly Committed By Mr. Dellinger And/Or His Co-Defendant Mr. Sutton Into Trial (Petition ¶ 3.3.11)*

In violation of Mr. Dellinger's right to due process and fundamental fairness under the Fourteenth Amendment, the trial court impermissibly allowed the state to submit proof of other crimes and bad acts that Mr. Dellinger and/or Mr. Sutton allegedly committed. These acts include proof regarding a fight between Tommy Griffin and unknown parties on Alcoa Highway shortly before Mr. Griffin was arrested on Friday, February 21, 1992; proof of the alleged arson of Tommy Griffin's trailer; and proof related to the death of Connie Branam in Sevier County (see section XI.C).

Respondent asserts that Mr. Dellinger's claims are not cognizable and that the reviewing state court's decision was neither unreasonable nor contrary to well established federal law. This is an error. As to the altercation on Alcoa Highway and the burned trailer, the state court held that "the Tennessee Supreme Court has previously recognized that evidence of prior acts of violence against the victim are admissible under Rule 404(b) because the evidence is relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." 2001 Tenn. Crim. App. LEXIS, at *67. As to proof regarding Connie Branam's death, the state court held that it was permissible and that "the evidence regarding the Branam murder was highly relevant to establishing the identity of Griffin's killer because it tended to show that Appellants had killed Branam in order to conceal the fact that they had murdered Griffin." Id. at 68-69. These holdings are contrary to well established federal law.

The Court has long held that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." Spencer, 386 U.S. at 563-64 (citing Tumey v. Ohio, 273 U.S. 510 (1927); Betts v. Brady, 316 U.S. 455 (1942); Gideon v. Wainwright, 372 U.S. 335 (1963); Estes v. Texas, 381 U.S. 532 (1965); Sheppard v. Maxwell, 384 U.S. 333 (1966); and Griffin v. Illinois, 351 U.S. 12 (1956)). Moreover, in *Dowling v. United States*, the Supreme Court held that – in circumstances much less serious than those presented here – the introduction of evidence pursuant to Rule 404(b) *necessarily* raises issues of fundamental fairness. *Dowling*, 493 U.S. at 348, 349, 352, 353 (1990); see also Lisenba v. California, 314 U.S. 219, 236 (1941) ("[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false," and that "[a]s applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice"); Jones v. Cain, 600 F.3d 527, 536 (5th Cir. 2010) (affirming habeas relief based on erroneous evidentiary ruling, because although "[t]he State is correct that federal courts sitting in habeas do not review state courts' application of state evidence law," the district court "correctly asked whether the state court's application of state evidence rules violated Jones' constitutional rights . . . Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application violates the Constitution. . . . Adoption of the State's argument would immunize constitutional error from review when the error is related . . . to a state evidentiary ruling. That is not the law") (citations omitted); Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001) ("What due process requires will often depend on what state law is . . . . Once states have promulgated laws to define criminal conduct, however, federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated those laws. Thus, while we may not

grant habeas relief for a 'mere error of state law,' a finding that the petitioner was erroneously deprived of [a trial ruling] to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights") (citations omitted).

Thus, the trial court's failure to keep the State from introducing evidence of bad acts and other crimes the Mr. Dellinger and/or Mr. Sutton allegedly committed resulted in clear violations of Mr. Dellinger's constitutional rights. Accordingly, the reviewing state court's decision was contrary to well established federal law and Respondent is not entitled to relief on this claim.

### L. *In Violation Of Mr. Dellinger's Rights, The Trial Court Admitted As Evidence Statements That Tommy Griffin Made To Law Enforcement Officers (Petition ¶ 3.3.13)*

In violation of Mr. Dellinger's right to due process under the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment, the trial court admitted as evidence Tommy Griffin's out-of-court statements to Officer Drew Roberts on February 21, 1992. Specifically, these statements include: Mr. Griffin allegedly telling Officer Roberts that he had been in an argument with some friends and that they had put him out of a car. Officer Roberts further testified that when he prodded Mr. Griffin for more information, Mr. Griffin allegedly said: "I just can't tell you man."

Respondent asserts that Mr. Dellinger fails to present a cognizable claim and that the state court's ruling on the matter was neither contrary to nor an unreasonable applicable of federal law. However, this is incorrect. Contrary to federal law, the Tennessee Court of Criminal Appeals held that such statements were admissible under Tenn. R. Evid 803(2)[23] because "evidence shows that Griffin was still under the stress or excitement of the altercation

[23] Excited Utterance: a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

when he made his statements." Dellinger, 2001 Tenn. Crim. App. LEXIS, at *72-74. The reviewing court also found that the trial court's decision to admit such evidence was not an abuse of discretion. Id.

The Sixth Amendment's Confrontation Clause confers upon the accused "[i]n all criminal prosecutions . . . the right . . . to be confronted with the witnesses against him." At the time of Mr. Dellinger's trial, the Supreme Court interpreted the Confrontation Clause to allow admission of absent witnesses' testimonial statements based on a judicial determination of reliability. Ohio v. Roberts, 448 U.S. 56, 66 (1980). "Reliability can be inferred . . . where the evidence falls within a firmly rooted hearsay exception." Id. However, the evidence that the state presented in form of Officer Drew Roberts was not firmly rooted an in exception – in this instance the reviewing court claimed it qualified as an excited utterance. Tommy Griffin's statements to Officer Roberts did not qualify as an excited utterance. He was sufficient cooled off from whatever altercation and his statements to Officer Roberts came as a result of pointed questions, not excited utterances fitting the legal definition or the lay definition.

As a result, the trial court's decision was contrary to clearly established federal law and Respondent is not entitled to summary judgment as to this claim.

### *M. In Violation Of Mr. Dellinger's Rights, The Trial Court Impermissibly Allowed The State To Present Dr. Charles Harlan As A Rebuttal Witness (Petition ¶ 3.3.14)*

In violation of Mr. Dellinger's due process right under the Fourteenth Amendment, the trial court impermissibly allowed the state to present Dr. Charles Harlan as a rebuttal witness. The trial court allowed Harlan to testify despite the state's failure to give notice of Harlan as a potential witness and despite defense counsels' argument that Harlan should have been called as

a witness in the State's case-in-chief. Instead, the court allowed the state to withhold its expert until after the defense's case and thus the court enabled the state to sandbag the defense.

Respondent asserts that the reviewing state court's holding was reasonable because the trial court did not abuse its discretion in allowing Harlan to testify. "The determination of the admissibility of rebuttal evidence lies in the discretion of the trial court and this Court will not interfere with the exercise of this discretion unless there has been clear abuse of discretion appearing on the face of the record." Dellinger, 2001 Tenn. Crim. App. LEXIS, at *78 (citation omitted). In light of well established federal law and the trial court records, the reviewing state court's decision was unreasonable.

The due process clause of the Fourteenth Amendment guarantees state criminal defendants a fair trial and "imposes on States certain duties consistent with their sovereign obligation to ensure that 'justice shall be done' in all criminal prosecutions." Cone v. Bell, 556 U.S. 449, 449 (2009) (citing United State v. Agurs, 427 U.S. 97, 111 (1976) (quoting Berger v. United States, 295 U.S. 78, 88 (1935))). Thus the trial court had a duty to ensure that Mr. Dellinger received a fair trial. The trial court failed to fulfill this duty when it green lighted the State's request to proffer Harlan as a rebuttal witness despite the defense's valid protests. "[W]e respectfully submit that you can't rebut an opinion. . . . They should have called an expert opinion as to the time of death as far as their proof." Tr. Vol. XIV, p. 2004. Mr. Dellinger's lawyers continued: "we would like, on the record, an objection to rebuttal being used to put in new proof in chief." Id. at 2005. Despite these valid and lawfully accurate claims, the trial court abused its discretion and allowed Harlan to testify. Id. at 2009.

The State then called Dr. Charles Harlan to rebut the defense's witness, Dr. Larry Wolfe, who testified about Tommy Griffin's time of death. In turn, Harlan offered new evidence that

was clearly not rebuttal testimony and that should have been part of the State's case-in-chief. Moreover, he testified falsely – about his qualifications, his methodology, and his medical opinions. See Section X.A.1. Harlan began by claiming that he was the most recent Chief Medical Examiner for the State of Tennessee. Tr. Vol. XIV, p. 2010. When the defense asked if Dr. Harlan still held that position, he coyly responded "That's a matter of debate . . . [b]etween lawyers" and then proceeded to tout his qualifications and experience as Chief Medical Examiner. Id. at 2031-32. Under these false pretenses of credibility, Dr. Harlan concluded that Tommy Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. February 22, 1992. Id. at 2016. This evidence was evidence that should have been submitted as part of the State's case-in-chief.

The State's case against Mr. Dellinger relied almost exclusively on the jury accepting the proposition that Tommy Griffin died shortly before midnight on Friday, February 21, 1992 or, in the very early morning hours of Saturday, February 22, 1992. Given the fact that the prosecution's case against Mr. Dellinger was based solely on circumstantial evidence, they used the time of death as a linchpin. Assistant District Attorney Edward Bailey's closing argument opened with the proposition that Tommy Griffin died shortly before midnight on Friday, February 21, 1992[24] and the following 60 pages of argument relied on that proposition. See Tr. Closing Argument by State, pp. 3-66. Attorney General Mike Flynn bolstered Dr. Harlan's testimony by emphasizing that "[t]he only person that you heard testify who is a board certified forensic pathologist who has done 15,000 autopsies is Dr. Charles Harlan." Id. at 42.

[24] ". . . I'm going to try to start at the beginning here. On Friday the 21st of February, just a few minutes before midnight, two gunshots were heard at the Blue Hole. That, you know, is a fact, ladies and gentlemen. At that moment, from this evidence, we think that the rational conclusion and the only rational conclusion is that at that moment Tommy Griffin, plunged head-first down that river bank, dead in all likelihood before he ever hit the ground." (Closing Argument of State, Tr. p. 5).

Thus the reviewing court's decision was contrary to well established federal law and Respondent is not entitled to summary judgment on this claim.

*N. In Violation Of Mr Dellinger's Rights, The Trial Court Unlawfully Instructed The Jury And Refused To Eliminate Jury Confusion On What Jurors Believed To Be A Core Issue – Namely, The Effect Of The Prior Sentence Of Life In The Sole Aggravating Circumstance (Sevier County Judgment For The First-Degree Murder Of Connie Branam) On The Decision Whether To Sentence Mr. Dellinger To Life Or Death (Petition ¶ 3.3.16)*

The Amended Petition states that the trial court gave unconstitutional and misleading instructions with respect to: (1) the meaning of "intentional" conduct; and (2) the fact that residual doubt could not be considered as a mitigating factor. D.E. 25 (11/30/09 Amended Petition at 15, ¶3.3.16.1.1 ("intentional:"); 17, ¶3.3.16.3 ("residual doubt"). The merits of these jury instruction claims are addressed in Sections XI; XII infra, which are incorporated herein by reference.

The Amended Petition also states that the trial court refused to eliminate jury confusion on what the jurors themselves perceived to be a central concern with respect to their sole charge at sentencing – whether Mr. Dellinger should be sentenced to life or death. The only evidence introduced on this issue by the State was the Sevier County judgment finding Mr. Dellinger guilty of the first degree murder of Connie Branam. This judgment reflected that Mr. Dellinger had been sentenced to life for this murder. The jurors asked the court to explain how the Sevier County judgment would be enforced so that they could evaluate its effect in their decision making..

There is no transcript of the discussion of counsel and the court on this issue. The record contains only a handwritten query from the jurors *and* the judge's handwritten response refusing to eliminate the juror's confusion or answer their question: "You should concern yourself with

the sentences in this case only." See Exhibit 47, *Handwritten Note Filed as Supplement to Appellate Record, September 4, 1997.* On this issue, Mr. Dellinger relies in part on the discussion of the merits of this claim, Section XI, infra, incorporated herein by reference. More must be said, however, about the trial court's grossly deficient performance in failing to answer the jury's question.

* * * *

Under the unique circumstances of this case, the trial court's refusal to eliminate the jurors' confusion about an issue they perceived to be important was (1) irresponsible; (2) an abdication of the trial court's duty, as defined by the Supreme Court; (3) completely absurd, given the state's evidence before the jury; and (4) profoundly unfair, depriving Mr. Dellinger and his counsel of any argument relating to the prior conviction *and* depriving the jury of information that would have assisted in making a better informed decision on whether Mr. Dellinger should be sentenced to life . . . or to death.

As discussed in Sections VI and VII, supra, the murder of Tommy Griffin at 11:55 p.m. on February 21, 1992 was not a capital murder case. Blount Count District Attorney Mike Flynn acknowledged as much. See Exhibit 21, *Blount can't seek execution for brother's death,* THE MOUNTAIN PRESS; Sevier County Technical Record Vol. _ at 297. Despite this, District Attorney Flynn vowed to work with the Sevier County District Attorney to obtain a death sentence in the Connie Branam murder. When the Sevier County capital murder prosecution for the murders of Connie Branam and Tommy Griffin did not work out as planned, District Attorney Flynn initiated a virtually identical second capital murder prosecution in Blount County. As the District Attorney had acknowledged neither a factual nor legal basis for the second capital prosecution existed on February 21, 1992. Compare D.E. 14 and (Addendum _ Vol. [VIII or I,

labeled variously as each] ( 4/20/94 Motions at 15) (District Attorney Flynn acknowledged that he simply intended to retry the Sevier County case, observing that, "This is an unusual case . . . because basically it has been tried once previously in another jurisdiction")).

As the record of pretrial proceedings reflects, Mr. Dellinger's counsel repeatedly assailed the fundamental unfairness of (1) having to defend a capital murder prosecution with respect to facts and circumstances that did not exist at the time of the murder; and (2) Mr. Dellinger being twice subjected to the same capital murder prosecution twice. See, e.g., (D.E. 24 Addendum _ (Vol.1 Technical Record at 66-67 ,¶¶1-5 (4/27/93 Motion To Strike Or Dismiss, asserting reliance on Branam capital murder prosecution violated double jeopardy and the Eighth Amendment); id at 70 (4/27/93 Motion To Strike The Death Penalty (because Branam murder was *after* the death of Tommy Griffin).

Counsel not only raised the fundamental unfairness of the second capital prosecution based on identical facts that did not exist at the time of the February 21, 1992 death of Tommy Griffin, but raised practical concerns about the importance under the circumstances of educating the jurors about the meaning of a life sentence. See, e.g., D.E. 24 Addendum _, Vol. _ (4/26/93 Motion (requesting voir dire on jurors understanding about meaning of life sentence because "there is a substantial likelihood that jurors would speculate").

In sum, from the outset the trial court was aware of how sensitive the overlapping (if not identical) issues in the Branam, Sevier County prosecution and the second capital murder prosecution for Tommy Griffin's murder in Blount County were to Mr. Dellinger's right to a fair trial See, e.g. D.E. 24 Addendum _ Vol. XIV Hearing on 6/18/96 Motions at 43-44) (on the Rule 404(b) issue the trial court held the evidence relevant and material, but noted with respect to the fact of the conviction of the first-degree murder of Connie Branam, "pretty clearly – the

prejudicial effect of that would be so great as to – I don't even think we'd even have a trial if that – if the fact of the conviction came into evidence during the state's case in chief").

Given the issues that had been before the trial court, its refusal to answer the jury's question is inexplicable. It was also a complete abdication of the court's responsibility. As the Supreme Court has explained, "The judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." Bollenbach v. United States, 326 U.S. 607, 611-12 (1946) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)). Thus, the ability of the jury to appropriately perform its duty in Mr. Dellinger's case demanded that the trial judge discharge his duty "to give the jury the required guidance by a lucid statement" that enabled them to make an informed decision. *Bollenbach*, 326 U.S. at 612-13. "When[,as here,] a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Id. *Bollenbach*, 326 U.S. at 612-23; McDowell v. Calderon, 130 F.3d 833, 839 (9th Cir. 1997) (jury's confusion at sentencing and trial judge's failure to correct confusion with instruction resulted in an Eighth Amendment violation (although citing due process cases about judge's duty)), cert. denied, 523 U.S. 1103 (1998); Davis v. Greer, 675 F.2d 141, 145 (7th Cir. 1982) (trial judge has "a duty to respond to the jury's request with sufficient specificity to clarify the jury's problem).

Here, the trial court's refusal to address the jury's request was not only an abdication of responsibility, it was absurd. To establish its argument that Mr. Dellinger should be sentenced to death, the State introduced one piece of evidence: the judgment showing that Mr. Dellinger had been previously convicted of the first-degree murder of Connie Branam *and been sentenced to life*. The State's own evidence, and the only evidence in support of a death penalty raised a

serious question in the minds of the jurors. The trial court had a duty to explain the jury's duty with respect to evaluating the state's evidence.

The judge's refusal deprived jurors of critical information that plainly weighed heavily on the minds of some of them. It deprived the jury of *any* basis whatsoever to weigh or consider this Sevier County judgment's relationship to their sentencing decision. In a sense, then, the direction to consider the Sevier County judgment, but not explaining how as to the sentencing aspect of the judgment, effectively rendered the Sevier County judgment a strict liability aggravating circumstance, depriving Mr. Dellinger of any defense or any ability to explain or address an important aspect of the judgment. By refusing to answer the jury's question, and in the absence of any other instructions touching on the issue, the trial court essentially instructed Mr. Dellinger's jury that in arriving at a sentence, they were to take into account every aspect of the Sevier County case, including the judgment, *but not the sentence*."

Mr. Dellinger's case is precisely like that in Simmons v. South Carolina, 512 U.S. 154 (1994), if not worse. Here, as in *Simmons*, an aggravating factor (Sevier County conviction/ future dangerousness) had been placed in issue by the prosecution. Here, as in *Simmons*, the jurors' question about how the life sentence would be treated touched on the meaningful exercise of their own judgment about whether Mr. Dellinger should live or die. As such, here, as in *Simmons*, the question touched on a matter that was "indisputably relevant." *Simmons*, 512 U.S. at 163.

Here, as in *Simmons*, the trial court's refusal to explain a key question essential stripped Mr. Dellinger of the opportunity to deny or explain information that was before the jury. *Simmons*, 512 U.S. at 161 (quoting Gardner v. Florida, 430 U.S. 349, 362 (1977)). And, here, as in *Simmons*, given the trial court's refusal to address their question about an aspect of the Sevier

County judgment that was the sole aggravating circumstance, the jury was left to speculate, to substitute its own calculus, or base their life or death decision on misunderstandings.. *Simmons*, 512 U.S. at 161, 162, and 167.

In Mr. Dellinger's case there is more. Here, unlike in *Simmons*[1], the *only* aggravating factor before the jury was the Sevier County judgment. Here, unlike in *Simmons*, the jury's question related to a judgment that was bound up in the *res gestae* of the Tommy Griffin murder, such that the aggravating circumstance of the Sevier County judgment was not simply an unrelated prior conviction, but one that went directly to the nature of the Blount County offense. And here, unlike in *Simmons*, the trial court's refusal to answer the jury's question was not simply an abdication of responsibility, it was absurd: The jurors were to consider the Sevier County judgment to determine whether the State had established an aggravating circumstance beyond a reasonable doubt; to weigh the Sevier County judgment in determining whether Mr. Dellinger should live or die; but not to consider the Sevier County judgment in determining whether Mr. Dellinger should be sentenced to life or to death.

The trial court's refusal to address the jury's question was a repudiation of its basic responsibility, gave rise to absurd directions, and led to unguided decision making relating to what the jury perceived to be a critical issue respecting whether Mr. Dellinger should live or die, The trial judge's actions, as well as the consequences, violate *Bollenbach*; *Simmons*; *Daniels v. Williams*, 474 U.S. at 331-32 (1986) (due process guarantee "intended to secure the individual from the arbitrary exercise of the powers of government"); *Moore v. Dempsey*, 261 U.S. 86, 87 (1923) (Holmes, J.) (the proceedings in state Court, "although a trial in form, were only a

---

[1] While South Carolina's death penalty statute identified aggravating circumstances supporting a death penalty, future dangerousness was not one of them. However, South Carolina courts had held that future dangerousness was a factor that a jury could consider in determining whether to impose a death sentence and the prosecution had specifically urged that the jury do so in Simmons' case. See *Simmons*, 512 U.S. at 157, 162.

form”):and *Furman v. Georgia*, 408 U.S. 238, 309 (1972) (per curiam) (Stewart, J., concurring) (the imposition of the death penalty under Georgia’s capital sentencing scheme is “cruel and unusual in the same way that being struck by lighting is cruel and unusual”).

### O. *In Violation Of Mr. Dellinger’s Rights, The Trial Court Denied Mr. Dellinger An Impartial Jury When It Refused To Excuse Juror Michael Everett (Petition ¶ 3.3.17)*

In violation of Mr. Dellinger’s constitutional right to a fair trial, the trial court refused to excuse Juror Michael Everett who had allegedly been offered a bribe for an acquittal of Mr. Dellinger’s co-defendant, Gary Sutton. See Exhibit 39, *September 1, 1996 Proceeding Regarding Bribery Attempt.* The Respondent claims that the state court’s adjudication of this claim was based upon a reasonable application of facts. This is incorrect. The Tennessee Court of Criminal Appeals held that “[a]fter a somewhat ambiguous statement [from Juror Everett], the trial court asked the juror whether he would be able to vote according to the dictates of his conscience based on the proof and the instructions from the court. The juror responded that he would.” Dellinger, 2001 Tenn. Crim. App. LEXIS, at *95-96. Given that Juror Everett unambiguously stated that “I’m not going to change what I already decided on” when the court asked him if he could decide the case based on the facts, the state court’s finding was unreasonable. Exhibit 39, *Sept. 1, 1996 Proceeding Regarding Bribery Attempt* at, p. 7.

The Sixth Amendment guarantees a criminal defendant a fair trial at the hands of an impartial jury. Duncan v. Louisana, 391 U.S. 145, 149 (1968). The Fourteenth Amendment extends this same right to defendants facing state criminal prosecutions. Id. Not only must jurors enter into a trial with an open mind, they must maintain an open mind until the conclusion of evidence. Reynolds v. United States, 98 U.S. 145, 155 (1878) (“[t]he theory of the law is that a juror who has formed an opinion cannot be impartial”).

Juror Everett's unambiguous statement that he had already made up his mind prior to the conclusion of trial makes clear that the state court's failure to grant Mr. Dellinger relief on this claim was unreasonable. The state court's finding was a clear violation of *Reynolds v. United States*. As a result, Respondent is not entitled to summary judgment on this claim.

## XII. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT FOR MR. DELLINGER'S CLAIM THAT HIS COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AS A MATTER OF LAW (Petition ¶ 3.7)

The State's motion for summary judgment on this claim should be denied because there is no dispute as to the material facts of Charles Deas and Eugene Dixon's representation at all points prior to and during the guilt-innocence and sentencing phases of Mr. Dellinger's trial. See Fed.R.Civ.P. 56(c). Neither Messrs. Deas nor Dixon had ever tried a capital case before representing James Dellinger. PC Vol. I, p. 66-67 ("Q: And had you ever had a capital case that went to trial? [Mr. Deas]: Never."); PC Vol. IV, p. 511 ("Q: At the time you were appointed to represent Mr. Dellinger's case, how many capital cases had you handled? [Mr. Dixon]: Zero."). Although they were well aware of the gravity of the case before them, they did not have the skills, experience, or wherewithal to effectively represent a client facing a potential death sentence. See Exhibit 44, *November 1993 Letter to Marjorie Fargo from Trial Counsel.*

Messrs. Deas and Dixon did know that their defense depended on casting doubt on the state's circumstantial evidence and refuting the state's experts. Mr. Dixon had attended the State's early prosecution of Mr. Dellinger in Sevier County and both attorneys reviewed the transcript from that trial in preparation for the Blount County case. PC Vol. IV, pp. 519, 525; PC Vol. I, p. 74 ("We had, of course, the transcript itself, which provided a blueprint of sorts for the testimony that we knew was coming."). Moreover, they knew that Mr. Dellinger had an alibi for the time period in which Mr. Griffin actually died. They knew that Mr. Dellinger exhibited signs

of mental disability and brain injury. They knew they needed qualified experts related to forensics, ballistics, and body decomposition, among other areas. Despite this knowledge, Messrs. Deas and Dixon's inexperience prevented them from providing more than a superficial and inadequate challenge to the State's case.

Notwithstanding the state court finding denying Mr. Dellinger relief as to his ineffective assistance of counsel claim (Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *75-101), this court is not beholden to those conclusions because they were "infected by constitutional error sufficiently serious to warrant" relief. Williams v. Taylor, 529 U.S. 362, 413 (2000). Although this Court may give the state court's conclusions a respectful reading, it is ultimately the law of the United States Supreme Court that dictates the outcome. Id. at 387. As such, this court must analyze counsel's deficient performance in light of the legal principles the Supreme Court set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); and the ABA Guidelines for the Appointment and Performance of Defense Counsel in a Capital Case which the Court has adopted. The Court has long referred to the ABA Guidelines (in all of its editions) as "guides to determining what is reasonable." Strickland, 466 U.S. at 688, Williams v. Taylor, 529 U.S. at 396; Wiggins, 539 U.S. at 524.

To establish ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. See Williams, 529 U.S. at 390-91 (quoting Strickland, 466 U.S. at 688). To establish prejudice, a petitioner must show that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See

Williams, 529 U.S at 390 (quoting *Strickland*, 466 U.S. at 694). Under these principles, Mr. Dellinger is entitled to relief and the State's motion should be denied.

### A. *Counsel Failed to Properly Investigate James Dellinger's Case Prior to Trial (¶ 3.7.1)*

In violation of Mr. Dellinger's constitutional rights, appointed counsel conducted virtually no investigation in the case, including investigating facts of the crime, Mr. Dellinger's mental disabilities, and his social or medical history. See Wiggins, 539 U.S. at 521 (counsel have duty to conduct reasonable investigation or to make "a reasonable decision that makes particular investigations unnecessary"); Rompilla v. Beard, 545 U.S. 374, 387 (2005) (counsel have a duty to investigate regardless of the defendant's intentions or actions). Mr. Deas later conceded that the defense attorneys for both Mr. Sutton and Mr. Dellinger shared one single investigator, Gary Litton who worked on "some issues." PC Vol. I, p. 79. However, it is clear from what Mr. Dellinger's lawyers failed to present during the trial, that very little investigation had been completed by Mr. Litton, let alone anyone else.

Based on the record, the actions of Mr. Dellinger's appointed counsel fell well below prevailing standards at the time for criminal defense counsel and, specifically, capital defense counsel. "Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case." Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, The Champion, (Jan./Feb. 1989) at 12.

"It is the duty of the lawyer to conduct prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate

exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." Rompilla, 545 U.S. at 387 (citing 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)). Mr. Dellinger's lawyers failed to adequately investigate his case. This was gross constitutional error that gave rise to a number of serious consequences.

1. Counsel Failed to Investigate Petitioner's Brain Injury and its Effect Upon his Ability to Form the Requisite Mens Rea for First Degree Murder (¶3.7.1.1.)

Despite having in their hands the report of Dr. Peter Young, neuropsychologist, counsel for Mr. Dellinger failed to appreciate the significant brain and cognitive impairments which affect all of Mr. Dellinger's thinking, decision-making, and his ability to form the specific intent of intentional, knowing and premeditated murder. Buried within the report from Dr. Young, but never further investigated, presented nor explained in any way to the jury was a finding that Mr. Dellinger is significantly brain injured: " His overall Halstead Impairment Index of 1.0 out of a possible 0-1.0 range is indicative of his problems . . . it is clear that his dominant hand and, by inference, his contralateral dominant hemisphere, that is his left hemisphere, are significantly compromised." Exhibit 48, *Report of Dr. Peter Young*. Counsel, however, abjectly failed to investigate or discover such evidence, and as a result, failed to present such evidence to the jury as proof of Mr. Dellinger's inability to form the mens rea for capital murder. Counsel performed deficiently in not investigating this compelling proof, and James Dellinger was prejudiced.

2. Counsel Failed to Obtain Competent Experts (¶3.7.1.2.)

Charles Deas and Eugene Dixon failed to secure the services of competent experts to assist in the investigation and preparation of Mr. Dellinger's defense despite information available to them at the time that dictated the need for experts. Strickland, 466 U.S. at 690 ("a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's

challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct"). At bottom, Mr. Dellinger's counsel should have retained an investigator exclusively dedicated to fact based investigation,[25] an investigator or mitigation specialist exclusively dedicated to developing mitigation, a forensic pathologist, a neuropsychiatrist, a medical doctor, a ballistics expert, a crime scene reconstructionist, a metallurgist, and an expert in intellectual disability diagnosis. Unfortunately, counsel attempted to conduct some of the investigation themselves and did so unsuccessfully. Such conduct amounted to ineffective representation.[26]

Messrs. Deas and Dixon knew much of the information that the State planned to present against Mr. Dellinger prior to trial due to the prior Sevier County prosecution. Mr. Dixon attended approximately 90 percent of Mr. Dellinger's Sevier County trial involving the death of Connie Branam. PC Vol. IV, pp. 519, 525. In addition, both Messrs. Deas and Dixon read copies of the Sevier County trial transcript in preparation for the Blount County trial. Id. Thus, Mr. Dellinger's lawyers knew which experts they needed to retain to mount an adequate defense of their client. See Wiggins, 539 U.S. at 485-86 (court must assess counsel's investigation in light of professional norms and based on counsel's perspective at the time of representation).

*a. Forensic pathologist (¶3.7.1.2.1.)*

Based on information available prior to trial, Messrs. Deas and Dixon knew that the time of Tommy Griffin's death was going to be a major issue in the State's case. As such, they should have retained an independent forensic pathologist to examine the autopsies of Tommy Griffin. Based on the State supplied autopsy, Mr. Dellinger's counsel knew the timing of rigor mortis, the

[25] "Counsel lacks the special expertise required to accomplish the high quality investigation to which a capital defendant is entitled and simply has too many other duties to discharge in preparing the case. Moreover, the defense may need to call the person who conducted the interview as a trial witness. As a result, an investigator should be part of the defense team at every stage of a capital trial." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 958 (2003).
[26] "In addition to employing the particular nonlegal resource that high quality legal representation requires in each individual case, the standard to practice demands that counsel have certain specific forms of assistance in every case." *ABA Guidelines*, at 958.

absence of insect activity around the body, and that there was undigested food in Mr. Griffin's stomach – all of which called into question the timing of Tommy Griffin's death. Exhibit 49, *Tommy Griffin Autopsy Report*, at p. 2. The State's case relied almost exclusively on the jury accepting the proposition that Tommy Griffin died shortly before midnight on Friday, February 21 or in the very early morning hours of Saturday, February 22, 1992. Had Mr. Dellinger's counsel acquired an expert to assert otherwise, the State would have had no case against Mr. Dellinger and the trial would have had a different outcome. See Strickland, 466 U.S. at 687.

Similarly, the independent pathologist Mr. Dellinger's attorneys should have retained could have reviewed the State's autopsy of Connie Branam. The State relied on Mr. Dellinger's conviction for Ms. Branam's death as the aggravating circumstance that made Mr. Dellinger eligible for the death penalty. Had his attorneys hired such an expert to call into question the cause of death and thus challenge the underlying conviction, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. Id.; see also Rompilla, 545 U.S. at 376 n.7 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, comment. (rev. ed. 2003)) ("Counsel must . . . investigate prior convictions . . . that could be used as aggravating circumstances or otherwise come into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a conviction.").

*b. Ballistics expert (¶3.7.1.2.2.)*

Mr. Dellinger's counsel knew that the State's case relied exclusively on circumstantial evidence, including linking shotgun shells found around both Connie Branam and Tommy Griffin's scenes with shells found on Mr. Dellinger's property. Had counsel retained the services of a competent ballistics expert, the defense could have argued that the shells did not match nor did Mr. Dellinger's gun fire them. Had counsel presented such information to the court, it is

reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687. Although Messrs. Deas and Dixon allegedly consulted with a former medical examiner, Cleland Blake regarding ballistic proof that the State planned to present, defense counsel failed to apprehend that Dr. Blake was not qualified nor trained in ballistics. Dr. Blake was a semi-retired medical doctor who lacked special training to identify firearm projectiles.

*c. Fingerprint(¶3.7.1.2.3.)*

During the course of the investigation, police officials uncovered fingerprints at both crime scenes. Specifically, fingerprints on the shell casing found at the Blount County scene and a fingerprint on a beer can found near the burned car at the Sevier County scene. The State conducted an analysis on the fingerprints, but did not present the information at trial. The defense failed to obtain the services of a fingerprint expert. The fingerprint expert would have been able to testify that the shotgun shell casing found near the Blount County scene did not have sufficient characteristics to perform a comparison with anyone's fingerprint, let alone Mr. Dellinger's prints. Exhibit 50, *Max Jarrell email to Michael Noles, October 11, 2011*. Had a fingerprint expert testified as such, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

*d. Crime scene and metallurgist (¶¶3.7.1.2.4; 3.7.1.2.5.)*

In violation of Mr. Dellinger's constitutional rights, Messrs. Deas and Dixon failed to obtain the services of a crime scene expert as well as a metallurgist. The State's case against Mr. Dellinger was largely circumstantial. As such, an attorney acting reasonably would have worked with a crime scene expert who could have demonstrated that the circumstances that the State established at trial were inconsistent with Mr. Dellinger's guilt. See Strickland, 466 U.S. at 688-89 (court's "performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances"). Had counsel presented such information to the court, it is

reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

Similarly, an attorney performing reasonably would have hired a metallurgist who could have testified that the brass shell casing found in Connie Branam's car would have melted if it had been there during the fire, which according to State expert Gary Clabo, reached 1500-2000 degrees. Such information would have supported the defense theory that the shell casing was planted at the scene after the Ms. Branam died to implicate Mr. Dellinger. Had counsel presented such information to the jury, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687. Although the defense consulted with Ted Kaplan, a fire expert, prior to trial, Mr. Kaplan was not qualified to make a determination about the temperature required to melt brass and thus was not able to make a determination about that fact.

*e. Experts to assess James Dellinger's intellectual disability, brain injury, and competency to stand trial. (¶3.7.1.2.6.)*

As asserted in Section IV.A, Mr. Dellinger is mentally retarded and sustained multiple head injuries as a youth which permanently damaged his brain. These factors, as well as his illiteracy, called into question his ability to meet the legal standard for competency to stand trial. At the time of their representation, Messrs. Deas and Dixon knew that the state of Tennessee had barred the execution of the mentally retarded since 1991 when the state passed T.C.A. § 39-13-203(b) (2011) ("no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death."). Any reasonable attorney would have investigated Mr. Dellinger's medical and educational history and then retained experts to assess Mr. Dellinger's intellectual disability, his brain injuries, and his competency to stand trial. See Wiggins, 539 U.S. at 524.

Information gleaned from such experts would have directly challenged Mr. Dellinger's ability to be prosecuted by the State (*Dusky v. United States*, 362 U.S. 402 (1960)) and Mr. Dellinger's eligibility for the death penalty, as argued above. Such experts include a competent neuropsychological examiner familiar with forensic work and legal definitions of intellectual disability, a neurologist, a psychiatrist, a neuroradiologist, a medical doctor, and an expert in diagnosing intellectual disability based on the Tennessee statutory definition and the medical professional norms. Although Mr. Dellinger's attorneys hired Dr. Peter Young of Knoxville to conduct a neuropsychological evaluation of Mr. Dellinger, Dr. Young was neither qualified nor competent to diagnosis intellectual disability. As such, Mr. Dellinger's attorneys performed ineffectively in failing to hiring competent experts in their representation of Mr. Dellinger. Had counsel performed competently, it is reasonably likely that Mr. Dellinger would not have been sentenced to death.

3. Failed to Investigate Alibi (¶ 3.7.1.3.)

James Dellinger had an alibi defense. Messrs. Deas and Dixon knew about it and even filed a notice of alibi, which included the names of witnesses they planned to call – Diane Sutton, Carolyn Weaver, and Lynda Dellinger. Exhibit 51, *Notice of Alibi, July 7, 1995*. However, Mr. Dellinger's lawyers failed to investigate a key component of Mr. Dellinger's alibi defense, failed to call Lynda Dellinger as a witness in the guilt phase, and thus failed to effectively represent Mr. Dellinger in violation of *Strickland* and its progeny.

James Dellinger told his attorneys that during the time that Tommy Griffin was killed, he was at the Huddle House, a restaurant in Pigeon Forge, with his wife, Gary Sutton, Gary's girlfriend, and a family member. Although Mr. Dixon planned to call Mr. Dellinger's wife, Gary's girlfriend, and the family member, he ultimately failed to call Mr. Dellinger's wife, Lynda to testify about the alibi. And although Mr. Dixon later admitted that non-family member

witnesses would have been more credible, Mr. Dixon never bothered to seek out nor talk to neutral witnesses who were at the Huddle House at the same time as Mr. Dellinger. PC Vol. IV, pp. 531-32. Moreover, he was unable to offer any explanation for why he failed to investigate this critical portion of Mr. Dellinger's defense. Id. Likewise, Mr. Deas admitted that he did not (nor did anyone else on the defense team) visit Huddle House to ask if anyone remembered seeing Mr. Dellinger during the relevant period. PC Vol. I, pp. 78-79.

Although *Strickland* affords great deference to a trial attorney's conduct, it does not require the reviewing court to give deference to a trial attorney's failure to perform based on unreasonable investigation choices. See Strickland, 466 U.S. at 690-91. If it never occurred to counsel to investigate some critical fact, such as an alibi, or counsel simply overlooked that fact, then the "decision" to not investigate cannot be considered an informed strategic one. Wiggins, 539 U.S. at 534. As such, the court cannot attribute counsel's failure to call Mrs. Dellinger during the guilt innocence phase of trial or counsel's failure to investigate Huddle House as "strategy." Instead, counsel's failures amount to constitutionally ineffective assistance of counsel. Had counsel fully investigated and presented Mr. Dellinger's alibi, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

4. Failed to Investigate Circumstances Of Barbara Gordon's Identification of the Truck Leaving Connie Branam's Crime Scene as Resembling Mr. Dellinger's Truck (¶ 3.7.1.4.)

Barbara Gordon, the closest thing the state had to an eye witness of the events, identified Mr. Dellinger's truck as the truck she saw leaving the area of where Connie Branam's car was burned (and presumably the area where Connie Branam was killed in that her body was found within the burned car). Though Mrs. Gordon testified at trial that she was certain of her

identification of Mr. Dellinger's truck, the circumstances of her identification of the truck would have led a reasonable juror to conclude otherwise, had such circumstances been investigated and presented.

As demonstrated by Exhibit 52, *Declaration of John McCarter*, Ms. Gordon's testimony was subject to attack, had counsel investigated to learn the substance of Exhibit 52. As set forth in Exhibit 52, at the time of the events, Mrs. Gordon identified the vehicle she observed as a "4 wheel drive, either a Bronco or Blazer." As related by Mr. McCarter, law enforcement suggestively told Mrs. Gordon that they knew "who was responsible" and showed Mrs. Gordon a photo of Mr. Dellinger's white truck. Not surprisingly, given the circumstances of the identification, Mrs. Gordon decided that the white truck in the photo was the vehicle she had seen. Counsel failed to interview Mr. McCarter to discover the context of Mrs. Gordon's identification of Mr. Dellinger's truck.

5. Failed to Investigate Dirt Samples and Tire Tread Impressions (¶3.7.1.5.)

Not only did counsel fail to investigate the circumstances of Mrs. Gordon's identification of Mr. Dellinger's truck, counsel also failed to pursue other available evidence that Mr. Dellinger's truck was not the vehicle Mrs. Gordon saw. Sevier County sheriff's department officials took dirt samples from Mr. Dellinger's truck and created casts of tire tread impressions in the logging road where Mrs. Gordon saw the suspicious vehicle, but neither law enforcement nor counsel ever moved to compare those samples/impressions with Mr. Dellinger's truck. Counsel's failure was deficient performance under *Strickland* and prejudiced Mr. Dellinger.

6. Failure to Investigate Mr. Dellinger's Intellectual Disability and Brain Injury Despite IQ Scores Indicating Impairment and Neurological Testing Indicative of Brain Damage (¶3.7.1.6.)

Counsel for Mr. Dellinger, though they possessed a report identifying their client as mentally retarded and brain damaged, failed to recognize or further investigate the information they possessed. As noted above at ¶ 1. (regarding claim ¶3.7.1.1) counsel obtained the services of neuropsychologist Peter Young. Though Dr. Young performed a neuropsychological examination of Mr. Dellinger and concluded that 1) he had significant brain damage and 2) his IQ was consistent with Tennessee jurisprudence governing intellectual disability, counsel failed to appreciate the import or substance of Dr. Young's report and failed to conduct any further investigation to understand or amplify his findings. See Exhibit 48, *Report of Dr. Peter Young* Where Mr. Dellinger's intellectual disability makes him actually innocent of the death penalty, counsel's failure to investigate clear indicators of Petitioner's low IQ is deficient performance pursuant to *Strickland*. See Exhibit 48, *Report of Dr. Peter Young* at p. 6, reporting full scale IQ on Woodcock Johnson Test of Cognitive Ability of 72 (within the standard error of measurement of Tennessee Code Annotated §39-13-203's requirement of an IQ of 70 or below). Further, given the nature of Dellinger's available defense --- a categorical exemption from capital punishment --- he was clearly prejudiced by counsel's failure.

*B. Counsel Failed to File Appropriate Motions (Claim 3.7.2)*

According to Mr. Dixon, he was in charge of preparing for the guilt-innocence phase of trial, which included pre-trial motions and any relevant motions throughout the proceedings. PC Vol. IV, p. 514. Mr. Dixon attended Mr. Dellinger's earlier Sevier County prosecution and read a transcript of the proceedings. PC Vol. IV, pp. 519, 525. As such, he knew what proof the State would use against Mr. Dellinger in the Blount County prosecution. PC Vol. I, p. 74 ("We had, of course, the transcript itself, which provided a blueprint of sorts for the testimony that we knew was coming."). Despite this information, Messrs. Deas and Dixon failed to file appropriate motions on behalf of Mr. Dellinger. "[C]ounsel should file written motions in limine prior to

trial raising any issues that counsel anticipate will arise at trial. All of the grounds should be set out in the motion." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1033 (2003) [hereinafter *ABA Guidelines*]. Counsel's failure to file the appropriate motions on behalf of Mr. Dellinger violated his right to effective representation under *Strickland* and its progeny.

Relatedly, the ABA Guidelines for death penalty counsel dictate that: "Counsel must . . . know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection, or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings." *ABA Guidelines*, at 1031. Thus, not only did Messrs. Deas and Dixon's ineffectiveness related to motion practice directly impact Mr. Dellinger's case at trial, it also negatively impacted his ability to seek relief in all subsequent appeals. Such ineffectiveness is not only unconscionable, but also unconstitutional.

1. Counsel Failed to Request Funding for Appropriate and Qualified Experts (¶ 3.7.2.1.)

To be sure, defense counsel filed some motions to request funding for expert services, specified below. However, counsel's motions reflected boilerplate language that merely scratched the surface of what the constitution requires of effective defense counsel in capital cases. See *ABA Guidelines*, at 955 (need for supporting services of experts is particularly acute in death penalty cases given the unique complexity of such cases).

*a. Failed to file requests* ex parte *( ¶3.7.2.1.1.)*

The defense's April 26, 1993 motion for expert witnesses and expenses laid out for the prosecution the defense's plan to challenge the ballistic findings of the State's experts. Exhibit 53, *April 26, 1993 Motion for Expert Assistance* at p. 1. Such caviler conduct flies in the face of

what is required, at bottom, from defense counsel in capital cases. *ABA Guidelines*, at 1004 ("it is counsel's obligation to insist upon making such requests *ex parte* and in camera"). In fact, Tennessee's high court held that requests for certain expert assistance *requires* an *ex parte* hearing if the defendant would be prejudiced by disclosing his defense at an adversarial hearing. State v. Barnett, 909 S.W.2d 423, 429 (Tenn. 1995). Ultimately, the defense did request an *ex parte* hearing for a subsequent motion for funding for a psychiatric expert (Exhibit 54, *December 10, 1993 Motion for Ex Parte Hearing*), but that proved to be an exception. Had counsel filed all such motions *ex parte*, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

*b. Failed to obtain the services of a qualified forensic pathologist.(¶3.7.2.1.2.)*

In August of 1996, the court approved funds for a defense expert, Dr. Larry Wolfe. See Exhibit 55, *Approval of funding for defense expert Larry Wolfe*. The defense intended to use Dr. Wolfe as an expert in forensic pathology to challenge the State's evidence regarding Tommy Griffin's time of death. PC Vol. 1, p. 128 ("We had meetings with him. And he had the possibility of enlarging the time frame to put it so that it was more than probable that James and Gary Sutton . . . weren't with Tommy Griffin."). However, Dr. Wolfe was not qualified to make such an assessment and thus his testimony was vulnerable to discrediting cross examination. The State did just that. Charles Deas later admitted that "Dr. Wolfe was not a – he didn't do a residency in pathology. We felt he was – I think he was a general practitioner that had an interest in pathology and [had] done some autopsies. So, he was not credentialed to that extent." PC Vol. I, pp. 138-39.

The ABA Guidelines for death penalty counsel make clear that "[c]ounsel must be experienced in the utilization of expert witnesses and evidence . . . and must be able to challenge

zealously the prosecution's evidence and experts through effective cross examination." *ABA Guidelines*, at 913. Counsel's failure in this regard amounted to constitutionally ineffective representation on behalf of Mr. Dellinger. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death.

c. *Failed to file request for funding to hire competent ballistics expert.(¶3.7.2.1.3.)*

On April 26, 1993, Mr. Dellinger's defense attorneys filed a motion for expert witnesses and expenses. Exhibit 53, *April 26, 1993 Motion for Expert Assistance*. In it they requested funds for a firearms expert because shotgun shells were found on Mr. Dellinger's property that the State claimed were the same shells that killed Tommy Griffin. Id. However, they retained a local coroner, Dr. Cleland Blake, and consulted with him regarding the ballistics evidence that the State obtained. Unfortunately, Dr. Blake was in no way qualified to provide the defense with information that would contradict the State's evidence. Dr. Blake had neither the experience nor knowledge to competently assist the defense regarding ballistic evidence; and thus the information he provided inhibited counsel from effectively cross examining the State's witness.

The ABA Guidelines for death penalty counsel, which the Supreme Court adopted, make clear that "[c]ounsel must be experienced in the utilization of expert witnesses and evidence . . . and must be able to challenge zealously the prosecution's evidence and experts through effective cross examination." *ABA Guidelines*, at 913. Counsel's failure in this regard amounted to constitutionally ineffective representation on behalf of Mr. Dellinger. Had counsel made such a request for a competent ballistics expert, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

d. *Failed to request additional funding to seek qualified expert to rebut Dr. Charles Harlan's bogus science.(¶3.7.2.1.4.)*

In violation of Mr. Dellinger's right to effective representation of counsel, his defense attorneys failed to request additional funding for a qualified expert to rebut the State's witness, Dr. Charles Harlan. Even though the State has since conceded that Dr. Harlan's testimony was false,[27] Mr. Dellinger's attorneys – due to their ineffective representation[28] – were not aware of that fact at the time of trial. Thus, Dr. Harlan offered false, unmitigated testimony, claiming that Tommy Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. February 22, 1992. Tr. Vol. XIV, p. 2016. In reaching that conclusion, Dr. Harlan testified that he relied on two factors: (1) the fact that rigor mortis was present when police found the body and (2) the examination of microscopic slides taken from the autopsy. Tr. Vol. XIV, p. 2015. However, his conclusions were false and the methodology he used to reach them was bogus science.

The result of Dr. Harlan's testimony was beyond damaging. The defense relied exclusively on their expert, Dr. Wolfe – who testified immediately before Dr. Harlan – to assert that Tommy Griffin died within a smaller and later window of time. Given that Dr. Harlan claimed he was "the most recent" Chief Medical Examiner of the State of Tennessee (Tr. Vol. XIV, p. 2010), the jury credited his testimony over the testimony of Dr. Wolfe. A defense attorney acting effectively would have sought a continuance to secure a rebuttal witness or even moved for a mistrial based on Dr. Harlan's blatantly false testimony. Unfortunately, Mr.

---

Respondent asserted that there was only one element of Petitioner's knowing presentation of false testimony claim (involving Charles Harlan) in dispute – whether the law requires the Court to impute the TBI and Attorney General's knowledge that Dr. Harlan testified falsely on the State trial attorneys who prosecuted Mr. Dellinger.

> [I]mputed knowledge, whether [the state] should have known about any larger scale investigation into Dr. Harlan at the time of the trial. The evidence that we will show at this hearing is that the Attorney General's Office or the District Attorneys Office knew of no investigation into that, nor should they have known of any investigation into that. Those are the only issues that are remaining.

D.E. 137, 22 (Sutton v. Colson, 3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010).

[28] "In fact, after [Dr. Harlan] testified, we would have liked to get another person to look at these things, and we didn't have time to do it." PC Vol. I, p. 131.

Dellinger's attorneys failed to act effectively. Mr. Deas's post-conviction testimony confirmed that:

> Q: Do you know why you did not move either for a mistrial or for a continuance to enable you to prepare –
>
> A: I don't know why.
>
> Q: -- to cross examine Dr. Harlan?
>
> A: I don't know if we were not paying attention. I don't know if we were that schooled at that point or not paying attention. I didn't – I don't know why.

PC Vol. I, p. 129.

Although both Messrs. Deas and Dixon were acutely aware that something should be done to mitigate Dr. Harlan's false and damaging testimony, they did not have the wherewithal to do something. "We didn't know how to deal with this. We wanted to deal with it." Id. at 149. Mr. Deas continued: "Maybe we didn't know we could do it [request for the opportunity to present surrebuttal evidence]." Id. at 150. The ABA Guidelines for death penalty counsel make clear that "[c]ounsel must be experienced in the utilization of expert witnesses and evidence . . . and must be able to challenge zealously the prosecution's evidence and experts through effective cross examination." *ABA Guidelines*, at 913. Had counsel filed such a motion, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

2. Failure to Demand a Speedy Trial (¶3.7.2.2.)

At the time of the indictment in this case, the Blount County District Attorney conceded that the State did not have any basis for seeking the death penalty in regards to the killing of Tommy Griffin. See Exhibit 21, *Blount can't seek execution for brother's death,* THE MOUNTAIN PRESS. Counsel's failure to demand a speedy trial allowed the State to seek a conviction in Sevier

County prior to the trial in Blount County, which the State used as an aggravating circumstance to seek death. See Exhibit 56, *Notice of Intent to Seek Death Penalty, Filed March 30, 1993.* Counsel's failure to file so simple a motion as a motion for speedy trial was clearly deficient performance and Mr. Dellinger was prejudiced. Strickland, supra.

3. Failure to File Any Motions (or to Present Proof) to Have Mr. Dellinger Declared Incompetent to Stand Trial and/or Ineligible for the Death Penalty due to Intellectual Disability and Brain Injury (¶ 3.7.2.3.)

As argued, above at Section IV, James Dellinger is mentally retarded. Counsel for Mr. Dellinger possessed, at the time of trial, IQ test results which, had counsel understood them, proved Mr. Dellinger's intellectual disability. Counsel failed to consult appropriately with their expert so as to understand the results of the IQ and neurological testing. As a result, counsel failed to move the court to disqualify Mr. Dellinger from eligibility for the death penalty pursuant to Tennessee Code Annotated §39-13-203. Counsel's failures were clearly deficient performance and Mr. Dellinger was prejudiced. Strickland, supra.

Further, counsel failed to appreciate the ways in which Mr. Dellinger's significant brain injury prevented him from assisting counsel and otherwise participating meaningfully in his defense. Because counsel failed to understand or investigate the report of Dr. Young, counsel failed to apprehend that Mr. Dellinger's brain damage prevented him from understanding or retaining the information counsel related to him and the information which was presented in the courtroom. See Exhibit 48, *Report of Dr. Peter Young* ("it should be clear Mr. Dellinger has significant problems in memory . . . even more apparent, however, is the difference between his ability to remember things in the immediate present (short term memory = 91) vs. the next day (long term retrieval = 52) . . .As such this score on the PPVT [Peabody Picture Vocabulary Test]

provides clear evidence of Mr. Dellinger's very limited access to language." Had counsel appreciated Mr. Dellinger's limitations in processing language, understanding oral information, and memory, counsel would have realized that Mr. Dellinger was essentially incompetent to stand trial --- unable to assist counsel with the presentation of his defense because of his limited ability to process information. See generally Exhibit 1a, *Report of Dr. Watson*.

4. Failure to File Any Motion to Strike the State's Notice of Intent to Seek the Death Penalty as Unconstitutional (¶ 3.7.2.4.)

Counsel failed to file any motion to strike the State' s notice of intent to seek the death penalty as unconstitutional. They could (and should) have filed a motion based on the fact that the State abused its discretion in delaying the Blount County prosecution in order to obtain a conviction in Sevier County. The State then used that conviction as an aggravating circumstance in order to seek the death penalty in the Blount County case, which violated the *ex post facto* clause. "Whether raising an issue specific to a capital case . . . or a more common motion shaped by the capital aspect of the case . . . , counsel should be sure to litigate all of the possible legal and factual cases for the request. This will increase the likelihood that the request will be granted and will also fully preserve the issue for post-conviction review in the event the claim is denied." *ABA Guidelines*, at 1031-32. Counsel's failure to file the appropriate motion violated Mr. Dellinger's right to effective representation. Rompilla, 545 U.S. 374 ("Counsel's obligation to rebut aggravating evidence extend(s) beyond arguing it ought to be kept out."). Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

5. Failure to File a Motion to Suppress Mr. Dellinger's Statements as Having Been Obtained in Violation of the Fifth and Fourteenth Amendment (¶ 3.7.2.5.)

Despite Mr. Dellinger's manifest difficulties with language and memory (see Exhibit 1a, Report of Dr. Watson; Exhibit 2a, Declaration of Dr. Greenspan; Exhibit 3, Report of Dr. Murray) counsel failed to apprehend that Mr. Dellinger's limited intelligence and brain damage were a basis for suppression of his statements. Had counsel spent appropriate time with Mr. Dellinger and had counsel requested the assistance of appropriate experts, counsel would have realized that the statement Mr. Dellinger gave to law enforcement was not knowing, voluntary nor intelligent and would have moved to suppress the statement. Counsel's failure to do so was deficient performance that prejudiced Mr. Dellinger in violation of *Strickland* and *Rompilla*. Strickland, Rompilla, *supra.*

6. Failure to File a Motion to Exclude the Irrelevant .303 Shell Casing Found at Connie Branam's Crime Scene (¶3.7.2.6.)

In violation of Mr. Dellinger's right to effective representation, his lawyers failed to file a motion to exclude the irrelevant .303 shell casing found at the Connie Branam scene. The State never produced evidence that Ms. Branam was shot, thus, the presence of a shell in Ms. Branam's car – which the State purported matched Mr. Dellinger's gun – mislead the jury and unfairly prejudiced Mr. Dellinger. That defense counsel failed to file an appropriate motion to exclude the shell underscores counsel's failure to perform a thorough investigation prior to trial. "Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted, or undercut." *ABA Guidelines*, at 1064. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

7. Counsel Failed to File a Motion to Exclude the Testimony of "Fire Expert" Gary Clabo (¶3.7.2.7.)

The State retained Gary Clabo, a fire expert, to offer testimony regarding the fires in Connie Branam's car and Tommy Griffin's trailer. However, he was grossly underqualified to offer an expert opinion and he failed to use scientific methods to support his inflammatory conclusions. That Mr. Dellinger's lawyers failed to exclude Mr. Clabo's testimony amounted to constitutionally ineffective representation. "Counsel should carefully research applicable state and federal law governing the admissibility of evidence in aggravation. Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that failed, rebut the evidence or offer mitigating evidence that will blunt its impact." *ABA Guidelines*, at 1064.

Gary Clabo was woefully underqualified to testify with any scientific certainty about either fire. Although Mr. Clabo had attended a handful of seminars and training session regarding fire and arson investigation, Mr. Clabo had only a high school degree and no knowledge of advanced chemistry which would have been required, at bottom, to actually understand burn patterns, fire sources, and the destruction that fire causes. See Tr. Vol. V, p. 706.

Had counsel thoroughly investigated Mr. Clabo and his supposed "scientific" methodology, they would have been able to exclude his testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). During trial, Mr. Clabo admitted that he merely visually inspected the fires and that he did not conduct any tests on materials found in the fire or conduct any mock fires in a laboratory to reconstruct fire burn patterns. Yet, actual fire experts know that "[w]ith the naked eye, it is impossible to distinguish between the pour patterns and puddle configurations caused by an accelerant and those caused naturally by post-flashover.[29] The only reliable way to tell the difference is to take samples from the burn patterns and test

---

[29] A flashover is "the point at which radiant heat causes a fire in a room to become a room on fire." Grann, *The New Yorker*, Sept. 7, 2009, 27.

them in a laboratory for the presence of flammable or combustible liquids." See, Exhibit 34, Grann, David "Trial by Fire: Did Texas execute an innocent man?" *The New Yorker*, at pps. 27-28.

Defense counsel's failure to exclude such evidence amounted to constitutionally ineffective representation. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

8. Counsel Failed to File a Motion to Exclude Dr. William Bass's Opinion Regarding the Presence of an Accelerant in Connie Branham's Car (¶ 3.7.2.8.)

The State retained Dr. William Bass as a fire expert to testify about the source of fire in Connie Branam's car. However, Dr. Bass was not a fire expert by any definition; he was an anthropology professor. Exhibit 65, *CV of Dr. William Bass*. Although Dr. Bass specialized in determining information from human skeletal remains, he was not qualified to testify about the origins or burn patterns of a fire. Thus, his testimony about the use of an accelerant as a fire source was pure speculation. When the State asked Dr. Bass to describe photos of the remains found in Ms. Branam's car, he claimed: "To get this much burning, you would have to have something added to this. There's simply not enough fuel load there to give you this amount of burning of a human body." Tr. Vol. V, p. 659.

James Dellinger's lawyers were constitutionally ineffective for failing to exclude Dr. Bass's testimony regarding the presence of an accelerant in the fire that burned Connie Branam's car. His testimony was unreliable, prejudicial, and outside his area of expertise. Although Mr. Dellinger's attorneys verbally objected to the testimony during trial (Tr. Vol. V, pp. 655-57), they had a constitutional duty to do more. They did not. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

9. Counsel Failed to File a Motion to Exclude the Testimony of State Ballistic Experts Joseph Masson and Don Carmen (¶ 3.7.2.9.)

James Dellinger's defense lawyers were ineffective for failing to file a motion to exclude the testimony of ballistics experts Joseph Masson and Don Carmen. Messrs. Masson and Carmen testified misleadingly that tool mark identification can match a projectile to a firearm "to the exclusion of all others," despite scientific evidence that tool marks change with use of a firearm over time. The "science" of tool mark analysis involves a witness testifying that the two items appear similar in the subjective opinion of that witness, thereby impermissibly and misleadingly elevating the opinion of the layperson to the statute of scientific truth. Such testimony does not meet the mandate that the Supreme Court dictated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) and *Daubert*, 509 U.S. 579.

Thus, defense counsel's failure to file a motion to exclude the testimony of Messrs. Masson and Carmen amounted to constitutionally ineffective representation. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

10. Counsel Failed to File any Motions Asserting Mr. Dellinger's Rights Under International Law (¶ 3.7.2.10.)

Defense counsel failed to raise any motions asserting Mr. Dellinger's rights under international law, including treaties that the United States ratified, customary international law, and treaties that the United States President entered into and ratified. When post-conviction counsel asked if it occurred to defense counsel to challenge the trial proceedings under international law, Mr. Deas replied: "It didn't enter my mind and I don't think it entered anybody else's mind." PC Vol. I, p. 106-07. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

*C. Counsel Were Ineffective At Trial (Claim 3.7.3)*

Charles Deas and Eugene Dixon were woefully inexperienced and lacked the wherewithal to represent Mr. Dellinger, or any capital client, effectively. Neither Mr. Deas nor Mr. Dixon had ever tried a capital case before. PC Vol. I, p. 66-67; PC Vol. IV, p. 511. Based on the division of labor, Mr. Dixon would be primarily responsible for the guilt/innocence phase of trial[30] and Mr. Deas planned to spearhead the sentencing efforts. PC Vol. I, pp. 68-69. In preparation for representation, Messrs. Deas and Dixon attended a death penalty seminar in Nashville. See PC Tr. Vol. I, p. 91. There, they heard about a jury consultant who had never had a jury vote for death on a capital case she worked on. Id. at 83.

Charles Deas and Eugene Dixon placed all their eggs in one basket – Marjorie Fargo, the jury selection expert. "I viewed her services as being not only invaluable, but as absolutely necessary. And I really did not want to do this case without her." Charles Deas, PC Tr. Vol. I, p. 85. When the court revoked funding for Ms. Fargo in late June 1996, Messrs. Deas and Dixon were left adrift without a captain to steer their ship. "[W]e were in shock[;] that was the point of shock, not having Margie Fargo back aboard. And we were discussing, you know, we – let's all – let's stop this madness, you know, and we will try to withdraw." Charles Deas, PC Tr. Vol. I, p. 90. However misplaced and irrational their dependence on Ms. Fargo, it was clear that Messrs. Deas and Dixon felt like throwing in the towel when the court informed them that they had no funding to continue using her. "[W]e were sincere about it [motion to withdraw as counsel] – I was sincere about the motion or I wouldn't have filed it, had I not been sincere. It was not perfunctory at all." Charles Deas, PC Tr. Vol. I, p. 142.

[30] Mr. Deas helped with portions of the guilt/innocence phase: "I cross-examined very few witnesses during the trial itself, just a few." PC Vol. I, p. 91.

At various points during the trial, Messrs. Deas and Dixon sensed they should challenge certain proof from the State, but they simply did not know what course of action to take. When post-conviction counsel asked why Mr. Deas failed to take a certain course of action, he responded: "It didn't enter my mind and I don't think it entered anybody else's mind." PC Vol. I, p. 106-07.

1. Counsel Were Ineffective at Voir Dire (¶3.7.3.1.)

Counsel were ineffective in voir dire for failing to challenge the composition of the venire and for failing to ask appropriate questions of perspective jurors. As demonstrated Exhibit 57, *Declaration of Juror Key,* counsel failed to discover that Juror Key personally knew two of the state's witnesses, Detective Widenour (the lead detective on the case) and jailer Ray Herron. Indeed, counsel failed to discover that Juror Key had previously worked for the Blount County Sherriff's department and had a pre-formed opinion of the truthfulness and trustworthiness of these two state's witnesses. Counsel's failures prejudiced Mr. Dellinger, depriving him of a fair and impartial jury.

2. For Failing to Challenge the State's Proof (¶3.7.3.2.)

a. *Failed to adequately challenge the State's proof regarding Tommy Griffin's time of death.*(¶3.7.3.2.1.)

As asserted previously, the State retained Dr. Charles Harlan to offer testimony regarding Tommy Griffin's time of death. Dr. Harlan offered false, unmitigated testimony, claiming that Mr. Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. February 22, 1992. Tr. Vol. XIV, p. 2016. In reaching that conclusion, Dr. Harlan testified that he relied on two factors: (1) the fact that rigor mortis was present when police found the body and (2) the examination of microscopic slides taken from the autopsy. Tr. Vol. XIV, p. 2015.

However, his conclusions were false and the methodology he used to reach them was bogus science.

Although the defense relied on Dr. Larry Wolfe to testify as to the same information, his testimony came immediately before Dr. Harlan's testimony. Thus, Dr. Harlan discredited Dr. Wolfe – his credentials and methodology – and the jury incorrectly credited Dr. Harlan. As argued previously and below, Messrs. Deas and Dixon failed to request funds for an expert to challenge Dr. Harlan's inflammatory testimony. Similarly, they failed to effective challenge Dr. Harlan's testimony in any meaningful way. Although both Messrs. Deas and Dixon were acutely aware that something should be done to mitigate Dr. Harlan's damaging testimony, they did not have the wherewithal to do something. "We didn't know how to deal with this. We wanted to deal with it." Id. at 149. Mr. Deas continued: "Maybe we didn't know we could do it [request for the opportunity to present surrebuttal evidence]." Id. at 150. This failure constituted ineffective representation.

b. *Failed to challenge the State's ballistics testimony.(¶3.7.3.2.2.)*

The State relied on Joseph Masson and Don Carmen to assert that shotgun shells found near Tommy Griffin's body had the same markings as shotgun shells found on Mr. Dellinger's property and that all the shells came from the same firearm. Such testimony was bogus and Mr. Dellinger's attorneys possessed information that would have enabled them to effectively challenge the testimony. Their failure to do so amounted to constitutionally ineffective assistance of counsel.

In the Sevier County trial, counsel for co-defendant Sutton attacked the State's ballistic proof, forcing the State's experts to conceded that out of the four marks that the experts used to make an identification, the casings found at the Griffin scene had only one mark in common with those found in Mr. Dellinger's yard. Mr. Dixon had attended the State's early prosecution of Mr.

Dellinger in Sevier County and both defense attorneys reviewed the transcript from that trial in preparation for the Blount County case. PC Vol. IV, pp. 519, 525; PC Vol. I, p. 74 ("We had, of course, the transcript itself, which provided a blueprint of sorts for the testimony that we knew was coming."). However, it seems that counsel did not carefully review the Sevier County transcript. Had they reviewed it, Messrs. Deas and Dixon would have been prepared to challenge the State's ballistic "proof." Their failure to do so violated Mr. Dellinger's rights under *Strickland*.

3. Failure to Present Available Proof to Support Defense (¶3.7.3.3.)

Counsel were ineffective for failing to present proof in support of their defense. Counsel failed to present the testimony of Johnny McCarter regarding the manner in which law enforcement manufactured the identification of Mr. Dellinger's truck by Barabara Gordon. See Exhibit 52, *Declaration of John McCarter.* Counsel further failed to present the testimony of Mr. Dellinger or to obtain a waiver from Mr. Dellinger of his right to testify. Counsel's failures resulted in a denial of due process and were clearly ineffective assistance of counsel pursuant to *Strickland* and *Rompilla*. Strickland, Rompilla, *supra.*

4. Failing to Challenge the State's Rebuttal Proof by Charles Harlan (¶3.7.3.4.)

As asserted above, Messrs. Deas and Dixon failed to request funds for an expert to challenge Dr. Harlan's inflammatory testimony. Similarly, they failed to effectively challenge Dr. Harlan's testimony in any meaningful way. Even though the State has since conceded that Dr. Harlan's testimony was false,[31] Mr. Dellinger's attorneys – due to their ineffective

[31] Respondent asserted that there was only one element of Petitioner's knowing presentation of false testimony claim (involving Charles Harlan) in dispute – whether the law requires the Court to impute the TBI and Attorney General's knowledge that Dr. Harlan testified falsely on the State trial attorneys who prosecuted Mr. Dellinger.

> [I]mputed knowledge, whether [the state] should have known about any larger scale investigation into Dr. Harlan at the time of the trial. The evidence that we will show at this hearing is that the Attorney

representation[32] – were not aware of that fact at the time of trial. Thus, Dr. Harlan offered false, unmitigated testimony, claiming that Tommy Griffin died between 11:30 p.m. on Friday, February 21, 1992 and 8:00 a.m. February 22, 1992. Tr. Vol. XIV, p. 2016. In reaching that conclusion, Dr. Harlan testified that he relied on two factors: (1) the fact that rigor mortis was present when police found the body and (2) the examination of microscopic slides taken from the autopsy. Tr. Vol. XIV, p. 2015. However, his conclusions were false and the methodology he used to reach them was bogus science.

The result of Dr. Harlan's testimony was beyond damaging. The defense relied exclusively on their expert, Dr. Wolfe – who testified immediately before Dr. Harlan – to assert that Tommy Griffin died within a smaller and later window of time. Given that Dr. Harlan claimed he was "the most recent" Chief Medical Examiner of the State of Tennessee (Tr. Vol. XIV, p. 2010), the jury credited his testimony over the testimony of Dr. Wolfe. A defense attorney acting effectively would have sought a continuance to investigate Dr. Harlan's credentials or filed a motion for a mistrial due to his blatantly false testimony. Unfortunately, Mr. Dellinger's attorneys failed to act effectively. Mr. Deas's post-conviction testimony confirmed that:

> Q: Do you know why you did not move either for a mistrial or for a continuance to enable you to prepare –
>
> A: I don't know why.
>
> Q: -- to cross examine Dr. Harlan?
>
> A: I don't know if we were not paying attention. I don't know if we were that schooled at that point or not paying attention. I didn't – I don't know why.

---

> General's Office or the District Attorneys Office knew of no investigation into that, nor should they have known of any investigation into that. Those are the only issues that are remaining.

D.E. 137, 22 (Sutton v. Colson, 3:06-cv-388) (Evidentiary Hr'g, Feb. 1, 2010).

[32] "In fact, after [Dr. Harlan] testified, we would have liked to get another person to look at these things, and we didn't have time to do it." PC Vol. I, p. 131.

PC Vol. I, p. 129.

Although both Messrs. Deas and Dixon were acutely aware that something should be done to mitigate Dr. Harlan's damaging and false testimony, they did not have the wherewithal to do something. "We didn't know how to deal with this. We wanted to deal with it." Id. at 149. Mr. Deas continued: "Maybe we didn't know we could do it [request for the opportunity to present surrebuttal evidence]." Id. at 150. The ABA Guidelines for death penalty counsel make clear that "[c]ounsel must be experienced in the utilization of expert witnesses and evidence . . . and must be able to challenge zealously the prosecution's evidence and experts through effective cross examination." *ABA Guidelines*, at 913. Counsel's failure in this regard amounted to constitutionally ineffective representation on behalf of Mr. Dellinger. Had counsel performed competently, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

5. The Jury Was Given Unconstitutional Jury Instructions, And Counsel Was Ineffective For Failing to Object to the Court's Unconstitutional Jury Instruction (¶3.7.3.5.)

The jury was provided jury instructions which relieved the prosecution of proving all elements of first-degree murder beyond a reasonable doubt, and which prevented the full consideration of mitigating evidence under Tennessee law. James Dellinger is entitled to habeas relief on such claims, as well as for any of counsel's failure to appropriately raise such objections at trial or on appeal.

*a. Jury Instructions On The Element Of "Intentional" Unconstitutionally Relieved The Prosecution Of Its Burden Of Proof (¶3.3.16.1.1)*

The jury was required to find beyond a reasonable doubt that the murder was "intentional." This essential element was defined as follows: "A person acts intentionally with

respect to the nature of the conduct **or** to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct **or** cause the result." T.R. 244. Given the disjunctive "ors" in this instruction, a juror could find that James Dellinger acted intentionally "with respect . . . to a result of the conduct" if it was his conscious objective "to engage in the conduct." In other words, the instruction allowed jurors to find that Mr. Dellinger intended to kill (cause the result) if they merely concluded that he intended to "engage in the conduct" which caused death – such as shooting at the victim – even absent specific intent to kill.

The constitutional problem with this instruction is that first-degree murder in Tennessee is a specific intent crime. State v. Vaughn, 279 S.W.3d 584, 608 (Tenn.Cr.App. 2008). That is, the prosecution bore the burden of proving that Mr. Dellinger specifically intended to kill, not simply that he intended to injure or the victim here. The jury instructions, however, allowed the jury to find specific intent to kill by merely finding a conscious objective to engage in the conduct which caused death. Cook v. State, 884 S.W.2d 485 (Tex.Cr.App. 1994)(improper to permit jury to find specific intent to kill using jury instruction that allowed finding of intent merely to engage in conduct leading to death). By allowing the jury to convict of the greater offense of intentional murder based solely upon a finding that James Dellinger engaged in conduct which caused death, the jury instructions relieved the prosecution of proving beyond a reasonable doubt the essential element of "intentional." Sandstrom v. Montana, 442 U.S. 510 (1979).[33]

[33] Because this instruction was clearly erroneous under Tennessee law, counsel had no tactical reason not to object to this patently erroneous instruction. Consequently, any failure to counsel to raise this issue at trial or on appeal was, by definition, ineffective under *Strickland*. Everett v. Beard, 290 F.3d 500 (3d Cir. 2002) (counsel ineffective for failing to object to erroneous jury instructions).

*b.* *The Jury Imposed The Death Sentence After Being Denied A Critical, Requested Instruction About The Manner In Which James Dellinger Would Serve A Life Sentence If The Jury Wished To Sentence Him To Life, Not Death (¶3.3.16.2)*

The jury was instructed that "Tennessee law provides that a person convicted of murder in the first degree shall be punished by death or by imprisonment for life." T.R. 243. As to a sentence of life imprisonment, the jury was further instructed:

> A defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence.

Id. The jury was aware, however, that James Dellinger had previously been convicted of first-degree murder in Sevier County and given a life sentence. Carefully considering the option of giving James Dellinger a life sentence for the Blount County murder, the jury was, however, concerned that if given a second life sentence, James Dellinger might ultimately receive no additional punishment at all, were the second life sentence to be consecutive to his current life sentence. Out of concern that Dellinger could get a second life sentence and no additional punishment, the jury wanted to make sure that a second life sentence would be consecutive to the first life sentence.

The jury thus sent the following note to the judge during their sentencing deliberations, seeking to understand how Dellinger would be punished if sentenced to life in prison:

> If James Dellinger and Gary Sutton were given life in prison from Sevier County and they are given life in prison in Blount County – will the prison terms be consecutive and/or concurrent [?]

See Exhibit 47, *Handwritten Note Filed as Supplement to Appellate Record, September 4, 1997.* To the jury's question, the Judge Thomas provided a cryptic, nonresponsive, and misleading answer: "**You should concern yourself with the sentences in these cases only**." Id.

In fact, however, that was precisely what the jury was concerned about, *viz*., the punishment attaching to a life sentence in this case. That is, whether a life sentence in the Blount County case would actually provide additional punishment to the punishment previously imposed in Sevier County (if consecutive) or whether a life sentence in Blount County meant effectively no punishment at all (if it were concurrent to the Sevier County life sentence).

The truth is that had the jury imposed a life sentence in Blount County, it was *fait accompli* that a Blount County life sentence would have been consecutive to the Sevier County life sentence. This means that James Dellinger would have had to serve fifty (50) years in prison on both life sentences before being eligible for parole. Indeed, when an inmate has previously been convicted of a criminal offense (State v. Moore, 942 S.W.2d 570 (Tenn.Crim.App. 1996)), under Tenn. Code Ann. §40-30-115(b), Judge Thomas would have been fully authorized to make the second life sentence consecutive to the first life sentence. See Tenn. Code Ann. §40-30-115(b)(2)(consecutive sentences authorized for offender with extensive history of criminal activity); §40-30-115(b)(3)(consecutive sentences for dangerous mentally abnormal persons); §40-30-115(b)(4) (consecutive sentences for dangerous offender with little or no regard for human life).

The trial judge's failure to answer the jury's question not only misled the jury, but it violated the Eighth and Fourteenth Amendments as well. Given the qualitative difference between a life sentence and a death sentence, the Eighth Amendment demands heightened "reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976). When a defendant's life is at stake, any failure to properly instruct jurors about their sentencing options violates the Eighth Amendment because it "creates the risk that the death penalty will be imposed in spite of factors which may

call for a less severe penalty." Lockett v. Ohio, 438 U.S. 586, 605 (1978). See Beck v. Alabama, 447 U.S. 625, 638 (1980)(Eighth Amendment invalidates procedural rules which tend[] to diminish the reliability of the sentencing determination.").

Similarly, under the Fourteenth Amendment, when a trial judge refuses, upon request, to "apprise the jury of information so crucial to its sentencing determination," the trial court's refusal "cannot be reconciled with our well-established precedents interpreting the Due Process Clause." Simmons v. South Carolina, 512 U.S. 154, 164 (1994). Jurors are often reasonably misled about the effective punishment attaching to a life sentence, and to the extent any such "misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Id. at 162. Under such circumstances, due process mandates that the jury not be so misled. Id. at 171. See also Id. at 172-174 (Souter, J., concurring)(in death-sentencing proceeding, failure to inform jurors about significance of a life sentence "diminished the reliability of the jury's decision that death, rather than the alternative, was the appropriate penalty in this case.").

Here, the jury was under the completely false impression that if they sentenced James Dellinger to life, his life sentence would be concurrent to his prior life sentence, and thus he would receive no effective punishment at all for the Blount County murder. This was a demonstrably false dichotomy with deadly consequences. Having perceived death as the only viable choice under the circumstances, this "all or nothing" punishment scenario resulted in the very risk prohibited by the Eighth and Fourteenth Amendments as stated in *Beck*. Indeed, exactly as in *Beck*, jurors imposed death because they wanted to impose some sort of punishment upon Dellinger, and a life sentence would have meant no punishment whatsoever. Dellinger is thus entitled to habeas relief under the Eighth Amendment under the direct authority of *Beck*, *Lockett*,

and *Woodson*, and the state court's denial of relief was contrary to, or an unreasonable application of, *Beck*, *Lockett*, and/or *Woodson*.

Similarly, where the trial judge failed to answer the jurors' question and thus misled jurors into imposing death based upon the patently erroneous notion that Dellinger would not be punished if sentenced to life, the failure to instruct the jury also violated the Fourteenth Amendment under *Simmons*, and the state court's denial of relief was contrary to, or an unreasonable application of, *Simmons* and its precursors.

Respondent's motion for summary judgment on these claims should, therefore, be denied.

*c. The Trial Judge Made Patent Error By Instructing Jurors That Residual Doubt Of Guilt Could Not Be Considered At Sentencing (¶3.3.16.3)*

At the capital sentencing hearing, the trial judge instructed jurors that lingering or residual doubt about James Dellinger's guilt could not be considered as a mitigating factor at sentencing: "Lingering doubt about the guilt of the defendant is not a circumstance to be considered as mitigation." T.R. 248. This instruction was patently erroneous.

Indeed, the Tennessee Supreme Court has held that a defendant is entitled to an instruction that jurors shall consider residual or lingering doubt as mitigating evidence. State v. Kiser, 284 S.W.3d 227, 260 (Tenn. 2009); State v. Thomas, 158 S.W.3d 361, 402-403 (Tenn. 2005). See State v. Hester, 324 S.W.3d 1, 84 (Tenn. 2010)(defendant "asserted residual doubt as a basis for mitigation.") Because Dellinger's jury had the right to consider residual doubt as a matter of Tennessee law, Dellinger had a liberty interest in having the jury consider such doubt as mitigation, and the jury instruction prohibiting such consideration violated due process of law. Hicks v. Oklahoma, 447 U.S. 343 (1980).

And the error was not harmless. It was not that the jury was instructed in a less-than-clear manner about its ability to consider this mitigating circumstance. See See e.g., Kiser, *supra*. Rather, the jury was specifically told – contrary to law – that there was a categorical prohibition against considering such residual doubt as mitigating evidence. Where proof of Dellinger's guilt was not airtight, this erroneous instruction was thus not harmless.

Respondent should therefore be denied summary judgment on these claims.[34]

*D. Counsel Were Ineffective At Sentencing (Claim 3.7.4)*

As discussed above, neither attorney had any experience trying a capital case, let alone conducting a capital sentencing hearing. PC Vol. I, p. 66-67; PC Vol. IV, p. 511. Mr. Deas later admitted that he "seemed to be more interested in the mitigation phase" of trial, so the two attorneys decided that Mr. Deas would take responsibility for all aspects of mitigation. PC Vol. I, pp. 69-70. Unfortunately, Mr. Deas's interest in mitigation did not translate into expertise.

In preparation for his first capital sentencing proceeding, Mr. Deas later claimed that he "did some reading," attended a "seminar," and "tried to determine my own strategy as to what to present about James." Id. at 91-92. Mr. Deas later admitted that "I was aware of [having a social history] and I was not aware that perhaps we could have help to do that, that we could have someone who was schooled in a clinical look as well as a humanistic look at somebody. We were aware that we should develop [a social history] in a general terms, but nothing as a document. Nothing to work from." Id. at 92. Such lack of awareness proved lethal and violated Mr. Dellinger's right to effective representation. "It is necessary for attorneys in capital cases to recognize at the beginning that they do not have the skills to accomplish the goals of mitigation

[34] Because this instruction was clearly erroneous under Tennessee law, counsel had no tactical reason not to object to this patently erroneous instruction. Consequently, any failure to counsel to raise this issue at trial or on appeal was, by definition, ineffective under *Strickland*. Everett v. Beard, 290 F.3d 500 (3d Cir. 2002)(counsel ineffective for failing to object to erroneous jury instructions).

and to go out and seek the assistance of psycho-social professionals who are skilled in these fields." David C. Stebbins and Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion, (Aug. 1986), at 14, 16.

Trial counsel has a constitutional "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 323-24 (1983). "There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Id. As shown below, Mr. Dellinger's attorneys failed to adhere to these constitutional standards while preparing for and conducting Mr. Dellinger's sentencing phase of trial.

1. Failed to Present Available Proof Regarding Mr. Dellinger's Brain Dysfunction (¶3.7.4.1)

Counsel failed to present available proof regarding Mr. Dellinger's brain dysfunction during the sentencing phase of trial. Dr. Peter Young, who testified for petitioner as an expert in neuropsychology, wrote in his May 31, 1995 report that Mr. Dellinger's score on an impairment test is the "most powerful indicator[] of brain damage." Exhibit 48, *Report of Dr. Peter Young* at p. 9. However, inexplicably counsel failed to present this critical and highly persuasive mitigating evidence to the jury prior to the jury's decision to sentence Mr. Dellinger to death.

It is vital that defense counsel present information about a capital defendant's brain functioning, particularly when there are "powerful indicators" that the defendant's brain is

damaged. "Counsel's duty to investigate and *present* mitigating evidence is now well established." *ABA Guidelines*, at 1021 (emphasis added). "In particular, mental health experts are essential to defending capital cases." Id. at 956. As such, mental health experts' findings that result in mitigation evidence are essential in defending capital cases. Mr. Dellinger's lawyers' failure to present such evidence proved lethal.

Although *Strickland* affords great deference to a trial attorney's conduct, it does not require the reviewing court to give deference to a trial attorney's failure to perform based on unreasonable choices. See Strickland, 466 U.S. at 690-91. If it never occurred to counsel to follow-up on some critical fact, such as significant mitigating evidence, or counsel simply overlooked that fact, then the "decision" to not follow-up cannot be considered an informed strategic one. Wiggins, 539 U.S. at 534. As such, the court cannot attribute counsel's failure to call present Dr. Young's May 31, 1995 report during the sentencing phase of trial as "strategy." Instead, counsel's failure amounts to constitutionally ineffective assistance of counsel. Had counsel fully presented the contents of Dr. Young's report regarding Mr. Dellinger's brain damage, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

2. Counsel Failed to Present an Accurate Definition of Mitigation (¶3.7.4.2)

In violation of Mr. Dellinger's constitutional right to effective counsel, Messrs. Deas and Dixon failed to present an accurate definition of mitigation to the jury. Throughout voir dire and the penalty phase, counsel referred to sentencing phase evidence as "good things" or "bad things" about the defendant. This inaccurate description of mitigation improperly narrowed the scope of evidence that the jury would consider in determining whether to sentence Mr. Dellinger to life or death.

Neither Messrs. Deas not Dixon had ever prepared for, let alone conducted the sentencing phase of a capital trial. PC Vol. I, pp. 66-67; p. 511. As such, the attorneys were woefully unprepared to educate the jury on how to consider information about Mr. Dellinger when deciding upon a sentence. At bottom, mitigation is "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant." *ABA Guidelines*, at 1022 (quoting Brown v. State, 526 So. 2d 903, 908 (Fla. 1988)). The Court has further clarified that: "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstance of the particular offense as a constitutionally indispensible part of the process of inflicting the death penalty." Locket v. Ohio, 438 U.S. 586, 604 (1978) (quoting Woodsonn v. North Carolina, 428 U.S. 280, 305 (1976)). Conversely, Mr. Dellinger's attorneys referred to mitigation evidence as "good things," which barely scratches the surface of what mitigation is and how the jury should consider such evidence.

Had counsel provided the jury with an accurate definition of mitigation, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687. Thus, counsel's actions constituted ineffective assistance of counsel in violation of *Strickland* and its progeny.

3. Failed to Object to the Prosecution's Improper Argument Which Suggested that the Jury Should Weigh the Value of Tommy Griffin's and Connie Branam's Lives Against the Mitigating Factors and Proof the Defense Submitted (¶3.7.4.3)

The State improperly argued that the jury should weigh the value of Tommy Griffin and Connie Branham's lives against the defense's mitigation proof. This was grossly impropriate. As such, Mr. Dellinger's attorneys should have objected. Their failure to do so amounted to constitutionally ineffective representation. "Counsel should object to anything that appears

unfair or unjust even if it involves challenging well-accepted practices. *ABA Guidelines*, at 1032. When post-conviction counsel asked Mr. Deas if he had an explanation for why failed to make such an object, he responded: "I do not." PC Vol. I., p. 105. Had Mr. Dellinger's attorneys made an appropriate objection to the State's inflammatory argument, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

4. Failed to Object to and Raise in the Motion for New Trial, the Improper Argument of the State Inviting the Jurors to Consider Mr. Griffin's Family's Feelings in the Weighing Process (¶3.7.4.4)

Defense counsel failed to object to the State's improper argument that the jury should consider Mr. Griffin's family's feelings when determining whether to sentence Mr. Dellinger to death. Moreover, Mr. Dellinger's lawyers also failed to raise the State's improper argument in their motion for a new trial. In adopting the ABA Guidelines for appointed counsel in death penalty cases, the Court has recognized that "[c]ounsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices. *ABA Guidelines*, at 1032. Mr. Dellinger's lawyers' failure to do so amounted to constitutionally ineffective counsel in violation of *Strickland* and its progeny.

Likewise, counsel's failure to include the State's improper argument in the motion for a new trial constituted deficient performance. "Counsel must . . . know and follow the procedural requirements for issue preservation and act with the understanding that the failure to raise an issue by motion, objection, or other appropriate procedure may well forfeit the ability of the client to obtain relief on that issue in subsequent proceedings." *ABA Guidelines*, at 1031. Had counsel performed competently, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

*E. Counsel Were Ineffective on Appeal (Claim 3.7.5)*

In addition to having no experience trying capital cases, Messrs. Deas and Dixon had no experience appealing capital convictions and sentences. PC Vol. IV, pp. 544. Their lack of experience was evident when Mr. Dixon testified about his representation of Mr. Dellinger during the state post-conviction proceedings:

> Q: At the time you where preparing the appeal, were you aware of the connections between the direct appeal in a capital case and collateral proceedings, both in State Court and in Federal Court?
>
> A: Yes.
>
> Q: And so you were aware of the necessity to thoroughly exhaust and preserve as many issues as possible?
>
> A: Yes.
>
> Q: And the determination was made to work on the strongest claims, which ended up being about 50 in this case?
>
> A: Yes.
>
> Q: So, there was a conscious determination to abandon some claims in order to – is that correct? I mean, I guess –
>
> A: I believe so. I think that's probably accurate.

PC Vol. IV, 545. Thus, Mr. Dellinger's defense counsel simply ignored certain claims in the appeal with the knowledge that their client would likely be procedurally barred from raising those claims in future appeals. "Appellate counsel must be intimately familiar with technical rules of issue preservation and presentation, as well we the substantive state, federal, and international law governing death penalty cases, including issues which are 'percolating' in the lower courts but have not yet been authorized by the Supreme Court." *ABA Guidelines*, at 931. Unfortunately, Messrs. Deas and Dixon lacked such familiarity. Their shortcomings and failure

to provide effective representation violated Mr. Dellinger's rights under *Strickland* and its progeny.

1. Failed to Appeal the Court's Denial of the Motion for a Change of Venue (¶3.7.5.1)

James Dellinger's lawyers failed to appeal the court's denial of their motion for change of venue. Pretrial publicity regarding this case was extensive, particularly due to the small rural community where the deceased and charged all resided. Counsel properly raised the issue of a change of venue, citing the extensive press coverage of the crime and the highly inflammatory and prejudicial law enforcement statements. However, despite the abundant need for a venue change, counsel failed to appeal the trial court's decision of their motion. Their failure to do so amounted to constitutionally ineffective representation. "The obligations imposed on counsel by this Guideline apply to all stated of the case. Thus, post conviction counsel, from direct appeal through clemency . . ." *ABA Guidelines*, at 1010. Had counsel challenged the court's denial of the motion for a change of venue, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

2. Failed to Appeal the Trial Court's Order Restricting Voir Dire (¶3.7.5.2)

The defense was ineffective for failing to appeal the trial court's order restricting voir dire. Following counsel's unsuccessful attempt to find an impartial jury in January 1996, the trial court ordered that the court would conduct voir dire on the issues of death qualification and publicity. As a result, defense counsel was unable to conduct individual voir dire and direct the effort to obtain a death qualified jury. "Case law stemming from Supreme Court decisions that address capital jury selection procedures has resulted in a highly specialized and technical procedure." *ABA Guidelines*, at 1052. As such, the power to direct and conduct voir dire should have been in the hands of defense counsel, not the trial court.

Had counsel appealed the trial court's unlawful ruling restricting voir dire, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

3. Failed to Object to and Appeal the Improper Arguments the State Made During the Penalty Phase (¶3.7.5.3)

The State improperly argued that the jury should weigh the value of Tommy Griffin and Connie Branham's lives against the defense's mitigation proof. This was grossly impropriate. Despite the impropriety of the State's argument, defense counsel failed to object (as argued above ¶¶3.7.4.3 and 3.7.4.4), and failed to appeal.

When post-conviction counsel asked why he failed to object to the State's inflammatory comment about weighing non-statutory circumstances, Mr. Deas replied, "I have no idea why no objection was made." Mr. Deas later conceded that he didn't object to the State's arguments because "I guess I was too much involved in the facts that were before me and developing those and developing a list [of mitigation]." Id. at 106. Such failure constituted ineffective assistance of counsel.

The ABA Guidelines speak, generally, to counsel's duty to appeal such improprieties: "The obligations imposed on counsel by this Guideline apply to all stated of the case. Thus, post conviction counsel, from direct appeal through clemency . . ." *ABA Guidelines,* at 1010. However, counsel failed to carry out their constitutionally mandated duty when they failed to appeal the State's improper closing arguments from the penalty phase of trial.

Had counsel objected to and appealed the State's improper closing arguments during the penalty phase of trial, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

4. Failing to Appeal Erroneous Jury Instructions (¶3.7.5.4)

Defense counsel failed to appeal the court's erroneous and prejudicial jury instructions. Counsel could (and should) have appealed because the instructions shift the burden of proof away from the prosecution. The court provided jury instructions which relieved the prosecution of proving all elements of first-degree murder beyond a reasonable doubt, and which prevented the full consideration of mitigating evidence under Tennessee law.

The constitutional problem with this instruction is that first-degree murder in Tennessee is a specific intent crime. State v. Vaughn, 279 S.W.3d 584, 608 (Tenn.Cr.App. 2008). That is, the prosecution bore the burden of proving that Mr. Dellinger specifically intended to kill, not simply that he intended to injure or the victim here. The jury instructions, however, allowed the jury to find specific intent to kill by merely finding a conscious objective to engage in the conduct which caused death. Cook v. State, 884 S.W.2d 485 (Tex.Cr.App. 1994) (improper to permit jury to find specific intent to kill using jury instruction that allowed finding of intent merely to engage in conduct leading to death). By allowing the jury to convict of the greater offense of intentional murder based solely upon a finding that James Dellinger engaged in conduct which caused death, the jury instructions relieved the prosecution of proving beyond a reasonable doubt the essential element of "intentional." Sandstrom v. Montana, 442 U.S. 510 (1979).[35]

"Appellate counsel must be intimately familiar with technical rules of issue preservation and presentation, as well we the substantive state, federal, and international law governing death penalty cases, including issues which are 'percolating' in the lower courts but have not yet been

[35] Because this instruction was clearly erroneous under Tennessee law, counsel had no tactical reason not to object to this patently erroneous instruction. Consequently, any failure to counsel to raise this issue at trial or on appeal was, by definition, ineffective under *Strickland*. Everett v. Beard, 290 F.3d 500 (3d Cir. 2002) (counsel ineffective for failing to object to erroneous jury instructions).

authorized by the Supreme Court." *ABA Guidelines*, at 931. Had counsel appealed the court's improper jury instruction, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

### 5. Failed to Have a Full and Complete Transcript of Proceedings Prepared and Filed as Part of the Appellate Record (¶3.7.5.5)

Counsel failed to have a full and complete transcript of the proceedings prepared and filed as the appellate record. Messrs. Deas and Dixon's failure deprived Mr. Dellinger of a full and fair appellate review. Counsel's failure in this regard constituted ineffective assistance of counsel. "Trial counsel should file the necessary documents and take whatever other steps are needed to preserve the client's right to review, such as ordering transcripts of the trial proceedings and objecting to any governmentally imposed barriers . . . to obtaining such review." *ABA Guidelines*, at 1077. Having a full and complete transcript of the trial proceedings prepared and filed as part of the appellate record would have helped Mr. Dellinger preserve his right to review. Instead, counsel's failure to order the transcript and file it as part of the appellate record robbed Mr. Dellinger of his right to review.

Had counsel filed a full and complete transcript of the proceedings as part of the appellate record, it is reasonably likely that Mr. Dellinger's death sentence would have been overturned. See Strickland, 466 U.S. at 687.

### 6. Failed to Appeal the Trial Court's Instructions That Residual Doubt is Not a Mitigating Circumstance (¶3.7.5.6)

James Dellinger's lawyers failed to appeal the trial court's unlawful instruction that residual doubt is not a mitigating circumstance. Such oversight amounted to ineffective assistance of counsel. Specifically, the trial court instructed the jury that "[l]ingering doubt about the guilt of the Defendant is not a circumstance to be considered in mitigation." Tr. Vol.

XXXVII, p. 18. However, Tennessee law is clear – residual doubt is a mitigating circumstance. See State v. Thomas, 158 S.W. 3d 361, 403 (Tenn. 2005) (citing State v. McKinney, 74 S.W. 3d 291, 307 (Tenn. 2002) and State v. Odom, 928 S.W. 2d 18, 30 (Tenn. 1996)).

Similarly, the Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 317 (1989), reiterated that "the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty." The Court in *Penry* also clarified that "[t]o provide the individualized sentencing determination required by the Eighth Amendment . . . the sentencer must be *allowed* to consider mitigating evidence." Id. at 316 (emphasis added). In clear violation of federal and Tennessee law, the court's instruction prevented the sentencer from considering mitigating evidence. As such, Mr. Dellinger's attorneys had a constitutional duty to appeal the trial court's infraction. "The obligations imposed on counsel by this Guideline apply to all stated of the case. Thus, post conviction counsel, from direct appeal through clemency . . ." *ABA Guidelines*, at 1010.

Had counsel appealed the trial court's instruction that residual doubt is not mitigating evidence, it is reasonably likely that the jury would not have sentenced Mr. Dellinger to death. See Strickland, 466 U.S. at 687.

*F. Counsel Were Ineffective For Failing to Raise All Claims Contained In Petitioner's Amended Petition (Claim 3.7.6)*

James Dellinger's attorneys were ineffective for failing to raise all the claims that the undersigned counsel plead in the Amended Petition. D.E. 26. A reasonable attorney acting effectively would have done so. Trial counsel's failure to raise these claims prejudiced Mr. Dellinger as argued above. As a result, Mr. Dellinger's counsel violated his rights under *Strickland* and its progeny. Had counsel raised all claims contained in Petitioner's Amended

Petition, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

### G. *Petitioner's Ineffective Assistance Of Counsel Claims Are Properly Exhausted, And/or Dellinger Can Show "Cause And Prejudice" Or A Fundamental Miscarriage Of Justice If His Claims Are Not Fully Reviewed By This Court*

Respondent requests summary judgment on Petitioner's ineffective assistance of counsel claims, alleging: (1) various claims of ineffective assistance of counsel are procedurally defaulted; and/or (2) in light of the state court's ruling on such claims, petitioner is not entitled to relief under 28 U.S.C. §2254(d). Respondent is incorrect on both accounts.

#### 1. Dellinger's Ineffective Assistance Of Counsel Claims Are Properly Before This Court

Contrary to Respondent's contentions of procedural default, James Dellinger's ineffective assistance of counsel claims are properly before this Court on habeas review. Many of his claims were fairly presented to the state court. For other claims, James Dellinger has "cause and prejudice" for any failure to present such claims to the state courts. Even so, this Court's failure to review any allegedly defaulted claims would otherwise result in the incarceration and/or execution of someone who is both "actually innocent" of the offense of first-degree murder and "actually innocent" of the death sentence. For these reasons, this Court must review James Dellinger's ineffective assistance of counsel claims, and this Court must deny Respondent's motion for summary judgment.

##### a. *James Dellinger fairly presented numerous claims of ineffective assistance to the Tennessee state courts.*

Respondent claims that various ineffective assistance of counsel claims should be denied because they are procedurally defaulted. Respondent is in error. For instance, Respondent maintains that Dellinger has defaulted Amended Petition ¶3.7.1.2.1 (regarding counsel's failure

to present forensic proof concerning the time of death) by failing to raise this claim in the state court. This is not true. In post-conviction proceedings, Dellinger extensively raised such claim, providing significant proof, and carefully briefing and arguing such a claim in the Court of Criminal Appeals. See Brief Of The Appellant, Dellinger v. State, CCA No. E2005-1485-CCA-R3-PD, pp. 3-31, 31-33, 82-93, 101-103. Respondent's motion as to Amended Petition ¶3.7.1.2.1 must therefore be denied.

In addition, in post-conviction proceedings and on appeal, Dellinger claimed that counsel was ineffective for failing to present crime scene evidence from experts, such as entomologist Dr. Haskell and pathologist Dr. Kessler to prove that Dellinger could not have killed Tommy Griffin, given entomological evidence (or lack thereof) at the crime scene. See Brief Of The Appellant, Dellinger v. State, CCA No. E2005-1485-CCA-R3-PD, pp. 7-10, 11-15, 82-89. Respondent is therefore incorrect to claim default as to Amended Petition ¶¶3.7.1.2.5, 3.7.2.1.2, and 3.7.2.1.4, all of which relate to counsel's ineffectiveness for failure to present crime scene expert testimony and to rebut the prosecution's case.

In the same vein, Respondent contends that Dellinger has defaulted his claim that counsel was ineffective on *voir dire*, Amended Petition ¶3.7.3.1. The state court record belies that assertion. Brief Of The Appellant, Dellinger v. State, CCA No. E2005-1485-CCA-R3-PD, pp. 109-112. The record also does not support Respondent's assertion that Dellinger's allegation of prejudice from counsel's performance (Amended Petition ¶3.7.3.6) was not presented to the state courts. It was. See Brief Of The Appellant, Dellinger v. State, CCA No. E2005-1485-CCA-R3-PD, pp. 113-114.

*b. James Dellinger has "cause and prejudice" for alleged defaults of his ineffective assistance claims.*

Even so, as to other claims alleged by Respondent to be procedurally defaulted, James Dellinger has "cause and prejudice" for any alleged default, such that his claims must still be reviewed by this Court in habeas. In particular, during post-conviction proceedings, Dellinger requested, but was denied, a continuance to allow him to fully investigate and present his claims of innocence and ineffective assistance of counsel. See e.g., Brief Of The Appellant, Dellinger v. State, CCA No. E2005-1485-CCA-R3-PD, pp. 123-125. The denial of a continuance establishes "cause" because it was "something *external* to the petitioner, something that cannot fairly be attributed to him which impeded [his] efforts to comply with" the state's procedural rules. Maples v. Thomas, 565 U.S. ___, ___ (2012)(slip op. at 12), *quoting* Coleman v. Thompson, 501 U.S. 722, 753 (1991).

In addition, Dellinger maintains that any ineffective assistance by post-conviction counsel constitutes "cause" for any failure to raise any and all allegedly defaulted claims of ineffectiveness of trial counsel, where such claims could only be raised for the first time in post-conviction proceedings. To be sure, the federal courts have generally concluded that ineffectiveness of post-conviction counsel cannot establish "cause" under such circumstances, but the Supreme Court is now considering that issue in Martinez v. Schriro, 623 F.3d 731 (9th Cir. 2010), *cert. granted sub nom. Martinez v. Ryan*, 563 U.S. ___ (2011)(U.S. No. 10-1001).

Dellinger maintains that under *Martinez*, he can establish the ineffectiveness of post-conviction counsel for failing to raise any particular claims of ineffective assistance of trial counsel. Consequently, this Court should deny Respondent's motion for summary judgment, but instead grant Dellinger a hearing on the effectiveness of his post-conviction counsel. At such a hearing, and based upon the evidence supporting his claims of ineffective assistance, Dellinger

would show that post-conviction counsel, because of mere negligence, simply failed to raise claims of ineffectiveness of trial counsel which would have entitled Mr. Dellinger to relief.

*c. James Dellinger would suffer a fundamental miscarriage of justice absent federal habeas review of his ineffective assistance of counsel claims.*

In addition, as Dellinger has demonstrated elsewhere in this response, a full exposition of all the evidence concerning his guilt would establish that he is "actually innocent" of the offense of first-degree murder. House v. Bell, 547 U.S. 518 (2006). Similarly, James Dellinger is also "actually innocent" of the death sentence as well, because (1) there is no valid aggravating circumstance supporting the death sentence (See ¶ XI) and (2) James Dellinger is also mentally retarded under *Atkins*, and thus categorically ineligible for execution. See Sawyer v. Whitley, 505 U.S. 333, 339 (1992); and ¶ IV, *supra*.

Under the clear teachings of *House* and *Sawyer*, a habeas corpus petition who is either actually innocent of the capital offense (as Dellinger is) or actually innocent of the death sentence (as Dellinger also is) is entitled to habeas review of any allegedly defaulted claims, lest he become a victim of a "fundamental miscarriage of justice."

Again, therefore, this Court must deny Respondent's motion for summary judgment, because James Dellinger can otherwise establish that he is actually innocent of both first-degree murder and the death sentence. Rather than granting summary judgment, this Court should order further proceedings on whether Dellinger is actually innocent of murder or the death sentence, including an evidentiary hearing at which he can show that but for constitutional error, no reasonable juror would have convicted him of first-degree murder beyond a reasonable doubt, nor sentenced him to death. Respondent's motion should be denied.

## XIII. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT FOR MR. DELLINGER'S CLAIM OF JURY MISCONDUCT INVOLVING JUROR MICHAEL EVERETT BECAUSE THE CLAIM IS PROPERLY BEFORE THIS COURT (Petition ¶ 3.8)

James Dellinger is entitled to summary judgment, and not the Respondent, for his claim of juror misconduct involving Juror Michael Everett because the evidence, looked at in the light most favorable to Petitioner, presents a genuine issue of material facts. Anderson v. Liberty Looby, Inc., 477 U.S. 242, 248 (1986) ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); Fed. R. Civ. P. 56(e). Respondent concedes that Petitioner validly raised the juror misconduct claim involving Juror Everett on direct appeal (*Tennessee v. Dellinger and Sutton*, No. 301-9706-cc-00226, Appellant CCA Brief, p. 159-60), but stops short of refuting the factual allegations that Petitioner raised in his Amended Petition (D.E. 26, p. 38-39) in support of the claim. D.E. 34, p. 101. Because the Petitioner raised the issue in direct appeal to the Court of Criminal Appeals, it is not defaulted and thus, it is properly before this Court and can be considered on the merits.

### A. *Jury Misconduct Standard*

The accused is entitled to a fair trial with an impartial jury, meaning one without bias and without prejudgment. This is an axiomatic concept within the law and serves as the cornerstone of due process and fundamental fairness under the Constitution. Irvin v. Dowd, 366 U.S. 717 (1961). Not only must jurors enter into a trial with an open mind, they must maintain an open mind until the conclusion of evidence. Reynolds v. United States, 98 U.S. 145, 155 (1878) ("[t]he theory of the law is that a juror who has formed an opinion cannot be impartial").

B. *In Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, the Trial Court Denied Mr. Dellinger his Right to a Fair Trial Due to Juror Michael Everett's Misconduct.*

On September 1, 1996, Juror Michael Everett informed the trial court that he received a phone call from his ex-wife while sequestered. Tr. Sept. 1, 1996 Proceeding, pp. 3-12, also found at Exhibit 39, *September 1, 1996 Proceeding Regarding Bribery Attempt*. During the call, the ex-wife stated that in exchange for Mr. Everett voting not-guilty on Mr. Sutton, "they" would pay him $500. Id. at 4. She did not elaborate on who "they" were. When the court asked how that situation made him feel about staying on the jury and listening to the instructions, Mr. Everett replied: "I'm not going to change what I already decided on." Id. at 7. This conversation with the court occurred prior to the end of the presentation of proof. Despite the court's earlier instruction to the jury that no juror was to make any determination regarding the case until all the evidence had been presented and the law charged, Juror Everett admitted that he had already made his determination. This was a clear violation of Mr. Dellinger's constitutional rights. Reynolds, 98 U.S. at 155. Thus, the Court should deny Respondent summary judgment as to this claim.

**XIV. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS THAT (A) MR. DELLINGER WAS UNLAWFULLY CONVICTED AND SENTENCED TO DEATH AFTER AN OFFER OF LIFE; AND (B) DEATH BY ELECTROCUTION IS CRUEL AND UNUSUAL IN VIOLATION OF THE EIGHTH AMENDMENT BECAUSE MR. DELLINGER HAS CAUSE FOR THE DEFAULT AND CAN SHOW PREJUDICE AS A RESULT OF THE DEFAULT (Petition ¶¶ 3.10 and 3.11)**

In the event that the court deems Mr. Dellinger's claims – (a) the prosecution's offer of life prior to the jury's death sentence and (b) death by electrocution violates the Eighth Amendment – are defaulted, there is cause and prejudice to excuse any default. Federal courts retain jurisdiction to consider the merits of a procedurally defaulted claim. They must do so if the habeas petitioner establishes cause for the default and prejudice arising from such default.

Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977). A habeas petitioner establishes cause for a procedural default by demonstrating that the default occurred due to "something that cannot fairly be attributed to him." Coleman v. Thompson, 501 U.S. 722, 753 (1991). Under this standard, cause for a procedural default exists if the default occurs at a stage of the proceedings at which a petitioner is entitled to effective representation, and counsel in allowing the default, performs deficiently. Murray v. Carrier, 477 U.S. 478, 488 (1986). Because Mr. Dellinger had the right to constitutionally effective counsel pre-trial, during trial, and on direct appeal (*Strickland v. Washington*, 466 U.S. 668 (1984) and *Evitts v. Lucey*, 469 U.S. 387, 393 (1985)), and because, as discussed below, in failing to take specified actions counsel performed ineffectively, this Court should consider the merits of specified claims.

Counsel renders ineffective assistance if he fails to present to the state courts an available, arguably meritorious issue. See Ratliff v. United States, 999 F.2d 1023, 1026 (6th Cir. 1993). Because appellate counsel could raise on direct appeal any issue, whether brought to the attention of the trial court or not, *State v. Duncan*, 698 S.W.2d 63, 67-68 (Tenn. 1985), in addition to any claim that was or could have been perfected for appeal in the trial court, any issue appearing on the face of the record was also available for counsel to raise.

The following issues were available for presentation to the trial court and/or available for appeal. Because they are meritorious for the following reasons, any failure of counsel to perfect and raise them constitutes a deficient, prejudicial performance.

A. *In Violation of Due Process and Equal Protection Under the Fourteenth Amendment and The Sixth Amendment Right to a Jury Trial, The Jury Convicted and Sentenced Mr. Dellinger to Death After The Prosecution Made an Offer of Life (Petition ¶ 3.10).*

Attorney General Bailey and General Flynn offered James Dellinger a life sentence after the lawyers presented arguments to the jury, but prior to the jury's sentence of death. Exhibit 64, *Transcript Regarding Offer of Life* (PC Vol. IV, pp. 516-19). Having offered Mr. Dellinger a

life sentence, the prosecution conclusively acknowledged that this case did not warrant the death penalty. The prosecution conditioned the imposition of the noncapital sentence upon Mr. Dellinger's agreement to plead guilty and forgo the remainder of his trial. Once Mr. Dellinger declined to waive his right to a jury trial, the prosecution proceeded with the remainder of the trial and ultimately secured a death sentence. Thus, the imposition of the death sentence under these circumstances is unconstitutional.

The primary effect of the prosecution's offer of life if Mr. Dellinger pled guilty and cut short his jury trial was to burden Mr. Dellinger's right to seek a trial in the matter. Indeed, once the prosecution acknowledged that life was the appropriate sentence here, the only conceivable reason for seeking the death penalty at trial was to penalize Mr. Dellinger for exercising his constitutional rights. Therefore, the death sentence was imposed in direction violation of *United States v. Jackson*, 390 U.S. 570 (1968).

In *Jackson*, the federal kidnapping statute precluded imposition of the death sentence on a plea of guilty; however, the defendant faced the death sentence if he sought a trial. Under such a regime, "the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die." Jackson, 390 U.S. at 581. An inevitable effect of such a regime is to "deter exercise of the Sixth Amendment right to demand a jury trial" and to "penalize[e] those who choose to exercise" that right. Id. The Supreme Court in *Jackson* struck down the regime, holding that the government "cannot impose [the death] penalty in a manner that needlessly penalizes the assertion of a constitutional right." Id. at 583.


Case 3:09-cv-00104-TAV-DCP Document 63 Filed 02/24/12 Page 227 of 242 PageID #: 1853

According to *Jackson*, it is unconstitutional for the government to employ a death-penalty regime which "permit[s] imposition of the death sentence only upon a jury's recommendation and thereby ma[kes] the risk of death the price for a jury trial." Brady v. United States, 397 U.S. 742 (1970); see also Lockett v. Ohio, 438 U.S. 617-18 (1978) (Blackmun, J., concurring) (Ohio death sentence unconstitutional under *Jackson* where, upon pleading guilty, defendant would receive life, but would face death sentence upon exercise of right to trial).

Further, in offering a life-sentence prior to the conclusion of trial, the State has shown that the imposition of the death sentence is not "necessary to promote a compelling state interest" under the Fourteenth Amendment's due process and equal protection guarantees. According to Supreme Court precedent, when a party's fundamental rights are at stake, under principles of substantive due process and equal protection, the state cannot deprive the individual of that right unless such deprivation is both: (a) necessary to promote a compelling state interest; and (b) the government uses the least restrictive means of achieving that interest. See e.g., San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1 (1972); Shapiro v. Thompson, 394 U.S. 618, 634 (1969). In particular, the Fourteenth Amendment's guarantee of due process of law includes a substantive component, which forbids the government from infringing any fundamental right "at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993).

Thus, where the prosecution offered life before the conclusion of trial, but sought and received death after Mr. Dellinger refused to waive his rights, Mr. Dellinger's death sentence was imposed in violation of his Sixth, Eighth, and Fourteenth Amendment rights. This Court should deny the Respondent's motion for summary judgment as to Claim 3.10.

B. *Use of Tennessee's Electric Chair will Violate Mr. Dellinger's Rights to be Free From Cruel and Unusual Punishment Under the Eighth Amendment and his Right to Substantive Due Process Under the Fourteenth Amendment (Petition ¶3.11).*

Attempting to kill Mr. Dellinger using Tennessee's electric chair carries an unacceptable risk that Mr. Dellinger will not be killed, but will be rendered a brain-dead vegetable in violation of the Eighth Amendment. Further, death as a result of the electric chair would deprive him of his right to life and violate Mr. Dellinger's substantive due process rights under the Fourteenth Amendment.

On November 29, 1989, Fred A. Leuchter Associates , Inc., installed at the Riverbend Maximum Security Institution (RMSI) a Modular Electrocution System (Electric Chair). Chief Engineer Fred A. Leuchter, Jr., certified that "this System is competent and ready to be utilized for the purpose for which it was constructed." Exhibit 58, *Equipment Certification, November 29, 1989*.

On April 16, 1994, Michael S. Morse, Ph.D., tested the Electric Chair Leuchter Associates installed at RMSI. Morse believed, for various reasons, that "(t)he electrocution system for the State of Tennessee does not deliver adequate current and does not seem to have the capacity to function with a typical load for execution." Exhibit 59, *Summary of Equipment Testing, April 18, 1994,* at p. 3. Mr. Morse made recommendations and suggestions about what Tennessee should do to make its Electric Chair operable. Id. at 4-5.

Tennessee contracted with Jay Wiechert, owner and apparent sole employee of Jay Wiechert Manufacturing (JWM), to retrofit the Electric Chair as Morse suggested. Exhibit 60, *Invoice, May 1, 1994.* Prior to starting JWM, Weichert worked at Whirpool and General Electric developing new features on clothes washers and dryers, trash compactors, and air conditioners. Exhibit 61, *Weichert Resume, July 22, 1999.*

At RMSI, Wiechert made some of the changes Morse suggested and believed that others were not proper. Exhibit 62, *Weichert Recommendations*, at 1-2. See, e.g., id. at 1, ¶4 (while

Morse recommends that only one of an inmate's legs should be attached to an electrode, Wiechert concludes that both should be attached to electrodes and therefore leaves two leg electrodes on Tennessee's Electric Chair; id. at 1, ¶6 (while Morse recommends replacing a specified wire, Wiechert concludes that wire should not be replaced); id. at 2, ¶14 (while Morse recommends that a chart recorder that clearly reads both current and voltage should be added to the Electric Chair, Wiechert concludes that Tennessee's Electric Chair cannot be modified to include this safety measure).

Upon learning of the modifications Wiechert made, the successor to Leuchter Associates, JVM, wrote RMSI Associate Warden Bobby Campbell. In that letter, JVM President, John Maye stated that the Wiechert modifications created the possibility of "'tissue cooking' of the executee and further, fibrillation of the excutees heart resulting in a failure to execute and a brain dead vegetable at the conclusion of the execution procedure." Exhibit 63, *Maye letter to Campbell, April 23, 1996*. JVM therefore voided the guarantee Leuchter Associates had issued for the Electric Chair and concluded that its only legal responsibility was to inform Tennessee of "the possibility of torture" associated with an execution attempted in the Electric Chair as retrofitted by JWM. Id. at 2.

As argued above, an attempt to execute Mr. Dellinger in Tennessee's electric chair would violate the Eighth and Fourteenth Amendments to the United States Constitution. Summary judgment on this claim is therefore inappropriate. James Dellinger is entitled to relief on his claim, or at the very least, this Court should order an evidentiary hearing.

## XV. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT FOR MR. DELLINGER'S CLAIMS INVOLVING THE CONSTITUTIONALITY OF THE IMPOSITION OF THE DEATH PENALTY BECAUSE THE STATE COURTS' RESOLUTION OF THESE CLAIMS WAS CONTRARY TO ESTABLISHED FEDERAL LAW (Petition ¶¶ 3.12-3.15)

A State court decision is contrary to clearly established federal law when it resolves a claim through application of an incorrect standard. William v. Taylor, 529 U.S. 362, 405-06 (2000). Such is the case here.

### *A. The State Courts' Resolution of Mr. Dellinger's That Lethal Injection is Cruel and Unusual in Violation of the Eighth Amendment (Petition ¶ 3.12).*

The Tennessee Criminal Court of Appeal's ruling regarding the constitutionality of Tennessee' lethal injection protocol is contrary to clearly established federal law. Moreover, instead of engaging Mr. Dellinger's individual arguments, the court merely cited a lengthy excerpt from the Sixth Circuit Court of Appeals and disposed of Mr. Dellinger's constitutional challenges. Dellinger v. State, 2007 Tenn. Crim. App. LEXIS 682, * 115-18 (Tenn. Crim. App. Aug. 28, 2007) (citing Philip Workman v. Governor Bredesen, 486 F.3d 896, 2007 U.S. App. LEXIS 10851 (6th Cir. 2007)).

Well established federal law dictates that "[p]unishments are cruel when they involve lingering death." In Re Kemmler, 136 U.S. 436, 447 (1890); see also McCleskey v. Kemp, 481 U.S. 279, 299 (1987). As argued in the Amended Petition, Tennessee's lethal injection procedure does not provide for adequate selection, education, or training of persons involved in the process. Further, the Tennessee protocol does not have adequate procedures in place for the use of sodium thiopental, pancuronium bromide, and potassium chloride. Thus, the protocol amounts to cruel and unusual punishment in violation of the Eighth Amendment. Kemmler, 136 U.S. at 447; McCleskey, 481 U.S. at 299. Moreover, in *Gregg v. Georgia*, the Court held that

the Eighth Amendment prohibits "the unnecessary and wanton infliction of pain." 428 U.S. 153, 173 (1976).

Mr. Dellinger is entitled to relief as to claim 3.12 because the Tennessee Criminal Court of Appeal's decision regarding the constitutionality of the state's lethal injection procedure was contrary to the abovementioned well established federal law.

*B. Contrary to the State Court's Findings, Mr. Dellinger's Death Sentence Was Imposed In an Arbitrary Manner (Petition ¶ 3.13).*

James Dellinger's death sentence was imposed in an arbitrary manner in violation of his constitutional rights. Although the State admitted that Mr. Dellinger was not death eligible, it waited years until the State secured a conviction in the Sevier County case, before pursuing death in the Blount County case. The State subsequently relied on the Sevier County conviction as an underlying aggravator to seek death in the Blount County case. Such conduct smacks of gamesmanship and highlights the fact that Mr. Dellinger's death sentence is arbitrary. Gregg v. Georgia, 453 U.S. 153, 188, 96 S.Ct. 2909 (1976) (state may not impose death sentence arbitrarily).

The Tennessee Criminal Court of Appeals summarily rejected Mr. Dellinger's claim regarding the arbitrariness of his death sentence. Dellinger v. State, 2007 Tenn. Crim. App. LEXIS 682, *110-124 (Tenn. Crim. App. Aug. 28, 2007). In doing so, it merely referenced a handful of Tennessee Supreme Court cases to justify its dismissal of Petitioner's assertions. This was in error.

Justice Stewart in his concurrence in *Furman v. Georgia* found that the death sentences before the Court were "cruel and unusual in the same way that being struck by lightning is cruel and unusual" because the petitioners were "among a capriciously selected random handful upon whom the sentence of death [had] been imposed." Furman, 408 U.S. 238, 309-10. Justice White

concluded that "the death penalty is exacted with great infrequency even for the most atrocious of crimes and [] there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." Id. at 313. When the Court affirmed the revised capital sentencing regimes in *Gregg*, it did not abandon or overturn the principle that where a jury is given the opportunity to kill a defendant, the risk of arbitrary and capricious action must be minimized. Gregg, 428 U.S. at 189.

By seeking to put Mr. Dellinger to death, the State set the stage for a sentence that violates both *Furman* and *Gregg*. For this reason, Mr. Dellinger's death sentence violates the Sixth, Eighth, and Fourteenth Amendments. As a result, the Court should not grant summary judgment to Respondent with respect to Claim 3.13.

### *C. Contrary to the State Court's Findings, Mr. Dellinger's Death Sentence Violates International Treaties (Petition ¶ 3.14).*

James Dellinger's death sentence violates his rights under customary international law, which American federal law has incorporated (see The Paquete Habana, 175 U.S. 677 (1900)), and his rights under the Supremacy Clause of the United States Constitution. See United States v. Belmont, 301 U.S. 324 (1937) and U.S. Const. art. VI, cl. 2. Moreover, Mr. Dellinger's impending execution would further violate such rights.

Contrary to the well established federal law above, the Tennessee Criminal Court of Appeals merely listed two Tennessee Supreme Court cases to support its conclusion that "petitioner is not entitled to relief on this claim." Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *118. The court provided no further explanation. However, Mr. Dellinger's death sentence violates his rights under the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, G.A. res. 39/46, annex, 39 U.N. GAOR, 39th Sess., Supp. (No. 51), U.N. Doc. A/39/46 (1984), entered into force June 26, 1987. In addition, the

conditions of Mr. Dellinger's confinement on death row, including the length of his confinement, constitute torture, or cruel, inhuman or degrading treatment or punishment in violation of Mr. Dellinger's rights under treaties or international compacts or agreements that the United States entered into.

Thus, Respondent is not entitled to summary judgment as to Claim 3.14.

### D. *Contrary to the State Court's Findings, The Prosecution Did Not Properly Submit to the Jury the Aggravating Factor Which Made Mr. Dellinger Eligible for the Death Penalty In Violation of* Apprendi v. New Jersey, *530 U.S. 466 (2000) (Petition ¶ 3.15).*

Contrary to well established law, the Tennessee Criminal Court of Appeals held that *Apprendi* does not affect capital sentencing in Tennessee and that the state is not required to include aggravating circumstances in the indictment. Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *111-13 (citing State v. Reid, 164 S.W. 3d 286, 312 (Tenn. 2005)). This does not comport with well established federal law.

In *Jones v. United States*, 526 U.S. 227 (1999) the Supreme Court held that the prosecuting state must specify the distinct elements of the crime (to be proven to a jury beyond a reasonable doubt) in the indictment. Relatedly, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Court held that in all criminal prosecutions, the defendant is entitled to a jury determination that he is guilty of every element of the crime he is charged with beyond a reasonable doubt. Apprendi, 530 U.S. at 476-77 (citing United States v. Gaudin, 515 U.S. 506, 510 (1995)). Shortly after deciding *Apprendi*, the Supreme Court made clear that these constitutional requirements extended to the prosecution of capital defendants as well. Ring v. Arizona, 536 U.S. 584, 589 (2002) ("capital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment").

In violation of this well established federal law, Tennessee's courts approved of the fact that the prosecution neglected to include the aggravating circumstance that made Mr. Dellinger death eligible in the indictment. Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *111-13. Without the aggravating circumstance – Mr. Dellinger's earlier conviction for Connie Branham's death – the prosecution would not have been able to charge Mr. Dellinger with a capital offense for Tommy Griffin's death. In other words, the aggravating circumstance was an element of the offense of capital murder. Thus, Mr. Dellinger, and not the Respondent, is entitled to Summary Judgment as to Claim 3.15.

*E. Contrary to the State Court's Findings, Tennessee's Capital Sentencing Scheme (Tenn. Code Ann. §§ 39-13-204 and 39-13-206) Violates the Fifth, Sixth, Eighth, and Fourteenth Amendments (Petition ¶¶ 3.16 and 3.17).*

In violation of James Dellinger's Fifth, Sixth, Eighth, and Fourteenth Amendment rights, Tennessee's capital sentencing scheme is unconstitutional. However, contrary to well established federal law, the Tennessee Court of Criminal Appeals summarily dismissed all of Mr. Dellinger's arguments regarding the constitutionality of the statute, claiming that petitioner was merely "duty bound" to include them in his appeal. Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *124. This was an error.

As asserted in Mr. Dellinger's Amended Petition, Tennessee's death penalty scheme fails to narrow the class of death eligible defendants, the state has applied several of the statutory aggravating factors in an unconstitutionally overbroad manner, the statute allows for arbitrary and capricious sentences, the state imposes the death penalty in a discriminatory manner, prosecutors have unlimited discretion whether to seek the death penalty, there are multiple constitutional violations involving jury selection and the jury's role, defendants are denied final closing argument during the penalty phase, the appellate review process is unconstitutionally

flawed, and the state supreme court comparative review process is unconstitutional. D.E. 26, at pp. 43-45.

Contrary to *Furman v. Georgia*, 408 U.S. 238 (1972), T.C.A. § 39-13-204 fails to meaningfully narrow the class of death eligible defendants in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. In his concurrence, Justice White concluded that "the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." Id. at 313 (White, J., concurrence). Closely related to *Furman*, *Lockett v. Ohio*, 438 U.S. 586 (1978), mandated that the discretion to impose death must be closely confined to avoid arbitrariness. Given that Tennessee's statute fails to narrow the class of eligible defendants through statutorily defined aggravating circumstances, or otherwise, to avoid arbitrariness, it violates federal law.

Federal law has held that the requirement that the death penalty be imposed "fairly, and with reasonable consistency or not at all," has proven impossible to implement in practice. Callins v. Collins, 510 U.S. 1141, 1144 (1994) (Blackman, J., dissenting from the denial of certiorari). Tennessee's death penalty scheme is no exception. The fact that it allows for arbitrary and capricious sentences due to the issues Petitioner asserted in the amended petition (D.E. 26, at pp. 43-36) exemplifies why the statute violates Mr. Dellinger's constitutional rights. Thus, the decision of Tennessee's lower courts is contrary to federal law.

Mr. Dellinger is entitled to relief as to claims 3.16 and 3.17 because the state court's decision regarding the constitutionality of the state's death penalty scheme was contrary to the abovementioned well established federal law.

*F. Contrary to the State Court's Findings, Tennessee's Death Penalty Statute (Tenn. Code Ann. §§ 39-13-204 and 39-13-206) Impinges on James Dellinger's*

*Fundamental Right to Life in Violation of the Fourth, Sixth, Ninth, and Fourteenth Amendments (Petition ¶ 3.18).*

Tennessee's death penalty statute violates Mr. Dellinger's Fourth, Sixth, Ninth, and Fourteenth Amendment rights and it impinges on his right to life. Moreover, the right to life is fundamental and there is no compelling state interest in punishing petitioner with a sentence of death. Relatedly, the state has not shown that there are no less restrictive means of punishing Mr. Dellinger. Contrary to well established federal law, Tennessee's Criminal Court of Appeals held that the state supreme court "has repeatedly rejected" petitioner's arguments related to these issues. Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *111. In doing so, the court cited three state cases and ultimately failed to engage petitioner's argument regarding his fundamental right to life. Id.

The fundamental right to life is a longstanding principle protected by the United States Constitution. The right to life, as well as the fundamental rights to liberty and the pursuit of happiness, defines our nation as one that grants equal and just laws to all citizens. See Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). Given the importance of the fundamental right to life, the Court must apply a strict scrutiny standard to any state imposition of that right. See United States v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). Under strict scrutiny, the state cannot deny an individual the right to life unless there is a compelling state interest, the denial or action is narrowly tailored to achieve that interest, and the denial or action is the least restrictive means for achieving that interest. See Roe v. Wade, 410 U.S. 113 (1973).

The State of Tennessee has failed to show that there is a compelling state interest in sentencing Mr. Dellinger to death; it has failed to show that his sentence is narrowly tailored to the state's interest; and it has failed to show that there are no less restrictive means of punishing Mr. Dellinger. Thus, the Criminal Court of Appeals decision is contrary to well established

federal law and the principles of the United States Constitution. As a result, Mr. Dellinger is entitled to relief as to claim 3.18.

G. *Contrary to the State Court's Findings, James Dellinger's Death Sentence Violates Rudimentary Notions of Due Process and Equal Protection Under the Eighth and Fourteenth Amendments (Petition ¶ 3.19).*

As argued in the Amended Petition, Mr. Dellinger's death sentence violates his due process and equal protection rights because there are no standards for the prosecution to seek (or impose) the death sentence (in violation of Bush v. Gore, 531 U.S. 98 (2000)), nor are there fixed standards for a state proportionality review. D.E. 26, at p. 46. The Tennessee Criminal Court of Appeals stated that the state high court had already "rejected general challenges to the unlimited discretion to seek the death penalty vested in prosecutors in this state." Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *114. The court continued that "this court recently concluded that *Bush v. Gore*, a voting rights case relief upon by the petitioner, did not apply in the context of a criminal prosecution." Id. In response to petitioner's argument about the lack of proportionality review standards, the Criminal Court of Appeals merely mentioned the fact that petitioner had raised the argument in his state post-conviction petition (Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *12), but the court failed to make any determination on the point.

In *Bush v. Gore*, the Supreme Court reasoned that when a state court issues a remedy, it must include "at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." 531 U.S. at 109. Contrary to Tennessee's high court's decision, such language extends beyond voting rights – it is equally applicable to prosecutorial functions of the state which (according to *Bush*) require a duty to ensure that the prosecution of crimes is implemented fairly. In finding an equal protection violation in *Bush*, the Court held that "the problem inheres in the absence of specific standards to ensure its equal application." Id. at 106. The Court continued to reason that "the formation of uniform standards" was

"practicable and . . . necessary" to comport with equal protection. Id. Tennessee's death penalty scheme does not include such protections. There are no standards that prosecutors must adhere to when seeking (or imposing) the death penalty. Thus, the Tennessee court ruled contrary to federal law.

Similarly, the Tennessee Criminal Court of Appeals ruled contrary to well established federal law when it failed to recognize or engage petitioner's arguments regarding the state's lack of proportionality review. Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *12.

Thus, Mr. Dellinger is entitled to relief as to claim 3.19 because the state court's decision was contrary to the abovementioned well established federal law.

*H. Contrary to the State Court's Finding, James Dellinger's Death Sentence is Unconstitutionally Cruel and Unusual In Violation of* Lackey v. Texas*, 514 U.S. 1045 (1995) (Petition ¶ 3.20).*

As Mr. Dellinger argued in his Amended Petition, the State's imposition of the death penalty is cruel and unusual in violation of *Lackey v. Texas*, 514 U.S. 1045 (1995). D.E. 26, p. 46. The Tennessee Criminal Court of Appeals grouped all of Mr. Dellinger's arguments regarding the constitutionality of the death penalty in general and as applied to him, together. In doing so, the court failed to engage Mr. Dellinger's specific *Lackey* claim and merely stated that "we conclude that none of the challenges are meritorious." Dellinger, 2007 Tenn. Crim. App. LEXIS 682, at *110-11. This is incorrect and contrary to federal law.

Although the Supreme Court denied certiorari in *Lackey*, Justice Stevens articulated a concern that the length of time an individual has spent on death row can potentially constitute cruel and unusual punishment in violation of the Eighth Amendment. The petitioner in *Lackey* was on death row for 17 years at the time of his petition. A jury sentenced Mr. Dellinger to death in September 1996. Thus he has been on death row for nearly 16 years. Petitioner adopts

the rationale that Justice Stevens articulated in *Lackey* in arguing for relief. As such, respondent is not entitled to summary judgment as to Claim 3.20.

## XVI. THE STATE IS NOT ENTITLED TO SUMMARY JUDGMENT FOR PETITIONER'S CLAIM THAT THE CUMULATIVE EFFECT OF THE ERRORS IN MR. DELLINGER'S CASE VIOLATED HIS DUE PROCESS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. (Petition ¶ 3.22)

The cumulative effect of the errors in Mr. Dellinger's case, including some or all errors cited in his Amended Petitioner (D.E. 26), denied Mr. Dellinger due process of law under the Sixth, Eighth, and Fourteenth Amendments. The respondent asserts that procedural default bars petitioner's claim, arguing that petitioner has never presented the claim before a Tennessee state court. Petitioner asserts below that he has cause to excuse the default and that prejudice resulted from that default. Respondent then argues that regardless, *Teague v. Lane*, 489 U.S. 288 (1989), prevents relief because the Supreme Court has never held that habeas relief is warranted on the basis of cumulative error. Respondent's *Teague* argument misinterprets petitioner's claim before this court.

In the event that the court deems Mr. Dellinger's claim is defaulted, there is cause and prejudice to excuse any default. Federal courts retain jurisdiction to consider the merits of a procedurally defaulted claim. They must do so if the habeas petitioner establishes cause for the default and prejudice arising from such default. Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977). Mr. Dellinger was entitled to effective representation (as argued in Section XI) and because counsel failed to assert Claim 3.22, their performance was deficient. Had counsel previously raised this claim, it is reasonably likely that Mr. Dellinger would not have been sentenced to death. See Strickland, 466 U.S. at 687.

Petitioner is not asking this court to create a new rule of law, which would violate *Teague*, petitioner is merely requesting this court to analyze petitioner's claim in a new light. Accordingly, if this court finds that two or more of petitioner's claims amount to constitutional violations standing alone, but that each individual violation is harmless or not prejudicial, petitioner requests this court to consider those individual constitutional violations in tandem when deciding whether to grant habeas relief to petitioner. Under this analysis, Respondent is not entitled to summary judgment as to Claim 3.22 and petitioner is entitled to habeas relief.

## XVII. CONCLUSION

For the foregoing reasons, this Court should deny Respondent's Motion for Summary Judgment.

Respectfully Submitted,

Amy D. Harwell, Tn.S.Ct.# 018691
Michael J. Passino, Tn.S.Ct.# 005725
Office of the Federal Public Defender
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

Francis L. Lloyd, Jr., Tn.S.Ct.#009808
Law Office of Francis L. Lloyd, Jr.
Suite D-200 9111 Cross Park Drive Knoxville, TN
37923 (865) 209-9472

By: *<u>/s/ Amy D. Harwell</u>*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this document has been served electronically upon Andrew Smith, Assistant Attorney General, 425 5th Avenue North, Nashville, Tennessee 37243

Date: February 24, 2012

/s/ *Amy D. Harwell*