**Exhibit 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| JAMES **DELLINGER**, | ) | |
| | ) | |
| Petitioner, | ) | No.3:09-cv-104 |
| | ) | Judge Varlan/Magistrate Shirley |
| vs. | ) | |
| | ) | |
| ROLAND **COLSON**, Warden, Riverbend Maximum Security Institution, | ) | **Death Penalty Case** |
| | ) | |
| | ) | |
| Respondent. | ) | |

**AFFIDAVIT OF DALE G. WATSON, PH.D.**

I, Dale G. Watson, Ph.D., being of lawful age, swear as follows:

1. I am a clinical psychologist, specializing in neuropsychology and neuropsychological assessment. I am licensed to practice in California. I am a member of the American Psychological Association (APA) and subdivisions of that organization including Division 33 (Intellectual and Developmental Disabilities), Division 40 (Clinical Neuropsychology), and Division 41 (American Psychology – Law Society). I am also a member of the International Neuropsychological Society (INS), the National Academy of Neuropsychology (NAN), and the American Association on Intellectual and Developmental Disabilities (AAIDD).

2. I received a Bachelor of Arts degree in Psychology from California State College, Sonoma in 1975; a Master of Arts degree in Clinical Psychology from John F. Kennedy University in Orinda, California in 1980; and a Ph.D. in Clinical Psychology from the California School of Professional Psychology in Berkeley/Alameda, California (an APA accredited institution) in 1988.

3. I have been in private practice in Pinole, California – providing comprehensive neuropsychological and psychodiagnostic assessment services, individual psychotherapy, and forensic evaluation and consultation – since 1990. In addition, since 2000, I have served as a Clinical Neuropsychologist for Neurobehavioral Cognitive Services in Dixon, California. In this capacity, I have

provided neurocognitive consultation services including neuropsychological and psychodiagnostic evaluation, treatment planning, and individual psychotherapy with neurologically impaired patients.

4. I am an adjunct faculty member at the Wright Institute, an APA accredited institution in Berkeley, California, where I teach a 3-trimester course in Graduate Level Psychodiagnostic Assessment focusing on intellectual, academic and psychological evaluation.

5. I have been qualified as an expert and testified in the Superior Courts for the California counties of Contra Costa, Alameda, Fresno, Los Angeles, Marin, Monterey, Sacramento, San Mateo, Santa Clara, San Francisco, and Shasta. I have also been qualified and testified as an expert in Howard County, Arkansas; Custer County, Montana; King and Whatcom Counties, Washington; Harris County, Texas; Butts County, Georgia; and the York County – Poquoson Circuit Court of Virginia. In addition, I have testified in United States District Courts in California, Oklahoma, and Montana.

6. I have completed a number of "Atkins" evaluations during the course of my career – assessing intellectual disabilities – in my role as a forensic neuropsychologist. In addition, I have testified as a defense witness in cases addressing the question of intellectual disabilities, including: *Commonwealth of Virginia v. Daryl Renard Atkins*, York County – Poquoson Circuit Court, York, Virginia; *People v. DeShawn Campbell*, Santa Clara County Superior Court, San Jose, California; and *U.S. v. Joshua Larson*, U.S. District Court for the District of Montana, Butte Division, Butte, Montana (non-Atkins intellectual disability case).

7. I was a Clinical Neuropsychologist for NeuroCare in Concord, California from 1989 to 1992. In that role, I conducted neuropsychological evaluations; post-acute rehabilitation of the brain-injured; treatment planning; individual, couples, and group psychotherapy; substance abuse treatment; cognitive rehabilitation; and crisis intervention. From 1986 to 1989, I was a Staff Psychologist at Specialized Rehabilitation Services in Fremont, California. In that capacity, I coordinated the Treatment Team for the Brain Injury Rehabilitation Program (1986-87), and conducted case management, patient education, and individual and group psychotherapy for the Chronic Pain Management Program.

8. I have given numerous presentations throughout my career to professional, academic, and legal organizations. Topics of my presentations have included the neuropsychology of mental retardation and other intellectual disabilities, the neuropsychology of schizophrenia, neuropsychological assessment and brain impairment, brain functions including executive functioning, the roles of psychology and neuropsychology in forensic evaluations, and the impact of norms on the interpretation of neuropsychological data.

9. My curriculum vita is attached as Appendix B.

10. Counsel for James Dellinger has asked that I provide additional analysis of the results of my neurocognitive evaluation of Mr. Dellinger in light of the Tennessee Supreme Court's ruling in the case of Michael Angelo *Coleman v. State* of Tennessee (2011 WL 1346932 (Tenn.)), as well additional information that has become available regarding his psychosocial history. I have previously evaluated Mr. Dellinger, and summarized those findings in a report dated December 13, 2010. The results of that evaluation revealed that Mr. Dellinger has, in my professional opinion, an intellectual disability, is functionally illiterate, has at least a moderate degree of brain dysfunction, impaired language skills, marked attentional deficits, significant verbal memory deficits, significantly impaired problem solving skills, and thinks concretely. These findings represent substantial indications of brain dysfunction.

11. In preparation of this affidavit, I have reviewed additional materials that include:

- Declaration of Maralee Dellinger Ramsey, 1/5/2012;
- Declaration of Mary Helen Dellinger Ramsey, 1/4/2012;
- Declaration of John Albert Dellinger, 1/15/2012;
- Declaration of Clyde McKinley Dellinger, Junior, 1/4/2012;
- Declaration of Ralph Edward Dellinger, 1/5/2012;
- School records of George, Clyde, Anna, John, Mary, Ralph, and Maralee Dellinger, Sevier County, Tennessee;
- *Coleman v. State*, No. W2007-02767-SC-R11-PD, 2011 WL 1346932 (Tenn.);

- Tennessee Code Annotated § 39-13-203 (2011);
- Matarazzo, J.D., & Herman, D.O. (1984). Base rate data for the WAIS-R: Test-retest stability and VIQ-PIQ differences. Journal of Clinical Neuropsychology, 6(4), 351-366.;
- Lineweaver, T.T., & Chelune, G.J. (2003). Use of the WAIS-III and WMS-III in the context of serial assessments: Interpreting reliable and meaningful change. In D. S. Tulsky, D.H. Saklofske, G.J. Chelune, R.J. Ivnik, A. Prifitera, R.K. Heaton, R. Bornstein, & M.F. Ledbetter (Eds.), Clinical Interpretation of the WAIS-III and WMS-III. New York, N.Y.: Academic Press, 618 pps.;
- Catron, A.W., & Thompson, C.C. (1979). Test-retest gains in WAIS scores after four retest intervals. Journal of Clinical Psychology, 35(2), 352-357.;
- Reynolds, C.R., Niland, J., Wright, J.E., & Rosenn, M. (2010). Failure to apply the Flynn correction in death penalty litigation: Standard practice of today maybe, but certainly malpractice of tomorrow. Journal of Psychoeducational Assessment, 28: 477-481, first published on July 20, 2010 doi:10.1177/0734282910373348;
- Fletcher, J.M., Stuebing, K.K., Hughes, L.C. (2010). IQ Scores Should Be Corrected for the Flynn Effect in High-Stakes Decisions. Journal of Psychoeducational Assessment. 28: 469-473, first published on July 7, 2010 doi:10.1177/0734282910373341.;
- Wechsler, D. (1991). Wechsler Intelligence Scale for Children – Third Edition (WISC-III). San Antonio: The Psychological Corporation, 294 pps.;
- Schalock, R.L, Buntinx, W., Borthwick-Duffy, S., Luckasson, R., Snell, M., Tassé, and Wehmeyer, M. (2007). User's Guide: Mental Retardation – Definition, Classification and Systems of Supports – 10th Edition, Washington, D.C.: American Association on Intellectual and Developmental Disabilities, 67 pps.;

- The Psychological Corporation (2002). WAIS-III/WMS-III Technical Manual, by author, 425 pps.;
- Cunningham, M.D. & Tassé, M.J. (2010). Looking to science rather than convention in adjusting IQ scores when death is at issue. Professional Psychology: Research and Practice, 41 (5), 413-419.;
- American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definitions, Classification, and Systems of Supports (11th ed. 2010) ("AAIDD 2010"), Washington, D.C.: by author, 259 pps.;
- American Psychiatric Association. (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: by author, 943 pps.;
- Carroll, J.B. (1993). Human Cognitive Abilities: A Survey of Factor-Analytic Studies. New York, N.Y.: Cambridge University Press, 819 pps.;
- Schneider, W.J. & McGrew, K.S. (2012). The Cattell-Horn-Carroll model of intelligence. In Dawn P. Flanagan and Patti L. Harrison (eds.) Contemporary Intellectual Assessment, Third Edition: Theories, Tests and Issues. New York: The Guilford Press, 99-144.;
- Lichtenberger, E.O. & Kaufman, A.S. (2009). Essentials of WAIS_IV Assessment. Hoboken, NJ: John Wiley & Sons, Inc., 406 pps.;
- McGrew, K.S. & Flanagan, D.P. (1998). The Intelligence Test Desk Reference (ITDR): *Gf-Gc* Cross-Battery Assessment. Needham Heights, MA: Allyn & Bacon, 485.;
- Schneider, W.J. (2012). Can't decided which IQ is best? Make a composite score. Online at http://www.scribd.com/doc/77854520/Composite-Computation, 14 pps.;
- McGrew, K.S. (2009). Applied psychometrics 101: IQ test score difference series – Understanding global IQ test correlations. http://www.iapsych.com/iapap101/iapap101_1.pdf, 10 pps.;

- Declaration of Sidney G. Hall, 1/3/2012;
- Kaufman, A.S. (1990). Assessing Adolescent and Adult Intelligence. Boston, MA: Allyn & Bacon, 753 pps.;
- Kaufman, A.S. & Lichtenberger, E.O. (2006). Assessing Adolescent and Adult Intelligence, Third Edition, Hoboken, N.J.: John Wiley & Sons, 796 pps.;
- Declaration of Alan S. Kaufman, Ph.D., in *Holt*, March 2011;
- Declaration of Stephen Greenspan, Ph.D., 12/11/2010;
- Affidavit of Stephen Greenspan, Ph.D., 2/7/2012;
- Vita of Christine Marie Malone, undated;
- Comprehensive Psychological Evaluation of James Dellinger, Jr., son of James Dellinger, by John Porter, M.S., Psychological Examiner, 5/30/1996;
- Birth and school records of James Anderson Dellinger, Jr.;
- School records of Tammy Sue Dellinger;
- School records of Timmy Lee Dellinger;
- Neuropsychological Evaluation of James Dellinger, Dale G. Watson, Ph.D., 12/13/2010.

12. In *Coleman*, the Tennessee Supreme Court made a number of findings relevant to the determination of an intellectual disability in Mr. Dellinger's case. The thrust of the opinion dealt with "the process and criteria used by the courts to determine whether a criminal defendant charged with first degree murder should not be subject to the death penalty because he or she was a person with intellectual disability when the murder was committed."[1] The court reiterated the need to establish a diagnosis of intellectual disability using the tripartite model adopted by the Tennessee legislature, to wit:

> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
> (2) Deficits in adaptive behavior; and

[1] *Coleman v. State*, No. W2007-02767-SC-R11-PD, 2011 WL 1346932 (Tenn.), 8.

(3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.[2] [3]

13. The court noted the similarities between this standard and those promulgated by the American Psychiatric Association (APA) and the American Association on Intellectual and Developmental Disabilities (AAIDD). There were also differences. These similarities and differences are discussed below.

14. The *Coleman* court addressed a number of issues related to the determination of the level of intellectual functioning. The court wrote, "In formulating an opinion regarding a criminal defendant's I.Q. at the time of the offense, experts may bring to bear and utilize reliable practices, methods, standards, and data that are relevant in their particular fields."[4] In the footnote to this statement, reference was made to the phenomenon of the standard error of measurement, the Flynn Effect, and the practice effect. The court added, "Accordingly, if the trial court determines that professionals who assess a person' s I. Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's 'functional intelligence quotient' on a consideration of those factors."[5]

<u>*Standard Error of Measurement*</u>

15. As to the standard error of measure and whether there is a "bright-line cutoff," the Court made a distinction between the clinical standard and the standard established by the Tennessee legislature. For example, the AAIDD has indicated:

> The significant limitations in intellectual functioning criterion for a diagnosis of ID is an IQ score of approximately two standard deviations below the mean, considering the standard error of measurement for the specific instrument used and the instruments' strengths and limitation. It is clear from this significant limitations criterion used in this *Manual* that AAIDD (just as the American Psychiatric Association, 2000) *does not* intend

[2] *Coleman v. State,* citation to the Tenn. Code Ann. § 39-13-203(a), 9-10.
[3] Tenn. Code Ann. § 39-13-203(a) (2011).
[4] *Coleman v. State,* 24.
[5] *Id,* 25.

> for a fixed cutoff point to be established for making the diagnosis of ID. Both systems (AAIDD and APA) require clinical judgment regarding how to interpret possible measurement error. Although a fixed cutoff for diagnosing an individual as having ID is not intended, and cannot be justified psychometrically, it has become operational in some states (Greenspan & Switzky, 2006). It must be stressed that the diagnosis of ID is intended to reflect a clinical judgment rather than an actuarial determination.[6]

The Court addressed this issue, writing, "For the purposes of Tenn. Code Ann. § 39-I3-203(a)(1), a criminal defendant has '[s]ignificantly subaverage general intellectual functioning' if he or she had a 'functional intelligence quotient of seventy (70) or below' at the time the crime was committed."[7] The court moreover noted, "The statute does not require a 'functional intelligence quotient test score of seventy (70) or below.' Because the statute does not specify how a criminal defendant's functional I.Q. should be determined, we have concluded that the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below."[8] Finally, "...consistent with the plain language to Tenn. Code Ann. § 39-13-203(a)(I), as interpreted in *Howell v. State*, an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is 'seventy (70) or below' or is above 70)."[9]

16. Given these findings in *Coleman*, Mr. Dellinger's functional IQ must be determined with some preciseness and expressed not as a range of scores. This is done below.

---

[6] American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definitions, Classification, and Systems of Supports (11th ed. 2010) ("AAIDD 2010"), Washington, D.C.: by author, 40.

[7] *Coleman v. State*. 23.

[8] *Id*, 24.

[9] *Id*, 15.

*Practice Effect*

17. Turning now to the issue of practice effects, according to the AAIDD, "The *practice effect* refers to gains in IQ scores on tests of intelligence that result from a person being retested on the same instrument."[10]

18. Retesting with the same IQ test risks spurious elevations in subsequent testing. These impacts are more likely to occur on measures of nonverbal intelligence as opposed to measures of verbal intelligence. The reason for this disparity in impact is based upon the fundamental nature of the scales themselves. For example, measures of verbal intelligence are largely dependent upon what has been termed "crystallized intelligence." Crystallized intelligence is a manifestation of innate verbal capacities but also prior learning, either in school settings or generally during the course of everyday life. The types of questions involved in these verbal scales can depend upon knowledge of vocabulary words or history. Once this type of information has been acquired it tends to be available to the person thereafter. However, if the individual has not acquired this information they will not be able to "reason through" the problem presented. In contrast, measures of nonverbal intelligence tend to involve tasks requiring "on-the-spot" or novel problem solving abilities. Typical tasks can involve arranging blocks to match patterns or putting puzzles together. These tasks depend upon their novelty in order to assess this intellectual ability. And here, once one has been exposed to the task and either solved the problem or acquired knowledge of the procedures for solving the task, it becomes easier. Because of the nature of verbal and nonverbal measures of intelligence, the latter are more sensitive to practice effects than the former. Nonetheless, because nonverbal intelligence is a component of the Full Scale IQ (FSIQ) of the Wechsler scales, there is an expected inflationary impact on the FSIQ.

19. The manual for the Wechsler Adult Intelligence Scale – Revised (WAIS-R) includes information about the magnitude of practice effects over the course of 2 to 7 week intervals between testing. This data is summarized here:

[10] AAIDD, 2010, 38.

| Wechsler Adult Intelligence Scale – Revised<br>Mean Changes on Cases Tested Twice | | | |
|---|---|---|---|
| Age Range | Verbal IQ Gains | Performance IQ Gains | Full Scale IQ Gains |
| 25-34 (N = 71) | 3.3 | 8.9 | 6.6 |
| 45-54 (N = 48) | 3.1 | 7.7 | 5.7 |

20. As is apparent, the average gain in the WAIS-R Full Scale IQ ranges from about 5.7 to 6.6 points. Importantly, it is also noted that these are average gains and that some individuals will have greater gains and some lesser. Mattarazo & Herman (1984) subjected this data to further analysis that revealed, "The mean change upon retest after 2 to 7 weeks for the 119 subjects is a gain of the order of 3 points in VIQ, 8 points in PIQ, and 6 points in FSIQ."[11] Critically, "The range of these individual changes was greatest in PIQ where the changes on retest spanned a range of -12 to +28 points, was least for VIQ ( -12 to +15) and, as would be expected, was intermediate for FSIQ (-12 to +20). Furthermore, although the majority of the 119 increased their score on retest...some individuals decreased from first to second testing."[12]

21. Further, there is reason to expect that these gains may occur over longer intervals as well. For example, research with the WAIS-III has demonstrated substantial gains over 3 – month and 6 – month re-test intervals.[13] Catron and Thompson (citing earlier work by Kangas & Bradway, 1971) commented, "Even retest data from normal populations after an interval of 12 years reveal significantly higher retest scores (Kangas & Bradway, 1971). Apparently, the experience of taking the test just once forever alters any subsequent test results, especially Performance and Full Scale IQ scores and, when intervals are less than 4 months, the Verbal IQ score also."[14]

---

[11] Matarazzo, J.D., & Herman, D.O. (1984). Base rate data for the WAIS-R: Test-retest stability and VIQ-PIQ differences. Journal of Clinical Neuropsychology, 6(4), 353. http://dx.doi.org/10.1080/01688638408401227

[12] *Id, 356.*

[13] Lineweaver, T.T., & Chelune, G.J. (2003). Use of the WAIS-III and WMS-III in the context of serial assessments: Interpreting reliable and meaningful change. In D. S. Tulsky, D.H. Saklofske, G.J. Chelune, R.J. Ivnik, A. Prifitera, R.K. Heaton, R. Bornstein, & M.F. Ledbetter (Eds.), Clinical Interpretation of the WAIS-III and WMS-III. New York, N.Y.: Academic Press, 310.

[14] Catron, A.W., & Thompson, C.C. (1979). Test-retest gains in WAIS scores after four retest

22. This data logically leads to the conclusion that, as a result of repeated administrations of the same IQ test, practice effects can significantly inflate IQ scores. Further, and particularly when the same test is re-administered within a year of prior testing, subsequent scores from the same test cannot be relied upon as accurate measures of an individual's level of intellectual functioning. For this reason, AAIDD concluded, "...established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence."[15] The impact of having done so will be addressed in Mr. Dellinger's case below.

*Flynn Effect*

23. We turn our attention now to the "Flynn Effect" (FE). The Flynn Effect is the phenomenon, discovered by James Flynn, Professor Emeritus at the University of Otago, New Zealand, in about 1981, of steady increases in intelligence levels within populations over time. Reynolds et al. (2010) described the FE as "a well documented phenomenon demonstrating score increases on IQ measures over time that average about 0.3 points per year."[16] This phenomenon has been acknowledged by the major publisher's of intelligence tests at least since the early 1990s. For example, The Psychological Corporation, in the manual for the Wechsler Intelligence Scale for Children – III (WISC-III), wrote:

> Research indicates that norms for intelligence tests become dated over time (Doppelt & Kaufman, 1977; Flynn, 1984; Kaufman, 1990). Specifically, over a period of several decades, average performance on the kinds of tasks typical of intelligence tests have been increasing. The changes appear to be greater for performance than for verbal measures. Regardless of the reasons for these changes in test performance, periodic updating of norms for such tests is essential. Otherwise, average IQ scores will gradually drift upward and give a progressively deceptive picture of a child's abilities relative to others in the same age group. That is, when outdated norms are used, a child's IQ score will generally be higher than when current norms are used. This upward drift poses problems particularly for children whose scores fall into the high and low ranges. This deceptively higher score can result in exaggerated expectations. For example, a child whose IQ is 80 according to outdated norms but is actually several points lower according to updated

---

intervals. Journal of Clinical Psychology, 35(2), 356.

[15] AAIDD, 2010, 38.

[16] Reynolds, C.R., Niland, J., Wright, J.E., & Rosenn, M. (2010). Failure to apply the Flynn correction in death penalty litigation: Standard practice of today maybe, but certainly malpractice of tomorrow. Journal of Psychoeducational Assessment, 28, 477. Originally published online 20 July 2010, DOI: 10.1177/0734282910373348, 2.

norms may be expected to perform at a level beyond his or her abilities. For this reason, developing new norms on a contemporary sample of children was the principle goal of preparing this new edition of the Wechsler children's scale.[17]

24. Though there has been controversy regarding the application of the Flynn Effect in capital cases, "best practices require recognition of a potential Flynn Effect…"[18] Moreover, in the User's Guide: Mental Retardation – Definition, Classification and Systems of Supports – 10th Edition, the American Association on Intellectual and Developmental Disabilities' guidelines made note of the need to "Recognize the 'Flynn Effect.'"[19] Furthermore, "…the clinician needs to use the most current version of an individually administered test of intelligence and take into consideration the Flynn Effect… when estimating an individual's true IQ score."[20] [21] Reynolds et al, (2010) have gone so far as to opine, as related to death penalty litigation, "If the FE is real, the failure to apply the Flynn correction as we have described it is tantamount to malpractice. No one's life should depend on when an IQ test was normed."[22]

25. Reynolds et al. (2010) have explained this position further, noting:

> Because of the central role IQ tests play in determining an individual's level of mental retardation, and because of the importance of mental retardation in determining a defendant's eligibility to be killed by the State, it is imperative that the FE, if it is real, be taken into account in capital cases. IQ ranges that indicate mental retardation are determined relative to the average score (which has been set by convention, albeit arbitrarily, at 100). The so-called average score is derived from a reference group, which is a snapshot of the population at one particular point in time. The determination of the intelligence component of the diagnosis of mental retardation (we do recognize that the actual diagnosis is far more complex than looking at an IQ—but the IQ is a crucial component, and we deal only with it here) should be based on the person's standing relative to the target population at the time the person was actually tested, not the target population when the test was normed. Because it is at this time a practical impossibility to renorm tests annually to maintain a more appropriate reference group, to the extent corrections are available and valid, they should be applied to obtained scores so the most accurate estimate of standing possible is obtained. To do less is to do wrong—what

---

[17] Wechsler, D. (1991). Wechsler Intelligence Scale for Children – Third Edition (WISC-III). San Antonio: The Psychological Corporation, 4.

[18] AAIDD, 2010, 37.

[19] Schalock, R.L, Buntinx, W., Borthwick-Duffy, S., Luckasson, R., Snell, M., Tassé, and Wehmeyer, M. (2007). User's Guide: Mental Retardation – Definition, Classification and Systems of Supports – 10th Edition, Washington, D.C.: American Association on Intellectual and Developmental Disabilities, 20.

[20] *Id, 21.*

[21] This approach to the use of the Flynn Effect was similarly endorsed in AAIDD, 2010.

[22] Reynolds et al., 1.

possible justification could there be for issuing estimates of general intelligence in a death penalty case that are less than the most accurate estimates obtainable?[23]

26. The procedure for computing an adjustment for the Flynn Effect has generally involved calculating the time between the administration of a test and the midpoint of the year(s) of norming (which is often one to four years prior to publication), multiplying that number by .3 points and subtracting this amount from the obtained Full Scale IQ score of the test in question. However, some have questioned whether the Flynn Effect might be slowing and thus require an adjustment to this calculation. For example, the manual for the Wechsler Adult Intelligence Scale – III (WAIS-III) reported that the mean FSIQ difference scores for individuals administered both the WAIS-R and the WAIS-III was 2.9 points (n = 192; 17-year annual inflation rate = 1.7 points).[24] In contrast, data that is more recent does not support the slowing of the Flynn Effect. As reported by Cunningham and Tassé (2010), "Counterbalanced administrations of the WAIS-III and WAIS-IV accomplished as part of the WAIS-IV standardization yielded mean WAIS-III scores that were 2.9 points higher for general examinees (*n* = 238, 12-year annual inflation rate = 0.26 points; Pearson, 2008)."[25] Moreover, within the range of intellectual disabilities, "The WAIS-IV Technical Manual (Pearson, 2008) reported that examinees classified as "intellectual disability–mild" (*n* = 24) exhibited Full Scale IQ scores that were 4.1 points higher on the WAIS-III as compared to the WAIS-IV (12-year annual inflation rate = 0.34 points).

27. Furthermore, a recent meta-analysis of the Flynn Effect (Fletcher et al, 2010) reported a FE "mean of about 3 and a SEM of about 1 [that] supports the correction and is consistent with the Flynn correction of 3 points per decade."[26] Given these findings the calculations that follow will incorporate the 0.30 points annual inflation rate as the most widely cited average for the Flynn Effect.[27]

---

[23] *Id*, 2.

[24] The Psychological Corporation (2002). WAIS-III/WMS-III Technical Manual, by author, 109.

[25] Cunningham, M.D. & Tassé, M.J. (2010). Looking to science rather than convention in adjusting IQ scores when death is at issue. Professional Psychology: Research and Practice, 41 (5), 417.

[26] Fletcher, J.M., Stuebing, K.K., Hughes, L.C. (2010). IQ Scores Should Be Corrected for the Flynn Effect in High-Stakes Decisions. Journal of Psychoeducational Assessment. 28, 472, first published on July 7, 2010 doi:10.1177/0734282910373341.

[27] It is noted that using a rate of only .17 points per year for the WAIS-R does change some of

*Clinical Judgment*

28. The Tennessee Supreme Court also addressed the issue of clinical judgment in the determination of an intellectual disability. The AAIDD has noted the importance of clinical judgment in making classificatory and diagnostic decisions related to intellectual disabilities. Further, the AAIDD has outlined a four-step clinical judgment strategy as follows: 1) Understand the question; 2) Conduct or access a thorough history; 3) Conduct a broad-based assessment; and 4) Synthesize the obtained information.[28]

29. AAIDD also more specifically addressed the need for clinical judgment when an individual is incarcerated or test findings are either outdated or contradictory:

> Although the clinician is always using clinical judgment regarding the diagnosis, classification, or supports planning for persons with ID, there are four situations in which the critical thinking skills and the synthesis guidelines discussed in this section of the chapter become more apparent:
>
> 1. The complexity of the person's functioning, including medical and behavioral conditions, precludes standardized assessment alone. Examples include persons with severe mental health problems or significant challenging behaviors.
> 2. Legal restrictions significantly reduce opportunities to observe and assess the person in age-appropriate community environments. Examples include persons being in physical restraints, imprisoned, or highly medicated.
> 3. Historical information is missing and cannot be obtained. Examples include an adult with suspected fetal alcohol syndrome but whose mother is dead, and there is no one who can provide any information about pre- and postnatal environments or an adult who is requesting disability benefits but has no school records that can be obtained and no reliable family or childhood community reports that can be obtained.
> 4. Test results are either inconclusive or questionable. Persons with ID are frequently evaluated using a variety of assessment instruments, some of which are appropriate and relevant to the question(s) being asked, some of which are outdated, and some of which produce contradictory results.[29]

30. In *Coleman*, the Tennessee Supreme Court wrote:

> Our construction of Tenn. Code Ann. § 39-13-203(a) is consistent with the current emphasis on clinical judgment in the assessment of borderline cases of intellectual disability. Aligning the application of the statute with the clinical approach to diagnosing

---

calculations in Mr. Dellinger's case. However, the ultimate impact upon his underlying "true score," to be demonstrated later, is not significantly changed.

[28] AAIDD 2010, 92-103.

[29] AAIDD 2010, 99.

and assessing intellectual disability will result in more accurate and consistent decisions. While Tenn. Code Ann. § 39-13-203( a)(1) is substantially consistent with clinical practice, it differs in one material respect. Clinicians diagnosing intellectual disability generally report their conclusions within a range (a person's I.Q. is between 65 and 75). Tenn. Code Ann. § 39-13-203(a)(I) requires clinicians to give more definite testimony. They must testify to a specific score or at least that the criminal defendant's 'functional intelligence quotient' is either 'seventy (70) or below' or above seventy.[30]

*Exchangeability of IQ Scores*

31. Clinical standards have established that the IQ prong of the diagnostic criteria for intellectual disabilities must be established using an individually administered IQ test and generally one that measures global intellectual abilities. For example, the DSM-IV (2000) diagnostic criteria specify the use of "an individually administered IQ test."[31] Moreover, AAIDD makes the point, "intellectual functioning...is best conceptualized and captured by a general factor of intelligence (*g*)."[32] As such, instruments that measure more limited intellectual abilities, for example, only nonverbal intelligence or only word knowledge, do not have the requisite breadth to establish, in and of themselves, the level of intellectual functioning. Rather, such instruments are best seen as auxiliary to more comprehensive instruments. So, for example, the Test of Nonverbal Intelligence – 2 (TONI-2), the Beta – II, and the Peabody Picture Vocabulary Test – Revised (PPVT-R) are not comprehensive measures of global intellectual functioning but rather narrower measures of specific intellectual abilities.

32. AAIDD makes the further point that "Not all scores obtained on intelligence tests given to the same person will be identical. Specifically, IQ scores are not expected to be the same across tests, editions of the same test, or time periods (Evans, 1991)."[33] Though this fact should be well known within the field, it raises issues of concern when multiple instruments have been administered to an individual potentially subject to the death penalty, and the results *appear* contradictory. As such, some attempt must be made to resolve these apparent contradictions.

---

[30] *Coleman v. State.*

[31] American Psychiatric Association. (2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.). Washington, DC: Author, 49.

[32] AAIDD, 2010, 34.

[33] *Id,* 38.

33. As a rule of thumb, scores on IQ tests that do not overlap in terms of their 95% confidence interval can be said to differ in a statistically significant way. However, when there is overlap in these confidence intervals, the tests cannot be said to be statistically significantly different.

34. Differences in scores, when they exist across instruments, may stem, in part, from differing factor structures for the instruments. Carroll (1993) accomplished an extensive meta-analytic study of the extant literature on the factor structure of intelligence.[34] In this work, he established the major components of intellectual functioning. This work was subsequently combined with that of John Horn and Raymond Cattell to provide a structural model of intellectual functioning termed the Cattell – Horn – Carroll (CHC) theory. Schneider and McGrew (2012) recently concluded, "...a review of the extant intelligence theory and assessment literature published during the past 20+ years indicates that CHC theory has attained the status as the consensus psychometric model of the structure of human cognitive abilities."[35] These authors also cited Ackerman and Lohman (2006) who concluded "The Cattell – Horn – Carroll (CHC) theory of cognitive abilities is the best validated model of human cognitive abilities"[36] and Keith and Reynolds (2010) who wrote, "we believe that CHC theory offers the best current description of the structure of human intelligence."[37]

35. CHC theory posits a hierarchical structure of intelligence with a general ability factor (*g*) at the apex. Subsumed under this general intelligence factor are broad cognitive abilities, which are in turn subsumed by narrow cognitive ability factors. The CHC broad cognitive ability factors include Fluid Intelligence (*Gf*), Crystallized Intelligence (*Gc*), Short-Term Memory (*Gsm*), Visual Processing (*Gv*), Auditory Processing (*Ga*), Long-Term Storage and Retrieval (*Glr*), Processing Speed (*Gs*), Decision/Reaction Time/Speed (*Gt*), Quantitative Knowledge (*Gq*), and Reading and Writing (*Grw*). The

---

[34] Carroll, J.B. (1993). Human Cognitive Abilities: A Survey of factor-analytic studies. New York, N.Y.: Cambridge University Press, 819 pps.

[35] Schneider, W.J. & McGrew, K.S. (2012). The Cattell-Horn-Carroll model of intelligence. In Dawn P. Flanagan and Patti L. Harrison (eds.) Contemporary Intellectual Assessment, Third Edition: Theories, Tests and Issues. New York: The Guilford Press, 109.

[36] *Id.*

[37] *Id.*

latter two measures are often considered elements of academic functioning. The existent intelligence tests measure somewhat overlapping broad cognitive abilities but generally do not measure all of the component parts of intellectual abilities. For example, the *WAIS-IV* is considered to be an adequate measure of *Gf, Gc, Gv, Gsm,* and *Gs.*[38] In contrast, the *WAIS-R* likely only adequately measures *Gc, Gsm,* and *Gf.*[39] Importantly, the WAIS-R does not measure Fluid Intelligence (*Gf*) at all – an ability associated with the neuropsychological concept of executive functions and at the core of intelligent behavior. Finally, McGrew and Flanagan (1998) noted, "Currently only one intelligence battery, the Woodcock-Johnson Psycho-Educational Battery – Revised (WJ-R; Woodcock & Johnson, 1989), comes close to measuring the broad abilities specified in the more 'complete' psychometrically based *Gf*-Gc multiple intelligences theories."[40] [41] The WJ-R assesses seven of the ten domains of intellectual functioning including *Gf, Gc, Gv, Gsm, Gs, Ga,* and *Glr.* The point being simply that different intelligence tests are measuring somewhat different aspect of intelligence and as a result will not provide IQ scores that are precisely the same. Therefore, IQ scores between instruments are not perfectly "exchangeable" and the breadth of coverage of the factors measured may be an important element of the weight to be given to any particular score. In particular, instruments such as the WAIS-IV and the WJ-R have greater breadth of coverage than does the WAIS-R.

*Calculation of Composite IQ Scores*

36. Nonetheless, it is of importance to be able to determine a best estimate of the "true" IQ score. W. Joel Schneider (2012) reported, "The psychometric true score is the probability-weighted average of all possible measurements under reasonable conditions."[42] Thus, the true score is the theoretical score if it

---

[38] Lichtenberger, E.O. & Kaufman, A.S. (2009). Essentials of WAIS_IV Assessment. Hoboken, NJ: John Wiley & Sons, Inc.

[39] Extrapolated from data found in McGrew, K.S. & Flanagan, D.P. (1998). The Intelligence Test Desk Reference (ITDR): G*f*-G*c* Cross-Battery Assessment. Needham Heights, MA: Allyn & Bacon.

[40] *Id, 6.*

[41] *Gf-Gc* theory is now known as CHC theory.

[42] Schneider, W.J. (2012). Can't decided which IQ is best? Make a composite score. Online at http://www.scribd.com/doc/77854520/Composite-Computation. Accessed 2/7/2012.

were possible to administer a test an infinite number of times (without practice effects) to any one individual. In some sense then, this estimated true score is the "real" IQ.

37. Schneider provided an explanation of the potential methods of combining IQ scores in order to estimate the true score. One method would simply be to calculate the average of the obtained scores. However, this procedure will not provide an accurate estimate of the true score. Schneider (2012) wrote:

> The problem with simple averages is that the averaged score does not have the same standard deviation as the scores being averaged. Properly adjusted so that the composite score has a mean of 100 and a standard deviation of 15, the composite score is more extreme than the averaged score. That is, when the average of the test scores is less than 100, the composite score is lower than the averaged score. When the average of the test scores is higher than 100, the composite is higher than the averaged score. To see this, imagine that a person scored 75 on two different IQ tests. The average of 75 and 75 is 75. About 5% of the population scores 75 or lower on the first test and about 5% score 75 or lower on the second test. Unless the tests are perfectly correlated (and they never are), a smaller group of people score an average of 75 or lower on both tests. Thus, an averaged score of 75 represents a more extreme score than a 75 on either test. Why is this so? When a smaller percentage of people obtain a score, it represents a lower score. Thus, an adjustment needs to be made to reflect the more extreme nature of averaged scores so that they are on the same scale (i.e., have the same mean and standard deviation) as the scores being combined.[43]

38. Schneider does provide the requisite calculations in order to create a psychometrically sound composite measure derived from multiple valid measures of IQ.[44]

39. These calculations require information as to the correlation between the instruments in question. The correlation between the WAIS-R and WJ-R has been reported in the literature. For example, Kaufman (1990) cited research that provided the correlation coefficients for the WAIS-R and WJ-R stating, "The WJ-R Broad Cognitive Ability Scale, both Standard and Extended versions, correlated only .63-.64 with WAIS-R FS-IQ for 51 adolescents aged 17 (Woodcock & Mather, 1989a, Table 7.9).[45] A somewhat higher correlation coefficient was provided by McGrew (2009) who cited the <u>WJ-R Technical Manual</u> (McGrew, Werder & Woodcock, 1991) in describing the correlation between the WAIS-R and WJ-R in a sample of 55 10th -11th grade above average subjects. McGrew (2009) wrote, "The correlation

---

[43] *Id.*
[44] *Id.*
[45] Kaufman (1990), 604.

between the two IQs is statistically significant and high ($r = .706$).[46] The higher correlation (.706) is utilized in the calculations here inasmuch as it is the more conservative approach, i.e., less likely to find a composite IQ score within the ID range.

40. No studies are known to have compared the correlations between the WAIS-R with the WAIS-IV. However, the correlation between the WAIS-III and the WAIS-IV was .94 overall but only .86 for those with Mild Intellectual Disabilities and .82 for those with Borderline Intellectual Functioning.[47] The correlation coefficient between the WAIS-R and the WAIS-III was .93.[48] The latter correlation coefficient can serve as a conservative upper limit for the relationship between the WAIS-R and the WAIS-IV inasmuch as it is very unlikely that the more recent WAIS-IV would be more highly correlated with the WAIS-R than was the WAIS-III, particularly in light of their different factor structures. However, it is entirely possible that the .86 or .82 correlation coefficients seen in the Mildly Intellectually Disabled and Borderline groups are the more accurate limits. The WAIS-R and WJ-R correlation of .706 can serve as a conservative upper limit for the WAIS-IV and WJ-R correlation. Though using these numbers requires making assumptions regarding the relationship between the WJ-R and the WAIS-IV and the WJ-R and the WAIS-IV, those assumptions are both conservative and reasonable.

41. The procedures for completing the required calculations are attached as Appendix A.

*James Dellinger's Intellectual Functioning:*

42. In light of the *Coleman* decision, and the review of the issues provided above, the following analysis of James Dellinger's IQ test scores is presented as a means to understand his "functional I.Q."

43. As noted in my report dated December 13, 2010, Mr. Dellinger has been administered a number of intelligence tests over the course of his life. The obtained scores might initially appear to be

---

[46] McGrew, K.S. (2009). Applied psychometrics 101: IQ test score difference series – Understanding global IQ test correlations. < http://www.iapsych.com/iapap101/iapap101_1.pdf> Accessed online 2/7/2012.

[47] Wechsler, D. (2008). WAIS-IV Technical and Interpretive Manual. San Antonio, TX: NCS Pearson, 75,78, 79.

[48] The Psychological Corporation, 107.

contradictory in some instances but a number of issues related to the use of "aging" tests, practice effects, examiner qualifications, overlap of the Standard Error of Measurement, changes in the conceptual understanding of intellectual functioning, and procedures for obtaining a "true" score, complicate the analysis of these findings.

44. The following chart summarizes the results of the various IQ tests.

| Test | Examiner | Date of Admin. | Estimated Date of Norming | VIQ VCI | PIQ PRI | Obtained FSIQ | Flynn Adjusted FSIQ | Practice Effect Present |
|---|---|---|---|---|---|---|---|---|
| WAIS-R | McCoy, M.A.[49] | 12/30/1991 | 1978 | 75 | 85 | 79 | 75 | No |
| WAIS-R | S. Hall | 12/7/1992 | 1978 | 82 | 99 | 89 | 85 | Yes |
| Beta-II | P. King | 4/1/1993 | 1974 | --- | 72 | --- | --- | No |
| WAIS-R | Malone, M.S.[50] | 9/22/1993 | 1978 | 78 | 89 | 83 | 78 | Yes |
| WJ-R | Young, Ph.D. | 3/29/1995 | 1987 | --- | --- | 72 | 70 | No |
| PPVT-R | Young, Ph.D. | 1995 | 1978 | 61 | --- | --- | --- | No |
| TONI-2 | Young, Ph.D. | 1995 | 1989 | --- | 83 | --- | --- | No |
| WAIS-IV | Watson, Ph.D. | 9/15/2010 | 2007 | 78 | 75 | 69 | 68 | No |

WAIS-R – Wechsler Adult Intelligence Scale – Revised; WJ-R – Woodcock Johnson – Revised; PPVT-R – Peabody Picture Vocabulary Test – Revised (Using norms for 16-3 to 40-11 years); TONI-2 – Test of Nonverbal Intelligence – 2; WAIS-IV – Wechsler Adult Intelligence Scale – IV. The WAIS-IV scores reported are the VCI (Verbal Comprehension Index) and the PRI (Perceptual Reasoning Index) as the VIQ and PIQ were dropped in this version of the test.

45. The most immediate issue revealed by an examination of the above chart is that at least three of the instruments, the Beta-II, the PPVT-R, and the TONI-2, are not comprehensive measures of intellectual functioning. The Beta-II and the TONI-2 are measures of nonverbal abilities whereas the PPVT-R is a measure of vocabulary and receptive language. As such, they can only be considered as providing supportive evidence as to any diagnosis of an intellectual disability. The Beta-II and the PPVT-R are both consistent with an intellectual disability whereas the TONI-2 would not be within the intellectually

[49] In my original report, the administrator of this first WAIS-R was listed as M.Vick. Subsequent information has made it clear that the examiner was R. Bruce McCoy, M.A., a Psychological Examiner.

[50] This WAIS-R was apparently completed by Christine Malone, M.S. Ms. Malone, according to her curriculum vitae, subsequently obtained her doctorate degree. At the time of the testing, on September 22, 1993, she appears to have been a graduate student at the beginning of an internship. From September 1993 until August 1994, she was an intern during which time she served a Minor Rotation at the Middle Tennessee Mental Health Institute, Forensic Services under the supervision of Amin Azimi, Ed.D., a Staff Psychologist. The date of the report, indicated by the notation "R + T: 5/9/95" was apparently in May 1995 seemingly after Ms. Malone left this internship.

disabled range. These instruments will not be considered further. No attempt to adjust these scores for the Flynn Effect is offered either given the lack of information on such adjustments on these instruments.

46. Further examination of the chart above also revealed that a practice effect likely significantly influenced the 12/7/1992 and 9/22/1993 WAIS-R scores. The WAIS-R was first administered to Mr. Dellinger on 12/30/1991 when he obtained a FSIQ of 79. It was re-administered within a year by Sidney Hall, Master Psychological Examiner, and a FSIQ of 89 was obtained.[51] The WAIS-R was again administered to Mr. Dellinger, by Christine Malone, M.S., an intern, within 10 months and a FSIQ of 83 was obtained. As outlined above, due to practice effects, these later evaluations cannot be considered to provide valid IQ scores for Mr. Dellinger. As a result, only the first WAIS-R score, obtained by R. Bruce McCoy, M.A., Psychological Examiner, in conjunction with the WJ-R and WAIS-IV, which are not vulnerable to issues of practice effects, can be considered when evaluating Mr. Dellinger's functional IQ.

47. In light of the above, Mr. Dellinger's most reliable and valid scores, are as follows:

| Test | Examiner | Date of Admin. | Estimated Date of Norming | VIQ | PIQ | Obtained FSIQ | Flynn Adjusted FSIQ | Practice Effect Present |
|---|---|---|---|---|---|---|---|---|
| WAIS-R | McCoy, M.A. | 12/30/1991 | 1978 | 75 | 85 | 79 | 75 | No |
| WJ-R | Young, Ph.D. | 3/29/1995 | 1988 | --- | --- | 72 | 70 | No |
| WAIS-IV | Watson, Ph.D. | 9/15/2010 | 2007 | 78 | 75 | 69 | 68 | No |

WAIS-R – Wechsler Adult Intelligence Scale – Revised; WJ-R – Woodcock Johnson – Revised; WAIS-IV – Wechsler Adult Intelligence Scale – IV.

48. Application of the Flynn Effect adjustment increases the validity of the obtained scores. The 1991 WAIS-R was administered 13 years after the estimated norming date. Applying the .3 points per year correction factor provides a Flynn Adjusted FSIQ of 75. Similar adjustments to the WJ-R and the WAIS-IV result in Flynn Adjusted IQs of 70 and 68 respectfully. The application of the Flynn Effect is the recommended procedure for removing error inherent in using tests normed at some date in the past.

[51] Sidney G. Hall Declaration, 1/3/2012. Mr. Hall reported in his declaration that prior to the evaluations of Mr. Dellinger and Gary Sutton, at the Sevier County Jail, he had never administered an IQ test to an adult. Furthermore, these were the first and only forensic psychological evaluations that he has completed during his career. Given Mr. Hall's inexperience in administering tests to adults, these results are suspect particularly in that these scores are far more extreme than those of the WAIS-R administered subsequently.

49. The next question to be answered is, "How reliable are the scores obtained in Mr. Dellinger's case?" One means of determining whether scores from different tests are in essential agreement with one another is to examine the overlap of the confidence intervals. As seen in the chart below, the 95% confidence intervals based upon the Standard Error of Measurement (SEM) for each of the instruments each overlap with the others. Given this, we must conclude that there is no statistically significant difference between Mr. Dellinger's IQ scores on the 1991 WAIS-R, the 1995 WJ-R, and the 2010 WAIS-IV.

**Intelligence Test Confidence Intervals**




It is important to recognize here that this use of the SEM is different than that addressed by the court in the *Coleman* decision. The purpose here is not to describe Mr. Dellinger's IQ as falling in a range (though it does), but rather to make a judgment as to whether there is a significant statistical difference between these three scores – and there is not.

50. Finally, some determination must be made as to a "true score" for Mr. Dellinger's IQ. As outlined above, it is not appropriate to simply average the three scores. Rather, we must attempt to create a

---

[52] Wechsler, D. 1981). WAIS-R Manual. San Antonio, TX: The Psychological Corporation, 32.

[53] The reliability coefficient for the WJ-R was .95 resulting in an SEM of 3.35. See Kaufman, A.S. (1990). Assessing Adolescent and Adult Intelligence. Boston, MA: Allyn & Bacon, 603.

[54] These calculations are based upon the WAIS-IV FSIQ Standard Error of Measurement, which is 2.12 rather than the Standard Error of Estimate (SEE), in order to maintain consistency with the other measures.

composite score that is the best estimate of Mr. Dellinger's true IQ score. Such a calculation is in part a function of the correlations between instruments.

51. Following the procedures outlined by Schneider, considering the correlations between the instruments, and using the three IQ scores available, assuming that there is no reason to favor one above the others, the best estimate, using the most conservative data (WAIS-R – WJ-R correlation = .706; WAIS-R – WAIS-IV correlation = .93), is that his IQ is 69. Using somewhat more advantageous assumptions, (WAIS-R – WJ-R correlation = .63; WAIS-R – WAIS-IV correlation = .86), his composite IQ would be 68. Simply using the two most recent tests to determine Mr. Dellinger's composite IQ, given their improved psychometric properties, it would be 66.

52. Based upon the above, it is my clinical judgment that Mr. Dellinger's actual IQ falls below 70. Furthermore, there is no compelling reason to suggest that his functional IQ is different in any significant respect from this calculated composite true IQ score. Based upon this finding, Mr. Dellinger meets the prong one criteria of "Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below."[55]

*Adaptive Functioning*

53. We now turn to the issue of adaptive functioning. As noted in my previous report, I have not completed a formal adaptive functioning evaluation of Mr. Dellinger. However, based upon my examination of Mr. Dellinger it is clear that he has, at a minimum, adaptive functioning deficits in the area of functional academic skills based upon his degree of illiteracy with reading comprehension levels below the kindergarten level. There are also indications that he has adaptive functioning deficits in other domains of functioning as well.

54. In my 2010 report, I made note of the fact that Mr. Dellinger "is functionally illiterate, has at least a moderate degree of brain dysfunction, impaired language skills, marked attentional deficits, significant

[55] Tenn. Code Ann. § 39-13-203(a) (2011).

verbal memory deficits, significantly impaired problem solving skills, and thinks concretely."[56] These impairments, as part and parcel of his limitations in intellectual functioning, serve as the foundation for Mr. Dellinger's deficits in adaptive functioning.

55. Declarations of family members described Mr. Dellinger's limitations in adaptive functioning. For example, Mr. Dellinger's sister, Maralee Dellinger Ramsey, reported, "James tried to learn in school, but he just couldn't remember what he studied the very next day."[57] She also noted, "I don't think James ever learned to write a check."[58]

56. In addition, I have reviewed the declarations of Stephen Greenspan, Ph.D., a foremost authority on Adaptive Functioning and Intellectual Disabilities. Dr. Greenspan examined Mr. Dellinger, reviewed records, and completed collateral interviews of individuals who knew the Mr. Dellinger well. Those who were able to provide information regarding Mr. Dellinger described him as quite limited in his ability to navigate the requirements of daily living. Dr. Greenspan reported:

> The picture that emerged of Mr. Dellinger was that of someone with very significant adaptive deficits, both before and after the age of 18. Although Mr. Dellinger was able to hold a job (as is true of many people with mild MR), he was severely limited in the kinds of tasks he could perform. He was basically an unskilled helper who could not perform tasks with any degree of complexity. He often did not learn from either experience or teaching, as in his inability to heed advice as to how to walk safely on a roof, an inability which eventually got him banned from being on roofs. Mr. Dellinger was very aware of his limits (such as an inability to make required measurements), and often opted out of performing work tasks that most people in construction easily mastered. Thus, while Mr. Dellinger was able to hold a job from a boss who took a benevolent interest in him, he exhibited significant limitations of judgment and knowledge, and these limitations are certainly congruent with mild MR.
>
> The interview with Mr. Dellinger's first wife, Annabel Stewart, was extremely informative. The picture that emerged was someone who functioned almost as a child in a grown-up body, as Mr. Dellinger could not do many of the tasks one would expect of a young adult. Particularly relevant to my task here is that Mr. Dellinger was described as very gullible, dependent on others who led him easily and often exploited his naïve trust. Gullibility (defined sometimes as "naïve trust") is a very common characteristic of people with intellectual impairments [see S. Greenspan, G. Loughlin & R. Black, (2009). Credulity and gullibility in persons with mental retardation. In L.M. Glidden (Ed.), International Review of Research in Mental Retardation, Vol. 24, pp. 101-135].

---

[56] Watson, 12/13/2010.
[57] Declaration of Maralee Dellinger Ramsey, 1/5/2012.
[58] *Id.*

> Gullibility reflects an inability to understand complexity and a compensation for that inability by adopting a personality style of passively going along with actions suggested by others. Such a dependent follower mentality provides an easy way of dealing with unknown situations and it often works well.[59]

57. Dr. Greenspan concluded that Mr. Dellinger met the deficits in adaptive functioning prong of the diagnostic criteria for an Intellectual Disability under the standards of the AAIDD, APA, and the relevant Tennessee Code.

58. Based upon the available evidence, and in my clinical judgment, Mr. Dellinger is judged to meet the second prong of the criteria for an intellectual disability as outlined in the Tennessee Code Annotated § 39-13-203 (2011) and *Coleman v. State*, No. W2007-02767-SC-R11-PD, 2011 WL 1346932 (Tenn.).

*Onset Prior to Age 18*

59. Based upon my review of Mr. Dellinger's records, it is apparent that Mr. Dellinger has a developmental disorder with the onset of intellectual and adaptive functioning deficits during the developmental period and prior to the age of 18. He thus meets the third prong of the diagnostic criteria for an intellectual disability.

*Etiology*

60. It is not possible to determine with great certainty the cause of Mr. Dellinger's intellectual disability and this is not required in order to establish the diagnosis. It appears that Mr. Dellinger was raised in poverty in a family that was food insecure, that he was likely exposed as a child to pesticides, and that he incurred at least one head injury. Nonetheless, it is noted that it appears that intellectual disabilities may simply run in Mr. Dellinger's family. This is perhaps not surprising in that there is a significant genetic component to intellectual functioning. Kaufman and Lichtenberger (2006) reported, "Probably the best overall estimate of the heritability of IQ is 50%, a value proposed as the most sensible summary of the results from the diversity of behavioral genetic research (Plomin & Petrill, 1997)."[60]

---

[59] Greenspan, 2/7/2012.

[60] Kaufman, A.S. & Lichtenberger, E.O. (2006). Assessing Adolescent and Adult Intelligence, Third Edition, Hoboken, N.J.: John Wiley & Sons, 29.

Other estimates of the heritability of IQ are as high as 85%. Nevertheless, in other words, at a minimum, 50% of the variance in an individual's intelligence is attributable to hereditary factors.

61. Examination of the records of Mr. Dellinger's son, James Anderson Dellinger, Jr. revealed that at the age of 15 he was identified as having Mild Mental Retardation based upon deficits in intellectual functioning and adaptive behaviors. Specifically, John Porter, M.S., Psychological Examiner, in his report dated 5/30/1996, indicated that the younger Dellinger had obtained a WISC-III Verbal IQ of 66, and Performance IQ of 65, and a Full Scale IQ of 63.[61] In addition, results of the Vineland revealed adaptive functioning deficits. Mr. Dellinger's son was also diagnosed with a "Serious Emotional Disturbance."[62]

62. Furthermore, school records of Timmy Lee Dellinger, James Dellinger's other son, revealed that, though he obtained a high school diploma it was a Special Education diploma. Group IQ testing using the Otis-Lennon revealed his intellectual functioning to be at only the 2nd percentile when he was 6 years 10 months old and at the 8th percentile rank when he was 9 years 3 months old.[63]

63. Additionally, Dr. Greenspan's interviews of Mr. Dellinger's siblings revealed, "Mary and Ralph [Dellinger] appear to have similar intellectual difficulties as James."[64]

64. Given these facts, it appears possible that Mr. Dellinger has at least some element of a genetically determined intellectual disability.

*Opinion*

65. Based upon the results of my examination of Mr. Dellinger and a review of his records, it is my scientific, professional, and expert opinion, which I hold to a reasonable degree of scientific certainty, that James Dellinger meets the criteria for an intellectual disability as specified in the Tennessee Code Annotated § 39-13-203 (2011) and *Coleman v. State*, No. W2007-02767-SC-R11-PD, 2011 WL 1346932 (Tenn.) as well as the clinical diagnostic criterion put forth by the American Psychological Association

---

[61] Comprehensive Psychological Evaluation of James Dellinger, Jr., by John Porter, M.S., Psychological Examiner, 5/30/1996.

[62] *Id.*

[63] School records of Timmy Lee Dellinger.

[64] Greenspan, 12/11/2010.

(APA) and the American Association on Intellectual and Developmental Disabilities (AAIDD).

Specifically, Mr. Dellinger demonstrates:

- "Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;"
- "Deficits in adaptive behavior;" and
- An "intellectual disability [that] manifested during the developmental period, or by eighteen (18) years of age."

66. Finally, Mr. Dellinger had an intellectual disability at the time of his crimes.

Further, affiant saith not.

Dale G. Watson, Ph.D.

Subscribed to and sworn to me on this 17th day of February, 2012.

(*) See Attached Jurat.

Notary Public

## APPENDIX A

### Steps in the Calculation of the Composite True Score

**Computation Steps**

*Step 1*: Add up all of the scores.

In this case,

75 + 70 + 68 = 213

*Step 2*: Subtract the number of tests times 100.

In this case, there are three tests. Thus,

213 – (3 * 100) = -87

*Step 3*: Divide by the square root of the sum of all the elements in the correlation matrix. In this case, the three tests are correlated as such:

| TEST | WAIS-R | WJ-R | WAIS-IV |
|---|---|---|---|
| WAIS-R | 1.0 | .706 | .93 |
| WJ-R | .706 | 1.0 | .706 |
| WAIS-IV | .93 | .706 | 1.0 |

The sum of all nine elements of the correlation matrix, including the ones in the diagonal is 7.684. The square root of 7.684 is about 2.772. Thus,

-87 / 2.772 = -31.3853

*Step 4*: Complete the computation of the composite score by adding 100.

In this case,

-31.3853 + 100 = 68.614
= 69

Given the three IQ scores available, assuming that there is no reason to favor one above the others, the best estimate is that his IQ is 69. Simply using the two most recent tests to determine Mr. Dellinger's composite IQ, it would be 66.

# APPENDIX B

## Curriculum Vitae

DALE G. WATSON, PH.D.
*Clinical & Forensic Neuropsychology*
*2160 Appian Way, Suite 105*
*Pinole, CA 94564*
*Office: 866-536-5301 / Fax: 925-757-3690*
*Email: watson.dale@comcast.net*

---

CURRICULUM VITAE — FEBRUARY 16, 2012

## EDUCATION:

1988 Ph.D. California School of Professional Psychology-Berkeley/Alameda
Clinical Psychology (APA accredited)
1980 M.A. John F. Kennedy University, Orinda, CA.
Clinical Psychology
1975 B.A. California State College, Sonoma, Rohnert Park, CA.
Psychology

## PROFESSIONAL EXPERIENCE:

**1990-** **Private Practice**
Pinole, CA.
- Forensic Evaluation/Trial Consultation.
- Comprehensive Neuropsychological/Psychodiagnostic Assessment services.
- Mental Retardation "Atkins" evaluations.
- Adjudicative Competency & to be Executed, Insanity, Mitigation and Future Dangerousness.
- Trial testimony in Superior and Federal District Courts.
- Individual Psychotherapy.

**2000-** **Clinical Neuropsychologist**
Neurobehavioral Cognitive Services, Dixon, CA.
- Neurocognitive rehabilitation services including consultation and treatment planning.
- Individual and Group Psychotherapy with neurologically impaired patients.
- Neuropsychological and Psychodiagnostic Assessment.

**2007-** **Adjunct Faculty**
**1994-2000** The Wright Institute, Berkeley, CA. (APA accredited)
- Teaching 3-trimester courses in Graduate Level Psychodiagnostic Assessment including intellectual and psychological evaluation and neuropsychological screening.
- Dissertation supervision.

**1989-1992** **Clinical Neuropsychologist**
NeuroCare, Concord, CA.
- Acting program director (July 1991).
- Psychology team leader.
- Supervision of interns and the behavioral technician.
- Post-acute rehabilitation of the brain-injured.
- Neuropsychological evaluation.
- Treatment planning.
- Individual/Couples/Group Psychotherapy.
- Substance Abuse treatment/Cognitive Rehabilitation/Crisis Intervention.

## PROFESSIONAL EXPERIENCE (CONTINUED):

**1988-1990 Psychological Assistant**
Supervisor: Virginia Wulf, Ph.D., Pinole, CA.
- Individual/Couples Psychotherapy.

**1988-1989 Psychological Assistant**
Supervisor: Norbert Ralph, Ph.D.
Comprehensive Assessment Services/Sausalito Professional Clinic Sausalito, CA.
- Psychodiagnostic evaluations of hospitalized, adolescent substance abusers.
- Hospital Consultation (New Beginnings - Modesto).

**1986-1989 Staff Psychologist**
Supervisors: Michael Shore, Ph.D./Harry Noda, Jr., Ph.D.
Specialized Rehabilitation Services
An affiliate of Transitions / Bay Area Recovery Centers, Fremont, CA.

Brain Injury Rehabilitation Program (1986-1987)
- Coordinating the Treatment Team.
- Neuropsychological and Psychodiagnostic Evaluation.
- Cognitive Rehabilitation.
- Individual Psychotherapy/Case Management.

Chronic Pain Management Program
- Individual/Group Psychotherapy.
- Case Management.
- Biofeedback Training.
- Patient education.

**1981-1986 Clinical Coordinator/ Psychological Assistant**
Supervisors: Sheila Bastien, Ph.D./Ann Hoff, Ph.D.
Spectrum Psychology Associates, Berkeley, CA.
- Clinical Coordination.
- Neuropsychological, Psychodiagnostic and Vocational Evaluation.
- Evaluation of the Developmentally Disabled
- Individual Psychotherapy.
- Forensic psychology.

**1984-1985 Clinical Psychology Intern (Academic Year)**
Supervisor: Neil Young, Ph.D.
Community Education and Counseling Center, Fremont, CA.
- Individual Psychotherapy within a Control Mastery framework.
- Group and Couples Psychotherapy.
- Community Needs Assessment (Program Evaluation).

**1983-1984 Clinical Psychology Intern (Academic Year)**
Supervisor: Joan Roth, Ph.D.
Northern California Reception Center,
California Medical Facility, Vacaville, CA.
- Psychodiagnostic Evaluation of court referred criminal offenders.
- Group Psychotherapy with Category "B" inmates (Pre-operational Transsexuals).
- Individual Psychotherapy.

## PROFESSIONAL EXPERIENCE (CONTINUED):

**1983** **Teaching Assistant**
Neuropsychological Measurement Laboratory
California Graduate School of Marital and Family Therapy, San Rafael, CA.
- Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1983** **Clinical Psychology Intern**
East Bay Activities Center, Oakland, CA.
- Milieu therapy in classroom setting with emotionally disturbed children.

**1983** **Co-Leader: Neuropsychological Assessment - An In-service Training Workshop. Sonoma County Office of Education.**
- 1-day in-service training workshop with psychologists and nurses.

**1982** **Teaching Assistant**
Neuropsychological Measurement Laboratory
California School of Professional Psychology, Berkeley, CA.
- Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1982** **Teaching Assistant**
Neuropsychological Measurement Laboratory
California Graduate School of Marital and Family Therapy
San Rafael, CA.
- Taught the laboratory section of Neuropsychological Assessment using the Halstead-Reitan Battery.

**1979-1980** **Counselor Intern**
Contra Costa County Alcoholism Information and Rehabilitation Service (AIRS), Antioch, CA.
- Conducted Alcoholism Education Orientations.
- Individual, Marital and Group Psychotherapy.

**1978-1979** **Counselor Intern**
John F. Kennedy University Community Counseling Center, Concord, CA.
- Individual, Marital, and Family Psychotherapy.
- Peer Supervision.

**1975** **Staff Counselor**
New Horizons Center, Pittsburg, CA.
- Milieu treatment of developmentally disabled and psychotic adolescents and young adults.
- Liaison to Consulting Psychiatrist.

## RECENT PROFESSIONAL TRAINING:

2011 "Introduction to the Rorschach Performance Assessment System: Practical Clinical Training and Case Illustrations." Donald Viglione, Ph.D. & Philip Erdberg, Ph.D. Alliant International University, June 3 & 4, 2011. San Francisco, CA (12.5 CE credits)

2011 "Biopsychosocial Outcome from Mild Traumatic Brain Injury." Grant Iverson, Ph.D. The American College of Professional Neuropsychology, March 12, 2011. Las Vegas, NV. (3 CE credits)

2011 "Reframing Nonverbal Learning Disorders: Identifying Clinical Subgroups." Gail M. Grodzinsky, Ph.D., ABPdN. The American College of Professional Neuropsychology, March 12, 2011. Las Vegas, NV. (3 CE credits)

2011 "From Movement to Thought: Subcortical Contributions to Psychiatric and Learning Disorders." Dana Chidekel, Ph.D., ABPdN & Deborah E. Budding, Ph.D., ABPdN, ABN. The American College of Professional Neuropsychology, March 11, 2011. Las Vegas, NV. (3 CE credits)

RECENT PROFESSIONAL TRAINING (CONTINUED):

2011 "Neuropsychological Science and Forensic Competencies: Applications in Civil and Criminal Cases." Daniel A. Martell, Ph.D., A.B.P.P. The American College of Professional Neuropsychology, March 11, 2011. Las Vegas, NV. (3 CE credits)

2010 "Neuroanatomical Dissection: Human Brain and Spinal Cord." William E. Cullinan, Ph.D., David A. Baker, Ph.D., Subhash C. Bhatnagar, M.S.-CCC (SPL), Ph.D., James P. Herman, Ph.D., John R. Mantsch, Ph.D., & Robert C. Thompson, Ph.D. Marquette University, July 15 – 17, 2010. (21 hours)

2010 "Finding Balance: Legal & Ethical Issues of Boundaries & Privacy in Psychotherapeutic Services." Daniel Taube, J.D., Ph.D. John F. Kennedy University, March 12, 2010. Campbell, CA. (6 C.E. credits)

2010 "Neuropsychology and the Death Sentenced Inmate." Michael B. Charlton, J.D. Annual Conference of the American College of Professional Neuropsychology, February 27, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "Introduction to Empirically Based Assessment: Developing an EBA Model for AD/HD." Steven J. Hughes, Ph.D., LP, ABPnN. Annual Conference of the American College of Professional Neuropsychology, February 27, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "Central Auditory Processing in Children and Adolescents." Teresa Bailey, Ph.D., Ph.D. Annual Conference of the American College of Professional Neuropsychology, February 26, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation." Thomas J. Reidy, Ph.D., ABPP. Annual Conference of the American College of Professional Neuropsychology, February 26, 2010. Las Vegas, NV. (3 C.E. credits)

2010 "Reitan Society Meeting." Ralph Reitan, Ph.D., Deborah Wolfson, Ph.D., Jim Hom, Ph.D., & Janice Nice, Ph.D., February 24-25, 2010. Las Vegas, NV. (12 C.E. credits)

2009 "WAIS-IV/WMS-IV and the Advanced Clinical Solutions for WAIS-IV/WMS-IV: Clinical Application and Interpretation in Neurological and Psychiatric Disorders." James A. Holdnack, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 14, 2009. New Orleans, LA. (3 C.E. credits)

2009 "Neuroimaging Evidence in the Criminal Trial Process: Recent Developments, the Role of Attitudes, Some Unasked Questions, and Predictions for the Future." Michael L. Perlin, J.D. 29th Annual Conference of the National Academy of Neuropsychology, November 12, 2009. New Orleans, LA. (3 C.E. credits)

2009 "Psychometrics: Making Test Classification Decisions Practical." Richard Frederick, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 12, 2009. New Orleans, LA. (3 C.E. credits)

2009 "Functional Neuroanatomy of Memory: Three Amnesias or One?" Russell M. Bauer, Ph.D. 29th Annual Conference of the National Academy of Neuropsychology, November 11, 2009. New Orleans, LA. (3 C.E. credits)

2008 "Law and Ethics." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, March 10, 2006. Pleasant Hill, CA. (6 APA CE units).

2007 "Useful Clinical Ratings of CT and MRI in the Clinical Practice of Neuropsychology." Erin Bigler, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "The Amazing Halstead Finger Oscillation Test." George Prigatano, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "Introducing the MMPI-2-RF (Restructured Form)." Yossef Ben-Porath, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "Behavioral Teratology: Neuropsychological Effects of Prenatal Exposures. Sarah N. Mattson, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (1.5 CE Credits).

RECENT PROFESSIONAL TRAINING (CONTINUED):

2007 "Releasing Raw Data and Psychological Test Materials: Ethical Dilemmas, Legal Requirements, and Simple Solutions to Discovery Demands." Paul Kaufmann, J.D., Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (1.5 CE Credits).

2007 "The Neurobiology of Antisocial, Violent, and Psychopathic Behavior." Adrian Raine, Ph.D. 27th Annual Conference of the National Academy of Neuropsychology, November 14-17, 2007. Scottsdale, AZ (3 CE Credits).

2007 "Forensic Evaluation." Institute of Law, Psychiatry and Public Policy, School of Medicine & School of Law, University of Virginia under contract for the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services and the Office of the Attorney General, April 30 - May 4, 2007, Charlottesville, VA (30 APA CE Units).

2006 "Deepening Legal and Ethical Understanding in Clinical Practice." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, March 10, 2006. Pleasant Hill, CA. (6 APA CE units).

2004 "Assessment of Response Bias: Beyond Malingering Tests." Scott R. Millis, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE units).

2004 "Neurochemistry and Medication Management of Aggression in Children, Adolescents, and Adults." Daniel Matthews, M.D. 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004 "Constitutional/Judicial Foundations for Criminal Forensic Neuropsychology: Competency to Stand Trial and Confess." Robert L. Denny, Psy.D. & James Sullivan, Ph.D., 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004 "Professional Issues." Antonio Puente, Leslie Rosenstein, & Patricia Pimental, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (1.0 APA CE Units).

2004 "Pediatric Brain Injury: Neuroimaging, Clinical Presentation, and Neuropsychological Status, Dr. Paul C. Lebby, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004 "What neuropathology can teach us about the neurobiology of the self." Todd Feinberg, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (1.5 APA CE Units).

2004 "Imaging brain circuitry in the clinical neuropsychology of memory: fMRI, morphometry & DTI. Andrew J. Saykin, 24th Annual Conference of the National Academy of Neuropsychology, November 17-20, 2004. Seattle, WA. (3 APA CE Units).

2004 "Workshop in Clinical Neuropsychology: Significant Developments and Advanced Clinical Issues." Ralph Reitan, Deborah Wolfson, Jim Hom et al. Reitan Neuropsychology Laboratories, October 1-3, 2004. Phoenix, AZ (17 APA CE Units).

2004 "Spousal/Partner Abuse Assessment and Treatment: Domestic Violence Training." John F. Kennedy University, February 20, 2004. Pleasant Hill, CA. (7 APA CE unites).

2004 "6-Hour Ethics and the Law." Daniel O. Taube, J.D., Ph.D. John F. Kennedy University, February 6, 2004. Pleasant Hill, CA. (6 APA CE units).

2003 "A New Anatomical Framework for Neuropsychiatric Disorders: Systems Analysis and Hands-On Dissection of the Human Brain." Lennart Heimer, M.D. Saint Louis University School of Medicine Practical Anatomy Workshop, October 31-November 2, 2003. St. Louis, MO. (17 APA CE units).

2003 "Practical Issues and Clinical Methods of Practice with the Wechsler Scales." David Tulsky, Gordon Chelune & Josette Harris, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

## RECENT PROFESSIONAL TRAINING (CONTINUED):

2003 "New Scores and Methods of Practice with the Wechsler Scales." Gordon Chelune, David Tulsky & Josette Harris, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003 "Race and Education in Neuropsychological Testing." Jennifer Manly, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003 "Neuropsychological Impairment and Environmental Risk Factors in Capital Murder Offenders." Robert A. Geffner, Elizabeth Lim, Barbara Hart & Robert Owen, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX.

2003 "Functional Neuroanatomy Primer: Clinical Presentation of Patients with Neuropsychological Conditions." Paul Lebby, Ph.D., 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX.

2003 "The Atkins Decision and the Forensic Evaluation of Mental Retardation: Roles for the Neuropsychologist and Special Educator." J. Randall Price & Kay Stevens, 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

2003 "Increasing Diagnostic and Predictive Accuracy in Neuropsychology." David Faust, Ph.D., 2003 23rd Annual Conference of the National Academy of Neuropsychology, October 15-18, 2003. Dallas, TX. (3 APA CE units).

## PUBLICATIONS:

Abueg, F., Woods, G.W., & Watson, D.G. (2000). Disaster Trauma. In Frank M. Dattillio & Arthur Freeman (Eds.) Cognitive Behavioral Strategies in Crisis Intervention, Second Edition. New York, N.Y.: Guilford Press.

Bastien, S., Peterson, D. & Watson, D.G. (1996). IQ abnormalities associated with chronic fatigue syndrome in repeated WAIS-R testing (abstract). Journal of Chronic Fatigue Syndrome, 2(2/3).

## RECENT INVITED PRESENTATIONS:

2011 "Atkins and Neuro-Psychological Testing." Co-presented with Mark Olive, Esq. Capital Case Litigation Training Conference, Office of the Public Defender of the State of Delaware. October 13, 2011, Dover, Delaware.

2011 "The Neuropsychology of Fetal Alcohol Spectrum Disorders." Capital Mitigation – Beyond Atkins. Center for American and International Law. July 9, 2011. Houston, TX.

2011 "Uncovering Evidence of Brain Damage: Phineas Gage." Co-presented with Richard Burr, Esq. and Russell Stetler, National Mitigation Coordinator. National Capital Habeas Unit (CHU) Conference. Administrative Office of the United States Courts. April 8, 2011. Austin, TX.

2011 "Testing Issues in Intellectual Disability/*Atkins* Cases." Eighth National Seminar on the Development and Integration of Mitigation Evidence: Mitigation Narratives. Habeas Assistance and Training Counsel/Administrative Offices of the United States Courts. April 2, 2011, Chicago, IL.

2011 "Winning *Atkins* hearings: Case Studies." Co-presented with Michael Burt, Esq. Eighth National Seminar on the Development and Integration of Mitigation Evidence: Mitigation Narratives. Habeas Assistance and Training Counsel/Administrative Offices of the United States Courts. April 2, 2011, Chicago, IL.

2011 Plenary Presentation: "DSM-5 (Psychosis Risk Syndrome/Intellectual Disability)." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 20, 2011. Monterey, CA.

2011 "Cross Examination of a Defense Mental Retardation/Intellectual Disability Expert." Co-presented with Edward Souza, J.D. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 19, 2011. Monterey, CA.

## RECENT INVITED PRESENTATIONS (CONTINUED):

2011 "Basic Neuropsychology (Brain Dysfunction)." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 19, 2011. Monterey, CA.

2011 "Current Issues in Neuropsychology." Fourth National Seminar on Mental Health and the Criminal Law. Habeas Assistance and Training Counsel/Administrative Office of the United States Courts. January 15, 2011. New Orleans, LA.

2010 "DSM-5: Proposed Changes." Habeas Corpus Resource Center Spring Conference. Habeas Corpus Resource Center. May 17, 2010. San Francisco, CA.

2010 "Neuropsychology of Mental Retardation." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2010. Monterey, CA.

2010 "Model Direct of a Mental Retardation Neuropsychologist." Co-presented with Edward Sousa, J.D. CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 14, 2010. Monterey, CA.

2009 "Presenting a Reason to Vote for Life via the Testimony of a Neuropsychologist." 2009 Death Penalty Defense Seminar. Oregon Criminal Defense Lawyers Association (OCDLA), October 23, 2009, Bend, Oregon.

2009 "The Neuropsychology of Intellectual Disabilities: Current Research on Intellectual Impairment." 14th Annual Federal Habeas Corpus Seminar. Administrative Offices of the U.S. Courts. August 22, 2009, Pittsburgh, PA.

2009 "The Neuropsychology of Schizophrenia." 14th Annual Federal Habeas Corpus Seminar. Administrative Offices of the U.S. Courts. August 22, 2009, Pittsburgh, PA.

2009 "Testing and Other Psychological Issues." Habeas Corpus Resource Center Spring Conference. Habeas Corpus Resource Center. June 19, 2009. San Francisco, CA.

2009 Plenary Presentation: "The Neuropsychology of Intellectual Disabilities: Current Research on Intellectual Impairment." Fifth National Seminar on the Development and Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 18, 2009, Philadelphia, PA.

2009 "Neuropsychological Assessment and Brain Impairment." Life in the Balance 2009. The National Legal Aid & Defender Association. March 7, 2009. New Orleans, LA.

2009 "Mental Health/Mental Retardation Testing." Life in the Balance 2009. The National Legal Aid & Defender Association. March 7, 2009. New Orleans, LA.

2009 Plenary Presentation: "The Neuropsychology of Psychiatric Disorders – Schizophrenia." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2009. Monterey, CA.

2009 "New Developments in Psychological Testing." CACJ/CPDA Capital Case Defense Seminar. California Attorneys for Criminal Justice/California Public Defender Association. February 15, 2009. Monterey, CA.

2008 "Executive Functioning." 2008 Capital Case Seminar. Los Angeles County Public Defender. October 17, 2008. Los Angeles, CA.

2008 "Recent Developments in the Science of Brain Damage and Observations on Interviewing Experts." Mitigation Workshop. Virginia Capital Representation Resource Center (VCCRC). September 25, 2008. Charlottesville, VA.

2008 "Intellectual Disabilities: IQ and Adaptive Functioning Evaluation." Life in the Balance 2008: Defending Death Penalty Cases. The National Legal Aid & Defender Association. March 8, 2008. Atlanta, GA.

2008 "Neuropsychological Evaluation." Life in the Balance 2008: Defending Death Penalty Cases. The National Legal Aid & Defender Association. March 8, 2008. Atlanta, GA.

## RECENT INVITED PRESENTATIONS (CONTINUED):

2007 "The Roles of Psychology and Neuropsychology in Forensic Evaluations." Second Annual Solano County Public Defender Felony Transition Seminar. Office of the Solano County Public Defender. September 28, 2007. Fairfield, CA.

2007 "Attacks on Neuropsychological Norms." National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases. Administrative Office of the US Courts. March 30, 2007. Washington, D.C.

2007 "Intelligence Testing." National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases. Administrative Office of the US Courts. March 30, 2007. Washington, D.C.

2007 "Neuropsychological Evaluation: The Impact of Norms." 2007 CACJ/CPDA Capital Case Defense Seminar. February 18, 2007. Monterey, CA.

2007 "Frontal and Temporal Brain Systems and Functions." Co-presented with Karen Froming, Ph.D. 2007 CACJ/CPDA Capital Case Defense Seminar. February 18, 2007. Monterey, CA.

2006 "Neuropsychological Assessment." Making the Case for Life IX: Mitigation and Jury Selection in Capital Cases. National Association of Criminal Defense Lawyers and the Southern Center for Human Rights. September 30, 2006. Las Vegas, NV.

2006 "Foundations of Neuropsychology." First Annual Felony Transition College. Solano County Public Defender's Office. June 23, 2006. Fairfield, CA.

2006 "Psychological and Neuropsychological Testing." Motions, Evidence & Expert Witnesses. The Center for American and International Law. May 21, 2006. Plano, TX.

2006 "Brain, Behavior, and Cognition." Co-Presented with James R. Merikangas, M.D. National Seminar on the Development and Integration of Mitigation Evidence. Administrative Offices of the U.S. Courts. April 28, 2006. Washington, DC.

2005 "Executive Functions." Second National Seminar on Development and Integration of Mitigation Evidence. Administrative Office of the U.S. Courts. April 22, 2005. Salt Lake City, UT.

2005 "Law and the Brain – The Neurobiology of Violence." Washington State Appellate Courts Spring Judicial Conference. April 6, 2005. Walla Walla, WA.

2005 "Mental Retardation." Texas Criminal Defense Lawyers Association. February 23 & 24, 2005. Dallas, TX.

2005 "Neuropsychological Evaluation." 2005 CACJ/CPDA Capital Case Defense Seminar. February 21, 2005. Monterey, CA.

2005 "Mental Retardation." CACJ/CPDA Capital Case Defense Seminar. February 21, 2005. Monterey, CA.

2004 "Developmental Aspects of Executive Functions." 2004 CACJ/CPDA Capital Case Defense Seminar. February 15, 2004. Monterey, CA.

2004 "Advanced Determination of Competency – A Case Study (Workshop)." Co-presented with John Philipsborn and Judge Michael Ryan. 2004 CACJ/CPDA Capital Case Defense Seminar. February 15, 2004. Monterey, CA.

2003 "Update on IQ Testing: Neuropsychology for the 21st Century." Paper presented with George W. Woods, M.D. at the 2003 Annual Meeting of the American Academy of Psychiatry and the Law (AAPL), October 19, 2003, San Antonio, TX.

2003 "The Subtlety of IQ Testing." 8th Annual National Federal Habeas Corpus Seminar. Administrative Office of the United States Courts and Habeas Assistance and Training Counsel. Chicago, IL.

2003 "Mental Retardation." Investigating Capital Cases Seminar. Virginia Capital Representation Resource Center. Charlottesville, VA.

2003 "Intelligence Testing in Mental Retardation." Litigation Training: Investigating and Proving Mental Retardation. Federal Defender Program of Atlanta and the Habeas Assistance and Training Counsel. Atlanta, GA.

## DISSERTATION:

"Screening for Neurotoxicity: A Comparison of the Neurobehavioral Evaluation System and the California Neuropsychological Screening Battery"

## LICENSES, QUALIFICATIONS AND CERTIFICATES:

| | |
|---|---|
| 1990-Present | State of California Licensed Psychologist (PSY11899) |
| 2010 | State of Texas Psychology Temporary License No. TLP-10-0019 |
| 2010 | State of Louisiana Temporary Registration (LA R.S.37:2365.D) |
| 2009-2010 | State of Washington Psychology Permit (TE 60072389) |
| 2007-Present | Virginia Qualified Forensic Evaluator |
| 2006 & 2007 | State of Texas Psychology Temporary License No. TLP-07-0009; TLP-07-0014 |
| 2005 | State of Oregon Psychology Permit |
| 2003-2004 | State of Washington Psychology Permit (030503) |
| 2002-2004 | State of Oregon Psychology Permit (LP 077) |
| 2001-2002 | State of Washington Psychology Permit (010903) |
| 1999-2000 | State of Washington Psychology Permit (990903) |
| 1992-1994 | Qualified Medical Examiner / Psychology (State of California Industrial Medical Council # 009321) |

## HOSPITAL PRIVILEGES:

| | |
|---|---|
| 2000-2003 | Doctors Medical Center – San Pablo Campus |
| 1991-2003 | Doctors Medical Center – Pinole Campus |
| 1992-1997 | East Bay Hospital, Richmond, CA. |
| 1993-1995 | First Hospital of Vallejo |

## PROFESSIONAL AFFILIATIONS:

| | |
|---|---|
| International: | Member, International Neuropsychological Society (2004-present) |
| National: | Member, American Psychological Association (1988-present). |
| | Member, Division 33 (Intellectual and Developmental Disabilities) |
| | Member, Division 40 (Clinical Neuropsychology) |
| | Member, Division 41 (American Psychology - Law Society) |
| | Member, National Academy of Neuropsychology (1995-present) |
| | Associate Member /1983-1994 |
| | Member, the Reitan Society (1998-2006) |
| | Member, American Association on Intellectual and Developmental Disabilities (2007-present) |
| | Member, Society for Personality Assessment (2009-present) |

REFERENCES ON REQUEST

# JURAT

**State of California** )
**County of** Contra Costa )

**Subscribed and sworn to (~~or affirmed~~) before me on this** 17th **day of** February,
**20**12, **by** Dale G. Watson,
**personally known to me or proved to me on the basis of satisfactory evidence to be the person~~(s)~~ who appeared before me.**

RESHMINI DEALMEIDA
COMM. #1866683
Notary Public - California
Contra Costa County
My Comm. Expires Oct. 27, 2013
NR01

**(Seal)**

RDealmeida
**Notary Signature**

**DESCRIPTION OF ATTACHED DOCUMENT:**

Title or Type of Document: Death Penalty Case - Affidant of Dale G. Watson, P.h.D.
Date of Document: No Date
No. of Pages 38

To order supplies, please contact McGlone Insurance Services, Inc. at (916) 484 0804.