**Exhibit 1A**

**Dale G. Watson, Ph.D.**
***Clinical & Forensic Neuropsychology***
***3377 Deer Valley Road, PMB 310***
***Antioch, CA 94531***
***Office: 866-536-5301, Fax: 925-757-3690***
***Email: watson.dale@comcast.net***

---

**December 13, 2010**

**Amy Harwell, Assistant Federal Public Defender**
**Michael Passino, Assistant Federal Public Defender**
**Office of the Federal Public Defender**
**810 Broadway**
**Suite 200**
**Nashville, TN 37203**

**Re: James Dellinger**

**Dear Ms. Harwell and Mr. Passino:**

At your request, I have completed a comprehensive neuropsychological evaluation of your client, James Anderson Dellinger, in order to determine if any brain-related neurocognitive deficiencies, impairments, limitations, or dysfunction were present. As you are aware, Mr. Dellinger is currently incarcerated at the Riverbend Maximum Security Institution in Nashville, Tennessee under a sentence of death. He was convicted in separate trials, of the first-degree murders of Connie Branum and Tommy Griffin.

I evaluated Mr. Dellinger on September 15, 16, and 17, 2010 at the Riverbend Maximum Security Institution in Nashville, Tennessee. The evaluation procedures included a clinical interview and administration of a battery of instruments including: the *Test of Memory Malingering (TOMM)*, the *Victoria Symptom Validity Test (VSVT), Advanced Clinical Solutions for the WAIS-IV and WMS-IV Word Choice/Effort Test, Green's Non-Verbal Medical Symptom Validity Test (NV-MSVT), Test of Premorbid Functioning (TOPF), Wechsler Adult Intelligence Scale – IV (WAIS-IV), Wide Range Achievement Test – Fourth Edition (WRAT4), Conners' Continuous Performance Test (CPT II V.5), Wechsler Memory Scale – Fourth Edition (WMS-IV), California Verbal Learning Test - II (CVLT - II), Speech Sounds Perception Test, Seashore*

*Rhythm Test, Dichotic Word Listening Test, SCAN-3 for Adolescents & Adults, Boston Naming Test, Token Test, Sentence Repetition Test, Aphasia Screening Test, Sensory Perceptual Exam, Finger Localization, Judgment of Line Orientation (JOLO), Tactile Form Recognition Test, Lateral Dominance Exam, Dynamometer (Grip Strength), Grooved Pegboard Test, Finger Tapping Test, Tactual Performance Test (attempted), Digit Vigilance Test, Trailmaking A & B, Color Trails Test, Wisconsin Card Sorting Test (WCST), Booklet Category Test, Delis-Kaplan Executive Function System (D-KEFS) (Verbal Fluency, Design Fluency, Color-Word Interference Test, Twenty Questions Test, Tower Test, Proverb Test), Advanced Clinical Solutions for the WAIS-IV and WMS-IV Social Cognition Test,* and the *Beck Depression Inventory – II (BDI-II).*

In addition, I have reviewed the following records regarding Mr. Dellinger:

1) Sevier County Department of Education records for James Dellinger.
2) Neuropsychological Evaluation of James Dellinger by Peter B. Young, Ph.D., 5/13/1995.
3) Test protocols administered by Peter B. Young, Ph.D.
4) Trial Testimony of Peter B. Young, Ph.D.
5) Report of R. Bruce McCoy, M.A., Psychological Examiner, and Diana L. McCoy, Ph.D., Supervising Psychologist regarding James Dellinger, 1/2/1992.
6) Report of Rokeya S. Farooque, M.D., and Amin Azimi, Ed.D., Forensic Services Outpatient Evaluation of James Dellinger, September 15, 1993.
7) Psychoeducational Report prepared by Sidney G. Hall, Psychological Examiner, 12/7/1992.
8) TOMIS Classification Psychological Summary, prepared by Phillip King, 4/1/1993.
9) Signed/Draft Declaration of Stephen Greenspan, Ph.D., Psychological Consultant, December 10, 2010.

Based upon my review of records, a clinical interview of the petitioner and the results of this comprehensive neuropsychological battery I have formed opinions regarding Mr. Dellinger's intellectual and neuropsychological functioning that I hold to a reasonable degree of professional certainty. More specifically, I have been asked to determine the impact of Mr. Dellinger's intellectual and neuropsychological on his capacity to develop and file claims relevant to his criminal appeals during the

period before the spring, 2007, when the statute of limitation expired. Furthermore, I have been asked to render an opinion whether Mr. Dellinger meets the relevant standards for an Intellectual Disability (Mental Retardation). These opinions and the basis for these opinions are set forth below.

## INTELLECTUAL DISABILITY

Mental Retardation, which is now referred to as Intellectual Disability, has been defined by both the American Association on Intellectual and Developmental Disabilities (AAIDD),[1] and the American Psychiatric Association (APA).[2] These definitions involve a three-pronged criterion set including 1) significantly subaverage general intellectual functioning, 2) concurrent deficits in adaptive functioning, and 3) these deficits manifested prior to the age of 18.

***Significantly Subaverage General Intellectual Functioning:***

Significant limitations in intellectual functioning are met by "an IQ score that is approximately two standard deviations below the mean, considering the standard of error of measurement for the specific assessment instruments used and the instruments' strengths and limitations."[3] DSM-IV notes, "...there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65-75."[4] Thus, a Wechsler IQ

---

1 American Association of Intellectual and Developmental Disabilities, *Intellectual Disability: Definitions, Classification, and Systems of Supports* ("AAIDD 2010") 6 (11th ed. 2010) ("Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.")

2 American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") 41-48 (4th ed. text rev. 2000)

3 AAIDD 2010 at 27.

4 DSM-IV-TR, p. 41.

score of 70 falls two standard deviations below the mean,[5] and the overall standard error of measurement for the WAIS – IV is 2.16.[6] A score of 70 is best understood not as a precise cut-off measurement, but as a range of scores based upon the standard error of measurement.

In reviewing an individual's IQ finding it is of critical importance to consider the so-called "Flynn Effect." It is known that, "Ever since the introduction of standardized IQ tests in the early 20th century, there has been a systematic and pervasive rise in IQ scores all over the world, including the United States."[7] This phenomenon has been termed the Flynn Effect after it discoverer, James Flynn. In the United States, the average gain in IQ has been about 3 points per decade. As a result, as an IQ test ages it tends to inflate, artificially and inaccurately, an individual's IQ score. For this reason, it is important to re-anchor periodically IQ tests with new normative samples. This procedure was last accomplished for the Wechsler scales with the publication of the WAIS-IV in 2008. At that time, the Flynn Effect was reaffirmed. Adjusting of IQ scores by 0.3 points per year between the collection of the normative data and the date of the test administration resets the score to the original metric in order to determine whether the score falls approximately two standard deviations below the mean.

***Adaptive Behavior:***

"Adaptive behavior" and "adaptive functioning" are terms that refer to the effectiveness with which an individual copes with the nature and social demands of his environment, as it pertains to his ability to function and maintain himself independently and his ability to meet the culturally imposed demands of

---

5 *See* DSM-IV-TR at 49 (significantly subaverage intellectual functioning is defined by "An IQ of approximately 70 or below on an individually administered IQ test.")

6 Wechsler, D. (2008). Wechsler Adult Intelligence Scale – Fourth Edition, Technical and Interpretive Manual. San Antonio, TX: Pearson, p. 45.

7 Kanaya, T., Scullin, M., & Ceci, S.J. (2003). The Flynn Effect and U.S. policies. American Psychologist, 58(10), 778.

personal independence and social responsibility.[8] The AAIDD separates adaptive behavior into three domains: conceptual skills; social skills; and practical skills.[9] Under the AAIDD standard, an individual must have significant limitations in one of the three domains in order to be diagnosed as intellectually disabled.[10]

The APA diagnostic criteria for intellectual disability are similar to the AAIDD criteria, although the criteria are defined somewhat differently. Under the APA criteria, an individual must demonstrate significant limitations in two of eleven domains, each of which are subsumed within one of the AAIDD categories: communication (conceptual skills), self-care (practical skills), home living (practical skills), social/interpersonal skills (social skills), use of community resources (practical skills), self-direction (conceptual skills), health (practical skills), safety (practical skills), functional academic skills (conceptual skills), leisure (social skills), and work (practical skills).[11]

***Age of Onset:***

The third criterion is that the deficits in intellectual functioning and adaptive behaviors manifested during the developmental period. This does not mean that an IQ score must be available pre-18 years of age. Rather, the deficits must have originated and manifested in during the developmental period.

## RELEVANT HISTORY

***Family History:***

James Dellinger was born on January 25, 1951, the son of Clyde and Janie (Floyd) Dellinger, at home in Sevier County, Tennessee. He was the sixth of eight children; including five boys and three girls. The family worked a 180-acre farm raising both food and tobacco as their "money crop." Mr. Dellinger

---

8 AAIDD at 44.

9 AAIDD at 44.

10 AAIDD at 47.

11 DSM-IV-TR at 49.

described his father as "a perfect father" whom he liked being around. Similarly, he described his mother as "a perfect momma." Though he was disciplined by a leather strop, he described it as making noise but not inflicting much damage. He related, "They'd bust your ass if needed" but then neither of them could "bust a grape."

Mr. Dellinger has primarily resided in Sevier County though he did live in Marietta, Georgia for some six years.

Mr. Dellinger has been married twice. First, at the age of 17, he married Ann Count and had three children, James, Tim and Tammy, who died at the age of 18 in an automobile accident. This marriage lasted a "couple of years." In 1980, he married Linda Buchanon, his current wife. A son from this marriage, Jamie, died at the age of 2 ½ to 3 years, when a stove turned over on top of him.

***Education:***

Mr. Dellinger was credited, for purposes of this evaluation, as having a second grade education. He reported that he began school in the first grade and may have attended for parts of four or five years. Nonetheless, he does not think that he ever passed a grade so that he may have also ended in the first grade. He was moved into the third grade row simply because of his size. His family lived off the roads and so he did not attend school when it was snowing. The school was a one-room schoolhouse. He reported that he hated school and would rather be working on the family farm.

The Official School Record for the Sevier County Department of Education in Sevierville, Tennessee showed him to have been in the third grade for three years. During the 1961-1962 school year, he was ten years old at the beginning of the school year. That year he attended fewer days than he missed; he was in school for 50 days and absent for 67. He also obtained a D- in citizenship. During the 1963-1964 school year, he was withdrawn for not returning to school. During the 1964-1965 school year, which he began at age 13 years, 7 months, when he should have been in the eighth grade, he once again repeated the third grade. Of the 69 days he was expected to be in school he only attended seven days.

Mr. Dellinger reported that each of his brothers had learning problems. He indicated that none of the

boys got out of the first grade.

***Medical History:***

Mr. Dellinger indicated that he has never been hospitalized for a head injury. He did experience one automobile crash but, even though he was dazed, he did not lose consciousness. He was also kicked by a horse and hit in the head by a two by four. He was also stunned while boxing. Despite these injuries, he denied a loss of consciousness to his recollection.

Mr. Dellinger reported that he had a history of hypertension and elevated cholesterol levels. His blood pressure has subsequently normalized. He is prescribed eye drops for glaucoma.

He denied other significant illnesses.

***Substance Use/Abuse:***

Mr. Dellinger described beginning to drink by sipping blackberry wine as early as seven or eight years old. By the time he was nine or ten years old he was working and he and his co-workers would drink a couple of cases on Friday nights after work. He did not consider himself an alcoholic saying, "I just always drank as much as I wanted and then quit. Sometimes a little more and sometimes a little less." By the time he was incarcerated he was drinking up to a fifth a day. He related that he and a friend could drink a case of beer plus a fifth of Bourbon together each day.

After a fall in which he injured his back he began drinking even more alcohol because he did not want to take pain pills.

He acknowledged having tried marijuana, xanax and valium but did not like the effects of them and never did many non-prescription drugs.

Records indicated that he had been arrested for public drunkenness several times.[12]

---

[12] Report of Rokeya S. Farooque, M.D., and Amin Azimi, Ed.D., Forensic Services Outpatient Evaluation of James Dellinger, September 15, 1993, p. 2.

***Occupational History:***

Mr. Dellinger related that he has worked primarily in construction doing many different types of jobs including electrical, plumbing, sheetrock, and roofing work. As a young boy, he worked on the family farm and, as a result, was exposed to lots of pesticides. He began doing "public work" when he was only nine to ten years old.

## RECORDS REVIEW

A report prepared by R. Bruce McCoy, M.A., Psychological Examiner, and Diana L. McCoy, Ph.D., Supervising Psychologist, dated January 2, 1992, detailed the results of a psychological evaluation conducted when Mr. Dellinger was 40 years of age. He was being evaluated after becoming disabled due to a fall while on the job. He became unable to work and developed depression. On the *Wechsler Adult Intelligence Scale – Revised (WAIS-R)* Mr. Dellinger obtained a Verbal IQ of 75, a Performance IQ of 85 and a Full Scale IQ of 79.[13] He was described as performing "in the borderline mental retardation range…"

Mr. Dellinger was evaluated on December 7, 1992, by Sidney G. Hall, a Psychological Examiner.[14] On the *WAIS-R* Mr. Dellinger obtained a Verbal IQ of 82, a Performance IQ of 99 and Full Scale IQ of 89.[15] It was noted that there was a 17-point difference between the VIQ and PIQ.

Mr. Dellinger was committed to prison and evaluated on April 1, 1993 by Phillip King. Mr. King

---

13 The WAIS-R was published in 1981 and normed between 1976 and 1980. Using 1978 as the mid-year norming date, the test would thus be about 14 years old at the time of the administration. Due to Flynn Effects, this FSIQ was more probably about 75.

14 Sidney Hall's degree is not provided in this "Psychoeducational Report," which would raise concerns regarding the level of training possessed by the examiner.

15 The Flynn adjusted score would be 85. However, the test was administered about 11 months after the previous testing and clearly was impacted by practice effects. As such, this test should be considered an outlier.

reported, "[Mr. Dellinger's] intellectual ability was estimated to be near the borderline range. This was supported by results obtained from the Revised Beta II. Scores on the WRAT/TABE are expressed in Grade Level Equivalents and are as follows: (3) Spelling; (3) Math; (3) Reading." Mr. Dellinger's score on the *Beta II* was 72, falling nominally within the borderline range.

Mr. Dellinger underwent an evaluation of competency to stand trial on September 15, 1993. Another *WAIS-R* was administered resulting in a Verbal IQ of 79, a Performance IQ of 89, and a Full Scale IQ of 83. The results were contained in the report of Rokeya S. Farooque, M.D., and Amin Azimi, Ed.D., who completed a Forensic Services Outpatient Evaluation of Mr. Dellinger, on September 15, 1993.[16] The test was administered by an unnamed MTMHI-FSD psychologist. The doctors found Mr. Dellinger competent to stand trial.

Peter B. Young, Ph.D. completed a neuropsychological evaluation of James Dellinger on March 29 and 30, 1995. Dr. Young evaluated Mr. Dellinger following his conviction in the murder of Connie Branum and prior to his trial for the murder of Tommy Griffin. He was asked to complete the evaluation as part of developing mitigation evidence in the sentencing phase of the impending trial.

Consistent with current findings, Dr. Young found Mr. Dellinger to be "essentially incapable of reading."[17] He further indicated, "This alexia limited Mr. Dellinger's academic progress to such a degree that, after the third grade, he stopped attending school. He reported that, even while in the third grade, he was continuing to work on first grade work."

Dr. Young indicated that he had been provided a copy of the *Wechsler Adult Intelligence Scale –*

---

[16] This administration of the WAIS-R occurred approximately 15 years after the test was normed. Due to Flynn Effects, this FSIQ was more probably about 78. However, given practice effects, due to the previous administration, the score could be even lower. The *WAIS-R* manual indicates that practice effects over two to seven weeks average nearly six to seven points.

[17] Report of Peter B. Young, Ph.D., 5/31/1995.

*Revised* that had been administered to Mr. Dellinger on 9/22/1993. As described above, this test was apparently administered as part of a court ordered evaluation and resulted in a Full Scale IQ of 83, a Verbal IQ of 79, and a Performance IQ of 89.[18]

Dr. Young administered the *Woodcock Johnson*, a comprehensive measure of intellectual functioning, to Mr. Dellinger. On this instrument, Mr. Dellinger obtained a Broad Cognitive Ability standard score of 72.[19] This score is the equivalent of a Full Scale IQ score. Notable sub-scores from this battery included a Long Term Retrieval score of only 52 (falling over three standard deviations from the mean of the population). Further, on the Peabody Picture Vocabulary Test-Revised, his standard score of only 61, revealed clearly impaired vocabulary – a common surrogate for verbal intelligence. Dr. Young also found him to have "abysmal capacities in reading and spelling."

On the Halstead Impairment Index, Mr. Dellinger's score of 1.0 was reflective of significant brain dysfunction. On the *Category Test* Mr. Dellinger made 100 errors – a markedly impaired score. Furthermore, on the *Tactual Performance Test,* Mr. Dellinger was markedly impaired with his dominant right hand but not the left. Dr. Young concluded that Mr. Dellinger's "contralateral dominant hemisphere, that is, his left hemisphere, are significantly compromised."[20]

Dr. Young concluded:

> [I]t seems clear that [Mr. Dellinger] is a man who has suffered cognitive difficulties throughout his life, with emotional deprivation, and perhaps even abuse, exacerbating his functional problems. It is not surprising that he has difficulty in being organized or integrated, since his left

---

18 As noted above, due to Flynn Effects this FSIQ was more probably about 78. However, given practice effects, due to the previous administration, the score could be even lower.

19 It appears that Dr. Young used the 1989 version of the Woodcock-Johnson. A Flynn adjustment would make this score about 70.

20 Young, p. 8.

hemisphere, which is most given to organizational activities, is inherently less robust.[21]

In addition, Dr. Young reported, "It seems evident that Mr. Dellinger operates intellectually somewhere between IQ scores of 72 and 83, where the mean equals 100 $\pm$ 15. Further, his fund of available information is statistically lower than these scores (61), with even greater difficulties in visual language, whether reading or writing."[22]

Dr. Young testified in Mr. Dellinger's trial and reiterated the findings of his evaluation. In particular, Dr. Young stated, "He has a lot of trouble thinking in language. And even though language is not the only way we think, it is probably the main way that we organize our thoughts and organize how we function in the world, is through language."

Finally, I have reviewed the draft evaluation of Stephen Greenspan, Ph.D. who concluded that Mr. Dellinger met the criteria for an intellectual disability. In reviewing his history, Dr. Greenspan noted that Mr. Dellinger had been in the second grade for two years and in the third grade for four years. He dropped out of school in September of 1965. He also reviewed incidents of head trauma experienced by Mr. Dellinger. These include multiple car accidents and being kicked in the forehead and left eye by a horse at age 13 or 14. He was rendered unconscious by the blow and was temporarily blind for several weeks. At the age of two Mr. Dellinger had Scarlet Fever with a very high fever. As regards adaptive behavior, Dr. Greenspan interviewed Mr. Dellinger's sister, Mary Dellinger Ramsey, a brother, Ralph Dellinger, a former employer, Jeff Dodgen, and his former wife, Annabel Stewart. Dr. Greenspan also administered subtests from the *Test of Adolescent and Adult Language, Third Edition (TOAL-3),* assessing language and speaking. Dr. Greenspan also specifically indicated that those familiar with Mr. Dellinger "described him as very gullible, dependent on others who easily led him astray and often

---

21 *Id.*

22 *Id., p. 9.*

exploited his naïve trust."[23] Dr. Greenspan concluded that Mr. Dellinger: 1) Met the clinical criterion for a diagnosis of Mental Retardation; 2) Shows evidenced of brain damage; 3) Shows impairment in the ability to process language both oral and written; 3) Is a dependent person who can be misled and manipulated; 4) Was incapable given his lawyer's repeated assurances, of questioning their ability to protect his legal interests; and 5) Was unable to represent his own interests in court.[24]

## MENTAL STATUS AND BEHAVIORAL OBSERVATIONS

James Anderson Dellinger is a 59-year-old, right-handed, Caucasian male of average build. He was in no acute distress and looked his stated age. He had very short hair and a neatly trimmed, blond mustache and goatee. At the time of the evaluation he was dressed in a T-shirt, white, prison-issued pants, and a white cap. He wore a wristwatch and had bifocals available to him. Mr. Dellinger's judgment was grossly intact, with no signs of auditory or visual hallucinations. He was oriented to the month, year, and place but not to the date. His mood was euthymic and affect was within normal limits. There were no apparent motor anomalies. Speech was of normal, tone, rate and volume and provided no indication of either tangentiality or circumstantiality.

Mr. Dellinger reported some degree of color blindness affecting the discrimination between blue and purple and between orange and yellow. He would then not appear to have the more common red-green color blindness.

For the most part Mr. Dellinger was cooperative with the examination. However, during administration of the *Tactual Performance Test (TPT)* he complained bitterly that his right hand was becoming numb and he refused to continue. He also related that he had a fractured neck that had necessitated surgery. He stated "I ain't going to hurt myself for no test" and further that the testing was useless for his case.

---

23 Signed Draft Declaration of Stephen Greenspan, December 10, 2010.

24 *Id., pps. 17-18.*

Mr. Dellinger related that he was prescribed eye drops to treat glaucoma but was then taking no other medications.

The evaluation was conducted in a small interview room at the prison. Mr. Dellinger was informed of the nature of the evaluation. He was told of the limits of attorney client privilege as applied to the results of the evaluation. With this knowledge, he agreed to proceed with the evaluation. Mr. Dellinger's hands were unrestrained and no others were present for the evaluation.

## NEUROPSYCHOLOGICAL FINDINGS

A neuropsychological evaluation assesses the behavioral expression of the functioning of an individual's brain. Medical and professional disciplines have recognized, and a long history of rigorous clinical work and research supports, the validity of neuropsychological evaluation and the ability of neuropsychological tests accurately to assess brain functioning, localize deficits within the brain, and describe the cognitive and behavioral effects of such damage or dysfunction.

A comprehensive neuropsychological assessment measures various aspects of brain functioning including intelligence, attention, concentration, working memory, speed of information processing, verbal and visual memory, expressive and receptive language, visual-spatial processing, upper motor and sensory-perceptual abilities, abstract reasoning, executive functioning (such as planning, self-monitoring, utilizing feedback, inhibition of impulses, and mental flexibility), and academic achievement. Adequate functioning in these areas allows individuals to perform effectively in their daily life, efficiently complete tasks, and respond appropriately to a variety of social situations. Impairments in any of these areas may severely affect an individual's capacities, perceptions, and behavior.

### *Effort and Validity:*

In order to insure the validity of a neuropsychological evaluation it is important to make a concurrent assessment of effort and to rule out response bias, exaggeration or malingering. Malingering is "the intentional production of false or exaggerated symptoms, motivated by external incentives." In the context of a neuropsychological evaluation an individual might malinger by deliberately performing poorly

on a battery of tests or by endorsing symptoms which are either non-existent or grossly exaggerated. Such behaviors reflect an intention to perform poorly. However, there are other mechanisms that can also interfere with optimal performance and these include a lack of interest, high levels of fatigue or internal distractibility and genuine impairment of memory and cognitive functioning. In such cases it is important to make an assessment of the factors which might be impacting test results.

Mr. Dellinger's performance on measures of effort, including the Test of Memory Malingering (TOMM), the Victoria Symptom Validity Test (VSVT), and Green's Nonverbal Medical Symptom Validity Test (NV-MSVT indicated an intention to perform well and the results were inconsistent with malingering. His performance on the Word Choice/Effort Test, and memory measures from the Wechsler Adult Intelligence Scale – IV (WAIS-IV) and the Wechsler Memory Scale – IV (WMS-IV), though below expectations for the overall clinical sample, were consistent with the results seen in individuals with an Intellectual Disability of Mild Severity.

Based on these findings, the results of the neuropsychological evaluation are judged to be valid and to accurately reflect his current cognitive and neuropsychological functioning.

***Halstead Reitan Neuropsychological Battery Summary Indices:***

The evaluation of Mr. Dellinger was built around a core battery of neuropsychological tests known as the *Halstead-Reitan Neuropsychological Battery (HRNB)*. The *HRNB* is designed to assess an array of cognitive and sensory-motor functions associated with most cortical areas of the brain. It was designed as a set of tests that, on an empirical basis, were able to accurately identify individuals with brain damage. The battery includes tests to measure problem solving, abstract thought, language, auditory processing, sensory-motor integration, sensory perception, motor strength and dexterity. The battery has been shown to discriminate between normal controls and those with brain damage with considerable accuracy. Normative data and an extensive research literature support its sensitivity and specificity to brain dysfunction. In addition to the *HRNB*, a number of more recently developed neuropsychological measures were included that allow for a more complete description of his neurocognitive abilities.

Interpretation of the *HRNB* proceeds through a sequential process of analysis: 1) the "level of performance" is examined, i.e., how does an individual's performance compare to that of normal and brain damaged individuals; 2) the protocol is examined for the presence of "pathognomonic signs," i.e., performance errors which are particularly characteristic of brain impairment; 3) discrepancies between indices of intellectual functioning and an index of impairment (Halstead Impairment Index (HII)) are identified; and 4) discrepancies in performance between the left and right sides of the body are examined.

A number of summary indices for the *HRNB* have been developed in order to facilitate decisions regarding the presence and severity of brain dysfunction. The most comprehensive of these summary measures is the *General Neuropsychological Deficit Scale (GNDS)* (Reitan and Wolfson, (1993).[25]

Mr. Dellinger's raw score on the *General Neuropsychological Deficit Scale,* a summary measure incorporating 42 measures from the HRNB, was 44 – falling within the Moderate Impairment range of neuropsychological functioning. This index score likely significantly overestimates his actual level of functioning because five of the 42 scores, each from the *Tactual Performance Test (TPT),* were not included in the index. Were this test to be included it is likely that his impairments would be rated as more severe.[26] His *Left Neuropsychological Deficit Scale (GNDS)* score, associated with the functioning of the left hemisphere, was 11, is suggestive of significant dysfunction within the left hemisphere. His *Right Neuropsychological Deficit Scale (RNDS),* modified to a minor extent because of the use of the newer *Wechsler Adult Intelligence Scale – IV,* was 1 – suggesting that there is limited indication of right hemisphere dysfunction. Again, each of these indices do not include measures from the *TPT.*

Of the four most sensitive indicators of brain dysfunction from the *HRNB, e.g.,* the *HII,* the *Booklet*

---

25 Additional summary measures, including the *Global Deficit Score (GDS)* (Heaton et al., 2004) and the *Average Impairment Rating (AIR)* were not available due to Mr. Dellinger's limited education.

26 Peter Young, Ph.D., in his 1995 evaluation of Mr. Dellinger specifically commented that the *Tactual Performance Test* was significantly impaired.

*Category Test, Trail Making B,* and the *Tactual Performance Test (TPT) Localization* score, Mr. Dellinger demonstrated severe impairment on each of the two measures that were administered (the *Category Test* and the *Trail Making Test – Part B).* Golden et al. (2000) has suggested that when two or more of these indicators are positive there is a high probability of brain dysfunction.[27]

***Intellectual Functioning:***

Mr. Dellinger has significant limitations in intellectual functioning, consistent with a diagnosis of Intellectual Disability (Mental Retardation).

Mr. Dellinger's level of intellectual functioning was assessed using the *Wechsler Adult Intelligence Scale – IV (WAIS-IV).* His performance on the *WAIS-IV* placed his overall level of intellectual function within the Extremely Low range. His Full Scale IQ (FSIQ) was 69, placing him at the 2nd percentile rank of the population. With a 95% degree of confidence Mr. Dellinger's *WAIS-IV* FSIQ can be said to fall within the range of 66 to 74.

The *WAIS-IV* assesses intelligence across several domains of cognitive ability. Interpretation of the scores may utilize either the Wechsler Four-Index Model[28] or the theoretically more complete Keith Five-Factor Model.[29] The interpretation that follows will focus on an analysis of the "Keith Factors." Mr. Dellinger's *WAIS-IV* factor scores were as follows:

---

27 Golden, C.J., Espe-Pfeifer, P., & Wachsler-Felder, J. (2000). Neuropsychological Interpretations of Objective Psychological Tests. New York: Kluwer Academic/Plenum Publishers, p. 234.

28 The four Wechsler indices are the Verbal Comprehension Index (VCI), the Perceptual Reasoning Index (PRI), the Working Memory Index (WMI), and the Processing Speed Index (PSI).

29 Lichtenberger, E. O. & Kaufman, A.S. (2009). Essentials of WAIS-IV Assessment. Hoboken, N.J.: John Wiley & Sons.

| ***Wechsler Adult Intelligence Scale – IV (WAIS – IV)*[30]** | | | | |
|---|---|---|---|---|
| ***Index/Composite*** | ***Standard Score*** | ***Confidence Range*** | ***%ile Rank*** | ***Qualitative Description*** |
| Full Scale IQ | 69 | 66-74 | 2 | Extremely Low |
| General Ability Index | 74 | 70-80 | 4 | Borderline |
| ***Index Scores*** | | | | |
| Verbal Comprehension | 78 | 73-85 | 7 | Borderline |
| Perceptual Reasoning | 75 | 70-82 | 5 | Borderline |
| Working Memory | 66 | 61-75 | 1 | Extremely Low |
| Processing Speed | 74 | 68-85 | 4 | Borderline |
| ***Keith Factor Scores*** | | | | |
| Crystallized Intelligence (Gc) | 76 | 72-82 | 5 | Borderline |
| Short-Term Memory (Gsm) | 69 | 65-77 | 2 | Extremely Low |
| Fluid Reasoning (Gf) | 78 | 73-86 | 7 | Borderline |
| Visual Processing (Gv) | 75 | 71-83 | 5 | Borderline |
| Processing Speed (Gs) | 74 | 70-84 | 4 | Borderline |

Mr. Dellinger's profile of intellectual functioning is marked by a pattern of low scores across domains. Each of the five Keith Factors measures a different cluster of cognitive abilities, derived from different combinations of subtests, and consistent with the most widely accepted model of cognitive abilities.[31] Crystallized Intelligence (Gc) measures the breadth and depth of an individual's accumulated knowledge of culture and the effective use of that knowledge. Short-Term Memory (Gsm) measures the ability to apprehend and hold information in immediate awareness and to use it within a few seconds. Fluid Reasoning (Gf) encompasses the mental operations that an individual uses when faced with a novel task that cannot be performed automatically. These latter mental operations include forming and recognizing

30 Standard Scores have a mean (average) of 100 and a standard deviation of 15. The average range for IQ scores for the population falls between 85 and 115.

31 This model, known as Cattell-Horn-Carroll theory, is viewed as the most theoretically complete model of intellectual functioning.

concepts, perceiving relationships among patterns, drawing inferences, and problem solving. Visual Processing (Gv) measures the ability to generate, perceive, analyze, synthesize, store, retrieve, manipulate, and transform visual patterns and stimuli. Processing speed (Gs) assesses the speed with which an individual can organize and process relatively simple psychomotor tasks.

As is evident from the Keith Factors, on a broad array of cognitive abilities, Mr. Dellinger's scores are similar, and each represents a normative weaknesses. His vocabulary and fund of information were limited. In addition, his ability to analyze and manipulate visual information was also limited. In particular, his working memory was impaired such that he would be expected to have difficulty focusing and holding onto simple information long enough to process that information. He was also quite slow in responding on psychomotor tasks that most individuals find quite easy.

In summary, the results of the *WAIS-IV* demonstrated that Mr. Dellinger's intellectual abilities are limited – falling overall at about the 2nd percentile rank. As such, he meets the criteria for the first prong of the diagnosis of Mental Retardation, i.e., significant deficits in intellectual abilities.

***Premorbid Functioning:***

Estimates of Mr. Dellinger's pre-morbid intellectual functioning were derived using the *Test of Premorbid Functioning (TOPF)* in combination with demographic variables. This measure uses the ability to read/pronounce words to estimate the *WAIS-IV* FSIQ and factor indices. Estimates of pre-morbid functioning permit an informed judgment of the probable level of functioning attained during the developmental period – allowing for a judgment as to whether neurocognitive impairments are acquired or developmental in nature.

Mr. Dellinger's estimated *WAIS-IV* standard score, using both his performance on the *TOPF* combined with demographic predictors, was 63. His obtained *FSIQ* was 69, which is higher than predicted but which nonetheless is still significantly impaired. Mr. Dellinger is unable to read more than a few words and could not read such words as "address," "whole," and "enough." This fact, and given that he appears to have completed no more than two years of education, would suggest that his intellectual disability is of long-

standing duration, and present during the developmental period.

***Academic Skills:***

The *Wide Range Achievement Test, 4th Revision (WRAT-4)* was administered to Mr. Dellinger to assess his academic skills. His standard scores, confidence intervals, percentile ranks, and grade equivalent levels were as follows:

***Wide Range Achievement Test – IV***
***WRAT – IV***

| ***Index/Composite*** | ***Standard Score*** | ***Confidence Range*** | ***%ile Rank*** | ***Grade Equiv.*** |
|---|---|---|---|---|
| Word Reading | 55 | 50-64 | 0.1 | K.9 |
| Sentence Comprehension | 55 | 50-63 | 0.1 | <K.0 |
| Spelling | 55 | 50-65 | 0.1 | 1.1 |
| Math Computation | 65 | 58-76 | 1 | 2.5 |
| Reading Composite | 55 | 51-61 | 0.1 | N/A |

These scores demonstrated that Mr. Dellinger has a profound inability to pronounce words, to spell and to comprehend written language. Strikingly, he has virtually no ability to decode written words. For example, he read the word "milk" as "keep," "red" as "read," and "city" as "why." He appears to be decoding as few as one letter, i.e., "k" in "milk," and "y" in "city," and then using that in his attempt to guess the word. When asked to fill in the blank in the sentence, "Dee is having a birthday party for her brother. He will be seven __________ old." he replied "so" rather than the correct "years." These results demonstrate that he has a profound dyslexia (alexia), is illiterate and cannot understand virtually any written materials. This finding clearly demonstrates an area of impaired adaptive functioning in the domain of functional academic skills.

***Attention, Learning and Memory:***

Mr. Dellinger has significant deficits in attention, a profound deficit in auditory memory abilities, and signs of consolidation deficits affecting visual memory processes.

The *Conners' Continuous Performance Test - II (CPT II V.5)*, is a computerized measure of sustained attention that assesses for the presence of inattentiveness, distractibility and impulsivity. The instrument is useful for the identification of attentional deficits such as might be found in Attention Deficit Hyperactivity Disorder (ADHD) or in some neurological conditions. Mr. Dellinger's pattern of performance revealed a high probability of his having attentional deficits consistent with either ADHD or a neurological disorder. The chances were nearly 80 out of 100 that a significant attentional disorder exists similar to those seen in the neurologically impaired. He at once responds quite slowly, even cautiously, but rather erratically in the face of changes in the level of stimulation. Given the number of abnormal scores, it is quite probable that Mr. Dellinger's attention problems are clinically significant and affect his daily life.

On a non-language based measure of auditory attention, that required him to attend to tonal patterns, the *Seashore Rhythm Test,* Mr. Dellinger's performance was mildly to moderately impaired.

This impairment of attentional processes was likewise seen on the *California Verbal Learning Test – II (CVLT – II).* This measure required him to memorize a 16-item list of words over the course of five trials. He was initially slow to acquire the words but ultimately performed in the Below Average range.

More profound levels of impairment were seen when complex aspects of memory were assessed, especially within the auditory memory domain. On the *Wechsler Memory Scale - IV (WMS – IV)* Mr. Dellinger performed significantly below expectations on measures of verbal memory but not on measures of visual memory. That is, Mr. Dellinger's verbal memory abilities were significantly and substantially poorer than would have been predicted by his IQ scores. That was not the case for measures of visual memory. His *WMS-IV* memory scores were as follows:

/

/

/

/

/

| ***Wechsler Memory Scale – IV*** ***WMS – IV*** | | | | |
|---|---|---|---|---|
| ***Index/Composite*** | ***Standard Score*** | ***WAIS-IV* GAI** | ***%ile Rank*** | ***Qualitative Description*** |
| Auditory Immediate Memory | 52 | 74 | 0.1 | Extremely Low |
| Auditory Delayed Memory | 56 | 74 | 0.2 | Extremely Low |
| Visual Immediate Memory | 92 | 74 | 30 | Average |
| Visual Delayed Memory | 95 | 74 | 37 | Average |

The *WMS – IV* scores make it apparent that Mr. Dellinger has a level of verbal memory dysfunction that is substantial for even someone of his relatively low intellectual capacity. He demonstrated significant and rare weaknesses in both auditory immediate and delayed memory abilities in comparison to the GAI of the *WAIS-IV*. Moreover, his auditory memory abilities fall at substantially less than the 1st percentile rank. Thus, he has difficulty taking in oral information presented either in associative or in paragraph formats. It is likely that his attentional deficits simply make it impossible to process even moderately lengthy oral instructions or information. This level of dysfunction may have been noticeable to those close to him.

In contrast, Mr. Dellinger is apparently able to recall visual-spatial information with greater facility. There was a 40 point discrepancy between his Auditory Immediate and Visual Immediate Indices (AII = 52; VII = 92) and a 39 point discrepancy between his Auditory and Visual Delayed Indices (ADI = 56; VDI = 95). Discrepancies of this magnitude are significant and rare, falling at only the 0.4 and 0.8 percentile ranks of the population respectively. Thus within the visual memory domain, Mr. Dellinger's abilities are average and represent a strength for him. He was able to inspect visual designs and configurations, recall and then reproduce those designs with an average degree of ability.

Even given his apparent strength in visual memory, there was reason to believe that he does have difficulties consolidating, or storing, visual information. On the *Rey Complex Figure Test (Rey CFT)*, his pattern of performance was consistent with difficulties in consolidation. That is, Mr. Dellinger has difficulties in initially storing information into memory but improves over time as memories consolidate.

His initial recall of the complex figure was quite simplified, with a performance falling at only the 2nd percentile rank, a moderately impaired performance. His performance improved, following an approximately 30 minute delay, to the 8th percentile rank, a mildly impaired performance. On a recognition trial, his performance was at the 21st percentile rank, and fell within the Below Average range. He is likely to recall information more effectively if required to increase the amount of effort directed at remembering.

***Speed of Information Processing:***

Mr. Dellinger's ability to complete simple tasks quickly is variable depending on the task requirements. For example, on the *WAIS-IV* Processing Speed Index his score of 74 suggests significant deficiencies in the speed with which he can process simple information. Furthermore, on the *Digit Vigilance Test* his speed at crossing out 6's arrayed on a page was mildly to moderately impaired (31-T). In contrast, on a measure of sequencing numbers, the *Color Trails Test,* Mr. Dellinger's performance was below average (44-T). On a similar task, *Trailmaking A,* his performance was within normal limits. Nonetheless, overall, his processing speed appears to fall within a borderline level of performance.

***Auditory Processing and Language Functions:***

Mr. Dellinger made two right-side errors on double-simultaneous auditory stimulation, accomplished with finger "rushes" at each ear. He made no errors on the right. This finding adds to the impression that Mr. Dellinger has specific impairment of the left hemisphere of the brain and represents a mild to moderate degree of impairment.

The *Dichotic Word Listening Test* assesses the ability to repeat different words presented to each ear simultaneously via stereo headphones. Mr. Dellinger's performance fell below the 5th percentile cutoff for the right ear, the left ear and both ears together (15-T; 17-T; and 9-T respectively). On each trial, he demonstrated a severe degree of impairment that was not the result of a primary hearing problem per se. Rather, he has deficits in processing auditory that make it difficult to efficiently attend to and understand language-based codes and information. Thus, he appears to have a deficit in central auditory processing with probable involvement of the temporal lobes. Individuals with this impairment will have difficulties with

taking in multiple external stimuli and organizing it. For instance, if multiple ideas are being presented on a topic, he may still be processing one idea when another is presented. He will be easily distracted. Notably, this measure is particularly sensitive to subcortical brain dysfunction.

The findings of the *Dichotic Words Test* were partially supported by the *SCAN-3 for Adolescents and Adults Tests for Auditory Processing Disorder*. Even though Mr. Dellinger's age fell outside the range of the normative sample it is worth noting that he failed two of the three screening measures for the presence of an auditory processing disorder. In particular, he had significant deficits in figure-ground discrimination. In other words, in noisy environments, he has difficulty attending to relevant information. In addition, on a task similar to the *Dichotic Word Listening Test,* when directing his attention to his left ear, he missed words being presented to the right ear. This again points to left hemisphere dysfunction and is consistent with an auditory processing disorder.

Mr. Dellinger demonstrated a severe degree of impairment (Reitan norms) on a task of recognizing the written equivalent of spoken sounds, the *Speech Sounds Perception Test*. This performance is of course consistent with his profound dyslexia (alexia).

Mr. Dellinger shows signs of multiple developmental, language-based disabilities including spelling dyspraxia, dyslexia, mild dysnomia, and dyscalculia. These disabilities are invariably associated with impairment of the dominant (usually left) hemisphere. Mr. Dellinger's performance on the *Aphasia Screening Test* reflected this significant language dysfunction. There were signs of significant dyslexia, as seen in his attempt to read the sentence, "He is a friendly animal, a famous winner of dog shows," which he read as "He is a friend, of dogs." He was also entirely incapable of spelling simple words such as "square," "cross," or "triangle." On the last word he simply said, "I believe it starts with 'T'." When asked to write the name of a clock, he said, "Starts with a K, don't know anything else." When asked to give the name of a drawing of a triangle, he replied, "A triangle, rectangle," and when asked which, he said, "Rectangle." He was likewise unable to perform simple calculations reliably (consistent with the results of the *WRAT-4)*. This dysfunction offers a clear understanding as to the reasons for Mr. Dellinger's history of school failure

and his inability to read.

Mr. Dellinger has difficulties following directions – becoming confused because a receptive language deficits. On the *Token Test,* his performance fell at the 14th percentile rank with an education-corrected raw score of 156. According to Spreen and Strauss (1998), "Scores below 157 are virtually absent in a normal adult population."[32] His errors appeared to reflect auditory comprehension deficits marked by failures to complete the tasks requested. For example, when instructed, "Pick up the red circle – no – the white square." he simply picked up the red circle. Some caution must be advised regarding these specific findings due to the unknown impact of Mr. Dellinger's blue-yellow color blindness.

On the *Boston Naming Test* Mr. Dellinger's performance fell within the Average range suggesting that he does not have significant confrontation naming deficits. Likewise, he was able to repeat sentences with an average degree of accuracy.

It is clear, based upon these results, that Mr. Dellinger has auditory processing deficits in conjunction with language-based impairments marked by apparent receptive language dysfunction, spelling dyspraxia, dyslexia, mild dysnomia, and dyscalculia. Recognizing that his repetition of sentences is intact, which is a more anterior function, it is likely that Mr. Dellinger has impairments of posterior language-related areas of the left temporal, occipital and parietal regions.

***Visual-Spatial processing:***

Mr. Dellinger made no visual errors on double-simultaneous stimulation within the visual fields.

Mr. Dellinger's drawing of simple geometric figures including a key did not display obvious distortions characteristic of constructional dyspraxia. Likewise, his copy of a complex geometric figure was reasonably accurate and without marked distortions. Constructional tasks are putatively sensitive to right-hemisphere-related disruptions of drawing ability.

---

[32] Spreen, O., & Strauss, E. (1998). A Compendium of Neuropsychological Tests. New York: Oxford University Press, p. 477.

### *Sensory and Motor Functions:*

On double-simultaneous tactile stimulation of the hands and face, Mr. Dellinger made multiple errors including four on the left side and four on the right – a severely impaired performance. He also made four errors on both the right and left hands when, on the *Tactile Finger Recognition Test,* he was required to identify which finger was touched. He made eight right-sided and six left-sided errors on the *Fingertip Number Writing* test – a severely impaired performance.

Deficits in tactile discrimination were also found on the *Finger Localization Test.* On this measure, Mr. Dellinger's pattern of performance was consistent with a severe defect characterized as a bilateral asymmetric (right hand) defect.

Fine motor speed as measured on the *Finger Tapping Test* was mild to moderately impaired but without lateralizing significance. He tapped 46 taps with the right hand and 38 taps with the left hand. Grip strength appeared to be within normal limits. Fine motor control as measured by the *Grooved Pegboard Test* was within normal limits though the relationship between the two hands implicated dysfunction of the left hemisphere.

The *Tactual Performance Test (TPT)* is a complex motor-sensory problem-solving task that taps the "mapping capacity" of the posterior hemispheres. The task requires an individual to place puzzle pieces in a form-board while blindfolded – first with the dominant hand, then the non-dominant and finally using both hands together. While completing the tasks the arms are frequently being extended at shoulder height. Mr. Dellinger's performance with the right hand was mildly to moderately impaired. However, because of pain he was unable to complete the task. As a result, the results of the *TPT* are of limited interpretive significance.

### *Executive Functions & Problem-Solving:*

Executive functions are those brain-related abilities involving the planning, initiation, monitoring, and shifting of behavior. The importance of executive functions in activities of daily living is well recognized. Duffy and Campbell (1994) noted that executive abilities "are necessary to produce context-

appropriate, goal-oriented behavior, including motivation, planning, self-regulation, and self-monitoring.[33] A deficit in any of these supervisory mental processes will result in a breakdown in autonomous behavior and render the individual incapable of generating self-determined rather than environmentally determined (stimulus bound) behavior." M.-Marsel Mesulam (2002), noting that executive function deficits affect an individual's ability to shift mental sets and perspective wrote, "The ability to shift vantage points into the future so as to predict potential consequences of contemplated behaviors would provide the essential ingredients for planning, sequencing, and foresight, faculties that become severely impaired in patients with prefrontal damage."[34] Individuals with executive dysfunction tend to become stuck in "mental ruts" – demonstrating perseverative behaviors that involve the continuance of behaviors beyond their relevance.

Mr. Dellinger has deficits in conceptual thought. The *Booklet Category Test (BCT)* is a measure of complex problem solving that is widely used as a measure of executive functioning, evaluates an individual's abstraction ability; that is, one's ability to analyze patterns in order to develop overarching principles. More specifically, the test required Mr. Dellinger to discern and identify patterns across cards containing various geometric patterns and designs, generate hypotheses about those patterns, and modify those hypotheses based on feedback I provided by telling him that he had correctly or incorrectly identified the pattern each time. This task is sensitive to brain dysfunction anywhere in the brain.

Mr. Dellinger could not form concepts or generalize the overarching principle when the details of the figures changed. Golden (1981) citing Wheeler, Burke, & Reitan (1963) reported that the Category Test

---

[33] Duffy, J.D., & Campbell, J.J. (1994). The regional prefrontal syndromes: A theoretical and clinical overview. The Journal of Neuropsychiatry and Clinical Neurosciences, 6(4), pps. 379-387, specifically p. 380.

[34] M.-Marsel Mesulam (2002). The human frontal lobes: Transcending the default mode through contingent encoding. In Donald T. Stuss and Robert T. Knight (Eds.), Principles of Frontal Lobe Function. New York: Oxford University Press, p. 22.

"has been found to be up to 90 percent effective in distinguishing between brain-damaged subjects and normal nonpsychiatric subjects."[35] Reitan and Wolfson (1993), modifying Halstead's original cutoff of 50, have suggested a cutoff score of greater than 45 as being indicative of impairment. Mr. Dellinger made more than twice this number of errors: 93 in total. This score, as reported above, places his performance in the Severe Impairment range. Mr. Dellinger was simply unable to effectively profit from the feedback provided during this test. Accordingly, Mr. Dellinger's performance on the Category Test suggests that he has significant deficits in problem solving abilities, is cognitively inflexible, and struggles to benefit and modify his behavior from environmental feedback. Further, Heaton and Pendleton (1981) further suggested, "Patients who are severely impaired on the Category Test probably should not be functioning independently in important everyday situations that are novel or complex; they could well be inaccurate in their assessment of such situations and may exercise poor judgment as a result."[36]

Mr. Dellinger also struggled to form concepts on the *Wisconsin Card Sorting Test (WCST)*. The *WCST* requires an individual to match cards from a deck of cards to one of four "key" cards – based upon the color, shape, or number of design elements on the card. For example, a card might have four blue circles on it, which might be matched to a key card with two blue crosses. Each time a choice is made the person is told whether they are correct or incorrect and in this way, most people learn to do the task and typically can complete six different sorting rules (e.g., color, shape or number completed twice). The task is particularly sensitive to perseveration, which is characteristic of some types of brain dysfunction, particularly those involving the frontal lobes of the brain.

Mr. Dellinger completed only one of the expected six categories on the *WCST* – a performance

---

35 Golden, C.J., Osmon, D.C., Moses, J.A., & Berg, R.A. (1981). Interpretation of the Halstead-Reitan Neuropsychological Battery: A Casebook Approach. New York: Grune & Stratton, P.18.

36 Heaton, R.K., & Pendleton, M.G. (1981). Use of neuropsychological tests to predict adult patients' everyday functioning. Journal of Consulting and Clinical Psychology, 49(6), 807-821.

falling between the 2nd and 5th percentile ranks, suggesting that he could not form the correct conceptual framework. However, he also struggled to maintain cognitive sets as well, becoming distracted on three occasions (6th – 10th percentile rank) so that even though he appeared to have grasped the concept he quickly lost track, shifting to another conceptual strategy. Overall, his performance was mildly impaired and did not point as much to perseveration as it did to conceptual deficits.

Mr. Dellinger's performance on the *Trailmaking B* test fell into the Severe Impairment range. However, the test was stopped after three minutes when he became bogged down due to his inability to sequence the alphabet. On the *Color Trails Test Part 2,* an analogous task not using letters, his performance was in the Mildly Impaired range and at the 10th percentile rank, suggesting that the requirement for sequencing letters on the *Trailmaking Test* did significantly impede his performance.

Mr. Dellinger was able to complete mazes, which are sensitive to visual-spatial planning deficits, with an average degree of speed. His performance on the *Neuropsychological Assessment Battery (NAB) Mazes Test* fell within the average range (45-T).

On measures from the *Delis-Kaplan Executive Function System (D-KEFS),* a battery of measures specifically designed to evaluate executive functions, Mr. Dellinger's performance was mixed. His deficits on this battery of tests were frequently the result of his previously identified deficits in reading and being color-blind. On other measures, for example, the *Tower Test,* a measure of non-verbal planning, he had an average performance (Scaled Score = 9). On the *Twenty Questions Test,* which requires verbal problem solving, he demonstrated average levels of abstraction (Scaled Score = 11) and problem solving (Scaled Score = 9). Still, verbal abstraction on the *Proverb Test* was significantly impaired (Abstraction Only Scaled Score = 2). The degree of concreteness in his thinking was typified by his explanation of the proverb, "People who live in glass houses shouldn't throw stones" – "Don't be throwin rocks if you live in a glass house - you'll get yorn torn down."

Finally, Mr. Dellinger appears to have average social cognition abilities. That is, on a measure of affect identification, the *Advanced Clinical Solutions for the WAIS-IV and WMS-IV Social Cognition Test*

Mr. Dellinger's scores fell in the lower reaches of the average range.

***Psychological Functioning:***

The items of the *Beck Depression Inventory – II (BDI – II)* were read to Mr. Dellinger by the examiner. Mr. Dellinger did endorse a sufficient number of items to suggest that he is experiencing mild levels of depression. However, this level of depression was not judged to be contributing significantly to the pattern of deficits.

## OPINIONS

The following conclusions, which I hold to a reasonable degree of professional certainty, based on the results of a comprehensive neuropsychological examination, a clinical interview of Mr. Dellinger, and a review of available records, are respectfully submitted.

1) Mr. Dellinger demonstrated clear and convincing evidence of significant brain dysfunction impacting his overall intellectual capacity, his capacity to attend, his memory abilities, executive functions, his ability to problem solve, and to perform essentially any academic task be it reading, spelling or arithmetic. He has limited capacities for planning, self-regulation, self-monitoring, forming concepts, and for maintaining cognitive sets over time. The severity of his impairments is of at least a moderate intensity, which is sufficient to cause significant problems in his day-to-day life. The findings point to a focus of impairment within the left hemisphere of the brain.
2) Mr. Dellinger thus meets the first criterion for an intellectual disability: his general intellectual functioning is significantly subaverage. As discussed above, Mr. Dellinger's Full Scale IQ score is 69. In other words, with a 95% degree of confidence Mr. Dellinger's true IQ will fall within the range of scores between 66 and 74.[37]

---

[37] This calculation is derived from the *Standard Error of the Estimate (SEE)* rather than the *Standard Error of Measurement (SEM)*. According to Wechsler (2008), "Confidence intervals calculated with

3) A review of his historical measures of intellectual functioning suggests that the most reliable measures fall within similar ranges. The following chart details these results:

| Instrument | Examiner | Date of Admin. | Estimated Date of Norming | Obtained FSIQ | Flynn Adjusted FSIQ | Practice Effect Present |
|---|---|---|---|---|---|---|
| WAIS-R | M. Vick | 12/30/1991 | 1978 | 79 | 75 | No |
| WAIS-R | S. Hall | 12/7/1992 | 1978 | 89 | 85 | Yes |
| Beta-II | P. King | 4/1/1993 | 1974 | 72 | 66 | No |
| WAIS-R | Unknown | 9/15/1993 | 1978 | 83 | 78 | Yes |
| Woodcock Johnson | Young, Ph.D. | 3/29/1995 | 1988 | 72 | 70 | No |
| WAIS-IV | Watson, Ph.D. | 9/15/2010 | 2007 | 69 | 68 | No |

A review of these findings indicates that the examinations in which practice effects were at issue consistently showed higher results. These cannot be considered reliable measures of Mr. Dellinger's intellectual capacities. Of the remaining instruments, the Beta-II is not a comprehensive measure of intellectual functioning, and though consistent with other findings, cannot be determinative, in itself. The remaining test results then range from a Flynn-Adjusted score of 68 (Watson, 2010), to 70 (Young, 1995) to 75 (1991). The latter instrument was apparently administered by a non-doctoral assistant. In sum then, these results demonstrate that Mr. Dellinger does meet prong one of the diagnosis of Mental Retardation.

4) Mr. Dellinger also meets the second criterion for a diagnosis of intellectual disability—his general intellectual functioning exists concurrently with deficits in adaptive behavior. I did not complete an assessment of adaptive functioning. Instead, I am relying, in part, on the findings of Stephen Greenspan, a foremost authority on adaptive functioning deficits in Intellectual Disabilities. Dr. Greenspan concluded that Mr. Dellinger had adaptive function deficits,

---

*SEM* are banded around the observed scores, whereas confidence intervals calculated with the *SEE* are banded around the estimated true score corrected for regression toward the mean" p. 126. Using the *SEM* in this calculation provides a range between 65 and 73.

specifically citing problems with language/communication, work, and academic skills. The results of this neuropsychological evaluation also confirm deficits in functional academic skills and language-based communication. As such, I also find Mr. Dellinger to meet the criterion for significant limitations in adaptive functioning.

5) Moreover, Mr. Dellinger's deficits are life-long and both developed and manifested during the developmental period, before the age of 18.

6) Given the above, I conclude that Mr. Dellinger has an Intellectual Disability (Mental Retardation).

7) Irrespective of the diagnosis of Mental Retardation, Mr. Dellinger's deficits precluded him from acting on his own to represent his own interests in court. He is functionally illiterate, has at least a moderate degree of brain dysfunction, impaired language skills, marked attentional deficits, significant verbal memory deficits, significantly impaired problem solving skills and thinks concretely. This combination of deficits made him entirely dependent upon counsel to represent adequately his interests.

12/13/2010

X

Dale G. Watson, Ph.D.
Clinical and Forensic Neuropsychologist