**Exhibit 2**

**STEPHEN GREENSPAN, Ph.D.**
**Psychological Consultant**

PO Box 620550
Littleton, CO 80162
WORK: (303) 948-3452
MOBILE: (720) 341-5404
E-MAIL: stephen.greenspan@gmail.com
Licenses : PSY-100295 (Nebraska; exp. 2013)
PSY636 (Tennessee; inactive)
Academic appointments:
Emeritus Prof. (Ed. Psychology): Univ. of Connecticut
Clinical Prof. (Psychiatry): Univ. of Colorado

Hiring attorney: Amy Harwell, Esq.
Deputy Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203 February 7, 2012

Re: In re James Dellinger

**AFFIDAVIT OF STEPHEN GREENSPAN, PhD**

I, Stephen Greenspan, a 70-year-old psychologist residing in Colorado, declare that everything I have written below is true and correct, to the best of my knowledge. I write this under penalty of perjury, according to the laws of Tennessee, Colorado and the United States of America.

Background

1. Mr. Dellinger is a 61-year-old Caucasian male who was convicted of two separate first degree murders, receiving a life sentence in Sevier County, and a death sentence in Blount County. He is currently residing in the A (least restrictive) unit in the State of Tennessee's Death Row at the Riverbend correctional facility in Nashville.

2. In November, 2010, I wrote a report in which I evaluated Mr. Dellinger for the purpose of an equitable tolling petition stemming from the apparent failure of his previous appellate lawyers on his capital case to follow through on a promise to assist him with meeting a Federal habeas filing deadline in the (linked) non-capital case. As I found Mr. Dellinger's cognitive limitations to be highly relevant to considering his request for relief from the missed filing deadline, I did comment in my Declaration about what I considered to be the defendant's mental retardation (MR, now to be referred to as Intellectual Disability (ID), the term I shall henceforth use). However, my report did not make the diagnosis of ID its central focus.

3. I have since learned that there will be a proceeding to address the *Atkins* issue, and I was asked to revisit my earlier report and revise it to focus solely on the matter of Mr. Dellinger's possible ID. In doing this revision, I have also taken into account some additional materials which were provided to me during the interim.

<u>Qualifications</u>

4. In the past half-dozen years, I have been qualified as a psychologist and expert on Mental Retardation and related cognitive disorders in fifteen criminal proceedings, three of them in Federal district courts (in Ohio, Idaho and Louisiana). In addition, my writings or affidavits have been heavily cited in support of rulings by Federal judges in capital proceedings in at least two other jurisdictions: Texas (in *re Yokoman Hearn*) and Maryland (in *re Earl Davis*).

5. I am a licensed psychologist in the state of Nebraska and was previously licensed in the state of Tennessee (current status: inactive). In addition to testifying in several so-called "*Atkins*" proceedings, I have been a consultant (and submitted declarations) in numerous other criminal cases. Most of my work has been at the request of defense attorneys, but I did submit one affidavit at the

request of a Federal prosecutor (in a non-capital case in Utah) and one at the request of a state court judge (in a capital case in Arizona). Furthermore, although generally hired by defense attorneys, I refuse to support their claims in over a third of the cases in which I consult.

6. I am a Clinical Professor of Psychiatry at the University of Colorado Health Sciences Center, and Emeritus (retired) Professor of Educational Psychology at the University of Connecticut. I received a Ph.D. in Developmental Psychology from the University of Rochester, and was a Postdoctoral Fellow in Mental Retardation and Developmental Disabilities at the University of California at Los Angeles' Neuropsychiatric Institute. Before moving to Connecticut, I held academic appointments at the University of Nebraska and at George Peabody College of Vanderbilt University.

7. I have been elected "Fellow" (a designation given only to the most qualified members) by the Mental Retardation and Developmental Disabilities division of the American Psychological Association and by the American Association on Intellectual and Developmental Disabilities. I was also elected to a term as President of the Academy on Mental Retardation, which is the most prestigious research organization in the field. I have published extensively on mental retardation and related disorders, with particular emphasis on "adaptive behavior."

8. I am a leading scholar in the developmental disabilities field, as reflected in my being by far the most-cited authority in both the 2002 and 2010 diagnostic manuals of the American Association on Intellectual Disabilities, which is the basis for all legal and clinical definitions of mental retardation, including Tennessee's [for the most recent manual, see Robert Schalock et al, INTELLECTUAL DISABILITIES: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS (11th Edition, 2012)].

9\.

My book WHAT IS MENTAL RETARDATION, co-edited with H. Switzky (AAMR; 2003; rev. ed. 2006) has, in a short time, become one of the most-quoted reference works in the field of mental retardation and has been described by Yale professor Edward Zigler as "the best book ever written about the definition and diagnosis of mental retardation." In 2008, AAMR recognized my contributions to the field by granting me its highest honor, the Gunnar and Rosemary Dybwad Award for Humanitarianism. In 2011, the American Psychological Association did likewise, by awarding me its John Jacobson Award for Critical Thinking relating to ID.

10\. In addition, I am considered a leading authority on gullibility, especially in people with cognitive limitations. My book ANNALS OF GULLIBILITY (2009, Praeger) is the first comprehensive work on the topic. Gullibility is a topic with obvious relevance to diagnosing ID, as reflected in the fact that AAIDD is about to publish the Diagnostic Adaptive Behavior Scale (DABS) with a number of gullibility items, all of them provided by me.

11\. <u>Materials Examined</u>

- Declaration of James Dellinger, January 2010
- Federal Rules of Civil Procedure
- Declaration of Alexis Hag, January 2010
- Declaration of Catherine Brockenborough, September 2010
- Declaration of Donald Dawson, February 2010
- Declaration of Tammy Kenned, September 2010
- Declaration of Richard Burnette, January 2010
- Education records for James Dellinger
- Education records for siblings of James Dellinger
- Neuropsychological test scores (results only) by Dr. Dale Watson, November 2010

- Neuropsychological report by Dr. Peter Young, May 1995, plus test protocols
- Report on Competency Evaluation, Middle Tennessee Mental Health Institute, November 1993
- WAIS-R IQ Scores, September 1993 (part of above?)
- Psychoeducational report by Sidney Hall, December 1992
- Psychological report by Bruce McCoy, undated
- Tennessee Disability Determination report, January 1992
- Psychological evaluation report by Dr Peggy Cantrell, undated
- Psychological evaluation and prison classification report by Phillip King, April 1993
- Cumulative Educational Summary, N.E. Correctional Center, July 1995
- Basic Education report, Riverbend Institution, September 1997
- Appeal for relief of Sevier County conviction, September 1994
- Opinions denying appeal, July 1995 and January 1996
- Habeas petition filed in US District Court, September5 2009
- Declaration by Sidney Hall, January 2012
- Biopsychosocial report by Jan Vogelsand, Lic. Soc. Worker
- Declaration by Dr. John Enloe, Sevier Schools, January 2012
- Segment from history of Sevier County by Dr. William Bruce Wheeler
- Declaration by Maralee Ramsey, sister of defendant
- Declaration by Mary Helen Dellinger, sister of defendant
- Declaration by John Albert Dellinger, brother of defendant
- Declaration by Clyde McKinley Dellinger, Jr., brother of defendant
- Declaration by George Frank Dellinger, brother of defendant
- Declaration by Ralph Edward Dellinger, brother of defendant
- Declaration by Sidney Hall, psychological examiner
- CV of "C.Malone"

12. Activities Performed

- Read all of the documents cited above
- Clinical interview with James Dellinger on November 22, 2010
- Assessed defendant's understanding of his case
- Assessed defendant's competence to assist in a habeas proceeding
- Administered suitable portions of the Test of Adolescent and Adult Language, third edition (TOAL-3)
- Adaptive behavior interviews with family, former employer and ex-wife

Definition of Mental Retardation/ Intellectual Disability

13. In my earlier report (which focused on the equitable tolling issue) I wrote "I believe that Mr. Dellinger is right at the cusp of the mental retardation category, and whether or not he qualifies for that diagnosis depends on how rigidly or flexibly one interprets the IQ cut-off. Currently, Tennessee is one of a small number of states which uses a bright line IQ ceiling of 70 points (the majority of state and federal statutes or court decisions allow for some adjustment to account for test unreliability, practice effect, and adequacy or obsolescence of test content and norms). However, it is my understanding that this bright line approach has been challenged and the Tennessee Supreme Court is considering whether to amend that policy."

14. It is my understanding that the court did subsequently rule on the matter, and that Tennessee has now joined the majority of states (and federal jurisdictions) where some degree of flexibility in the interpretation of IQ scores is recognized. As a result of this development, I revise my earlier conclusion and instead of saying that "Mr. Dellinger is right at the cusp of the mental retardation category" am now able to say that Mr. Dellinger, in my professional opinion qualifies for a diagnosis of Intellectual Disability (formerly

referred to as Mental Retardation). Before giving my reasons for so concluding, I shall provide a brief discussion of the nature and definition of Intellectual Disability (ID).

15. The governing Tennessee criminal statute (Tennessee Code Annotated § 39-13-203) defines mental retardation as follows: "(1) Significantly subaverage general intellectual functioning as evidenced by a functional IQ of 70 or below; (2) deficits in adaptive behavior; (3) the mental retardation must have been manifested during the developmental period or by age 18." I believe this definition is still operative, except as noted, the first prong (intellectual functioning) is now to be interpreted more flexibly, to take into account sources of unreliability such as norm obsolescence (the "Flynn effect"), test unreliability (standard error), and effects of repeated testing (the "practice effect").

16. The Tennessee definition is virtually identical to the constitutive definition first published in 1961 by the American Association on Mental Deficiency (AAMD) in its diagnostic manual. AAMD, which subsequently changed its name to the American Association on Mental Retardation (AAMR) and more recently to the American Association on Intellectual and Developmental Disabilities (AAIDD), retained this definition in its revised editions, most recently published in 2002 and 2010.

17. The AAMR/AAIDD definition was adopted by the American Psychiatric Association's Diagnostic and Statistical Manual in its third edition in 1980 (DSM III) and retained in its 1994 (DSM IV) and 2000 (DSM IV-TR) revisions. Minor differences between the AAMR and DSM definitions are mainly in the operational criteria (for example, the specification of the nature of adaptive behavior) and these changes mainly reflect the fact that DSM has not been revised since 2000 and is modeled, therefore, on a now-outdated 1992 edition of the AAMR manual. In the balance of this section, I shall discuss the three criteria to be used in diagnosing MR/ ID., emphasizing both the

letter and the spirit of those criteria.

18. ***The Intellectual Criterion***. MR is a disorder whose core impairment is in the area of intellectual functioning. This construct is typically measured through performance on an intelligence test, which results in a full-scale IQ score that locates an individual's functioning in relation to the mean for the general population. IQ tests are constructed so that the population mean is set at a score of 100, with a standard deviation (an index of statistical variability) of 15. The ceiling for MR is currently established by both 2010 AAIDD-11 and DSM IV-TR as "approximately two standard deviations below the population mean." The term "approximately" refers mainly to the fact that no test is fully reliable and one should take various factors into account when interpreting a test number.

19. One thing to take into account is the fact that test scores vary approximately five points around one's "true score." As two standard deviations (2 x 15) equals 30 points, the upper IQ level for meeting the intellectual criterion for MR is 75 (100 minus 30 plus 5 [the reliability index]). In addition, one should take into account factors such as practice effect (possible learning from taking a second test), changes in and adequacy of test norms (a major example of which is the so-called "Flynn effect"), and possible malingering.

20. To summarize, the phrase "approximately two standard deviations below the population mean on a standardized test of intelligence" means that one should not rely rigidly on an IQ score number, but should take into account the adequacy of the test, the nature and meaning of the norms, the context in which the test was administered, ethnic and linguistic factors, etc. This is the main use for "clinical judgment" in diagnosing MR. As noted in the book CLINICAL JUDGMENT (AAMR, 2006) by Robert Schalock and Ruth Luckasson (two of the main authors of AAMR-10), clinical judgment in diagnosing MR is not a matter of relying on intuition or gut feeling (which can be misleading, especially in unqualified clinicians) but

rather involves using test scores in a thoughtful and scientifically valid manner. A rigid reliance on a test score, without such thoughtfulness, can and often does result in "false positives" (wrongly concluding someone has MR when he does not) or "false negatives" (wrongly concluding someone does not have MR when he does).

21. The requirement that clinicians and agencies diagnosing MR interpret IQ scores flexibly is explicitly spelled out in the manuals published by the two major American scientific and medical organizations in the mental retardation field: AAIDD (which published the 2010 AAIDD-11 diagnostic manual) and the American Psychiatric Association (which published the 1994 DSM IV and the 2002 DSM IV-TR Manuals). 2010 AAIDD-11 notes:

> [The intent of the definition of intelligence] is not to specify a hard and fast cutoff point/score for meeting the significant limitations in intelligence functioning criterion of ID. Rather, one needs to use clinical judgment in interpreting the obtained score in reference to the test's standard error of measurement, the assessment instrument's strengths and limitations, and other factors such as practice effects, fatigue effects, and age of norms used . . . . The use of "approximately" reflects the role of clinical judgment in weighing the factors that contribute to the validity and precision of a decision. The term also addresses statistical error and uncertainty inherent in any assessment of human behavior. In that regard, the decision-making process cannot be viewed as only a statistical calculation . . . . A fixed cutoff for diagnosing an individual as having ID is not intended, and cannot be justified psychometrically. The diagnosis of ID is intended to reflect clinical judgment rather than an actuarial determination. The term approximately addresses statistical error and

uncertainty inherent in any assessment of human behavior. (pp. 35, 40.)

22. The 2010 AAIDD-11 manual further states that the operational definition of the intellectual deficit criterion is "an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations." (p. 27). This point is similarly emphasized in AAMR's publication, USER'S GUIDE FOR AAMR'S 2002 DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT: APPLICATIONS FOR CLINICIANS, EDUCATORS, DISABILITY PROGRAM MANAGERS AND POLICY MAKERS (October 2005) ("User's Guide") as follows: "The intellectual functioning criterion for diagnosing mental retardation is approximately two standard deviations below the mean, considering the standard error of measurement (SEM) for the specific instrument used and the instrument's strengths and limitations." (pp. 11-12).

23. The DSM IV-TR makes the same point, as seen in the following passage: "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below [using a standardized individually administered IQ test] . . . It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (*e.g.*, a Wechsler IQ of 70 is considered to represent a range of 65-75). Thus, it is possible to diagnose Mental Retardation/Intellectual Disability in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." (pp. 41-42).

24. Because in the past, clinicians often relied rigidly and mindlessly on an IQ number, and particularly failed to take into account the five-point standard error of test scores, AAMR/AAIDD, beginning in 1992 and in successive manuals, has emphasized that the Standard Error of Measurement effectively raises the range of scores that satisfy the intellectual deficit criterion. For example, AAMR's 1992 Manual, AM.

ASS'N ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORTS (9th Edition, 1992) (1992 AAMR-9) operationally defined approximately two standard deviations below the mean as "a score below 70 to 75." (p. 5). Similarly 2002 AAMR-10 noted that the standard for intellectual functioning "is approximately two standard deviations below the mean, considering the Standard Error of Measurement for the specific assessment instruments used and the instruments' strengths and limitations . . . . In effect, this expands the operational definitions of mental retardation to 75, and that score of 75 may still contain measurement error." (p. 58). This indicates that clinicians or agencies making a determination of MR solely on whether a score is below or above 70 are not engaging in acceptable practice. Raising the ceiling from 70 to 70-75 also reflected a policy decision that past manuals, in their concern to eliminate false positives, had defined the MR class too narrowly and some loosening of the criteria was needed to avoid the now-widespread problem of false negatives.

25. The 2010 AAIDD-11 manual does not use the past "70-75" wording, instead describing the IQ criterion as "approximately two standard deviations below the mean." (p. 27.) However, 2010 AAIDD-11 mandates that clinicians consider "the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations" (*id.*) and as described above, 2010 AAIDD-11 strongly decries rigid reliance on obtained scores. *Id.* at 35, 40. In addition, DSM IV-TR indicates that there are circumstances when reliance on a single "full-scale" IQ score can be misleading. *E.g.*, DSM IV-TR at 42. Specifically, it is well-known that individuals with known brain damage syndromes present a mixed pattern of intellectual competence and incompetence, and summarizing across a range of scores to obtain a single score can serve to obscure the true nature and extent of an individual's impairment. In such circumstances, one must be especially careful to go beyond just full-scale IQ and look at other (sometimes more qualitative) sources of intellectual functioning data when they are

available and useful.

26. An additional factor to take into account when looking at IQ scores is what has been generally referred to as the "Flynn Effect." Named for James Flynn who discovered it, the Flynn Effect is also known as the "phenomena of norm obsolescence."

All IQ scores report an individual's intelligence with respect to a "norm," which is based on the general intelligence of the population. A person's IQ test score, then, is not an absolute or fixed number, but rather it is a relative score that reflects a relationship between the test subject's intellectual abilities, on the one hand, and a norm tethered to the intelligence of the population generally, on the other. Flynn discovered that the intelligence of the general population (at least as it is measured on IQ tests) is gradually increasing and, as such, so are the abilities of the persons taking IQ tests. Thus, as time passes and a test's fixed norms age, any test subject's abilities increase and her scores relative to those fixed norms improve. This means that as a test instrument's norms age, the relationship of a given test subject's abilities relative to the mean (which is, after all what an IQ score reflects) becomes misleadingly inflated.

Flynn determined that for each year which passes after an IQ test is normed (norm obsolescence), individual scores are, on average, falsely inflated by 0.3 points. To correct for this effect, individual test scores are reduced by 0.3 points for every year that has passed after the test was normed. So, for example, if a person scored a 76 on IQ test 20 years after it was normed, to correct for false inflation the score would be reduced by 6 points (0.3 x 20), or to an IQ of 70. Accounting for the Flynn Effect is important in evaluating an individual test score and in comparing and evaluating a series of IQ scores on different tests (which by necessity were taken at different times, in changing circumstances, and with norms of varying ages

It should not be surprising, then, that the AAIDD standards call for Flynn adjustments in the interpretation of IQ scores. 2010 AAIDD-11 notes that "best practices require recognition of a potential Flynn effect when older editions of an intelligence test (with corresponding older norms) are used in the interpretation and assessment of an IQ score . . . . 'In cases where a test with aging norms is used, a correction for the age of the norm is warranted.'" 2010 AAIDD-11, p. 37 *quoting* User's Guide, p. 21.

27. ***The Adaptive Behavior Criterion***. For more than 45 years, AAIDD has emphasized that one cannot rely solely on IQ scores in determining whether an individual has MR. IQ test scores, particularly in the "mild" level of impairment, do not always translate to non-academic settings, and a diagnosis of MR should indicate a fairly global impairment affecting many areas of functioning. To qualify for a diagnosis of MR, one must show significant deficits in both IQ and "adaptive behavior." The current AAIDD conceptualization of adaptive behavior relies on a "tripartite model" of intelligence and adaptive functioning that I developed more than 25 years ago, and uses my work as the basis for this evaluation.

28. The 2010 and 2002 AAIDD Manual's three-domain model of adaptive behavior is an evolution of the 10-skill model in its earlier 1992 AAMR manual. The earlier 1992 AAMR-9 criterion for adaptive deficits required impairments in at least two of the following ten adaptive skills areas to satisfy the adaptive deficit criterion for MR: communication, self-care, home living, social or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, and health/safety.

29. DSM IV (published in 1994) and DSM IV-TR (text revision, published in 2000) took the 1992 AAMR definition and modified it slightly, by breaking health and safety up into separate skill areas. Thus, the DSM IV-TR requires deficits in two out of eleven adaptive skill areas, with health and safety now constituting separate skill areas. However, it is

expected that the DSM-V (which is contemplated for publication in 2013) will be modified to bring it into line with 2010 AAIDD-11, and will thus, involve two major changes: (a) substitution of the term "Intellectual Disabilities" for "Mental Retardation," and (b) substituting the tripartite (conceptual, social and practical) model of adaptive behavior with a requirement of one out of three domain deficits, for DSM's current two-out-of eleven adaptive skills deficit model.

30. The tripartite model of adaptive deficits has three parts: (a) "conceptual" adaptive skills (communicative and related academic competence); (b) "practical" adaptive skills (competence and understanding of physical or mechanical processes) and (c) "social" adaptive skills (understanding people and social processes). In determining if someone meets the Adaptive Behavior criterion, it is necessary to show significant deficits in only one of these three areas (2010 AAIDD-11). Relevant data can come from a variety of sources, including formal test scores on adaptive skills rating instruments (such as the Vineland-2 or ABAS-2) administered to informants; qualitative information gathered from affidavits, records, and informant interviews; and observation by an evaluator.

31. In establishing the possibility that individuals with MR/ID can function ably in one, or even two, of the three adaptive skill areas (or have good scores on particular items within sub-average adaptive skill areas), AAIDD wished to emphasize that having mild MR is not incompatible with being able to do many things, such as being able to drive a car, hold a job, being married, having relatively normal language and (even) committing crimes that may require some degree of planning and volition. One of the central principles of MR/ID diagnosis is the idea that "[w]ithin an individual, limitations co-exist with strengths." 2010 AAIDD-11, p. 1.

32. As already mentioned, one operational difference between 2010 AAIDD-11 and DSM IV-TR, in terms of adaptive behavior/functioning, is that the DSM uses the words "limitations" and "deficits," implying a greater degree of impairment. 2010 AAIDD-11, on the other hand, uses the words "significant deficits," implying a more substantial degree of impairment. In the DSM IV-TR, the criterion for adaptive functioning (the term that manual prefers, but which means the same thing as adaptive behavior) is defined as deficits in at least two out of eleven functional areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety. This list is derived from 1992 AAMR-9, which was published eight years before DSM IV-TR. In AAMR-9, the adaptive behavior criterion was established as deficits in 2 out of 10 adaptive skill areas (health and safety were combined into one area) or deficits in the overall composite adaptive quotient. In 2010 AAIDD-11, these ten (11 in DSM IV-TR) skill areas have been collapsed into the three adaptive behavior domains (social, practical, conceptual) mentioned above.

33. The way in which AAMR made the transition from its ten adaptive skill areas in 1992 to its three adaptive behavior domains in 2002 and 2010 was simply to take the ten areas (eleven in DSM IV-TR) and collapse them into the three domains, as follows: Conceptual Adaptive Behavior, consisting of "Communication", "Functional Academics" and "Self-Direction"; Practical Adaptive Behavior, consisting of "Community Use", "Home Living", "Health/ Safety", "Self-Care" and "Work"; and Social Adaptive behavior, consisting of "leisure" and "social."

34. One important thing to keep in mind about the 2-out-of-11 skills (or one out of three domains) of the adaptive functioning deficit, is the clear implication that a diagnosis of MR is not ruled out by evidence of any particular skill that is at or near normal levels. For example, one can work (as most people with mild MR do), drive a car, and engage in numerous other tasks. This cannot be used to rule out MR,

especially as there is not one single area of adaptive functioning deficit that (unlike IQ scores) is critical for diagnostic purposes.

35. Another important consideration is that heightened clinical judgment, requiring that the assessment of MR/ID draw from a synthesis of various sources of information, may be necessary when legal restrictions, including imprisonment, reduce the opportunity to view the individual in an unmedicated state in age-appropriate community environments. 2010 AAIDD-11, p. 99. In these cases, a clinician will need to synthesize data obtained from a broad-based assessment employing alternative assessment strategies. 2010 AAIDD-11, p. 99. In such cases, it may be necessary to integrate information from multiple sources after collecting a thorough history, standardized assessments of intelligence and adaptive deficits, and possibly additional assessments and data relevant to diagnosis. 2010 AAIDD-11, p. 100.

36. ***The Developmental Criterion***. MR is a term indicating that an individual has intellectual and adaptive impairments that first manifested during what is termed the "developmental period." The developmental period is defined as anytime between birth and age 18 (some extend the period to include gestation and entirety of one's 18th year). The purpose of this criterion is to rule out those who developed normally in childhood and adolescence, but whose impairments first manifested in adulthood, such as through a motor vehicle accident. Information about whether one meets the developmental criterion can come from a variety of sources, such as medical or school records and testimony by teachers, family members and peers.

37. One of the unresolved questions in interpreting the developmental criterion involves whether one needs test data (IQ or adaptive functioning) that meets the 70-75 standard, obtained during, or retroactively referenced to, the developmental period. The views of AAIDD are instructive in this regard. As discussed below, both the

most recent diagnostic manual produced by the AAIDD in 2010 and AAMR's User's Guide contemplate retrospective assessment, especially in *Atkins* cases, long after the end of the developmental period and conceive that such assessment may be possible despite the lack of contemporaneous diagnoses of mental retardation.

38. Under the flexible approach contemplated by these standards, all that is needed to satisfy the developmental criterion is to show that when a person qualifies as having MR as an adult, there were precursors or indicators that developed or were evident during the childhood or adolescent period. In other words, a diagnosis of MR would be inappropriate if a child was of average or above-average intellectual and adaptive functioning prior to 18, but suddenly showed a steep decline, perhaps because of some infection or injury that developed during adulthood. Outcome-based evidence, such as a child being retained in elementary school, very low academic achievement, assignment to special education, and receipt of social security disability funding should easily satisfy the developmental criterion, even in the absence of formal IQ or adaptive behavior data collected during that period.

**DOES MR. DELLINGER MEET THE THREE CRITERIA FOR A DIAGNOSIS OF MR/ID?**

39. It is my professional opinion, to a reasonable degree of scientific certainty, that James Dellinger qualifies for a diagnosis of MR/ ID under the relevant criminal statute and court decisions governing criminal proceedings in the state of Tennessee. Specifically, I believe he meets all the three prongs in the definition. These will be discussed separately.

40. Intellectual Level. In its last three diagnostic manuals (1992, 2002, 2010), the AAIDD set the IQ ceiling for the mental retardation category at 75. Tennessee law requires a "functional intelligence

quotient (I.Q.) of seventy (70) or below." Under either definition, Mr. Dellinger clearly meets prong one.

In September 2010, neuropsychologist Dr. Dale Watson obtained a full-scale IQ score of 69 on the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV). That score, even without a one point "Flynn correction" for the WAIS-IV's three years of norm obsolescence (again, something allowed in most jurisdictions), is under both the AAIDD recommended clinical ceiling of 75 and falls well below the Tennessee statutory requirement.

41. Several other IQ scores also were under or around the ceiling for diagnosing MR in Tennessee. In March 1995, psychologist Dr. Peter B. Young obtained a "Broad Cognitive Ability" score (equivalent to full-scale IQ) of 72 on the Woodcock-Johnson Cognitive Abilities Test. That score is very much in line with the prong one requirement of a score on a comprehensive individually administered intelligence measure that that is approximately two standard deviations below the general population mean of 100.

42. Dr. Young administered the Test of Non-Verbal Intelligence, 2nd edition (TONI-2) and obtained a score of 83, which is very low, but above the usual MR ceiling. However, the TONI-2 is not a comprehensive IQ measure and is, therefore, specifically excluded by the AAIDD from the list of approved tests for diagnosing MR. Furthermore, as indicated in its own test manual, there were problems with the standardization of the TONI-2 (somewhat corrected in the TONI-3) involving too few low-functioning people in the norming sample, which creates a "floor effect" which artificially inflates the scores of low-performing subjects. For that reason alone, the TONI-2 should not be used to rule out MR, and the scores on the TONI-2 in no way invalidate the much more convincing scores obtained on the WAIS-IV and the Woodcock-Johnson Cognitive Abilities Test.

43. One other IQ test needs to be mentioned, and that was a Wechsler Adult Intelligence Scale, Revised (WAIS-R). This IQ instrument was administered to Mr. Dellinger on three occasions. In 1993 the WAIS-R was administered by Middle Tennessee Mental Health. The examiner listed is "C. Malone," whose CV has been provided to me. According to her CV, at the time of the administration of the WAIS-R, Ms. Malone was a graduate student licensed as a psychological examiner. As a rule, an IQ test in a high-stakes situation should be by a licensed doctoral level psychologist (which actually requires training beyond the PhD), and even a MA level examiner is suspect, except when the person is a certified school psychologist (which actually requires a year of training beyond the MA). The full-scale score reported by Ms. Malone on the WAIS-R was 83, which is quite low, but above the ceiling for diagnosing MR. The reason why the qualifications of the examiner is relevant is because a less-trained administrator is more likely to depart from standard administration guidelines, give extra time or prompting, etc. MA or BA level examiners are also not trained in professional ethics or as guided by ethical considerations.

44. Two additional things need to be pointed out about this score, however. The first is that the WAIS-R was published in 1981 and normed in 1979, and the norms were thus 14 years out of date in 1993. A correction for the "Flynn effect" of 0.3 points per year of norm obsolescence would bring this score down by five points (14 times 0.3 is 4.8, rounded to 5 and subtracted from 83) to 78, which is very close to the ceiling of 75 noted in AAIDD manuals. A second point is that there was a very sizeable discrepancy of ten points between verbal IQ (79) and performance IQ (89) and the MR section in DSM4-TR states that where there are very sizeable verbal-performance splits, one should eschew reliance on full-scale IQ and consider that the lowest of the two summary standard scores may be the most valid indication of actual intellectual functioning level. Were that to be the case here, Mr. Dellinger's verbal score of 79 (Flynned to 74) would be the most reliable indicator of his IQ from this test

administration. As noted, above, a score of 74 is within the standard error of measurement (+/- 5) of a score indicating mental retardation under the Tennessee statute.

45. The second thing which it is critical to note regarding Mr. Dellinger's scores on the WAIS-R is that three different examiners administered the WAIS-R to Mr. Dellinger on three separate occasions in less than 2 years. In addition to the MTMHI administration discussed above at ¶48, Mr. Dellinger took the WAIS-R in December 1991 and in December 1992. The first administration of the WAIS-R in December 1991 by a psychological examiner identified as Bruce McCoy reported a full-scale score of 79. A Flynn correction would bring this down an additional four points, to 75, which is right at the upper ceiling for MR (when considering the standard error of measurement to be +/- 5 points). The second administration of the WAIS-R, in December of 1992 was by another psychological examiner, Sidney Hall. I have been provided a declaration by Sidney Hall regarding his complete inexperience in the administration of IQ tests to adults and his inexperience in the forensic arena. As a result of Mr. Hall's admissions regarding his lack of experience and qualifications, I do not place much if any weight on the scores attained by Mr. Hall.

46. Further, there is a well-established "practice effect" of five or more points occurs from the administration the same IQ test on two occasions. Because IQ scores reflect a test subject's abilities relative to the mean ability of the population in general, that score loses value if the test circumstances of the test subject are not the same as those of the group from which the norms are developed. That is to say, when a person is repeatedly administered an IQ instrument, even a person with a substantial disability will improve relative to the mean scores of the population who took it only one time. This improvement is known as "the practice effect."

47. In the present case, with the administration of the same test three times in a relatively short amount of time, the practice effect likely accounts for some portion of Mr. Dellinger's higher scores on these tests. In any case, I find the scores attained on the WAIS-R, particularly the second two administrations, to be of less value to my assessment given both the inexperience and lack of credentials of the administrators of the tests and the likely applicability of the practice effect.

48. Language is a skill area that overlaps considerably with intelligence. Mr. Dellinger would appear to have significant language deficits that are quite severe in nature. I administered four of the eight sub-scales on the Test of Adolescent and Adult Language, third edition (TOAL-3). The four sub-scales administered all involved listening and speaking, while the four that were not administered all involved reading or writing. The reason why I excluded the reading and writing-related subscales is obvious: Mr. Dellinger spent three years in grade 1, dropped out of school midway through primary school, and has never learned to read and write. Thus, if I had included all eight subscales, the overall score would be even lower than the extremely low scores that were obtained, but I would not necessarily have considered it a valid test administration.

49. As it is, the obtained pro-rated full-scale language score is extremely low: a standard score of 67, which places Mr. Dellinger below the second percentile of the population in his ability to process linguistic information. This score is in line with the standard score of 61 obtained by Dr. Peter Young in 1995 on the Peabody Picture Vocabulary Test, Revised (PPVT-R), Form L. Both of these tests indicate that Mr. Dellinger has very significant problems in processing language information, and these language deficits are in line with the low IQ scores obtained by various psychologists (the PPVT is in fact often used as a screening measure of IQ, especially with children). .

50. In sum, while there is some variability in obtained scores, it is my professional opinion to a reasonable degree of certainty that James Dellinger meets the first prong of the definition of mental retardation regarding intellectual functioning. Dr. Watson's score obtained on the WAIS-IV seems to be the most reliable indicator of Mr. Dellinger's functional IQ, though it appears that all the reliable scores congregate around the score of 70. For the reasons discussed below in regards to Mr. Dellinger's adaptive deficits, and in light of my clinical judgment, it is my opinion to a reasonable degree of certainty that James Dellinger has "significantly subaverage intelligence as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below" (Tenn. Code Ann. 39-13-203(a)(1)) and that he demonstrates significantly subaverage intelligence within the meaning of the definitions of mental retardation contained in AAIDD and DSM-IV.

51. Adaptive Behavior. Unlike for prong one, the Tennessee statute does not provide an operational definition of this second prong, does not require the use of standardized measures, and does not specify any cut-off score if a formal measure is used. Information about adaptive behavior can come from several sources: (a) use of third-party adaptive behavior rating instruments, (b) use of a "direct" test of adaptive behavior, and (c) qualitative information about strengths and deficits, coming from documents and interviews or statements by family, teachers or other percipient witnesses.

52. I attempted to use all three of the above-mentioned methods to obtain information about Mr. Dellinger's level of adaptive functioning. Because of the long elapsed time, the people I interviewed were unable to answer questions retrospectively (to before age 18) on standardized instruments. I, therefore, relied on other sources of information, including qualitative interviews. It is my professional opinion that these provided a good understanding of the defendant's adaptive strengths and limitations both before and after age 18, in spite of the absence of ABAS or Vineland standard scores.

53. One important thing to keep in mind about the adaptive behavior prong is that the various clinical manuals, and those state statutes which do provide more specific guidelines, all make clear that one can meet this second prong without having to show global deficits in all areas of functioning. Thus, the 2002 and 2010 AAIDD manuals state that one needs to show significant deficits in only one of three adaptive domains (conceptual, social or practical—a taxonomy first proposed by me over two decades ago), while the 2000 DSM4-TR requires deficits in only two out of eleven adaptive skill areas.

54. The reason for not requiring global overall impairment in adaptive behavior is that for individuals with "mild" MR (by far the largest category) there are many roles and skills that people with MR can demonstrate, and one typically finds a mixed pattern of competence and incompetence. Thus, it is not proper to point to an isolated behavior or role that a subject can perform and say that it rules out a diagnosis of MR. In fact, there is no specific area of adaptive functioning that rules a diagnosis of MR in or out. But there is a requirement for some evidence of adaptive deficits, and the expectation is that these will be the kinds of deficits that are logically connected to problems in thinking and problem-solving, which go to the heart of what MR is all about.

55. I conducted interviews in November 2010 with two of Mr. Dellinger's siblings, (his younger brother Ralph Dellinger and his older sister Mary Ramsey), with his first wife (Annabel Stewart, who married him when Mr. Dellinger was 17 and, thus, knew him during the developmental period) and with a former supervisor and friend (Jeff Dodgen, the son of the owner of Dodgen construction, where Mr. Dellinger worked in the late 1980's). The two siblings were not good informants as they could not answer questions with any degree of confidence or specificity (the sister, in fact, barely was able to focus or answer any questions, and I mercifully ended the interview after less than 30 minutes had elapsed).

56. The other two informants were quite helpful, however, even though my interview with Mr. Dodgen focused mainly on work-related competencies. The picture that emerged of Mr. Dellinger was that of someone with very significant adaptive deficits, both before and after the age of 18. Although Mr. Dellinger was able to hold a job (as is true of many people with mild MR), he was severely limited in the kinds of tasks he could perform. He was basically an unskilled helper who could not perform tasks with any degree of complexity. He often did not learn from either experience or teaching, as in his inability to heed advice as to how to walk safely on a roof, an inability which eventually got him banned from being on roofs. Mr. Dellinger was very aware of his limits (such as an inability to make required measurements), and often opted out of performing work tasks that most people in construction easily mastered. Thus, while Mr. Dellinger was able to hold a job from a boss who took a benevolent interest in him, he exhibited significant limitations of judgment and knowledge, and these limitations are certainly congruent with mild MR.

57. The interview with Mr. Dellinger's first wife, Annabel Stewart, was extremely informative. The picture that emerged was someone who functioned almost as a child in a grown-up body, as Mr. Dellinger could not do many of the tasks one would expect of a young adult. Particularly relevant to my task here is that Mr. Dellinger was described as very gullible, dependent on others who led him easily and often exploited his naïve trust. Gullibility (defined sometimes as "naïve trust") is a very common characteristic of people with intellectual impairments [see S. Greenspan, G. Loughlin & R. Black, (2009). Credulity and gullibility in persons with mental retardation. In L.M. Glidden (Ed.), International Review of Research in Mental Retardation , Vol. 24, pp. 101-135]. Gullibility reflects an inability to understand complexity and a compensation for that inability by adopting a personality style of passively going along with actions suggested by others. Such a dependent follower mentality provides

an easy way of dealing with unknown situations and it often works well.

58. However a key to surviving in complex situations is the ability to recognize occasions when trust is not justified. Mr. Dellinger appears to lack this ability, and my reason for this conclusion stems mainly from my interview with Annabel Stewart, who described for me many occasions where Mr. Dellinger was unable to see through deception or to exercise good judgment in potentially risky situations.

59. In my interview with Mr. Dellinger, following a structured interview format that focused on understanding of appellate issues in a capital proceeding, Mr. Dellinger showed some real limitations, which are in line with Ms. Stewart's observations. The defendant indicated that it is his policy to always trust others (a common compensatory mechanism for people with ID), including his attorneys, although he now seems to understand that his earlier appellate attorneys dropped the ball in meeting a critical filing deadline.

60. It is my professional opinion to a reasonable degree of certainty that James Dellinger meets the second prong of the definition of mental retardation, regarding adaptive deficits. It is my opinion to a reasonable degree of certainty that he demonstrates "deficits in adaptive behavior" within the meaning of Tenn. Code Ann. 39-13-203(a)(2)), and the definitions of adaptive deficits contained in AAIDD and DSM-IV.

61. Developmental Onset. The third diagnostic prong is referred to as the "developmental" or "age-of-onset," criterion and states that the onset of cognitive and adaptive impairments had to have first become evident during the childhood or adolescence period. The intent of this prong is to rule out individuals with average or above average intelligence who suffer an accident in their 20's and become brain injured and cognitively impaired. Such individuals would

experience dementia but they would not be eligible for a diagnosis of MR.

62. In order to satisfy prong three, it is not necessary to show that an individual had ID, or was diagnosed with ID, during the pre-18 period. That is because such identification depends to a large extent on the time period or location in which one resided, the existence of educational or other services, the presence of knowledgeable and motivated family members or advocates, etc. Such considerations certain apply to Mr. Dellinger, as he grew up in abject poverty in an isolated region in a family where illiteracy was the norm, and in a school district which not only lacked special education services but allowed him to drop out of school without even completing third grade. This explains the almost complete absence of school records, but what few have been located give clear evidence of James Dellinger's failure to learn. The fact that Mr. Dellinger was retained in first grade twice, and that he gave evidence of adaptive incompetence in adolescence, are both strongly supportive of prong three having been met.

63. Although ID is a functional diagnosis that does not require proof of etiology (and in most cases of mild ID, specific etiology is unknown), it is helpful to see evidence of brain-based dysfunction (especially occurring during the developmental period) that could have causative significance. Virtually all of the psychologists who have evaluated Mr. Dellinger have made note of apparent brain damage and related cognitive impairments in the area of "executive functioning" (ability to plan, think strategically, manage, control and regulate oneself, seek goals, etc.). For example, Dr. Peter Young noted that "complexity is particularly difficult for Mr. Dellinger." He stated that Mr. Dellinger received an overall impairment score on the Halstead (a widely used measure of neuropsychological impairment) of one, which indicates very severe deficiency in executive functioning.

64. Causes of such likely brain damage are not always easy to pinpoint and certainly that is the case here. Unlike many cases where a subject's known history simply does not account for the deficits demonstrated, Mr. Dellinger's history is replete with possible causes of brain dysfunction. One can speculate that any number of the risk factors present in Mr. Dellinger's life, from pre-natal maternal malnutrition and his difficult birth, to his significant head injuries as a child, to his heavy consumption of moonshine liquor beginning in early adolescence, may have contributed to his disability in combination with growing up in a very deprived and under-stimulating family environment. Brain-based problems of executive functioning certainly seem to have been a severe handicapping factor affecting Mr. Dellinger's ability to regulate his behavior, plan effectively, and monitor ongoing events, such as his prior attorney's failure to meet complicated legal filing deadlines.

65. It is my professional opinion to a reasonable degree of certainty that James Dellinger meets the third prong of the definition of mental retardation, regarding age of onset. It is my opinion to a reasonable degree of certainty that Dellinger's mental retardation "manifested during the developmental period, or by eighteen (18) year of age" (Tenn. Code Ann. 39-13-203(a)(3)) and that he meets the age of onset required by the definitions of mental retardation contained in AAIDD and DSM-IV.

66. Conclusions: It is my conclusion to a reasonable degree of scientific certainty, that James Dellinger is mentally retarded/intellectually disabled under the definitions of Tennessee Code Annotated §39-13-203, the AAIDD, and the DSM-IV-TR based on my clinical judgment and significant evidence that:

(1) James Dellinger's functional IQ is below 70;
(2) That he exhibits significant deficits in his adaptive behavior; and
(3) That these manifested prior to age eighteen

I declare upon penalty of perjury under the laws of Tennessee, Colorado and the United States of America that the foregoing is true and correct.

Executed this 7th day of February, 2012

__________________________

66. Conclusions: It is my conclusion to a reasonable degree of scientific certainty, that James Dellinger is mentally retarded/intellectually disabled under the definitions of Tennessee Code Annotated §39-13-203, the AAIDD, and the DSM-IV-TR based on my clinical judgment and significant evidence that:

(1) James Dellinger's functional IQ is below 70;
(2) That he exhibits significant deficits in his adaptive behavior; and
(3) That these manifested prior to age eighteen

I declare upon penalty of perjury under the laws of Tennessee, Colorado and the United States of America that the foregoing is true and correct.

Executed this 7th day of February, 2012

Stephen Greenspan

State of Colorado
County of Jefferson
The foregoing instrument was acknowledged before me on this 7th day of February 2012
by Stephen Greenspan
who is personally known to me or has produced CO D.L 98-238-0438 as identification

Jean M. Maddox
Notary's Signature
Jean M. Maddox

My Commission Expires
06/25/2012