**Exhibit 2A**

STEPHEN GREENSPAN, Ph.D.
Psychological Consultant

PO Box 620550
Littleton, CO 80162
TEL: (303) 948-3452
FAX: (303) 948-3451
E-MAIL: stephen.greenspan@gmail.com
License: PSY-100295 (Nebraska; exp. 2013)
Academic appointments:
Emeritus Prof. (Ed. Psychology): Univ. of Connecticut
Clinical Prof. (Psychiatry): Univ. of Colorado

Hiring attorney: Amy D. Harwell
Assistant Federal Public Defender
Office of the Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203

December 11, 2010

Re: James Dellinger (3:09-cv-404)

........................................................................

DECLARATION OF STEPHEN GREENSPAN, PhD

I, Stephen Greenspan, a psychologist residing in Colorado, declare that everything I have written below is true and correct, to the best of my knowledge. I write this under penalty of perjury, according to the laws of the United States of America.

## I. Summary of Findings

James Dellinger, a 59-year-old (DOB: 01/24/1951) Caucasian male convicted of two separate first degree murders, is serving a life sentence for one conviction and a death sentence for the other. Mr. Dellinger is currently

residing on Tennessee's Death Row at the Riverbend Maximum Security Institute in Nashville.

After careful analysis and based on my expertise, I concluded that Mr. Dellinger is mentally retarded and illiterate. More specifically, Mr. Dellinger's mental functioning is significantly impaired and he has adaptive behavioral deficits in multiple areas of cognition. According to information from individuals who knew Mr. Dellinger during his childhood, these adaptive deficits manifested before James reached age 18.

Mr. Dellinger also appears to be significantly brain damaged, which has impaired his executive functioning. From his history, it seems likely the damage occurred in his early teen-age years. As a result, Mr. Dellinger has had difficulty establishing short and long-term plans, thinking abstractly, and assessing information rationally when making decisions. Although these handicaps manifest in myriad ways, it is clear that Mr. Dellinger's cognitive deficits would have compromised his ability to process information from his attorneys and would have prevented him from handling his own legal matters.

## II. Background

### a. Experience and Publications

In the past half-dozen years, I have been qualified as a psychologist and expert on Mental Retardation and related cognitive disorders in fifteen criminal proceedings, three of them in federal district courts (Ohio, Idaho and Louisiana). In addition, my writings or affidavits have been heavily cited in support of rulings by federal judges in capital proceedings in at least two other jurisdictions: Texas (Yokamon Hearn) and Maryland (Earl Davis).

I am a licensed psychologist in the state of Nebraska and was previously licensed in the state of Tennessee, though I have allowed my Tennessee license to become inactive. In addition to testifying in several Atkins proceedings, I have been a consultant (and submitted declarations) in numerous other capital and non-capital cases at the request of defense attorneys, a federal prosecutor (Utah), and at the request of a state court judge (Arizona).

I am a Clinical Professor of Psychiatry at the University of Colorado Health Sciences Center, and Emeritus Professor of Educational Psychology at the University of Connecticut. I received a Ph.D. in Developmental Psychology

from the University of Rochester, and was a Postdoctoral Fellow in Mental Retardation and Developmental Disabilities at the University of California at Los Angeles' Neuropsychiatric Institute. Before moving to Connecticut, I held academic appointments at the University of Nebraska and at George Peabody College of Vanderbilt University.

I have been elected "Fellow" (a designation given only to the most qualified members) by the Mental Retardation and Developmental Disabilities division of the American Psychological Association and by the American Association on Intellectual and Developmental Disabilities (AAIDD, formerly AAMR). I was also elected to a term as President of the Academy on Mental Retardation, which is the most prestigious research organization in the field. I have published extensively on mental retardation and related disorders, with particular emphasis on "adaptive behavior."

I am a leading scholar in the developmental disabilities field and I am the most-cited authority in both the 2002 and 2010 diagnostic manuals of the American Association on Intellectual Disabilities, which is the basis for all legal and clinical definitions of mental retardation. For the most recent AAIDD manual, see Robert Schalock et al, Intellectual Disabilities: Definition, Classification and Systems of Support (11th Edition, 2012).

My book, What Is Mental Retardation, co-edited with H. Switzky (AAMR; 2003; rev. ed. 2006), is one of the most referenced works in the field of mental retardation and has been described by Yale professor Edward Zigler as "the best book ever written about the definition and diagnosis of mental retardation." In 2008, AAMR recognized my contributions to the field by granting me its highest honor, the Gunnar and Rosemary Dybwad Award for Humanitarianism. In addition, I am considered a leading authority on gullibility, especially in people with cognitive limitations. My book Annals of Gullibility (2009, Praeger) is the first comprehensive work on that topic.

b. Materials Examined

- Declaration of James Dellinger, January 2010
- Declaration of Alexis Hoag, January 2010
- Declaration of Catherine Brockenborough, September 2010
- Declaration of Donald Dawson, February 2010
- Declaration of Tammy Kennedy, September 2010
- Declaration of Richard Burnette, January 2010

- Declaration of Annabel Stewart
- Declaration of Jeff Dodgen
- Education records for James Dellinger
- Education records for siblings of James Dellinger
- Neuropsychological test scores (results only) by Dr. Dale Watson, November 2010
- Neuropsychological report by Dr. Peter Young, May 1995, plus test protocols
- Report on Competency Evaluation, Middle Tennessee Mental Health Institute, November 1993
- WAIS-R IQ Scores, September 1993
- Psychoeducational report by Sidney Hall, December 1992
- Psychological report by Bruce McCoy, undated
- Tennessee Disability Determination report, January 1992
- Psychological evaluation and prison classification report by Phillip King, April 1993
- Cumulative Educational Summary, Northeast Correctional Center, July 1995
- Basic Education report, Riverbend Institution, September 1997
- Appeal for relief of Sevier County conviction, September 1994
- Opinions denying appeal, July 1995 and January 1996
- Habeas petition filed in federal district court, September 2009

c. Activities Performed

- Clinical interview with James Dellinger on November 22, 2010, during which I evaluated Mr. Dellinger's understanding of his case, the circumstances surrounding the missed habeas deadline, and effects of his cognitive limitations on his ability to represent himself and or to comprehend and assess information from, advice of, and promises of his counsel.
- Administered suitable portions of the Test of Adolescent and Adult Language, third edition (TOAL-3)
- Conducted adaptive behavior interviews with Mary Dellinger Ramsey (sister); Ralph Dellinger (brother); Jeff Dodgen (former employer); and Annabel Stewart (former wife) – (November 2010)

III. Issue Presented

Mr. Dellinger's current federal habeas attorneys asked me to conduct a psychological evaluation of James Dellinger and to assess his cognitive and behavioral abilities with particular emphasis on Mr. Dellinger's abilities during and prior to the relevant period (spring 2007) when his statute of limitation ran.

IV. Mental Retardation

The American Association on Intellectual and Developmental Disabilities (AAIDD, formerly AAMR) and the Diagnostic and Statistical Manual of the American Psychiatric Association, fourth edition, text revision (DSM4-TR), define mental retardation as a condition marked by significantly below-average intellect and a lack of skills necessary for daily living, both of which must manifest before age 18. Thus, when determining whether a subject has mental retardation, I focus on three factors: (1) intellectual ability; (2) adaptive behavior; and (3) developmental onset of the first two factors. Mr. Dellinger's cognitive and adaptive deficits meet the threshold requirement for the diagnosis of mental retardation under the abovementioned prevailing clinical definition. Below are descriptions of the three factors and my assessments of Mr. Dellinger with respect to each factor.

a. Intellectual Ability

To determine Mr. Dellinger's intellectual ability, I assessed his intellectual development during childhood and reviewed the history of IQ tests administered to him as an adult. IQ scores are extremely important in determining whether the prong one criterion has been met, but it must be noted that any given IQ score is an approximation of one's true IQ and IQ scores are only an approximation of one's "true intelligence." Thus, other information – quantitative and descriptive—of cognitive functioning—should be examine and the 2010 AAIDD cognitive (and its predecessors) make it clear that the usual ceiling IQ score standard of an IQ "approximately two standard deviations below the mean" (a score below the range of 70-75) is merely a guideline. In fact, the manual states clearly that nothing in the definition requires absolute or rigid application of an IQ cut-off when diagnosing MR.

Nevertheless, on the formal IQ tests, Mr. Dellinger consistently received test scores that meet the threshold ceiling (70-75) guideline for diagnosing mental retardation under the accepted clinical definition. To determine his intellectual development, I spoke with his family members who relayed detailed accounts of James as a child and who described the conditions of his childhood.

I also reviewed his educational records. The picture that emerged is of an individual who consistently exhibited low intellectual functioning and whose mental limitations were exacerbated by certain socio-environmental factors, specifically growing up in an economically deprived and under-stimulating household. Thus, I conclude that Mr. Dellinger's intellectual ability is significantly impaired and that he meets the first prong of the accepted clinical definition of mental retardation.

i. Testing History

In examining Mr. Dellinger's testing history, I examined the IQ scores provided, looking critically at the testing dates, test publication dates, and at the credentials of the test administrators.

The testing dates and test publication dates are essential for calculating the possible existence of obsolete test norms (the so-called "Flynn effect") and the resultant need to correct for any such obsolescence. The Flynn effect is a much-studied and widely-validated phenomenon, and the appropriateness of making "Flynn corrections" has been established in numerous state and federal court decisions (Davis in Maryland, Hardy in Louisiana, among others) around the U.S. It refers to the well-established fact that succeeding editions of the major intelligence tests (WAIS, WISC, Stanford-Binet) over many decades have had their norms toughened in order to correct for increasing performance of the national normative samples and in order to keep the population full-scale IQ mean at 100. This shift in performance has averaged three points per decade, regardless of the test edition. In order to ensure fairness in comparing test scores, and in order that a determination of mental retardation in a capital case (where Flynn corrections are almost universally done) is based on equitable data, the convention is to calculate the number of years elapsed between test date and test norm development (typically two years before test publication date), multiply the resulting number by 0.3, and subtract the obtained figure from the obtained full-scale IQ score.

Thus, if a subject received a score of 72 (which is already under the clinical MR ceiling of 70-75) through a test administration in 1998 of a test normed in 1986, one would multiply 12 (years of obsolescence) by 0.3 (the yearly correction factor), and subtract the resulting number (4) from 72, obtaining a Flynn-corrected full-scale IQ score of 68.

*Wechsler Adult Intelligence Scale, 4th Edition (September 2010)*

In September 2010, neuropsychologist Dr. Dale Watson obtained a full-scale IQ score of 69 on the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV). The Wechsler series of intelligence instruments has long been regarded as the "gold standard" for the assessment of IQ. The WAIS-IV is the most recent revision of this instrument, normed in 2006 and published in 2008. Additionally, I am familiar with Dr. Watson and his work, knowing Dr. Watson to be a highly trained and careful test administrator. Accordingly, because this is the most recent version of the Wechsler test, and because Dr. Watson's work is recognized as reliable, the results obtained by Dr. Watson must be accorded great weight in the approximation Mr. Dellinger's actual IQ. This IQ score clearly falls well within the AAIDD guidelines for the clinical diagnosis of mental retardation. With the recommended one point "Flynn correction" for the WAIS-IV's four years of norm obsolescence, Mr. Dellinger's score is 68.

*Woodcock-Johnson Cognitive Abilities Test (March 1995)*

Prior to the trial of this matter, in March 1995, psychologist Dr. Peter B. Young obtained a "Broad Cognitive Ability" score (equivalent to full-scale IQ) of 72 on the Woodcock-Johnson Cognitive Abilities Test, which meets the AAIDD diagnosis criterion for mental retardation.

Dr. Young also administered the Test of Non-Verbal Intelligence, 2nd edition (TONI-2) and obtained a score of 83. However, the TONI-2 is not a comprehensive IQ measure and is, therefore, specifically excluded by the AAIDD from the list of approved tests for diagnosing MR. Furthermore, as indicated in its own test manual, there were problems with the standardization of the TONI-2 (somewhat corrected in the TONI-3) involving too few low-functioning people in the norming sample, which creates a "floor effect" which artificially inflates the scores of low-performing subjects. Therefore, the TONI-2 should not be used to rule out MR, and the scores on the TONI-2 in no way invalidate the more accurate scores obtained on the WAIS-IV and the Woodcock-Johnson Cognitive Abilities Test – both of which are more reliable tests.

Each of these tests administered by Dr. Young are congruent with the full-scale IQ score obtained by Dr. Watson on the WAIS-IV, confirming the accuracy of that instrument's assessment of Mr. Dellinger's true or functional level of intelligence.

*Halstead-Reitan Neuropsychological Test Battery (March 1995)*

Virtually all of the psychologists who have evaluated Mr. Dellinger have made note of apparent brain damage and related cognitive impairments in the area of "executive functioning" (ability to plan, think strategically, manage, control and regulate oneself, seek goals, etc.). The results of the Halstead-Reitan Neuropsychological Battery (Halstead), a well-regarded test widely used to measure neuropsychological impairment, are particularly noteworthy. Mr. Dellinger scored a 1.0 on the Halstead impairment index, which indicates the highest level of neuropsychological impairment on that test.

Dr. Peter Young administered the Halstead to Mr. Dellinger. In summarizing his findings from the Halstead, Dr. Young explained that "Mr. Dellinger was able to perform at a marginally acceptable level on several of the more basic tasks, but he became quite incapable in the face of more complex tasks." Dr. Young also noted that "it is clear that . . . [Mr. Dellinger's] left hemisphere [is] significantly compromised [. . . ] It is not surprising [then] that he has difficulty in being organized or integrated, since his left hemisphere, which is most given to organizational activities, is inherently less than robust."

*Wechsler Adult Intelligence Scale Revised (WAIS-R; 1991, 1992, and 1993)*

In reviewing Mr. Dellinger's testing history, I encountered three Wechsler Adult Intelligence Scale, Revised (WAIS-R) test results. It appears that Mr. Dellinger was given the WAIS-R by three separate administrators in 1991, 1992, and 1993 and that he received scores of 79, 89, and 83, respectively. Alarmingly, it seems that each subsequent test administrator was unaware that Mr. Dellinger had taken the test previously. These test results are problematic for multiple reasons and reliance on the scores reported would be misplaced.

The fact that Mr. Dellinger was given the same test on three separate occasions in quick succession raised an immediate red flag. Proper testing protocol requires that a period of at least two years lapse between administration of a given IQ instrument. Because the goal of IQ testing (and assessment for MR in general) is to identify a subject's **typical** performance (as opposed to maximum performance), protocol prohibits allowing the subject to "learn" the test through repeated administration in a short period of time. Allowing such familiarity with the instrument, the so-called "practice effect," inevitably inflates the reported IQ score artificially. (The subject's reported IQ score is reported relative to a normed sample of subjects who did not benefit

from multiple administrations, therefore the reported score of a subject benefitting form the "practice effect" is artificially high). Here, the inflation caused by the multiple administrations of the WAIS-R in such a short period of time seriously undercuts any significance that should be accorded these scores.

The test scores are also problematic given the examiners' lack of appropriate credentials. As a rule, an IQ test in forensic setting should be administered by a licensed doctoral level psychologist (which requires training beyond a doctorate degree). Even a masters-level examiner's results are suspect, except when the examiner is a certified school psychologist (which actually requires a year of training beyond a master's degree). The qualifications of the examiner are relevant, because a less-trained administrator is more likely to depart from standard administration guidelines, give extra time or prompting, etc. Additionally, master's or bachelor's level examiners are likely not trained in professional ethics and are not as beholden to ethical considerations as a doctoral level examiner. Here, the 1991 administration of the WAIS-R was administered by M. Vick, who – as no degree was provided – appears to have been a bachelor's degree tester. The author of the report was R. Bruce McCoy, MA, who also does not appear to have specialized certification. Similarly, Mr. Dellinger's 1992 WAIS-R was administered by Sydney Hall, who was a non-doctorate level psychological examiner, and the 1993 test was given by Christine Malone, who was a graduate student.

Finally any weight which might have been accorded these scores is further diminished by the time which lapsed between the date of publication of the WAIS-R relative to the date it was administered, and the large discrepancy between Mr. Dellinger's verbal and performance IQ scores.

Here the date of publication and norming of the WASI-R relative to the date the test was administered is a problematic factor warranting discussion. All three of the WAIS-R tests administered to Mr. Dellinger were published in 1981 and normed in 1979, thus the norms were 12 years (1991 test), 13 years (1992 test), and 14 years (1993 test) out of date when applied to Mr. Dellinger's raw scores. A correction for the "Flynn effect" of 0.3 points per year of norm obsolescence would bring each reported score down. For instance, the 1991 test score of 79 would go down four points (12 times 0.3 is 3.6, rounded to 4 and subtracted from 79) to 75 – which falls within the AAIDD ceiling (70-75) for MR; the 1992 test score of 89 would go down four points (13 times 0.3 is 3.9, rounded to 4 and subtracted from 89) to 85; and the 1993 score of 83 would

go down 4 points (14 times 0.3 is 4.2, rounded to 4 and subtracted from 83) to 79.

Lastly, the sizable discrepancy between the verbal IQ scores and the performance IQ scores of each of the WAIS-R test results is significant. The DSM4-TR states that where there are sizeable verbal-performance splits; one should eschew reliance on full-scale IQ and consider that the lower of the two summary standard scores may be the most valid indication of actual intellectual functioning. On the 1991 test, Mr. Dellinger received a verbal IQ score of 75 and a performance IQ score of 85 – reflecting a ten point spread, which would ultimately mean his overall score should be considered to be around 75 (which would then have to be adjusted for norm obsolescence as discussed above).

Though I cannot place much reliance on any of the WAIS-R scores reported here due to the improper and compromised administrations as described above, the first (1991) administration of the WAIS-R (Flynn-corrected full-scale IQ of 75) clearly has greater potential to reflect Mr. Dellinger's actual IQ than the two subsequent administrations.

ii. Intellectual Development

James Dellinger's intellectual abilities are bound up in a culture of rural Appalachian poverty and, more specifically, in an immediate community where illiteracy was common and special educational services were nonexistent. Neither of Mr. Dellinger's parents could read or write, although James' father Clyde was able to sign his own name.

The influence of early environment on brain development is long lasting and it is clear that in Mr. Dellinger's case, his brain was starved for enrichment and stimulation to help "wire" connections among his brain cells. James, unfortunately, received scant stimulation as an infant and the situation improved only marginally once he enrolled in school.

Mr. Dellinger, along with his siblings, attended a one-room school house with one teacher for all grades. There was not much time for the teacher to spend individually with each grade level let alone with an individual student. Even at school, obtaining an education was not always a priority. One sibling recalls that the students would go out for lunch and instead of returning to the classroom, they would play ball for the remainder of the day.

Social and financial pressures also kept James and his siblings from attending school. Their peers made fun of their clothing and shoes, taunting that they were unclean and had lice. Moreover, the Dellinger children often had to miss school in order to fulfill farm obligations. The Dellinger family processed tobacco, a notoriously labor-intensive crop. As such, James and his siblings were responsible for planting tobacco seeds, dusting the tobacco crops with lead arsenate, and pulling off suckers from the tobacco plants – duties they performed with their bare hands. James likely ingested harmful toxins, such as lead arsenic, while playing in and around the tobacco fields as a toddler and while dusting the crops with the poison as a child. Exposure to lead arsenate would have had a detrimental effect on James' neurological development.

From reviewing James' school records it is clear that James had difficulty learning and had to repeat grades. According to James and his siblings, the teacher moved James from the first grade, in the front of the classroom, to the third grade, in the back of the classroom, because smaller younger children could not see the front board while seated behind him. James eventually dropped out of school in September of 1965; he was fourteen and had been enrolled in the third grade for four years in a row. He had also been in first grade for two years and was physically more mature than his classmates. Today, a student with such dramatic difficulty in developing intellectually would without question be receiving special education services. Furthermore, because his learning difficulties cut across all topic areas, and is reflective of low general intelligence, the most appropriate special education label would be "mental retardation."

It was around this time that James began drinking locally-made moonshine. It is well documented that alcohol consumption among children impairs crucial aspects of youthful brain development and can cause irreversible brain damage. This appears to be true in Mr. Dellinger's case.

Brain damage played a large part in Mr. Dellinger's intellectual development. However, it is not always easy to pinpoint the cause of such damages and that is certainly the case here. Below, I have analyzed some of the contributing factors, such as multiple head injuries that James sustained as an adolescent. Before James was old enough to obtain a driver's license, he ran moonshine, driving over back roads and through fields. While being chased by police, James had multiple accidents, once even rolling his car during a time when seatbelts were not required in cars. Some of these accidents could have

resulted in brain injuries that would have impaired James' executive functioning and social behavior – areas in which James has obvious impairments. Perhaps most significantly, when James was thirteen or fourteen-years-old, a horse kicked him in the forehead and left eye. The incident rendered him temporarily unconscious and left him blind in one eye for a number of subsequent weeks though he eventually regained his vision. These incidents, particularly because they occurred during childhood, likely resulted in irreparable harm to James' still developing brain. Although James' physical scars healed, the symptoms of these brain injuries (memory loss, behavioral changes, personality changes, and lack of concentration) seem to have persisted for the rest of his life.

James' lack of medical treatment for otherwise routine childhood illnesses may have also played a role in his intellectual development. The Dellingers lacked funds for doctors and thus illnesses went undiagnosed and untreated. Lack of medical treatment during childhood can cause developmental impairments which disrupt normal brain development. James, along with his siblings, did not receive medical treatment for aliments such as mumps, chicken pox, German measles, and frequent nosebleeds. When James was about two-years-old he had scarlet fever and ran a very high fever, which also went untreated. The family used home remedies which included turpentine for cuts, castor oil for various ailments, aspirin and lemonade for colds, and moonshine mixed with sugar for fevers. The fact that untreated illnesses disrupted James' development during childhood is, again, particularly relevant to James' intellectual development.

Though it is unnecessary to determine an etiology to diagnose mental retardation and indeed in the vast majority of MR cases the etiology is unknown, any of Mr. Dellinger's above-mentioned issues could have caused MR and when combined, the chances that they caused MR increase exponentially.

b. Adaptive Behavior

Information about adaptive behavior can come from several sources: (1) use of third-party adaptive behavior rating instruments; (2) use of a "direct" test of adaptive behavior; and (3) qualitative information about strengths and deficits, coming from documents and interviews or statements by family, teachers or other percipient witnesses. I relied on all three sources of information when obtaining information about Mr. Dellinger's level of adaptive

functioning. At least some of this information was obtained retrospectively to learn about his level of functioning during the "developmental" (prior to age 18) period. As mentioned previously, the definition of mental retardation includes a requirement that an individual's deficiencies originate prior to age 18. As a result of my analysis, I was able to conclude that Mr. Dellinger's deficiencies persist to the present day and thus existed during the period of his missed habeas filing deadline.

Various clinical manuals make clear that an individual can fulfill the second requirement of mental retardation (adaptive deficits) without having to show global deficits in all areas of functioning. Thus, the 2002 and 2010 AAIDD (formerly AAMR) manuals state that one needs to show significant deficits in only one of three adaptive domains: (1) conceptual, (2) social, or (3) practical. In contrast, the 2000 DSM4-TR requires deficits in two out of eleven adaptive skill areas. There are many roles and skills that people with MR can demonstrate, and one typically finds a mixed pattern of competence and incompetence among individuals with a diagnosis of mild MR (the largest category). Thus, it is improper to point to an isolated behavior or role that an individual can perform to rule out a diagnosis of MR. In fact, there is no specific area of *adaptive* functioning that is dispositive of MR. However, a diagnosis of MR requires some evidence of adaptive *deficits*. Often these deficits are associated with problems in thinking and problem-solving, which is the essence of the disability.

*Interview Subjects*

I conducted interviews in November 2010 with two of Mr. Dellinger's siblings (his younger brother Ralph Dellinger and his older sister Mary Ramsey), with his first wife (Annabel Stewart, who began dating Mr. Dellinger when he was 16-years-old), and with a former supervisor and friend (Jeff Dodgen).

I found it difficult to obtain pertinent information about Mr. Dellinger during my interviews with his two siblings, Ralph and Mary. Mary, in particular, had difficulty focusing on my questions. She appeared to not understand the nature of my inquiries and was therefore unable to provide direct responses. Similarly, Ralph could not provide detailed responses. I concluded the interview with Mary after a mere 30 minutes, which was particularly noteworthy because these forensic interviews often last a couple of hours.

I offer an explanation for Mary and Ralph's inability to provide me with candid reports about their brother. Mary and Ralph appear to have similar intellectual difficulties as James. Like James, both Mary and Ralph failed to obtain an education beyond grade school and they were exposed to many of the same socio-environmental factors that shaped James' intellectual development. Regardless, the information I was provided from other sources painted a vivid picture of the Dellinger household and circumstances surrounding James' childhood.

Mr. Dellinger's first wife, Annabel ("Annie") Stewart and Mr. Dellinger's former supervisor, Jeff Dodgen, were able to provide me with a wealth of information about James when I met with them. Annie's accounts were particularly helpful due to the fact that she began dating James when he was 16-years-old and she married him when he was 17-years-old. As noted above, to diagnose an individual as having MR, there must be evidence of impairment in intellectual and adaptive functioning prior to age 18. Likewise, Jeff Dodgen was able to provide detailed information about Mr. Dellinger in employment and social contexts. Jeff is the son of the owner of Dodgen Construction, where Mr. Dellinger worked in the late 1980's. In addition to working with Mr. Dellinger, Mr. Dodgen socialized with him outside work and later became his supervisor.

*Qualitative Information*

The picture painted of Mr. Dellinger was that of someone with very significant adaptive deficits both before and after the age of 18. Mr. Dellinger's illiteracy (he signed his name with an "X" and later memorized how to write the letters necessary for his name) seemed to further exacerbate the difficulties he encountered performing basic tasks, such as telling time, reading calendars, and phoning acquaintances – tasks that many mentally retarded individuals have trouble with. James wore a digital watch, but was unable to express time conceptually as "a quarter till or a quarter after." Mr. Dellinger could not "keep up with dates, not even his own birthday." His former wife recalled that he "couldn't point to a date on a calendar; he'd be confused as to what day of the week it was." Mr. Dellinger could not keep track of telephone numbers either. He kept a little book with a list of numbers without corresponding names. If Mr. Dellinger didn't remember which number belonged to which person, "he'd call every one of the numbers in his book until he got the right person."

As mentioned previously, Mr. Dellinger began driving before he was of legal age to obtain a license. However, when it came time for James to take a driving test, Mary noted that James' brother-in-law, Wade, took James around the day of the test to all the different traffic signs and pointed out what each one meant because James couldn't read the signs. According to Wade, James didn't drive on interstates, just on the two-way road beyond the holler where they lived. "James knew how to get to the two-way road and then back home again, but that was about it." It appears that James could not follow verbal or written directions, but if someone drove him to a nearby location, he could later get there on his own.

Mr. Dellinger exhibited similar limitations in social and interpersonal settings. His first wife described Mr. Dellinger as someone who functioned almost as a child in a grown-up body: "if I said don't jump on the bed, he would do it." Mr. Dellinger could not perform many of the tasks one would expect of a young adult – housework, saving money, opening a bank account, or setting short and long term goals. When ordering food from a restaurant, Mr. Dellinger would state what he wanted (but not from looking at the menu) or have someone read the menu to him. When the words "female" or "male" were posted on a public restroom door without the corresponding symbols, James often went into the wrong one. Annabel also recalled that Mr. Dellinger could not assess the dangerousness of engaging in risky behavior. Specifically, Annabel related an instance when James held her head underwater for a prolonged period of time at a swimming hole as a joke. "He had no idea that I would get so scared . . . I don't think he realized that I could have died." The inability to assess risk is symptomatic of impaired brain development.

James' siblings and former wife also spoke candidly about his general difficulty in stores and purchasing necessities. His former wife revealed that he did not know the face value of bills or coins and thus couldn't differentiate between a dime and a quarter. "When he needed to pay for something, he would put out his hand with some money in it and let whoever he was paying take what they wanted." On one occasion, James went to the store to purchase hair grease and purchased shampoo instead. He used the shampoo as if it were grease and only noticed it wasn't when it rained and the shampoo ran into his eyes, causing them to burn. Annabel recalled that James had trouble remembering small things, like grocery lists. "He would forget before he was out the door. I would tell him to bring milk and he'd bring bread."

With respect to work, Mr. Dellinger was only marginally employed as evidenced by his SSA wage reports, which reflect years of reported earnings under $1,000 (12/31/1976 $376.10; 12/31/1977 $891; 12/31/1978 $433; 12/31/1979 $792.25). Moreover, Mr. Dellinger "never knew how to figure out how much his paycheck was going to be – he couldn't figure out his rate of pay times the number of hours worked." When Mr. Dellinger was employed, he was assigned to doing unskilled labor, largely on construction projects. However, Mr. Dellinger was often unable to learn from either teaching or experience; his inability to learn even rudimentary skills like walking safely on the roof (after countless directions and warnings) resulted in his being removed from such projects.

Jeff Dodgen, Mr. Dellinger's employer and friend, recalled that on jobsites "you had to figure out how to explain things to James; [and you] had to be selective in how you said it. You had to give explicit instructions and usually had to repeat the instructions." Jeff was very clear about what duties James could perform: carry lumber and supplies and occasionally saw pre-marked boards. However, he was just as clear about what James could not do: measure boards, operate big equipment, or skilled carpentry work. Above all, Dodgen emphasized that Mr. Dellinger had to be monitored closely on job sites because he would often forget instructions and had to be frequently reminded of steps to take to complete a task. It appears that Mr. Dellinger was able to hold such unskilled construction jobs largely through the benevolence of his employers and friends who recognized, accepted, and accommodated his limitations. Thus, while Mr. Dellinger was able to hold employment from a boss who took a benevolent interest in him, he exhibited significant limitations of judgment and knowledge, and these limitations are certainly congruent with MR.

c. Developmental Onset.

The third developmental prong is referred to as the "developmental" or "age-of-onset," criterion and states that the onset of cognitive and adaptive impairments had to have first become evident during childhood or adolescence. The intent of this prong is to rule out individuals with average or above average intelligence who suffer an accident in their 20's or later and become brain injured and cognitively impaired. Such individuals may experience dementia but they would not be eligible for a diagnosis of MR.

It is not necessary to show that an individual was diagnosed with MR prior to turning 18-years-old to satisfy prong three. Such identification depends, to a large extent, on the time period or location in which the individual resided, the existence of appropriate special educational or other services, and the presence of knowledgeable and motivated family members or advocates, etc. In Mr. Dellinger's case, he did not have access to resources that would have identified him as MR because he grew up in an isolated region where illiteracy was common and was educated in a school system that lacked many basic educational services. James' school records give clear evidence of his inability to learn. They also reveal a child who was retained in first grade for two years and held in the third grade for four years. It appears that James merely aged out of school, rather than advancing based on mastering even the low level material required for third grade. As such, James has very clearly met the third prong of the MR definition.

V. Language Limitations

Language is a skill area separate from cognition/intelligence, although there is some overlap between the two constructs. Language, especially processing of receptive language, has obvious relevance to the matter of Mr. Dellinger's ability to understand the specific requirements of the law and the verbal assurances given to him by his attorneys. Mr. Dellinger has significant language deficits that are independent of his intellectual deficits and which may even exceed those deficits in their severity.

I administered four of the eight sub-scales on the Test of Adolescent and Adult Language, third edition (TOAL-3). The four sub-scales administered all involved listening and speaking, while the four that were not administered all involved reading or writing. The reason why I excluded the reading and writing-related subscales is obvious: Mr. Dellinger spent two years in first grade and four years in third grade, dropped out of school midway through primary school, and has never learned to read and write. Thus, if I had included all eight subscales, the overall score would be even lower than the extremely low scores that were obtained, but I would not have considered it a valid test administration.

As it is, the obtained pro-rated full-scale language score is extremely low: a standard score of 67, which places Mr. Dellinger below the second percentile of the population in his ability to process linguistic information. This score is

in line with the standard score of 61 obtained by Dr. Peter Young in 1995 on the Peabody Picture Vocabulary Test, Revised (PPVT-R), Form L. Both of these tests indicate that Mr. Dellinger has very significant problems in processing language and in making decisions based on information communicated through verbal and (by extension) written language.

Mr. Dellinger masks his inability to comprehend and engage in basic communication. In speaking with Mr. Dellinger, I noted the frequency in which he went off on tangents, particularly in response to direct questions, in an attempt to steer the conversation to a familiar topic. This was confirmed when I spoke to Annabel who noted that "James could change the subject real easy if he didn't know what you were talking about. If you were talking and he didn't understand he would start talking about something he knew." This is especially relevant as it shows Mr. Dellinger may have appeared to understand what was going on with his case, but in reality, he was likely covering for his lack of comprehension and communication skills.

## VI. Gullibility and Naïve Trust

Gullibility (defined sometimes as "naïve trust") is a very common characteristic of people with intellectual impairments [see S. Greenspan, G. Loughlin & R. Black, (2009), "Credulity and gullibility in persons with mental retardation," International Review of Research in Mental Retardation, Vol. 24, pp. 101-135]. It reflects an inability to understand complexity and a compensation for that ability by adopting a personality style of passively going along with actions suggested by others.

Each person I spoke to about Mr. Dellinger described him as very gullible, dependent on others who easily led him astray and often exploited his naïve trust. His former wife remarked that a lot of people took advantage of James. "He took people at their word." For example, a friend repeatedly sold broken down cars to James under the guise that they were "great cars" and needed only a few repairs. Instead, these cars were in such disrepair, they didn't run well enough to make it to James' home. "But James kept trusting [the friend]. This happened at least three times." Annabel also recalled that James often gave his friends money to purchase items for him. When Annabel informed him that his friends had kept significant portions of the change James was owed, James neglected to follow up with his friends.

Such naïve trust is a common characteristic of people with MR and certainly is relevant to understand why Mr. Dellinger would be so trusting of his previous attorneys. Mr. Dellinger is incapable of assessing his situation critically or independently. However a key to surviving in complex situations is the ability to recognize occasions when trust is not justified. Mr. Dellinger appears to lack this ability. He simply did not have the wherewithal to question his attorneys with respect to his filing deadline. Mr. Dellinger trusted them completely, more so than a client with average linguistic and intellectual skills would his lawyer. Instead, Mr. Dellinger's trust was akin to the way a young child has, at times, blind faith in any adult authority figure.

## VII. Conclusions

It is my conclusion to a reasonable degree of scientific certainty, that James Dellinger:

a. Has significant cognitive and adaptive deficits that manifested before age 18 and thus meets the clinical criterion for a diagnosis of mental retardation;

b. Shows evidence of brain-damage, as reflected in very significant impairment in executive functioning (ability to plan, self-regulate, and take the steps needed to attain complex goals) and his history of brain injuries sustained during childhood;

c. Shows impairment in the ability to process language, both oral and written;

d. Is a dependent person who can easily be misled and manipulated;

e. Was incapable, given his lawyers' repeated assurances, of questioning or evaluating their ability to protect his legal interests.

f. Was unable to represent his own interests in court.

I declare upon penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11th day of December, 2010

Stephen Greenspan, Ph.D.