**Exhibit 3**

# *James F. Murray, Ph.D., P.C., FAClinP, ABPP*

***Clinical and Forensic Psychology***

*Fellow, Academy of Clinical Psychology* *Diplomate, American Board of Professional Psychology*

**5401 Kingston Pike, Ste. 280**
**Knoxville, Tennessee 37919**

**Telephone:(865) 330-0191**
**Facsimile: (865) 330-3611**

## FORENSIC PSYCHOLOGICAL CONSULTATION

**Name:** **James Dellinger**

**Date of Birth:** **January 24, 1951**

Materials Reviewed

- Neuropsychological Evaluation Report by Peter Young, Ph.D., May 1995 and associated data
- Competency Evaluation Report, Middle Tennessee Mental Health Institute, November 1993
- WAIS-R IQ data, September 1993
- Psychoeducational Report by S. Hall, December 1992
- Psychological Report by B. McCoy, MA and D. McCoy, Ph.D., January 1992
- Tennessee Disability Determination Report, January 1992
- Psychological/Offender Classification Report by P. King, April 1993
- Forensic Services Outpatient Evaluation Report by R. Farooque, M.D., and A. Azimi, Ed.D., September, 1993
- Educational Summary Report, Northeast Correctional Center, July 1995
- Education Report, Riverbend Correctional Intuition, September 1997
- Psychological Consultation Report, S. Greenspan, Ph.D., December, 2010
- Neuropsychological Evaluation Report, D. Watson, Ph.D., December 2010 and associated evaluation data
- Declaration of Julia J. Tate, JD, LCSW (undated)
- Declaration of Amanda G. Sparks-Bushnell, M.D. (undated)
- Declaration of Catherine Brockenborough, September 2010

**General Observations:**

This forensic psychological consultation was conducted at the request of Amy D. Harwell, Assistant Federal Public Defender, Nashville, Tennessee. James Dellinger is a 59-year-old Caucasian male. He has been convicted of two separate first degree murders and is serving a life sentence for one of the convictions and a death sentence for the other. He is incarcerated at the Riverbend Maximum Security Institute, on Tennessee's Death Row.

According to supplied materials, Mr. Dellinger's legal representation is challenging his capacity to exercise diligence in asking his court appointed attorneys to file a document for him and then trusting them to do so. The evaluation consisted of review of submitted materials and the examiner had no direct contact with Mr. Dellinger.

**Review of records and historical material:**

Stephen Greenspan, Ph.D. has issued a report, dated 12/11/2010, in which he addressed Mr. Dellinger's cognitive and behavioral abilities as they relate to Dellinger's capacities during and prior to the spring of 2007; the period of time relevant to the identified legal issue associated with the statute of limitation expiring. Dr. Greenspan is an identified expert in the areas of mental retardation and developmental disabilities, adaptive behavior, and gullibility.

In his report, Dr. Greenspan noted what appear to be three major factors that are relevant for consideration in assessing Mr. Dellinger's general cognitive functioning as well as his capacity for "diligence" in the spring of 2007. These three factors would appear to involve Mr. Dellinger's general or overall intellectual capacity (especially as measured by IQ), his experience of environmental deprivation and environmental toxicity, and his experiencing exacerbating factors likely to have been induced by traumatic brain injury.

Dr. Greenspan reviewed and evaluated a large number of intellectual, academic, and neuropsychological assessments on Mr. Dellinger dating from 1992 through the most recent neuropsychological evaluation by Dr. Dale Watson, performed in November 2010. Dr. Greenspan noted that the obtained IQ scores from these assessments over an eighteen year period consistently meet the threshold ceiling (IQ= 70-75) for diagnosis of mental retardation using accepted clinical criteria. However, careful review of the tests and the circumstances of the testings led to the discovery of a number of factors highly likely to induce systematic error in the test scores (i.e., the reported IQ scores). First, he found that the evaluators failed to consider the impact of their utilization of obsolete test norms in the calculation of IQ scores. This factor has been identified in the research as the "Flynn effect" and Dr. Greenspan noted that this systematic error consistently inflated Mr. Dellinger's measured test IQ score above what is likely to be his "true test score".

Second, he noted that in some instances non-comprehensive and non-approved tests (e.g., the TONI-2) were used as estimates of IQ, again yielding likely overestimates of his actual IQ. Third, he noted that the WAIS-R test was administered to Mr. Dellinger in 1991, again in 1992, and again in 1993. Research has consistently identified a "practice effect" (i.e., an increase in measured IQ scores) when the subject is retested and able to use familiarity with test content or test procedures to perform better. Problematic inflation of test scores due to the practice effect can occur for periods of up to 1-2 years and research has indicated that inflation of test scores can even occur up to 9 month intervals even for head injury patients.

Dr. Greenspan also noted likely problems with the accuracy of obtained IQ test scores for Mr.

Dellinger due to the examiner's lack of appropriate credentials for assessment in crucial circumstance such as a forensic context. He noted that less-trained examiner is more likely to depart from the standardized administration procedures, give extra time for item completion, or initiate more prompting. He noted that for the 1991 administration of the WAIS-R the examiner provided no credentials and the apparent supervisor was not a licensed doctoral psychologist, the 1992 administration was by a non-doctoral examiner, and the 1993 testing was by a graduate student. The net effect of likely deviations from standardized test administration and scoring in the context of less-experienced or credentialed test administrators is decreased accuracy in measurement.

Finally, Greenspan noted that these testings display a consistent discrepancy between Verbal (VIQ) and Performance IQ (PIQ) scores (with PIQ greater than VIQ). This is partially expected as the practice effect tends to produce a more pronounced inflation of the PIQ score. In many instances, it is advocated (e.g., Diagnostic and Statistical Manual-IV-TR®) that in these instances of a substantial discrepancy between VIQ and PIQ, the clinician should consider the lower IQ as being the most valid measure of actual intellectual functioning.

Dr. Greenspan's analysis of the intellectual assessments prior to 2007 leads him to conclude that the most accurate measure of Mr. Dellinger's intellectual function is the first WAIS-R administration occurring in 1991, when adjusted, using the Flynn correction, to a Full Scale IQ score of 75. This score appears most effectively negate or minimize error likely to be induced by the factors noted above.

Dr. Greenspan also noted a number of environmental factors impacting Mr. Dellinger's cognitive development and functional capacity, independent of native intelligence. Mr. Dellinger experienced severe environmental deprivation as he grew up in Appalachian poverty, and his immediate community had high rates of illiteracy and could provide no special education services. Neither of his parents could read or write, and he attended a one-room school house in which there was one teacher to serve all grade levels. One of Mr. Dellinger's siblings reported that after lunch the students played ball and did not return to academic instruction. Even in the setting of a generally deprived community, Mr. Dellinger and his siblings were reportedly teased for their poor clothes, lack of cleanliness, and infestations of lice.

Dr. Greenspan's review of school records indicates that Mr. Dellinger had severe difficulty learning in all academic areas, repeated the first grade twice, and repeated the third grade for four consecutive years. The records suggest that grade placement often occurred irrespective of actual performance as he is identified as moving from first to third grade because he was too big for the younger children sitting behind him to see over. Dr. Greenspan concluded that his school records indicate that in the present day he would be identified as "mentally retarded" and, as such, would qualify for special education services.

Mr. Dellinger was frequently kept from school to work on the family farm. Dr. Greenspan noted that in addition to this environmental deprivation, though his farm activities as a child he was likely to have been exposed to harmful toxins though "dusting" crops with poisons. These toxic substances during childhood would have the potential to induce neurological damage beyond congenital

intellectual deficits.

Other factors also seem to have compromised his already severely impaired cognitive and functional/adaptive capacities. Dr. Greenspan noted that around fourteen years of age James Dellinger became involved with moonshine. He is reported to have begun drinking locally-made moonshine at about this age. Greenspan noted that research indicates that consumption of alcohol during childhood "impairs crucial aspects of youthful brain development and can cause irreversible brain damage." Additionally, before reaching legal age, James began running moonshine, outrunning police by driving over back roads and through fields. James is identified as being in multiple accidents, including rolling his car, during an era without seatbelts. Dr. Greenspan noted these accidents could have produced brain injuries resulting in impairments to James' executive functioning and social development. Of additional concern, at age thirteen or fourteen, he was kicked in the head by a horse. This acute head injury resulted in temporary unconsciousness and left him blind in one eye for a number of weeks. Dr. Greenspan noted that the symptoms of brain damage associated with these injuries (memory dysfunction, behavioral and personality changes, and impaired concentration) seem to have become enduring deficits for Mr. Dellinger.

DSM-IV-TR®, and other sources of established diagnostic criteria for the diagnosis of mental retardation, identify two criteria that have to be met for the diagnosis of mental retardation to be established. The first is substantially subnormal intellectual functioning. The second involves impairments in day-to-day adaptive function in such areas as communication, self-care, social/interpersonal functioning, academic performance, work, etc. Onset is identified as occurring before age 18. Based on his review of the historical, as well as the intellectual and neuropsychological assessment data on Mr. Dellinger, Dr. Greenspan concluded that his intellectual impairments existed in childhood, that his intellectual functioning is within the mentally retarded range and qualify him for the IQ portion of the mental retardation diagnostic component, and that these intellectual impairments have persisted from childhood up to the present time.

Dr. Greenspan assessed Mr. Dellinger's adaptive behavior capacities by interviewing relatives, friends, and acquaintances, as well as through review of records. Greenspan noted that Dellinger's brother and sister both had severe difficulty participating in the interview process due to their own substantial impairments in intellectual and functional capacity. He concluded that they have impairments quite similar to James', and he noted they did not progress beyond the grade school level. However, he was able to obtain useful information from Dellinger's first wife and James' former work supervisor during his period of construction employment.

These informants indicated that James was unable to sign his name but later memorized the letters sufficiently to write his name. Although he had been driving for years without a license, he could not read or otherwise identify traffic signs. Prior to his driver's test, his bother took him over the test course and told him what to do. James could not follow verbal or written directions but had to memorize from actually driving the route. He could use a digital watch but was never able to comprehend concepts such as "a quartet to or a quarter after". He was unable to use a calendar and could not keep up with dates; even his own birthday. When shown a calendar he would reportedly become confused because he could not tell the day of the week. He was reported to be incapable of

keeping track of telephone numbers. He kept a book with a list of telephone numbers but absent any corresponding names. If he could not make a connection between the number and desired contact person, he would simply call every number in his book until he got the person he was seeking.

His behavior was pervasively child-like. He could not do housework, save money, use a bank, or set long or short term goals. He could not select the correct restroom when pictures depicting gender were not present. He was unable to read a menu and simply ordered without looking or asked someone to read menu items to him. He was unable to ascertain the value of coins or bills and would purchase items by holding out money in his hand and trusting the clerk to take the correct amount. He was often cheated by 'friends' because of this. He could not select the correct products from stores and was known to use the wrong product without recognizing his mistake (e.g. buying and using shampoo in place of hair grease and not discovering his error until he was out in the rain). He could not be relied on to go to the store for errands, even if the list contained only one or two items.

On the work site he was largely unable to learn new tasks. even when they were repeatedly outlined or involved basic safety precautions. His employment does not appear to have netted more than $900 for any year from 1976-1979. His construction job was apparently maintained at the benevolence of his boss. He reportedly required almost continuous monitoring and reminding, even when dealing with seemingly simple and familiar tasks. He was able to do tasks such as carrying lumber and supplies, and occasionally sawing pre-marked boards. He was unable to measure boards, operate equipment, or do detailed work. He was often unable to anticipate consequences and his lapses appear to have placed him and others at risk. This inability to anticipate consequence, and what Dr. Greenspan described as his gullibility, often resulted in Dellinger being taken advantage of by others. His ex-wife noted that he "took other people for their word". She reported that he repeatedly bought cars from a friend in such disrepair that they broke down immediately upon purchase. She stated that James implicitly trusted his friend's promise that these were fine cars, and despite the cars breaking down in each instance, he bought at least three cars from this friend.

Also reviewed was the neuropsychological evaluation of Mr. Dellinger by Dr. Watson, dated 12/13/2010. In summary, Dr. Watson concluded that the results of his evaluation, including measures of effort and validity, indicate that his findings are valid, unlikely to be impacted by malingering, and likely to yield results that are accurate and interpretively useful for neuropsychological purposes. He concluded that Mr. Dellinger functions intellectually in the mentally retarded range with a WAIS-IV Full Scale IQ score of 69 (functioning below 98% of the population). There exists a 95% degree of certainty that his WAIS-IV FSIQ lies between 66 and 74. Mr. Dellinger displayed his poorest functioning in the area reflecting short-term memory and memory for auditorily presented verbal material. These functions were identified as being in the Extremely Low range. His WMS-IV Auditory Immediate Memory (reflecting immediate recall of material read to him) performance was below 99.9% of individuals. His Auditory Delayed Memory performance (memory for same material after 20-25 minute delay) was below 99.8% of individuals. Further assessment in the auditory processing area led him to conclude that he is likely to have "difficulty attending to multiple external stimuli and organizing it." Consequently, "if multiple ideas are being presented on a topic, he may still be processing one idea when another is presented." Based on calculations, Watson identified Mr. Dellinger's severely impaired intellectual functioning to be of long-standing duration and dating

from childhood (developmental) years. He found what he considers to be the most reliable and valid prior intellectual and neuropsychological testing to be consistent with his data and conclusions.

His assessment results identified impairments in all academic areas assessed. Watson concluded that Mr. Dellinger had "a profound dyslexia (alexia), is illiterate and cannot understand virtually any written materials." Dellinger appeared to guess at words based on identification of only a single letter in the word. For example, when presented with the word "milk" he would guess the word as "keep", when presented with 'city" he would guess the word as "why". Grade equivalents identified by the WRAT-IV ranged from the middle of 2nd grade (Math Composite) down to below the kindergarten level. Further assessment of his basic reading capacity produced even more stunning results. Mr. Dellinger's attempt to read the sentence, "He is a friendly animal, a famous winner of dog shows", was read by him as, "He is a friend, of dogs." He was unable to spell simple words such as "cross" or "square".

Though his evaluation results Dr. Watson identified Mr. Dellinger as suffering from receptive language dysfunction, spelling dyspraxia, dyslexia, mild dysnomia, and dyscalcula. On the basis of these impairments he diagnosed him as having brain damage in the left temporal, occipital, and parietal regions of the brain.

In addition to these more discrete dysfunctions, Dr. Watson's evaluation identified Dellinger as having substantial impairment in executive functions and problem-solving. Impairments in these areas reflect problems in the brain's ability to perform higher order and integrative tasks, as are required for activities such as planning, initiating action, monitoring one's own and other's behavior, and shifting courses of behavior in response to new information. Severe problems in these areas can grossly limit the individual's ability to control his or her own circumstances by monitoring circumstances, assessing the meaning and significance of events, evaluating potential courses of action, anticipating the consequences of potential actions, selecting a favorable course of action, executing that chosen action, and monitoring the progress of the action, and modifying the action as necessary. On measures assessing these capacities his performances reflected very concrete thinking with limited capacity for conceptualization, abstraction, or generalization. Dr. Watson noted that Dellinger was often incapable of using feedback (instruction that his responses were correct or incorrect) to improve his thinking, decision-making, and performance on future test items. Severe impairments in these areas are consistent with brain damaged individuals who are grossly impaired in their capacity to function independently. Dr. Watson noted that typically, these individuals are seen by experts as incapable of functioning independently in day-to-day situations that are novel, complicated, or important, as their understanding of situations tend to be inaccurate, resulting in poor judgment.

Based on his evaluation, and his review of Dr. Greenspan's assessment of Dellinger's adaptive functioning, Dr. Watson reached a number of conclusions. He concluded that Mr. Dellinger is mentally retarded based on limitations in intellect and adaptive functioning. He identified Mr. Dellinger as having a variety of cognitive impairments associated with at least a moderate level of brain damage (in addition to the mental retardation). These particular, and in some cases quite marked, deficits include impaired language skills, functional illiteracy, marked attentional deficits,

significant verbal memory deficits, significantly impaired problem solving, and excessively concrete thinking. He opined that the combined impact of these impairments left Mr. Dellinger sufficiently incapable of independent functioning that he was rendered fully dependent on legal counsel to represent his interests.

Also reviewed were documents outlining Mr. Dellinger's legal, and particularly his representational, status over time. These documents indicate that he had murder trials in Blount County (capital) and Sevier County (noncapital). The events related to the charges as well as certain legal issues were often linked or interrelated. In other instances, e.g., rulings regarding the admissibility of evidence, there were distinct differences between jurisdictions. The Sevier County trial began in February 1993, the Blount County trial began in August 1996. Reports indicate that Mr. Dellinger had five attorneys (pre and post conviction) in the Sevier County case, and four attorneys (pre and post conviction) for the Blount County case. To add to the confusion, in some instances there was overlap across the cases, in some instances there was not. Additionally, it is reported that in some instances the attorneys functioned as counsel of record and in some instances they were "arm-chair counsel". Statements indicate that the assumed role and responsibility of counsel was not necessarily consistent with what would be assumed from "counsel of record" versus "arm-chair" designations. Additionally, counsel appointed for post-conviction action in one jurisdiction saw a necessity to assume an active role as pre-conviction counsel in the other jurisdiction.

Further complicating matters, are the circumstances involving attorney Catherine Brockenborough, identified as "the lead attorney in charge of litigation of Mr. Delliger's cases" (i.e., in charge of post-conviction litigation for the Blount County case and trial litigation in the Sevier County case). Ms. Brockenborough indicted that she informed Dellinger that she was responsible for filling the appropriate documents in his cases. Affidavits filed by Ms. Brockenborough, her psychiatrist (Dr. Sparks-Bushnell), and her therapist (Julia J. Tate, JD, LCSW) indicate that Ms. Brockenborough has suffered from a severe and at some points incapacitating mental illness from at least August 2001 through the present time. According to the record, Ms. Brockenborough was treated psychiatrically starting in 2001 for Major Depressive Disorder, recurrent, of moderate severity, and for Generalized Anxiety Disorder. Her psychiatrist reported that in the fall of 2006 Ms Brockenborough was "biologically stable" (i.e., her medication was working as intended) but was not "psychologically stable" (her thinking, emotions, and behavior was inadequately controlled). Dr. Sparks-Bushnell and Ms. Tate (her therapist) concur on a number of points regarding Ms. Brockenborough. First, they both note that her personality and interpersonal relatedness style leads her to deceive herself and others about her own weakness and failings, particularly with regard to work performance and issues of personal responsibility. Secondly, both treating professionals indentify the death of Ms. Brockenborough's father (in the fall of 2006) as being a highly destabilizing event. Third, both see her as developing a full blown Bipolar Disorder subsequent to the fall of 2006. Both treating professionals describe her as being highly deceptive in concealing her severe decline in functioning at work as well as in other spheres, such as the treatment settings. Dr. Sparks-Bushnell has stated that Ms. Brockenborough's functioning was so compromised at the late 2006 to 2007 time frame that she was substantially unable to look after her own interests, let alone someone else's interests. She stated that if she had been aware of the extent of dysfunction, she would have advised Ms. Brockenborough to inform her clients and supervisor of her disability. Ms. Tate (a practicing attorney as well as a

social worker) indicated that Brockenborough was so impaired by her mental illness that she advised her to apply for Social Security Disability, as she viewed her patient as incapable of even "flipping burgers". Ms. Tate concluded that, based on her patient's reports of the extent of her psychiatric disturbance, it is her opinion that Ms. Brockenborough was "incapable of practicing law for several years, including the period from late 2006 through 2007."

Based on the evaluation conducted, with a reasonable degree of psychological certainty I conclude the following:

1. Mr. Dellinger has severe intellectual deficits that place him in the mentally retarded range of functioning. These deficits have been exhibited by him from childhood to the present time, and they severely impact his functioning across a wide variety of essential areas of functioning.
2. In addition to the general intellectual deficit, Mr. Dellinger manifests severe or extreme impairment in specific areas of cognitive functioning that place him well below what would be expected merely given his low IQ. These impairments include functional illiteracy, particularly severe impairment with receptive language skills, marked attentional deficits, severe memory problems (particularly verbal memory problems), and substantial impairment in executive functioning, as manifested in concrete thinking, poor capacity for abstraction, generalization, and conceptualization, an impaired capacity to plan and to anticipate consequences, and severe problems learning from errors or prior experience. These specific deficits, extending below levels reflecting his general intellectual deficit, are consistent with brain dysfunction or damage.
3. Descriptions of Mr. Dellinger's behavior throughout his life give vivid depictions of how these general and specific cognitive impairments have impacted his day-to-day life and his adaptive functioning.
4. Descriptions of Mr. Dellinger's legal situation and the circumstances of his legal representation depict a complicated, fluid, and sometimes unclear set of circumstances. Mr. Dellinger had two trials, in two different venues, occurring at different times, or when occurring simultaneously, at different stages in the legal process. Accounts identify five different attorneys serving at various points in his Sevier County trial and four attorneys serving for his Blount County trial. In some instances attorneys overlapped jurisdictions and in other instances they didn't. There appears to have been changes and a lack of clarity in terms of roles and responsibilities amongst counsel. In addition, the attorney identified as most consistently engaged, working in both the Blount and Sevier cases, and identified as communicating to Mr. Dellinger her responsibility for managing the submission of the appropriate documents, suffered a severe psychiatric decompensation and hid the extent of her compromised personal and professional functioning from responsible parties. She was fired from her position and her treating professionals opine that she was functionally and professionally disabled during this period.
5. Mr. Dellinger was placed in a complicated legal situation with multiple

attorneys across two venues. The attorney most identified with investment in his case was functionally and professionally compromised by a severe psychiatric disorder. His general intellectual functioning was at the upper end of the mentally retarded range and his focal cognitive impairments that precluded his being able to read or write, severely impaired his capacity to understand material presented to him verbally, and he was substantially impaired in his ability to recall verbally presented material even after only a short delay. His impairments in executive functioning very severely impaired his ability to conceptualize, abstract, or generalize. He had gross deficiencies in his ability to make decisions which extremely limited in his ability to anticipate the consequences of courses of action and he was significantly limited in his ability to use feedback or past experience to learn from mistakes.

6. Given the totality of the circumstances, it is my opinion that Mr. Dellinger was incapable of adequately understanding the significance of filing the habeas petition, the consequence of failing to file the petition, or the means by which one would enlist counsel's aid in filing, or one would file on one's own. Mr. Dellinger's severe impairments in executive functioning would preclude him from the conceptual activity necessary to comprehend the significance of filing this petition. Additionally, these same impairments in executive function would not allow him to anticipate and weigh the consequences of failing to file this petition.

7. Even if he were to have the capacity to dimly recognize the importance of the timely filing, he would have to possess the means to initiate, direct, or accomplish the filing. In order to direct legal counsel to initiate the filing of the petition (assuming that he had some recognition of its importance) Mr. Dellinger would have to have knowledge of the names of counsel, some sense of their designated responsibility, and the means to contact and communicate with them. Mr. Dellinger is unable to read or write. He is not capable of writing a letter to his attorney. He could not access addresses or telephone numbers through typical means such as directories, even if he had ready access to them. He is identified as having great difficulty recalling names and phone numbers. Additionally, his inability to read or write means that all information he received regarding the filing of the habeas petition would have to come from someone presenting the necessary information verbally to him. For this information to be utilized by him it would have to have overcome a number of hurdles created by his severe cognitive impairments. First, the verbally presented information would be subject to deterioration and distortion due to his identified poor receptive language functioning. Secondly, even if he were to initially receive the information in a relatively intact form, it would be subject to similar deterioration and distortion given his impaired verbal memory functioning. Most individuals in this type of situation would commit this material to writing, as adequately functioning people intuitively recognize that simple memory recall of verbally presented material is problematic at best. Mr. Dellinger did not have access to this process.

8. Even if one assumes that he was capable of conceptualizing the significance of the petition, and either contacting a responsible party or initiating the process on his own, there would remain concrete tasks (especially if he were to attempt to file on his own) that are clearly beyond his capabilities. First, he would have to have a reasonable conceptualization of time and the means of measuring and thinking about time. Relatives note that he was unable to use a calendar and would become confused when presented with one and asked to use it to figure out some schedule or event. They also note that he had no sense of time even in terms of registering his birthday. Mr. Dellinger would need to have some sense of time and how one thinks about and measures time in order to comprehend the window of opportunity presented for the filing of the petition and the consequences of missing that window. In addition to a basic sense of time and the measurement of time, he would need to be able to perform calculations to concretely define that window of opportunity. For this calculation he would need to possess certain skills. First, he would have to have the means to acquire the legal or regulatory rules by which this window is calculated. Once he had that, he would need to be able to identify particular legal events that initiate the clock or add time to the window. He would then have to access either from memory or records information that would inform him of the dates that particular legal events took place. Upon receiving this information he would have to ascertain the mathematical formula for calculating the time period for filing, plug in the appropriate numbers, and then perform the necessary calculation. Evaluations past and recent all identify severe impairment in the requisite cognitive operations. It is worth noting that his attorney has stated that she performed a serious miscalculation in dealing with this very material. The reviewed records, the psychological and neuropsychological evaluations both past and recent, and Mr. Dellinger's life history clearly indicate that the types of cognitive operations are well beyond his capabilities.

9. In addition to the multiple cognitive and intellectual deficits rendering Mr. Dellinger incapable of ascertaining the significance of the petition, the consequences of failing to file, and making him incapable of taking the necessary action to monitor or initiate the filing of the petition by counsel, there exist psychological or personality factors that would serious impair these necessary actions. As Dr. Greenspan has pointed out in his discussion of "gullibility", individuals with major intellectual deficits or severe cognitive impairments due to brain dysfunction frequently develop a passive-dependent or acquiescent pattern of relating to people; particularly people upon whom they have relied in the past. These substantially impaired individuals experience frequent instances of failure on tasks that are simple and easily performed by other people. They have frequently experienced ridicule by others when failing or have a sense of their own failings and inadequacy, and develop a sense of embarrassment and shame. They learn that if they remain passive, don't respond, and defer to others, their weaknesses and deficiencies can be somewhat concealed and they are less exposed to painful emotional experiences.

Consequently, the assurance by his attorney (Ms. Brockenborough) that she would take care of the petition for him, or find someone else to do it for him, would be extremely comforting to him and would be steadfastly maintained by him, even in the face of information that would raise concerns in a normal individual. For him to confront the possibility that no one was attending to these circumstances would be overwhelming for him, given his own vague sense that the demands of this legal situation were completely beyond his recognition and capabilities.

James F. Murray, PhD PC

James F. Murray, Ph.D., P.C., FAClinP, ABPP
Licensed Clinical Psychologist
Fellow, Academy of Clinical Psychology
Diplomate, American Board of Professional Psychology