**Exhibit 10**

**Biopsychosocial Evaluation of James Dellinger**

Before James Dellinger entered this world, his life was being shaped by forces of deprivation and want. Born the sixth of eight children to an illiterate and malnourished mother, James's difficult birth set the stage for his life to come. As the lay midwife pulled James from the womb he literally and figuratively inherited his parents' struggles with hunger, ignorance, and cultural isolation. It was against this genetic and sociological backdrop that the particulars of James's life played out.

The biopsychosocial assessment which follows here employs the clinical methods particular to the discipline of clinical social work consisting of gathering historical information on an individual and their family. The purpose of such an assessment is not to excuse any particular human behavior, but rather to shed light on the significant factors that shaped the individual's development. A biopsychosocial assessment is used in a variety of different settings, including the judicial system.

A full biopsychosocial assessment draws from numerous sources. It is comprised of clinical interviews, a review and assessment of relevant documents, consultation with other professionals and a review of their reports and opinions, historical research, visits to the community, and if needed, visual aids. When circumstances in the environment, such as extreme poverty, result in limited historical documentation about an important area of a subject's history, it is necessary to examine more current information to shed light on historical familial patterns.

**Professional Background:**

I am licensed by the State of South Carolina Board of Social Work Examiners and board certified by the American Board of Examiners in Clinical Social Work. I hold a Master of Social Work degree from the University of South Carolina (1980) and a Bachelor of Arts degree in Psychology from Pepperdine University (1977).

I have conducted biopsychosocial assessments for thirty-three years both in my private practice and for the courts. I have been qualified as an expert witness in the field of social work in the courts of South Carolina, North Carolina, Tennessee, Virginia, Georgia, Florida, Alabama, Mississippi, Texas, California, Kentucky, and Alaska.

Counsel for James Dellinger asked me to conduct a biopsychosocial assessment on Mr. Dellinger and his family. To that end, I conducted the following clinical interviews and reviewed the following documents:

**Clinical Interviews Conducted:**

Mary Ramsey (sister)

Maralee Ramsey (sister)

George Dellinger (brother)

Clyde Dellinger (brother)

John Dellinger (brother)

Sadie Dellinger (sister-in-law)

Lisa Schultz (niece)

Bruce Ogle (friend)

Gene Lethco (friend)

Eula Ogle (neighbor)

Helen Ogle (friend of family)

Gene Ramsey (brother-in-law)

Shirley Dellinger (sister-in-law)

James Dellinger (defendant)

**Documents reviewed:**

Family birth certificates

Clyde Dellinger, Sr., Clyde Dellinger, Jr., Georgia Frank Dellinger, Anna Mae Dellinger, Mary Helen Dellinger, John Albert Dellinger, Mara Lee Dellinger, Ralph Edward Dellinger, Tammy Sue Dellinger, Timmy Lee Dellinger, James Anderson Dellinger, Jr.

Marriage certificates

Clyde Dellinger and Janie Floyd, James Dellinger and Annabel Cowan, James Dellinger and Lynda Buchanan

Sworn Declarations

Annabel Stewart, Jeff Dodgen, Rickey Harvell, Clyde McKinley Dellinger, Jr., George Frank Dellinger, Mary Helen Dellinger Ramsey, John Albert Dellinger, Maralee Dellinger Ramsey, Ralph Edward Dellinger

Family school records

George Dellinger. Ralph Dellinger, John Dellinger, Mary Helen Dellinger, Mary Lee (Maralee) Dellinger, Anne Mae Dellinger, James Anderson Dellinger, James Dellinger, Jr., Tammy Sue Dellinger, Timothy Lee Dellinger

Military records for Clyde McKinley Dellinger, Sr.

Trial testimony

Ralph Dellinger, Margaret Ramsey, Kathy Dellinger, Clyde Dellinger, Jr., Maralee Ramsey, Anna Morris, Daniel Dellinger, Timothy Dellinger

Expert Testimony

Dr. Peggy Cantrell, Dr. Peter Young

Psychological Evaluations

Dr. Stephen Greenspan report, Dr. Dale Watson report, Dr. Peter Young report, Dr. Peggy Cantrell report

Area History

Dr. Bruce Wheeler, "The Almost Invisibles of Sevier County"

Newspaper articles and videos

SSI records for James Dellinger

Topographical maps of Sevier County

Land deeds for Dellinger properties

Family photos

Family videos

Tennessee Department of Corrections Educational Records

**Intergenerational Family History:**

For the Dellinger family – a family that is illiterate, uneducated, and with little oral history of their ancestors – it is as if life itself began in the hollows of Sevier County. Existence outside of Sevier County simply is inconceivable. In fact, the very idea of a family history that might extend back as far as European ancestors aroused suspicion in some family members. The simple understanding that all "Dellingers" are not related appears to have spawned paranoia about the entire notion of ancestry and became a reason for not learning about **any** "Dellingers." The history of their maternal family, the Floyds, is equally unknown to them. Whereas most people are fascinated with their family tree, the older Dellingers appear, at best, disinterested in their origins and, at worst, afraid of learning about their history.

Despite a dearth of knowledge of their family history, the Dellingers were able to relate a little about their family beyond James's grandparents. The meager family photographs and stories about earlier generations support a general history of the Dellingers as small plot farmers and sharecroppers with large families. These stories are consistent with the history of Sevier County, specifically, and Appalachia, generally. Like many families in the region, family members believe that some of their relatives married people from the Cherokee Nation.

Although there is no information on how the Dellingers came to America, it is clear that they settled in Sevier County by the late 1800's and early 1900's. James's paternal grandparents, Andy Anderson Dellinger and Julie Carr Dellinger, were farm laborers. These earlier Dellingers were of the social sub-culture that Dr. Bruce Wheeler described as "in-migrants" because of their multiple migrations within the same area. Both isolated and insulated, members of the "in-migrant" subculture had few skills beyond farming and little or no education. The lack of education and marketable skills prevented members of the in-migrant subculture from functioning effectively in the Sevier County community, which, by the late twentieth century, had transitioned to a thriving, tourism driven economy. Despite the progress and improvements that came to Sevier County with the arrival of tourism, the Dellingers, like others of the in-migrant subculture, remained invisible to outsiders and rarely – if at all – benefitted from the

changes taking place around them.

Over time these "in-migrant" families have, paradoxically, become even more isolated as the booming tourist industry has taken over the economy in Sevier County. Though prosperity is apparent within just miles of their homeplaces, descendents and members of the in-migrant subculture remain largely unable to avail themselves of resources and programs brought by the economic and social changes in Sevier County. In-migrants have remained largely ignored or rejected by the rest of the community. This was the case with James and his family whose many moves within the hollows and valleys reflected a constant struggle to keep their heads above water. The Dellingers and other in-migrant families became and remain "invisible" and are described by at least one social historian as "yesterday's people."

**Origins: The Hardscrabble Existence of Clyde and Janie Dellinger**

*"I remember how hard Mama worked. She was a good mama."* Mary Helen Ramsey

*"[Clyde Dellinger] states he went to school 'off and on' for 8 years and never did get out of 'primer' or first grade. He couldn't learn. He had 4 months school at Camp Shelby but couldn't learn there either. He can write his name only – cannot read."*
Army Airforces Progress Notes 10/30/44
For Clyde McKinley Dellinger, Sr.

Predictably, the history of James's parents foreshadows the story which the Dellinger children would inherit. Though James and his siblings know very little about Clyde Dellinger or Janie Floyd's childhoods, they do know that their parents endured the same hard scrabble existence of subsistence farming and sharecropping as they did. Like each of their children after them, Janie and Clyde had little or no schooling and could not read or write. Clyde was born in 1915 and Janie was born in 1917 and each grew up laboring on the land, regularly missing school, and working alongside their parents to put food on the table and keep a roof over their heads. As both are now deceased, many details of Janie and Clyde's childhoods are lost. Both grew up in large families and their surviving relatives are in poor health, suffering from dementia, or otherwise unable to recall their past.

Clyde McKinley Dellinger and Janie Mae Floyd married on January 27, 1934 in

Sevier County. After farming and other odd jobs, James's father, Clyde, Sr. tried to take advantage of some of the growth beginning in Tennessee in the early forties. He left farming to become part of the labor force for the Tennessee Valley Authority (TVA) working as a jack hammer operator on the Fontana and Douglas Dams. Clyde, though warned about the possibility of the draft, left TVA in 1943 for a better paying job at the new Alcoa plant. Inevitably, he was drafted before he could begin that job.

Janie was pregnant with the couple's third child when the United States Army drafted Clyde, Sr. to fight in World War II. He was allowed about three days to spend with Janie before he entered the Army Air Forces on December 29, 1943. Janie was left alone with a newborn and two small children. At that time, the family lived in "Frog Alley" (also known as McMahan Addition), a section of Sevierville known for squalor and violence. Janie supported her small family on Clyde's "allotment" from his military service, which according to military records was a scant $7 a month. She took in laundry as extra income.

Clyde's military records outline his service in the Pacific Theater. Clyde was awarded a WWII Victory Ribbon, an American Theater ribbon, Asian Pacific Theater Ribbon with Bronze Star, and the Philippine Liberation ribbon, which was awarded to servicemen who participated in any engagement with the Japanese forces between October 17 and September 2, 1945. After the surrender by the Japanese, the army sent Clyde to Atsugi Naval Air Base on the Honshu Prefecture outside Toyko. Clyde drove an artillery truck. He was stationed only seven hours from Hiroshima and ten hours from Nagasaki. Clyde was honorably discharged from service on December 26, 1945.

Significantly, military progress notes state that upon conscription, Clyde reported that he had attended school off and on for eight years but never matriculated out of first grade. He succinctly reported to the conscription officials that he simply "could not learn." At Camp Shelby, instructors tried for four months to teach Clyde to read and write, but he couldn't learn there either. Clyde could not read and could only write his name.

**Family Life After The War**

*"Dad came home from the army when the war ended in December. He joked and said old Santa rode home on the boat from the war with him. Dad was drinking worse after he came home from the war."* Clyde McKinley Dellinger, Jr.

The trauma of war and the memories of the dead and dying haunted Clyde for years and profoundly affected his behavior toward his family. Clyde returned to Sevier County and to his family a damaged and tormented man. Even though he had served his country with distinction, Clyde suffered from his memories of war. Drinking heavily, he worried his young wife with his nightmares, angry outbursts, and marching in his sleep. Clyde rarely spoke of his experiences at war, but when he did, he described horrors that he simply could not get out of his mind. Treatment for such trauma was not an option after World War II. Like many soldiers of that generation, Clyde tried to leave the war behind – but to no avail.

Today's diagnosis of and treatment for post-traumatic stress disorder did not exist in the post-World War II era, but family stories of Clyde's behavior reflect that he suffered from symptoms of that disorder. Clyde took his anger and other trauma symptoms out on his wife and children. Illiterate and with no parenting skills, Clyde used the stick liberally to keep his children laboring in the small farm plots to make ends meet. His violent behavior toward his children continued over the years and each child received Clyde's lashes when he lost control. Although Clyde and Janie's children loved their parents and believe deeply that they were, in turn, loved, neither Clyde nor Janie expressed parental love. Despite the lack of affection and the turmoil of their family life, the Dellinger children grew up believing they were loved and continue to speak of their parents with deep and abiding respect.

Janie Dellinger had no skills or understanding of how to deal with her traumatized and now abusive husband. She threatened to leave him and take the children. In response, Clyde fled, taking Clyde, Jr., his oldest son. Along with Clyde's brother Conley, who was recovering from a gunshot wound sustained while fighting the Nazis in Europe, Clyde wandered from place to place – ultimately ending up in Chicago, Illinois.

Squandering money that his wife and children needed desperately, Clyde ran from his war experiences with alcohol and women.

Clyde finally returned to Sevier County and reunited with his wife and his children. Unfortunately his reaction to the trauma of war set the family on a course that was unpredictable and chaotic. Clyde resumed working odd jobs and began moving his family around the county in pursuit of ready work and the cheapest property prices. The family moved from Frog Alley/McMahan Addition in 1945, renting property and sharecropping tobacco on the rented land. Thanks to the GI Bill, in 1948 Clyde was able to buy a small family farm with one tobacco allotment in Cold Springs Hollow (also known to the Dellinger children as "Christopher Hollow"). It was the first of many properties Clyde Sr. obtained over the years, moving his wife and children from place to place. (*See* attachment 1, Map of Family Homesteads, location #1, Cold Springs Hollow).

The Dellinger property at Cold Springs Hollow was isolated, geographically, topographically, and existentially. Topographically, Cold Springs Hollow lies folded within the foothills of the Appalachians. The hollow sits at the end of a footpath – off the end of a gravel road, at the end of the paved road, off Allensville Road, on the outskirts of Sevierville. The hills that surround the hollow are so high they block all direct sunlight, isolating the hollow and its inhabitants from even the sun. This isolation cast a literal as well as figurative chill over the family. As Mary Ramsey reports, "It's always colder back in that hollow," a refrain echoed by her brother John: "It was cold up in that hollow . . . I remember that house. It was like we were in the jungle back in that hollow. It was all closed in back there." Literally off the beaten path, the family had only each other upon which to rely.

Over the years, Clyde continued to exhibit violent behavior. He beat his oldest daughter, Anna until her back was bloody because she refused to marry an older man Clyde had chosen for her. Fourteen-year-old Anna finally gave in to her father and married Mr. Sutton. On another occasion Clyde, Jr. tried to stop his father from beating his mother, and his father told Junior that Junior should find his own place to live. Because of this tension, Clyde, Jr. went to live with his uncle and his grandmother.

Though the exact date of this occurrence is unknown, it happened while the family lived in Cold Springs Hollow between 1948 and1953 – when Clyde Jr. was no more than thirteen-years-old. The children remember the welts and even bloody lacerations left by their father's outbursts. In one of many beatings James received for wandering off, Clyde, Sr.'s razor strop raised welts.

James's mother Janie never learned to read or write, but after her children grew up, she learned to sign her name. A Trust Deed in 1973 bears the first of Janie's signatures on a legal document. Before 1973, Janie signed each conveyance of family property with an "X."

In addition to her work in the fields, cooking for a family of ten, canning for the winter, and other subsistence chores, Janie took in washing and sewing from the neighbors for extra money. Janie did laundry on a washboard, and she used an old heavy iron that had to be repeatedly placed on a wood stove to stay hot. The family remembers the luxury of getting a wringer washer and a "new" iron that held hot coals – sometime after 1953 when the family moved out of Cold Springs Hollow and up onto Allensville Road. (*See* attachment 1, Map of Family Homesteads, location #2, First House on Allensville Road).

**A Vulnerable Childhood: Cold, Hunger, and Harm**

*"We lived in hellacious places back when we were kids."* John Albert Dellinger

*"I dreaded winter because it was so cold."* Mary Helen Ramsey

On the day James was born, the weather was January cold. Like his siblings, "an old grannywoman," an untrained midwife, assisted at his birth. From the account Mary Ramsey learned from her mother, James's delivery was rough, and the grannywoman kept pulling on James. Finally the grannywoman told Clyde to go get the doctor. Clyde kept his old car parked at a neighbor's house, because the unpaved road from their house at Christopher Hollow to Allensville Road was impassable except by wagon on sled runners when it became muddy or icy. Clyde made it out to the road and to his car and returned with the doctor. Mary recalls her mother relating that the doctor had to pull

James into the world with forceps.

Janie Dellinger's health at the time James was born is not documented, though the family reluctantly remembers times when Janie went hungry to make sure her small children were fed. As Maralee Ramsey recalls, "Sometimes Daddy didn't make enough money to keep the bills up, and we went hungry." As Mary Ramsey poignantly remembers, "If there wasn't much food, [Mama would] claim she wasn't hungry. Now, looking back, I know that she was, but she wanted us children to have her food. I remember sometimes we'd ask her if she was going to eat, and she'd say, 'I'll eat after awhile.'" Though no health records for Janie Floyd Dellinger exist, her death certificate reflects malnutrition to be a cause of death.

By 1951, the year of James's birth, healthcare services were available for pregnant women living in other areas, but prenatal or postnatal care was not even a consideration for Janie. The idea of sanitation and Apgar scores during delivery and before release from a hospital were not just foreign, but completely unheard of concepts. The reasons for James's difficult birth and the need for a doctor and the use of forceps are not known, but it is generally agreed by family members that James's birth was distinctly difficult from the rest.

At the age of two, James had scarlet fever and ran a very high temperature. He also had persistent nosebleeds. Because the family did not have money to visit Sevierville's doctor, these medical problems went undiagnosed and untreated. In James's youth, the family used turpentine for cuts, castor oil for various ailments, aspirin and lemonade for colds and moonshine mixed with sugar for fevers, because of the lack of money for medical care. Although moonshine was often distilled under unsanitary circumstances involving the use of toxic materials, the family used it to treat a variety of illnesses. For instance, they rubbed it on sore gums and poured it into ears to alleviate earaches. For breathing problems, Janie made poultices of hog lard applied to the children's chests. Like his siblings, James made it through chicken pox, mumps and German measles without care of a doctor.

From the time James was born in January of 1951, until the time he left home as an adolescent, his family never had running water nor indoor plumbing. They used a

wood stove for heat and covered cracks in their dwellings with wallpaper, newspapers and anything else they could find to try and stay warm. They hand carried water from the stream for cooking, washing and bathing. Although Janie demanded cleanliness and kept her children as clean as she could, bathing was not a daily exercise as the family used slop buckets for bathing and outhouses for toilets.

**Coming Up Hard: Poverty, Tobacco, and Moonshine**

*"My daughter heard me telling about some of these things. I told her we were so poor growing up that I feel ashamed of it."* Mary Helen Ramsey

During James's early childhood, his family began farming tobacco. Growing tobacco was harsh and dangerous work. Clyde provided the seeds, the plow, the mule, the pesticides, and the labor – using his wife and eight children as labor. After James, Clyde and Janie had two more children, totaling eight in all. The older children recall Janie breastfeeding in the midst of the toxin encrusted tobacco fields, thus exposing the infants, including James, to dangerous chemicals, rending them all the more vulnerable during their developing years.

In Cold Springs Hollow where the family lived from 1948-1953, Clyde and Janie had an allotment of approximately two acres. They also sharecropped their neighbors' allotments, giving the Dellingers a total of about five or six acres to tend. Clyde Jr. describes the family life during that time as revolving around the tobacco crop: Clyde, Sr. and Janie both worked the tobacco allotment, leaving Clyde, Jr. (age ten) in charge of George (age seven) and Anna Mae (age five) and Mary Helen (age two). When John was born in 1949 and then James in 1951, Clyde, Jr. looked after them as well. As Clyde, Jr. describes those days, "Before I got old enough to work in the tobacco, I took care of the kids so Mama could work in the fields. I cooked some, diapered them and learned some of them how to walk. I'd let em hold on to a little chair and drag it along till they got steady on their feet. John was crazy about me. I'd have to carry him up and down the rows in the field or he'd cry."

Tobacco farming was this family's livelihood, and as the children aged it became a family endeavor. Everyone in the family had to work the tobacco beginning in

February, with the burning of the tobacco bed to kill weeds and insects, to the planting season, the transplanting of seedlings into the field, and through to harvest. The children's duties included treating the plants for horn worms by dusting with lead arsenate. Unable to afford proper and safe equipment, the Dellingers made pesticide dusters out of old coffee cans with holes punched in the bottom and a stick nailed on as a handle.

From the time he was old enough to hold a duster, James shook the lead arsenate on the tobacco plants and, like the other children and his parents, breathed in lead arsenate dust. The family worked the plots from daylight until dark. Janie, covered in lead arsenate dust, would stop long enough to nurse a new baby. Though accounts differ as to what age James began working the tobacco, it is clear that by the time Clyde Sr. purchased the farm on Mill Creek when James was ten-years-old, James was expected to do a full day's work the same as an adult.

When they weren't farming, their father performed odd jobs to make ends meet. Clyde Sr. and the boys sometimes cut pulpwood, another dangerous job for which they had few skills and inadequate equipment. Clyde also held other jobs, working at a canning factory and putting sod out on the parkway. When he was away, his family felt his absences deeply. Not only did they miss Clyde, but, as he took the family's only transportation with him, the family was completely isolated on the farm while he was gone.

The family recalls the winter of 1961, when James was ten, as a period marked by extreme want. In January of that year, Clyde moved the family across Sevierville to the far side of the next town, Pigeon Forge, to property on Mill Creek. (*See* attachment 1, Map of Dellinger Homesteads location #4). The family had not been able to do any canning, and they faced winter without supplies. James's sisters Maralee and Mary Helen remember being so hungry that their mother, who didn't even have corn meal, was forced to ask a neighbor for a piece of cornbread to give Maralee who was crying and begging for food. With great shame the family remembers that their father was reduced to accepting "government food" on one occasion. Though James's siblings' accounts of this time are stoic – only hinting at how hard things really were – when pressed they

admit to the fear which accompanies true hunger.

When James was about ten-years-old, a pony kicked him in the head. His brother Clyde, Jr. had brought a pony named "Little Boy" to the homestead thinking that the younger boys might like to play with him. James had been around the family mules, Kate and Toby, and knew they were prone to kick. Even so, James grabbed the pony's tail hoping to catch a ride when the pony began to run. The pony kicked both hind legs and caught James in the forehead. The kick knocked James out, swelling his eyes shut. Afterward, James could not see normally for over three weeks. James told his family it was like trying to look through a keyhole. James had severe headaches for a time following this accident. Despite the severity of James's injury, the family did not seek medical attention because there simply was no money to pay a doctor.

After this injury, James began to "wander off." Clyde and Janie were unaware that there might be some medical explanation for James's easy distraction and inattentiveness, and Clyde punished James frequently and severely. Clyde's beatings had no effect on James's behavior. According to James's siblings, James was never a bad child and in fact was not lazy or trying to get out of work, he would just "run off." Although James's siblings were all tired of hard work, the threat of their father's discipline kept them on task. Conversely, regardless of the beatings, James seemed unable to conform to the behavior his father expected. Like most children, his siblings wanted to avoid the pain, but James didn't seem able to remember the consequences of his behavior, and instead took the beatings repeatedly.

**School Years**

*"Big ole James is blocking the board and I can't see it."* - Laurel Lick 1st Grade Student

*"Many families were fundamentally unable to value the education of their children because of the parents' lack of education, the need for children to assist with farming, or simply due to the family's unrelenting struggle for survival. For many Sevier County families, in the midst of hunger and want, education was a luxury."* -Dr. John Enloe, Sevier County Board of Education

KELLUM SCHOOL



*Kellum School*

A one teacher school located on Kellum Creek off of Allensville Road near Douglas Lake. This picture is of students in front of the building in 1935-36.

James attended Kellum public school in Sevier County from 1957 through 1960. Kellum was a one-room schoolhouse for grades one through eight with approximately thirty pupils. There was only one teacher who also had to fill the duties of janitor and principal. No scholastic records for James Dellinger are available from Kellum School.

LAUREL LICK SCHOOL



*Laurel Lick School 1940*

When the Dellinger family left the Allensville Road area for a new homestead on Mill

Creek in 1961, James attended Laurel Lick School from 1961 through 1965. School records indicate that teachers were aware of the extreme poverty of the Dellinger children even as compared to that of their impoverished schoolmates. This is evident in the fact that the teachers commented on the inadequacy of the Dellinger children's clothing.

| Date | Teacher's Notes ( Taken from Classroom Worksheet or Data Furnished by Other Worker by Name ) |
| --- | --- |
| | Absence Due to Colds, Sore Throat, Headaches, Hygiene, Etc. |
| | Clothing insufficient for good |
| | attendance during school months |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Neither Kellum nor Laurel Lick School provided for special needs children nor did the Dellinger family have such resources outside the school system. Even if such resources had been available, it is unlikely that the Dellinger family would have taken advantage of those programs. Pride and shame isolated them even further from society.

All of James's siblings had problems with attendance and learning, and all received social, as opposed to merit, promotions. James was held back so much that he outgrew the other children who could not see over his shoulders. At Laurel Lick School, where James was in first grade as a ten-year-old, the teacher "socially promoted" him to third grade when a girl behind him complained of not being able to see the board around him. The family laughingly recounts that James was moved all the way to third grade, because that is where there was an empty seat. James remained in third grade, though unable to read or write, until he left school at age fourteen.

Although all the Dellinger children encountered obstacles to education – they only attended school when there was no farm work to perform, none of them had adequate clothes for winter school attendance, no one in the family could read – it was clear that James's difficulties were markedly different from his siblings. His siblings

recall that James simply could not learn, no matter how hard he tried. Other children in school with James were aware that James was "slow," and two of his childhood friends recall how difficult it was for him to catch on to numbers and letters even when they tried to help him.

James and his siblings suffered enormous shame and embarrassment from their extreme poverty. Though living in a generally impoverished area of the county, they were aware of the difference in their homes, clothing, and resources as opposed to those around them. They often went to school hungry with next to nothing to eat all day. James was particularly miserable as he grew physically larger while remaining in the same grade with younger and smaller children.

A chart of the Dellinger family scholastic achievements reflects a family pattern of illiteracy and learning disabilities (ie. once such diagnoses were available).

| Name | Relation to James | Grade Completed | Years Attended | Learning Disabled | Illiterate |
|---|---|---|---|---|---|
| Anderson Dellinger | Paternal Grandfather | None | N/A | Unknown | Yes |
| Julia Carr Dellinger | Paternal Grandmother | None | N/A | Unknown | Yes |
| Amos Floyd | Maternal Grandfather | None | N/A | Unknown | Yes |
| Laura Manning Floyd | Maternal Grandmother | None | N/A | Unknown | Yes |
| Clyde Dellinger, Sr. | Father | Repeated 1st grade repeatedly | Unknown | Unknown | Yes |
| Janie Dellinger | Mother | None | N/A | Unknown | Yes |
| Clyde Dellinger, Jr. | Brother | 1st (dropped out at age 7) | 1944 - 1945 | Unknown | Yes |
| George Dellinger | Brother | 1st grade | 1949 - 1954 | Unknown | Yes |
| Anna May Dellinger | Sister | 3rd grade | 1950 - 1958 | Unknown | ???/ unclear how well she reads |
| Mary Helen Dellinger | Sister | 3rd grade | 1955 - 1959 | Unknown | ???/ reports can read most words of newspaper, but without comprehension |
| John Dellinger | Brother | 1st grade (Repeated from 1956-1960) | 1956 - 1960 | Yes | Yes |

| Name | Relation to James | Grade Completed | Years Attended | Learning Disabled | Illiterate |
|---|---|---|---|---|---|
| Mara Lee Dellinger | Sister | 2nd grade | 1958 - 1964 | Unknown | Yes |
| Ralph Dellinger | Brother | 1st grade (was not promoted from 2nd grade | 1966 - 1967 | Unknown | Yes |
| Tammy Sue Dellinger | Daughter | 8th grade (Special Education) | 1977 - 1985 | Yes | Unknown |
| Timothy Lee Dellinger | Son | 12th grade (non-graded program) | 1983 - 1997 | Yes | No |
| James Dellinger, Jr. | Son | Completed a non-graded program | 1987- 1999 | Yes | No |

**Adolescent Years Through Adulthood: Deficits Begin To Show**

*"The Law would be waiting for James every Friday afternoon. They knew James didn't have a license and that he'd just gotten paid. The cops took his money just about every weekend."* Maralee Ramsey

James reached adolescence having failed to master many of the most basic skills necessary for adulthood. He was especially at a loss to read or write. Although his siblings had many of the same academic problems, their problems did not reach the same level of difficulty in functioning as James's. Though James shared many difficulties and risk factors with his siblings – malnutrition, poor medical treatment, and exposure to toxins, James had additional unaddressed birth complications and serious head injuries that his siblings did not have.

Life laboring tobacco plots was filled with hazards, and in addition to the head injury from the horse that kicked James in the head, James's abilities were perhaps further compromised when a two by four fell three stories from the roof of a barn striking him squarely on the head. Even against the backdrop of his siblings' limitations, James's stood out. Although it is impossible to identify the exact causes of his limitations, James's complicated birth and his untreated head injuries are possible sources.

To his unique mix of risk factors, James exposed his still developing brain to an additional toxin: he began drinking moonshine around the age of eleven. Readily

available, this extremely toxic and potentially lethal form of pure grain alcohol was typically mixed with substances such as battery acid and horse manure to expedite the distilling process. According to James and his brothers, moonshine producers would lower car batteries into the mash, which would cause the moonshine to start bubbling; thus "cooking" the shine faster. Older friends introduced James to "shine," and James began to sneak out to the barn at night to drink – attempting to alleviate the pain and suffering of abject poverty and deprivation.

James began to run moonshine during his early adolescence. Lacking a driver's license and unable to drive safely, he took chances and risks that reflect his lack of judgment. Others taught James to drive the back roads and fields to make deliveries. On multiple occasions, he crashed and rolled the cars he drove – barely escaping serious injury. One time, James ended up in a creek bed with the tires of his car resting on two rocks while a swift stream ran down the middle of the underside of the vehicle.

James did not then – nor does he even now – grasp the dangerousness of his actions. James engaged in such risky behavior, not from just the invincibility of his youth but from a genuine inability to forecast consequences. Older, more experienced lawbreakers took advantage of James's lack of judgment and easily manipulated him. James received the attention and approval he had never known before, and was incapable of the reflection necessary to realize that others did not have his best interests at heart. After leaving school, James hauled moonshine until he was about eighteen-years-old.

James's interactions with Sevier County law enforcement typify his adaptive deficits. Though he worked "public" jobs away from the family homestead as a teenager, James was unable to obtain a driver license. As the family reports events, law enforcement stopped James for driving without a license every Friday after he cashed his pay check. After pilfering a portion of James's pay, the officers allowed him to continue driving home. Despite the predictability of this occurrence, James never sought another form of transportation nor did he learn an alternate route home. He simply let the law catch him driving illegally and surrendered a portion of his pay to them.

**Relationships and Marriage**

*"James was real good at changing the subject. If he didn't know what you were talking about, if you were talking and he didn't understand, he would start talking about something he did know."* Annabel Stewart

James's compromised intellectual abilities, combined with his total lack of resources and services as a child and adolescent, set him on a very limited path in life. James had friends who were also impaired but not to the same degree as he. Though now able to admit to their own deficits, his friends report that even as youngsters they knew that James was "slow." They often manipulated him and easily convinced him to engage in dangerous behavior, which at the time, they thought was funny. Only in hindsight, do they recognize that James could have been hurt or killed. James's friends report that both they and James were usually drinking heavily when they were "getting into mischief."

By James's account, by the time he was sixteen, he was buying his own clothes, fixing up old beat up cars, and dating pretty girls. Yet his "success" at any of these endeavors is questionable. Independent reports on his adaptive abilities differ wildly from James's self-assessment.

Prior to marriage, James benefited from structure and the direction of others. This was true on the farm, in school, and even in the hollow running moonshine. When he was sixteen, James met Annabel Cowan, two-years his junior, at a skating rink in Pigeon Forge. About a year later, they married. On his own with Annabel, James's inability to function independently became more apparent. James wanted to be the man of the house and manage the money he earned, but he could not count or make change. James did not know the denominations of bills, and when he needed to pay for something, he would merely hold out his hand with some money in it and let whomever he was paying take what they wanted, trusting they would return the change.

While he was married to Annabel, James was involved in a tragic car accident. Although physically unharmed, the incident left an indelible mark on James's psyche. A young man riding a motorcycle smashed into the side of James's car. James instinctively jumped out and held the bleeding man who ultimately died from his injuries. Entitled to a sizable settlement from insurance, James told the lawyers not to ask for anything.

James had great difficulty dealing with the emotional trauma of the accident.

James always cashed his paychecks at the same store, because the staff cashier at the store knew him and would cash his check without comment. James later learned to sign his name, but he never could learn to read. If a public restroom was marked with the words for men and women instead of the symbols, James could not tell which one to use and frequently walked into the wrong one. If his wife Annabel sent James to the store to get groceries, he could not remember what to bring home and was unable to read a list.

James mostly worked construction from the time he was thirteen until he was injured in 1990. Unable to fill out the Workman's Compensation forms unassisted, his second wife Lynda had to apply on his behalf. Though he received a sizeable settlement from a worker's compensation claim, the money did not last long. James quickly lent money to friends and gave it to various family members, depleting his only source of sustenance.

James wanted to work and worked hard, but he wasn't capable of working independently. Jeff Dodgen, James's employer, reports that James was able to assist as a construction laborer, but only when others gave him step-by-step instructions and watched over him. As Mr. Dodgen states, "James was strictly a laborer not a skilled carpenter." James could not use a measuring tape, and his employers had to figure out simple ways to explain things to him. Each day his employer would have to repeat what he had taught James the day before. James could remember to sweep the floor, but most tasks had to be taught anew each day.

James worked for a while at Cherokee Mills but was color blind and unable to distinguish thread colors. While still married to Annabel, James met another woman, Lynda, at Cherokee Mills. James moved with Lynda to Marietta, Georgia and never told Annabel he was leaving.

During his adulthood, James suffered two major losses: the death of a son and a daughter in separate accidents. In 1978 James's two-year-old son with Lynda, Jamie, died when a stove fell over and crushed him. Tammy Sue, James's eighteen-year-old daughter with Annabel, was killed in a car accident in 1988. Following Tammy's death, James began to drink heavily and take pain medication that started a downward spiral

from which he would never recover. The loss of two of his children within five years left James bereft and inconsolable. He was unable to identify his daughter's body, because he was overcome with emotion.

**And His Children After Him: Recent History as Confirmation of Historically Observed Deficits**

*"Dellinger had already been in the program at least a couple years when I became his teacher. At the point I took over, he knew almost all his ABC's."*

Rickey Harvell, TDOC Education Specialist

Although the sources of James's intellectual disabilities and related impairments are not precisely known, it seems certain James inherited some of his impairments, whether genetically or familially, and that he passed impairments on to his children. James had three children who attended school. Their records reflect that each child exhibited learning problems consistent with those discovered on both the maternal and paternal sides of James's family and with those exhibited by James. According to school records, Tammy (killed in a car accident at the age of eighteen), Timothy Lee, and James, Jr. each had intellectual disabilities.

James's daughter Tammy had significant cognitive and behavioral problems. According to a 1979 evaluation, Tammy reportedly functioned at the "borderline" range of intelligence. (Despite the administration of the Wechsler Intelligence Scale for Children (WISC), the report does not contain an actual IQ score for Tammy.) However characterization of her functioning as "borderline" is contradicted by school records which indicate that she was placed in special education. Pursuant to federal law, under the 1974 Individuals with Disability Education Act (IDEA), a child had to be found mentally retarded in order to be placed in special education classes. Tammy remained in the first grade for three years before promotion to the second grade at the age of nine further indicating significant impairments. She failed the fourth grade twice. Due to special education classes, educational testing, and other services not available during her father's childhood, Tammy was able to make it to the 8th grade before dropping out.

James's son Timothy Lee attended school from 1983 through 1997. His assignments were all "modified" due to his recognized cognitive disabilities. He was

schooled in a non-graded program and was able to do satisfactory work in that environment.

James, Jr. attended school from 1987-1999. He failed kindergarten and was socially promoted from the first to the second grade. In 1993, James, Jr. was placed in a non-graded program. He scored a 63 on the WAIS-R, a test of intellectual ability, clearly placing him in the mentally retarded range of functioning. He was placed at Douglas Cooperative for special needs children in 1998 and 1999.

After his incarceration at Riverbend Maximum Security Prison, James participated in a pre-GED program for four years. Rickey Harvelle, the GED instructor, assisted James three times a week. The program allowed inmates to work at their own level. When Mr. Harvelle began working with him, James had already been in the program for two years. Despite his participation for two years, James had not yet managed to learn the entire alphabet. According to Mr. Harvelle, even after Mr. Harvelle's years of one-on-one tutoring, James could only work at the lowest level and never scored high enough to be able to qualify for the full GED program – much less to take the GED.

**ASSESSMENT:**

The Dellinger family system was unable to meet a significant number of James's physical, emotional, cognitive, and educational needs. James's childhood was defined by want. At various times throughout his childhood, he did not have enough to eat, he did not have warm enough clothes for the winter, and the modest homes he lived in did not have plumbing or adequate heat. This was the reality of his siblings as well. Despite his parents' best efforts, the family system (and the culture they existed within) failed to provide the nurturing and good nutrition necessary for a healthy life.

However, unlike his siblings, James exhibited special needs, marked by inability to learn and clear indicators of cognitive impairment. Parents like the Dellingers – who are tired, traumatized, fearful, and abusing substances – are unable to provide the panoply of resources a special needs child requires to become a well-rounded, functional adult. When such a situation is combined with parental illiteracy and abject poverty, as was the

case here, the combination can prove especially pernicious for a child like James, virtually guaranteeing that his needs will go unaddressed.

An additional factor that often prevents special needs children from receiving necessary resources is a misperception as to how such children should present or "look." In particular, mentally retarded children can appear more competent than they actually are. This phenomenon is known in clinical and forensic circles as "the cloak of competence." Because intellectually disabled children sense that that they are different from their peers, they often expend a great deal of energy attempting to appear "normal." Despite this reality or, perhaps, because of it, the community at large, including parents and educators, still associate the mentally retarded as having a certain look or speech pattern or other identifying physical trait or characteristic.

James's differences were lurking beneath a thin veneer; his façade of competence did not adequately mask his deficits. His disabilities, while not formally identified as such by a wholly inadequate school system, were obvious nonetheless to his teachers and friends – and even to his siblings who, themselves, had serious learning problems. Although none of the people interviewed described James as having "special needs" (because it was neither a familiar term nor concept) – several identified him as "slow." Tellingly, every person interviewed described limitations and behaviors in James that were consistent with serious adaptive deficits that define mental retardation. At another time and in another setting, James would have been identified as a child eligible for special services.

Risk factors accumulated over James's developmental years. Beginning with probable maternal malnutrition in the prenatal period, progressing to untreated and repeated serious head injuries with loss of consciousness and exposure to environmental toxins – including moonshine – during childhood and adolescence, James's life is replete with multiple possible causes of mental retardation and brain damage. To counter these risk factors, there were few positive factors, limited primarily to an intact and loving family. Unfortunately even the positive factor of James's family was qualified, due to his family's inability to perceive his needs or to respond effectively to them. Significantly, there was a complete lack of either public or private intervention to assist James in

overcoming his intellectual impairments and special needs.

Children who are in the significantly impaired range of ability similar to James's are nevertheless deemed to be "educable." There are a range of skills such children can learn so that they can lead safe and productive lives. Depending on the child and the level and timing of the supports and education provided, such children may be able to live independently as adults or may live independently with some supervision. Parents who have the resources and the understanding to effectively ameliorate this level of impairment must recognize first that their child has special needs and second, that their child will require special help both at home and outside the home. Parents with access to resources to effectively deal with such children learn about their child's impairments, seek special services, and realize that their involvement in their child's life may mean supporting them well into adulthood, if not for a lifetime.

Below is a list of risk factors that contributed to James disabilities and/or prevented James from having the opportunities he required to be "educable" on a level that was safe for him and for the community:

## ACCUMULATION OF RISK FACTORS

- James was preceded by an intergenerational history on both the maternal and paternal sides of his family that included illiteracy and other intellectual losses, poverty and deprivation, isolation from the larger community and its resources, family violence, and substance abuse.
- James was born to a father who could not read or write.
- James was born to a father whose violent behavior was largely driven by untreated trauma from WWII.
- James was born to a mother who could not read or write.
- James was born to parents whose own lives were so deprived as to render them unaware of resources or how to obtain and use them.
- James and his siblings had no prenatal care and were delivered by poorly trained midwives.

- James was born into poverty and deprivation which affected sanitation, adequate food, clothing and shelter, and access to education.

- James's parents' pride and shame prevented them from seeking help for their family. Regardless, community resources were meager even if the family had sought such help.

- James was born into a sub-group of the Appalachian culture classified by at least one scholar as "in-migrants," and his family lived an unstable and unpredictable existence, including multiple moves all over the county.

- James never had traditional medical care as a child or adolescent and suffered numerous serious head injuries without the benefit of medical intervention. Specifically, when James was ten, he was kicked in the head by a pony. He received no medical care even though he lost consciousness for a protracted period of time, his vision was affected for three weeks, and he suffered severe headaches for an even longer time. Additional reported head injuries include being hit by a falling two by four and injury from multiple car accidents.

- During the developmental period, James was exposed to numerous chemical toxins as he worked alongside his parents in tobacco farming.

- James demonstrated his special needs from a young age, but his parents did not have the knowledge or skills to distinguish his behaviors from those of his siblings who also had problems learning.

- James attended school according to the tobacco harvesting schedule and therefore had poor attendance from the first grade until the third when he stopped going to school.

- James often went to school hungry.

- James was socially promoted from first grade to third because of his size.

- James stayed in third grade until he dropped out of school at fourteen years of age.

- James was never promoted due to merit from one grade to the next.

- James could not learn to read or write.

- By the age of eleven, James was drinking moonshine, a mixture often

contaminated by battery acid and horse manure. Ingestion of large quantities of any type of alcohol during the developmental period can affect brain development.

- From the ages of approximately fourteen to eighteen, James drank and ran moonshine to be able to buy his clothes.

- James's siblings were also poorly educated and unable to help him.

- There were no resources in the community to intervene on James's behalf. His special educational and intellectual needs were undetected.

- James was the recipient of his father's harsh beatings, and he grew up witnessing his father's violence and infidelity toward his mother.

- James married while still a minor and entered adulthood lacking any understanding of relationships with women or with others.

The accumulation of these risk factors over the course of James's life, combined with neglect and the total lack of intervention for his special needs, James's own self medication with alcohol, his lack of adaptive skills, and his intellectual deficits, were contributing causes of his disabilities and forces that rendered James particularly vulnerable to destructive forces in life. These factors adversely affected his judgment, insight, decision-making, emotional stability, and impulse control.

Jan Vogelsang, LISW-CP, BCD

1/18/12
Date