**Exhibit 14**

**Andres M. Lugo, M.D., M.P.H., FACMT**
CLINICAL, ENVIRONMENTAL & OCCUPATIONAL TOXICOLOGY
804 Old Bridge Cir. Davenport, Florida 33897
(863) 420-7075, Lugo0015@umn.edu & drlugotox@toxicorp.com

February 6, 2012

Amy D. Harwell
Assistant Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville TN 37203

Re: James Dellinger's Toxicology Report

Ms. Harwell:

**Purpose of Engagement**

At your request, I have conducted an initial Toxicological investigation and evaluation to determine the extent to which James Dellinger was exposed to toxic chemical substances, to identify what the toxic substance were or likely were, to identify the biological effects such substances can have, and to report – as a Medical Toxicologist – on the relationship between any such exposure and Mr. Dellinger's cognitive impairments, which others have identified. Below, I describe my education, training and experience; identify the information provided and the nature of my investigation; summarize my conclusions; and outline the factual basis for my conclusions.

**Summary of Qualifications**

As described more fully in my Curriculum Vitae, I am a Medical Toxicologist and Fellow of the American College of Medical Toxicology. I am also as Poison Specialist certified by the American Association of Poison Control Centers; I have a Master's Degree in Public Health from the University of Texas; I have Doctorate studies in Toxicology at the University of Minnesota; and I have more than twenty-four years of experience working in the field of toxicology.

**Information Provided and Documents Reviewed**

You provided me numerous records, declarations, and reports to assist me in my investigation and evaluation. It is my understanding that you provided these same materials to other experts to assist in their investigations and assessments and that you will ultimately provide these materials to the Court as well. Of particular significance for my purposes are the

declarations and reports relating to Mr. Dellinger's family history. You have also provided me with various medical and psychological reports and assessments regarding Mr. Dellinger that detail his conditions and disabilities. These include a neuropsychological evaluation conducted by Dr. Peter B Young, Ph.D., Clinical Psychologist, in which Dr. Young reported that Mr. Dellinger scored a 1.0 out of a possible 0.0 -1.0 range on the Halstead Impairment Index, indicating that James Dellinger has severe neurological damage. I also reviewed James Dellinger's Forensic Evaluation performed by Rokeya Farooque, M.D.; Amin Azimi; Ed.D.; a Psychological Examination by Bruce McKoy, M.A.; a Psychiatric Review by Warren W Webb, Ph.D.; a Psychological Evaluation by Peggy Cantrell, Ph.D.; a Psycho-educational report by Sidney Hall, Ph.D.; and a report from Larry Southard, Director Forensic Services. Independently of the above-described document, I personally interviewed James Dellinger's brothers and sisters in Sevier County Tennessee, where he was born and raised.

**Summary of Conclusions**

By way of introduction, I must point out that toxic substances occur naturally in the environment. Such substances can also be manmade, and then introduced into the environment in many ways. Whether naturally occurring or manmade, such substances can have extremely harmful, and indeed fatal consequences on humans that are exposed to them. At times, the identification of a toxin or poison and its link to the effect on a person is quite straightforward, such as the administration of a poison that causes immediate death.

Conversely, there are times when establishing the link between exposure to a toxin and the causal effect of that exposure can be difficult. Causation and linkage to effect obviously turn on a number of variables dealing with the nature of the toxin, its strength or concentration, the manner of exposure (for example, through ingestion, respiration, or direct contact), the length of exposure, and the point in life when a person was exposed. In cases like the present one, cause and effect are less certain than when, as in the abovementioned example, a person ingests poison and dies.

Thus, cause and effect must be addressed in terms of probabilities, despite the fact that it is scientifically established, indeed it is beyond debate, that exposure to certain toxins has clear biological consequences and effects. For example, as relevant here, the exposure to certain toxins will have an identifiable effect on a person's development, including neuropsychological development. The extent of such effect is again based on when the person was exposed, to what toxin, and for what period of time.

With this brief, explanation, and based on my own investigation and the materials that you provided me, it is my opinion that there is a significant probability that Mr. Dellinger's identified neurological and cognitive disabilities were in part, if not in whole, the product of his mother's exposure to highly toxic pesticides during her pregnancy and from Mr. Dellinger's own exposure to such substances throughout his childhood and increasingly during his adolescence. This conclusion is based on the high toxicity of the substances, the period when Mr. Dellinger was first exposed, the length of time he was exposed, the introduction and exposure of other toxins during his developmental period, and the known fact that the exposure to such toxins

prenatally and throughout childhood can have a direct, substantial impact of neurological development.

**Outline of Facts Supporting Conclusion.**

The purpose of the recitation of facts is not to state them comprehensively, as others have done or will do. Rather, my purpose is to set out generally the facts that are salient with respect to my charge. It is plain that Mr. Dellinger was exposed to highly toxic pesticides and lead poisoning prenatally. This exposure continued throughout his childhood and adolescence as he participated in subsistence farming with his parents and siblings, which included the tobacco allotments of his family and their neighbors. During his childhood, Mr. Dellinger was exposed to other toxins, most notably, when, at age 12, Mr. Dellinger began to consume toxic ethanol (homemade moonshine) that had been produced by local stills.

The interviews and documents reveal that Mr. Dellinger was born in a very poor farming community, in which his family was considered among the poorest. The Dellinger family's principal, if not sole source of income, was subsistence farming. The Dellinger farm produced a small amount of tobacco and corn, along with other vegetables consumed by the family. This farming enterprise exposed Mr. Dellinger's mother and Mr. Dellinger to toxic pesticides such as *lead arsenate, aldrin, DDT* and other highly toxic organochlorine pesticides. Significantly, Mr. Dellinger and his siblings were constantly engaged in farming activity, as evidenced by the fact that they were unable to regularly attend school because their work was necessary to the Dellinger family's survival.

The principal source of income for the family was the proceeds from their tobacco allotment and the family's share of the proceeds from neighbors' allotments in exchange for the family's labor. The entire Dellinger family participated in planting, removing weeds, harvesting, tanning, and grading tobacco. They also fumigated the tobacco with a pesticide containing lead arsenate "using a duster made with an empty can or with their bare hands to sprinkle lead arsenate on each tobacco plant." Thus, not only was Mr. Dellinger continually exposed to a strong toxin, but the crude manner in which the pesticide was dispersed substantially increased exposure and consequently toxicity.

In addition to the exposure resulting from farming, Mr. Dellinger grew up in the midst of a highly toxic environment. He spent his childhood playing and working near tobacco fields and other crops. In addition, the family's homes, located in the midst of the fields, were uninsulated shacks where it was possible to see daylight through the cracks in the walls and through which the dirt and toxins blew and settled on everything.

The Dellinger family was unaware of their chronic occupational and environmental exposure to highly toxic substances. Regardless, given the circumstances, such knowledge of the serious danger the toxins imposed, would not have enabled them to take protective action. Given the extreme danger to humans and injury to the environment generally, many of these highly toxic pesticides used during James's childhood have since been banned or severely restricted in the United States and in other countries worldwide. The reason for the bans and restrictions is that the substances cause endocrine disruption and severe developmental affects

in children (such as brain damage and cognitive problems), among other severe health and environmental effects.

In addition to exposure to pesticides, Mr. Dellinger and his family lived in old houses where Mr. Dellinger was exposed to lead. To the extent that the Dellingers maintained such houses, if at all, and some plainly were not – for example, in one house, they "covered" holes in the plank wall with wallpaper – the paint used during that time was usually lead-based. Studies show that chronic exposure to lead-based paints causes neurological damage and learning disabilities in children. In turn, this affects neurological and cognitive development and major brain functions, such as intelligence and motor skills. There is a high probability that Mr. Dellinger's present developmental disabilities are a product of early, on-going and significant exposure to pesticides, to lead-based paint, or to the toxins in home-made moonshine discussed below.

More specifically, I base my opinion that there is a high probability that Mr. Dellinger's early, significant, and extended exposure to highly toxic substance was a principal cause of his cognitive deficits and substantial neurological damage on the following:

1. Prior to his birth and throughout his childhood, Mr. Dellinger's mother lived and worked on a farm performing very hard and hazardous jobs, specifically, harvesting tobacco, corn, and other crops. She performed this work without having knowledge or awareness of the health dangers of pesticides much less the hazards to a pregnant woman and her unborn child, such as working in the fields immediately after fumigating the crops with hazardous toxins. In fact none of the Dillingers, had knowledge about pesticide toxicity or how to protect themselves from exposure. Such small production farmers never received training on the importance of personal protective equipment or on how to decontaminate their clothing and themselves after using pesticides. They were also unaware of the fact that working with pesticides outdoors could lead to contamination in their homes, thus exposing their families to pesticides. While tending tobacco, Mr. Dellinger and his family applied lead arsenate and other pesticides by hand; these very rudimentary methods of application substantially increased the amount and severity of their exposure to these highly toxic substances. These conclusions are supported by the fact that Mr. Dellinger's siblings recalled that the pesticides had a very strong odor and that their clothes were soaked or covered with powder and fluids after they tending the crops. Mr. Dellinger's siblings also recalled licking their fingers after applying powdered arsenic to tobacco plants and that it tasted sweet. Virtually all of the Dellingers were illiterate so they were unable to decipher warning labels on the hazardous pesticide they used, thus increasing the risk of becoming chronically exposed to highly toxic pesticides. Moreover, the Dellingers were less likely to seek medical attention when their children got sick because they were unaware that they had been exposed to highly toxic substances and they did not have access to even the most basic medical care.

2. Mr. Dellinger and his family lived in poverty in very old houses where they were exposed to lead paint. Studies show that indoor lead paint is one of the main sources of toxic exposure in children in the United States. Particularly houses built before the 1970's, which, of course, included all of the houses in which Mr. Dellinger grew up as a child.

3. James Dellinger suffered from chronic occupational and environmental exposure to highly toxic pesticides. According to records from US EPA, US Department of Agriculture and the Tennessee Department of Agriculture farmers producing tobacco, cotton, corn, and other crops extensively used highly toxic pesticides due to severe plant infestations and plant diseases. These pesticides included, but are not limited to, lead, arsenic, Atrazine, Chloranil, Heptachlor, BHC, 2,4-D, 2,4,5-T, Chlordane, Chlorobenzilate, Phenoxy Herbicides, Mevinphos, Organic Mercuric Compounds, Aldrin, Dieldrin, Acephate, Silvex, DDT. Carbofuran, Methiocarb, Arsenicals, Calcium Cyanide, Hydrocyanic Acid, Nitrobenzene, Diplumbic Arsenate of Lead, Cryolite, and Tetraethyl Pyrophosphate (OP).

4. Many of the above named pesticides have been banned in the United States and countries worldwide due to their severe toxic effects capable of causing brain damage, endocrine disruption, cancer, chronic degenerative diseases, and other severe developmental effects in humans. Studies show that chronic exposure to highly toxic industrial pesticides has a very high risk of causing severe developmental effects in humans. Notably, research shows that the human brain is particularly susceptible to damage due to toxic exposure; resulting in learning disabilities, cognitive and/or behavioral problems, as well as damage to pregnant women and their developing fetuses.

5. The Dellinger family's occupational exposure to highly toxic pesticides in the agricultural plots contaminated their homes in East Tennessee, which was located merely a few yards away from the plots they farmed.

6. It is well documented that working as an agricultural farm worker is one of the most hazardous occupations. Farm workers and by extension, their families, are at a greater risk of suffering exposure to toxic pesticides than other workers. There are many hazards in this occupation that include not only exposure to agricultural chemicals (pesticides, herbicides, and fertilizers), but injury from farm machinery, toxic biological agents, animal and insect bites, animal diseases and infections, and other related dangers.

7. When James Dellinger was approximately 12-years-old, he started to drink locally manufactured moonshine. People in his community used lead batteries, animal manure, and other toxic substances to manufacture moonshine. Besides being exposed to toxic ethanol during his childhood, James was also exposed to lead and other toxic substances commonly used in moonshine production. Children exposed to alcohol in early years of life are significantly more likely to suffer brain and neurological damage as well as to develop behavioral and social problems.

## CONCLUSION

The Dellinger family lived in a toxic environment as a result of their need to engage in subsistence farming to survive. Their illiteracy prevented them from being aware of the hazards they faced and from taking steps to reduce those hazards. Mr. Dellinger was exposed to extremely toxic substances *in* utero. He continued to be exposed to significant amounts of these substances orally (in his food), through his respiratory system, and by constant contact through his skin. This exposure occurred during the development period, when his brain was still developing. This exposure continued throughout the time he lived with his family. Mr. Dellinger was exposed to other toxins, including both the alcohol and the additives customarily involved in making moonshine.

Psychological and neurological testing reveal that Mr. Dellinger's cognitive abilities are substantially impaired in a number of ways. Such testing also reveals that Mr. Dellinger has significant brain damage. These medical, psychological and neurological conclusions are supported, as those experts' reports, by extremely poor school performance and by limitations in his day-to-day life (such as the ability to count money or to operate a telephone). Such limitations, as the other experts can testify, can be the product of many causes. That said, it is my opinion, to a reasonable degree of scientific certainty, that given the above described exposure to dangerous toxins, (from before birth and through the entire developmental period) the nature and extent of Mr. Dellinger's disabilities, and the time when the disabilities were evidenced, that there is a high probability that Mr. Dellinger's disabilities were caused, at least in part, by this exposure.

I declare under the laws of the United States and under penalty of perjury that the foregoing is true to the best of my information and belief.

Andrés Lugo, M.D., M.P.H., FACMT
804 Old Bridge Cir.
Davebport Fl 33897
(863) 420-7075, (915) 203-6784 (Cell)
Lugo0015@umn.edu &
drlugotox@toxicorp.com