**Exhibit 25**

LLRX.com - Legal Research
Expert Witness Directory
Nolo Consumer & Business
US Court Forms
WashLaw Directory
World LII

**Cases Provided By**
Creative Commons
public.resource.org
fast

The following search terms have been highlighted for you: **bobby floyd drugs**

## United States of America, Plaintiff-appellee, v. Bobby C. Floyd, et al., Defendants-appellants

## United States Court of Appeals, Sixth Circuit. - 16 F.3d 1222NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.

**Jan. 21, 1994**

Before: KEITH, JONES, Circuit Judges, and
RUBIN, District Judge.[1]

PER CURIAM:

1 Defendant Bobby C. Floyd ("Floyd") appeals his jury convictions and sentences for conspiring with co-Defendant Richard A. Clark ("Clark") and two others to possess and to distribute cocaine hydrochloride, in violation of 21 U.S.C. Sec. 841(a)(1) (Count I); aiding and abetting in the distribution of cocaine hydrochloride, in violation of 21 U.S.C. Sec. 841(a)(1) (Counts II, III, IV and VI); and using a firearm in relation to a drug trafficking offense, in violation of 18

U.S.C. Sec. 924(c) (Count V). Clark, who pled guilty to all Counts except Count V, appeals his jury conviction for using a firearm in relation to a drug trafficking offense. For the reasons stated below, we AFFIRM both Defendants' convictions and sentences.

2 On September 6, 1991, Floyd agreed to sell Michael Gaines ("Gaines"),[2] an informant who had been arrested on federal drug charges, an ounce of cocaine for $1500. Both men agreed Gaines would pay Floyd first and then they would collect the cocaine. After Floyd received the money, he and Gaines travelled to Sevier County to get the cocaine. Before arriving in Sevier County, however, Floyd realized the police were following them and cancelled the sale.

3 On September 10, Floyd again agreed to sell Gaines an ounce of cocaine for $1500. After he was paid, Floyd told Gaines he had called his cocaine source and the source would call him back later.[3] Later the same day, Gaines returned to Floyd's home. Floyd told Gaines that an anonymous caller would provide him directions for the delivery of the ounce of cocaine and the price of a kilogram of cocaine. Both agreed the caller would refer to himself as "ABC." As agreed, "ABC," a male, phoned Gaines the same day and explained the cocaine delivery was delayed. Gaines later identified "ABC's" voice as Clark's voice.

4 On September 11, "ABC," who Gaines again identified as Clark, phoned Gaines and told him the cocaine was at the foot of a stop sign on Roberts Road near Douglas Dam in Sevier County, Tennessee. Gaines and his wife retrieved the cocaine on the same day and gave it to the police. At trial, Clark testified he was with Floyd when he hid the cocaine on Roberts Road.

5 On September 15, "ABC" phoned Gaines and stated no one had given him a price for "34 acres" (a kilogram of cocaine) and he did not have any more "lots" (an ounce of cocaine). Additionally, the two arranged another purchase using the same procedure of payment first and delivery later. They also agreed "ABC" would call Gaines the following day at 5:00 or 6:00 p.m.

6 On September 16, Gaines missed "ABC's" call. Later the same day, Floyd told Gaines "ABC" was upset because Gaines missed his call and that "ABC" gave him a price of "nineteen" ($19,000) on "34 acres." Floyd also vouched for the quality of the kilogram of cocaine.

7 On September 17, Floyd told Gaines he was taking him to meet "ABC." The two

travelled through Sevier County and arrived at Clark's residence at the Shady Grove Mobile Home Park in Maryville, Tennessee. During the meeting, Floyd (referring to Gaines) said to Clark, "I told him nineteen." Gaines calculated the cost of an ounce of cocaine based upon a kilogram of cocaine priced at $19,000 and said if he purchased a kilo, he wanted to exchange the cocaine and money simultaneously. While Gaines calculated the price of an ounce of cocaine, Clark said he was upset because Floyd brought Gaines to his home without any notice. The two then stepped outside to finish the discussion. When Gaines and Floyd left Clark's residence, Gaines asked why Clark was upset. Floyd said Clark was expecting cocaine buyers and Gaines responded he didn't see any problem with people coming over to pick up a couple ounces of cocaine. Floyd remarked the sale was for two kilograms. During their departure, Floyd and Gaines encountered two men whom Floyd identified as Clark's buyers.

8 After the September 17 meeting, Gaines did not have any further contact with Clark. Although Floyd and Gaines negotiated additional purchases of cocaine, neither Floyd or Clark delivered additional cocaine to Gaines.

9 In the fall 1991, Floyd and Clark also distributed approximately one ounce of cocaine to undercover operative David Bowers ("Bowers") on three separate occasions. Floyd and Clark obtained the cocaine used in those sales from Gregory Anawalt ("Anawalt") and Jimmie Gates ("Gates").

10 In the fall 1991, Anawalt and Gates received quantities of cocaine through the U.S. Mail from Bogota, Columbia. On November 21, Sevier County resident Johnny Thompson ("Thompson") introduced Anawalt and Gates to Floyd to provide them with a distributor for the South American cocaine. After they met, Floyd took Anawalt and Gates to Clark's residence in Maryville, Tennessee where they attempted to secure a buy for an ounce of cocaine. Anawalt provided twenty grams of pure cocaine which was then "cut" to obtain an ounce. Floyd, however, failed to produce a buyer for the ounce of cocaine. Anawalt became angry and threatened Floyd with a .357 magnum revolver. Later, Clark drove Anawalt, Thompson and Floyd back to Thompson's residence in Sevier County. Fearing for his safety, Floyd fled from the residence.

11 The next morning on November 22, Floyd called Gates at a motel in Greeneville, Tennessee. Floyd told him he was still interested in obtaining cocaine from Gates but refused to deal with Anawalt because of the treatment he received the night before. Floyd agreed to sell the ounce of cocaine from the previous evening as

long as Anawalt was not involved. Gates then agreed to meet Floyd at a location in Knox County and together they traveled to Clark's residence in Maryville, Tennessee. Later the same day, Bowers, an undercover operative, went to Clark's residence and purchased an ounce of cocaine for $1400. Gates, Floyd and Clark were all present during the transaction. After Bowers left the residence, Gates gave Floyd and Clark additional cocaine (approximately 10 or 15 grams).

12 On November 27, in Newport, Tennessee, Gates and Anawalt met Floyd and gave him more cocaine. During the meeting, Anawalt and Floyd reconciled their differences and agreed to continue their cocaine business.

13 On December 2, Gates and Anawalt met Floyd, Clark and Bowers at Clark's residence in Maryville, Tennessee to distribute additional cocaine. Floyd, Clark, Gates and Anawalt diluted twenty grams of pure cocaine and sold Bowers an ounce of cocaine for $1400. During the transaction, Bowers saw the loaded .357 magnum revolver that Anawalt had used to previously threaten Floyd in the waistband of Anawalt's trousers. While Floyd weighed an ounce of cocaine, Bowers and Anawalt discussed the firearm.

14 That same night, Bowers returned to Clark's residence in Maryville to purchase an additional ounce of cocaine. When Bowers arrived, he saw a pile of cocaine which he described as approximately three inches in diameter and three to four inches high. Floyd and two other individuals were present but Clark was not. Because Floyd needed a scale to weigh the cocaine, Bowers waited for Clark to arrive. When Clark arrived, he weighed out the cocaine and completed the sale.

15 On December 21, investigating officers directed Bowers to deal directly with Gates and Anawalt. On December 27 and 28, Bowers purchased additional cocaine from Anawalt and Gates who continued to supply Clark and Floyd with varied quantities of cocaine from December 11 until January 17.

16 On January 16, 1992, the government filed a criminal complaint in the United States District Court for the Eastern District of Tennessee charging the defendants, Floyd and Clark, with distributing approximately one ounce of cocaine on December 11, 1991, in violation of 21 U.S.C. Sec. 841(a)(1). Floyd was arrested and appeared initially before a United States Magistrate Judge on January 17, 1992. The government moved for detention, and on January 31, 1992, Floyd, who was on state parole at the time of the offense and his arrest, waived a detention hearing and agreed to remain in custody. On January 21,

1992, Clark was arrested and appeared before a United States Magistrate Judge. He was released on a non-surety bond filed the same day.

17 On January 22, 1992, a federal grand jury for the Eastern District of Tennessee returned a single count indictment against Floyd and Clark. Both were charged with aiding and abetting each other in the distribution of cocaine hydrochloride on December 11, 1991, in violation of 21 U.S.C. Sec. 841(a)(1). On January 31, 1992, both Floyd and Clark pled not guilty to the charge.

18 On March 17, 1992, the federal grand jury returned a six-count superseding indictment against Floyd and Clark. Count I of the superseding indictment charged Floyd and Gates with conspiring with each other, two named individuals (Anawalt and Gates) and other unnamed persons to possess with intent to distribute, and to distribute cocaine hydrochloride from approximately the beginning of September 1991 until the time of their arrest in mid-January 1992, in violation of 21 U.S.C. Sec. 841(a)(1). Counts II, III, IV and VI charged both with aiding and abetting one another in the distribution of cocaine on specific dates, in violation of 21 U.S.C. Sec. 841(a)(1). Count V charged both with using a firearm in relation to a drug trafficking offense on December 2, 1991, in violation of 18 U.S.C. Sec. 924(c)(1).

19 On May 18, 1992, the jury trial commenced. After the jury was empaneled and sworn, Floyd plead guilty to Counts I, II, III, IV and VI (all drug violations), but maintained his plea of not guilty to Count V (firearms violation). Clark again plead not guilty to all counts and orally moved for severance. The district court denied the motion for severance and proceeded with the trial. On May 21, 1992, the jury returned a guilty verdict on Count V of the superseding indictment as to Floyd and a guilty verdict on all counts of the superseding indictment as to Clark.

20 A United States Probation Office prepared and filed presentence reports for both Floyd and Clark. On July 23, 1992, Floyd filed written objections to his presentence report and Clark filed written objections to his presentence report on September 14, 1992. The government filed a written response to the objections.

21 On December 21, 1992, the court held an evidentiary hearing to resolve Floyd's and Clark's objections to the presentence reports. The government introduced additional testimony and exhibits and both defendants testified. FBI Special Agent Mark Swanger, Jr. testified Gaines told him Floyd and Gates travelled to Miami, Florida, on at least two occasions, to purchase approximately one

kilogram of cocaine from sources known only to Floyd. FBI Special Agent Joseph T. Mann testified that while Floyd was incarcerated in Knox County, Tennessee in 1989, Floyd identified several cocaine sources and referred to at least one occasion in which kilogram quantities were involved. Additionally, he testified that while incarcerated in Sevier County in 1992, Floyd stated he could obtain eight to ten ounces of cocaine from his sources while incarcerated.

22 Both Clark and Floyd testified and denied the ability and the intent to distribute a kilogram of cocaine to Gaines. Floyd admitted to previously purchasing cocaine in Florida with Gaines.

23 The court sentenced Floyd to one hundred (100) months of imprisonment on Counts I, II, III, IV and VI to run concurrently and sentenced Clark to seventy (70) months imprisonment on Counts I, II, III, IV and VI to run concurrently. Additionally, the district court sentenced both Floyd and Clark to sixty (60) months imprisonment on Count V to run consecutive to their drug-related sentences.

24 Floyd and Clark first argue the convictions for the firearm offense must be vacated because the evidence was insufficient to support guilty verdicts based on any of the instructed theories. Second, Floyd and Clark contend the evidence was insufficient to support convictions for aiding and abetting the use of a firearm in relation to a drug trafficking offense. Third, Floyd and Clark submit the use of the Pinkerton[4] doctrine in relation to the firearm count violated their due process rights. Fourth, Defendants argue the district court erred in denying Clark's motion for severance. Fifth, Defendants assert the district court erroneously attributed 1.34 kilograms to them for sentencing. Sixth, Defendants contend the imposition of a consecutive sentence for a firearm offense under the sentencing guidelines violates the Double Jeopardy Clause of the Fifth Amendment. Finally, Defendants challenge the constitutionality of the Sentencing Guidelines. Each allegation of error will be discussed below.

25 Floyd and Clark argue the general guilty verdicts should be set aside because the jury was instructed on alternative theories of guilt for the firearm violation and the evidence is insufficient to support convictions based on any of the instructed theories. Additionally, Floyd and Clark argue the convictions for the firearms offense should be set aside because the jury returned a general guilty verdict and the theory of guilt was indiscernible. We disagree.

774-4903

26 Floyd and Clark argue the evidence was insufficient to support a conviction for a Sec. 924(c)(1) violation because there was no evidence either Floyd or Clark carried a firearm and the evidence was insufficient to impute guilt under the Pinkerton doctrine. We disagree.

27 When reviewing the sufficiency of the evidence supporting a jury verdict, this court must sustain the determination of the jury if it is supported by substantial and competent evidence. United States v. Tilton, 714 F.2d 642, 645 (6th Cir.1983). Viewing the evidence in the light most favorable to the government, this court must determine whether any rational trier of fact could have found the essential elements of the crime, beyond a reasonable doubt. United States v. Sanchez, 928 F.2d 1450, 1457 (6th Cir.1991) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In the instant case, sufficient evidence existed for a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.

28 Under Pinkerton, the overt act of one co-conspirator may be considered the act of all co-conspirators without any new agreement specifically directed to that act. 328 U.S. at 647. Gates and Anawalt testified in November 1991 they and Floyd and Gates agreed to and distributed cocaine. Additionally, Floyd, Gates, Anawalt and Clark were all present when Bowers purchased cocaine. Based on this testimony, a rational trier of fact could infer Clark and Floyd conspired with one another and with Gates and Anawalt to possess and sell cocaine.

29 On November 21, 1991, Anawalt threatened Floyd with a .357 magnum when Floyd failed to supply a cocaine buyer. Bowers testified Anawalt carried the same firearm during a later drug transaction where Floyd and Clark were present and discussed the firearm in their presence. Neither Defendant expressed surprise or dismay at Anawalt's possession of a firearm. Based on these facts, a rational trier of fact could infer Anawalt, a co-conspirator, used a gun to facilitate drug transactions in violation of Sec. 924(c)(1) and Anawalt's co-conspirators, Floyd and Clark, were also guilty of the offense under the Pinkerton doctrine. We find the evidence was sufficient to support a conviction for a violation of Sec. 924(c)(1).

30 Additionally, Floyd and Clark argue because the district court instructed the jury it could use one of two bases to convict Defendants of using a firearm in relation to a drug trafficking offense, the jury's general verdict must be overturned. Essentially, Floyd and Clark contend the jury could have improperly convicted

them finding they used a firearm. Such a finding was improper, according to the Defendants, because no evidence existed to support that finding. The Defendants, therefore, conclude the general verdict must be overturned because it is unclear which theory the jury used.

31 Floyd and Clark cite inapplicable case law to support their argument. Defendants erroneously rely on Zant v. Stephens, 462 U.S. 862, 880 (1983) which held "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." The court defined an insufficient basis as a legally unconstitutional basis. The holding in Zant is generally applicable where "a general verdict on a single-count indictment or information rest[s] on both a constitutional and unconstitutional ground." Id. at 882 (emphasis in the original).

32 The general verdict did not rest on a constitutional and unconstitutional ground and both bases for conviction were constitutional. Although the evidence does not support a guilty verdict based on an actual violation by Floyd or Clark, the jury was not instructed that the Defendants used a firearm in relation to a drug trafficking offense. Rather they were instructed such behavior was prohibited. In fact, to use the Pinkerton doctrine to impute one co-conspirator's offense to another co-conspirator, a district court must give the elements of the underlying offense so the jury may determine whether the defendant or a co-conspirator committed the offense. Thus, we conclude Defendants' argument is meritless.

33 Floyd and Clark argue the evidence was insufficient to support a guilty verdict for aiding and abetting the use of a firearm in relation to a drug trafficking offense. Defendants assert that in the Sixth Circuit mere presence and knowledge of the crime are insufficient to support a conviction for aiding and abetting.

34 Mere presence and knowledge of an offense are not sufficient to convict a defendant of aiding and abetting that offense. United States v. Morrow, 977 F.2d 222, 231 (6th Cir.1991). Under the Pinkerton doctrine, however, if a co-conspirator's use of a firearm is reasonably foreseeable to the defendant, then the defendant may be convicted for aiding and abetting the use of a firearm. United States v. Christian, 942 F.2d 363, 367-68 (6th Cir.1991).

35 As the above discussion establishing the sufficiency of the evidence indicated, applying Pinkerton, a rational trier of fact could find beyond a reasonable doubt

the use and possession of the firearm were reasonably foreseeable to Floyd and Clark, and therefore, they aided and abetted the possession of a firearm in relation to a drug trafficking offense.

36 Floyd and Clark assert the court's instruction on the Pinkerton doctrine violated their due process rights by impermissibly reducing the government's burden of proof from beyond a reasonable doubt to criminal negligence. During the jury charge, the trial court instructed the jury that the Defendants could be held responsible for acts committed by other members of the conspiracy "as long as those acts [we]re committed to help advance the conspiracy, and [we]re within the reasonably foreseeable scope of the agreement." The court further defined "reasonably foreseeable scope" stating, "[t]he crime must have been one that the defendant could have reasonably anticipated as a necessary or natural consequence of the agreement."

37 This circuit and others have repeatedly rejected Defendants' argument and upheld convictions for violations of 18 U.S.C. Sec. 924(c)(1) under the Pinkerton doctrine and its foreseeability standard. United States v. Cummings, 937 F.2d 941 (4th Cir.1991); United States v. Lucas, 932 F.2d 1210, 1219-20 (8th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 399 (1991); United States v. Christian, 942 F.2d 363, 367 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 905 (1992); United States v. Martin, 920 F.2d 345, 348 (6th Cir.1990), cert. denied --- U.S. ----, 111 S.Ct. 2038 (1991); United States v. Raborn, 872 F.2d 589, 595-96 (5th Cir.1989); United States v. Diaz, 864 F.2d 544, 548-49 (7th Cir.1988), cert. denied, 490 U.S. 1070 (1989).

38 Floyd and Clark erroneously rely on United States v. Blatt, 811 F.Supp. 625 (D.Kan.1993), which is inapplicable to the case at hand. Additionally, the Blatt holding is contrary to the law of this circuit. United States v. Christian, 942 F.2d 363, 367-68 (6th Cir.1991). Based on the law of this circuit, we find the Pinkerton foreseeability standard does not reduce the government's burden of proof, and thus, does not violate the Defendants' due process rights.

39 Floyd and Clark next argue the district court abused its discretion by failing to grant Clark's motion for severance. Floyd, however, failed to renew his motion for severance at the end of trial. This circuit has previously deemed a severance motion waived if it is not renewed. United States v. Swift, 809 F.2d 320, 323 (6th Cir.1986). Because Floyd failed to renew his motion for severance, we find the issue was not preserved for appellate review.

Floyd and Clark argue the district court erred in attributing 1.34 kilograms of cocaine to them for sentencing because: (1) they lacked the intent and ability to distribute a kilogram of cocaine; (2) the negotiated amount of cocaine originated with the informant and therefore should not be attributed to them; and (3) their co-conspirators' cocaine sales were not foreseeable. After an evidentiary hearing on December 21, 1992, the district court found that both Defendants "participated in the distribution or the negotiation of not less than 1.34 kilograms of cocaine during the conspiracy." Discussing the negotiated amount of cocaine, the court found the Defendants did "not demonstrat[e] that they did not have the ability and intent to obtain such quantities." The court found Anawalt's and Gates' additional cocaine sales occurred during the life of the conspiracy and were reasonably foreseeable. Applying Sentencing Guideline Sec. 1B1.3(A)(1), the court held Clark and Floyd accountable for the distribution of 1.34 kilograms of cocaine. We agree.

41 Although the government has the burden of proving the amount of drugs attributable to defendants, the defendant bears the burden of proving he lacked both the ability and the intent to distribute negotiated drug amounts. United States v. Gessa, 971 F.2d 1257 (6th Cir.1992) (en banc ); United States v. Rodriguez, 896 F.2d 1031 (6th Cir.1990). Floyd and Clark must prove by a preponderance of the evidence they lacked the intent and the ability to distribute the negotiated amounts. Rodriguez, 896 F.2d at 103. This court may not disturb factual findings which underlie a court's sentencing decision unless such findings are clearly erroneous. See e.g., United States v. Moreno, 899 F.2d 465, 470 (6th Cir.1990).

42 Floyd and Clark assert because they and Anawalt and Gates were drug addicts they never had the ability to acquire a kilogram of cocaine. Although Gates and Anawalt were drug addicts, they were only one of the Defendants' cocaine sources. Anawalt and Gates did not supply the Defendants with cocaine until mid-November, after the distribution to Gates and after negotiations for the one kilogram had been initiated. In fact, the negotiations for the kilogram of cocaine began on September 4, 1991. In a recording of the September 4 conversation, Floyd and Gaines discussed the price of an ounce and a kilogram of cocaine and the procedures for delivery of the cocaine. On September 6, Floyd indicated his supplier had the ability to obtain quality kilogram quantities of cocaine.

43 Floyd similarly indicated his ability to obtain one kilogram of cocaine on other occasions. On September 10, Floyd told Gaines that he had been unable to

reach his regular contact and therefore might have to go out of town to obtain a price on a kilogram of cocaine. On September 16, he vouched for the quality, quantity and price of the cocaine. All these events occurred before Anawalt and Gates met Floyd and Clark. Additionally, while incarcerated, Floyd identified at least one other transaction in which he had participated where kilogram quantities were involved.

44 Both Floyd and Gates contemplated the cost of a kilogram and gave Gaines reports on their efforts to obtain the kilogram. Floyd expressly discussed the procedures for the transaction. The facts indicate Floyd and Clark had access to more than one supplier, and despite their habits, had the intent and the ability to obtain and sell a kilogram of cocaine.

45 Floyd and Clark, therefore, failed to prove by a preponderance of the evidence that they did not have the intent or ability to obtain and sell a kilogram of cocaine. Thus, the district court's assignment of the negotiated amount of cocaine (1 kilogram) to the Defendants was not clearly erroneous.

46 Floyd and Clark additionally cite United States v. Foley to support their argument that the district court should not have attributed the kilogram to them because the government informer initiated the negotiations. 906 F.2d 1261 (8th Cir.1990). Foley, however, is distinguishable on its facts. In Foley, the police informant merely suggested purchasing an additional two ounces of cocaine. The Eighth Circuit held that while the two ounces were within the defendant's means to supply, the parties never agreed to an actual sale. The court stated "[w]hile a defendant may be sentenced on the basis of uncharged conduct, that conduct must be his own (or where applicable that of a co-conspirator), not the government's conduct. We should not countenance allowing the government to manufacture conduct or negotiation without some evidence of knowing participation by the defendant in that conduct or negotiation." Id.

47 In the present case, Gaines suggested purchasing a kilogram of cocaine. Unlike the situation in Foley, Floyd and Clark actively participated in negotiations for the kilogram. Floyd persistently tried to obtain the kilogram and kept Gaines informed of his efforts. Floyd and Clark both discussed prices for the kilogram with Gaines on numerous occasions. Based on the record, there is evidence of both Defendants' knowing participation. The district court, therefore, did not erroneously attribute the kilogram of cocaine to the Defendants.

48 Floyd and Clark argue the district court erroneously attributed the eight ounces of cocaine sold by Anawalt and Gates to Bowers to the Defendants because the sales were not reasonably foreseeable to them. The district court, however, found the sales were foreseeable. We agree.

49 The calculation of drug quantities for sentencing purposes under the sentencing guidelines includes all drugs involved in the conspiracy of which defendants were either aware or which were reasonably foreseeable. U.S.S.G. Sec. 1B1.3(A)(1); United States v. Hodges, 935 F.2d 766, 774 (6th Cir.1991). The district court's decision regarding the amount of cocaine for which a defendant is held accountable is a finding of fact which must be accepted by a court of appeals unless clearly erroneous. United States v. Walton, 908 F.2d 1289, 1301 (6th Cir.1990).

50 Prior to the sale of eight ounces of cocaine to Bowers, Floyd and Clark were present on three separate occasions when Bowers purchased cocaine; Bowers was a regular customer. Although Defendants were arrested before Anawalt and Gates made the final sale to Bowers, Bowers' later purchases from Anawalt and Gates were reasonably foreseeable to the Defendants. Thus, the district court's determination that Anawalt's and Gates' eight ounce cocaine sale to Bowers was reasonably foreseeable to the Defendants was not clearly erroneous.

51 Floyd and Clark argue Congress evinced an intent that individuals convicted of drug trafficking offenses and firearms violations should be punished by an increase of two levels in the sentencing guidelines rather than by the imposition of consecutive sentences. The imposition of a consecutive sentence, therefore, they argue, violates the double jeopardy clause. We disagree.

52 Congressional intent behind 18 U.S.C. Sec. 924(c) has been clearly settled by interpretations in this and other circuits. In United States v. Moore, this circuit held the imposition of a consecutive sentence for a Sec. 924(c) violation in addition to the sentence for the predicate felony does not violate the double jeopardy clause. 917 F.2d 215 (6th Cir.1990); cert. denied, --- U.S. ----, 111 S.Ct. 1590 (1991). Recently the Sixth Circuit reaffirmed Moore's holding. See United States v. Gibbons, 994 F.2d 299, 301-02 (6th Cir.1993). Thus, Defendants' argument is meritless.

53 Individually, Clark argues the district erred in not awarding a two level decrease in the base offense level for his conspiracy conviction because he was a minor

participant. The district court stated the defendant failed to meet his burden, and therefore, was not entitled to the two level decrease under the Sentencing Guidelines. We agree.

54 This court reviews the district court's determination concerning a decrease or increase under the Sentencing Guidelines as a factual finding and must affirm unless the determination is clearly erroneous. See United States v. Sims, 975 F.2d 1225, 1242 (6th Cir.1992). The Sentencing Guidelines provide that, where appropriate, the sentencing court may adjust the offense level based upon a particular defendant's aggravated or mitigated role in offenses. The determination should be based on all relevant conduct. U.S.S.G. Sec. 3B1.1, et seq., Introductory Commentary. The defendant has the burden of proving a minor participant role. United States v. White, 985 F.2d 271, 274 (6th Cir.1993).

55 Clark agreed to help Anawalt and Gates distribute cocaine, he is, therefore, no less culpable than his co-conspirators. Clark participated in conversations discussing the sale of cocaine as well as arranging the delivery of cocaine. He was present on at least three separate occasions when cocaine was sold to Bowers. Additionally, on two occasions, Clark supplied scales to weigh cocaine for the transactions. During one transaction, his co-conspirators waited for Clark to provide scales. Clark also used his residence for the transactions in November and December of 1991. Thus, the district court's determination that Clark failed to prove minor participation for the two level decrease under the Sentencing Guidelines was not clearly erroneous.

56 Finally, Floyd and Clark challenge the constitutionality of the Federal Sentencing Guidelines alleging the relevant conduct provisions of Sentencing Guidelines exceed the scope of authority Congress granted and violate their Fifth and Sixth Amendment rights. These allegations of error are well settled and must fail. First, Congress explicitly authorized the use of "relevant conduct" in sentencing. See 28 U.S.C.A. Sec. 994(c) (West Supp.1992); United States v. Davern, 970 F.2d 1490, 1495 n. 6 (6th Cir.1992) (en banc ). Additionally, this circuit has consistently held the Sentencing Guidelines' relevant conduct provisions do not violate the Fifth and Sixth Amendments. See United States v. Miller, 910 F.2d 1321 (6th Cir.1990); United States v. Bronaugh, 895 F.2d 247, 251 (6th Cir.1990); United States v. Morrow, 977 F.2d 222 (6th Cir.1992); United States v. Silverman, 976 F.2d 1502 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1595 (1993).

57 For the reasons stated above, we AFFIRM the convictions and sentences of the Defendants.

---

1

The Honorable Carl B. Rubin, United States District Judge for the Southern District of Ohio, sitting by designation

2

Gaines agreed to tape his meetings and conversations with Floyd and Clark. The government entered many of these recordings into evidence. Some of the facts set out below contain information elicited from the tapes

3

The telephone record indicated that on September 9, 1991 Floyd placed a call from his residence in Sevier County to a coin telephone located at Shady Grove Mobile Home Park in Maryville, Tennessee. During this time period Clark managed and lived in this mobile home park. He also used the coin telephone

4

"It is settled that 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act.' " Pinkerton v. United States, 328 U.S. 640, 646-47 (1946) (quoting Hyde v. United States, 225 U.S. 347, 369 (1912)

Copyright © Justia :: Company :: Terms of Service :: Privacy Policy :: Contact Us :: Have a Happy Day!

Justia | Supreme Court Center | US Laws | Blawgs.FM | BlawgSearch.com

Search Justia

Justia > Cases > US Court of Appeals > F.3d > 16 > 1222 - United States of America, Plaintiff-appellee, v. Bobby C. Floyd, et al., Defendants-appellants

Case Resources

**Search this Case**
in Google Scholar

**on the Web**
Google Web Search
MSN Web Search
Yahoo! Web Search

**in the News**
Google News Search
Google News Archive Search
Yahoo! News Search

**in the Blogs**
BlawgSearch.com Search
Google Blog Search
Technorati Blog Search

**in other Databases**
Google Book Search

**Justia Research Resources**
Justia.com
Supreme Court Center
US Regulation Tracker
US District Court Opinions
Federal District Court Civil Case Filings
Legal Blog Search
Legal Podcast Search
USA Constitution Annotated

**Online Research Resources**
Cornell LII
Cornell Wex Dictionary & Encyclopedia