**Exhibit 34**

THE NEW YORKER

D #UHSR UWHU#D W#OD UJ H

## WUID O#E\ #IIJH

*Did Texas execute an innocent man?*

d{ #Gc x Kf #Jtc pp#

SEPTEMBER 7, 2009



Cameron Todd Willingham in his cell on death row, in 1994. He insisted upon his innocence in the deaths of his children and refused an offer to plead guilty in return for a life sentence. Photograph by Ken Light.

The fire moved quickly through the house, a one -story wood-frame structure in a working-class neighborhood of Corsicana, in northeast Texas. Flames spread along the walls, bursting through doorways, blistering paint and tiles and furniture. Smoke pressed against the ceiling, then banked downward, seeping into each room and through crevices in the windows, staining the morning sky.

Buffie Barbee, who was eleven years old and lived two houses down, was playing in her back yard when she smelled the smoke. She ran inside and told her mother, Diane, and they hurried up the street; that's when they saw the smoldering house and Cameron Todd Willingham standing on the front porch, wearing only a pair of jeans, his chest blackened with soot, his hair and eyelids singed. He was screaming, "My babies are burning up!" His

children—Karmon and Kameron, who were one-year-old twin girls, and two-year-old Amber—were trapped inside.

Willingham told the Barbees to call the Fire Department, and while Diane raced down the street to get help he found a stick and broke the children's bedroom window. Fire lashed through the hole. He broke another window; flames burst through it, too, and he retreated into the yard, kneeling in front of the house. A neighbor later told police that Willingham intermittently cried, "My babies!" then fell silent, as if he had "blocked the fire out of his mind."

Diane Barbee, returning to the scene, could feel intense heat radiating off the house. Moments later, the five windows of the children's room exploded and flames "blew out," as Barbee put it. Within minutes, the first firemen had arrived, and Willingham approached them, shouting that his children were in their bedroom, where the flames were thickest. A fireman sent word over his radio for rescue teams to "step on it."

More men showed up, uncoiling hoses and aiming water at the blaze. One fireman, who had an air tank strapped to his back and a mask covering his face, slipped through a window but was hit by water from a hose and had to retreat. He then charged through the front door, into a swirl of smoke and fire. Heading down the main corridor, he reached the kitchen, where he saw a refrigerator blocking the back door.

Todd Willingham, looking on, appeared to grow more hysterical, and a police chaplain named George Monaghan led him to the back of a fire truck and tried to calm him down. Willingham explained that his wife, Stacy, had gone out earlier that morning, and that he had been jolted from sleep by Amber screaming, "Daddy! Daddy!"

"My little girl was trying to wake me up and tell me about the fire," he said, adding, "I couldn't get my babies out."

While he was talking, a fireman emerged from the house, cradling Amber. As she was given C.P.R., Willingham, who was twenty-three years old and powerfully built, ran to see her, then suddenly headed toward the babies' room. Monaghan and another man restrained him. "We had to wrestle with him and then handcuff him, for his and our protection," Monaghan later told police. "I received a black eye." One of the first firemen at the scene told investigators that, at an earlier point, he had also held Willingham back. "Based on what I saw on how the fire was burning, it would have been crazy for anyone to try and go into the house," he said.

Willingham was taken to a hospital, where he was told that Amber—who had actually been found in the master bedroom—had died of smoke inhalation. Kameron and Karmon had been lying on the floor of the children's bedroom, their bodies severely burned. According to the medical examiner, they, too, died from smoke inhalation.

News of the tragedy, which took place on December 23, 1991, spread through Corsicana. A small city fifty-five miles northeast of Waco, it had once been the center of Texas's first oil boom, but many of the wells had since dried up, and more than a quarter of the city's twenty thousand inhabitants had fallen into poverty. Several stores along the main street were shuttered, giving the place the feel of an abandoned outpost.

Willingham and his wife, who was twenty-two years old, had virtually no money. Stacy worked in her brother's bar, called Some Other Place, and Willingham, an unemployed auto mechanic, had been caring for the kids. The community took up a collection to help the Willinghams pay for funeral arrangements.

Fire investigators, meanwhile, tried to determine the cause of the blaze. (Willingham gave authorities permission to search the house: "I know we might not ever know all the answers, but I'd just like to know why my babies were taken from me.") Douglas Fogg, who was then the assistant fire chief in Corsicana, conducted the initial inspection. He was tall, with a crew cut, and his voice was raspy from years of inhaling smoke from fires and cigarettes. He had grown up in Corsicana and, after graduating from high school, in 1963, he had joined the Navy, serving as a medic in Vietnam, where he was wounded on four occasions. He was awarded a Purple Heart each time. After he returned from Vietnam, he became a firefighter, and by the time of the Willingham blaze he had been battling fire—or what he calls "the beast"—for more than twenty years, and had become a certified arson investigator. "You learn that fire talks to you," he told me.

He was soon joined on the case by one of the state's leading arson sleuths, a deputy fire marshal named Manuel Vasquez, who has since died. Short, with a paunch, Vasquez had investigated more than twelve hundred fires. Arson investigators have always been considered a special breed of detective. In the 1991 movie "Backdraft," a heroic arson investigator says of fire, "It breathes, it eats, and it hates. The only way to beat it is to think like it. To know that this flame will spread this way across the door and up across the ceiling." Vasquez, who had previously worked in Army intelligence, had several maxims of his own. One was "Fire does not destroy evidence—it creates it." Another was "The fire tells the story. I am just the interpreter." He cultivated a Sherlock Holmes-like aura of invincibility. Once, he was asked under oath whether he had ever been mistaken in a case. "If I have, sir, I don't know," he responded. "It's never been pointed out."

Vasquez and Fogg visited the Willinghams' house four days after the blaze. Following protocol, they moved from the least burned areas toward the most damaged ones. "It is a systematic method," Vasquez later testified, adding, "I'm just collecting information. . . . I have not made any determination. I don't have any preconceived idea."

The men slowly toured the perimeter of the house, taking notes and photographs, like archeologists mapping out a ruin. Upon opening the back door, Vasquez observed that there was just enough space to squeeze past the refrigerator blocking the exit. The air smelled of burned rubber and melted wires; a damp ash covered the ground, sticking to their boots. In the kitchen, Vasquez and Fogg discerned only smoke and heat damage—a sign that the fire had not originated there—and so they pushed deeper into the nine-hundred-and-seventy-five-square-foot building. A central corridor led past a utility room and the master bedroom, then past a small living room, on the left, and the children's bedroom, on the right, ending at the front door, which opened onto the porch. Vasquez tried to take in everything, a process that he compared to entering one's mother-in-law's house for the first time: "I have the same curiosity."

In the utility room, he noticed on the wall pictures of skulls and what he later described as an image of "the Grim Reaper." Then he turned into the master bedroom, where Amber's body had been found. Most of the damage there was also from smoke and heat, suggesting that the fire had started farther down the hallway, and he headed that way, stepping over debris and ducking under insulation and wiring that hung down from the exposed ceiling.

As he and Fogg removed some of the clutter, they noticed deep charring along the base of the walls. Because gases become buoyant when heated, flames ordinarily burn upward. But Vasquez and Fogg observed that the fire had burned extremely low down, and that there were peculiar char patterns on the floor, shaped like puddles.

Vasquez's mood darkened. He followed the "burn trailer"—the path etched by the fire—which led from the hallway into the children's bedroom. Sunlight filtering through the broken windows illuminated more of the irregularly shaped char patterns. A flammable or combustible liquid doused on a floor will cause a fire to concentrate in these kinds of pockets, which is why investigators refer to them as "pour patterns" or "puddle configurations."

The fire had burned through layers of carpeting and tile and plywood flooring. Moreover, the metal springs under the children's beds had turned white—a sign that intense heat had radiated beneath them. Seeing that the floor had some of the deepest burns, Vasquez deduced that it had been hotter than the ceiling, which, given that heat rises, was, in his words, "not normal."

Fogg examined a piece of glass from one of the broken windows. It contained a spiderweb-like pattern—what fire investigators call "crazed glass." Forensic textbooks had long described the effect as a key indicator that a fire had burned "fast and hot," meaning that it had been fuelled by a liquid accelerant, causing the glass to fracture.

The men looked again at what appeared to be a distinct burn trailer through the house: it went from the children's bedroom into the corridor, then turned sharply to the right and proceeded out the front door. To the investigators' surprise, even the wood under the door's

aluminum threshold was charred. On the concrete floor of the porch, just outside the front door, Vasquez and Fogg noticed another unusual thing: brown stains, which, they reported, were consistent with the presence of an accelerant.

The men scanned the walls for soot marks that resembled a "V." When an object catches on fire, it creates such a pattern, as heat and smoke radiate outward; the bottom of the "V" can therefore point to where a fire began. In the Willingham house, there was a distinct "V" in the main corridor. Examining it and other burn patterns, Vasquez identified three places where fire had originated: in the hallway, in the children's bedroom, and at the front door. Vasquez later testified that multiple origins pointed to one conclusion: the fire was "intentionally set by human hands."

By now, both investigators had a clear vision of what had happened. Someone had poured liquid accelerant throughout the children's room, even under their beds, then poured some more along the adjoining hallway and out the front door, creating a "fire barrier" that prevented anyone from escaping; similarly, a prosecutor later suggested, the refrigerator in the kitchen had been moved to block the back-door exit. The house, in short, had been deliberately transformed into a death trap.

The investigators collected samples of burned materials from the house and sent them to a laboratory that could detect the presence of a liquid accelerant. The lab's chemist reported that one of the samples contained evidence of "mineral spirits," a substance that is often found in charcoal-lighter fluid. The sample had been taken by the threshold of the front door.

The fire was now considered a triple homicide, and Todd Willingham—the only person, besides the victims, known to have been in the house at the time of the blaze—became the prime suspect.

Police and fire investigators canvassed the neighborhood, interviewing witnesses. Several, like Father Monaghan, initially portrayed Willingham as devastated by the fire. Yet, over time, an increasing number of witnesses offered damning statements. Diane Barbee said that she had not seen Willingham try to enter the house until after the authorities arrived, as if he were putting on a show. And when the children's room exploded with flames, she added, he seemed more preoccupied with his car, which he moved down the driveway. Another neighbor reported that when Willingham cried out for his babies he "did not appear to be excited or concerned." Even Father Monaghan wrote in a statement that, upon further reflection, "things were not as they seemed. I had the feeling that [Willingham] was in complete control."

The police began to piece together a disturbing profile of Willingham. Born in Ardmore, Oklahoma, in 1968, he had been abandoned by his mother when he was a baby. His father, Gene, who had divorced his mother, eventually raised him with his stepmother, Eugenia. Gene, a former U.S. marine, worked in a salvage yard, and the family lived in a cramped house; at

night, they could hear freight trains rattling past on a nearby track. Willingham, who had what the family called the "classic Willingham look"—a handsome face, thick black hair, and dark eyes—struggled in school, and as a teen-ager began to sniff paint. When he was seventeen, Oklahoma's Department of Human Services evaluated him, and reported, "He likes 'girls,' music, fast cars, sharp trucks, swimming, and hunting, in that order." Willingham dropped out of high school, and over time was arrested for, among other things, driving under the influence, stealing a bicycle, and shoplifting.

In 1988, he met Stacy, a senior in high school, who also came from a troubled background: when she was four years old, her stepfather had strangled her mother to death during a fight. Stacy and Willingham had a turbulent relationship. Willingham, who was unfaithful, drank too much Jack Daniel's, and sometimes hit Stacy—even when she was pregnant. A neighbor said that he once heard Willingham yell at her, "Get up, bitch, and I'll hit you again."

On December 31st, the authorities brought Willingham in for questioning. Fogg and Vasquez were present for the interrogation, along with Jimmie Hensley, a police officer who was working his first arson case. Willingham said that Stacy had left the house around 9 A.M. to pick up a Christmas present for the kids, at the Salvation Army. "After she got out of the driveway, I heard the twins cry, so I got up and gave them a bottle," he said. The children's room had a safety gate across the doorway, which Amber could climb over but not the twins, and he and Stacy often let the twins nap on the floor after they drank their bottles. Amber was still in bed, Willingham said, so he went back into his room to sleep. "The next thing I remember is hearing 'Daddy, Daddy,' " he recalled. "The house was already full of smoke." He said that he got up, felt around the floor for a pair of pants, and put them on. He could no longer hear his daughter's voice ("I heard that last 'Daddy, Daddy' and never heard her again"), and he hollered, "Oh God— Amber, get out of the house! Get out of the house!' "

He never sensed that Amber was in his room, he said. Perhaps she had already passed out by the time he stood up, or perhaps she came in after he left, through a second doorway, from the living room. He said that he went down the corridor and tried to reach the children's bedroom. In the hallway, he said, "you couldn't see nothing but black." The air smelled the way it had when their microwave had blown up, three weeks earlier—like "wire and stuff like that." He could hear sockets and light switches popping, and he crouched down, almost crawling. When he made it to the children's bedroom, he said, he stood and his hair caught on fire. "Oh God, I never felt anything that hot before," he said of the heat radiating out of the room.

After he patted out the fire on his hair, he said, he got down on the ground and groped in the dark. "I thought I found one of them once," he said, "but it was a doll." He couldn't bear the heat any longer. "I felt myself passing out," he said. Finally, he stumbled down the corridor and

out the front door, trying to catch his breath. He saw Diane Barbee and yelled for her to call the Fire Department. After she left, he insisted, he tried without success to get back inside.

The investigators asked him if he had any idea how the fire had started. He said that he wasn't sure, though it must have originated in the children's room, since that was where he first saw flames; they were glowing like "bright lights." He and Stacy used three space heaters to keep the house warm, and one of them was in the children's room. "I taught Amber not to play with it," he said, adding that she got "whuppings every once in a while for messing with it." He said that he didn't know if the heater, which had an internal flame, was turned on. (Vasquez later testified that when he had checked the heater, four days after the fire, it was in the "Off" position.) Willingham speculated that the fire might have been started by something electrical: he had heard all that popping and crackling.

When pressed whether someone might have a motive to hurt his family, he said that he couldn't think of anyone that "cold-blooded." He said of his children, "I just don't understand why anybody would take them, you know? We had three of the most pretty babies anybody could have ever asked for." He went on, "Me and Stacy's been together for four years, but off and on we get into a fight and split up for a while and I think those babies is what brought us so close together . . . neither one of us . . . could live without them kids." Thinking of Amber, he said, "To tell you the honest-to-God's truth, I wish she hadn't woke me up."

During the interrogation, Vasquez let Fogg take the lead. Finally, Vasquez turned to Willingham and asked a seemingly random question: had he put on shoes before he fled the house?

"No, sir," Willingham replied.

A map of the house was on a table between the men, and Vasquez pointed to it. "You walked out this way?" he said.

Willingham said yes.

Vasquez was now convinced that Willingham had killed his children. If the floor had been soaked with a liquid accelerant and the fire had burned low, as the evidence suggested, Willingham could not have run out of the house the way he had described without badly burning his feet. A medical report indicated that his feet had been unscathed.

Willingham insisted that, when he left the house, the fire was still around the top of the walls and not on the floor. "I didn't have to jump through any flames," he said. Vasquez believed that this was impossible, and that Willingham had lit the fire as he was retreating— first, torching the children's room, then the hallway, and then, from the porch, the front door. Vasquez later said of Willingham, "He told me a story of pure fabrication. . . . He just talked and he talked and all he did was lie."

Still, there was no clear motive. The children had life-insurance policies, but they amounted to only fifteen thousand dollars, and Stacy's grandfather, who had paid for them, was listed as the primary beneficiary. Stacy told investigators that even though Willingham hit her he had never abused the children—"Our kids were spoiled rotten," she said—and she did not believe that Willingham could have killed them.

Ultimately, the authorities concluded that Willingham was a man without a conscience whose serial crimes had climaxed, almost inexorably, in murder. John Jackson, who was then the assistant district attorney in Corsicana, was assigned to prosecute Willingham's case. He later told the Dallas *Morning News* that he considered Willingham to be "an utterly sociopathic individual" who deemed his children "an impediment to his lifestyle." Or, as the local district attorney, Pat Batchelor, put it, "The children were interfering with his beer drinking and dart throwing."

On the night of January 8, 1992, two weeks after the fire, Willingham was riding in a car with Stacy when SWAT teams surrounded them, forcing them to the side of the road. "They pulled guns out like we had just robbed ten banks," Stacy later recalled. "All we heard was 'click, click.' . . . Then they arrested him."

Willingham was charged with murder. Because there were multiple victims, he was eligible for the death penalty, under Texas law. Unlike many other prosecutors in the state, Jackson, who had ambitions of becoming a judge, was personally opposed to capital punishment. "I don't think it's effective in deterring criminals," he told me. "I just don't think it works." He also considered it wasteful: because of the expense of litigation and the appeals process, it costs, on average, $2.3 million to execute a prisoner in Texas—about three times the cost of incarcerating someone for forty years. Plus, Jackson said, "What's the recourse if you make a mistake?" Yet his boss, Batchelor, believed that, as he once put it, "certain people who commit bad enough crimes give up the right to live," and Jackson came to agree that the heinous nature of the crime in the Willingham case—"one of the worst in terms of body count" that he had ever tried—mandated death.

Willingham couldn't afford to hire lawyers, and was assigned two by the state: David Martin, a former state trooper, and Robert Dunn, a local defense attorney who represented everyone from alleged murderers to spouses in divorce cases—a "Jack-of-all-trades," as he calls himself. ("In a small town, you can't say 'I'm a so-and-so lawyer,' because you'll starve to death," he told me.)

Not long after Willingham's arrest, authorities received a message from a prison inmate named Johnny Webb, who was in the same jail as Willingham. Webb alleged that Willingham had confessed to him that he took "some kind of lighter fluid, squirting [it] around the walls and the floor, and set a fire." The case against Willingham was considered airtight.

Even so, several of Stacy's relatives—who, unlike her, believed that Willingham was guilty—told Jackson that they preferred to avoid the anguish of a trial. And so, shortly before jury selection, Jackson approached Willingham's attorneys with an extraordinary offer: if their client pleaded guilty, the state would give him a life sentence. "I was really happy when I thought we might have a deal to avoid the death penalty," Jackson recalls.

Willingham's lawyers were equally pleased. They had little doubt that he had committed the murders and that, if the case went before a jury, he would be found guilty, and, subsequently, executed. "Everyone thinks defense lawyers must believe their clients are innocent, but that's seldom true," Martin told me. "Most of the time, they're guilty as sin." He added of Willingham, "All the evidence showed that he was one hundred per cent guilty. He poured accelerant all over the house and put lighter fluid under the kids' beds." It was, he said, "a classic arson case": there were "puddle patterns all over the place—no disputing those."

Martin and Dunn advised Willingham that he should accept the offer, but he refused. The lawyers asked his father and stepmother to speak to him. According to Eugenia, Martin showed them photographs of the burned children and said, "Look what your son did. You got to talk him into pleading, or he's going to be executed."

His parents went to see their son in jail. Though his father did not believe that he should plead guilty if he were innocent, his stepmother beseeched him to take the deal. "I just wanted to keep my boy alive," she told me.

Willingham was implacable. "I ain't gonna plead to something I didn't do, especially killing my own kids," he said. It was his final decision. Martin says, "I thought it was nuts at the time—and I think it's nuts now."

Willingham's refusal to accept the deal confirmed the view of the prosecution, and even that of his defense lawyers, that he was an unrepentant killer.

In August, 1992, the trial commenced in the old stone courthouse in downtown Corsicana. Jackson and a team of prosecutors summoned a procession of witnesses, including Johnny Webb and the Barbees. The crux of the state's case, though, remained the scientific evidence gathered by Vasquez and Fogg. On the stand, Vasquez detailed what he called more than "twenty indicators" of arson.

"Do you have an opinion as to who started the fire?" one of the prosecutors asked.

"Yes, sir," Vasquez said. "Mr. Willingham."

The prosecutor asked Vasquez what he thought Willingham's intent was in lighting the fire. "To kill the little girls," he said.

The defense had tried to find a fire expert to counter Vasquez and Fogg's testimony, but the one they contacted concurred with the prosecution. Ultimately, the defense presented only one witness to the jury: the Willinghams' babysitter, who said she could not believe that

Willingham could have killed his children. (Dunn told me that Willingham had wanted to testify, but Martin and Dunn thought that he would make a bad witness.) The trial ended after two days.

During his closing arguments, Jackson said that the puddle configurations and pour patterns were Willingham's inadvertent "confession," burned into the floor. Showing a Bible that had been salvaged from the fire, Jackson paraphrased the words of Jesus from the Gospel of Matthew: "Whomsoever shall harm one of my children, it's better for a millstone to be hung around his neck and for him to be cast in the sea."

The jury was out for barely an hour before returning with a unanimous guilty verdict. As Vasquez put it, "The fire does not lie."

## II

When Elizabeth Gilbert approached the prison guard, on a spring day in 1999, and said Cameron Todd Willingham's name, she was uncertain about what she was doing. A forty-seven-year-old French teacher and playwright from Houston, Gilbert was divorced with two children. She had never visited a prison before. Several weeks earlier, a friend, who worked at an organization that opposed the death penalty, had encouraged her to volunteer as a pen pal for an inmate on death row, and Gilbert had offered her name and address. Not long after, a short letter, written with unsteady penmanship, arrived from Willingham. "If you wish to write back, I would be honored to correspond with you," he said. He also asked if she might visit him. Perhaps out of a writer's curiosity, or perhaps because she didn't feel quite herself (she had just been upset by news that her ex-husband was dying of cancer), she agreed. Now she was standing in front of the decrepit penitentiary in Huntsville, Texas—a place that inmates referred to as "the death pit."

She filed past a razor-wire fence, a series of floodlights, and a checkpoint, where she was patted down, until she entered a small chamber. Only a few feet in front of her was a man convicted of multiple infanticide. He was wearing a white jumpsuit with "DR"—for death row—printed on the back, in large black letters. He had a tattoo of a serpent and a skull on his left biceps. He stood nearly six feet tall and was muscular, though his legs had atrophied after years of confinement.

A Plexiglas window separated Willingham from her; still, Gilbert, who had short brown hair and a bookish manner, stared at him uneasily. Willingham had once fought another prisoner who called him a "baby killer," and since he had been incarcerated, seven years earlier, he had

committed a series of disciplinary infractions that had periodically landed him in the segregation unit, which was known as "the dungeon."

Willingham greeted her politely. He seemed grateful that she had come. After his conviction, Stacy had campaigned for his release. She wrote to Ann Richards, then the governor of Texas, saying, "I know him in ways that no one else does when it comes to our children. Therefore, I believe that there is no way he could have possibly committed this crime." But within a year Stacy had filed for divorce, and Willingham had few visitors except for his parents, who drove from Oklahoma to see him once a month. "I really have no one outside my parents to remind me that I am a human being, not the animal the state professes I am," he told Gilbert at one point.

He didn't want to talk about death row. "Hell, I live here," he later wrote her. "When I have a visit, I want to escape from here." He asked her questions about her teaching and art. He expressed fear that, as a playwright, she might find him a "one-dimensional character," and apologized for lacking social graces; he now had trouble separating the mores in prison from those of the outside world.

When Gilbert asked him if he wanted something to eat or drink from the vending machines, he declined. "I hope I did not offend you by not accepting any snacks," he later wrote her. "I didn't want you to feel I was there just for something like that."

She had been warned that prisoners often tried to con visitors. He appeared to realize this, subsequently telling her, "I am just a simple man. Nothing else. And to most other people a convicted killer looking for someone to manipulate."

Their visit lasted for two hours, and afterward they continued to correspond. She was struck by his letters, which seemed introspective, and were not at all what she had expected. "I am a very honest person with my feelings," he wrote her. "I will not bullshit you on how I feel or what I think." He said that he used to be stoic, like his father. But, he added, "losing my three daughters . . . my home, wife and my life, you tend to wake up a little. I have learned to open myself."

She agreed to visit him again, and when she returned, several weeks later, he was visibly moved. "Here I am this person who nobody on the outside is ever going to know as a human, who has lost so much, but still trying to hold on," he wrote her afterward. "But you came back! I don't think you will ever know of what importance that visit was in my existence."

They kept exchanging letters, and she began asking him about the fire. He insisted that he was innocent and that, if someone had poured accelerant through the house and lit it, then the killer remained free. Gilbert wasn't naïve—she assumed that he was guilty. She did not mind giving him solace, but she was not there to absolve him.

Still, she had become curious about the case, and one day that fall she drove down to the courthouse in Corsicana to review the trial records. Many people in the community remembered the tragedy, and a clerk expressed bewilderment that anyone would be interested in a man who had burned his children alive.

Gilbert took the files and sat down at a small table. As she examined the eyewitness accounts, she noticed several contradictions. Diane Barbee had reported that, before the authorities arrived at the fire, Willingham never tried to get back into the house—yet she had been absent for some time while calling the Fire Department. Meanwhile, her daughter Buffie had reported witnessing Willingham on the porch breaking a window, in an apparent effort to reach his children. And the firemen and police on the scene had described Willingham frantically trying to get into the house.

The witnesses' testimony also grew more damning after authorities had concluded, in the beginning of January, 1992, that Willingham was likely guilty of murder. In Diane Barbee's initial statement to authorities, she had portrayed Willingham as "hysterical," and described the front of the house exploding. But on January 4th, after arson investigators began suspecting Willingham of murder, Barbee suggested that he could have gone back inside to rescue his children, for at the outset she had seen only "smoke coming from out of the front of the house"—smoke that was not "real thick."

An even starker shift occurred with Father Monaghan's testimony. In his first statement, he had depicted Willingham as a devastated father who had to be repeatedly restrained from risking his life. Yet, as investigators were preparing to arrest Willingham, he concluded that Willingham had been *too* emotional ("He seemed to have the type of distress that a woman who had given birth would have upon seeing her children die"); and he expressed a "gut feeling" that Willingham had "something to do with the setting of the fire."

Dozens of studies have shown that witnesses' memories of events often change when they are supplied with new contextual information. Itiel Dror, a cognitive psychologist who has done extensive research on eyewitness and expert testimony in criminal investigations, told me, "The mind is not a passive machine. Once you believe in something—once you expect something—it changes the way you perceive information and the way your memory recalls it."

After Gilbert's visit to the courthouse, she kept wondering about Willingham's motive, and she pressed him on the matter. In response, he wrote, of the death of his children, "I do not talk about it much anymore and it is still a very powerfully emotional pain inside my being." He admitted that he had been a "sorry-ass husband" who had hit Stacy—something he deeply regretted. But he said that he had loved his children and would never have hurt them. Fatherhood, he said, had changed him; he stopped being a hoodlum and "settled down" and "became a man." Nearly three months before the fire, he and Stacy, who had never married,

wed at a small ceremony in his home town of Ardmore. He said that the prosecution had seized upon incidents from his past and from the day of the fire to create a portrait of a "demon," as Jackson, the prosecutor, referred to him. For instance, Willingham said, he had moved the car during the fire simply because he didn't want it to explode by the house, further threatening the children.

Gilbert was unsure what to make of his story, and she began to approach people who were involved in the case, asking them questions. "My friends thought I was crazy," Gilbert recalls. "I'd never done anything like this in my life."

One morning, when Willingham's parents came to visit him, Gilbert arranged to see them first, at a coffee shop near the prison. Gene, who was in his seventies, had the Willingham look, though his black hair had gray streaks and his dark eyes were magnified by glasses. Eugenia, who was in her fifties, with silvery hair, was as sweet and talkative as her husband was stern and reserved. The drive from Oklahoma to Texas took six hours, and they had woken at three in the morning; because they could not afford a motel, they would have to return home later that day. "I feel like a real burden to them," Willingham had written Gilbert.

As Gene and Eugenia sipped coffee, they told Gilbert how grateful they were that someone had finally taken an interest in Todd's case. Gene said that his son, though he had flaws, was no killer.

The evening before the fire, Eugenia said, she had spoken on the phone with Todd. She and Gene were planning on visiting two days later, on Christmas Eve, and Todd told her that he and Stacy and the kids had just picked up family photographs. "He said, 'We got your pictures for Christmas,' " she recalled. "He put Amber on the phone, and she was tattling on one of the twins. Todd didn't seem upset. If something was bothering him, I would have known."

Gene and Eugenia got up to go: they didn't want to miss any of the four hours that were allotted for the visit with their son. Before they left, Gene said, "You'll let us know if you find anything, won't you?"

Over the next few weeks, Gilbert continued to track down sources. Many of them, including the Barbees, remained convinced that Willingham was guilty, but several of his friends and relatives had doubts. So did some people in law enforcement. Willingham's former probation officer in Oklahoma, Polly Goodin, recently told me that Willingham had never demonstrated bizarre or sociopathic behavior. "He was probably one of my favorite kids," she said. Even a former judge named Bebe Bridges—who had often stood, as she put it, on the "opposite side" of Willingham in the legal system, and who had sent him to jail for stealing—told me that she could not imagine him killing his children. "He was polite, and he seemed to care," she said. "His convictions had been for dumb-kid stuff. Even the things stolen weren't significant." Several months before the fire, Willingham tracked Goodin down at her office, and proudly

showed her photographs of Stacy and the kids. "He wanted Bebe and me to know he'd been doing good," Goodin recalled.

Eventually, Gilbert returned to Corsicana to interview Stacy, who had agreed to meet at the bed-and-breakfast where Gilbert was staying. Stacy was slightly plump, with pale, round cheeks and feathered dark-blond hair; her bangs were held in place by gel, and her face was heavily made up. According to a tape recording of the conversation, Stacy said that nothing unusual had happened in the days before the fire. She and Willingham had not fought, and were preparing for the holiday. Though Vasquez, the arson expert, had recalled finding the space heater off, Stacy was sure that, at least on the day of the incident—a cool winter morning—it had been on. "I remember turning it down," she recalled. "I always thought, Gosh, could Amber have put something in there?" Stacy added that, more than once, she had caught Amber "putting things too close to it."

Willingham had often not treated her well, she recalled, and after his incarceration she had left him for a man who did. But she didn't think that her former husband should be on death row. "I don't think he did it," she said, crying.

Though only the babysitter had appeared as a witness for the defense during the main trial, several family members, including Stacy, testified during the penalty phase, asking the jury to spare Willingham's life. When Stacy was on the stand, Jackson grilled her about the "significance" of Willingham's "very large tattoo of a skull, encircled by some kind of a serpent."

"It's just a tattoo," Stacy responded.

"He just likes skulls and snakes. Is that what you're saying?"

"No. He just had—he got a tattoo on him."

The prosecution cited such evidence in asserting that Willingham fit the profile of a sociopath, and brought forth two medical experts to confirm the theory. Neither had met Willingham. One of them was Tim Gregory, a psychologist with a master's degree in marriage and family issues, who had previously gone goose hunting with Jackson, and had not published any research in the field of sociopathic behavior. His practice was devoted to family counselling.

At one point, Jackson showed Gregory Exhibit No. 60—a photograph of an Iron Maiden poster that had hung in Willingham's house—and asked the psychologist to interpret it. "This one is a picture of a skull, with a fist being punched through the skull," Gregory said; the image displayed "violence" and "death." Gregory looked at photographs of other music posters owned by Willingham. "There's a hooded skull, with wings and a hatchet," Gregory continued. "And all of these are in fire, depicting—it reminds me of something like Hell. And there's a picture—a Led Zeppelin picture of a falling angel. . . . I see there's an association many times with

cultive-type of activities. A focus on death, dying. Many times individuals that have a lot of this type of art have interest in satanic-type activities."

The other medical expert was James P. Grigson, a forensic psychiatrist. He testified so often for the prosecution in capital-punishment cases that he had become known as Dr. Death. (A Texas appellate judge once wrote that when Grigson appeared on the stand the defendant might as well "commence writing out his last will and testament.") Grigson suggested that Willingham was an "extremely severe sociopath," and that "no pill" or treatment could help him. Grigson had previously used nearly the same words in helping to secure a death sentence against Randall Dale Adams, who had been convicted of murdering a police officer, in 1977. After Adams, who had no prior criminal record, spent a dozen years on death row—and once came within seventy-two hours of being executed—new evidence emerged that absolved him, and he was released. In 1995, three years after Willingham's trial, Grigson was expelled from the American Psychiatric Association for violating ethics. The association stated that Grigson had repeatedly arrived at a "psychiatric diagnosis without first having examined the individuals in question, and for indicating, while testifying in court as an expert witness, that he could predict with 100-per-cent certainty that the individuals would engage in future violent acts."

After speaking to Stacy, Gilbert had one more person she wanted to interview: the jailhouse informant Johnny Webb, who was incarcerated in Iowa Park, Texas. She wrote to Webb, who said that she could see him, and they met in the prison visiting room. A man in his late twenties, he had pallid skin and a closely shaved head; his eyes were jumpy, and his entire body seemed to tremble. A reporter who once met him described him to me as "nervous as a cat around rocking chairs." Webb had begun taking drugs when he was nine years old, and had been convicted of, among other things, car theft, selling marijuana, forgery, and robbery.

As Gilbert chatted with him, she thought that he seemed paranoid. During Willingham's trial, Webb disclosed that he had been given a diagnosis of "post-traumatic stress disorder" after he was sexually assaulted in prison, in 1988, and that he often suffered from "mental impairment." Under cross-examination, Webb testified that he had no recollection of a robbery that he had pleaded guilty to only months earlier.

Webb repeated for her what he had said in court: he had passed by Willingham's cell, and as they spoke through a food slot Willingham broke down and told him that he intentionally set the house on fire. Gilbert was dubious. It was hard to believe that Willingham, who had otherwise insisted on his innocence, had suddenly confessed to an inmate he barely knew. The conversation had purportedly taken place by a speaker system that allowed any of the guards to listen—an unlikely spot for an inmate to reveal a secret. What's more, Webb alleged that Willingham had told him that Stacy had hurt one of the kids, and that the fire was set to cover

up the crime. The autopsies, however, had revealed no bruises or signs of trauma on the children's bodies.

Jailhouse informants, many of whom are seeking reduced time or special privileges, are notoriously unreliable. According to a 2004 study by the Center on Wrongful Convictions, at Northwestern University Law School, lying police and jailhouse informants are the leading cause of wrongful convictions in capital cases in the United States. At the time that Webb came forward against Willingham, he was facing charges of robbery and forgery. During Willingham's trial, another inmate planned to testify that he had overheard Webb saying to another prisoner that he was hoping to "get time cut," but the testimony was ruled inadmissible, because it was hearsay. Webb, who pleaded guilty to the robbery and forgery charges, received a sentence of fifteen years. Jackson, the prosecutor, told me that he generally considered Webb "an unreliable kind of guy," but added, "I saw no real motive for him to make a statement like this if it wasn't true. We didn't cut him any slack." In 1997, five years after Willingham's trial, Jackson urged the Texas Board of Pardons and Paroles to grant Webb parole. "I asked them to cut him loose early," Jackson told me. The reason, Jackson said, was that Webb had been targeted by the Aryan Brotherhood. The board granted Webb parole, but within months of his release he was caught with cocaine and returned to prison.

In March, 2000, several months after Gilbert's visit, Webb unexpectedly sent Jackson a Motion to Recant Testimony, declaring, "Mr. Willingham is innocent of all charges." But Willingham's lawyer was not informed of this development, and soon afterward Webb, without explanation, recanted his recantation. When I recently asked Webb, who was released from prison two years ago, about the turnabout and why Willingham would have confessed to a virtual stranger, he said that he knew only what "the dude told me." After I pressed him, he said, "It's very possible I misunderstood what he said." Since the trial, Webb has been given an additional diagnosis, bipolar disorder. "Being locked up in that little cell makes you kind of crazy," he said. "My memory is in bits and pieces. I was on a lot of medication at the time. Everyone knew that." He paused, then said, "The statute of limitations has run out on perjury, hasn't it?"

Aside from the scientific evidence of arson, the case against Willingham did not stand up to scrutiny. Jackson, the prosecutor, said of Webb's testimony, "You can take it or leave it." Even the refrigerator's placement by the back door of the house turned out to be innocuous; there were two refrigerators in the cramped kitchen, and one of them was by the back door. Jimmie Hensley, the police detective, and Douglas Fogg, the assistant fire chief, both of whom investigated the fire, told me recently that they had never believed that the fridge was part of the arson plot. "It didn't have nothing to do with the fire," Fogg said.

After months of investigating the case, Gilbert found that her faith in the prosecution was shaken. As she told me, "What if Todd really was innocent?"

## III

In the summer of 1660, an Englishman named William Harrison vanished on a walk, near the village of Charingworth, in Gloucestershire. His bloodstained hat was soon discovered on the side of a local road. Police interrogated Harrison's servant, John Perry, and eventually Perry gave a statement that his mother and his brother had killed Harrison for money. Perry, his mother, and his brother were hanged.

Two years later, Harrison reappeared. He insisted, fancifully, that he had been abducted by a band of criminals and sold into slavery. Whatever happened, one thing was indisputable: he had not been murdered by the Perrys.

The fear that an innocent person might be executed has long haunted jurors and lawyers and judges. During America's Colonial period, dozens of crimes were punishable by death, including horse thievery, blasphemy, "man-stealing," and highway robbery. After independence, the number of crimes eligible for the death penalty was gradually reduced, but doubts persisted over whether legal procedures were sufficient to prevent an innocent person from being executed. In 1868, John Stuart Mill made one of the most eloquent defenses of capital punishment, arguing that executing a murderer did not display a wanton disregard for life but, rather, proof of its value. "We show, on the contrary, most emphatically our regard for it by the adoption of a rule that he who violates that right in another forfeits it for himself," he said. For Mill, there was one counterargument that carried weight—"that if by an error of justice an innocent person is put to death, the mistake can never be corrected."

The modern legal system, with its lengthy appeals process and clemency boards, was widely assumed to protect the kind of "error of justice" that Mill feared. In 2000, while George W. Bush was governor of Texas, he said, "I know there are some in the country who don't care for the death penalty, but . . . we've adequately answered innocence or guilt." His top policy adviser on issues of criminal justice emphasized that there is "super due process to make sure that no innocent defendants are executed."

In recent years, though, questions have mounted over whether the system is fail-safe. Since 1976, more than a hundred and thirty people on death row have been exonerated. DNA testing, which was developed in the eighties, saved seventeen of them, but the technique can be used only in rare instances. Barry Scheck, a co-founder of the Innocence Project, which has used

DNA testing to exonerate prisoners, estimates that about eighty per cent of felonies do not involve biological evidence.

In 2000, after thirteen people on death row in Illinois were exonerated, George Ryan, who was then governor of the state, suspended the death penalty. Though he had been a longtime advocate of capital punishment, he declared that he could no longer support a system that has "come so close to the ultimate nightmare—the state's taking of innocent life." Former Supreme Court Justice Sandra Day O'Connor has said that the "execution of a legally and factually innocent person would be a constitutionally intolerable event."

Such a case has become a kind of grisly Holy Grail among opponents of capital punishment. In his 2002 book "The Death Penalty," Stuart Banner observes, "The prospect of killing an innocent person seemed to be the one thing that could cause people to rethink their support for capital punishment. Some who were not troubled by statistical arguments against the death penalty—claims about deterrence or racial disparities—were deeply troubled that such an extreme injustice might occur in an individual case." Opponents of the death penalty have pointed to several questionable cases. In 1993, Ruben Cantu was executed in Texas for fatally shooting a man during a robbery. Years later, a second victim, who survived the shooting, told the Houston *Chronicle* that he had been pressured by police to identify Cantu as the gunman, even though he believed Cantu to be innocent. Sam Millsap, the district attorney in the case, who had once supported capital punishment ("I'm no wild-eyed, pointy-headed liberal"), said that he was disturbed by the thought that he had made a mistake.

In 1995, Larry Griffin was put to death in Missouri, for a drive-by shooting of a drug dealer. The case rested largely on the eyewitness testimony of a career criminal named Robert Fitzgerald, who had been an informant for prosecutors before and was in the witness-protection program. Fitzgerald maintained that he happened to be at the scene because his car had broken down. After Griffin's execution, a probe sponsored by the N.A.A.C.P.'s Legal Defense and Educational Fund revealed that a man who had been wounded during the incident insisted that Griffin was not the shooter. Moreover, the first police officer at the scene disputed that Fitzgerald had witnessed the crime.

These cases, however, stopped short of offering irrefutable proof that a "legally and factually innocent person" was executed. In 2005, a St. Louis prosecutor, Jennifer Joyce, launched an investigation of the Griffin case, upon being presented with what she called "compelling" evidence of Griffin's potential innocence. After two years of reviewing the evidence, and interviewing a new eyewitness, Joyce said that she and her team were convinced that the "right person was convicted."

Supreme Court Justice Antonin Scalia, in 2006, voted with a majority to uphold the death penalty in a Kansas case. In his opinion, Scalia declared that, in the modern judicial system,

there has not been "a single case—not one—in which it is clear that a person was executed for a crime he did not commit. If such an event had occurred in recent years, we would not have to hunt for it; the innocent's name would be shouted from the rooftops."

"My problems are simple," Willingham wrote Gilbert in September, 1999. "Try to keep them from killing me at all costs. End of story."

During his first years on death row, Willingham had pleaded with his lawyer, David Martin, to rescue him. "You can't imagine what it's like to be here, with people I have no business even being around," he wrote.

For a while, Willingham shared a cell with Ricky Lee Green, a serial killer, who castrated and fatally stabbed his victims, including a sixteen-year-old boy. (Green was executed in 1997.) Another of Willingham's cellmates, who had an I.Q. below seventy and the emotional development of an eight-year-old, was raped by an inmate. "You remember me telling you I had a new celly?" Willingham wrote in a letter to his parents. "The little retarded boy. . . . There was this guy here on the wing who is a shit sorry coward (who is the same one I got into it with a little over a month ago). Well, he raped [my cellmate] in the 3 row shower week before last." Willingham said that he couldn't believe that someone would "rape a boy who cannot even defend himself. Pretty damn low."

Because Willingham was known as a "baby killer," he was a target of attacks. "Prison is a rough place, and with a case like mine they never give you the benefit of a doubt," he wrote his parents. After he tried to fight one prisoner who threatened him, Willingham told a friend that if he hadn't stood up for himself several inmates would have "beaten me up or raped or"—his thought trailed off.

Over the years, Willingham's letters home became increasingly despairing. "This is a hard place, and it makes a person hard inside," he wrote. "I told myself that was one thing I did not want and that was for this place to make me bitter, but it is hard." He went on, "They have [executed] at least one person every month I have been here. It is senseless and brutal. . . . You see, we are not living in here, we are only existing." In 1996, he wrote, "I just been trying to figure out why after having a wife and 3 beautiful children that I loved my life has to end like this. And sometimes it just seems like it is not worth it all. . . . In the 3 1/2 years I been here I have never felt that my life was as worthless and desolate as it is now." Since the fire, he wrote, he had the sense that his life was slowly being erased. He obsessively looked at photographs of his children and Stacy, which he stored in his cell. "So long ago, so far away," he wrote in a poem. "Was everything truly there?"

Inmates on death row are housed in a prison within a prison, where there are no attempts at rehabilitation, and no educational or training programs. In 1999, after seven prisoners tried to escape from Huntsville, Willingham and four hundred and fifty-nine other inmates on death row

were moved to a more secure facility, in Livingston, Texas. Willingham was held in isolation in a sixty-square-foot cell, twenty-three hours a day. He tried to distract himself by drawing—"amateur stuff," as he put it—and writing poems. In a poem about his children, he wrote, "There is nothing more beautiful than you on this earth." When Gilbert once suggested some possible revisions to his poems, he explained that he wrote them simply as expressions, however crude, of his feelings. "So to me to cut them up and try to improve on them just for creative-writing purposes would be to destroy what I was doing to start with," he said.

Despite his efforts to occupy his thoughts, he wrote in his diary that his mind "deteriorates each passing day." He stopped working out and gained weight. He questioned his faith: "No God who cared about his creation would abandon the innocent." He seemed not to care if another inmate attacked him. "A person who is already dead inside does not fear" death, he wrote.

One by one, the people he knew in prison were escorted into the execution chamber. There was Clifton Russell, Jr., who, at the age of eighteen, stabbed and beat a man to death, and who said, in his last statement, "I thank my Father, God in Heaven, for the grace he has granted me—I am ready." There was Jeffery Dean Motley, who kidnapped and fatally shot a woman, and who declared, in his final words, "I love you, Mom. Goodbye." And there was John Fearance, who murdered his neighbor, and who turned to God in his last moments and said, "I hope He will forgive me for what I done."

Willingham had grown close to some of his prison mates, even though he knew that they were guilty of brutal crimes. In March, 2000, Willingham's friend Ponchai Wilkerson—a twenty-eight-year-old who had shot and killed a clerk during a jewelry heist—was executed. Afterward, Willingham wrote in his diary that he felt "an emptiness that has not been touched since my children were taken from me." A year later, another friend who was about to be executed—"one of the few real people I have met here not caught up in the bravado of prison"—asked Willingham to make him a final drawing. "Man, I never thought drawing a simple Rose could be so emotionally hard," Willingham wrote. "The hard part is knowing that this will be the last thing I can do for him."

Another inmate, Ernest Ray Willis, had a case that was freakishly similar to Willingham's. In 1987, Willis had been convicted of setting a fire, in West Texas, that killed two women. Willis told investigators that he had been sleeping on a friend's living-room couch and woke up to a house full of smoke. He said that he tried to rouse one of the women, who was sleeping in another room, but the flames and smoke drove him back, and he ran out the front door before the house exploded with flames. Witnesses maintained that Willis had acted suspiciously; he moved his car out of the yard, and didn't show "any emotion," as one volunteer firefighter put it. Authorities also wondered how Willis could have escaped the house without burning his bare

feet. Fire investigators found pour patterns, puddle configurations, and other signs of arson. The authorities could discern no motive for the crime, but concluded that Willis, who had no previous record of violence, was a sociopath—a "demon," as the prosecutor put it. Willis was charged with capital murder and sentenced to death.

Willis had eventually obtained what Willingham called, enviously, a "bad-ass lawyer." James Blank, a noted patent attorney in New York, was assigned Willis's case as part of his firm's pro-bono work. Convinced that Willis was innocent, Blank devoted more than a dozen years to the case, and his firm spent millions, on fire consultants, private investigators, forensic experts, and the like. Willingham, meanwhile, relied on David Martin, his court-appointed lawyer, and one of Martin's colleagues to handle his appeals. Willingham often told his parents, "You don't know what it's like to have lawyers who won't even believe you're innocent." Like many inmates on death row, Willingham eventually filed a claim of inadequate legal representation. (When I recently asked Martin about his representation of Willingham, he said, "There were no grounds for reversal, and the verdict was absolutely the right one." He said of the case, "Shit, it's incredible that anyone's even thinking about it.")

Willingham tried to study the law himself, reading books such as "Tact in Court, or How Lawyers Win: Containing Sketches of Cases Won by Skill, Wit, Art, Tact, Courage and Eloquence." Still, he confessed to a friend, "The law is so complicated it is hard for me to understand." In 1996, he obtained a new court-appointed lawyer, Walter Reaves, who told me that he was appalled by the quality of Willingham's defense at trial and on appeal. Reaves prepared for him a state writ of habeas corpus, known as a Great Writ. In the byzantine appeals process of death-penalty cases, which frequently takes more than ten years, the writ is the most critical stage: a prisoner can introduce new evidence detailing such things as perjured testimony, unreliable medical experts, and bogus scientific findings. Yet most indigent inmates, like Willingham, who constitute the bulk of those on death row, lack the resources to track down new witnesses or dig up fresh evidence. They must depend on court-appointed lawyers, many of whom are "unqualified, irresponsible, or overburdened," as a study by the Texas Defender Service, a nonprofit organization, put it. In 2000, a Dallas *Morning News* investigation revealed that roughly a quarter of the inmates condemned to death in Texas were represented by court-appointed attorneys who had, at some point in their careers, been "reprimanded, placed on probation, suspended or banned from practicing law by the State Bar." Although Reaves was more competent, he had few resources to reinvestigate the case, and his writ introduced no new exculpatory evidence: nothing further about Webb, or the reliability of the eyewitness testimony, or the credibility of the medical experts. It focussed primarily on procedural questions, such as whether the trial court erred in its instructions to the jury.

The Texas Court of Criminal Appeals was known for upholding convictions even when overwhelming exculpatory evidence came to light. In 1997, DNA testing proved that sperm collected from a rape victim did not match Roy Criner, who had been sentenced to ninety-nine years for the crime. Two lower courts recommended that the verdict be overturned, but the Court of Criminal Appeals upheld it, arguing that Criner might have worn a condom or might not have ejaculated. Sharon Keller, who is now the presiding judge on the court, stated in a majority opinion, "The new evidence does not establish innocence." In 2000, George W. Bush pardoned Criner. (Keller was recently charged with judicial misconduct, for refusing to keep open past five o'clock a clerk's office in order to allow a last-minute petition from a man who was executed later that night.)

On October 31, 1997, the Court of Criminal Appeals denied Willingham's writ. After Willingham filed another writ of habeas corpus, this time in federal court, he was granted a temporary stay. In a poem, Willingham wrote, "One more chance, one more strike / Another bullet dodged, another date escaped."

Willingham was entering his final stage of appeals. As his anxieties mounted, he increasingly relied upon Gilbert to investigate his case and for emotional support. "She may never know what a change she brought into my life," he wrote in his diary. "For the first time in many years she gave me a purpose, something to look forward to."

As their friendship deepened, he asked her to promise him that she would never disappear without explanation. "I already have that in my life," he told her.

Together, they pored over clues and testimony. Gilbert says that she would send Reaves leads to follow up, but although he was sympathetic, nothing seemed to come of them. In 2002, a federal district court of appeals denied Willingham's writ without even a hearing. "Now I start the last leg of my journey," Willingham wrote to Gilbert. "Got to get things in order."

He appealed to the U.S. Supreme Court, but in December, 2003, he was notified that it had declined to hear his case. He soon received a court order announcing that "the Director of the Department of Criminal Justice at Huntsville, Texas, acting by and through the executioner designated by said Director . . . is hereby DIRECTED and COMMANDED, at some hour after 6:00 p.m. on the 17th day of February, 2004, at the Department of Criminal Justice in Huntsville, Texas, to carry out this sentence of death by intravenous injection of a substance or substances in a lethal quantity sufficient to cause the death of said Cameron Todd Willingham."

Willingham wrote a letter to his parents. "Are you sitting down?" he asked, before breaking the news. "I love you both so much," he said.

His only remaining recourse was to appeal to the governor of Texas, Rick Perry, a Republican, for clemency. The process, considered the last gatekeeper to the executioner, has been called by the U.S. Supreme Court "the 'fail safe' in our criminal justice system."

**IV**

One day in January, 2004, Dr. Gerald Hurst, an acclaimed scientist and fire investigator, received a file describing all the evidence of arson gathered in Willingham's case. Gilbert had come across Hurst's name and, along with one of Willingham's relatives, had contacted him, seeking his help. After their pleas, Hurst had agreed to look at the case pro bono, and Reaves, Willingham's lawyer, had sent him the relevant documents, in the hope that there were grounds for clemency.

Hurst opened the file in the basement of his house in Austin, which served as a laboratory and an office, and was cluttered with microscopes and diagrams of half-finished experiments. Hurst was nearly six and half feet tall, though his stooped shoulders made him seem considerably shorter, and he had a gaunt face that was partly shrouded by long gray hair. He was wearing his customary outfit: black shoes, black socks, a black T-shirt, and loose-fitting black pants supported by black suspenders. In his mouth was a wad of chewing tobacco.

A child prodigy who was raised by a sharecropper during the Great Depression, Hurst used to prowl junk yards, collecting magnets and copper wires in order to build radios and other contraptions. In the early sixties, he received a Ph.D. in chemistry from Cambridge University, where he started to experiment with fluorine and other explosive chemicals, and once detonated his lab. Later, he worked as the chief scientist on secret weapons programs for several American companies, designing rockets and deadly fire bombs—or what he calls "god-awful things." He helped patent what has been described, with only slight exaggeration, as "the world's most powerful nonnuclear explosive": an Astrolite bomb. He experimented with toxins so lethal that a fraction of a drop would rot human flesh, and in his laboratory he often had to wear a pressurized moon suit; despite such precautions, exposure to chemicals likely caused his liver to fail, and in 1994 he required a transplant. Working on what he calls "the dark side of arson," he retrofitted napalm bombs with Astrolite, and developed ways for covert operatives in Vietnam to create bombs from local materials, such as chicken manure and sugar. He also perfected a method for making an exploding T-shirt by nitrating its fibres.

His conscience eventually began pricking him. "One day, you wonder, What the hell am I doing?" he recalls. He left the defense industry, and went on to invent the Mylar balloon, an improved version of Liquid Paper, and Kinepak, a kind of explosive that reduces the risk of accidental detonation. Because of his extraordinary knowledge of fire and explosives, companies in civil litigation frequently sought his help in determining the cause of a blaze. By

the nineties, Hurst had begun devoting significant time to criminal-arson cases, and, as he was exposed to the methods of local and state fire investigators, he was shocked by what he saw.

Many arson investigators, it turned out, had only a high-school education. In most states, in order to be certified, investigators had to take a forty-hour course on fire investigation, and pass a written exam. Often, the bulk of an investigator's training came on the job, learning from "old -timers" in the field, who passed down a body of wisdom about the telltale signs of arson, even though a study in 1977 warned that there was nothing in "the scientific literature to substantiate their validity."

In 1992, the National Fire Protection Association, which promotes fire prevention and safety, published its first scientifically based guidelines to arson investigation. Still, many arson investigators believed that what they did was more an art than a science—a blend of experience and intuition. In 1997, the International Association of Arson Investigators filed a legal brief arguing that arson sleuths should not be bound by a 1993 Supreme Court decision requiring experts who testified at trials to adhere to the scientific method. What arson sleuths did, the brief claimed, was "less scientific." By 2000, after the courts had rejected such claims, arson investigators increasingly recognized the scientific method, but there remained great variance in the field, with many practitioners still relying on the unverified techniques that had been used for generations. "People investigated fire largely with a flat-earth approach," Hurst told me. "It looks like arson—therefore, it's arson." He went on, "My view is you have to have a scientific basis. Otherwise, it's no different than witch-hunting."

In 1998, Hurst investigated the case of a woman from North Carolina named Terri Hinson, who was charged with setting a fire that killed her seventeen-month-old son, and faced the death penalty. Hurst ran a series of experiments re-creating the conditions of the fire, which suggested that it had not been arson, as the investigators had claimed; rather, it had started accidentally, from a faulty electrical wire in the attic. Because of this research, Hinson was freed. John Lentini, a fire expert and the author of a leading scientific textbook on arson, describes Hurst as "brilliant." A Texas prosecutor once told the Chicago *Tribune,* of Hurst, "If he says it was an arson fire, then it was. If he says it wasn't, then it wasn't."

Hurst's patents yielded considerable royalties, and he could afford to work pro bono on an arson case for months, even years. But he received the files on Willingham's case only a few weeks before Willingham was scheduled to be executed. As Hurst looked through the case records, a statement by Manuel Vasquez, the state deputy fire marshal, jumped out at him. Vasquez had testified that, of the roughly twelve hundred to fifteen hundred fires he had investigated, "most all of them" were arson. This was an oddly high estimate; the Texas State Fire Marshals Office typically found arson in only fifty per cent of its cases.

Hurst was also struck by Vasquez's claim that the Willingham blaze had "burned fast and hot" because of a liquid accelerant. The notion that a flammable or combustible liquid caused flames to reach higher temperatures had been repeated in court by arson sleuths for decades. Yet the theory was nonsense: experiments have proved that wood and gasoline-fuelled fires burn at essentially the same temperature.

Vasquez and Fogg had cited as proof of arson the fact that the front door's aluminum threshold had melted. "The only thing that can cause that to react is an accelerant," Vasquez said. Hurst was incredulous. A natural-wood fire can reach temperatures as high as two thousand degrees Fahrenheit—far hotter than the melting point for aluminum alloys, which ranges from a thousand to twelve hundred degrees. And, like many other investigators, Vasquez and Fogg mistakenly assumed that wood charring beneath the aluminum threshold was evidence that, as Vasquez put it, "a liquid accelerant flowed underneath and burned." Hurst had conducted myriad experiments showing that such charring was caused simply by the aluminum conducting so much heat. In fact, when liquid accelerant is poured under a threshold a fire will extinguish, because of a lack of oxygen. (Other scientists had reached the same conclusion.) "Liquid accelerants can no more burn under an aluminum threshold than can grease burn in a skillet even with a loose-fitting lid," Hurst declared in his report on the Willingham case.

Hurst then examined Fogg and Vasquez's claim that the "brown stains" on Willingham's front porch were evidence of "liquid accelerant," which had not had time to soak into the concrete. Hurst had previously performed a test in his garage, in which he poured charcoal-lighter fluid on the concrete floor, and lit it. When the fire went out, there were no brown stains, only smudges of soot. Hurst had run the same experiment many times, with different kinds of liquid accelerants, and the result was always the same. Brown stains were common in fires; they were usually composed of rust or gunk from charred debris that had mixed with water from fire hoses.

Another crucial piece of evidence implicating Willingham was the "crazed glass" that Vasquez had attributed to the rapid heating from a fire fuelled with liquid accelerant. Yet, in November of 1991, a team of fire investigators had inspected fifty houses in the hills of Oakland, California, which had been ravaged by brush fires. In a dozen houses, the investigators discovered crazed glass, even though a liquid accelerant had not been used. Most of these houses were on the outskirts of the blaze, where firefighters had shot streams of water; as the investigators later wrote in a published study, they theorized that the fracturing had been induced by rapid cooling, rather than by sudden heating—thermal shock had caused the glass to contract so quickly that it settled disjointedly. The investigators then tested this hypothesis in a laboratory. When they heated glass, nothing happened. But each time they applied water to the heated glass the intricate patterns appeared. Hurst had seen the same phenomenon when he had

blowtorched and cooled glass during his research at Cambridge. In his report, Hurst wrote that Vasquez and Fogg's notion of crazed glass was no more than an "old wives' tale."

Hurst then confronted some of the most devastating arson evidence against Willingham: the burn trailer, the pour patterns and puddle configurations, the V-shape and other burn marks indicating that the fire had multiple points of origin, the burning underneath the children's beds. There was also the positive test for mineral spirits by the front door, and Willingham's seemingly implausible story that he had run out of the house without burning his bare feet.

As Hurst read through more of the files, he noticed that Willingham and his neighbors had described the windows in the front of the house suddenly exploding and flames roaring forth. It was then that Hurst thought of the legendary Lime Street Fire, one of the most pivotal in the history of arson investigation.

On the evening of October 15, 1990, a thirty-five-year-old man named Gerald Wayne Lewis was found standing in front of his house on Lime Street, in Jacksonville, Florida, holding his three-year-old son. His two-story wood-frame home was engulfed in flames. By the time the fire had been extinguished, six people were dead, including Lewis's wife. Lewis said that he had rescued his son but was unable to get to the others, who were upstairs.

When fire investigators examined the scene, they found the classic signs of arson: low burns along the walls and floors, pour patterns and puddle configurations, and a burn trailer running from the living room into the hallway. Lewis claimed that the fire had started accidentally, on a couch in the living room—his son had been playing with matches. But a V-shaped pattern by one of the doors suggested that the fire had originated elsewhere. Some witnesses told authorities that Lewis seemed too calm during the fire and had never tried to get help. According to the Los Angeles *Times*, Lewis had previously been arrested for abusing his wife, who had taken out a restraining order against him. After a chemist said that he had detected the presence of gasoline on Lewis's clothing and shoes, a report by the sheriff's office concluded, "The fire was started as a result of a petroleum product being poured on the front porch, foyer, living room, stairwell and second floor bedroom." Lewis was arrested and charged with six counts of murder. He faced the death penalty.

Subsequent tests, however, revealed that the laboratory identification of gasoline was wrong. Moreover, a local news television camera had captured Lewis in a clearly agitated state at the scene of the fire, and investigators discovered that at one point he had jumped in front of a moving car, asking the driver to call the Fire Department.

Seeking to bolster their theory of the crime, prosecutors turned to John Lentini, the fire expert, and John DeHaan, another leading investigator and textbook author. Despite some of the weaknesses of the case, Lentini told me that, given the classic burn patterns and puddle

configurations in the house, he was sure that Lewis had set the fire: "I was prepared to testify and send this guy to Old Sparky"—the electric chair.

To discover the truth, the investigators, with the backing of the prosecution, decided to conduct an elaborate experiment and re-create the fire scene. Local officials gave the investigators permission to use a condemned house next to Lewis's home, which was about to be torn down. The two houses were virtually identical, and the investigators refurbished the condemned one with the same kind of carpeting, curtains, and furniture that had been in Lewis's home. The scientists also wired the building with heat and gas sensors that could withstand fire. The cost of the experiment came to twenty thousand dollars. Without using liquid accelerant, Lentini and DeHaan set the couch in the living room on fire, expecting that the experiment would demonstrate that Lewis's version of events was implausible.

The investigators watched as the fire quickly consumed the couch, sending upward a plume of smoke that hit the ceiling and spread outward, creating a thick layer of hot gases overhead—an efficient radiator of heat. Within three minutes, this cloud, absorbing more gases from the fire below, was banking down the walls and filling the living room. As the cloud approached the floor, its temperature rose, in some areas, to more than eleven hundred degrees Fahrenheit. Suddenly, the entire room exploded in flames, as the radiant heat ignited every piece of furniture, every curtain, every possible fuel source, even the carpeting. The windows shattered.

The fire had reached what is called "flashover"—the point at which radiant heat causes a fire in a room to become a room on fire. Arson investigators knew about the concept of flashover, but it was widely believed to take much longer to occur, especially without a liquid accelerant. From a single fuel source—a couch—the room had reached flashover in four and a half minutes.

Because all the furniture in the living room had ignited, the blaze went from a fuel-controlled fire to a ventilation-controlled fire—or what scientists call "post-flashover." During post-flashover, the path of the fire depends on new sources of oxygen, from an open door or window. One of the fire investigators, who had been standing by an open door in the living room, escaped moments before the oxygen-starved fire roared out of the room into the hallway—a fireball that caused the corridor to go quickly into flashover as well, propelling the fire out the front door and onto the porch.

After the fire was extinguished, the investigators inspected the hallway and living room. On the floor were irregularly shaped burn patterns that perfectly resembled pour patterns and puddle configurations. It turned out that these classic signs of arson can also appear on their own, after flashover. With the naked eye, it is impossible to distinguish between the pour patterns and puddle configurations caused by an accelerant and those caused naturally by post-

flashover. The only reliable way to tell the difference is to take samples from the burn patterns and test them in a laboratory for the presence of flammable or combustible liquids.

During the Lime Street experiment, other things happened that were supposed to occur only in a fire fuelled by liquid accelerant: charring along the base of the walls and doorways, and burning under furniture. There was also a V-shaped pattern by the living-room doorway, far from where the fire had started on the couch. In a small fire, a V-shaped burn mark may pinpoint where a fire began, but during post-flashover these patterns can occur repeatedly, when various objects ignite.

One of the investigators muttered that they had just helped prove the defense's case. Given the reasonable doubt raised by the experiment, the charges against Lewis were soon dropped. The Lime Street experiment had demolished prevailing notions about fire behavior. Subsequent tests by scientists showed that, during post-flashover, burning under beds and furniture was common, entire doors were consumed, and aluminum thresholds melted.

John Lentini says of the Lime Street Fire, "This was my epiphany. I almost sent a man to die based on theories that were a load of crap."

Hurst next examined a floor plan of Willingham's house that Vasquez had drawn, which delineated all the purported pour patterns and puddle configurations. Because the windows had blown out of the children's room, Hurst knew that the fire had reached flashover. With his finger, Hurst traced along Vasquez's diagram the burn trailer that had gone from the children's room, turned right in the hallway, and headed out the front door. John Jackson, the prosecutor, had told me that the path was so "bizarre" that it had to have been caused by a liquid accelerant. But Hurst concluded that it was a natural product of the dynamics of fire during post -flashover. Willingham had fled out the front door, and the fire simply followed the ventilation path, toward the opening. Similarly, when Willingham had broken the windows in the children's room, flames had shot outward.

Hurst recalled that Vasquez and Fogg had considered it impossible for Willingham to have run down the burning hallway without scorching his bare feet. But if the pour patterns and puddle configurations were a result of a flashover, Hurst reasoned, then they were consonant with Willingham's explanation of events. When Willingham exited his bedroom, the hallway was not yet on fire; the flames were contained within the children's bedroom, where, along the ceiling, he saw the "bright lights." Just as the investigator safely stood by the door in the Lime Street experiment seconds before flashover, Willingham could have stood close to the children's room without being harmed. (Prior to the Lime Street case, fire investigators had generally assumed that carbon monoxide diffuses quickly through a house during a fire. In fact, up until flashover, levels of carbon monoxide can be remarkably low beneath and outside the

thermal cloud.) By the time the Corsicana fire achieved flashover, Willingham had already fled outside and was in the front yard.

Vasquez had made a videotape of the fire scene, and Hurst looked at the footage of the burn trailer. Even after repeated viewings, he could not detect three points of origin, as Vasquez had. (Fogg recently told me that he also saw a continuous trailer and disagreed with Vasquez, but added that nobody from the prosecution or the defense ever asked him on the stand about his opinion on the subject.)

After Hurst had reviewed Fogg and Vasquez's list of more than twenty arson indicators, he believed that only one had any potential validity: the positive test for mineral spirits by the threshold of the front door. But why had the fire investigators obtained a positive reading only in that location? According to Fogg and Vasquez's theory of the crime, Willingham had poured accelerant throughout the children's bedroom and down the hallway. Officials had tested extensively in these areas—including where all the pour patterns and puddle configurations were—and turned up nothing. Jackson told me that he "never did understand why they weren't able to recover" positive tests in these parts.

Hurst found it hard to imagine Willingham pouring accelerant on the front porch, where neighbors could have seen him. Scanning the files for clues, Hurst noticed a photograph of the porch taken before the fire, which had been entered into evidence. Sitting on the tiny porch was a charcoal grill. The porch was where the family barbecued. Court testimony from witnesses confirmed that there had been a grill, along with a container of lighter fluid, and that both had burned when the fire roared onto the porch during post-flashover. By the time Vasquez inspected the house, the grill had been removed from the porch, during cleanup. Though he cited the container of lighter fluid in his report, he made no mention of the grill. At the trial, he insisted that he had never been told of the grill's earlier placement. Other authorities were aware of the grill but did not see its relevance. Hurst, however, was convinced that he had solved the mystery: when firefighters had blasted the porch with water, they had likely spread charcoal-lighter fluid from the melted container.

Without having visited the fire scene, Hurst says, it was impossible to pinpoint the cause of the blaze. But, based on the evidence, he had little doubt that it was an accidental fire—one caused most likely by the space heater or faulty electrical wiring. It explained why there had never been a motive for the crime. Hurst concluded that there was no evidence of arson, and that a man who had already lost his three children and spent twelve years in jail was about to be executed based on "junk science." Hurst wrote his report in such a rush that he didn't pause to fix the typos.

## V

"I am a realist and I will not live a fantasy," Willingham once told Gilbert about the prospect of proving his innocence. But in February, 2004, he began to have hope. Hurst's findings had helped to exonerate more than ten people. Hurst even reviewed the scientific evidence against Willingham's friend Ernest Willis, who had been on death row for the strikingly similar arson charge. Hurst says, "It was like I was looking at the same case. Just change the names." In his report on the Willis case, Hurst concluded that not "a single item of physical evidence . . . supports a finding of arson." A second fire expert hired by Ori White, the new district attorney in Willis's district, concurred. After seventeen years on death row, Willis was set free. "I don't turn killers loose," White said at the time. "If Willis was guilty, I'd be retrying him right now. And I'd use Hurst as my witness. He's a brilliant scientist." White noted how close the system had come to murdering an innocent man. "He did not get executed, and I thank God for that," he said.

On February 13th, four days before Willingham was scheduled to be executed, he got a call from Reaves, his attorney. Reaves told him that the fifteen members of the Board of Pardons and Paroles, which reviews an application for clemency and had been sent Hurst's report, had made their decision.

"What is it?" Willingham asked.

"I'm sorry," Reaves said. "They denied your petition."

The vote was unanimous. Reaves could not offer an explanation: the board deliberates in secret, and its members are not bound by any specific criteria. The board members did not even have to review Willingham's materials, and usually don't debate a case in person; rather, they cast their votes by fax—a process that has become known as "death by fax." Between 1976 and 2004, when Willingham filed his petition, the State of Texas had approved only one application for clemency from a prisoner on death row. A Texas appellate judge has called the clemency system "a legal fiction." Reaves said of the board members, "They never asked me to attend a hearing or answer any questions."

The Innocence Project obtained, through the Freedom of Information Act, all the records from the governor's office and the board pertaining to Hurst's report. "The documents show that they received the report, but neither office has any record of anyone acknowledging it, taking note of its significance, responding to it, or calling any attention to it within the government," Barry Scheck said. "The only reasonable conclusion is that the governor's office and the Board of Pardons and Paroles ignored scientific evidence."

LaFayette Collins, who was a member of the board at the time, told me of the process, "You don't vote guilt or innocence. You don't retry the trial. You just make sure everything is in

order and there are no glaring errors." He noted that although the rules allowed for a hearing to consider important new evidence, "in my time there had never been one called." When I asked him why Hurst's report didn't constitute evidence of "glaring errors," he said, "We get all kinds of reports, but we don't have the mechanisms to vet them." Alvin Shaw, another board member at the time, said that the case didn't "ring a bell," adding, angrily, "Why would I want to talk about it?" Hurst calls the board's actions "unconscionable."

Though Reaves told Willingham that there was still a chance that Governor Perry might grant a thirty-day stay, Willingham began to prepare his last will and testament. He had earlier written Stacy a letter apologizing for not being a better husband and thanking her for everything she had given him, especially their three daughters. "I still know Amber's voice, her smile, her cool Dude saying and how she said: I wanna hold you! Still feel the touch of Karmon and Kameron's hands on my face." He said that he hoped that "some day, somehow the truth will be known and my name cleared."

He asked Stacy if his tombstone could be erected next to their children's graves. Stacy, who had for so long expressed belief in Willingham's innocence, had recently taken her first look at the original court records and arson findings. Unaware of Hurst's report, she had determined that Willingham was guilty. She denied him his wish, later telling a reporter, "He took my kids away from me."

Gilbert felt as if she had failed Willingham. Even before his pleas for clemency were denied, she told him that all she could give him was her friendship. He told her that it was enough "to be a part of your life in some small way so that in my passing I can know I was at last able to have felt the heart of another who might remember me when I'm gone." He added, "There is nothing to forgive you for." He told her that he would need her to be present at his execution, to help him cope with "my fears, thoughts, and feelings."

On February 17th, the day he was set to die, Willingham's parents and several relatives gathered in the prison visiting room. Plexiglas still separated Willingham from them. "I wish I could touch and hold both of you," Willingham had written to them earlier. "I always hugged Mom but I never hugged Pop much."

As Willingham looked at the group, he kept asking where Gilbert was. Gilbert had recently been driving home from a store when another car ran a red light and smashed into her. Willingham used to tell her to stay in her kitchen for a day, without leaving, to comprehend what it was like to be confined in prison, but she had always found an excuse not to do it. Now she was paralyzed from the neck down.

While she was in an intensive-care unit, she had tried to get a message to Willingham, but apparently failed. Gilbert's daughter later read her a letter that Willingham had sent her, telling her how much he had grown to love her. He had written a poem: "Do you want to see beauty—

like you have never seen? / Then close your eyes, and open your mind, and come along with me."

Gilbert, who spent years in physical rehabilitation, gradually regaining motion in her arms and upper body, says, "All that time, I thought I was saving Willingham, and I realized then that he was saving me, giving me the strength to get through this. I know I will one day walk again, and I know it is because Willingham showed me the kind of courage it takes to survive."

Willingham had requested a final meal, and at 4 P.M. on the seventeenth he was served it: three barbecued pork ribs, two orders of onion rings, fried okra, three beef enchiladas with cheese, and two slices of lemon cream pie. He received word that Governor Perry had refused to grant him a stay. (A spokesperson for Perry says, "The Governor made his decision based on the facts of the case.") Willingham's mother and father began to cry. "Don't be sad, Momma," Willingham said. "In fifty-five minutes, I'm a free man. I'm going home to see my kids." Earlier, he had confessed to his parents that there was one thing about the day of the fire he had lied about. He said that he had never actually crawled into the children's room. "I just didn't want people to think I was a coward," he said. Hurst told me, "People who have never been in a fire don't understand why those who survive often can't rescue the victims. They have no concept of what a fire is like."

The warden told Willingham that it was time. Willingham, refusing to assist the process, lay down; he was carried into a chamber eight feet wide and ten feet long. The walls were painted green, and in the center of the room, where an electric chair used to be, was a sheeted gurney. Several guards strapped Willingham down with leather belts, snapping buckles across his arms and legs and chest. A medical team then inserted intravenous tubes into his arms. Each official had a separate role in the process, so that no one person felt responsible for taking a life.

Willingham had asked that his parents and family not be present in the gallery during this process, but as he looked out he could see Stacy watching. The warden pushed a remote control, and sodium thiopental, a barbiturate, was pumped into Willingham's body. Then came a second drug, pancuronium bromide, which paralyzes the diaphragm, making it impossible to breathe. Finally, a third drug, potassium chloride, filled his veins, until his heart stopped, at 6:20 P.M. On his death certificate, the cause was listed as "Homicide."

After his death, his parents were allowed to touch his face for the first time in more than a decade. Later, at Willingham's request, they cremated his body and secretly spread some of his ashes over his children's graves. He had told his parents, "Please don't ever stop fighting to vindicate me."

In December, 2004, questions about the scientific evidence in the Willingham case began to surface. Maurice Possley and Steve Mills, of the Chicago *Tribune*, had published an investigative series on flaws in forensic science; upon learning of Hurst's report, Possley and

Mills asked three fire experts, including John Lentini, to examine the original investigation. The experts concurred with Hurst's report. Nearly two years later, the Innocence Project commissioned Lentini and three other top fire investigators to conduct an independent review of the arson evidence in the Willingham case. The panel concluded that "each and every one" of the indicators of arson had been "scientifically proven to be invalid."

In 2005, Texas established a government commission to investigate allegations of error and misconduct by forensic scientists. The first cases that are being reviewed by the commission are those of Willingham and Willis. In mid-August, the noted fire scientist Craig Beyler, who was hired by the commission, completed his investigation. In a scathing report, he concluded that investigators in the Willingham case had no scientific basis for claiming that the fire was arson, ignored evidence that contradicted their theory, had no comprehension of flashover and fire dynamics, relied on discredited folklore, and failed to eliminate potential accidental or alternative causes of the fire. He said that Vasquez's approach seemed to deny "rational reasoning" and was more "characteristic of mystics or psychics." What's more, Beyler determined that the investigation violated, as he put it to me, "not only the standards of today but even of the time period." The commission is reviewing his findings, and plans to release its own report next year. Some legal scholars believe that the commission may narrowly assess the reliability of the scientific evidence. There is a chance, however, that Texas could become the first state to acknowledge officially that, since the advent of the modern judicial system, it had carried out the "execution of a legally and factually innocent person."

Just before Willingham received the lethal injection, he was asked if he had any last words. He said, "The only statement I want to make is that I am an innocent man convicted of a crime I did not commit. I have been persecuted for twelve years for something I did not do. From God's dust I came and to dust I will return, so the Earth shall become my throne." ♦

To get more of *The New Yorker*'s signature mix of politics, culture and the arts: **Subscribe now**