**Exhibit 46**

IN THE CIRCUIT COURT FOR BLOUNT COUNTY, TENNESSEE
AT MARYVILLE

STATE OF TENNESSEE )
)
VS. ) INDICTMENT NO. C-6669
)
JAMES HENDERSON DELLINGER )
)
)

FILED
MAR - 7 1994
ENOCH B. SIMERLY
CIRCUIT COURT CLERK

MEMORANDUM IN SUPPORT OF EX PARTE SEALED MOTION
FOR DEFENSE SERVICES

COMES now the accused, James Henderson Dellinger, and respectfully shows to this court in support of its ex parte sealed motion for defense services is as follows:

T.C.A. § 40-14-207(b) (Supp.) provides as follows:

> (b) In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an ex parte hearing may in its discretion determine that investigative or expert services or other similar services are necessary to insure that the constitutional rights of a defendant are properly protected. If such a determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the reimbursement of reasonable and necessary expenses by the Executive Secretary of the Supreme Court as authorized by this part, and rules promulgated thereunder by the Supreme Court.

Tennessee Supreme Court Rule 13(2)(B)(10) provides as follows:

> In capital cases, the court may determine that investigative or expert services, or other similar services are necessary to insure the protection of the constitutional rights of a defendant. (T.C.A. § 40-14-207). The defense counsel must seek prior approval for such services by submitting a written motion to the court setting forth:
> (a) The name of the proposed or service;
> (b) How, when, and where the expert examination is to be conducted or the services to be performed;
> (c) The cost of the evaluation and report thereof;
> (d) The cost of any other necessary services, such as court appearances.
> If the motion for expert services is granted, the court must grant the prior authorization for these services and a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall be made a part of the record in the case and a certified copy included with the attorney's claim for compensation

and reimbursement. Payment may be made directly to the individuals rendering the expert services upon certification by the attorney that the services have been rendered and approved by the court. If the attorney is to be reimbursed, the expense shall be included in the attorney's claim for compensation and reimbursement and supported by such receipts as may be required by the Executive Secretary.

In the case of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 85 L.Ed.2d 53 (1985), the United States Supreme Court stated:

> This court has long recognized that when a state brings its judicial powers to bear on an indigent defendant in a criminal proceeding, it must take steps to insure that the defendant has a fair opportunity to present his defense. This elementary principal, grounded in significant part in the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake. (Emphasis added.) 105 S.Ct. at 1093.

And further:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the state proceeds against an indigent defendant without making certain that he has access to the raw materials integral in the building of an effective defense. Thus, while the Court has not held that a state must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, (citation omitted), it has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system (citation omitted)....
>
> The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. Indeed, the host of safeguards fashioned by this court over the years to diminish the risk of erroneous convictions stands as a testament to that concern. The interest of the individual in the outcome of the state's effort to overcome the presumption of innocence is obvious and weighs heavily in our analysis. (Emphasis added.) 105 S.Ct. 1094.

The Tennessee State Supreme Court, per Justice Cooper, has provided:

> There is no question but that an indigent defendant in a criminal prosecution must be provided with the tools of an adequate defense or appeal when these are tools available for a price to other defendants. State v. Elliot, 524 S.W.2d 473, 475 (Tenn. 1975).

The United States Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice (1963) and the American Bar Associations: Standards Relating to Providing

Defense Services, Section 1.5 (1968) promulgated similar standards requiring the provisions of "investigative, expert, or other services necessary for an adequate defense to the indigent criminal defendant." And see, American Bar Association: Standards for Criminal Justice, Section 5-1.4 (2d ed. 1980).

Also, see ABA Guidelines for the Appoint and Performance of Counsel in Death Penalty Cases, Guideline 8.1 and Commentary (approved by ABA on February 7, 1989). Guideline 8.1 provides as follows:

> Guideline 8.1-Supporting Services: The legal representation plan for each jurisdiction should provide counsel appointed pursuant to these guidelines with investigative, expert, and other services necessary to prepare and present an adequate defense. These should include not only those services and facilities needed for an effective defense at trial, but also those that are required for effective defense representation at every stage of the proceedings, including the sentencing phase.

The constitutional basis for the support services requested is as follows:

1. The accused in this case has a right to the provision of the support services requested pursuant to the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 8 of the Tennessee Constitution. As a matter of "fundamental fairness," the accused has a right to the requisites of an adequate defense. One who is indigent and cannot afford to purchase the resources for an adequate defense should have necessary resources made available to him by the state. See, Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L. Ed. 158 (1932); Ake v. Oklahoma, supra.

2. The accused has a right to the provision of the support services requested pursuant to the equal protection clause of the Fourteenth Amendment of the United States Constitution. See, for example, Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed 891 (1956); Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

3. The accused has a right to the provision of the support services requested pursuant to the right to the effective assistance of counsel, provided in the Sixth Amendment of the United States Constitution and Article I, Section 9 of the

Tennessee Constitution. See, for example, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Gideon v. Wainwright, 375 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

4. The accused has a right to the provision of the support services requested pursuant to the right to compulsory process of witnesses pursuant to the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Tennessee Constitution. See, for example, People v. Watson, 221 N.E.2d 645 (1966). Also, see, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

The accused's rights to the provision of support services such as investigator, psychologist, and other forensic experts, upon the demonstration of a need, is particularly important in a case in which the state seeks to impose the sentence of death. The United States Supreme Court has continually recognized a heightened standard of due process in capital cases. The Court in Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), noted:

> In the twelve years since Furman v. Georgia,... every member of this court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to insure that it is a justified response to a given offense. 104 S.Ct. at 3167.

Also, in this regard, see, Eddings v. Oklahoma, 45 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); and finally, Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), in which the court stated:

> ...death, in its finality, differs more from life imprisonment than a one hundred year prison term differs from one of only a year or two.

FOR THE FOREGOING REASONS, the accused respectfully requests that this court authorize funds necessary to provide the support services requested in order that the accused may be able to prepare and present an adequate defense.

Respectfully submitted,

EUGENE B. DIXON
Attorney for Defendant
215 Ellis Avenue
Maryville, TN 37801
615/982-4747

CHARLES DEAS
Attorney for Defendant
320 S. Court Street
Maryville, TN 37801
615/984-2720

IN THE CRIMINAL COURT OF SUMNER COUNTY, TENNESSEE

AT GALLATIN

STATE OF TENNESSEE )

FILED

VS ) NO. 5748

MAR 7 1994

JOE T. BAKER )

ENOCH B. SIMERLY
CIRCUIT COURT CLERK

TRANSCRIPT OF THE PROCEEDINGS

VOLUME I OF I VOLUME

EX PARTE MOTIONS - SEPTEMBER 7, 1990

THE HONORABLE FRED A. KELLY, III, PRESIDING

APPEARANCES

FOR THE DEFENDANT:

MR. JAMES A. SIMMONS
ATTORNEY AT LAW
NASHVILLE, TENNESSEE

MR. STEVEN F. GLASER
ATTORNEY AT LAW
NASHVILLE, TENNESSEE

THE COURT: You can be excused for today. We look forward to seeing you Monday. And before you go, if you will get Mr. Simmons here.

(All but the necessary parties were excluded from the courtroom.)

THE COURT: This is an ex parte hearing. Tell me who is in the courtroom.

MR. SIMMONS: This is Margie Fargo.

THE COURT: I know Mr. Edwards.

MR. SIMMONS: And with her is Mr. Skip Gant with the Capital Case Resource Center. His full name is Isaiah "Skip" Gant, G-A-N-T.

Your Honor, this is an ex parte hearing, and quite frankly I have never done one before. I was under the assumption it was going to be in chambers and had planned to proceed informally.

THE COURT: It was for the convenience of the court reporter. My chambers are too small for us all together. That did leave the jury room, but this seemed to be convenient, if it's convenient for you now.

MR. SIMMONS: It's strictly up to you, Your Honor.

THE COURT: Let's proceed. The doors are closed.

MR. SIMMONS: I'll proceed with less formality than I normally would.

Your Honor, I had filed a motion in this case,

least three times and pistol-whipped him. There are gruesome photographs, a gruesome video, that will be introduced. And in addition to that, Your Honor, we're going to have the family on the front row during this trial all lined up, and I would assume we'll have a six-year-old little girl.

That is going to be in contrast to our client, Joe T. Baker, black male, inarticulate, 22 years old. He has a prior drug conviction, cocaine; has a dishonorable discharge from the Marine Corps, basically unemployed all his life, using drugs at the time of this offense. He came from out of county into Sumner County where this crime was committed. At this time he has pending armed robbery, murder, and perjury charges in Clarksville, and a trial is set for November 13th. I fully anticipate that he will be convicted before the trial in Sumner County, which I would anticipate he's going to have possibly a death sentence consecutive to a life sentence consecutive to some other sentence before we even have an opportunity to try him here. And all those factors are going to be made known to the jury.

The Clarksville case is possibly -- or equally as bad as the Sumner County, with a young, white female shot in cold blood at the convenience store.

The testimony has been at the trial of the co-defendant, in Bigbee, that in Clarksville Joe T. Baker was

I'd call Margie Fargo.

DEFENDANT'S PROOF

MARGIE FARGO,

having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SIMMONS:

Q You are Margie Fargo?

A Yes, I am.

MR. SIMMONS: I'm just going to hand you -- this is your -- a brief resume, biographical information.

(Exhibit 1 was marked and filed.)

Q This is a brief description of Jury Services and prior experience your office has had in capital cases?

A This is specifically with capital case work.

(Exhibit 2 was marked and filed.)

Q Tell the Judge a little bit about your background and your experience in jury selection and why it's necessary.

A Judge Kelly, I'm really here as a member of the board of directors of the American Society of Trial Consultants. I am a trial consultant, and I have a business in Washington, D.C., Jury Services, Inc. I have been a

Jury Services necessarily but trying to reflect the concerns that trial consultants have that in this kind of complex case area the defense attorneys do have the benefit of social science information of jury attitudes and the communications skills that we think are so important in conducting their voir dire in these type cases.

Q You are familiar with the basic facts of the Joe T. Baker case? I have made you familiar with them?

A Yes.

Q And I have made you familiar with somewhat of the area of Sumner County and Gallatin and Hendersonville, Tennessee.

Could you tell the Judge the communication skills which are required and the nuances that are required in the selection of a death-penalty-case jury under the facts and why a lawyer needs help picking that jury?

A Can I backtrack a little bit?

THE COURT: Yes. I appreciate not only your attitude but the service which you're making available, so you may backtrack or present an answer to the question in your own manner.

A (cont'd) Okay. I have worked myself, personally, about 25 capital cases since 1975. One of the first cases before the death penalty was really commonly or frequently being used in the last -- I guess the last 10 or 11 years I

sensitive as the death penalty.

And over the years -- and stop me any time you want to ask a question. I was told this was going to be a rather informal hearing. I haven't come to make a formal presentation.

In the 25 cases that I have worked on, one of the biggest problems that I have seen facing both the judge and the attorneys in the case is just getting the jurors to a point where they can act -- where they can really reveal how they feel about the death penalty. Jurors come into the courtroom not really knowing that they are going to be called on a capital case at first, and I think once they learn that the death penalty is involved that seems to cause them to freeze up, become anxious. A lot of times it's difficult for them to communicate how they do feel.

We have found that jurors seem to fall in three categories: ones that know how they feel and have real fixed attitudes all their life; and ones that have never really thought about it but take the case very seriously and are very concerned about what they're going to be saying and what position they're going to take; and others that are just the kind of person that necessarily is not going to have an opinion either way. And one of the first problems that the attorneys face is how to get these people to talk about their attitudes, to reveal how they feel in their

that is one problem that the jury -- that the attorney is facing is that you have got a core of 10 to 15 percent of the people who they need to identify in some way on those attitudes.

And, depending on the facts of the case, usually around 25 percent of the venire pool has attitudes on specific aspects of that case having to do with aggravating circumstances that they heard, that one fact alone that is going to close their mind to considering a life sentence. Some of those situations are rape combinations, double homicide.

The most recent one I have found that is extremely prejudicial is either a multiple murder or a person is a repeat offender, as we fear this particular defendant is going to be portrayed by the time the case goes to trial here. And it's very important if the attorneys are able to elicit that information from the jury pool to find out who the people are, what percent of the people would hold that attitude when voting for life or death.

There are other jurors that have very strong concerns about do they believe in the death penalty for reasons that we have termed extralegal. They don't believe the taxpayers' money should be used to keep people on death row doing a life sentence, and judges are concerned about that, and that information is taken out.

have said to me, Margie, really I need you there; I need someone in your firm there; someone in some other trial consulting company there, because it is so difficult to ask the questions, listen to the answers, try to follow up on what the persons says, and also take notes and try to really make an objective assessment of the strengths and weaknesses of each of these jurors. So, for that reason we are called on quite frequently to be of assistance in these cases, in capital cases.

Also, there have been studies, national studies, done that have indicated that there are significant problems with, quite simply, the process of death penalty cases that tend to create an additional barrier to selecting a fair jury. For example, a large study was done in California about five or six years ago where people were surveyed about their attitudes toward the death penalty and their attitudes toward the criminal justice process, and the data was analyzed in terms of jurors who would be excluded due to *Witherspoon*, they would never consider voting for capital punishment and those that would consider it. And it showed pretty clearly that jurors who are *Witherspoon* excludable also tend to be the ones that also have the greatest ability to keep an open mind on the guilt or innocence stage. So, what happens is once you eliminate all these people, which is the law of *Witherspoon*, you're left with a pool of people

where there was no death qualification, just regular voir dire, and a mini trial. And the differences we found within the two groups were fairly significant and clearly indicated that the process simply of watching people talk about their attitudes toward the death penalty and proceeding with the defense attorneys asking questions about the death penalty, the judge asking the questions about the death penalty, the prosecutor asking questions about the death penalty, had a desensitizing effect on the jurors to the degree that the ones who experienced the death-qualified voir dire were much more likely to vote to find the person guilty and to believe that the judge, the prosecutor, and the defense attorney believed he was guilty and believed he would be sentenced to death than the other jurors who did not experience just the questioning process alone.

We all know that it is the law that the jury will be disqual -- death qualified. We're not here to challenge that but just to take note of the fact that there are a lot of complex issues involved in the selection of a jury in a capital murder case.

And trial consultants, because most of us have a background in social science, and the ones who work on capital cases, primarily have done their own research on community attitudes toward the death penalty and toward jurors about the death penalty rather than a life sentence.

Q There is a substantial likelihood?
A A substantial likelihood that would be the case.
I think those four factors give you the general areas where you're going to have to be particularly careful in voir dire.
The other areas, as a general area, of the rehabilitation, the defense attorney to rehabilitate jurors who may be opposed to capital punishment but still properly bring the case to closing.
These are interviewing techniques in order to determine first the jurors' qualifications. That is difficult, I think, for anybody, whether you're a psychologist or not; and attorneys, generally speaking, don't have training in these type of skills available to them from law schools or very infrequently through seminars; and it has been our role as trial consultants to work with attorneys in developing the skills.
Q Has it been your experience that even the most seasoned death-penalty lawyer doesn't possess the level of skills that they feel necessary to pick a jury?
A That's right. I mean, even very highly qualified trial attorneys have told me we're trained in cross-examination; our job primarily in the course of being a lawyer in the courtroom is to cross-examine people. Those are not skills that are directed toward eliciting

point in their life in a convenience store and are concerned.

Q And all these factors would influence that juror's attitude one way or the other?

A It would be -- there is a whole list of factors. In a normal case what we would do is conduct an attitude survey or focus group for mock trial to try to assess the strengths and weaknesses of some of these factors.

Q And what other assistance would you give to the trial attorney that the trial attorney -- the skills you have that the trial attorney doesn't have?

A Then we would develop a pre-voir-dire questionnaire. I don't know if you're familiar with those. In high-profile cases questionnaires are helpful as a supplement to voir dire. So, we would direct those, help develop those questions; and then we would work primarily -- in the capital work that we do, we spend a lot of time with the attorneys in preparing voir dire information. We actually do practice voir dire sessions with the attorneys where we call in people who represent a range of attitudes toward the death penalty and have the attorneys conduct a practice session, conducting the session, eliciting the attitudes, going through the entire voir dire process they would go through in a capital murder case, and critique them on areas where a juror gave an answer the attorney didn't

the same kind of people, but what we do is bring those kinds of observations to bear in a case and give that information to the attorneys to factor in their decision-making process.

MR. SIMMONS: Your Honor, should you have any questions as to what her experience is --

THE COURT: I think the material I have and the testimony of the witness has been sufficient.

Q (By Mr. Simmons) Have you surveyed other jurisdictions to determine whether they're receiving public assistance or state funds and hiring your jury selection expertise?

A The American Society of Trial Consultants, we were curious to the extent of which there are public funds being allocated. We have started a survey of our membership to find out who has gotten court appointed or paid for the public defenders. We haven't completely finished the survey, but I have a report. This states where there have been funds, separated into court appointment and public funds, those public funds usually coming through public defenders' offices, there are a few states here where there are public funds for civil cases, legal aid societies; but for the most part these are capital cases, and it's either court-appointed funds or public funds.

Q Are you familiar with some of the specifics of those cases?

THE COURT: That's just conceded, and the defense attorneys have conceded in sincerity and manner they have. I take that as fact this is a bad case.

Q Let's talk about cost for a moment. Your firm, should your firm be involved in this case, what amount of money would it take for you to provide assistance to me and Mr. Glaser in the selection of the jury in this case? Assuming we did all the legwork ourselves with the jury questionnaire we formulated over the telephone, but actually coming down for the jury selection process, what is your normal fees and what could you cut them to to assist in this case?

A Well, I wouldn't charge -- our normal fee is about $125 an hour. That's not the range of this kind of case. Normally we charge 35 to $50 an hour in the southeastern states for --

Q Public defenders or court-appointed cases?

A Well, for capital cases, if it's a regular public defender case. But in cases -- in capital murder cases we reduce it by 50 to 65 percent, and in a case where we came and worked with Jim and his co-counsel in doing what I was suggesting, which is developing voir dire and doing practice sessions -- is this going to be sequestered voir dire? Assuming it was a two-or three-day voir dire --

THE COURT: The way that will be done is with

and doing some practice sessions, it usually ends up being about $50 an hour.

MR. SIMMONS: She's willing to stay at my house so we don't have lodging expenses.

THE COURT: That's courteous.

MR. SIMMONS: We'd hold fees to the absolute minimum.

Q (By Mr. Simmons) In your opinion, are these skills which you have discussed essential to providing Mr. Baker a fair trial?

A Absolutely. I don't need to elaborate. I think you understand.

Q Are there any other areas that we haven't covered that you'd like to discuss?

A Well, for the most part I think we have covered it.

If I could recount just one brief example, just briefly on the difficulty, about two weeks ago I was participating in a jury selection in Baltimore, a resentencing. And the judge called in 25 jurors at a time and conducted initial voir dire and then took them one at a time. He made it perfectly clear to the jurors that this was resentencing a man that had been found guilty of first-degree murder and there was no question of his guilt or innocence; it was a closed question; and he didn't want any jurors coming in and

Q You have come to testify as to the need of assistance in selecting a jury in this case?
A That's correct.
Q And I have made you familiar with the facts of this case?
A Uh-huh.
Q And you are familiar with Mrs. Fargo and other jury consultants and have brought a current resume?
A Yes, I have.
MR. SIMMONS: I'd like to make that an exhibit to your testimony.
(Exhibit 4 was marked and filed.)
Q You have participated in a capital case?
A Eight.
Q What is your educational background?
A I'm a graduate of Loyola University in Chicago, graduated in 1974.
Q You're currently employed where?
A I'm currently employed, Your Honor, at the Capital Case Resource Center of Tennessee, which is located in Nashville, Tennessee. I have been there approximately -- I'm in my sixth month. My responsibilities there are I am one of two lawyers that head up the state component of the office. Our primary function is to resource; that is, provide services to lawyers, state and federal, who are

was involved in there were a number of lawyers, so you could draw off the experiences of other lawyers. There were no other lawyers with death penalty experience but were older lawyers, because the death penalty wasn't in vogue at the time, but they tried heavy felony murder cases. So you had a lot to draw on. It is an overwhelming experience to try a capital case.

THE COURT: Would you mind being interrupted? If you will step out in the hall, we'll resume right away.

(Exhibit 5 was marked and filed.)

(A break was taken.)

THE WITNESS: Judge, if I may pick up where I left off, trying a capital case is an awesome responsibility.

THE COURT: Let me make this suggestion. I can listen better if you will be concise.

I had an unusual experience of two capital cases tried two in my first six months, and it is an awesome responsibility and entirely different from other cases, and I'm aware of that.

THE WITNESS: Because Your Honor is aware of that you understand that the lawyer, obviously, in picking this young man and his co-counsel, you felt they possessed the kind of qualities you would expect the attorneys to exhibit in such a case. And it appears, Your Honor, because these two young men don't have the actual trial experience in

probe with a black jury. That's a difficult question not only to frame but to put for a young lawyer who has never been under the pressure of having to attempt to save somebody's life and ask somebody that you don't know do you understand that this is a case that involves a black defendant and a white victim. That's tough for me to do, and I've got years of experience.

This man has got the heart and the ability --

THE COURT: Get to the point.

THE WITNESS: Sure, Judge.

And I think with the assistance of someone like Miss Fargo or some jury psychologist he or she can aid these two lawyers in framing the kinds of questions and eliciting the kind of answers where they could make some serious and conscientious kinds of determinations, not just guesss with the client's life hanging in the balance. It would almost, Judge, be bordering on malpractice for these young men or even someone with experience to attempt to pick a jury, given the facts of this case, without that kind of assistance.

MR. SIMMONS: I think that's all I have, Your Honor.

THE COURT: I'm certainly pleased. It's been pleasant having you testify to this information.

**********

been and continue to serve on the board of directors of the National Association of Criminal Defense Lawyers, and I have in the past been president of the Tennessee Association of Criminal Defense Lawyers. And for about five years, I believe it is, I have been on the faculty of the National Criminal Defense College, which conducts two postgraduate two-week-long trial institutes for criminal defense lawyers each summer. And I have had the pleasure of practicing in Your Honor's court on numerous occasions and in all the state and federal courts in Tennessee.

Q And I'm associated in the practice of law with you at this time and have been for approximately two or two and a half years?

A Yes, sir.

Q You are familiar with my abilities?

A Yes.

Q We have discussed the facts of the Joe T. Baker case?

A Yes, we have.

Q And you're familiar with the basic facts and the theories, and, as it appears to be, the case will go to trial?

A Yes, I am.

Q We have discussed the need for assistance in selecting a jury in this case?

of one kind or another. And when you get cases that have both those attributes, there is so much to overcome in selecting the jury that is not already psychologically predisposed one way or the other before the first witness takes the stand.

And in a death case, with all that portends, along with the facts that have been mentioned this afternoon, any lawyer -- a lawyer is just not trained. A lawyer in order to make the decisions in voir dire, in order to bring out the information in voir dire, and make the decisions in voir dire that have to be made in this case without making horrible mistakes -- and obviously Jim and Steve are taking the responsibility that is placed upon them in defending this man's life very seriously. I think it would be a horrible thing to them, to say nothing of the horrible thing to their duty under the sixth amendment, to not -- to force them to go into voir dire in a case like this without having some help. Trial lawyers' professional training and experience, even trial lawyers who go to seminars and go to trial institutes, are trained in working with facts and being advocates and bringing out facts or challenging facts, but we're not trained in the nuance and the finest of social sciences where you're trying to, without alienating a citizen who probably would prefer not to be where they are, on jury duty, in the first place, much less a jury that has

THE COURT: All right. Thank you.

I don't believe any summary is necessary, and on this particular motion I'm going to take it under advisement. The waiting period for my decision will not be long, but with the trial date being set after Christmas, I don't feel like I need to make it this afternoon. I'm going to study some certain points and give it consideration.

MR. SIMMONS: A couple of points I'd like to make. We're making this request certainly under the assumption it's a death case.

THE COURT: I understand.

MR. SIMMONS: We will not expend funds until it is.

THE COURT: I'm going to disagree with you there to this point. I'm going to seek authorization for you to proceed early, before the Attorney General announces that it is a death case, which would be to your advantage, of course.

MR. SIMMONS: Your Honor, I think I speak for Steve also. We're simply before the Court because we feel we need the assistance; we need the help in picking the jury.

THE COURT: You have made that plain in your motion, and this excellent testimony has been given.

MR. SIMMONS: That's all.

MINUTES, CRIMINAL COURT, SUMNER COUNTY, TENNESSEE - MINUTES FOR SEPTEMBER 17, 1990

IN THE CRIMINAL COURT FOR SUMNER COUNTY, TENNESSEE, AT GALLATIN

STATE OF TENNESSEE

VS

JOE T. BAKER

NO. 5748A

FILED 10-4 1990
Date
TIME: 2:00 P M
Mahailiah Hughes, Clerk
By: [signature] D.C.

O R D E R

Motions have been filed in the above case for an Ex Parte hearing and these motions, with testimony, were heard extensively on September 7, 1990. Upon hearing testimony, the Court does sustain said motions in part and overrule said motions in part.

The portions of the motions sustained, regarding the employment of Margaret Fargo, to assist in jury selection are as follows:

1. To assist in developing questions by defense attorneys to ask jurors on voir dire.
2. To review the proposed questionnaires to be sent to the jurors prior to voir dire.
3. To advise defense attorneys on proper interviewing technique on voir dire.
4. To list factors for defense attorneys that would be critical in voir dire.
5. To conduct a preview of mock panel voir dire with a limited time basis.

The portions of the motions that are overruled and are not granted are as follows:

1. To have a jury specialist seated at counsel table during jury selection or trial.
2. To meet with a jury specialist panel other than for a limited time voir dire of a mock panel.
3. To conduct a scale profile of the prospective jurors during voir dire.
4. To have an interview, regarding technique other than during the mock panel.

The reasons for the rulings given on this motion are that the Court finds that Sumner County consists of homogeneous populous while being cosmopolitan in nature. It is further the Court's opinion that the county is lacking in particular ethnic groups or significant religious differences. It is further

000060