**Exhibit 48**

PETER B. YOUNG, PhD
Clinical Psychologist
4709 Papermill Road
Suite 202, Building 2
Knoxville, Tennessee 37909
(615) 588-6313

# NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| NAME: | DELLINGER, JAMES |
| AGE: | 44 years |
| DATES OF EVALUATION: | 3/29/95 & 3/30/95 |
| DATE OF DICTATION: | 5/31/95 |
| EXAMINER: | Peter B. Young, PhD |

## BACKGROUND INFORMATION AND REASON FOR REFERRAL:

In March of 1992, Mr. James Dellinger was arrested and charged with the murders of both Connie Branum and Tommy Griffin. He was subsequently convicted for the first murder and put in the state prison. He presently is awaiting trial for the second murder.

Mr. Dellinger's lawyer, Eugene B. Dixon, contacted this examiner requesting a psychological and/or neuropsychological evaluation of Mr. Dellinger. This evaluation was requested as part of developing materials for consideration of mitigating circumstances that might be brought to bear in the possible sentencing phase of Mr. Dellinger's upcoming second trial.

Mr. Dellinger describes a childhood wherein he was provided the necessities of life but not many of the joys. He reports that his father was a hard working farmer, and the family members spent a considerable amount of time working on the farm. Indeed, Mr. Dellinger indicated that he often stayed out of school in order to help his father on the farm. It also became clear rather quickly that in Mr. Dellinger's younger years he experienced considerable difficulty in managing various tasks required at school. As subsequent data will point out, Mr. Dellinger is essentially incapable of reading. This alexia limited Mr. Dellinger's academic progress to such a degree that, after the third grade, he stopped attending school. He reported that, even while in the third grade, he was continuing to work on first grade work.

Mr. Dellinger is married for some 20 years to his wife, Linda, and the couple has two children of their own and two from her previous marriage. Mr. Dellinger's parents are both deceased.

Mr. Dellinger readily acknowledges that in the past he frequently engaged in activities that were illegal and/or destructive. He frequently fought, stole, and lied. On the other

hand, Mr. Dellinger vehemently denies his culpability on the charges of murder. He stated firmly and with considerable reference to actual events during his first trial that the legal process whereby he was convicted was riddled with illegal irregularities and compromises of his case. Such a stand is not that unusual for an individual in Mr. Dellinger's position; nonetheless, there were numerous facts which he cited, that, if true, would lead one to question the propriety of legal procedures that resulted in his conviction. The crux of such statements, however, is whether or not his claims are true.

During the evaluation of Mr. Dellinger, he and the examiner sat in an unheated room in the basement of the Maryville jail. While conditions were clearly less than optimal, the resulting information would appear to be relatively accurate and consistent with Mr. Dellinger's capacities. He was cooperative throughout the lengthy process and seemed responsive in general.

Since Mr. Dellinger does not read, the examiner read to him various evaluation instruments, such as the Minnesota Multiphasic Personality Inventory, in order for Mr. Dellinger to provide responses. Such procedures are often employed via tape recordings. Hence, the resulting information would appear to be trustworthy and accurate.

PROCEDURES EMPLOYED:
Clinical Interviews
Review of Records
Minnesota Multiphasic Personality Inventory (MMPI)
Millon Clinical Multi-Axial Inventory - Second Edition (MCMI-II)
Profile of Mood States (POMS)
Carlson Psychological Survey (CPS)
Rorschach Inkblot Test (RIT)
Human Figure Drawings (HFD)
Halstead-Reitan Neuropsychological Battery (HRB)
Grooved Pegboard (GP)
Boston Naming Test (BNT)
Clock Drawing (CD)
Wisconsin Card Sorting Test (WCST)
Two Card Memory/Attention Task (2CMAT)
Woodcock-Johnson Tests of Cognitive Ability (WJ)
Test of Nonverbal Intelligence - Second Edition (TONI-II)
Peabody Picture Vocabulary Test - Revised (PPVT-R)
Multilingual Aphasia Examination (MAE)
Wechsler Memory Scale - Revised (WMS-R)

Rey Visual Design Learning Test (RVDLT)
Benton Visual Retention Test (BVRT)
California Verbal Learning Test (CVLT)
Wide Range Achievement Test - Third Edition (WRAT-III)

EVALUATION RESULTS AND INTERPRETATION:
Mr. Dellinger's endorsement of items on the MMPI was, for the most part, honest and revealing of his issues. There was some slight exaggeration of distress, as manifested by all obvious scales being higher than subtle; however, this was only statistically significant for Hysteria and Psychopathic Deviate. Particularly, the latter endorsement of obvious items would seem unusual, given Mr. Dellinger's present context. It would seem that he is making efforts to present himself as more angry than he actually feels. As subsequent data will show, Mr. Dellinger generally tends to be a rather passive individual with significant needs for dependence and emotional nurturance within an adaptation of distancing himself from others in anxiety and distrust. These major issues pull away from open expression of anger and hostility. On the MMPI, the clinical scales that were significantly elevated are as follows, in descending order: Psychasthenia, Hypochondriasis, and Depression. Near statistical significance (70) are Hysteria (69) and Social Introversion (68).

Similarly, on the MCMI-II, Mr. Dellinger had significant elevations (greater than T = 75) for the following scales: Schizoid, Dependent, Avoidant, and Self Defeating. Of note, also, was his lowest score on Aggressive/Sadistic, especially in a context of apparent open responding, as indicated by validity indices. On the POMS, Mr. Dellinger had significant elevations on Anger and Vigor, with near significant elevations on Tension and Fatigue. These various scales being elevated would seem to form a contradiction or confusion; how can one be vigorous and fatigued? As with other data, there is an impression of more than one side to Mr. Dellinger.

On the CPS, an instrument distinctly constructed and designed to assess individuals in forensic contexts, Mr. Dellinger endorsed items in such a way so as to approximate a profile of Code 7. The only scale elevated that does not fit this Code 7 is the Antisocial Tendencies scale. The Profile 7 composite suggests immaturity, emotional lability, dependency, needs for attention, somatization, lack of dependability, poor self esteem, and feelings of guilt, despair, anxiety and depression. Once again, at least within the context of the Profile 7, Mr. Dellinger's endorsement of items on the Antisocial Tendencies scale at a higher level than fits this profile 7, would appear to represent a contradiction or confusion. How is someone weak, despairing, anxious, and depressed, while also being manipulative and uncaring?

On the RIT, Mr. Dellinger provided yet more evidence of his immaturity and lack of psychological development. He tends to merge feelings with thinking during problem solving, and has considerable difficulty in modulating emotional stimuli. This can lead to overly intense displays of emotional material and tendencies towards impulsiveness. He tends to view himself based primarily on imaginary rather than real experience. He is apt to experience frequent difficulties "when interacting with the environment that often extend into the interpersonal sphere." He "does not experience needs for emotional closeness in ways similar to most people." He is especially uncomfortable in interactions which entail "tactile exchange."

Taken together, these various measures of psychological functioning coalesce and provide background to Mr. Dellinger's human figure drawings. His male figure is merely the front part of a face with eyes staring out intensely and tentatively. There is no head, neck, or body attached to this image. His female figure has eyes without pupils, an overly worked mouth with teeth, attractive hair and a neck coming down from the head suggestive of a being more complete than the male, but still lacking more than not. It seems very likely that Mr. Dellinger has lived in a state of exacerbated chronic dependency needs, particularly because of relationships early in his life. Whether his mother and father or others were primary in his existence at that time, the impact on him has been large and continuous. To a large extent, he presents as an individual who is unformed as a psychological being, relying on relatively primitive and emotionally immature ways of coping, more appropriate to a small child. As a small child might, Mr. Dellinger may very well have moments of extreme anger and lash out at others. In such a state, he may very well be a truly "bad dude." At such times, he may be cold and uncaring, only later, after he has calmed down, to return to feeling guilt, despair, and anguish. As such, he does not appear to be a man who has the psychological oomph or grit to plan acts of aggression at some point in the future. Further, as most of the measures indicate, particularly the MCMI-II, Mr. Dellinger appears to lack the core meanness and lack of regard for others to be sadistic and intentionally hurtful to others in an ongoing fashion.

His lack of internal containment or ego strength could readily find him in contexts where anger and feelings of hurt or fear could lead to him lashing out at others, but again, he does not appear to have the psychological structures to be intentionally sadistic in an ongoing manner.

This examiner received a copy of the WAIS-R (Wechsler Adult Intelligence Scale - Revised) protocol that was administered to Mr. Dellinger on 9/22/93 as a part of his court ordered evaluation. At that time, he obtained a Verbal subscale score of 79 and a Performance subscale score of 89, culminating in a full scale IQ score of 83, which is in

the lower average range of intellectual functioning. Within the Performance scale, there was significant scatter, suggesting that Mr. Dellinger is able to utilize auxiliary clues provided in visual processing tasks that allow him to function much more competently than otherwise might be the case. Without such compensation, his overall visual processing capacities appear less than robust. His language capacities look distinctly limited.

Since Mr. Dellinger had been administered this WAIS-R less than two years ago, a usual limit before retesting is acceptable, this examiner administered a WJ to Mr. Dellinger. The WJ is distinguished from the WAIS-R by being based on a different model of intelligence. Whereas the Wechsler scales tend to utilize tasks which have as much loading from "G", a construct of general intelligence, the WJ looks for tasks that provide insight into the components of intellectual functioning. Interestingly, the two tests tend to correlate at a rather high level for psychological instruments (.71). Nonetheless, the WJ provides greater insight into what constitutes what most people think of when they consider intelligence. Below for consideration are the various subtests and composite scores from the WJ.

| SUBTEST | SCORE | COMPOSITE | SCORE |
|---|---|---|---|
| Memory for Names | 45 | Long Term Retrieval | 52 |
| Memory for Sentences | 106 | Short Term Memory | 91 |
| Visual Matching | 67 | Processing Speed | 68 |
| Incomplete Words | 83 | Auditory Processing | 79 |
| Visual Closure | 98 | Visual Processing | 89 |
| Picture Vocabulary | 89 | Comprehension-Knowledge | 86 |
| Analysis-Synthesis | 80 | Fluid Reasoning | 86 |
| Visual-Auditory Learning | 66 | Broad Cognitive Ability | 72 |
| Memory for Words | 82 | Reading Aptitude | 78 |
| Crossout | 79 | Mathematics Aptitude | 74 |
| Sound Blending | 81 | Knowledge Aptitude | 91 |
| Oral Vocabulary | 80 | Oral Language | 88 |
| Concept Formation | 97 | Oral Language Aptitude | 78 |
| Numbers Reversed | 65 | | |
| Sound Patterns | 95 | | |
| Spatial Relations | 89 | | |
| Listening Comprehension | 91 | | |
| Verbal Analogies | 83 | | |

The different names for the above tests may leave some wondering as to what is involved. Despite such difficulties, it should be clear that Mr. Dellinger has significant

problems in memory, especially when not tied to meaningful material (Memory for Names). Even more apparent, however, is the difference between his ability to remember things in the immediate present (Short Term Memory = 91) vs. the next day (Long Term Retrieval = 52). This should be seen as even more dramatic since the usual time span between initial presentation and long term retrieval is a week. Similarly, his ability to learn via visual stimuli (Visual-Auditory Learning) is abysmal. He does the best when provided meaningful stimuli in an auditory domain (Memory for Sentences). He also is able to use recognition skills to integrate perceived stimuli (Incomplete Words, Visual Closure). Nonetheless, when he trots up to the finish line of overall intellectual functioning, he comes up somewhat less well appearing than in the Wechsler (Broad Cognitive Ability = 72).

These apparent weaknesses in language, albeit with some compensatory strengths, clearly manifest in both his MAE and his WRAT-III. On the MAE, Mr. Dellinger displayed considerable talent in remembering auditory stimuli and abysmal capacities in reading and/or spelling. Similarly, on the WRAT-III, Mr. Dellinger demonstrated very poor capacities in academic tasks.

| MAE | | WRAT-III | |
|---|---|---|---|
| SUBTEST | DESCRIPTOR | SUBTEST | SCORE |
| Visual Naming | Hi Av. | Reading | < 45 |
| Sentence Repetition | Superior | Spelling | < 45 |
| Controlled Aural Word Assoc. | Very defective | Arithmetic | 50 |
| Aural Spell | Severely defect. | | |
| Written Spell | Severely Defect. | | |
| Block Spell | Severely Defect. | | |
| Token Test | Average | | |
| Aural Comp of Words | Average | | |
| Read Comp of Words | Severely Defect. | | |

One can see from perusal of these scores that Mr. Dellinger has significant difficulties in managing language tasks in a written domain. These difficulties, moreover, extend into the fund of language available for use. On the BNT, a task wherein one has to merely name images of relatively simple and common objects, Mr. Dellinger obtained a scale score of 8, where average is 10. On the PPVT-R, which is anchored in a standardization population more representative of normal functioning than are the norms for the BNT, which is used almost exclusively in dealing with aphasic populations, he obtained a standard score of 61. As such, this score on the PPVT-R provides clear evidence of Mr.

Dellinger's very limited access to language.

One might think that, given these difficulties in language, Mr. Dellinger might have significant strengths in non-language domains, particularly visual. Unfortunately, the TONI-II results (TONI-II quotient = 83) suggest that even in such non-language domains, Mr. Dellinger has difficulty. This seems borne out further by Mr. Dellinger's efforts on the BVRT, wherein he obtained five successes while committing seven errors, where expectations for his age, education, and IQ are seven successes and five errors. Similarly, on the RVDLT, a measure of memory for 15 visual stimuli across five trials, Mr. Dellinger's efforts were 1.9 standard deviations below expectations for reproduction of the images, and nearly ten standard deviations below expectations for recognition of the images presented in an array of distractor images.

On the WMS-R, these difficulties in visual memory are also apparent. On this test, however, Mr. Dellinger's strength in memory for the spoken word appears. He obtained the following standard scores: Verbal Memory - 90; Visual Memory - 81; General Memory - 86; Attention/Concentration - 59; and Delayed Recall - 80. On this task wherein the visual stimuli are relatively simpler than those on the RVDLT, one can see that Mr. Dellinger is able to do somewhat better. What distinguishes the RVDLT from the tasks in the WMS-R are the number and complexity of the images that one is presented.

On the CVLT, Mr. Dellinger obtained a standard score scaled to a T score of 27, which is transformable to a standard score of approximately 54. The CVLT, like the RVDLT, is considerably more complex than the Verbal Memory subtasks of the WMS-R. In the CVLT, one is required to remember a list of 16 words presented across five trials. Hence, as with the RVDLT, there seems to be considerable degradation of capacity for Mr. Dellinger as complexity rises.

A similar pattern of difficulties with complexities could be seen in Mr. Dellinger's differential performance on the WCST vs. the Category Test from the HRB. On the former, Mr. Dellinger was able to achieve five categories (normative) while committing 35 perseverative errors (SS = 7), which is at the cusp of the range of impairment, according to the Heaton 1992 norms and in the latter, a considerably more complex non-verbal task, Mr. Dellinger committed 100 errors, resulting in a scale score of 4, which is in the range of impairment. Thus, it is clear that complexity is particularly difficult for Mr. Dellinger. In fact, on the HRB, Mr. Dellinger was able to perform at a marginally acceptable level on several of the more basic sensory tasks, but he became quite incapable in the face of more complex tasks. His overall Halstead Impairment Index of 1.0 out of a possible 0-1.0 range is indicative of his problems. He was able to accurately

**perceive auditory stimuli in both language form and rhythmic form at levels that are marginally acceptable. Similarly, his Sensory Perceptual Exam just passed muster. His Grip Strengths were above average, while his Finger Tapping with the dominant hand was just acceptable, and with non-dominant, not.**

**On the Tactual Performance Test the underlying basis of Mr. Dellinger's language problems was at least partly revealed. With his dominant hand, it took him almost a minute and a half to place each block, while blindfolded, in a form board. With his left hand, he was able to place blocks in less than a minute. Then with both hands, his time for placing each block was over a minute and a half, and nearly a minute and 3/4. Given that these trials are in the sequence as presented here, it is clear that his dominant hand and, by inference, his contralateral dominant hemisphere, that is, his left hemisphere, are significantly compromised. Given his history of difficulties in school, this compromise is most apt to have been longstanding. Fortunately, Mr. Dellinger's CD was acceptable, even though not perfect. While seemingly a simple task, drawing a clock is actually demanding of considerable neurological integration of information and representation of the same in space. That Mr. Dellinger's clock is adequate strongly suggests that whatever compromises he experiences are not ongoing or progressive.**

**Summarizing the above information into an image of Mr. Dellinger is complex. Nonetheless, it seems clear that he is a man who has suffered from cognitive difficulties throughout his life, with emotional deprivation, and perhaps even abuse, exacerbating his functional problems. It is not surprising that he has difficulty in being organized or integrated, since his left hemisphere, which is most given to organizational activities, is inherently less than robust. As a consequence of these various insults and lacks in his upbringing, Mr. Dellinger presents now as an individual with little purpose or meaning in life. This would likely be the case even if he had not found himself caught in these present legal complications.**

**But even as Mr. Dellinger presents as an individual with compromises and inadequacies, he does not appear as an individual who would willfully strike out at another with intent to kill. Even more, it does not seem within his nature to plan and carry out such behaviors. It is conceivable that in an intoxicated state or otherwise more compromised than usual, Mr. Dellinger might, in a moment of rage, strike someone, and thereby inflict serious injury. The present extensive data, however, do not present him as paranoid enough or sinister enough to be premeditatedly homicidal.**

**RECOMMENDATIONS:**
**Mr. James Dellinger was accused of murdering two individuals in March of 1992. He has been convicted of one murder and is about to stand trial for the second. Mr. Eugene B. Dixon, attorney at law, requested an evaluation of Mr. Dellinger as part of the process necessary for the possible sentencing phase of Mr. Dellinger's second trial. Mr. Dellinger was evaluated over a two day period with interviews and psychological and neuropsychological testing. Records were reviewed later.**

**It seems evident that Mr. Dellinger operates intellectually somewhere between IQ scores of 72 and 83, where the mean equals 100 $\pm$ 15. Further, his fund of available language is statistically lower than these scores (61), with even greater difficulties in visual language, whether reading or writing. His strength is in auditory language, where he is able to remember and converse at an essentially average level. His visual processing skills are also less than robust, leaving Mr. Dellinger with limited resources with which to have negotiated his life so far. Perhaps most telling was his overall Halstead Impairment Index, a composite score of most powerful indicators of brain damage from the Halstead-Reitan Neuropsychological Battery. He obtained a 1.0 out of a range of 0-1.0.**

**At the same time that Mr. Dellinger struggles with neuropsychological difficulties, he presents as an individual with relatively immature and inadequate psychological adaptations. He manifests considerable depression, dependency needs, schizoid withdrawal, and anxiety. He did endorse several blatant indicators of psychopathic proclivities, while not endorsing the more subtle indicators of such anger and meanness. Hence, even though he professes 'toughness,' the composite image of him does not support such bravado as his central nature. Rather he appears more as a young child: hurt, confused, and needing of emotional supplies more appropriate to a toddler, while masquerading as an adult. As such a child might, he has potential to hurt others, without thought of consequences. Later, his more depressive nature would be apt to wax anxious, distancing, and ruminative.**

**This basic lack of psychological integration would probably qualify Mr. Dellinger for a Borderline Personality Disorder, if he were not caught in legal complications and prone to more clearly antisocial ways of expressing his psychological difficulties. Invariably antisocial behaviors, at least of sufficient magnitude, tend to block out most others' awareness and/or appreciation of psychological issues.**

**It can not be argued that because of emotional difficulties or of emotional and cognitive difficulties, Mr. Dellinger should be exonerated. If he is actually guilty of the crimes for which he has been convicted, then surely he should have a consequence in keeping with**

those crimes.

His above-noted points of exception with the legal processes whereby he was convicted leave this examiner with significant doubt as to the propriety of his first conviction.

Assuming that he is appropriately convicted, the question still remains, how to assess him as an individual possibly responsible for two individuals' deaths. If he were not cognitively impaired, if he had not been raised in an apparently psychologically deprived environment, it would be easier to state, without hesitation, 'punish him however the law stipulates.'

How do such insults provide hesitation? And, even if hesitating, how does one proceed?

There are no easy answers here. Mr. Dellinger would have been a different person if he had not had such major compromises of his ability to manage written language tasks. Similarly he would have been very different if raised in a more nurturing family. At what magnitude does an insult or compromise to a child that is borne throughout life become sufficient to suggest leniency? This examiner can not answer this question, but it is clear that a fair system of justice does weigh such considerations carefully. It is hoped that those deciding Mr. Dellinger's sentence will weigh his situation carefully.

Peter B. Young, PhD
Clinical Psychologist

PBY/jw