**Exhibit 59**

Michael S. Morse, Ph.D.
P.O. Box 710402
San Diego, CA 92171-0402
(619) 277-9135
(619) 987-2397 cellular

April 18, 1994

State of Tennessee, Attorney General
Attn: Glenn R. Pruden
450 James Robertson Pkwy
Nashville, TN 37219

RE: Rickman v. Dutton

**Summary of Testing:**

On Saturday, April 16, 1994 I visited the Riverbend Maximum Security Institution in Nashville, Tennessee for the purpose of examining the Tennessee electrocution system. During my visitation, I talked with Warden, Michael Dutton, members of the execution team, and also with Facilities Manager, Jerry Moore.

Prior to my arrival, I had outlined the testing equipment and setup that I wished to use while at the prison. Mr. Moore and I discussed these requirements at some length in the days preceding my visit. I requested that a resistive testload be established that would permit us to vary resistance from 400 ohms down to 150 ohms. (Resistance during the executions that I have studied ranged as low as 150 ohms and I felt that the system should be able to deliver appropriate currents at that low a resistance.) I posed several design scenarios for the resistive testload and Mr. Moore chose to use 1500 watt heater elements configured in series. Each element has a resistance of approximately 9.6 ohms and Mr. Moore configured 42 in series such that each was submerged in water to dissipate the heat produced. Mr. Moore also provided me with an analog multimeter, a digital multimeter, and an inductive ammeter.

Prior to my visit to the prison, I examined the operating manual for the electrocution system.

Upon my arrival in the death chamber, I did a visual inspection of the testbed and of the requested equipment. I found everything suitable. I also did an external visual examination of the electric chair and supporting hardware. I spoke with members of the execution team and Warden Dutton regarding procedures and protocols. The execution team demonstrated their practice procedure for me twice. I found their procedures and the frequency with which they practice

acceptable and comparable with the other states in which I have made similar observations.

I requested that the sponges to be used in an execution be soaked in saline and that the testbed be established as I had requested earlier in the week. A short length of pipe was placed over the sponge at the leg electrode. A wire was run from the pipe to the testload. A wire was run from the other end of the heating elements in series (comprising the testload) to a semisphere that was clamped up against the soaked sponges in the headpiece. This completed the circuit. The inductive ammeter was set to the 15 Amp scale and clamped about the wire leading from the leg electrode to the testload. A digital multimeter was connected across one of the heater elements. That multimeter was set to record maximum voltage. (The total voltage drop would be equal to the voltage read from the multimeter multiplied by the number of elements in series.) A second digital multimeter was later connected across a second element and observed for changes in voltage during the cycle.

Initially, the system was tested briefly with all 42 elements in series. The resistance was measured to be 402 ohms. The maximum voltage drop observed across a single element was 55.5 volts (making the total voltage drop = 2331 volts). It was observed that upon activation of the system, the current peaked at approximately six amps then dropped to slightly over four amperes. This test was repeated several times with duplicate results. The meters on the equipment were observed to have similar readings to the meters that were attached at the testload.

The test was repeated with 40 elements in series. The measured resistance was 382 ohms. Peak voltage was measured at 56.3 volts across element (2252 volts total) and peak current was observed to be approximately 6 amperes with the current settling at slightly over 4 amperes.

The test was repeated with 38 elements in series. The measured resistance was 365 ohms. Each time the circuit was energized, it shutdown due to a blown circuit breaker.

The test was repeated with 39 elements in series. The measured resistance was 374 ohms. The circuit breaker shut the circuit off immediately upon starting the test.

The circuit was reconfigured for 40 elements in series. The equipment was run through its full cycle twice. Each time it performed the same. The circuit turned on at approximately 6.0 amperes and then dropped back fairly quickly to slightly over four amperes. The four ampere level was then maintained for the remainder of the cycle.

I saw no need to run further tests. I then discussed my results with Warden Dutton and Glen Pruden before I left the prison.

0870

**Conclusions:**

The following conclusions were reached:

1. The execution team performed in a professional and consistent manner and should continue with their practice and preparation procedures.

2. The electrocution system for the state of Tennessee does not deliver adequate current and does not seem to have the capacity to function with a typical load for an execution.

0871

**Recommendations:**

*The following are the most significant recommendations with lesser recommendations and suggestions having been made verbally:*

1. The procedures for each member of the execution team while well established and practiced should be written and provided to each member of the team to study.

2. The physical chair should be reinforced and strengthened to eliminate any sway or give.

3. The volume of sponges used during the execution should be increased at the leg electrodes to be certain that there is no direct contact between the leg electrode and the leg.

4. Only one electrode should be used at the leg and it should be consistent with that used in other states (historically).

5. All electrical connectors should be checked to be certain that they are rated appropriately.

6. In the electrical box at the base of the chair, the wire with the grooved insulation should be replaced.

7. The chair should be modified to be more conforming to the human form so that there is minimal free space between the inmate and the chair.

8. All metal to skin contact at any straps should be eliminated.

9. Strap placement should be evaluated for maximum stability and strength.

10. The electrical system should be modified to provide a voltage and current similar to that historically used in other states with a timing cycle that is also similar to that used historically. (A high voltage short duration cycle of 1800 - 2000 volts deliverable with typical currents of 7 - 12 amperes followed by a low voltage long duration cycle has been used.) I recommend the system in Virginia and also Alabama as good models. The system should be designed and to handle significantly greater currents than any worst case scenario such that shutdown or overload are not conceivable risks. The system should be able to operate with loads ranging as low as 100 ohms. The control electronics for the system should be minimal and have a

manual override that will operate even if the electronics fail to function properly.

11. A test procedure should be established and well documented for the full electrical system. Testing should include verification of system meter readings using secondary Ampere and Voltage meters. A test load should be built that allows testing at a wide range of loads.

12. A member of the facilities staff (or an outside electrician) should be designated as responsible for understanding all details of system operation and repair and should be present at all testing and also during the setup to the conclusion of an execution.

13. Adequate spare parts and backup equipment should be maintained and available at all times.

14. The system should include a chart recorder that clearly reads both current and voltage (as a function of time) as it is delivered to the chair.