**Exhibit 64**

Q. And do you recall what the pay scale was at the time?
A. For being appointed in this case?
Q. I'm sorry, yes, specifically this case.
A. I was thinking that it was $20 to $30 an hour.
Q. And is it possible that there may have been an increase in that rate during the --
A. There was.
Q. -- years that you handled the case?
A. There was.
Q. And do you have any recollection of what that increase was?
A. I was thinking that in a capital case there was a different -- a rather dramatic raise. I think it went up to $100 an hour.
Q. Did you make any attempts to settle the case or did the State give any offers of something less than death in an attempt to settle the case?
A. Yes.
Q. Do you recall at what point in

the proceedings that was and -- actually, first of all, what was the offer or offers that you may recall?

A. I've got a specific note somewhere in my fee schedule of a meeting with the District Attorney General about plea negotiations. If I could refer to that, I could maybe give you a time frame.

Q. That will be fine.

**MR. YOUNG:** I've got a copy he can use, if that will help anybody.

**THE WITNESS:** Sure.

**MR. YOUNG:** For once, I have something handy.

**THE WITNESS:** Bear with me. This is ...

(Whereupon, there was a brief pause, after which the proceedings continued, as follows:)

**THE WITNESS:** Let me tell you what I remember. I don't see it yet in my extensive notes here. We had a meeting in Mike Flynn's office before the August trial, and it did not result in settling the case, obviously, from that. And what

I remember more vividly than that meeting was a meeting that we had after the State had rested their case and after the Defense had put on either the majority of our case or had rested. We were approached by the State Prosecutor -- specifically, I recall, General Bailey and General Flynn -- and as I recall there was an offer, less than the death penalty, of concurrent life sentences -- or a life sentence. And that was discussed for a number of -- with the lawyers for a period of time. And we conveyed that to our client, and that was refused.

Q. And to clarify, this was either during the Defense's case in chief in the guilt/innocence phase, or immediately after?

A. My recollection was it was very close to the end and could probably have been -- was most likely after we had rested our case.

Q. And, again to clarify, this would be a life sentence and your understanding was that it would run concurrent with the life sentence --

A. Yes.

Q. -- imposed in Sevier County?

A. Yes, that's my recollection.

Q. And Mr. Dellinger, after consulting with you, decided not to accept the offer; is that correct?

A. Yes.

Q. Did you have any interaction with anyone from the defense team in Sevier County?

A. Yes. The primary thing that we relied upon was the transcript of the evidence that we had of that trial in the Sevier County Criminal Court. And I -- I was there during that trial and monitoring 90 percent of it, myself. And I made some pretty good notes so we would know what to expect and what the expert witnesses were going to testify in the Sevier County trial.

Q. So, even before the transcript had been prepared, you already had a good idea of what the State's case was against Mr. Dellinger?

A. Yes.

Q. And before I return to sort of the pretrial period, is it -- would you -- is it possible that as far as the changing of the fee schedule that the 100-hour in-court -- eighty -- $100 per hour in-court, $80 per hour in-court, came into